**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LISA AMOSON, ROBB HUCK, ALECIA RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH, MATTHEW LYNN HOFFACKER, as the executor of the estate of Troby Lane Parrish,<br><br>            Plaintiffs,<br><br>      v.<br><br>TAKEDA PHARMACEUTICALS U.S.A., INC.,<br><br>            Defendant. | Case No.: 1:22-cv-11963-GAO |

**TAKEDA PHARMACEUTICALS U.S.A., INC.'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PRELIMINARY STATEMENT ............................................................................... 1

II.   STATEMENT OF FACTS AND PROCEDURAL BACKGROUND........................... 4

    A.    Takeda Implements a COVID-19 Vaccine Policy to Help Protect the Health and Well-Being of its Employees, Customers, Patients, and Communities. ................................................................................................... 4

    B.    Takeda Utilizes an Interactive Process for Evaluating Religious Accommodation Requests. ............................................................................ 5

    C.    In-Person Interactions are an Essential Function of Plaintiffs' Field-Based Positions with Takeda. ................................................................. 6

        1.    Plaintiff Amoson's Field-Based Position ................................... 6

        2.    Plaintiff Huck's Field-Based Position ....................................... 7

        3.    Plaintiff Schmidt's Field-Based Position................................... 8

        4.    Plaintiff Silva's Field-Based Position ....................................... 8

        5.    Plaintiff Welch's Field-Based Position...................................... 9

        6.    Plaintiff Ramsey's Field-Based Position ................................. 10

        7.    Plaintiff Savage's Field-Based Position................................... 10

        8.    Plaintiff Singleton's Field-Based Position............................... 11

    D.    Takeda Denies Each Plaintiff's Religious Accommodation Request and Terminates Their Employment for Failing to Comply with the Vaccine Policy. ........................................................................................ 12

III.  ARGUMENT ................................................................................................... 12

    A.    The Applicable Legal Standard Precludes Plaintiffs' Claims as a Matter of Law. .......................................................................................... 12

    B.    Plaintiffs Cannot Establish a Claim For Failure to Accommodate a Sincerely Held Religious Belief as a Matter of Law. ........................... 13

        1.    The undisputed facts demonstrate that Plaintiffs did not have sincerely-held religious beliefs precluding them from compliance with the Vaccine Policy. ......................................... 14

            a.    Plaintiff Welch's objections to the COVID-19 vaccine were secular in nature, not religious. ................................... 15

            b.    Plaintiff Huck's objections to the COVID-19 vaccine were secular in nature, not religious. ................................... 18

            c.    Plaintiff Savage's objections to the COVID-19 vaccine were secular in nature, not religious. ........................... 19

i

# TABLE OF CONTENTS
(continued)

Page

d.  Plaintiff Schmidt's objections to the COVID-19 vaccine were secular in nature, not religious. ............................................. 22

e.  Plaintiff Silva's objections to the COVID-19 vaccine were secular in nature, not religious. .................................................... 23

f.  Plaintiff Amoson's objections to the COVID-19 vaccine were secular in nature, not religious. ............................................. 26

g.  Plaintiff Singleton's objections to the COVID-19 vaccine were secular in nature, not religious. ............................................. 28

h.  Plaintiff Ramsey's objections to the COVID-19 vaccine were secular in nature, not religious. ............................................. 29

2.  The undisputed evidence demonstrates that there was no reasonable accommodation available to Plaintiffs that would not cause Takeda to suffer undue hardship.................................................. 31

a.  Allowing Plaintiffs to conduct in-person interactions without receiving the COVID-19 vaccine would create an undue hardship for Takeda............................................................. 32

b.  Exempting Plaintiffs essential in-person interactions would create an undue hardship for Takeda. ........................................... 35

C.  The Court Should Dismiss Plaintiffs' Request for Punitive Damages. ............... 36

IV.  CONCLUSION................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aliano v. Twp. of Maplewood*,
    No. 22-CV-5598 (ES) (AME), 2023 WL 4398493 (D.N.J. July 7, 2023)..............................17

*Aly v. Mohegan Council, Boy Scouts of Am.*,
    871 F. Supp. 2d 19 (D. Mass. 2012) ....................................................................................37

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................................13

*August v. Off. Unltd., Inc.*,
    981 F.2d 576 (1st Cir. 1992)................................................................................................13

*Beickert v. N.Y.C. Dep't of Educ.*,
    2023 WL 6214236 (E.D.N.Y. Sept. 25, 2023) ..........................................................33, 34, 36

*Bordeaux v. Lions Gate Entm't, Inc.*,
    2023 WL 8108655 (C.D. Cal. Nov. 21, 2023).......................................................................34

*Bourque v. Shinseki*,
    No. CIV.A. 11-10164-RGS, 2011 WL 6148430 (D. Mass. Dec. 9, 2011)............................35

*Brox v. Hole*,
    590 F. Supp. 3d 359 (D. Mass. 2023) (Stearns, J.), *aff'd in relevant part*, 83 F.4th 87 (1st Cir.
    2023) ...................................................................................................................................34

*Bushra v. Main Line Health, Inc.*,
    No. CV 23-1090, 2023 WL 9005584 (E.D. Pa. Dec. 28, 2023) ............................................33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................................................13

*Conner v. Raver*,
    2023 WL 5498728 (N.D. Cal. Aug. 24, 2023) ................................................................33, 36

*D'Cunha v. Northwell Health Sys.*,
    2023 WL 2266520 (S.D.N.Y. Feb. 28, 2023), *aff'd*, 2023 WL 7986441 (2d Cir. Nov. 17,
    2023) ...................................................................................................................................34

*Dennison v. Bon Secours Charity Health Sys. Medical Corp.*,
    2023 WL 3467143 (S.D.N.Y. May 15, 2023) .......................................................................34

*DeVore v. Univ. of Ky. Bd. of Tres.*,
    No. 522CV00186GFVTEBA, 2023 WL 6150773 (E.D. Ky. Sept. 20, 2023)........................36

*Divine Equal. Righteous v. Overbrook Sch. for the Blind*,
  No. CV 23-846, 2023 WL 4763994 (E.D. Pa. July 26, 2023) ...............................................14

*EEOC v. Geo. Grp., Inc.*,
  616 F.3d 265 (3d Cir. 2010) ...............................................................................................33

*Ellison v. Inova Health Care Servs.*,
  692 F. Supp. 3d 548 (E.D. Va. 2023) .......................................................................18, 21, 26

*Equal Emp. Opportunity Comm'n v. Aviation Port Servs.*,
  LLC, No. CV 18-10909-FDS, 2020 WL 1550564 (D. Mass. Apr. 1, 2020) ....................36, 37

*Equal Emp. Opportunity Comm'n v. Baystate Med. Ctr., Inc.*,
  3:16-CV-30086-MGM, 2017 WL 4883458 (D. Mass. Oct. 30, 2017) ...................................15

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*,
  877 F.3d 487 (3d Cir. 2017) ...............................................................................................15

*Federoff v. Geisinger Clinic*,
  571 F. Supp. 3d 376 (M.D. Pa. 2023) ..................................................................................34

*Foshee v. AstraZeneca Pharmas. LP*,
  2023 WL 6845425 (D. Md. Oct. 17, 2023) ..........................................................................25

*Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*,
  2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023) ......................................................................17

*Griffin v. Mass. Dep't of Revenue*,
  No. 22-CV-11991-FDS, 2023 WL 4685942 (D. Mass. July 20, 2023) ..................................25

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ............................................................................................................31

*Hand v. Bayhealth Med. Ctr., Inc.*,
  No. CV 22-1548-RGA, 2024 WL 359245 (D. Del. Jan. 31, 2024) ..................................21, 26

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*,
  650 F.2d 430 (2d Cir. 1981) ...............................................................................................17

*Isaac v. Exec. Off. of Health & Hum. Servs.*,
  2023 WL 8544987 (D. Mass. Dec. 11, 2023) ......................................................14, 31, 33, 34

*Kiel v. Mayo Clinic Health Sys.*,
  2023 WL 5000255 (D. Minn. Aug. 4, 2023) .........................................................................21

*Kolstad v. ADA*,
  527 U.S. 526 (1999) ............................................................................................................37

*Leake v. Raytheon Tech. Corp.*,
   2023 WL 2242857 (D. Ariz. Feb. 27, 2023)........................................................34

*Leitgeb v. Sark Wire Corp. – GA*,
   2022 WL 18777380 (N.D. Ga. Sept. 21, 2022) ..................................................34

*Lowe v. Mills*,
   68 F.4th 706 (1st Cir. 2023)..............................................................................14

*Moore v. Montefiore Medical Ctr.*,
   2023 WL 7280476 (S.D.N.Y. Nov. 3, 2023) ......................................................34

*Ocasio-Hernández v. Fortuño-Burset*,
   777 F.3d 1 (1st Cir. 2015) .................................................................................13

*Passarella v. Aspirus, Inc.*,
   No. 22-CV-287-JDP, 2023 WL 2455681 (W.D. Wis. Mar. 10, 2023)............21, 25

*Prida v. Option Care Enters., Inc.*,
   No. 5:23-CV-00905, 2023 WL 7003402 (N.D. Ohio Oct. 24, 2023).....................21

*Robinson v. Children's Hosp. Boston*,
   2016 WL 1337255 ..............................................................................................34

*Rodrique v. Hearst Commc'ns, Inc.*,
   No. CV 22-12152-RGS, 2024 WL 733325 (D. Mass. Feb. 22, 2024) ...............2, 17

*Sánchez-Rodríguez v. AT & T Mobility P.R., Inc.*,
   673 F.3d 1 (1st Cir. 2012) .................................................................................14

*Soto-Ocasio v. Fed. Express Corp.*,
   150 F.3d 14 (1st Cir. 1998).................................................................................13

*Thornton v. Ipsen Biopharms., Inc.*,
   No. CV 23-11171-JCB, 2023 WL 7116739 (D. Mass. Oct. 26, 2023)............15, 29

*Tobin v. Liberty Mut. Ins. Co.*,
   553 F.3d 121 (1st Cir. 2009)...............................................................................37

*Together Emps. v. Mass Gen. Brigham Inc.*,
   573 F. Supp. 3d 412 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022)..........32, 34

*Webb v. City of Philadelphia*,
   562 F.3d 256 (3d Cir. 2009)...............................................................................33

*Winans v. Cox Auto., Inc.*,
   669 F. Supp. 3d 394 (E.D. Pa. 2023) ..................................................................17

*Zingg v. Groblewski,*
    907 F.3d 630 (1st Cir. 2018) ................................................................................................. 13

**STATUTES**

42 U.S.C. § 2000e(j) ................................................................................................................. 31

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ................................................................................................................. 13

## I.    PRELIMINARY STATEMENT

In September 2021, Defendant Takeda Pharmaceuticals U.S.A., Inc. ("Takeda" or the "Company") implemented a policy requiring its field-based employees—i.e., those engaging in direct, in-person interactions with healthcare providers ("HCPs"), their staff, and patients—to become vaccinated against COVID-19, unless a request for accommodation was granted (the "Vaccine Policy"). At the time, the COVID-19 pandemic had stretched over eighteen months, and a dangerous new variant (Delta) was rapidly spreading and threatening Takeda's plan to resume in-person HCP interactions. Takeda implemented its lawful Vaccine Policy to mitigate the significant health and safety risks posed by returning its sales employees to the field. Plaintiffs Lisa Amoson, Robb Huck, Alecia Ramsey, Larry Harold Savage, Jillyn Schmidt, Sandra Salazar Silva, Britt Harold Singleton, and Susan Welch (collectively, "Plaintiffs") were all field-based employees whose employment was terminated after Takeda denied their requests for religious accommodation and they refused to become vaccinated against COVID-19. Plaintiffs assert a single cause of action for religious discrimination under Title VII based on the denial of their religious accommodation requests.

The Court should grant summary judgment to Takeda. First, the undisputed facts demonstrate that Plaintiffs cannot establish that they each had a sincerely-held religious belief that precluded them from becoming vaccinated. Plaintiffs—who all identify as Catholic or Christian—offered various, often overlapping reasons for objecting to the COVID-19 vaccine, including the use of fetal cells in its development, alleged conversations with God, who told them not to get vaccinated, and their supposed belief that they should not ingest potentially harmful substances because their "body is a temple" of God. These do not qualify as sincerely-held religious beliefs under Title VII, particularly when Plaintiffs' conduct directly contradicts

any religious-based justification for refusing to comply with the Vaccine Policy—as confirmed by their testimony. Indeed, Plaintiffs all took various medications, received vaccinations, and/or consumed other substances without regard for the use of fetal cells in their development or potential safety risks, and without consulting God. Worse still, Plaintiffs did so even *after* they first allegedly became aware of the use of fetal cells in certain medications in connection with the development of the COVID-19 vaccine. The undisputed facts show that Plaintiffs' true reasons for objecting to the COVID-19 vaccine were secular, not religious. Summary judgment in favor of Takeda is warranted for this reason alone.

Earlier this year, this Court granted summary judgment to an employer where an employee objected to its vaccine policy, claiming that his religion precluded him from ingesting substances developed using fetal cells. *See Rodrique v. Hearst Commc'ns, Inc.*, No. CV 22-12152-RGS, 2024 WL 733325, at *1-2 (D. Mass. Feb. 22, 2024). The Court rejected the plaintiff's claim based on his testimony that he had taken "medications and received vaccinations in the past without questioning whether fetal cells were used at any stage during their development," finding that this inconsistent testimony "reflects a personal medical judgment about the necessity of COVID-19 vaccination rigged out with religious verbiage." *Id.* at *2. So too here. Because Plaintiffs' reasons for not receiving the COVID-19 vaccine are also secular, summary judgment is appropriate.

Even if there was a genuine dispute as to whether Plaintiffs held sincere religious beliefs (there is not), a second independent reason warrants summary judgement in favor of Takeda. That is, there was no reasonable accommodation that would have allowed Plaintiffs to perform the essential functions of their field-based jobs without imposing undue hardship on Takeda. Despite the many, unsupported conspiracy theories Plaintiffs espoused during their depositions,

there is no genuine dispute that the COVID-19 virus posed a significant health and safety threat, and that allowing Plaintiffs to engage in in-person interactions—particularly in the healthcare setting with exposure to immunocompromised patients—exacerbated those risks and therefore was unreasonable. Takeda has submitted an expert report confirming these facts without any rebuttal report from Plaintiffs.

In addition, while some Plaintiffs requested to work remotely, the undisputed record establishes that granting that request also would have created an undue hardship for Takeda. Plaintiffs all admitted during their depositions that in-person interactions were critical to their ability to build relationships with HCPs and their staff, and to ultimately deliver Takeda's products to patients. The cost of eliminating those in-person interactions would have been detrimental to Takeda's business operations, as confirmed by the drastic decline in sales during the period of the COVID-19 pandemic when Takeda was forced to temporarily remove its sales force from the field. Further, Takeda conducted an impact analysis that quantified an approximately 15% decline in sales if it were to eliminate its field-based sales force. Because Plaintiffs can offer no evidence to dispute this drastic cost, Takeda is entitled to summary judgment for this separate, independent reason.

Accordingly, as set forth in detail below, Takeda respectfully requests that the Court grant summary judgment in its favor on Plaintiffs' lone claim under Title VII.[1]

---

[1] Takeda and Plaintiff Matthew Lynn Hoffacker have reached an agreement in principle to settle Plaintiff Hoffacker's claims against Takeda; therefore, those claims are not subject to this Motion.

## II.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND[2]

### A.    Takeda Implements a COVID-19 Vaccine Policy to Help Protect the Health and Well-Being of its Employees, Customers, Patients, and Communities.

Takeda is a patient-focused, R&D-driven global biopharmaceutical company committed to bringing better health for people and a brighter future for the world. SUMF ¶ 1. Takeda's field-based employees represent the Company to its customers through in-person interactions with HCPs, pharmacies, and institutions. *Id.* ¶ 3. The interactions between Takeda's field-based employees and HCPs and the relationships they form are critical to Takeda's ability to serve its patients. *Id.* ¶ 4.

Consistent with Takeda's patient-focused core mission, the Company uses a values-based decision-making model that prioritizes the principles of Patient, Trust, Reputation, and Business, in that order. *Id.* ¶ 5. In other words, patients are Takeda's number one priority. Consequently, Takeda's objectives in responding to the COVID-19 pandemic were threefold: employee safety, mitigating the spread of the virus, and continuing to deliver medicines to patients safely. *Id.* ¶ 8.

Following a short operational shutdown in March 2020, Takeda implemented a phased approach for field employees to gradually resume HCP visits, where permitted by state and local guidance, as well as by customer policies and preferences. *Id.* ¶ 11. Takeda was scheduled to move into the final face-to-face phase of that approach in July 2021, but, around that time, the COVID-19 Delta variant began spreading across the world. *Id.* ¶ 12. As reported at the time, the Delta variant was far more contagious than previous variants—and potentially more dangerous. *Id.* ¶ 13. In light of the increasing health and safety risks—particularly for patients who are immunocompromised and more susceptible to COVID-19—and the availability of COVID-19

---

[2] Takeda incorporates by reference herein its contemporaneously filed Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("SUMF").

vaccinations, many Takeda customers required field-based employees to become vaccinated before conducting in-person visits. *Id.* ¶ 14.

In August 2021, Takeda decided to implement a policy—which it announced in September 2021—to require all field-based employees to become vaccinated, absent a medical or religious exemption, by November 1, 2021. *Id.* ¶ 15. In reaching the decision to implement the Vaccine Policy, Takeda considered the totality of the circumstances, in light of its Patient, Trust, Reputation, and Business decision-making model, including: the safety risks to patients, HCPs, and employees from unvaccinated employees; business continuity and continuing to provide medicines to patients; Takeda's reputation for doing the right thing for its patients, HCPs, and employees; and the psychological benefits to employees from allowing them to finally return to work. *Id.* ¶ 17. Takeda based its assessment of the health risks associated with the spread of the COVID-19 virus on CDC guidelines. *Id.* ¶ 18. Additionally, Takeda considered the policies of its peer companies, many of which were requiring that all employees become vaccinated. *Id.*

**B.    Takeda Utilizes an Interactive Process for Evaluating Religious Accommodation Requests.**

To assess religious accommodation requests, Takeda permitted employees to submit a written request form along with any supporting documentation, including supplemental written statements and letters from religious officials. *Id.* ¶ 21. Takeda also conducted interviews with each employee requesting an accommodation as part of the interactive dialogue. *Id.* ¶ 22. In evaluating each accommodation request, Takeda focused on the potential hardship that granting the request would pose and considered whether the employee could perform the essential functions of their field-based position with an accommodation. *Id.* ¶ 24. That evaluation included asking employees and/or their managers to confirm the frequency with which the employees engaged in in-person interactions. *Id.* ¶ 25. Takeda did not scrutinize employees' stated religious beliefs unless

they were facially deficient, untruthful, or otherwise invalid. Declaration of Mary Elizabeth Denmark ("Denmark Decl.") ¶ 3.

### C.    In-Person Interactions are an Essential Function of Plaintiffs' Field-Based Positions with Takeda.

Plaintiffs each held field-based positions for Takeda. SUMF ¶ 27. Plaintiffs Amoson, Huck, Schmidt, Silva, and Welch were each either Sales Representatives or Senior Sales Representatives (collectively "Sales Representatives") in the Company's Neuroscience Business Unit ("NSBU"). *Id.* ¶ 28. Plaintiff Ramsey was an NSBU Regional Sales Trainer. *Id.* ¶ 72. Plaintiff Savage did not work in Takeda's NSBU, but, as a Territory Business Manager for the Antitrypsin Deficiency disease state (referred to as "Alpha 1"), he performed duties very similar to those of NSBU Sales Representatives.[3] *Id.* ¶ 81. Plaintiff Singleton was a Patient Access Manager for Takeda's Immunology Business Unit. *Id.* ¶ 89. The job descriptions for each of these positions explicitly required Plaintiffs to travel to HCP locations as part of their respective roles. *Id.* ¶ 29. As field-based employees, Takeda considered Plaintiffs the "face of Takeda." *Id.* ¶ 30.

#### 1.    *Plaintiff Amoson's Field-Based Position*

Upon her hire as a Sales Representative on February 3, 2020, Takeda expected Plaintiff Amoson to spend practically all of her time in the field, calling on HCPs—including psychiatrists, family doctors, and pediatricians—in person. *Id.* ¶¶ 31-32. When Plaintiff Amoson was not actively meeting with HCPs, she spent her time waiting in HCPs' offices, as well as in the common areas of their facilities, including hallways and lunchrooms, among patients. *Id.* ¶ 35.

After a brief period of working remotely, in September 2021, Takeda allowed Plaintiff Amoson to return to the field and conduct in-person calls again. *Id.* ¶ 39. In Plaintiff Amoson's

---

[3] Alpha 1 is a genetic condition that limits the body's production of proteins that protect the lungs and liver and leads to increased risk of lung and liver disease. *Id.* ¶ 82.

particular territory around that time, 80% of HCPs were back to allowing in-person sales calls, and, for those HCPs, Takeda expected that she would conduct her sales calls in person. *Id.* ¶ 41. In fact, Plaintiff Amoson's manager encouraged her to increase her in-person interactions because her "job [wa]s to be in front of customers as much as [she could]." *Id.* ¶ 40. By the end of October 2021, Plaintiff Amoson was conducting 90% of her interactions with HCPs in person. *Id.* ¶ 43.

Plaintiff Amoson testified during her deposition that she believes in-person interactions were critical to her role with Takeda—including via breakfast and lunch calls with HCPs—as they allowed her more time in front of the HCPs and helped her to more easily build relationships with them and their office staff. *Id.* ¶¶ 34, 36. Building relationships with members of HCP staff was particularly important to Plaintiff Amoson because staff members could provide helpful information on the particular HCP Plaintiff Amoson was calling on. *Id.* ¶ 37. Plaintiff Amoson found it difficult to call on HCPs remotely during the pandemic because it was easier for her to be passionate and engaging in person. *Id.* ¶ 38.

### 2. *Plaintiff Huck's Field-Based Position*

In his role as a Senior Sales Representative, Plaintiff Huck called on HCPs in family practices and hospitals. *Id.* ¶ 44. Prior to the COVID-19 pandemic, he conducted these calls entirely in person and, during those calls, was in close proximity to patients, some of whom could have been immunocompromised or had comorbidities that made them more susceptible to the COVID-19 virus. *Id.* ¶ 45.

In late 2021, after a brief period of working remotely—during which Plaintiff Huck admitted his sales numbers declined—in-person calling had generally returned to its pre-pandemic form, with 80% of HCPs in Plaintiff Huck's territory going back to taking in-person calls. *Id.* ¶¶ 46-48.

### 3.    *Plaintiff Schmidt's Field-Based Position*

In her role as a Senior Sales Representative, Plaintiff Schmidt called on HCPs at clinics and doctor's offices. *Id.* ¶ 49. Prior to the COVID-19 pandemic, her work-related interactions were entirely in person, including sales calls with HCPs and their staff, as well as meetings with the other Sales Representative covering her territory. *Id.* ¶ 50. In fact, Takeda expected that 90% of her time would be spent in the field, calling on HCPs in person. *Id.* ¶ 55. During sales calls, Plaintiff Schmidt shared the same waiting room with patients and would be in close proximity to them as she moved around HCPs' facilities, including primary care and pediatrics facilities where patients were being treated for a range of illnesses. *Id.* ¶ 51.

After briefly working remotely during the COVID-19 pandemic, Takeda required Plaintiff Schmidt to return to the field, and, at the time, all but a couple of the HCPs she called on were taking in-person calls. *Id.* ¶ 52. By September 2021, approximately 75% of HCPs in Plaintiff Schmidt's territory were "business as usual" in terms of taking in-person sales calls. *Id.* ¶ 54. At least one of these providers required that sales representatives be vaccinated in order to participate in lunch calls—a crucial part of Plaintiff Schmidt's sales strategy. *Id.* ¶ 53.

### 4.    *Plaintiff Silva's Field-Based Position*

In her role as a Senior Sales Representative, Plaintiff Silva called on HCPs at family and primary care practices, psychiatric practices, and pediatric facilities. *Id.* ¶ 56. During these sales calls, she would be in close proximity to patients with various illnesses. *Id.* ¶ 58. Plaintiff Silva understood that, but for a brief period of remote work during the COVID-19 pandemic, her job required her to visit HCPs in person. *Id.* ¶ 57. In fact, by late 2021, Plaintiff Silva would typically spend 90% of her time in the field, calling on HCPs in person. *Id.* ¶ 60. Upon her returning to the field in 2021, many HCPs in Plaintiff Silva's territory had resumed in-person calling, including one provider who required sales representatives to be vaccinated. *Id.* ¶ 59.

### 5.    *Plaintiff Welch's Field-Based Position*

In her role as a Senior Sales Representative, Plaintiff Welch called on family doctors, psychiatrists, pediatricians, and primary care doctors, who practiced in both large health systems and in small medical offices. *Id.* ¶ 61. Prior to the COVID-19 pandemic, Plaintiff Welch conducted all of her sales calls in person. *Id.* ¶ 62. When making these sales calls, Plaintiff Welch met with HCPs in their office, in a designated meeting room, or in a lunchroom or breakroom. *Id.* ¶ 65. In those areas, particularly when calling on HCPs in hospitals, Plaintiff Welch was exposed to sick patients suffering from a variety of illnesses. *Id.* ¶ 63. In addition to these sales calls, Plaintiff Welch attended in-person meetings with other members of her team at Takeda, including quarterly districtwide meetings, annual nationwide meetings, and monthly one-on-one meetings with her manager. *Id.* ¶ 64.

Upon returning to the field in 2021 after a brief period of working remotely, 80% of HCPs in Plaintiff Welch's territory were back to taking in-person calls again. *Id.* ¶ 70. When Plaintiff Welch ranked last (by over 100 calls) in her region for in-person calling in the second quarter of 2021, her manager directed her to conduct more in-person calls. *Id.* ¶ 69. By October 2021, Plaintiff Welch was conducting in-person sales calls with "almost all" of the providers in her territory, calling on approximately forty providers per week, and was "in the field working the same way [she] was working before COVID." *Id.* ¶ 71.

During her deposition, Plaintiff Welch testified to the importance of in-person interactions, stating that selling Takeda's products over the phone was completely ineffective because she needed to be able to show the HCPs what she was selling. *Id.* ¶ 67. Moreover, Plaintiff Welch emphasized in-person interactions in building relationships with HCPs and their office staff, noting that, but for those relationships, she might not even be permitted to call on certain HCPs. *Id.* ¶ 66. Unsurprisingly then, as soon as Plaintiff Welch was allowed to return to the field in 2021, she

resumed in-person interactions because she wanted to keep her sales numbers up and reengage with her HCPs. *Id.* ¶ 68.

### 6.    *Plaintiff Ramsey's Field-Based Position*

During her employment with Takeda, Plaintiff Ramsey worked as a Regional Sales Trainer and interim District Business Manager in the NSBU. *Id.* ¶ 72. In her role as a Regional Sales Trainer, her duties included training Sales Representatives, which required her to be out in the field calling on HCPs, working one-on-one with Sales Representatives and their managers, and leading training classes for groups of Sales Representatives. *Id.* ¶¶ 73-74.

In her role as an interim District Business Manager, Plaintiff Ramsey's job was to manage a group of Sales Representatives. *Id.* ¶ 75. In that capacity, Plaintiff Ramsey conducted "ride-alongs" with Sales Representatives, accompanying them during all phases of their sales calls and calling on multiple HCPs—including psychiatrists, pediatricians, family doctors, internal medicine doctors, and sometimes neurologists—at multiple facilities each day. *Id.* ¶¶ 76-77. While calling on HCPs, Plaintiff Ramsey worked in the general vicinity of patients, including outside their rooms. *Id.* ¶ 78.

After Plaintiff Ramsey returned to the field after a brief period of remote work in 2021, most HCPs in her territory resumed in-person calling, which Plaintiff Ramsey believed was a "great way to conduct business." *Id.* ¶ 79. By October 2021, Plaintiff Ramsey was conducting in-person interactions with 60% of the HCPs in her territory, including one period during which she met face-to-face with approximately 30 HCPs in just three days. *Id.* ¶ 80.

### 7.    *Plaintiff Savage's Field-Based Position*

Plaintiff Savage worked as a Territory Business Manager in the Alpha 1 disease state. *Id.* ¶ 81. In that role, Takeda expected Plaintiff Savage to call on HCPs—most of whom were pulmonary and critical care doctors—in person at the clinics and office buildings where they

10

practiced. *Id.* ¶¶ 83-84. During these sales calls, Plaintiff Savage would meet with multiple doctors and medical assistants at a particular facility, moving among the office assistants' "stations" and using the same waiting room as patients—which included those being treated for pulmonary or lung-related conditions. *Id.* ¶¶ 85-86.

By the time he returned to the field in late 2021 after briefly working remotely, Plaintiff Savage's role "was pretty much back to normal" in terms of him making in-person sales calls. *Id.* ¶ 88. Plaintiff Savage, himself, admitted the importance of in-person calling, noting that working in person was the "most ideal way to do [his] job" as a Territory Business Manager. *Id.* ¶ 87.

### 8.    *Plaintiff Singleton's Field-Based Position*

Plaintiff Singleton was a Patient Access Manager for Takeda's Immunology Business Unit. *Id.* ¶ 89. In this role, Plaintiff Singleton's job was to interact with patients, HCPs, and insurance coordinators—which he did in person about half the time—essentially acting as a customer service agent to them. *Id.* ¶¶ 90-91. The patients with whom he interacted included those who were immunocompromised and particularly susceptible to getting sick. *Id.* ¶¶ 92, 94.

If patients or HCPs needed him to meet in-person, Takeda expected him to be there in person. *Id.* ¶ 91. In fact, certain HCPs in Plaintiff Singleton's territory required significant in-person assistance, and patients sometimes needed him to meet in person to discuss getting insurance approval for their treatments. *Id.* ¶¶ 91-92. Plaintiff Singleton also traveled to in-person meetings and conducted field rides with other Patient Access Managers to provide training and mentorship, as well as to build relationships with his colleagues. *Id.* ¶ 93.

During his deposition, Plaintiff Singleton emphasized the importance of in-person interactions, explaining that they made his job more efficient in terms of accessing people and information, particularly for the patients and HCPs that required more "handholding" and needed Plaintiff Singleton to "basically do the job for them." *Id.* ¶ 96. In fact, certain providers requested

that Plaintiff Singleton provide in-person training to allow them to assist their patients more efficiently. *Id.* ¶ 91. He also testified that in-person interactions allowed him to more effectively build relationships with patients and HCPs, and that building those relationships was important to his role because they led HCPs to be more responsive and receptive to him. *Id.* ¶ 95.

###### D.   Takeda Denies Each Plaintiff's Religious Accommodation Request and Terminates Their Employment for Failing to Comply with the Vaccine Policy.

In September 2021, Plaintiffs each requested to be exempt from the Vaccine Policy on the basis of their respective religions. *Id.* ¶¶ 117, 134, 158, 182, 204, 222, 242, 256. Takeda evaluated each accommodation request consistent with its established process and denied the requests because granting them—either by allowing in-person interactions without vaccination or by eliminating in-person interactions from Plaintiffs' job duties—created an undue hardship. *Id.* ¶¶ 272-74. Although Takeda informed Plaintiffs that their respective requests for religious accommodation were denied, they still refused to comply with the Vaccine Policy by getting vaccinated. *Id.* ¶¶ 275-76. Accordingly, Takeda terminated each Plaintiff's employment. *Id.* ¶¶ 277.

## III.   ARGUMENT

### A.   The Applicable Legal Standard Precludes Plaintiffs' Claims as a Matter of Law.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and

all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Id.* at 255.

Where the movant shows a prima facie entitlement to summary judgment, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact. *Id.* at 256. The party "opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 18 (1st Cir. 1998) (quoting *August v. Off. Unltd., Inc.*, 981 F.2d 576, 580 (1st Cir. 1992)); s*ee also Zingg v. Groblewski*, 907 F.3d 630, 634 (1st Cir. 2018) (explaining that "improbable inferences[ ] and unsupported speculation" cannot "establish a genuine dispute of fact" sufficient to withstand summary judgment motion) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4 (1st Cir. 2015)). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As demonstrated herein, the undisputed facts preclude Plaintiffs' religious discrimination claims based on an alleged failure to accommodate from surviving Takeda's Motion for Summary Judgment.

**B.    Plaintiffs Cannot Establish a Claim For Failure to Accommodate a Sincerely Held Religious Belief as a Matter of Law.**

"Courts assess religious discrimination claims under Title VII using a two-part framework." *Isaac v. Exec. Off. of Health & Hum. Servs.*, 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023). The first part requires the plaintiff to "'make [her] *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the

adverse employment action.'" *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023) (quoting *Sánchez-Rodríguez v. AT & T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012)) (alteration in original). If the plaintiff establishes a prima facie case, "[t]he burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." *Id.*

Here, Plaintiffs' accommodation claims fail under both parts: there is no genuine dispute that Plaintiffs are unable to show a sincerely held religious belief that precluded compliance with the Vaccine Policy, and any accommodation undisputedly would have imposed an undue hardship on Takeda.

### 1.    *The undisputed facts demonstrate that Plaintiffs did not have sincerely-held religious beliefs precluding them from compliance with the Vaccine Policy.*

Although Takeda did not challenge Plaintiffs' stated religious beliefs during the accommodation process, they still must offer evidence to satisfy their threshold burden in this case. *See Divine Equal. Righteous v. Overbrook Sch. for the Blind*, No. CV 23-846, 2023 WL 4763994, at *5 (E.D. Pa. July 26, 2023) ("But merely because Defendant 'did not question Plaintiffs' beliefs' at the time they requested an accommodation does not, for the purposes of their pleadings, establish that Plaintiffs have adequately alleged they have sincerely held religious beliefs."). And a review of the undisputed record evidence demonstrates that Plaintiffs cannot establish that they held sincere religious beliefs that prevented them from complying with the Vaccine Policy.

"The element of sincerity is fundamental, since if the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement." *Equal Emp. Opportunity Comm'n v. Baystate Med. Ctr., Inc.*, 3:16-CV-30086-MGM, 2017 WL 4883458, at *3 (D. Mass. Oct. 30, 2017). "A belief is religious if it 'addresses fundamental and ultimate questions having to do with

14

deep and imponderable matters,' are 'comprehensive in nature,' consisting of 'a belief-system as opposed to an isolated teaching,' and are accompanied by 'certain formal and external signs.'" *Thornton v. Ipsen Biopharmas., Inc.*, No. CV 23-11171-JCB, 2023 WL 7116739, at *3 (D. Mass. Oct. 26, 2023) (quoting *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 491 (3d Cir. 2017)).

Here, under this standard, the undisputed evidence demonstrates that Plaintiffs' objections to the COVID-19 vaccine were secular in nature, not religious. As a result, the Court should grant summary judgment in favor of Takeda for this lone reason.

### a. Plaintiff Welch's objections to the COVID-19 vaccine were secular in nature, not religious.

In her accommodation request to Takeda, Plaintiff Welch based her objection to the COVID-19 vaccine on the alleged "use [of] cell lines from aborted fetuses either in [its] direct manufacturing, development, or in [its] testing" and her purported "strong[] belie[f] in the sanctity of life and the rights of the un-born" as a Catholic. SUMF ¶¶ 256, 258. Plaintiff Welch attached to her request form a letter from the Bishop of the Diocese of Bismarck, North Dakota, stating that Plaintiff Welch is Catholic, and that Catholics are free to choose whether to get vaccinated against the COVID-19 virus. *Id.* ¶ 259. Plaintiff acknowledged during her deposition that the Pope deemed the COVID-19 vaccine "an act of love," but she believes that the Pope's assessment about the Catholic religion is wrong. *Id.* ¶ 261.

Plaintiff Welch testified at her deposition that she believes the COVID-19 vaccine could kill or seriously injure her because it caused her mother and sister to have cardiovascular issues. *Id.* ¶ 266. Plaintiff Welch also believes that the COVID-19 vaccine caused cancer in her mother. *Id.* Plaintiff Welch, in fact, submitted a medical exemption request to Takeda, citing the purported medical conditions of her mother and sister, and claiming that she feared experiencing similar

issues if she were required to take the vaccine. *Id.* ¶ 271; *see also id.* ¶ 267 (testifying that because there was no package insert or prescribing information with the COVID-19 vaccine, it could cause her harm, such as a "simian monkey thing that actually causes cancer").

Taking her safety concerns to the extreme, Plaintiff Welch further testified that she believes that the former U.S. Secretary of Health and Human Services, Alex Azar, used the COVID-19 vaccine to perpetuate "the largest genocide this country has ever seen." *Id.* ¶ 270. And because the U.S. Food and Drug Administration ("FDA") made the vaccine available through emergency use authorization, Plaintiff Welch believes it violated the Nuremburg Code. *Id.* ¶ 265. In that regard, Plaintiff Welch testified: "We're talking a situation like Nazi Germany where people were forced into an experimental drug without their informed consent, and if they were injured, they had no recourse." *Id.* ¶ 268. In her view, we should "incinerate every single vial" of the vaccine because it serves no public health benefit. *Id.* ¶ 269.

Further undercutting her stated reasons for requesting a religious accommodation, Plaintiff Welch testified that, other than the COVID-19 vaccine, she never objected to *any* product based on a connection with fetal cells. *Id.* ¶ 263. Nor did she ever once research whether other vaccines or products she has used were developed using fetal cell lines. *Id.* ¶ 262. In fact, Plaintiff Welch took Ivermectin to treat COVID-19 symptoms, even though it was developed using the *same* fetal cell lines used in developing the COVID-19 vaccine. *Id.* ¶¶ 264

This undisputed evidence belies any purported religious-based objections to the COVID-19 vaccine and conclusively demonstrates that Plaintiff Welch's true reasons for not getting vaccinated are secular, exposing her "motive to 'fraudulently hid[e] [those] interests behind a veil of religious doctrine.'" *Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*, 2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441

(2d Cir. 1981)). Courts have consistently dismissed religious discrimination claims where they are demonstrably inconsistent with the plaintiff's actions and true secular reasons for objecting to the COVID-19 vaccine. *See Rodrique*, 2024 WL 733325, at *2 (granting summary judgment where plaintiff based vaccination exemption request on "object[ion] to ingestion of artificial or man-made substances or substances developed using fetal cells" but "admit[ted] to having taken medications and received vaccinations in the past without questioning whether fetal cells were used at any stage during their development"); *Gardner-Alfred*, 2023 WL 6214863, at *18 (same where plaintiff "offer[ed] no evidence other than her own say-so to support the notion that she had a sincere religious objections" and "ha[d] on many occasions taken medications and received injections without first checking whether they contain or were made or manufactured with aborted fetal cell lines."); *Winans v. Cox Auto., Inc.*, 669 F. Supp. 3d 394, 401 (E.D. Pa. 2023) (same where plaintiff "d[id] not even identify why [he] objects to the use of fetal cell lines in the development of the COVID-19 vaccine," and "d[id] not link his 'sincere concerns' with the use of fetal cell lines to any 'formal and external signs' of religion"); *Aliano v. Twp. of Maplewood*, No. 22-CV-5598 (ES) (AME), 2023 WL 4398493, at *10-11 (D.N.J. July 7, 2023) (same where plaintiffs alleged only that the vaccine contained fetal cell lines, that the plaintiffs were Christian, that abortion conflicted with Christian teachings, and that the COVID-19 vaccine therefore conflicted with their religious beliefs); *Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548, 560-61 (E.D. Va. 2023) (same where plaintiff "fail[ed] to provide a sufficient connection between [her] objection to the COVID-19 vaccines—that they were 'tested or developed using cell lines derived from aborted fetuses,'—and her subjective religious beliefs").

17

Because the undisputed record establishes that Plaintiff Welch's objections to the COVID-19 vaccine were secular in nature, not religious, the Court should grant summary judgment in Takeda's favor.

> **b.     Plaintiff Huck's objections to the COVID-19 vaccine were secular in nature, not religious.**

The undisputed evidence related to Plaintiff Huck also demonstrates that his true reasons for not complying with the Vaccine Policy were secular. Plaintiff Huck, like Plaintiff Welch, sought a religious-based exemption from the Vaccine Policy on the grounds that his religion (Catholic) purportedly precluded him from receiving the COVID-19 vaccine because fetal cells were used in its development. SUMF ¶¶ 134, 136. Plaintiff Huck submitted with his accommodation request a note from his priest, stating that Plaintiff Huck was a practicing Catholic. *Id* ¶ 137. During his deposition, however, Plaintiff Huck did not even know whether the Catholic Church had an official stance on the COVID-19 vaccine.[4] *Id.* ¶.

Contradicting his stated religious objections during his deposition, Plaintiff Huck, like Plaintiff Welch, repeatedly expressed his concerns about the safety and efficacy of the COVID-19 vaccine. *Id.* ¶¶ 151-53, 155. He testified to his belief that the COVID-19 vaccination is unsafe because it is "experimental" and could cause "turbo cancer," blood clots, heart attacks, stroke, and sudden death. *Id.* ¶¶ 153, 155. Plaintiff Huck further testified that he thought vaccinated individuals are more likely to contract the COVID-19 virus than those who are unvaccinated, and that knowingly administering the vaccine is purportedly a "crime[] against humanity." *Id.* ¶ 152. In fact, he testified that it was his concerns about the speed with which the COVID-19 vaccination

---

[4] The Catholic Church, more broadly, has taken the position that it is morally acceptable to receive the COVID-19 vaccine. Indeed, the Pope has gone so far as to call vaccination an "act of love." Plaintiff Huck testified that he disagrees with both the Pope and the Catholic Church on this point. *Id.* ¶ 148.

was brought to market that caused him to first investigate and discover the use of fetal cells in the vaccine's development. *Id.* ¶ 141. Plaintiff Huck, like Plaintiff Welch, requested a medical accommodation from Takeda, claiming that the vaccine could be harmful to him because it had not been tested on individuals, like him, who had already been infected with the COVID-19 virus. *Id.* ¶ 157.

The similarities between Plaintiff Huck and Plaintiff Welch do not end there. He testified that, before objecting to the COVID-19 vaccine, he never refused *any* other vaccine or medication because of the suspected use of fetal cells in its development. *Id.* ¶ 142. Indeed, Plaintiff Huck testified that he took various vaccines and medications, including Ivermectin, without ever once researching whether they were developed using fetal cells. *Id.* ¶¶ 143-47.

These undisputed facts clearly establish that Plaintiff Huck's objections to the COVID-19 vaccine were secular in nature, not religious, and the Court should grant summary judgment in Takeda's favor as a result. *See* Section III.B.1.a, *supra* (collecting cases).

### c. Plaintiff Savage's objections to the COVID-19 vaccine were secular in nature, not religious.

Plaintiff Savage's claim fails for similar reasons. His accommodation request to Takeda also cited the use of fetal cells as the basis for his request. SUMF ¶ 184. Plaintiff Savage attached to his request form a letter from his pastor, even though he admitted his Christian church did not take an official position on COVID-19 vaccination and other members of his church with the same general beliefs had received the vaccine. *Id.* ¶ 185.

In direct conflict with the purportedly religious-based objections in his accommodation form, Plaintiff Savage testified that he was concerned about the safety and efficacy of the COVID-19 vaccine. *Id.* ¶¶ 202-203. He believes that it was "experimental," lacked long-term testing, and did not stop the spread of the virus. *Id.* Adding to the secular bases for his objection, Plaintiff

Savage further testified that he believes the Vaccine Policy is illegal because it requires individuals to put something permanent into their bodies—namely, the vaccine, which he referred to as a "coerced medical treatment." *Id.* ¶¶ 197, 201. In his opinion, he should be free to choose his own medical treatment. *Id.* ¶ 197. While Plaintiff Savage testified that "free will" is a "Biblical concept" based on the notion that his "body is a temple" of God, he acknowledged that the "free will" concept is "not as direct[ly]" religious as his anti-abortion beliefs. *Id.* ¶¶ 198-99.

Further contradicting his purportedly religious-based accommodation request, Plaintiff Savage, like Plaintiffs Welch and Huck, testified that he did not investigate whether fetal cell lines were used in pharmaceuticals until the summer of 2021, despite claiming to have been a devout Christian for many years. *Id.* ¶¶ 186-87. Plaintiff Savage further testified that he has taken various vaccines and over-the-counter medications without researching whether fetal cells were used in their development, and that he has taken Tylenol himself and has even given it to his minor daughter since learning that it was developed using fetal cells. *Id.* ¶¶ 188-93. He admitted that taking Tylenol offended the same alleged religious belief that purportedly prevented him from getting vaccinated against the COVID-19 vaccine. *Id.* ¶ 194. These inconsistencies reveal the true, secular basis for Plaintiff Savage's objection to the COVID-19 vaccine and doom his accommodation claim. *See* Section III.B.1.a, *supra* (collecting cases).

Moreover, Plaintiff Savage's contention that he could not get vaccinated against the COVID-19 virus because his "body is a temple" of God fails because he never raised that objection during Takeda's accommodation process. SUMF ¶ 199. And, even if he had, courts have repeatedly rejected that as a basis for refusing to comply with an employer's vaccination policy, finding that to hold otherwise would grant employees free rein to declare a work requirement against which he had a strong secular objection a violation of his religion. *See Kiel v. Mayo Clinic*

*Health Sys.*, 2023 WL 5000255, at *8 (D. Minn. Aug. 4, 2023) ("As to the [body is a temple] belief, courts have generally been hesitant to find such broad statements in opposition to vaccines to be a sincerely held religious belief."); *Passarella v. Aspirus, Inc*., No. 22-CV-287-JDP, 2023 WL 2455681, at *5-6 (W.D. Wis. Mar. 10, 2023) (granting motion to dismiss Title VII claims of two plaintiffs for failure to accommodate religious belief claims where plaintiffs claimed that the "body is a temple of the Holy Spirit," and "claim[ed] that their decisions had been ratified by prayer," "[b]ut the use of religious vocabulary does not elevate a personal medical judgment to a matter of protected religion."); *Prida v. Option Care Enters., Inc.*, No. 5:23-CV-00905, 2023 WL 7003402, at *5 (N.D. Ohio Oct. 24, 2023) (same where "[plaintiff's] alleged religious belief that her body is 'God's temple' would, if allowed, grant the plaintiff carte blanche to accept or reject nearly any condition of her employment," and noting that "courts have routinely rejected failure to accommodate claims based on such 'blanket assertions,' finding that they present 'isolated moral teachings' rather than sincerely held religious beliefs"); *Hand v. Bayhealth Med. Ctr., Inc.*, No. CV 22-1548-RGA, 2024 WL 359245, at *4-5 (D. Del. Jan. 31, 2024) (same where plaintiff claimed that the "body is a temple" and that the Holy Spirit had guided her not to receive the vaccine, noting that, "[f]orcing Defendant to 'unfailingly respect' any decisions Plaintiff makes by 'pray[ing] and ask[ing] God for wisdom and guidance' would grant her the type of 'blanket privilege' that does not qualify as religious belief under *Africa*."); *Ellison*, 692 F. Supp. 3d at 558-59 (same where plaintiff claimed that the "body is a temple" and that God had guided him not to receive the vaccine, noting that such a belief, "amounts to the type of 'blanket privilege' that undermines our system of ordered liberty," and "if taken to its logical extreme, [] would serve as a limitless excuse for avoiding all . . . obligations"). The Court should reject Plaintiff Savage's religious accommodation claim and grant summary judgment in Takeda's favor.

### d.    Plaintiff Schmidt's objections to the COVID-19 vaccine were secular in nature, not religious.

Plaintiff Schmidt refused to comply with the Vaccine Policy for reasons similar to Plaintiff Savage. In her accommodation request to Takeda, Plaintiff Schmidt objected to the COVID-19 vaccine because "[a]ll the currently available COVID-19 vaccines used cell lines originating from aborted children in their manufacturing, development and/or testing." SUMF ¶ 206. With her request form, Plaintiff Schmidt submitted a letter from the pastor of an online church in the form of a standard template available to anyone upon request. *Id.* ¶ 207. That church did not oppose the COVID-19 vaccination but believed that individuals should have the option to choose whether to get vaccinated. *Id.* ¶ 208. Similarly, to explain why members of her own Bible study group were vaccinated, Plaintiff Schmidt testified that "they can interpret the Bible [] how they want to interpret it. . . . [W]hen I read it, I'm going to interpret it for myself." *Id.* ¶ 209.

During her deposition, Plaintiff Schmidt revealed the true, secular reasons for her objection to the COVID-19 vaccine. She testified that her concerns with the vaccine's purported lack of efficacy, use of mRNA, and lack of FDA approval, as well as her own natural immunity—which she claimed was more effective than vaccine-provided immunity—were all reasons she did not get vaccinated. *Id.* ¶ 220. Plaintiff Schmidt further testified that she also decided not to get vaccinated due to safety issues, including adverse side effects, such as death, pericarditis, and myocarditis. *Id.* ¶ 221.

Further contradicting her purported religious objections to the vaccine, Plaintiff Schmidt testified that while she knows that fetal cells are regularly used in developing pharmaceuticals, she has taken several prescription and over-the-counter medications—such as aspirin, ibuprofen, and TUMS—without researching whether fetal cells were used in their development. *Id.* ¶¶ 218-19. This testimony is entirely inconsistent with Plaintiff Schmidt's purported religious basis for

refusing to comply with the Vaccine Policy and, again, is legally fatal to her accommodation claim. *See* Section III.B.1.a, *supra* (collecting cases).

Plaintiff Schmidt's only explanation for these obvious inconsistencies was: "I am choosing to take it . . . it's a medication, not a vaccine." *Id.* ¶ 219. In that regard, she testified that she does not necessarily object to medications because they, unlike vaccines, do not stay in your body forever: "[Y]ou cannot untake a vaccine. You can stop taking a medication." *Id.* ¶ 215. She also distinguished medications and vaccines stating: "you have a choice to take [medications] or not" and, in many cases, medications have been tested, have clear ingredients lists, and have been around for a long time. *Id.* ¶ 216. In an attempt to tie these secular objections to her religion, Plaintiff Schmidt testified that her body is a temple of God and was made in God's image, such that she cannot take things, like vaccines, that she believes interfere with her immune system. *Id.* ¶¶ 212-12. However, as demonstrated above, this "pick and choose" approach has been roundly rejected by Courts. *See* Section III.B.1.c, *supra* (collecting cases). The Court should reject her religious accommodation claims and grant summary judgment in Defendant's favor.

e.    **Plaintiff Silva's objections to the COVID-19 vaccine were secular in nature, not religious.**

Plaintiff Silva's accommodation request presents more of the same in terms of her secular reasons for objecting to the Vaccine Policy. She stated in her request form that, "Based on the use of fetal cell tissue lines to test the efficacy of covid vaccines or its use for research, development or manufacturing, [she chose] not [to] participate with any part of the covid vaccine in my body," and that she "believe[d] that this vaccine would violate [her] moral conscience in light of [her] religious belief[s]." SUMF ¶ 224. She purports to be Catholic but testified that she did not know

whether the Church had an official position on the vaccine, and that no Bible verses precluded her from taking the COVID-19 vaccine.[5] *Id.* ¶¶ 221, 237-38.

Plaintiff Silva further testified that safety concerns contributed to her decision not to get vaccinated. *Id.* ¶ 239. Those concerns were based on the purported lack of safety data, certain adverse effects, such as getting sick or dying from the vaccine, and the fact that the vaccine was not approved by the FDA. *Id.* ¶ 240. She also doubted the efficacy of the COVID-19 vaccine based on a purported lack of prescribing information and efficacy data. *Id.* ¶ 241.

Plaintiff Silva also contradicted the purported religious basis for her accommodation request by testifying that the COVID-19 vaccine was the only product she did not take based on the use of fetal cells in the development process. *Id.* ¶ 226. She further testified she took certain medications, including Advil and Benadryl, without researching whether they too were developed using fetal cells. *Id.* ¶ 227. Plaintiff Silva also took Ivermectin and Regeneron's COVID-19 treatment when she contracted the virus without inquiring whether fetal cells were used in their development. *Id.* ¶¶ 229-30.

When questioned about this inconsistent conduct during her deposition, Plaintiff Silva testified that the true reason she objected to the COVID-19 vaccine was a "gut feeling" she had about it. *Id.* ¶¶ 231, 234. She further testified the only reason she told Takeda she objected to the COVID-19 vaccine on fetal-cell grounds was because she did not know how to explain the "gut feeling." *Id.* ¶ 232. Attempting to tie this feeling to her religion, Plaintiff Silva testified: "It's hard to explain that. It's just – it's just like a gut feeling. . . . When the Spirit speaks to you, the Spirit speaks to you in different ways and, for me, it was just a sense of don't do it, kind of, thoughts in

---

[5] Again, the Catholic Church has taken the position that it is morally acceptable to receive the COVID-19 vaccine and the Pope has called vaccination an "act of love." *See* n. 4, *supra*.

my head." *Id.* ¶ 234. She further claimed: "I just knew when I prayed that [the COVID-19 vaccine] was just not right for me." *Id.* ¶ 235.

Plaintiff Silva's purported prayers to God do not save her religious accommodation claim from dismissal. For one, she completely contradicted herself by testifying that although she prayed to God before taking Advil, and He told her not to take it, she did so anyway because she "fell weak to [the pain]" she was experiencing. *Id.* ¶ 228. Moreover, courts have consistently rejected religious accommodation claims based on similar, self-serving claims that God purportedly told the plaintiff not to get vaccinated. Judge Saylor's decision dismissing a similar religious accommodation claim in *Griffin* is instructive:

> [I]t does not appear that her opposition to the COVID-19 vaccine in particular derives from a religious belief about vaccines in general, or indeed any preexisting principle of any kind. Instead, she describes her belief as a result of a personal practice of 'praying on it' when faced with difficult life decisions. . . . Again, while plaintiff is entitled to practice her own individualized form of faith, she is not entitled to a virtually automatic exception from the vaccination requirement, based solely on her own representation that it violates her religious principles on an *ad hoc* basis.

*Griffin v. Mass. Dep't of Revenue*, No. 22-CV-11991-FDS, 2023 WL 4685942, at *7 (D. Mass. July 20, 2023); *see also Foshee v. AstraZeneca Pharmas. LP*, 2023 WL 6845425, *4 n.3 (D. Md. Oct. 17, 2023) (dismissing religious accommodation claim because to recognize such a claim would mean that "a hypothetical plaintiff could assert, despite his shift starting at 8, that his God-given conscience or the Holy Spirit told him to rest and not start work until 10:30. Mandating that such assertions be accommodated as religious in nature would entirely frustrate an employer's ability to maintain an orderly workplace."); *Passarella*, 2023 WL 2455681, at *5-6 (granting motion to dismiss Title VII failure to accommodate claims where plaintiffs "couched their requests in religious terms, claiming that their decisions had been ratified by prayer"); *Hand*, 2024 WL 359245, at *5 ("Plaintiff's insistence that she 'would be going against God and the Holy Spirit's

convictions' if she received the vaccine does not save her claim. . . . Forcing Defendant to 'unfailingly respect' any decisions Plaintiff makes by 'pray[ing] and ask[ing] God for wisdom and guidance' would grant her the type of 'blanket privilege' that does not qualify as religious belief under *Africa*."); *Ellison*, 692 F. Supp. 3d at 559 ("[Plaintiff's] belief that if, after his prayer, 'God answers and interdicts [his] participation' amounts to the type of 'blanket privilege' that undermines our system of ordered liberty. Certainly, if taken to its logical extreme, [Plaintiff's] claim would serve as a 'limitless excuse for avoiding all . . . obligations.'"). Therefore, the Court should reject Plaintiff Silva's religious accommodation claims and grant summary judgment in favor of Takeda.

### f. Plaintiff Amoson's objections to the COVID-19 vaccine were secular in nature, not religious.

Similar to Plaintiff Silva, Plaintiff Amoson based her religious accommodation request on her view that "the Holy Spirit has moved on [her] heart and conscience that [she] must not accept the Covid-19 shot." SUMF ¶ 119. She identified as a Christian and further explained in her request form: "If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience. I do not turn my back on all 'modern' medicine and its practices and philosophies. There is a significant difference between a body in crisis needing help and a body that is healthy accepting a medical procedure. I believe God would accept the former, He would not accept the latter." *Id.* ¶ 117, 119. She, however, copied this language verbatim from a sample request letter she found online. *Id.* ¶ 120. Plaintiff Amoson also included with her request form a letter from her pastor, but she admitted during her deposition that she never spoke to the pastor about the COVID-19 vaccine and did not know whether her church had an official position on the vaccine. *Id.* ¶ 121.

Explaining her purported discussions with God, Plaintiff Amoson testified that she felt "uneasiness" about the COVID-19 vaccine and knew that "gut feeling" was God speaking to her. *Id.* ¶ 123. She further testified that when she prayed to God, He did not want her to become vaccinated because the COVID-19 vaccine was not approved by the FDA and did not have long-term data showing its safety or efficacy, and because she was not in a high-risk category. *Id.* ¶ 126. Plaintiff Amoson's testimony revealed that she has merely tried to cloak her secular safety and efficiency concerns about the COVID-19 vaccine as religious objections.

Consistent with these secular concerns, Plaintiff Amoson testified that she believes the COVID-19 vaccine was rushed to market, was ineffective, was potentially unsafe, and was merely used as a way to make money. *Id.* ¶ 131. She also believes that the COVID-19 virus itself is no more dangerous than the flu, that COVID-19-related deaths were overreported, and that the global pandemic was a "sham." *Id.* ¶¶ 132-33.

Further undercutting her alleged religious basis for objecting to the COVID-19 vaccine, Plaintiff Amoson testified that God never told her to refuse any other vaccine, medication, food, or other product, and that she never proactively prayed to God for guidance about *any* other vaccine she had taken, including the tetanus, MMR, and HPV vaccines. *Id.* ¶ 127. Plaintiff Amoson explained that she did not pray to God about taking other vaccines or medications because she believed they were safe and effective. *Id.* ¶ 128.

Plaintiff Amoson's own testimony confirms her true, secular reasons for refusing to comply with the Vaccine Policy, and the Court should dismiss her religious accommodation claim as a result. *See* Sections III.B.1.a, c, e, *supra* (collecting cases).

g.    **Plaintiff Singleton's objections to the COVID-19 vaccine were secular in nature, not religious.**

Plaintiff Singleton's accommodation request was similarly based on his personal, secular beliefs about the COVID-19 vaccination. In his request form, Plaintiff Singleton stated: "I believe in both the sovereignty and providence of God, and the leading of the Holy Spirit who works in the hearts of believers. I firmly and sincerely believe that taking this vaccine would violate my own conscience as enlightened by the Holy Spirit." *Id.* ¶ 244. He submitted with his request form letters from the pastor of his church and from a "spiritual mentor," but Plaintiff Singleton testified that his Christian church did not have an official position on the COVID-19 vaccine, and that nothing in the Bible precluded him from getting vaccinated. *Id.* ¶¶ 245-46.

During his deposition, Plaintiff Singleton revealed his concerns about the safety and efficacy of the vaccine. *Id.* ¶¶ 254-55. He explained that these concerns were based on the lack of full FDA approval and prescribing information. *Id.* ¶ 254. He believes that the COVID-19 vaccine was "not nearly as effective or safe as we were initially told," and that Dr. Anthony Fauci is a liar and a "bad influence" on our country. *Id.* ¶ 255.

As Plaintiff Singleton testified, these safety and efficacy concerns drove him to pray to God for guidance regarding whether to take the COVID-19 vaccine because "it's a serious thing to take an irreversible medical treatment." *Id.* ¶ 249. And when he prayed, Plaintiff Singleton explained, the message from "the still small voice of God that came to [him] was that the vaccine is not for [him]." *Id.* ¶ 247. He further testified that he decides whether to pray to God based on if he "feel[s] hesitation or doubt" and "there's something not quite right about the situation." *Id.* ¶ 253. But yet again, Plaintiff Singleton is engaging in the "pick and choose" tactic that courts have rejected. *See* Section III.B.1.c, *supra* (collecting cases). Indeed, Plaintiff Singleton did not pray to God before taking other vaccines, medications, or *any* other product. SUMF ¶¶ 251-52.

28

This testimony epitomizes an "isolated," self-selected belief system that is based on Plaintiff Singleton's personal beliefs, not a "comprehensive" religion. *Thornton*, 2023 WL 7116739, at *3; *see also* Section III.B.1.e, *supra* (collecting cases). The Court should reject his religious accommodation claims and grant summary judgment in Defendant's favor.

### h. Plaintiff Ramsey's objections to the COVID-19 vaccine were secular in nature, not religious.

In her accommodation request, Plaintiff Ramsey took a "kitchen sink" approach that fails for the reasons stated above. Her request form includes four purported grounds for objecting to the COVID-19 vaccine: (1) "I strongly oppose abortion," (2) "my body is a given vessel of the Holy Spirit and it is up to me to protect it," (3) "I must rely and trust on Him to care for me and not that of worldly wisdom," and (4) the "vaccine is the Mark of the Beast especially [if] it is required to earn a living." SUMF ¶ 160. Plaintiff Ramsey attached a letter to her request form, further explaining these reasons, but she copied portions of that letter from a sample exemption request letter she had received from a friend. *Id.* ¶ 161. She also attached a letter from the pastor at her Christian church, but she did not know whether her pastor or her church had an official stance on the COVID-19 vaccine, and some congregants of her church were vaccinated. *Id.* ¶ 162.

During her deposition, Plaintiff Ramsey acknowledged that she had concerns with the "science" of the COVID-19 vaccine, the rush to bring it to market, and the use of mRNA technology in the vaccine. *Id.* ¶ 178. She, like the other Plaintiffs, believes that the COVID-19 vaccine was developed too quickly and not tested sufficiently, leading to potential adverse side effects. *Id.* ¶ 179. In particular, she was concerned that the COVID-19 vaccine could alter her DNA. *Id.* ¶ 165.

Plaintiff Ramsey also believes that the COVID-19 vaccine is not effective because of the purported lack of long-term data, particularly for someone, like her, who is healthy and has no

comorbidities. *Id.* ¶ 180. She further testified that she disagreed with vaccine mandates generally because people should have the ability to make their own decision and, in her case, "it's [her] decision to put in [her] body what it is that [she] feel[s] is appropriate through God." *Id.* ¶ 181.

While Plaintiff Ramsey testified that her primary religious basis for objecting to the COVID-19 vaccine was that her body is a temple of God and she should not ingest substances that could potentially alter her DNA, she has never researched whether any medications she has taken could alter her DNA. *Id.* ¶¶ 163, 165-67. Her only explanation for this inconsistency is that she "ha[d]n't been compelled to do" that research and her "gut" told her the medications would not alter her DNA. *Id.* ¶ 166. In fact, the only substance Plaintiff Ramsey has refused to ingest based on her body being a temple of God is the COVID-19 vaccine. *Id.* ¶ 168. This testimony is completely inconsistent and cannot form the basis of a viable religious accommodation claim. *See* Section III.B.1.c, *supra* (collecting cases).

The Court should also reject Plaintiff Ramsey's claim that she relied on the word of God in refusing the COVID-19 vaccine, and that the vaccine was the "Mark of the Beast." She testified that the "worldly wisdom" argument means that God told her "that if man tells you to actually do it doesn't mean that you actually should have to do it," and that taking the COVID-19 vaccine would violate the word of God because the word of man (e.g., the FDA and Takeda) was telling her to get vaccinated. SUMF ¶¶ 169-70. Similarly, Plaintiff Ramsey explained that the Vaccine Policy was the "Mark of the Beast" because it precluded her from living her life as she previously did, i.e., without having to become vaccinated. *Id.* ¶ 177. These arguments, however, are just another attempt to cloak purely personal beliefs about whether to get vaccinated in religion. *See* Section III.B.1.e, *supra* (collecting cases). Indeed, Plaintiff Ramsey testified that she did not

consult God prior to receiving the flu, Hepatitis B, MMR, or Tdap vaccines, or before taking ADHD or allergy medication. SUMF ¶ 171.

Plaintiff Ramsey's testimony regarding fetal cells was also inconsistent with a sincerely-held religious belief. She admitted that she took Advil after learning that fetal cell lines were used in its development. *Id.* ¶ 173. In that case, Plaintiff Ramsey testified that God did not compel her to stop taking Advil. *Id.* She also admitted that she took the flu and Hepatitis B vaccines and used allergy and ADHD medication without researching whether fetal cell lines were used in their development. *Id.* ¶ 175. As such, the Court should reject Plaintiff Ramsey's fetal-cell argument. *See* Section III.B.1.a, *supra* (collecting cases).

### 2. *The undisputed evidence demonstrates that there was no reasonable accommodation available to Plaintiffs that would not cause Takeda to suffer undue hardship.*

Plaintiffs' religious discrimination claims fail for the additional, independent reason that exempting them from the Vaccine Policy would have caused Takeda an undue hardship. An employer need not offer accommodations that would cause "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "An accommodation poses an undue hardship 'when [the] burden is substantial in the overall context of an employer's business.'" *Isaac*, 2023 WL 8544987, at *2 (quoting *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)). To determine whether a burden is substantial, courts "must consider 'all relevant factors in the case at hand, including the particular accommodations at issue, and their practical impact in light of the nature, size and operating cost of [an] employer.'" *Id.* (quoting *Groff*, at 470-71).

Here, Plaintiffs requested to be exempted from the Vaccine Policy and permitted instead to either (1) utilize other protective measures, such as masking and testing, *in lieu* of receiving the COVID-19 vaccination when interacting in person with HCPs, their staff, patients, and Takeda

employees, or (2) work remotely and exclude in-person interactions from their field-based jobs. Both proposed accommodations posed an undue hardship to Takeda.

<strong>a.    Allowing Plaintiffs to conduct in-person interactions without receiving the COVID-19 vaccine would create an undue hardship for Takeda.</strong>

Allowing Plaintiffs to conduct their field-based job duties in person without being vaccinated presented significant health and safety risks to Takeda, its employees, and HCPs, including their staff and patients—many of whom were immunocompromised.[6] Indeed, it is undisputed that being infected with the COVID-19 virus could cause serious personal injury and even death, and that Takeda implemented the Vaccine Policy to mitigate against those risks. SUMF ¶¶ 17, 105. Moreover, as Takeda's expert witness, Dr. Daniel Salmon, found, unvaccinated individuals, including Plaintiffs, were at a greater risk of contracting and spreading the virus through their regular interactions with patients and other vaccinated Takeda employees. *Id.* ¶¶ 112-16. In fact, Dr. Salmon further found that the vaccines available at the time Plaintiffs submitted their accommodation requests in September 2021—i.e., the Moderna, Pfizer, and Janssen vaccines—were between 66.9% and 94.5% effective in preventing contraction of the COVID-19 virus. *Id.* ¶ 106. Other protective measures, such as masking, were less effective due to various factors, including difficulties implementing those protections. *Id.* ¶¶ 107-10. Thus, as Dr. Salmon concluded, requiring field-based employees to be vaccinated was the best way for Takeda to

---

[6] Plaintiffs Huck, Ramsey, and Silva did not ask to work remotely during the interactive process with Takeda. SUMF ¶¶ 118, 135, 159, 183, 205, 243, 257. Thus, they cannot avail themselves of such an accommodation. *See Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 434 (D. Mass. 2021) (rejecting argument that certain plaintiffs should have been permitted to work remotely or submit to other COVID-19 protective measures because they "did not mention such accommodations," and it was their "burden to demonstrate what specific accommodations they needed and how those accommodations were connected to their ability to work"), *aff'd*, 32 F.4th 82 (1st Cir. 2022).

protect its employees, HCPs, and patients against the health and safety risks posed by the COVID-19 virus. *Id.* ¶ 111.

Despite the misguided testimony of some Plaintiffs, Dr. Salmon's conclusions are not controversial (nor are they disputed as Plaintiffs submitted no rebuttal). Indeed, one district court has "take[n] judicial notice that COVID-19 caused a deadly global pandemic at a scale unseen in century" with, as of December 2023, "over one million people in the United States" having died from contracting the virus. *Bushra v. Main Line Health, Inc.*, No. CV 23-1090, 2023 WL 9005584, at *8 (E.D. Pa. Dec. 28, 2023). The *Bushra* Court, relying on an expert report similar to Takeda's report, granted summary judgment in favor of a healthcare system that required its medical staff to be vaccinated against the COVID-19 virus. *Id.* The court found that accommodating a doctor's request to be exempted from the vaccine policy based on his religion created an undue hardship to the healthcare system "in the form of substantial social, if not economic, costs" resulting from the risk of the doctor "infecting and even causing the death not only of his colleagues and [hospital] staff but also of vulnerable patients." *Id.*

This holding is not an aberration, and the same result is warranted here. It is well settled that an unsafe accommodation is not reasonable. *See EEOC v. Geo. Grp., Inc.*, 616 F.3d 265, 275 (3d Cir. 2010) (noting Title VII does not require that safety be subordinated to the religious beliefs of an employee); *Webb v. City of Philadelphia*, 562 F.3d 256, 262 (3d Cir. 2009) (recognizing "safety" as "an interest of the greatest importance"). As this Court has acknowledged, "[c]ourts across the country have found" an "undue hardship" to the employer based on evidence that individuals not vaccinated against COVID-19 are at higher risk of transmitting the disease. *Isaac*, 2023 WL 8544987, at *2 n.4 (citing *Conner v. Raver*, 2023 WL 5498728, at *6 (N.D. Cal. Aug. 24, 2023); *Beickert v. N.Y.C. Dep't of Educ.*, 2023 WL 6214236, at *5-6 (E.D.N.Y. Sept. 25,

2023)).[7] The Court in *Isaac* granted summary judgment in favor of the Massachusetts Executive

Office of Health and Human Services ("EOHHS"), holding that accommodating a Human Service

Coordinator, who developed individual service plans for children with developmental and

intellectual disabilities, from EOHHS's vaccination policy based on her religion posed undue

health and safety risks.

---

[7] *See also Brox v. Hole*, 590 F. Supp. 3d 359, 367 (D. Mass. 2023) ("The Authority has articulated
harms that it would incur in exposing its patrons to unvaccinated employees, including the risk to
public health and safety, the Authority's reputation as a steward of the public welfare, and its
financial interests, harms that cannot be dismissed as de minimis.") (Stearns, J.), *aff'd in relevant
part*, 83 F.4th 87 (1st Cir. 2023); *Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376, 388 (M.D. Pa.
2023) (finding undue burden because "an unvaccinated individual is likelier than a vaccinated
individual to be the source of an infection"); *Bordeaux v. Lions Gate Entm't, Inc*., 2023 WL
8108655, at *13 (C.D. Cal. Nov. 21, 2023) (accommodating unvaccinated television series actor
"would have put the lives of her fellow cast and crew members in danger" and finding that "[i]n
and of itself, this safety risk constitutes an undue hardship"); *Moore v. Montefiore Medical Ctr*.,
2023 WL 7280476, at *6 (S.D.N.Y. Nov. 3, 2023) (finding undue hardship because medical center
would have exposed itself to legal liability and its patients to an increased risk of infection);
*Kushner v. N.Y.C. Dep't of Educ.*, No. 22-cv-5265-DLI-VMS, 2023 WL 6214236, at *5 (E.D.N.Y.
Sept. 25, 2023) ("It is beyond cavil that safety within any work environment . . . is of absolute
importance. . . . [C]reating a health and safety risk that would have prevented the [defendant] from
fostering a safe educational and work environment . . . alone would have established an undue
hardship."); *Dennison v. Bon Secours Charity Health Sys. Medical Corp*., 2023 WL 3467143, at
*6 n.7 (S.D.N.Y. May 15, 2023) ("[T]here is also the obvious hardship associated with the
increased health and safety risk posed to other employees and patients by allowing Plaintiffs to
remain unvaccinated . . . and the risk of civil liability to anyone infected by an unvaccinated
employee.") (citations omitted); *D'Cunha v. Northwell Health Sys*., 2023 WL 2266520, at *3
(S.D.N.Y. Feb. 28, 2023) (finding undue hardship where accommodation would have "posed 'an
unacceptable health and safety risk to patients, co-workers, and visitors'"), *aff'd*, 2023 WL
7986441 (2d Cir. Nov. 17, 2023); *Leake v. Raytheon Tech. Corp*., 2023 WL 2242857, at *6 (D.
Ariz. Feb. 27, 2023) ("[A]n employer may deny a religious vaccination exemption on the ground
that such exemptions would pose an undue hardship on the employer's business by increasing the
spread of COVID-19 among the employees or public."); *Leitgeb v. Sark Wire Corp. – GA*, 2022
WL 18777380, at *11 (N.D. Ga. Sept. 21, 2022) ("Forcing Sark Wire to accommodate Plaintiff's
objections places an undue burden on Sark Wire's efforts to maintain workplace safety."); *cf.
Together Emps.*, 573 F. Supp. 3d at 441 (D. Mass. 2021) ("[P]ermitting the named plaintiffs to
continue to work at MGB . . . would materially increase the risk of spreading the disease and
undermine public trust and confidence in the safety of its facilities."); *Robinson v. Children's
Hosp. Boston*, 2016 WL 1337255, at *10 (D. Mass. Apr. 5, 2016) ("Had the Hospital permitted
her to forgo the [influenza] vaccine . . . , the Hospital could have put the health of vulnerable
patients at risk.").

Here, too, the health and safety risks in allowing Plaintiffs to engage in in-person interactions created an undue hardship to Takeda. Thus, it was not required to grant Plaintiffs' requests for such an accommodation.

> **b.    Exempting Plaintiffs essential in-person interactions would create an undue hardship for Takeda.**

Allowing Plaintiffs to work remotely also would have posed an undue hardship to Takeda. It is undisputed that conducting in-person interactions was critical to their field-based jobs in terms of building relationships, providing necessary customer service, and driving Takeda's business. *See* Section II.C, *supra*. An accommodation that would eliminate an essential function of the job is unreasonable as a matter of law. *Bourque v. Shinseki*, No. CIV.A. 11-10164-RGS, 2011 WL 6148430, at *5 (D. Mass. Dec. 9, 2011).

Moreover, removing in-person interactions from Plaintiffs' job duties would have created significant cost to Takeda. As evidence of this cost, sales of Takeda's primary neuroscience product declined approximately 19% during the initial stages of the COVID-19 pandemic when the country was on lockdown and Takeda was forced to pull its sales team from the field and engage in limited remote sales calls. SUMF ¶¶ 99, 101. Further, in 2023, Takeda evaluated whether, as a business profitability measure, to eliminate its field-based sales force and replace it with solely digital promotions. *Id.* ¶ 102. However, the analysis Takeda conducted to determine the impact that change would have on its revenue projected a substantial decline in sales—a 15% decline. *Id.* ¶ 103. As a result, the Company opted to retain its field-based selling model. *Id.* ¶ 104. This evidence demonstrates that allowing Plaintiffs to work remotely would have had a significant, adverse impact on Takeda's business, including a decline in sales in Plaintiffs' respective territories of between 15% and 19%.

Courts have routinely held that such costs create an undue hardship for employers, and this case is no different. *See Beickert*, 2023 WL 6214236, at *4-6 (granting defendant's motion to dismiss based on finding that allowing plaintiff to teach either remotely or in person while unvaccinated would have posed an undue hardship on defendant either by requiring defendant to hire another teacher to be present in person or by increasing the risk to others' health and safety); *DeVore v. Univ. of Ky. Bd. of Tres.*, No. 522CV00186GFVTEBA, 2023 WL 6150773, at *5-6 (E.D. Ky. Sept. 20, 2023) (granting summary judgment in favor of defendant where plaintiff's position required her physical presence in the office, as well as "daily interaction with faculty, staff, and students"); *Conner*, 2023 WL 5498728, at *6 (holding that to eliminate in-person interactions from plaintiff's job duties would create undue hardship because employer would have had "either to hire an additional employee to perform the duties Plaintiff was hired to perform, or to otherwise overhaul its operations in a manner that permitted the job of Executive Assistant to be performed remotely," either of which would have "substantially increased costs in relation to the conduct of the [employer's] particular business").

Because the undisputed record evidence demonstrates that granting Plaintiffs' accommodation request would have created an undue hardship for Takeda, the Court should grant summary judgment in Takeda's favor.

## C.    The Court Should Dismiss Plaintiffs' Request for Punitive Damages.

Plaintiffs cannot recover punitive damages as a matter of law. Title VII only allows punitive damages if a plaintiff can "demonstrate that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Equal Emp. Opportunity Comm'n v. Aviation Port Servs., LLC*, No. CV 18-10909-FDS, 2020 WL 1550564, at *10 (D. Mass. Apr. 1, 2020). "The justification for punitive damages 'lies in the evil intent of the defendant,' and therefore 'a positive

element of conscious wrongdoing is always required.'" *Id.* (quoting *Kolstad v. ADA*, 527 U.S. 526, 534 (1999)).

Here, Plaintiffs have not adduced even a shred of evidence of reckless or malicious conduct by anyone at Takeda. The undisputed facts demonstrate that Takeda instituted a lawful vaccine policy to protect its employees, HCPs, and patients from the COVID-19 virus. The policy expressly set forth a process to make requests for religious accommodations. Takeda carefully considered each Plaintiff's request, including by conducting interviews, asking for additional information to support their requests, and asking their managers about their in-person interactions. Only after Takeda obtained this information did it deny Plaintiffs' accommodation requests. Even then, it welcomed Plaintiffs to stay with Takeda if they came into compliance with the policy, and only terminated their employment when they refused to do so. Such undisputed facts do not provide a basis for punitive damages. *See Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 149 (1st Cir. 2009) (affirming district court in refusing to instruct the jury on punitive damages and noting that, for purposes of proving the requisite intent to violate Title VII, the "rejection of a requested accommodation does not by itself suggest that the employer knew its conduct may be in violation of the law"); *Aviation Port Servs.*, 2020 WL 1550564, at *10-11 (declining to award punitive damages in Title VII failure to accommodate case where "plaintiff ha[d] not made a sufficient showing that [the employer] terminated the individuals with the requisite malice or reckless indifference to their federally protected rights"); *Aly v. Mohegan Council, Boy Scouts of Am.*, 871 F. Supp. 2d 19, 26-27 (D. Mass. 2012) (granting defendant's motion for judgment as a matter of law and setting aside jury's punitive damages award, noting that "[a] party's mere awareness of the existence of anti-discrimination laws, without more, is not enough to prove that defendant subjectively perceived that its actions could violate plaintiff's federal rights"). Plaintiffs' request

for punitive damages fails as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, Takeda respectfully requests that the Court grant summary judgment in its favor and dismiss the Complaint in its entirety with prejudice.

Dated: August 12, 2024                         Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ *Keri L. Engelman*
            Keri L. Engelman (BBO# 704360)

Celina Antonellis (BBO# 708904)
One Federal Street
Boston, MA 02110
Tel. (617) 341-7700
Fax. (617) 341-7701
keri.engelman@morganlewis.com
celina.antonellis@morganlewis.com

Thomas A. Linthorst*
Jason J. Ranjo*
502 Carnegie Center
Princeton, NJ 08540
Tel. (609) 919-6600
Fax. (609) 919-6701
thomas.linthorst@morganlewis.com
jason.ranjo@morganlewis.com

*Attorneys for Defendant*

*Admitted Pro Hac Vice

38

## **CERTIFICATE OF SERVICE**

I, Keri L. Engelman, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 12, 2024.

*/s/ Keri L. Engelman*
Keri L. Engelman