# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LISA AMOSON, ROBB HUCK, ALECIA
RAMSEY, LARRY HAROLD SAVAGE,
JILLYN SCHMIDT, SANDRA SALAZAR
SILVA, BRITT HAROLD SINGLETON,
SUSAN WELCH, MATTHEW LYNN
HOFFACKER, as the executor of the estate of
Troby Lane Parrish,

        Plaintiffs,

    v.

TAKEDA PHARMACEUTICALS U.S.A.,
INC.,

        Defendant.

Case No.: 1:22-cv-11963-GAO

## DECLARATION OF KERI L. ENGELMAN

I, Keri L. Engelman, hereby state and declare as follows:

1.      I am an attorney admitted to practice before this Court and an attorney of record for Defendant Takeda Pharmaceuticals U.S.A., Inc. ("Takeda") in the above-captioned matter. This declaration is based on my personal knowledge and is submitted in support of Takeda's Motion for Summary Judgment.

2.      A true and correct copy of Takeda's objections and responses to Plaintiffs' First Set of Interrogatories is attached as **Exhibit A**.

3.      A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Mary Elizabeth Denmark is attached as **Exhibit B**.

4.      A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Lisa Amoson is attached as **Exhibit C**.

1

5.     A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Robb Huck is attached as **Exhibit D**.

6.     A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Alecia Ramsey is attached as **Exhibit E**.

7.     A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Larry Harold Savage is attached as **Exhibit F**.

8.     A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Jillyn Schmidt is attached as **Exhibit G**.

9.     A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Sandra Salazar Silva is attached as **Exhibit H**.

10.    A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Britt Harold Singleton is attached as **Exhibit I**.

11.    A true and correct copy of the relevant excerpts and exhibits from the transcript of the deposition of Susan Welch is attached as **Exhibit J**.

12.    A true and correct copy of Takeda's Rule 26(a)(2) expert disclosures and the corresponding expert report of Dr. Daniel Salmon, PhD, MPH is attached as **Exhibit K**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 12, 2024                          */s/ Keri L. Engelman*
                                                 Keri L. Engelman

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LISA AMOSON, ROBB HUCK, TROBY LANE PARRISH, ALECIA RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH, <br><br> Plaintiffs, <br><br> v. <br><br> TAKEDA PHARMACEUTICALS U.S.A., INC., <br><br> Defendant. | Case No.: 1:22-cv-11963-GAO |

### DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Takeda Pharmaceuticals U.S.A., Inc. ("Defendant," "Takeda," or the "Company"), by and through its attorneys, Morgan, Lewis & Bockius LLP, hereby provides the following responses and objections to the First Set of Interrogatories ("Interrogatories") of Plaintiffs Lisa Amoson, Robb Huck, Troby Lane Parrish, Alecia Ramsey, Larry Harold Savage, Jillyn Schmidt, Sandra Salazar Silva, Britt Harold Singleton, and Susan Welch (collectively, "Plaintiffs"). Because Defendant is responding to these Interrogatories based upon information learned to date through its ongoing investigation, Defendant reserves the right to supplement these responses and objections to include or reflect information subsequently acquired. Further, by responding to these Interrogatories, Defendant reserves its right to assert any available defense(s) regardless of the response.

## GENERAL OBJECTIONS

1.    Defendant objects to the Interrogatories to the extent that they seek the disclosure of information and/or documents that are protected by the attorney-client privilege, the work product doctrine, or are protected by any other applicable privilege.

2.    Defendant objects to the Interrogatories and their Definitions to the extent that they seek to impose obligations that exceed or are inconsistent with the Federal Rules of Civil Procedure, the Local Rules, and/or Orders of the Court.  Responses are limited to those required by the applicable procedural rules.

Defendant incorporates these objections into each and every response below to the extent applicable.  Defendant also reserves the right to raise objections at trial regarding the admissibility of any of the information that Defendant provides or agrees to provide.

## SPECIFIC OBJECTIONS AND RESPONSES

1.    Please identify the process by which you developed a policy requiring your employees in the United States to become fully vaccinated against COVID-19, providing a timeline of when the policy was first proposed, identifying all members of any committee studying the proposal, and identifying all persons whose approval was obtained to approve of making the policy mandatory.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is unduly burdensome and overbroad in scope, particularly in asking Defendant to describe an entire "process."  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case, as the process for developing Defendant's COVID-19 vaccination policy is not relevant to the individual decisions whether to grant Plaintiffs' religious exemption requests.  Defendant also objects to this Interrogatory because it assumes facts that have not been established with respect to Defendant's COVID-19 vaccination policy.  Defendant further objects to this Interrogatory to the extent it seeks information subject to the attorney-client privilege, work product doctrine, or any other applicable privilege.**

**Subject to and without waiving the foregoing objections, Defendant states that**

2

Takeda is a patient-focused, R&D-driven global biopharmaceutical company committed to bringing better health for people and a brighter future for the world. Consistent with this core mission, the Company uses a values-based decision-making model that prioritizes the principles of Patient, Trust, Reputation, and Business, in that order. In other words, patients are Takeda's number one priority.

The Company employs approximately 21,000 in the United States and Puerto Rico, including field-based employees in every state in the country. Takeda's field-based employees represent the Company to its customers through in-person interactions with healthcare providers, pharmacies, and institutions. These interactions and the relationships they form are critical to Takeda's ability to serve its patients.

In March 2020, in response to the COVID-19 pandemic, the Company created a U.S. Business Unit COVID-19 Response team ("Response Team"). That team reported to Takeda's U.S. Crisis Management Team ("US CMC"). Takeda's objectives in responding to the COVID-19 pandemic were employee safety, mitigating the spread of the virus, and continuing to deliver medicines to patients safely.

Members of the US CMC and Response Team included Company subject-matter experts in various areas, including Rajeev Venkayya, then-Head of Global Vaccines; Tom Koutsavlis, Chief Medical Officer; and Steve Schaefer, then-Head of the Neuroscience Business Unit. These teams met regularly to guide the Company's decisions related to its response to the COVID-19 pandemic using Takeda's values-based decision-making model.

Following a short operational shutdown in March 2020, Takeda implemented a phased approach for field employees to gradually resume customer visits, where permitted by state/local law and by customer policies/preferences. Takeda was scheduled to move into the final face-to-face phase of that approach in July 2021. However, around that time, the COVID-19 Delta variant began spreading across the world. As reported at the time, the Delta variant was far more contagious than previous variants and potentially more dangerous. In light of these increasing risks—particularly for patients who are immunocompromised and more susceptible to COVID-19—and the availability of COVID-19 vaccinations, many Takeda customers required field-based employees to become vaccinated before conducting in-person visits.

In August 2021, the US CMC met to consider the Company's response to this changing environment. Takeda decided to implement a policy to require all field-based employees to become vaccinated, absent a medical or religious exemption. Takeda also required that other employees be vaccinated to the extent they were to attend in-person activities, such as on-site or off-site meetings.

In reaching this decision, Takeda considered the totality of the circumstances, including the safety risks to patients, customers, and employees from unvaccinated employees; business continuity and continuing to provide medicines to patients; and the psychological benefits to employees from allowing them to return to work.

3

**Takeda also assessed its peer companies, many of which were requiring that all employees become vaccinated.**

**Takeda's COVID-19 vaccination policy went into effect on September 10, 2021 (the "Vaccine Policy").**

2.      Please identify any exemptions from the vaccination policy that were in place from

the time the policy was first implemented until the present.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope and unduly burdensome.  Defendant further objects to this Interrogatory because it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case, particularly insofar as it requests information about exemptions from the Vaccine Policy other than for religious reasons and/or accommodation requests by those not parties to this case. Defendant also objects to this Interrogatory to the extent it seeks discovery regarding any private information of non-parties.**

**Subject to and without waiving the foregoing objections, Defendant states that the Vaccine Policy applied only to U.S. field employees, as well as office and lab-based employees who interacted in-person with other employees, contractors, customers, and/or patients.  Defendant further states that, under the Vaccine Policy, employees could be exempted from the vaccine mandate if qualified for a medical or religious exemption.  By way of further response, pursuant to Fed. R. Civ. P. 33(d), Defendant refers Plaintiff to its COVID-19 vaccination policy in effect during Plaintiffs' employment with Takeda, which is produced herewith bearing Bates labels TAKEDA 000021 to TAKEDA 000022.**

3.      Please state how many of your employees in the United States were required to get

vaccinated under the policy from the date of its implementation until the present time.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Indeed, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

**Subject to and without waiving the foregoing objections, Defendant states that the Vaccine Policy applied only to U.S. field employees, as well as office and lab-based employees who interact in-person with other employees, contractors, customers, and/or patients.  By way of further response, pursuant to Fed. R. Civ. P. 33(d), Defendant refers Plaintiff to its COVID-19 vaccination policy in effect during Plaintiffs' employment with Takeda, which is produced herewith bearing Bates labels**

4

**TAKEDA 000021 to TAKEDA 000022.**

4.    Please state the number of employees who sought a religious exemption from the

vaccination requirement from the date the policy was first announced until the present time.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Indeed, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

5.    Please state what policies are in place to evaluate whether a religious exemption

from the vaccination requirement should be granted from the date the policy was first announced

until the present time.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Indeed, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.  Defendant also objects to this Interrogatory to the extent it seeks information subject to the attorney-client privilege, work product doctrine, or any other applicable privilege.**

**Subject to and without waiving the foregoing objections, Defendant states that Takeda's EEO Policy, Prohibition Against Harassment & Unprofessional/Disrespectful Conduct Policy, Religious Accommodation Policy, and Vaccine Policy applied to the process for evaluating requests for religious exemption from the COVID-19 vaccination policy during Plaintiffs' employment with Takeda. By way of further response, Defendant refers Plaintiffs to the policies produced herewith, bearing Bates labels TAKEDA 000021 to TAKEDA 000027.**

6.    Please state the number of employees granted a religious exemption from the

vaccination requirement under the policies described in your answer to question five.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Indeed, evaluating religious accommodation**

claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.

7.      Please state what policies are in place to evaluate whether a medical exemption from the vaccination requirement should be granted from the date the policy was first announced until the present time.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Plaintiffs do not assert any disability discrimination claims in this case and, as such, Defendant's evaluation of any requests for medical exemption to the Vaccine Policy is irrelevant.**

8.      Please state the number of employees who sought a medical exemption from the vaccination requirement from the date the policy was first announced until the present time.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Plaintiffs do not assert any disability discrimination claims in this case and, as such, Defendant's evaluation of any requests for medical exemption to the Vaccine Policy is irrelevant.  Further, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

9.      Please state the number of employees who were granted both a medical exemption and a religious exemption from the vaccination requirement from the date the policy was first announced until the present time.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it is overbroad in scope.  Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.  Plaintiffs do not assert any disability discrimination claims in this case and, as such, Defendant's evaluation of any requests for medical exemption to the Vaccine Policy is irrelevant.  Further, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

**With respect to Plaintiffs' request for the number of employees granted a religious accommodation, Defendant also objects to this Interrogatory because it is duplicative of Interrogatory No. 6, above. Defendant incorporates herein its objections to Interrogatory No. 6, above.**

10.    Please identify whether there are any bases other than religious or medical grounds for obtaining a medical exemption, and, if there are such other grounds, please state what they are. This request covers the period from the date the policy was first announced until the present time.

**RESPONSE: Defendant objects to this Interrogatory on the grounds that it is overbroad in scope. Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case. Plaintiffs assert only religious discrimination claims in this case and, as such, any other exemptions to the Vaccine Policy are irrelevant. Defendant further objects to this Interrogatory because it is duplicative of Interrogatory No. 2, above. Defendant incorporates herein its objections and response to Interrogatory No. 2, above.**

11.    Please state the number of employees who sought a religious exemption and asserted no other basis for an exemption from the vaccination policy from the date the policy was first announced until the present time.

**RESPONSE: Defendant objects to this Interrogatory on the grounds that it is overbroad in scope. Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case. Plaintiffs assert only religious discrimination claims in this case and, as such, any other exemptions to the Vaccine Policy are irrelevant. Further, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

12.    Please state the number of employees who sought a religious exemption and asserted no other basis for an exemption from the vaccination policy, and were granted a religious exemption, from the date the policy was first announced until the present time.

**RESPONSE: Defendant objects to this Interrogatory on the grounds that it is overbroad in scope. Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case. Plaintiffs assert only religious discrimination**

**claims in this case and, as such, any other exemptions to the Vaccine Policy are irrelevant. Further, evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

13.  Please identify any and all claims asserted against you in the United States asserting that you violated the religious beliefs of an employee by requiring them to get vaccinated as a condition of their employment. This claim pertains to claims filed in state or federal courts, before administrative agencies, or in the form of informal demand letters or attempts to negotiate either continued employment or severance, whether initiated by the employees themselves or through counsel.

**RESPONSE: Defendant objects to this Interrogatory on the grounds that it is unduly burdensome and overbroad in temporal and geographic scope. Defendant further object to this Request to the extent it seeks publicly available documents equally accessible to Plaintiffs. Defendant also objects to this Interrogatory on the grounds that it seeks confidential information about non-parties to this litigation that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case. Evaluating religious accommodation claims involves an individualized inquiry based on the requesting employee's particular circumstances, such that Defendant's decision with respect to one employee is not relevant to the analysis applied to any other employee.**

14.  Please identify whether you have become the target or subject of any investigation for violating the civil rights of your employees originating from any governmental agency anywhere within the United States, whether at the local, county, state or federal level.

**RESPONSE: Defendant objects to this Interrogatory on the grounds that it is unduly burdensome and overbroad in scope, particularly as it relates to information regarding "civil rights" claims, which is beyond the scope of this litigation. Defendant further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor proportional to the needs of this case.**

15.  Please identify the name of the person completing this interrogatory, including their title, and the location of the principal place of business.

**RESPONSE:  Defendant objects to this Interrogatory on the grounds that it imposes obligations on Defendant beyond those required by the applicable Rules.  Defendant further objects to this Interrogatory on the grounds that it seeks confidential information and information that is not relevant to the parties' claims or defenses.**

**Subject to and without waving these objections, Defendant refers Plaintiffs to the signed verification provided below.**

Dated: September 1, 2023                    **MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ *Keri L. Engelman*
       Keri L. Engelman (BBO# 704360)

Celina Antonellis (BBO# 708904)
One Federal Street
Boston, MA 02110
Tel. (617) 341-7700
Fax. (617) 341-7701
keri.engelman@morganlewis.com
celina.antonellis@morganlewis.com

Thomas A. Linthorst*
Jason J. Ranjo*
502 Carnegie Center
Princeton, NJ 08540
Tel. (609) 919-6600
Fax. (609) 919-6701
thomas.linthorst@morganlewis.com
jason.ranjo@morganlewis.com

*Attorneys for Defendant*

*Admitted Pro Hac Vice

## <u>VERIFICATION</u>

Beth Dean, being first duly sworn, states she is the Head of U.S. People Advisory Group for Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"), and although she does not have personal knowledge of all the information set forth in the answer portion of the foregoing responses to Plaintiff's Interrogatories, such information is true and correct upon her information and belief. To the extent Ms. Dean does not have personal knowledge of certain information contained in the answer portion of these responses, that information was collected and assembled by authorized employees who advised they do have personal knowledge of the facts asserted. The information was collected in accordance with the customary process for collecting and assembling such information. Therefore, the answer portions of the foregoing responses are hereby verified on behalf of Defendant Takeda.

_____
Beth Dean

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 1, 2023, the foregoing document was served by electronic mail upon the following:

Christopher DeMatteo
Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
Tel. (203) 393-3017
Fax. (203) 393-9745
cdematteo@pattisandsmith.com

Brian Unger
The Law Offices of
Warner Mendenhall, Inc.
20 Park Plaza, 400-4
Boston, MA 02116
Tel. (617) 297-2227
Fax. (330) 762-9743
brian@warnermendenhall.com

*Attorneys for Plaintiffs*

*/s/ Keri L. Engelman*
Keri L. Engelman

11

# Exhibit B

**LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.**
30(b)(6)    **Mary Elizabeth Denmark on 11/01/2023**

```
 2                                      Pages 1 - 86
 3                                      Exhibits 1 - 23
 4                 UNITED STATES DISTRICT COURT
 5                 DISTRICT OF MASSACHUSETTS
 6                      Civil Action No.: 1:22-cv-11963GAO
 7     **********************************
 8     LISA AMOSON, et al.              *
 9          Plaintiffs,                 *
10     V.                               *
11     TAKEDA PHARMACEUTICALS, USA, INC., *
12          Defendant.                  *
13     **********************************
14
15          Deposition of Takeda Pharmaceuticals, USA,
       Inc., by and through their representative Mary
16     Elizabeth Denmark, called as a witness by counsel for
       the Plaintiffs, pursuant to the applicable provisions
17     of the Massachusetts Rules of Civil Procedure, before
       Jacqueline P. Travis, RPR, CSR, Professional Court
18     Reporter and Notary Public in and for the
       Commonwealth of Massachusetts, taken via Zoom, on
19     Wednesday, November 1, 2023, commencing at 10:00 a.m.
20
21
22
23
24
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

```
 1    APPEARANCES:

 2         (All parties present from
           their respective locations
 3         via Zoom Videoconferencing.)

 4

 5    Representing the Plaintiffs:

 6         Pattis & Associates, LLC

 7         BY:  Christopher DeMatteo, Esquire

 8         383 Orange Street, 1st Floor

 9         New Haven, CT  06511

10         203-393-3017

11         cdematteo@pattislaw.com

12

13    Representing the Defendant:

14         Morgan Lewis

15         BY:  Jason Ranjo, Esquire

16         502 Carnegie Center

17         Princeton, NJ 08540-6241

18         609-919-6669

19         jason.ranjo@morganlewis.com

20

21    ALSO PRESENT:

22         Sonali Das, in-house legal counsel for Takeda

23    Pharmaceuticals, USA, Inc.

24
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

30(b)(6)                    Mary Elizabeth Denmark on 11/01/2023                    Page 3

```
 1                    I N D E X

 2

 3  Testimony of:                           Page(s)

 4  Mary Elizabeth Denmark

 5  By Mr. DeMatteo                                4

 6
                       E X H I B I T S
 7

 8  Exhibit No.        Description            For I.D.

 9  Exhibit  1    Deposition Notice                7

10  Exhibit  2    Defendant's Objections to
                  Plaintiffs' Notice of Rule
11                30(b)(6) Deposition              8

12  Exhibit  3    Complaint                        9

13  Exhibit  4    Defendant's Answer and
                  Defenses to the Complaint        9
14

15  Exhibit  5    Email dated September 10, 2021   23

16  Exhibit  8    Email dated October 26, 2021     50

17  Exhibit  9    Email dated October 14, 2021     57

18  Exhibit 11    Email dated October 14, 2021     60

19  Exhibit 12    Email dated October 13, 2021     62

20  Exhibit 14    Email dated October 13, 2021     63

21  Exhibit 16    Email dated October 14, 2021     65

22  Exhibit 17    Email dated October 13, 2021     67

23  Exhibit 18    Email dated October 12, 2021     69

24  Exhibit 19    Email dated October 13, 2021     71
```

**LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.**

```
 1   Exhibit  20  Email dated December 11, 2021        75

 2   Exhibit  21  Interactive Process Notes            76

 3   Exhibit  22  Email dated October 20, 2021         78

 4   Exhibit  23  Email dated October 22, 2021         79

 5

 6

 7              EXHIBITS RETURNED TO MR. DeMATTEO

 8

10   ** Exhibits 6,7,10,13,15 were not used **
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                  P-R-O-C-E-E-D-I-N-G-S

 2            MARY ELIZABETH DENMARK, having been

 3   satisfactorily identified and duly sworn by the

 4   Notary Public, was examined and testified as follows:

 5              MR. DeMATTEO:  Chris DeMatteo from Pattis &

 6   Associates representing all plaintiffs in this

 7   action.

 8              MR. RANJO:  Jason Ranjo from Morgan Lewis on

 9   behalf of the defendant, Takeda Pharmaceuticals, USA,

10   Inc.

11              MR. DeMATTEO:  Ms. Dean, are you ready to

12   go?

13              THE WITNESS:  I am.

14

15                  DIRECT EXAMINATION

16   BY MR. DeMATTEO:

17       Q.  Good morning.  Would you please just state

18   your name for the record.

19       A.  Sure.  Beth Dean.  Or my legal name is Mary

20   Elizabeth Denmark.

21       Q.  Are you currently employed by Takeda

22   Pharmaceuticals?

23       A.  I am.

24       Q.  What's your position with Takeda?
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

1        A.  I did not.

2        Q.  What is Takeda's business generally?

3        A.  It's a life sciences RD organization in the

4    pharmaceutical industry.

5        Q.  Does it produce any products?

6        A.  It does.

7        Q.  What does it make?

8        A.  We're made of different business units in

9    oncology, rare diseases, neuroscience, GI.  So it's

10   within those kind of business units.  We make drugs

11   specific for those types of patients.

12       Q.  Does Takeda operate in the United States?

13       A.  It does.

14       Q.  Does it operate in all 50 United States?

15       A.  It has entities across the region and we

16   have employees in all states, yes.

17       Q.  Does Takeda employ sales representatives?

18       A.  Yes.

19       Q.  Does it employ sales representatives in all

20   U.S. states?

21           MR. RANJO:  I'm just going to interpose an

22   objection.  I get that you're doing background

23   questions, Chris.  I'll just note, for the record,

24   that these are outside the scope of the corporate rep

```
 1   topics.  Ms. Dean can answer to the extent she can

 2   based on her own personal knowledge.

 3           MR. DeMATTEO:  Well, I'd say it goes to the

 4   policy itself, which is a topic.  But, yeah,

 5   obviously she can answer and we'll see what comes of

 6   it.

 7       A.  Would you mind repeating the question?

 8       Q.  I think the last question I asked was --

 9   actually, Jacqueline, would you please read back the

10   question?

11           (Read back.)

12       A.  I don't know if we have them in all states.

13       Q.  Okay.  You said you've been employed with

14   Takeda for the past four years?

15       A.  Yes.

16       Q.  So you would have started sometime in 2019?

17       A.  With the acquisition of Shire

18   Pharmaceuticals, yes.

19       Q.  What is Shire Pharmaceuticals?

20       A.  Shire -- Takeda acquired Shire

21   Pharmaceuticals, which is another life science -- or

22   was a life science pharmaceutical company.

23       Q.  Is that where you worked before Takeda?

24       A.  Yes.
```

```
 1   when did you become involved in that process?

 2       A.  At the beginning of the pandemic.  So March

 3   of 2020.

 4       Q.  And just what was your role?

 5       A.  The same role that I have today.  U.S.

 6   people advisory head.

 7       Q.  And what was your involvement in developing

 8   COVID-19 policy?

 9       A.  My accountability is for the U.S. region,

10   and so we were asked to work with our

11   interdisciplinary, you know, partners to ensure, you

12   know, folks that were working in the office, we --

13   you know, during the country kind of shut down, that

14   we were working remotely.  So I was helping support

15   when the world kind of shut down how Takeda was going

16   to support our employees at that time.

17       Q.  What are interdisciplinary partners?

18       A.  Facilities, our HR colleagues, our employee

19   safety, security.  In the beginning, those were the

20   key partners.

21       Q.  What do you mean by facilities?

22       A.  We had the head of the U.S. region

23   facilities in management, so making sure that our

24   doors were closed, you know, so that no one was
```

1   coming into the office.  Again, this was -- I'm

2   referring to that early time period in March in 2020.

3          People needed to gain access to, you know,

4   equipment to do their job from home.  We needed

5   facilities to be on board with how we were going to

6   allow for entry to the buildings.

7          Q.  So did Takeda -- there are different

8   divisions of Takeda, but was one of the policies you

9   were involved with developing a remote work policy?

10          A.  At this time we didn't draft a remote work

11   policy.  We communicated that we were moving to a

12   remote.  You know, I'm not recalling the development

13   of a policy.

14          Q.  Okay.  So but at some point Takeda did move

15   to remote work?

16          A.  What time period are you referring to?

17          Q.  I'd say early 2020.

18          A.  We all moved to remote work, but there was

19   no policy that was developed as a result of it.

20          Q.  Specifically, you said you all moved to

21   remote work.  Is that all Takeda employees?

22          A.  What time period are you referring to?

23          Q.  As soon as it started.

24          A.  Yes.

```
1          Q.  Would that include sales representatives?

2          A.  Yes.

3          Q.  How long did that remote work period last?

4          A.  I believe we pre-engaged with our staff in

5     April of 2020 where we had manufacturing employees

6     and biolife centers, which is our plasma donation

7     center, employees returned back to their work

8     environment.

9          Q.  What about sales representatives, was there

10    a time they were returned back to in-person work?

11              MR. RANJO:  I'm going to interpose the same

12    objection, that this is outside the scope of the

13    topic.  I understand you're trying to get background

14    information, but Ms. Dean is not testifying as a

15    corporate representative to discuss the duties and

16    responsibilities of the sales rep in early 2020.  She

17    can answer to the extent she can based on her

18    personal knowledge.

19              MR. DeMATTEO:  Please do.

20              THE WITNESS:  Would you mind just repeating

21    the question about the field staff?

22              MR. DeMATTEO:  Jacqueline, would you mind

23    reading back the question.

24              THE WITNESS:  Thank you.
```

```
 1            (Read back.)

 2       A.   Yes.  They came back in person at a certain

 3   time.

 4       Q.   Do you know what time that was?

 5       A.   I don't.

 6       Q.   Was it in 2020?

 7       A.   I would -- I would be speculating, but that

 8   sounds, you know, right.  There was a time period

 9   where they were being asked to re-engage, vis-à-vis

10   if the provider would allow for that.  And I believe

11   that message went out sometime in 2020.

12       Q.   Okay.  Well, since you're here to testify on

13   the vaccine policy, I might as well get right into

14   it.

15            What was your involvement generally in

16   developing Takeda's COVID-19 vaccine policy?

17       A.   Are you referring to the vaccine

18   requirement?

19       Q.   Yes.

20       A.   Okay.  So my involvement, because that was

21   going to be an HR -- was considered a human resources

22   policy, my involvement was developing it post

23   decision being made.  And so that work ramped up in

24   around September of 2021.
```

1      Q.  Okay.  You said it ramped up in 2021.  When

2  did it first start?

3      A.  What first started?

4      Q.  Developing the vaccine policy.

5      A.  To require vaccines for our field-base or

6  in-person interactions started in September --

7  August, September 2021.

8      Q.  Okay.  So at that time were sales

9  representatives working in the field?

10     A.  They were.

11     Q.  Do you know how long they had been back

12  working in the field before you started working on

13  the vaccine policy?

14     A.  I don't, no.  Because, again, it was based

15  on -- at some period of time was based on employee

16  preference and client preference, and regional, you

17  know, guidance, so.

18     Q.  Okay.  Again, before it started, before

19  Takeda started working on the vaccine policy, did it

20  have any other policies for field employees such as

21  masking or COVID testing?

22     A.  Yes.

23     Q.  What were those policies?

24     A.  The field-based colleagues, I believe, had

1   time?

2       A.  I don't recall the specifics for the field

3   around testing.

4       Q.  **Was there a masking policy at that time for**

5   **field employees?**

6       A.  I don't recall for that time period.

7       Q.  **Okay.  I'm going to show you another**

8   **exhibit.  Let me just open it up.  I just inserted**

9   **Exhibit 5 into the chat box.  Would you please**

10  **download and open it.**

11      A.  Okay.  I have it on my other screen.

12          (Exhibit No. 5, marked; Email dated

13  September 10, 2021.)

14      Q.  **Okay.  Could you identify Exhibit 5?**

15      A.  Sure.  This is a September 10th email that

16  went out to the USBU from the USBU COVID-19 response

17  team.

18      Q.  **Okay.  What's the USBU again?**

19      A.  United States Business Unit.

20      Q.  **Okay.  Are you familiar with this policy**

21  **beyond just seeing the exhibit today?**

22      A.  I'm familiar with this email, yes.

23      Q.  **Does this email reflect the vaccination**

24  **policy that Takeda implemented in 2021?**

1        A.  Yes.

2        Q.  Okay.  Let's just step back again.  You said

3    you were involved in developing this policy?

4        A.  Yes.

5        Q.  Okay.  With whom did you work in developing

6    this policy?

7        A.  There was a U.S. crisis management

8    committee, USCMC, and that committee, which I was a

9    member of at the time, developed -- helped develop

10   the policy.

11       Q.  Can you recall who else was in that

12   committee?

13       A.  Yes.

14       Q.  Who?

15       A.  It was an interdisciplinary committee

16   comprised of myself in human resources, facilities

17   management, legal counsel, environmental health and

18   safety.  We had Ramona Sequeira, who was our U.S.

19   president at the time on our committee.  Subject

20   matter experts from our vaccine and medical, their

21   staff.

22       Q.  Why did Takeda decide to develop a

23   vaccination requirement?

24       A.  Takeda has what we call PTRB where we make

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.
Mary Elizabeth Denmark on 11/01/2023

1    decisions based on patients first, trust second,

2    reputation third, and business fourth.  In that

3    order.  So the PTRB.  So when thinking about our

4    patients, the trust that we need to develop within

5    our communities, the reputation that we have, and

6    then fourth, the business.  We decided based on that

7    kind of decision framework to implement a vaccine

8    policy to ensure the safety of our employees, the

9    safety of our patients, and the communities in which

10   we serve.

11        Q.  Okay.  Let's take a step to each of those.

12   P.  P is patients.  Who does -- for purposes of that,

13   of your definition, who does Takeda consider its

14   patients?

15        A.  The folks that receive our medicines.

16        Q.  So those individuals, they likely receive

17   their prescriptions from physicians, right?

18        A.  That's correct.

19        Q.  Okay.  So how would -- how would a vaccine

20   requirement ensure the safety of patients?  Of

21   consumers of your products?

22        A.  If you think about our sales force in

23   engaging in in-person interactions, they're going in

24   to health care providers, hospitals, health care

1    centers engaging with, you know, with health care

2    providers in those settings.  So in that respect.

3    Touching the patient in that respect.

4         **Q.  Okay.  So wouldn't the patients you're**

5    **referring to be under the care of the health care**

6    **providers?**

7         A.  Yes.

8         **Q.  Okay.  So wouldn't the safety of those**

9    **patients be the responsibility of those providers**

10   **themselves?**

11        MR. RANJO:  Objection to form.

12        You can answer, if you understand.

13        A.  Yes.  And that's why I -- you know, likely

14   many of them had health vaccine requirements for

15   visitors, sales professionals.  Because we were all

16   accountable for keeping our patients safe.

17        **Q.  Okay.  But would you agree that the best --**

18   **the people in the best position to make policies on**

19   **their patient's safety are those physicians**

20   **themselves?**

21        MR. RANJO:  Objection to form.

22        You can answer, if you understand.

23        A.  I think we all have accountability.

24        **Q.  That isn't what I asked.  Could you answer**

1      Q.  You just said that Takeda considered -- puts

2   its patients first, right?  You said that, right?

3      A.  I did, yes.

4      Q.  And that's Takeda's position.  Patients

5   first.

6          MR. RANJO:  Objection to form.

7          You can answer, if you understand.

8      A.  We put patients, trust, reputation and

9   business.  We factor those in in all that we do, yes.

10     Q.  So in developing this vaccine policy, did

11   your committee seek input from actual health care

12   providers that your sales reps were traveling to?

13     A.  No.

14     Q.  So is it fair to say that health care

15   providers did not request such a policy to be made

16   for your sales reps?

17     A.  They did not request it specifically from

18   us, but we were informed that many of them were

19   requiring vaccination to visit their site.

20     Q.  But those were policies set by those

21   providers themselves, right?

22     A.  Correct.

23     Q.  Okay.  And those were policies that were

24   likely developed to protect, you know, their patients

 1   or personnel, right?

 2          MR. RANJO:  Objection to form.  It's also

 3   outside the scope of the deposition.  She can answer

 4   on her personal knowledge, if she can.

 5      A.  I don't know what their motivations were in

 6   developing their own policies.

 7      Q.  Again, Takeda, your sales reps deal with --

 8   they go to health care providers, right?

 9      A.  And in hospitals and institutions,

10   pharmacies, yes.

11      Q.  And they meet with physicians.

12      A.  I think they meet with physicians and other

13   health care providers, yes.

14      Q.  Okay.  By other health care providers are

15   you including nurses?

16      A.  I'm including nurses, nurse practitioners,

17   receptionists, pharmacists.

18      Q.  Now, would you agree -- would Takeda agree

19   that those health care providers have a

20   responsibility to their patients?

21          MR. RANJO:  Objection.  She's not speaking

22   on behalf of the company with respect to the question

23   you just asked.  It's outside the scope.  She can

24   answer on her --

```
 1              MR. DeMATTEO:  I disagree that that's
 2    outside the scope.  It's about the policy.
 3              MR. RANJO:  I don't care whether you
 4    disagree or not.  I just told you that her testimony
 5    will be based on her personal knowledge if she can
 6    even answer that very vague and ridiculous question.
 7              MR. DeMATTEO:  Let's just see if she can
 8    answer it.  We can always deal with it later.
 9         Q.  Can you answer that?
10         A.  I'm sorry, could you repeat the question?
11              MR. DeMATTEO:  Jacqueline, would you mind
12    reading the question back?
13              (Read back.)
14         A.  Yes.
15         Q.  Great.  Okay.  So what was that -- so put
16    patients first, what was the next letter?  Was that T
17    for trust?
18         A.  Yes.
19         Q.  Okay.  What does Takeda mean by that?
20         A.  Trust that we will do the right thing.
21    Trust in, you know, for our people, our patients, and
22    our planet.
23         Q.  What was the next one?  Was it safety?
24         A.  No, that's reputation.
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

1      Q.  Okay.  Reputation.  What does Takeda mean by

2  reputation in that context?

3          MR. RANJO:  Objection to form.

4          You can answer, if you understand.

5      A.  Generally it's around kind of our reputation

6  within the industry and our business.  Serving,

7  again, our patients, our people, and our planet.

8      Q.  Okay.  What was the next one?

9      A.  Business.

10      Q.  Okay.  What does Takeda mean by business in

11  that same context?

12      A.  Business continuity.  Business processes.

13      Q.  Okay.  So we'll take each one -- we already

14  did patients as much as we could.  Going into T for

15  trust, how did that tie into Takeda's decision to

16  institute a vaccination mandate?

17      A.  Trust that we do all that we can do to

18  protect our patients and our employees.

19      Q.  Okay.  So at that time the company viewed

20  the vaccination requirement as the most it could do

21  for trust?

22      A.  What time frame are you referring to?

23  Sorry.

24      Q.  The time frame in which the vaccine policy

```
 1   was developed.

 2        A.   Yes.

 3        Q.   Was it the company's position that the

 4   existing policies that we -- mask wearing and

 5   COVID-19 testing were not adequate?

 6        A.   Once the vaccine became widely available to

 7   the general population we viewed the vaccine as the

 8   strongest layer of protection in addition, you know,

 9   to all the other things that you just referred to.

10        Q.   Why did you -- why did you view the vaccine

11   as the strongest layer of protection?

12        A.   We would follow CDC guidance, and have all

13   along.  And so they had indicated that vaccines work

14   in terms of reducing the impact into, you know, an

15   individual's health.  And then the health of the

16   community, hospitalization, death rates, et cetera.

17        Q.   Was the company's opinion that masking was

18   not effective?

19        A.   Masking in addition to other layers of

20   protection.

21        Q.   What were those other layers?

22        A.   Vaccination, masking, testing, social

23   distancing.

24        Q.   Is it Takeda's position that being
```

1    vaccinated individuals cannot contract COVID-19?

2            MR. RANJO:  Objection to form.

3            You can answer, if you understand.

4        A.  What time frame are you referring to?

5        Q.  **The time frame in which the policy was being**

6    **developed.**

7        A.  No.  We understood that you could -- are you

8    asking about transmission or being infected?

9        Q.  **We'll start with infection.**

10       A.  No.  We knew from the science and from the

11   CDC that you could still be infected, but the impact

12   to that individual resulting in hospitalization or

13   death was lowered if vaccinated.

14       Q.  **Okay.  Now we'll move on to transmission.**

15   **So is it Takeda's position that vaccinated**

16   **individuals could not transmit COVID-19?**

17           MR. RANJO:  Objection to form.

18           You can under, if you understand.

19       A.  What time frame are you referring to?

20       Q.  **For all these questions let's just keep the**

21   **time frame as that in which the vaccination policy**

22   **was being developed.**

23       A.  So at that time frame the Delta variant was

24   -- had entered into the U.S., and so we knew from the

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.
Mary Elizabeth Denmark on 11/01/2023

```
 1   CDC that it also could -- vaccinated individuals
 2   could transmit.  However, the rate of transmission
 3   was lower if you were vaccinated.
 4        Q.  Do you know how much lower?
 5        A.  I don't.
 6        Q.  Did the company consider those rates?
 7        A.  Yes.  Well, we considered CDC guidance.  I'm
 8   not remembering any discussion around those
 9   particular rates.
10        Q.  But anyway, one of the reasons for the
11   policy, you know, going into P, was to protect the
12   patients of health care providers that your sales
13   reps were visiting, right?
14        A.  Correct.
15        Q.  Okay.  Yet, Takeda acknowledges that
16   vaccinated individuals still could transmit COVID-19.
17        A.  The CDC said that too as well, yes.
18        Q.  Right.  And then Takeda is not disputing
19   that fact, is it?
20        A.  No.  Yeah, no.
21        Q.  So even vaccinated employees could still
22   transmit COVID-19 to patients, would that be right?
23        A.  That's what the CDC said, yes.  They also
24   said that transmission was lower if you were
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.
30(b)(6)                Mary Elizabeth Denmark on 11/01/2023                Page 35

1   vaccinated.

2        Q.  Okay.  But, again, transmission was still a

3   possibility?

4            MR. RANJO:  Objection.  Asked and answered

5   three times.

6            MR. DeMATTEO:  She also answered something

7   that I didn't ask.  Let's move on to the next

8   question.

9        Q.  So where were we in the -- so it's patients,

10  trust, safety, business, right?

11       A.  No.

12       Q.  Okay.  Let's go back to business.  So this

13  was also a business decision.  The vaccine policy was

14  also a business decision for Takeda.  What do you

15  mean -- when Takeda means business, is it referring

16  to its profitability?

17           MR. RANJO:  Objection to form.

18       A.  No.  What I also said was that we make

19  decisions based on patients, trust, reputation,

20  business.  Business being the last.

21       Q.  Right.  That's what I wanted to get at.  I

22  wanted to get to business.  So do business

23  considerations include the company's profits?

24       A.  In making this decision, no.  It was the

1    patients, trust, and reputation.

2        Q.  **The vaccine policy had nothing to do with**

3    **the company wanting to increase sales or revenues?**

4        A.  This policy had nothing to do with revenue.

5    It had everything to do with the patients, the trust,

6    and the reputation.  We -- I'll stop there.

7        Q.  **You can finish.  What were you saying?**

8        A.  I answered the question.

9        Q.  **It sounded like you wanted to say something**

10   **else.  What else did you want to say?**

11       MR. RANJO:  Objection.  She just told you

12   she answered your question.

13       Q.  **So in developing this policy, again, how**

14   **long did it take from start to finish to develop the**

15   **vaccine policy?**

16       A.  Are you referring to like the actual writing

17   of the policy or the -- I mean, it was decided in the

18   end of August and it was communicated in September,

19   as you indicated in one of your exhibits.  And it was

20   fully implemented by November 1st.

21       Q.  **Okay.  So that's a period about what, three**

22   **months?**

23       A.  August, September, October, yes.

24       Q.  **In developing the policy did Takeda consider**

```
 1    the possibility of exemptions for employees?

 2        A.   Yes.

 3        Q.   Was one of those exemption categories

 4    medical?

 5        A.   Yes.

 6        Q.   Was another category for exemption

 7    religious?

 8        A.   Yes.

 9        Q.   So, again, developing the policy, did Takeda

10    consider the fact that not -- that some employees

11    would be exempt from it?

12             MR. RANJO:  Objection to form.

13             You can answer, if you can.

14        A.   When developing the policy we were prepared

15    for people to request exemptions.

16        Q.   Okay.  And were you prepared -- was the

17    company prepared to evaluate those requests?

18        A.   Yes.

19        Q.   And was it prepared to fairly grant or deny

20    those requests?

21        A.   Yes.

22        Q.   Did it develop policies in evaluating those

23    requests?

24        A.   We had existing policies, so we didn't have
```

```
 1    to develop new policies around accommodation.

 2         Q.  Are you familiar with the policy that was in

 3    place for evaluating religious exemption requests?

 4         A.  Yes.

 5         Q.  Okay.  What criteria was used to evaluate

 6    those requests?

 7         A.  First, the employee had to demonstrate that

 8    it sincerely held a religious belief, and that there

 9    was no undue hardship.

10         Q.  Let's turn to the first part.  How did

11    Takeda evaluate the sincerity of an employee's

12    claimed religious beliefs?

13         A.  When an employee would request on such an

14    accommodation they were asked if they wanted to

15    provide any supporting documentation.  So it's part

16    of the interactive dialogue.  There was a review of

17    any supporting documentation, asking of some just

18    general probing questions before moving on to the

19    second part of the analysis.

20         Q.  Okay.  Let's just stick with the first part

21    of the analysis.  What are some examples of probing

22    questions?

23         A.  I don't know.  I wasn't part of the actual

24    interviews.
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

1        Q.  Did you review any interviews?

2        A.  Did I review the interviews?

3        Q.  Yes.

4        A.  No.  I wasn't part of them.

5        Q.  Well, again, were transcripts of interviews

6    with employees and Takeda personnel, were those in

7    the documents that you reviewed in preparation for

8    today?

9        A.  No.

10       Q.  Let's move on to the next part of that

11   analysis.  You said that you reviewed for hardship?

12       A.  Yes.

13       Q.  The company would consider hardship.  In

14   that context, how does Takeda define hardship?

15       A.  So we would look at the ability to, you

16   know, perform the essential functions of the job.

17   Which for field-based employees was in-person

18   interactions, ability to be out in the field,

19   engaging with our health care providers and

20   stakeholders and vendors.

21       Q.  And then from there what else would the

22   company look for?

23       A.  I don't think I understand your question.

24   I'm sorry.

1       Q.  Well, you mentioned safety earlier in your

2  testimony.  So let's start with the safety of the

3  employees themselves.  Does the company consider the

4  safety of the employees who are requesting

5  exemptions?

6            MR. RANJO:  Objection to form.

7            You can answer, if you understand.

8       A.  We think about safety in all that we do.  So

9  I don't -- I didn't see it as something you need an

10  accommodation request.

11      Q.  Okay.  You did mention that -- you know, in

12  your -- in P, you know, the company considers

13  patients.  Does the company consider patients in its

14  hardship analysis?

15            MR. RANJO:  Objection to form.

16            You can answer, if you understand.

17      A.  I don't understand.

18      Q.  Well -- okay.

19      A.  That question.  Sorry, Chris.

20      Q.  Let's see if we could make this a little

21  clearer.  So the first part of evaluating religious

22  exemption is the sincerity of the employee's

23  religious beliefs.  And I think you said the second

24  part of the analysis is whether granting an exemption

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.
Mary Elizabeth Denmark on 11/01/2023

1    would create a hardship for the company.  Is that

2    right?

3         A.  The second part is the undue hardship

4    analysis.

5         Q.  Okay.  So let's focus -- I'm going to focus

6    the next few questions on the undue hardship

7    analysis.  What factors go into the undue hardship

8    analysis?

9         A.  We look at the essential functions of the

10   job to determine if we would be able to make any

11   adjustments and still, you know, have them conduct

12   the essential functions of the job.

13        Q.  Okay.  So let's just take that one.  So

14   essential functions of the job for a sales

15   representative would be visiting and interacting with

16   health care providers, right?

17        A.  Yes.

18        Q.  Okay.  So if an employee were able to

19   perform that function without being vaccinated to the

20   COVID-19 virus, would there be an undue hardship on

21   the company?

22        A.  In that regard, the risk and the concerns

23   around patient safety was outside there.

24        Q.  Okay.  So that's what I was getting at.

1    five minute quick bio break, water break?

2        Q.  Yeah, of course.  I would like you to just

3    answer that question though.

4            MR. RANJO:  There's no pending question.

5            MR. DeMATTEO:  There was.  Take the break,

6    we'll come back in five minutes and we'll see if we

7    can make some more progress.

8            THE WITNESS:  Great.  Thank you.

9            (Recess was taken at 11:04 a.m.)

10           (Reconvened at 11:09 a.m.)

11       Q.  (By Mr. DeMatteo)  Any time you need a

12   break, just let us know.  I don't think we're going

13   to spend the whole day here, so anybody needs a

14   break, that's fine with me.

15           Now, I think we left off, Ms. Dean, you were

16   discussing Takeda's holistic approach to safety.  All

17   right?  So individuals that were included in that

18   holistic approach to safety.  Who was Takeda seeking

19   to protect by instituting a vaccine policy?

20       A.  So if I go back, and I just have Exhibit 5

21   up on my other screen, it says very clearly to

22   "protect the health and wellbeing of our employees,

23   patients, and customers to mitigate the spread and to

24   follow our customer's preferences."  So to answer

1  your question, it's the health and wellbeing of our

2  employees, patients, and customers.

3      Q.  Okay.  So we're discussing that in relation

4  to undue hardship, all right?  So is it Takeda's

5  position that an employee who is requesting a vaccine

6  exemption would pose an undue hardship on Takeda if

7  he or she were to contract COVID-19?

8      A.  No.  We weren't looking at the contraction.

9  We were looking at their ability to perform the

10 essential functions of their job.

11     Q.  Okay.  Good.  Glad we got that.  So is

12 Takeda considering the possibility of an unvaccinated

13 employee transmitting the virus to somebody at one of

14 the facilities that person visited in performing the

15 job?

16     A.  Could you repeat the question?

17     Q.  Okay.  Let's break it down.  So one of the

18 -- one of the functions of a sales representative is

19 to visit health care facilities, right?

20     A.  The main function, yes.

21     Q.  Okay.  So was the company considering the

22 risk of an employee, nonvaccinated sales

23 representative possibly transmitting the virus to a

24 person he or she encountered on one of those visits?

```
 1        Q.  Okay.  I just want to make sure -- I'll just
 2   move on.
 3             Okay.  So what else -- so what else went
 4   into the undue analysis -- the undue hardship
 5   analysis?
 6        A.  Looking at the essential functions of the
 7   job.  So we would generally ask the individual how
 8   much of their time is spent out in the field
 9   performing, you know, the essential functions of
10   their job.  We validated, you know, their roles,
11   their types of engagements.
12        Q.  Okay.  I guess we can just move on to
13   specific plaintiffs.  Before we do that, did the
14   vaccine requirement for field employees apply to
15   employees in every state?
16        A.  They applied to every employee -- every
17   field-based employee.  Like I said, I don't know if
18   we have field-based employees in every state.
19        Q.  Are you aware of any individual state
20   policies or laws that prevented such a policy from
21   being enforced?
22             MR. RANJO:  Objection to form.
23             You can answer, if you understand.
24        A.  No.
```

1       Q.   Okay.  I'd like to start focusing on

2   individual plaintiffs in this case.  Are you at all

3   familiar with plaintiff Lisa Amoson?

4       A.   Other than she's a plaintiff.

5       Q.   I'm going to just post an exhibit in the

6   box.  I just posted Exhibit 8.  I didn't -- in case

7   anyone is wondering, I didn't use my Exhibit 6 or 7

8   yet, that's why we're on 8.  Do you mind downloading

9   and opening Exhibit 8?

10      A.   Okay.  It's opened up on my other screen

11  here.

12           (Exhibit No. 8, marked; Email dated October

13  26, 2021.)

14      Q.   Okay.  Exhibit 8 is an email from Christine

15  Mealey.  Do you know who she is?

16      A.   Yes.

17      Q.   Who is she?

18      A.   She is an employee relations partner.

19      Q.   Steve Severino is copied on it.  Do you know

20  who he is?

21      A.   I don't.

22      Q.   And it's directed to Lisa Amoson, who is a

23  plaintiff.  Are you familiar with this email at all?

24      A.   I am not.  I'm not on it.

1          Q.  You did not review it in preparation for

2    today's deposition?

3          A.  I did not.

4          Q.  Okay.  Well, let's take a look at it, and it

5    says "Hi, Lisa.  Thank you for submitting your

6    request for religious exemption from the COVID-19

7    vaccination requirement.  Upon review of the

8    information you provided, Takeda cannot accommodate

9    any conflict between your asserted religious belief

10   and the COVID-19 vaccination requirement."

11             Okay.  That sentence, what do you understand

12   that to mean?

13             MR. RANJO:  Objection.  Outside the scope of

14   the deposition topic.  She can answer to the extent

15   she can based on her personal knowledge.

16         Q.  Can you answer based on that?

17         A.  To me it means that we are not able to

18   accommodate her request.

19         Q.  Okay.  Let's go on to the next line.

20   "Because your essential job functions require in-

21   person attendance and involve direct contact with

22   coworkers and patients who may be contagious and/or

23   particularly vulnerable to COVID-19, your

24   unvaccinated status creates elevated health and

```
 1   She can answer based on her personal knowledge.

 2        A.   If it doesn't say it in the letter, we did

 3   not object to her sincerely held religious beliefs.

 4        Q.   Okay.  When you say we, you mean Takeda did

 5   not object to her sincerely held religious beliefs.

 6        A.   Correct.

 7        Q.   Okay.  Let's move on to another plaintiff.

 8   I just inserted Exhibit 9 into the chat box.  Could

 9   you please download, open, take a look at it.

10        A.   Okay.  It's opened.

11             (Exhibit No. 9, marked; Email dated October

12   14, 2021.)

13        Q.   Okay.  Here we have an email from Irving

14   Forester?

15        A.   Forestier, yeah.

16        Q.   I wasn't sure if it was Forestier,

17   Forest-ay.

18             Okay.  Who is Mr. Forestier.

19        A.   He's an employee relations partner.

20        Q.   Also copied to Staci Thompson and Kelly

21   Hanson.  Do you know who either of those people are?

22        A.   I don't.

23        Q.   Have you ever seen this particular email?

24        A.   No.
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

30(b)(6)                Mary Elizabeth Denmark on 11/01/2023                Page 58

```
 1        Q.  So it's not something that you reviewed in
 2   preparation for today's deposition?
 3        A.  That's correct.
 4        Q.  Okay.  So I'll just read the first
 5   paragraph.  "Dear Robb, thank you for submitting your
 6   request for religious exemption from the COVID-19
 7   vaccination requirement.  Upon review of the
 8   information you provided, Takeda cannot accommodate
 9   any conflict between your asserted religious beliefs
10   and the COVID-19 vaccination requirement.  Because
11   your essential job functions require in-person
12   attendance and involve contact with customers,
13   coworkers, and patients who may be contagious and/or
14   particularly vulnerable to COVID-19, your
15   unvaccinated status creates elevated health and
16   safety risks and presents an undue hardship for the
17   company."
18             So, again, this, this paragraph does not
19   reference Mr. Huck's -- does not reference the
20   sincerity of Mr. Huck's claim for religious beliefs;
21   is that fair to say?
22        A.  Yes.
23        Q.  Okay.  So if it does not -- since it does
24   not address Mr. Huck's religious beliefs or
```

```
 1        Q.  Okay.  Is that part of, you know, any policy

 2   in evaluating those exemption requests?

 3        MR. RANJO:  Objection to form.

 4        A.  I'm not sure I understand your question.

 5        Q.  Okay.  Well, you stated that if Takeda

 6   objected to an employee's -- to the sincerity of an

 7   employee's stated religious beliefs it would put that

 8   in the letter, right?

 9        A.  Correct.

10        Q.  Okay.  Is that because Takeda has a policy

11   in evaluating those exemption requests to state that

12   in communications to employees?

13        MR. RANJO:  Objection to form.

14        A.  We have a religious accommodation policy and

15   we have -- we're transparent around why things are

16   denied.

17        Q.  Okay.  That's -- thank you.

18        So let me put another letter into the box.

19   I just inserted Exhibit 11 into the chat box, Ms.

20   Dean.  Would you mind downloading and opening that

21   one?

22        A.  Sure.  Okay.  It's open.

23        (Exhibit No. 11, marked; Email dated October

24   14, 2021.)
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.
Mary Elizabeth Denmark on 11/01/2023

1           Q.   This is another letter, another email from

2      Irving Forestier as to Alecia Ramsey.   Are you

3      familiar with plaintiff Alecia Ramsey?

4           A.   Other than she's a plaintiff, that's all I

5      know.

6           Q.   Okay.   Did you review this email?

7           A.   No.

8           Q.   Again, I'll read the first paragraph.   "Dear

9      Alecia, thank your for submitting your request for

10     religious exemption from the COVID-19 vaccination

11     requirement.   Upon review of the information you

12     provided, Takeda cannot accommodate any conflict

13     between your asserted religious beliefs and the

14     COVID-19 vaccination requirement.   Because your

15     essential functions require in-person attendance and

16     involve direct contact with customers, coworkers, and

17     patients who may be contagious and/or particularly

18     vulnerable to COVID-19, your unvaccinated status

19     creates elevated health and safety risks and presents

20     an undue hardship for the company."

21           Again, I'll just be brief.   Was there any

22     reference to the sincerity or lack of sincerity of

23     Ms. Ramsey's stated religious beliefs in this email?

24           A.   No.

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

30(b)(6)                    Mary Elizabeth Denmark on 11/01/2023                    Page 62

```
 1        Q.  I'm going to put another one in.  I just
 2   uploaded -- well, it's uploading now, Exhibit 12.
 3   Would you mind downloading and opening that one when
 4   it appears.
 5        A.  Okay.  It's up now.
 6            (Exhibit No. 12, marked; Email dated October
 7   13, 2021.)
 8        Q.  This is another email from Christine Mealey.
 9   It's directed to Larry Savage.  Do you have any --
10   are you familiar with plaintiff Larry Savage at all?
11        A.  Other than he's a plaintiff.
12        Q.  Corey Bush is copied on the email.  Do you
13   know who Corey Bush is?
14        A.  I don't.
15        Q.  So, again, just quickly read.  "Dear Larry,
16   thank you for submitting your request for religious
17   exemption with the COVID-19 requirement.  Upon review
18   of the information you provided, Takeda cannot
19   accommodate any conflict between your asserted
20   religious beliefs and the COVID-19 vaccination
21   requirement.  Because your essential job function
22   requires in-person attendance and involves direct
23   contact with coworkers and patients who may be
24   contagious and/or particularly vulnerable to
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

30(b)(6)                    Mary Elizabeth Denmark on 11/01/2023          Page 63

```
 1   COVID-19, your unvaccinated status creates elevated
 2   health and safety risks and presents an undue
 3   hardship for the company."
 4          In this email is there any reference to
 5   Mr. -- to the sincerity of Mr. Savage's stated
 6   religious beliefs?
 7       A.  No.
 8       Q.  I just inserted Exhibit 14 into the chat
 9   box.  Ms. Dean, would you mind downloading and
10   opening this exhibit?
11       A.  Okay.  It's open.
12          (Exhibit No. 14, marked; Email dated October
13   13, 2021.)
14       Q.  It's an email between Christine Mealey and
15   Jillyn Schmidt.  Are you at all familiar with
16   plaintiff Jillyn Schmidt?
17       A.  Other than she's a plaintiff.
18       Q.  Okay.  Have you seen this email before?
19       A.  I have not.
20       Q.  Again, the first paragraph, "Dear Jillyn" --
21   well, first two paragraphs.  "Thank you for
22   submitting your request for religious exemption from
23   the COVID-19 vaccination requirement.  Upon review of
24   the information you provided, Takeda cannot
```

1    accommodate any conflict between your asserted

2    religious beliefs and the COVID-19 vaccination

3    requirement.  Because your essential job functions

4    require in-person attendance and involve direct

5    contact with coworkers and patients who may be

6    contagious and/or particularly vulnerable to

7    COVID-19, your unvaccinated status creates an

8    elevated health and safety risk and presents an undue

9    hardship for the company.

10          "Furthermore, allowing you to work remotely

11    when most health care providers in your area are

12    allowing face-to-face meetings will create a

13    territory in which our commercial efforts are not

14    maximized and may require personnel changes in order

15    to enable the face-to-face interactions that over

16    time have been shown to lead to the highest level of

17    commercial success.  This too presents an undue

18    hardship for Takeda under applicable law.  Therefore,

19    your request for religious exemption from COVID-19

20    vaccination requirement is denied."

21          Ms. Dean, is there any reference to the

22    sincerity or insincerity of Ms. Schmidt's asserted

23    religious beliefs in this communication?

24          A.  No.

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

30(b)(6)                Mary Elizabeth Denmark on 11/01/2023                Page 65

```
 1        Q.  Ms. Dean, are you familiar with plaintiff
 2   Britt Singleton?
 3        A.  Other than he's a plaintiff.
 4        Q.  Okay.  Let's -- I just uploaded Exhibit 16.
 5   Ms. Dean, would you please download and open that one
 6   as well?
 7             Do you have it open yet?
 8        A.  Sorry, I had to minimize other windows to
 9   get it to stay.  Hold on.  Okay, it's open.
10             (Exhibit No. 16, marked; Email dated October
11   14, 2021.)
12        Q.  Okay.  Britt Singleton states that he's a
13   patient access manager.  Do you know what a patient
14   access manager is?
15        A.  I can't -- I don't know what their detailed
16   job description is, no.  I wouldn't be able to speak
17   to it.
18        Q.  Again, this is an email sent to
19   Mr. Singleton from Christine Mealey.  Pete Fresca is
20   copied on it.  Do you know who Pete Fresca is?
21        A.  I don't.
22        Q.  The subject is religious accommodation
23   response, Britt Singleton.  Let's read the first
24   paragraph again.  "Dear Britt, thank you for
```

1    submitting your request for religious exemption from

2    the COVID-19 vaccination requirement.  Upon review of

3    information you provided, Takeda cannot accommodate

4    any conflict between your asserted religious beliefs

5    and the COVID-19 vaccination requirement.  Because

6    your essential job functions require in-person

7    attendance, involve direct contact with coworkers and

8    patients who may be contagious and/or particularly

9    vulnerable to COVID-19, your unvaccinated status

10   creates elevated health and safety risks and presents

11   an undue hardship for the company.

12          "Furthermore, allowing you to work remotely

13   when most health care providers in your area are

14   allowing face-to-face meetings will create a

15   territory in which our commercial efforts are not

16   maximized and may require personnel changes in order

17   to enable face-to-face interactions that over time

18   have been shown to lead to the highest level of

19   commercial success.  This too presents an undue

20   hardship for Takeda under applicable law.  Therefore,

21   your request for religious exemption from COVID-19

22   vaccination requirement is denied."

23          Does this communication reference Takeda's

24   position on the sincerity or insincerity of

```
 1    Mr. Singleton's asserted religious beliefs?

 2        A.  It does not.

 3        Q.  I just uploaded what's marked as Exhibit 17

 4    into the chat box.  Ms. Dean, would you please

 5    download and open that one.

 6        A.  Okay.  It's open.

 7            (Exhibit No. 17, marked; Email dated October

 8    13, 2021.)

 9        Q.  Okay.  Now, this is an email sent by Irving

10    Forestier to Christine Mealey on October 13th, 2021

11    at 11:03 a.m., and it looks like you're copied on it.

12    Is that you in the cc field?

13        A.  Yes.

14        Q.  Have you seen this email before?

15        A.  Okay.

16        Q.  Have you seen this before?

17        A.  Sorry.  Not in preparation for today's

18    meeting.

19        Q.  Okay.  Well, again, so this isn't something

20    that you reviewed for today, was it?

21        A.  No.

22        Q.  But it is something that you had seen

23    previously before you prepared for today?

24        A.  Yes, I would have seen this.
```

```
 1   job description?"
 2           Reading that now, do you recall what this
 3   email discussion was about?
 4       A.  It tends to -- I believe what they're
 5   referring to is that there might have been another
 6   individual in a similar role with a different
 7   manager.  And wanting to align, again, on the
 8   essential functions of the job.  Maybe they were
 9   hearing inconsistencies in what those were.
10           I would be -- at this time, again, because I
11   was not directly engaging with the employees, I was
12   not directly engaging with the managers, you know,
13   definitely supporting the team through this process.
14   So I imagine that there was, you know, a disconnect
15   with the information they were receiving.  Whether
16   that be from the employees or the managers.
17       Q.  Okay.  Let's go to that top email, the one
18   sent at 5:01, which was sent from -- sent by
19   Christine Mealey to you, Irving Forestier, and
20   Roberta Newcomb.  That's the one in which Christine
21   Mealey states "We can, but I support undue hardships
22   so I am fine with it."
23           Do you have any idea what she's referring to
24   with that statement?
```

LISA AMOSON, ET AL. vs TAKEDA PHARMACEUTICALS, USA, INC.

30(b)(6)                    Mary Elizabeth Denmark on 11/01/2023                    Page 75

```
 1               (Reconvened at 12:02 p.m.)

 2        Q.  (By Mr. DeMatteo)  Let me upload another

 3   exhibit.  I just inserted Exhibit 20.  Ms. Dean,

 4   would you please download and open Exhibit 20.

 5        A.  Okay.  It's open.

 6               (Exhibit No. 20, marked; Email dated

 7   December 11, 2021.)

 8        Q.  All right.  Exhibit 20, it looks like two

 9   emails here.  Well, three.  Let me just scroll down

10   to the third one.  It looks like there is an email --

11   I'd like to direct your attention to the middle of

12   the screen, there is an email from Irving Forestier

13   to Susan Welch.  Are you familiar with Susan Welch at

14   all?

15        A.  Other than being a plaintiff.

16        Q.  Then copied on that are -- it looks like two

17   people, Shannon Exner and Staci Thompson.  Do you

18   know who either of those individuals are?

19        A.  Staci Thompson is an HR business partner.  I

20   don't know Shannon.

21        Q.  Let's just read that first greeting in the

22   first paragraph.  "Dear Susan, thank you for

23   submitting your request for religious exemption from

24   the COVID-19 vaccination requirement.  Upon review of
```

1    the information you provided, Takeda cannot

2    accommodate any conflict between your asserted

3    religious beliefs and the COVID-19 vaccination

4    requirement.  Because your essential job functions

5    involve in-person attendance and involves direct

6    contact with customers, coworkers, and patients who

7    may be contagious and/or particularly vulnerable to

8    COVID-19, your unvaccinated status creates elevated

9    health and safety risks and presents an undue

10   hardship for the company."

11          Was there any mention in this email

12   communication regarding Takeda's position on the

13   sincerity of Ms. Welch's religious beliefs?

14       A.  No.

15       Q.  Okay.  I have another -- just a few more.  I

16   just inserted Exhibit 21 into the chat.  Would you

17   please download and open Exhibit 21.

18       A.  Okay.  Chris, it's open.

19          (Exhibit No. 21, marked; Interactive Process

20   Notes.)

21       Q.  Exhibit 21 is interactive process notes for

22   Susan Welch.  Are you -- I think you mentioned the

23   term interactive process notes previously.  What are

24   interactive process notes?

1      A.  What are interactive process notes?

2      Q.  Right.

3      A.  I would say that they're notes about the

4  interactive process.

5      Q.  Have you ever seen these notes before?

6  These particular notes?

7      A.  No.

8      Q.  So looking at this exhibit, it appears to be

9  some questions and answers between Irving Forestier

10  and Susan Welch.  To your knowledge did the religious

11  accommodation requirement require an interview

12  between the company and the employee?

13      A.  That's what we did.  I don't know if it's a

14  requirement, but we certainly engaged in interactive

15  dialogue with the employee, for sure.

16      Q.  Now, and just did you have any role in

17  developing that interactive dialogue process?

18      A.  The process is already -- there was already

19  a process before this, so.

20      Q.  Okay.  So I mean, just looking at this, are

21  these standard questions for that existing process?

22      A.  These, I believe, are standard.  Some of

23  them are standard process for this, but then one's

24  very specific about fetal cells.  That appears to be

1    very unique to the vaccine.  Religious, you know,

2    inquiry.

3         Q.  In terms of who made the ultimate decisions

4    -- well, who made the ultimate decision to grant or

5    deny an employee's exemption request?

6         A.  Whoever sent the email to the employees.

7         Q.  Okay.  So for Ms. Welch's case, I believe

8    that would be Mr. Forestier?

9         A.  That's correct.

10        Q.  And then in the emails, you know, that

11   Christine Mealey sent, she was the one making that

12   decision?

13        A.  Yes.

14        Q.  I think I just have two more exhibits.  Just

15   give me a minute so I can -- what we're going to do

16   is just rename them so it's consistent with what we

17   were doing today.  So that was Exhibit 21.  I just

18   inserted what I marked as Exhibit 22, Parrish.  Would

19   you please download and open Exhibit 22.

20        A.  Okay.

21             (Exhibit No. 22, marked; Email dated October

22   20, 2021.)

23        Q.  All right.  This is an email from Irving

24   Forestier to Troby Parrish.  Are you at all familiar

1   with plaintiff Troby Parrish?

2       A.  Other than he's a plaintiff.

3       Q.  Okay.  Have you ever seen this email before?

4       A.  I have not.  No.

5       Q.  In this looks like Mr. Forestier writes "Hi

6   Troby, it was a pleasure meeting you and talking to

7   you yesterday.  Troby, I do not think that anybody in

8   PAG or in legal would ask that question.  As

9   explained to you, we know your belief is sincerely

10  held.  That is not in question."

11          Again, do you know -- what was Irving

12  Forestier's position again?

13      A.  Employee relations partner.

14      Q.  And he was a person who was evaluating

15  exemption requests?

16      A.  Yes.

17      Q.  This should be my last exhibit.

18          I just inserted Exhibit 23 into the chat.

19  Ms. Dean, would you please download and open up that

20  one.

21      A.  Okay.

22          (Exhibit No. 23, marked; Email dated October

23  22, 2021.)

24      Q.  This is an email from Irving Forestier to

1    plaintiff Troby Parrish, sent on October 22nd, 2021.

2    Have you ever seen this email?

3         A.  I have not.

4         Q.  Copied on it are Michael Maddock and Staci

5    Thompson.  I think you mentioned Staci Thompson

6    already.  Do you know who Michael Maddock is?

7         A.  I do not.

8         Q.  Now, in this email Mr. Forestier writes

9    "Dear Troby, thank you for submitting your request

10   for religious exemption for COVID-19 vaccination

11   requirement.  Upon review of information you

12   provided, Takeda cannot approve your request.

13   Because your essential job functions require

14   in-person attendance and involve direct contact with

15   coworkers, health care providers, and patients who

16   may be contagious and/or particularly vulnerable to

17   COVID-19, your undocumented status creates elevated

18   health and safety risks, and presents undue hardship

19   for the company.

20        "Furthermore, allowing you to work remotely

21   when most health care providers in your area are

22   allowing face-to-face meetings will create a

23   territory in which our commercial efforts are not

24   maximized and may require personnel changes in order

1    to enable the face-to-face interactions that over

2    time have been shown to lead to the highest level of

3    commercial success.  This too presents an undue

4    hardship for Takeda under applicable law."

5         So, based on what you had said previously,

6    that the person from Takeda who sent an email denying

7    an employee's exemption request was, you know, the

8    person who made that decision, does it follow that

9    Mr. Forestier was the one who made the decision to

10   deny plaintiff Parrish's request?

11        A.  Yes.

12        Q.  And then, again, in these emails, that

13   Mr. Forestier was speaking on behalf of the company,

14   right?

15        A.  Yes.

16        Q.  And same thing, anyone who sent any of the

17   Takeda employees, who made these decisions and sent

18   these emails are speaking on behalf of Takeda?

19             MR. RANJO:  Objection to form.

20             You can answer, if you understand.

21        A.  When you say anyone, can you...

22        Q.  Sorry.  In these emails which, you know, for

23   our purposes, denied the plaintiffs' request for

24   reasonable accommodations, the Takeda people, Irving

1    Forestier, Christine Mealey, they were speaking on

2    behalf of Takeda when they wrote these, right?

3             MR. RANJO:   Same objection.

4        A.   Yes.

5        Q.   All right.   Really just a few more things.

6             You stated earlier this morning that you

7    were involved in the development of implementation of

8    Takeda's COVID-19 vaccination requirement.   When did

9    your work on that policy end?

10       A.   I mean, the policy remained in effect for

11   quite some time, so I don't know what you mean by

12   work.

13       Q.   I mean, so the policy was implemented in

14   September of 2021?

15       A.   It was communicated.   It was effective

16   November 1st.

17       Q.   Okay.   Did you have any involvement with

18   implementing the policy after November 1st of 2021?

19       A.   Once it was implemented, you know, we still

20   were undergoing accommodation requests for any new

21   hires that might've been hired.

22            So the accommodation process had stopped,

23   but once it was communicated my role in the

24   implementation process, I guess, was ceased.

```
 1        Q.  You said just a few minutes ago that the

 2   policy remained in effect for some time.

 3        A.  Mm-hmm.

 4        Q.  Do you know how long it remained in effect?

 5            MR. RANJO:  Objection.  Outside of the scope

 6   of the topics.  She can answer based on her personal

 7   knowledge, if she can.

 8        A.  I believe May of 2023.

 9            MR. DeMATTEO:  I actually don't have any

10   other questions.

11            MR. RANJO:  I don't have any questions

12   either.

13            (Whereupon the deposition concluded at

14   12:20 p.m.)

15

16

17

18

19

20

21

22

23

24
```

```
 1              CERTIFICATE OF COURT REPORTER

 2          I, Jacqueline P. Travis, Registered

 3  Professional Reporter, do certify that the deposition

 4  of MARY ELIZABETH DENMARK, in the matter of Amoson,

 5  et al. V. Takeda, on November 1, 2023, was

 6  stenographically recorded by me; that the witness

 7  provided satisfactory evidence of identification, as

 8  prescribed by Executive Order 455 (03-13) issued by

 9  the Governor of the Commonwealth of Massachusetts,

10  before being sworn by me, a Notary Public in and for

11  the Commonwealth of Massachusetts; that the

12  transcript produced by me is a true and accurate

13  record of the proceedings to the best of my ability;

14  that I am neither counsel for, related to, nor

15  employed by any of the parties to the above action;

16  and further that I am not a relative or employee of

17  any attorney or counsel employed by the parties

18  thereto, nor financially or otherwise interested in

19  the outcome of the action.

20  Jacqueline P. Travis, RPR, CSR

21  _____  November 9, 2023

22  Jacqueline P. Travis, RPR, CSR

23

24
```

**From:**      USBU Communications <SMB.USBUCommunications@Takeda.com>
**Sent:**      Friday, September 10, 2021 12:33 PM
**Cc:**        USBU Communications
**Subject:**   COVID-19 Update: Important USBU Vaccination and Testing Requirements

To:  All USBU Employees and Contractors



September 10, 2021

Dear Colleagues,

As you saw in today's announcement [s2.bl-1.com] from the U.S. Crisis Management Committee (US CMC), office-based and lab-based employees must be vaccinated to interact in-person with other employees, contractors, customers and patients, whether at a Takeda site or off-site. This impacts many of our USBU office-based employees and contractors.

Similarly, across the country, we are increasingly and consistently hearing from customers, and their respective healthcare institutions, that they now require proof of vaccination before entering their healthcare facilities. Requests like this will likely continue to increase as the virus progresses, in an effort to help reduce the risk of infection and transmission.

As the COVID-19 landscape continues to ebb and flow, we revisit our ways of working according to what we learn, while always remaining grounded in our Takeda values of patient-trust-reputation-business and our guiding principles (1) to protect the health and well-being of employees, patients and customers, (2) to mitigate virus spread, and (3) to follow our customers' preferences and requirements. With this in mind, **Takeda is implementing the following requirements**.



**Vaccination is required for all field employees. What does this mean for you?**
- If you are a field employee in the U.S. who calls on customers or patients as part of your role, <u>you must be fully vaccinated* by November 1, 2021</u>.
- Unvaccinated field employees are encouraged to schedule vaccination immediately, noting the recommended timeline [s2.bl-1.com] for COVID-19 vaccines that require 2 shots.
  - Pfizer-BioNTech COVID-19 vaccine: 2nd shot 3 weeks (or 21 days) after first
  - Moderna COVID-19 vaccine: 2nd shot 4 weeks (or 28 days) after first
- If you are unable to get vaccinated due to medical or religious reasons, please complete the medical [s2.bl-1.com] or religious [s2.bl-1.com] accommodation forms as soon as possible.
- A process for documenting proof of vaccination will be shared no later than mid-October.

1

- Failing to show proof of vaccination or an approved HR accommodation by November 1st, will result in separation from the company.

*\*Full vaccination means ≥ 2 weeks after receiving the second dose in a 2-dose series, or ≥ 2 weeks after receiving a single-dose vaccine.*

Vaccination provides the most effective layer of protection against COVID-19 and its variants, yet it is possible that even fully vaccinated individuals can become infected and transmit the virus, particularly in geographies with high transmission rates. Face masks and testing provide important added layers of protection. The more layers of protection that we utilize, the greater our defense. Therefore, we've added back the layer of protection provided by testing.

 **COVID-19 testing required for business travel, off-site meetings, congresses and speaker programs\*\***

- Any USBU employee (customer-facing or office-based) who travels by plane or long-distance train (e.g. Acela) to meet with employees, customers, patients or other colleagues is required to have a negative COVID-19 PCR test result within 7 days prior to boarding the flight or train.
- Any USBU employee attending off-site Takeda meetings, congresses, and speaker programs is required to have a negative COVID-19 PCR test result within 7 days prior to attending the meeting.
- Office-based employees, please use Color Genomics COVID-19 testing. The on-site testing FAQ can be found here [s2.bl-1.com] and at-home testing FAQ can be found here [s2.bl-1.com]. Below are helpful links.
  - Color Genomics at-home testing link for Cambridge-based employees: https://www.color.com/takeda-cambridgesquares [s2.bl-1.com]
  - Color Genomics at-home testing link for Lexington-based employees: https://www.color.com/takeda-lexingtonrnd [s2.bl-1.com]
- Field-based employees please use LabCorp COVID-19 testing.
  - Click here [s2.bl-1.com] for the LabCorp at-home testing login and registration.

*\*\* Employees have 2 weeks from the date of this announcement to comply with this testing requirement.*

All other previously communicated guidance remains unchanged and in effect until further notice. For reference, click here [s2.bl-1.com] for a summary infographic of current guidance. Answers to frequently asked questions will be available on the USBU COVID-19 microsite [s2.bl-1.com] shortly.

Please join me, Ramona Sequeira and members of the ELT on **Tuesday**, **September 14th** for a **Fireside Chat and Q&A with USBU and US-based GPLS colleagues**. We'll talk about our new hybrid working approach and how we are continuing to adapt to the dynamic environment. A calendar invite with details will follow.

Thank you for your continued compliance and patience.

Steve Schaefer
SVP, Business Unit Lead, NSBU, and Chief Operating Officer, USBU
On behalf of the USBU COVID-19 Response Team

TAKEDA 000022

EXHIBIT   8

M. Denmark
11/01/2023
Stenographer:
Jacqueline P. Travis, RPR, CSR

**From:**          Mealey, Christine
**Sent:**          Tuesday, October 26, 2021 12:56 PM
**To:**            Amoson, Lisa
**Cc:**             Severino, Steve
**Subject:**       Religious Accommodation Response - Lisa Amoson

Hi Lisa,

Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement.

Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement.  Because your essential job functions require in-person attendance and involve direct contact with co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company.  Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law.  Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated. Since your request for accommodation has been denied, you will have the opportunity to comply with the policy by becoming partially vaccinated and recording this as directed in the VaxDMS system prior to November 1, 2021.  In such a case, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work together to stay safe during the pandemic.  We understand that becoming vaccinated is an important personal decision.  If you have any questions, please let me know.

Kind Regards,


*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

CONFIDENTIAL                                                          TAKEDA_018575

**Request for Reasonable Accommodation**

EXHIBIT 9

M. Denmark
11/01/2023

Stenographer:
Jacqueline P. Travis, RPR, CSR

**From:** Forestier, Irving irving.forestier@takeda.com
**To:** Huck, Robb robb.huck@takeda.com
**Cc:** Thompson, Staci staci.thompson@takeda.com, Hanson, Kelly
    kelly.hanson@takeda.com
**Date:** Thu, Oct 14, 2021, 3:48 PM

Dear Robb,

Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement. Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement. Because your essential job functions require in-person attendance and involve direct contact with costumers, co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company.

Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law. Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated.
However, you will have the opportunity to comply with the policy by becoming partially vaccinated (i.e., receiving the first of a two-dose or one-dose series) and recording this as directed in the VaxDMS system prior to November 1, 2021. In such a case, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

1 / 2

Thank you for your understanding as we work together to stay safe during the pandemic. We understand that becoming vaccinated is an important personal decision. If you have any questions, please let me know.

Kind Regards



**Better Health, Brighter Future**
Irving I. Forestier
Employee Relations Partner
**Takeda Pharmaceutical Company Limited**
45 Hayden Avenue
Lexington, MA  02421
*Office:* 978.735.3163
irving.forestier@Takeda.com





| From: | Forestier, Irving |
|---|---|
| Sent: | Thursday, October 14, 2021 4:53 PM |
| To: | Ramsey, Alecia |
| Cc: | Rohrbach, Rachel; Thompson, Staci |
| Subject: | Request for Reasonable Accommodation |

Dear Alecia,

Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement. Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement. Because your essential job functions require in-person attendance and involve direct contact with costumers, co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company.

Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law. Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated. However, you will have the opportunity to comply with the policy by becoming partially vaccinated (i.e., receiving the first of a two-dose or one-dose series) and recording this as directed in the VaxDMS system prior to November 1, 2021. In such a case, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work together to stay safe during the pandemic. We understand that becoming vaccinated is an important personal decision. If you have any questions, please let me know.

Kind Regards



Better Health, Brighter Future

Irving I. Forestier
Employee Relations Partner
**Takeda Pharmaceutical Company Limited**
45 Hayden Avenue
Lexington, MA  02421
Office: 978.735.3163
irving.forestier@Takeda.com

CONFIDENTIAL                                      TAKEDA_018271

EXHIBIT 12

M. Denmark
11/01/2023
Stenographer:
Jacqueline P. Travis, RPR, CSR

| | |
|---|---|
| **From:** | Mealey, Christine |
| **Sent:** | Wednesday, October 13, 2021 3:21 PM |
| **To:** | Savage, Larry |
| **Cc:** | Bush, Corey |
| **Subject:** | Religious Accommodation Response –Larry Savage |

Dear Larry,

Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement.

Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement.  Because your essential job functions require in-person attendance and involve direct contact with co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company.  Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law.  Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated. Since your request for accommodation has been denied, you will have the opportunity to comply with the policy by becoming partially vaccinated and recording this as directed in the VaxDMS system prior to November 1, 2021.  In such a case, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work together to stay safe during the pandemic.  We understand that becoming vaccinated is an important personal decision.  If you have any questions, please let me know.

Kind Regards,


*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

CONFIDENTIAL                                                        TAKEDA_017941

EXHIBIT 14
M. Denmark
11/01/2023
Stenographer:
Jacqueline P. Travis, RPR, CSR

**From:** Mealey, Christine <christine.mealey@takeda.com>
**Sent:** Wednesday, October 13, 2021 2:20 PM
**To:** Schmidt, Jillyn <jillyn.schmidt@takeda.com>
**Cc:** Hanson, Kelly <kelly.hanson@takeda.com>
**Subject:** Religious Accommodation Response -Jillyn Schmidt

Dear Jillyn,

Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement.

Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement.  Because your essential job functions require in-person attendance and involve direct contact with co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company.  Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law.  Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated. Since your request for accommodation has been denied, you will have the opportunity to comply with the policy by becoming partially vaccinated and recording this as directed in the VaxDMS system prior to November 1, 2021.  In such a case, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work together to stay safe during the pandemic.  We understand that becoming vaccinated is an important personal decision.  If you have any questions, please let me know.

Kind Regards,


*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

CONFIDENTIAL                                                                              TAKEDA 000039



**Better Health, Brighter Future**

## Britt Singleton

Patient Access Manager

USBU, Patient and Market Access

**Takeda Pharmaceutical Company Limited**

300 Shire Way
Lexington, Massachusetts, 02421 USA
Tel +1 678-787-6776
britt.singleton@takeda.com

EXHIBIT 16
M. Denmark
11/01/2023
Stenographer:
Jacqueline P. Travis, RPR, CSR

For complete Prescribing Information, click the links below:
Takhzyro
Firazyr
Cinryze
Kalbitor
Cuvitru
HyQvia
Gammagard Liquid

---

**From:** Mealey, Christine <christine.mealey@takeda.com>
**Sent:** Thursday, October 14, 2021 12:46 PM
**To:** Singleton, Britt <britt.singleton@takeda.com>
**Cc:** Fresca, Pete <pete.fresca@takeda.com>
**Subject:** Religious Accommodation Response - Britt Singleton

Dear Britt,

Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement.

Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement. Because your essential job functions require in-person attendance and involve direct contact with co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company. Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law. Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated. Since your request for accommodation has been denied, you will have the opportunity to comply with the policy by becoming partially vaccinated and recording this as directed in the VaxDMS system prior to November 1, 2021. In such a case, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work together to stay safe during the pandemic. We understand that becoming vaccinated is an important personal decision. If you have any questions, please let me know.

Kind Regards,

CONFIDENTIAL    TAKEDA 000498

*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

3

CONFIDENTIAL                                          TAKEDA 000499

**EXHIBIT** 20
M. Denmark
11/01/2023
Stenographer:
Jacqueline P. Travis, RPR, CSR

**Jeff Welch**

| | |
|---|---|
| From: | Susan Welch <welch@bis.midco.net> |
| Sent: | Saturday, December 11, 2021 7:44 PM |
| To: | Jeff Welch |
| Subject: | Fwd: Request for Reasonable Accommodation/Religious Make PDF |

Sent from my iPad

Begin forwarded message:

> **From:** "Welch, Susan" <susan.welch@takeda.com>
> **Date:** October 26, 2021 at 1:44:34 AM CDT
> **To:** Susan Welch <welch@bis.midco.net>
> **Subject: Fwd: Request for Reasonable Accommodation/Religious**

> Get Outlook for iOS

> **From:** Forestier, Irving <irving.forestier@takeda.com>
> **Sent:** Monday, October 25, 2021 7:43:31 PM
> **To:** Welch, Susan <susan.welch@takeda.com>
> **Cc:** Exner, Shannon <shannon.exner@takeda.com>; Thompson, Staci <staci.thompson@takeda.com>
> **Subject:** Request for Reasonable Accommodation/Religious

> Dear Susan,

> Thank you for submitting your request for religious exemption from the COVID-19 vaccination requirement. Upon review of the information you provided, Takeda cannot accommodate any conflict between your asserted religious beliefs and the COVID-19 vaccination requirement. Because your essential job functions require in-person attendance and involve direct contact with costumers, co-workers and patients who may be contagious and/or particularly vulnerable to COVID-19, your unvaccinated status creates elevated health and safety risks and presents an undue hardship for the company.

> Furthermore, allowing you to work remotely when most health care providers in your area are allowing face-to-face meetings will create a territory in which our commercial efforts are not maximized and may require personnel changes in order to enable the face-to-face interactions that, over time, have been shown to lead to the highest level of commercial success. This, too, presents an undue hardship for Takeda under applicable law. Therefore, your request for religious exemption from the COVID-19 vaccination requirement is denied.

> As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated.
> However, you will have the opportunity to comply with the policy by becoming partially vaccinated (i.e., receiving the first of a two-dose or one-dose series) and recording this as directed in the VaxDMS system prior to November 1, 2021. In such a case, your manager will

work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work together to stay safe during the pandemic. We understand that becoming vaccinated is an important personal decision. If you have any questions, please let me know.

Kind Regards



**Better Health, Brighter Future**

Irving I. Forestier
Employee Relations Partner
**Takeda Pharmaceutical Company Limited**
45 Hayden Avenue
Lexington, MA 02421
Office: 978.735.3163
irving.forestier@Takeda.com



The content of this email and of any files transmitted may contain confidential, proprietary or legally privileged information and is intended solely for the use of the person/s or entity/ies to whom it is addressed. If you have received this email in error you have no permission whatsoever to use, copy, disclose or forward all or any of its contents. Please immediately notify the sender and thereafter delete this email and any attachments.

Exhibit C

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 1:22-cv-11963-GAO

--------------------------------------------------------

VIDEO REMOTE DEPOSITION OF LISA AMOSON

October 24, 2023

--------------------------------------------------------

LISA AMOSON, ROBB HUCK, TROBY LANE PARRISH, ALECIA

RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA

SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH,

Plaintiffs,

vs.

TAKEDA PHARMACEUTICALS U.S.A., INC.,

Defendant.

--------------------------------------------------------



Page 2

```
 1   APPEARANCES:
 2        PATTIS & SMITH, LLC
                By Christopher DeMatteo, Esq.
 3              383 Orange Street.
                New Haven, CT   06511.
 4              cdematteo@pattisandsmith.com.
                    Appearing remotely on behalf of
 5                  Plaintiffs.
 6        MORGAN, LEWIS & BOCKIUS LLP
                By Jason J. Ranjo, Esq.
 7              502 Carnegie Center
                Princeton, NJ  08540
 8              jason.ranjo@morganlewis.com
                    Appearing remotely on behalf of
 9                  Defendant.
10        TAKEDA PHARMACEUTICALS USA, INC.
                By Sonali Das, Esq.
11              1200 Lakeside Drive
                Bannockburn, IL  60015
12                  Appearing remotely as in-house
                    counsel.
13
     ALSO PRESENT:
14        Robin Skidmore, Legal Video Specialist
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

1        Pursuant to Notice and the Wyoming Rules
2  of Civil Procedure, the remote video deposition of
3  LISA AMOSON, called by MORGAN, LEWIS & BOCKIUS, LLP
4  was taken on Tuesday, October 24, 2023,
5  commencing at 8:06 a.m. before
6  Rosemary Novario, Registered Merit Reporter, and
7  Notary Public within and for the State of Wyoming.
8

              I N D E X
9

REMOTE VIDEO DEPOSITION-LISA AMOSON
10

EXAMINATION BY:                          PAGE
11

    Mr. Ranjo
12   Mr. DeMatteo                         231
13
14

EXHIBITS                      INITIAL REFERENCE
15

No. 1 .... P & S Info Only, E-mail chain ....  42
16

No. 2 .... E-mail dated May 23, 2023 from
17         Lisa Amoson to Jonathan Bruce ....  46
18  No. 3 .... Resume ..........................  79
19  No. 5 .... Manager Quality Conversations,
           Quarterly Feedback ................ 125
20

No. 6 .... Takeda Coaching Report ............128
21

No. 7 .... Takeda Coaching Report ............131
22

No. 8 .... Vaccine Mandate and Religious
23         Exemption ........................172
24  No. 9 .... Fax, 9-21-23 ....................175
25  No. 10 ... EEO Policy/Non-Discrimination/



Page 4

1   EXHIBITS CONT'D:
2   No. 12 ... Religious Accommodation Request
               Form ...............................186
3
    No. 13 ... Religious Accommodation, Interactive
4              Dialogue ..........................189
5   No. 14 ... Sample Religious Exemption Requests
               for COVID Shot Mandates ...........194
6
    No. 16 ... Seeking Justice E-mail Chain,
7              March 14, 2022 ....................200
8   No. 17 ... Defendant's First Set of
               Interrogatories Directed to
9              Plaintiff Lisa Amoson .............203
10  No. 18 ... New Vaccination Criteria for U.S.
               Immigration .......................206
11
    No. 19 ... Plaintiff Lisa Amoson's Supplemental
12             Responses to Defendant's First Set
               of Interrogatories ................207
13
14
15
16
17
18
19
20
21
22
23
24
25



```
 1                   P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  We're now on the record.
 3  This begins Video One in the deposition of
 4  Lisa Amoson in the matter of fact of Lisa Amoson,
 5  Robb Huck, Troby Lane Parrish, et al. versus Takeda
 6  Pharmaceuticals USA, Incorporated in the United
 7  States District Court, District of Massachusetts,
 8  Case No. 1:22-cv-11963-GAO.
 9           Today is Tuesday, October 24th, 2023 and the
10  time is 8:06 a.m. Mountain Time.  This deposition is
11  being taken at a remote location at the request of
12  Morgan Lewis & Bockius.  The videographer is Robin
13  Skidmore of Magna Legal Services, and the court
14  reporter is Rosemary Novario of Magna Legal Services.
15           Will counsel and all parties present state
16  their appearances and who they represent?
17           MR. RANJO:  Jason Ranjo from Morgan Lewis &
18  Bockius on behalf of the defendant.
19           MR. DeMATTEO:  Good morning.  Chris DeMatteo
20  from Pattis & Smith.  I represent the plaintiff
21  deponent, Lisa Amoson.
22           THE VIDEOGRAPHER:  And will the court
23  reporter --
24
25
```



Page 6

```
 1                    LISA AMOSON,
 2        being first duly sworn in the above cause, was
 3        examined and testified as follows:
 4                    EXAMINATION
 5  BY MR. RANJO:
 6     Q    Good afternoon, Miss Amoson.  I'm Jason
 7  Ranjo.  I'm an attorney for Takeda.  I'm here today
 8  to take your deposition.  Can you please state your
 9  full name for the record, please?
10     A    Lisa Joy Amoson.
11          THE REPORTER:  Can you spell your middle
12  name?
13          THE WITNESS:  J-O-Y.
14  BY MR. RANJO:
15     Q    And Miss Amoson, have you ever been deposed
16  before?
17     A    No.
18     Q    Okay.  We'll start with some ground rules
19  and some background.  You understand that you're
20  under oath, and that you're subject to the penalty of
21  perjury?
22     A    Yes.
23     Q    And we'll be taking breaks throughout the
24  day, and you are aware that your oath remains in
25  effect even once we go on break and come back
```



Page 53

1   of the Covid 19 vaccine?

2       A    Nothing technical, no.

3       Q    You believe that the Covid 19 -- strike

4   that.  Do you believe that the Covid 19 virus was

5   dangerous?

6       A    No.

7            MR. DeMATTEO:  Objection; form.

8   BY MR. RANJO:

9       Q    I'm sorry?

10      A    No.

11      Q    Do you believe that it caused any deaths in

12  the United States?

13      A    Likely, yes, as does the flu every year.

14      Q    So it caused deaths, but you don't think it

15  was dangerous?

16      A    No, that's correct.

17      Q    Can you think of anything else that has

18  caused deaths that is not dangerous?

19           MR. DeMATTEO:  Objection; form.

20      A    No.

21  BY MR. RANJO:

22      Q    All right.  Let's take a look at Page 30 of

23  the same document, Exhibit 2.  It is an article that

24  you posted on April 2nd, 2020.  The headline is,

25  "Rush Limbaugh shutdown unsustainable.  It's not



Page 55

```
 1   Ben Shapiro text says, "The latest hash tag fake news
 2   award goes to CBS News for pushing a viral video of a
 3   nurse in tears over her alleged treatment in the
 4   Corona virus unit of the hospital she," quote, works
 5   at.  Then underneath that it says, "Busted.  CBS
 6   pushes #fakenewsweepingCovid19nursevid"; you see
 7   that?
 8        A    Yes.
 9        Q    Do you know what video he's referring to
10   there?
11        A    I don't recall, no.
12        Q    He appears to be referring to a video he's
13   calling, "fake," right?
14        A    Yeah.  So I'm -- if memory serves me, it was
15   something about a nurse probably in an ER or
16   something like that crying over something to do with
17   Corona virus, and them pushing, you know, how many
18   people were in the hospitals and how overrun they
19   were, or whatever, at the time.
20        Q    Did you agree with Ben Shapiro that the
21   video was fake?
22        A    Likely.  If I posted it, yes.
23        Q    Why did you think it was fake?
24        A    Because I think everything with Covid was
25   overexaggerated.
```



Page 56

```
 1     Q    On the next page, Page 35, it's a post from
 2  you on April 8th, 2020 of what looks to be a spoofed
 3  CNN headline that says, "Skydiver who forgot power
 4  chute dies of Corona virus"; you see that?
 5     A    Um-hum.
 6     Q    And your comment is, "Ha ha ha ha ha"; what
 7  does that mean?
 8     A    Nothing, because at the time, everything --
 9  everyone -- everyone's dying from Corona virus,
10  everything.  I mean --
11     Q    Where did you get this spoofed article
12  headline?
13     A    Oh, gosh, I don't know.  It's probably from
14  some other article in some meeting.
15     Q    Did you think that certain people who were
16  identified as having died of Corona virus actually
17  died of other reasons?
18     A    Yes.
19     Q    How did you know how they died?
20     A    I'm sorry?
21          MR. DeMATTEO:  Objection; form.
22  BY MR. RANJO:
23     Q    How would you know how they died other than
24  what's reported to you?
25     A    I think that many people, you know, die
```



Page 57

1    every day, you know, in a hospital, and I think that

2    the number of deaths from Corona virus was

3    overinflated, and I think that not everyone died of

4    Corona virus.  They may have had it, but it may have

5    been a subset of something else that they had or

6    experienced or, you know, just like old age.

7        Q    So when you saw deaths being reported due to

8    the Corona virus, did you assume that there was some

9    other reason for the deaths, not the virus?

10       A    No, I didn't assume, no.

11       Q    But you didn't take it at face value,

12   right?

13       A    I believe that some people likely died from

14   the Corona virus, especially those that are in a

15   bracket that are more at risk, possibly, of, you

16   know, dying from whether it's the flu, which is what

17   I believe the Corona virus is.  It's a flu type

18   thing, and so a weakened immune system because of

19   their age puts them more at a higher risk of being

20   susceptible to death due to a virus.

21       Q    Did you ever research any particular case

22   about whether someone who was reported to have died

23   of Corona virus actually died from something else?

24       A    No.

25       Q    Can you please take a look at Page 48 of



Page 58

1    Exhibit 2?  It looks like a repost of yours from

2    April 23rd, 2020 of an article from the

3    oldschoolpatriot.com, and the title of the article

4    was, "The real truth about Covid 19"; do you see

5    that?

6        A    Um-hum.

7        Q    Do you remember what the real truth was

8    about in that article?

9        A    I don't recall.  Don't recall.

10       Q    So please take a look at Page 88 of Exhibit

11   A.  It's actually, 88 through 93.  Please read

12   through that and let me know when you're finished.

13            (Pause.)

14       A    Yes.

15       Q    Is this something you wrote on January 7th,

16   2022?

17       A    Yes.

18       Q    You believe that Covid 19 is a sham,

19   right?

20       A    I do.  I believe that Covid 19 is real in

21   the sense that it's a virus that exists, but I think

22   that what they've done to it or what they did, yes.

23       Q    Who's, "they"?

24       A    The government.

25       Q    Who in the government?



Page 60

```
 1      A     I believe, yeah.

 2      Q     You think he was tricked into getting

 3 vaccinated?

 4            MR. DeMATTEO:  Objection to form.

 5      A     I don't think tricked, and again, I'm not

 6 necessarily against getting vaccinated.  My point was

 7 always, if you want to get it, go ahead.  If you

 8 believe that it's going to protect you, go ahead, but

 9 I don't feel that I need it or you need to kind of

10 shut down.  Those were my issues.

11 BY MR. RANJO:

12      Q     Do you blame President Trump for the

13 shutdown?

14      A     No.

15      Q     He was the president at the time, wasn't

16 he?

17      A     Not for much longer, but it wasn't him that

18 made the mandate.

19      Q     What mandate are you referring to?

20      A     I think the companies of a certain size

21 would have to have their employees be vaccinated.

22      Q     You think the government required companies

23 to require their employees to be vaccinated?

24      A     I think that's what the companies

25 interpreted it as when Joe Biden came out September
```



Page 69

```
 1      Q     Please take a look at Amoson 99.  It's a
 2 post from you from January 28th, 2022.  It says,
 3 "Current mood," and then there's a screenshot of the
 4 movie Braveheart with the words "freedom" at the
 5 bottom; do you see that?
 6      A     Yes.
 7      Q     What does that mean?
 8      A     So at that time, you don't remember, but I'm
 9 originally from Canada.  I grew up in Canada.  There
10 was a huge trucker convoy that was happening at the
11 time.  It went worldwide, you know, and you know, I
12 was proud that Canada had, you know, really taken a
13 stand and that they were all, you know, meeting at
14 the capitol, and you know, I have friends and family
15 that are truckers, and that they had gotten together
16 and were fighting against what I believed -- what
17 they believed was tyranny against the government, and
18 this is just a meme, you know, from Braveheart with
19 Mel Gibson when he yelled, "Freedom," in the movie,
20 and so it was just that feeling that finally
21 someone's standing up, you know, for -- and
22 supporting this.
23      Q     You think you should have the individual
24 freedom to decide whether or not to be vaccinated?
25      A     Correct, yes.
```



Page 72

```
 1      Q    Okay.  Beneath where I left off, it says,

 2   "The vaccine does all these things except

 3   immunization"?

 4      A    Correct.

 5      Q    What does that mean?

 6      A    Well, the fact that you can still get it and

 7   continue to pass it on to others and the need for

 8   continual boosters.  That doesn't really give

 9   confidence in immunization, especially when the

10   percent kept changing.

11      Q    I'm sorry.  What percent?

12      A    Like, of effectiveness.

13      Q    Why do you think it kept changing?

14      A    I don't know why, but they kept changing.

15   It was 97 percent effective, then it was 93, then it

16   was 80 something, and it just kept changing.  So I

17   don't know if that was like a CYA kind of thing, but

18   I don't believe that it really helped people to not

19   get the Covid 19.

20      Q    So when they were putting out numbers like

21   96, 97 percent effective, you don't think -- you

22   think it was zero percent effective?

23      A    I think it was effective for those that they

24   believed it did, then so be it.  Like I've always

25   stated, if -- I always believed, and I always still
```



Page 73

1  believe, that if you want to wear a mask, wear a

2  mask.  If you want to get the vaccine, get the

3  vaccine.  If you believe it provides you the full

4  protection, that's great.

5          I believed that God was telling me that this

6  was not right for me.  I had huge feelings of

7  uneasiness, and God was telling me that I was --

8  should not get this, and I'm not going to judge

9  others if they want to get it.

10     Q    We'll get into that, but what I asked you

11 was whether or not you believed that it worked?

12     A    I believe that if you believe it worked, it

13 worked.

14     Q    So it was a placebo is what you're saying?

15          MR. DeMATTEO:  Objection;  form.

16     A    I don't think it was necessarily a placebo.

17 I just think it was something that was rushed.  I

18 think it was something that was for money, for

19 profit.  I think it was maybe somewhat effective, but

20 not effective enough to convince me to get it.

21 BY MR. RANJO:

22     Q    Do you think the vaccine -- a Covid 19

23 vaccine, any of them, had any benefit to society at

24 all?

25          MR. DeMATTEO:  Objection; form.



Page 88

```
 1        A    So oftentimes, we have to teach, like, the
 2   studies and things like that, showing the efficacy
 3   and showing safety things or teaching them how to use
 4   whatever device it is.  So at the time with GSK, I
 5   sold a COPD medication, and so we had to teach them
 6   how to use the inhaler because it was actually a
 7   brand-new kind of inhaler.  It wasn't your typical
 8   where you push a button.  So this was a different
 9   type of inhaler.
10            So it was teaching them, you know, how to
11   breathe in with the inhaler, teaching them about the
12   mechanism, how it works.  So it was very similar.  In
13   a lot of ways being a pharmaceutical rep, very, very
14   similar to a school teacher, just a different
15   audience, but essentially, the same.
16        Q    Is the pharma industry an in person selling
17   or is it telephonic, remote?
18        A    Both.  There's --
19        Q    Well, how about when you joined, GSK, let's
20   talk about that.
21        A    That was in person, basically.
22        Q    Why was it in person?
23        A    Why was what in person?
24        Q    Why was the selling, yeah, why was the
25   pharma industry in person?
```



Page 89

```
 1      A     That's what they required.

 2      Q     Did you -- did you disagree with that?

 3      A     No.

 4      Q     Why do you think that that what was

 5  required?

 6      A     Gives, you know, the chance for me to see

 7  the doctors, you know, face to face, in

 8  person and making --

 9            THE REPORTER:  I'm sorry.  You're fading

10  out.  "And making"?

11      A     Making more of a connection with providers,

12  especially if demonstrating how to use the tools for

13  the device, like the inhaler.  At the time, that's

14  just the way big pharma was.  You did it face to

15  face.

16  BY MR. RANJO:

17      Q     You agree that it's easier to make

18  connections with people in person?

19      A     I think so.  I think so.  I don't think it's

20  impossible.  I used to tease, you know, about -- at

21  first when I was worried about working remotely, I

22  was worried about losing that connection, and I used

23  to tease with my manager, and I said, "It seems so

24  much harder because then my doctors can't see me

25  sparkle," you know, with my eyes or whatever, you
```



Page 90

1  know, because I loved to be able to talk to not just

2  the doctors, but the staff as well.

3          Being a pharma rep, in general, can be

4  sometimes lonely.  People are either in their car

5  driving to the next destination or you're in an

6  office, but you're oftentimes alone, and so it's nice

7  to be able to talk with the receptionist or whatever

8  and chat about, you know, a TV show they might be

9  watching or whatever.  Having those connections and

10 having the lunches in person because then you get

11 more time.

12         So it's definitely an advantage for sure.

13 But when we switched with Takeda to remote, I felt

14 that it was difficult at first initially, but I was

15 quickly able to, I guess, adjust and transition.

16 Q      When you go that an office for an in-person

17 visit, do you have an appointment?

18 A      Not typically, no.  Some offices had

19 appointment books that you would sign or whatever, or

20 some -- but majority, no.

21 Q      So you walk in, and you see kind of this

22 office staff.  I guess they're the first person you

23 see walking in the door, right?

24 A      Correct, yes.

25 Q      And is it important to get to know those



Page 91

```
 1  folks; you mentioned that it was?
 2      A    Yeah, yeah.  A lot of times it is.
 3      Q    Why?
 4      A    You know, they're considered the gatekeepers
 5  in a sense, whether they're going to give you any
 6  inside information letting you know how the doctor's
 7  doing that day, if they're really backed up, and just
 8  being kind of like a help, you know, in your job.
 9      Q    So when you walk in -- it's my words --
10  schmooze -- schmooze the people at the front a little
11  bit, right, small talk; is that fair to say?
12      A    Yes, I guess, yes.  I'm not sure I like the
13  word, "schmooze," but I've never been someone that's
14  just small talk, is just a small talker, or I
15  genuinely feel like I would make a connection and
16  genuine connections, not just schmoozing, I guess.
17      Q    So you got to know even the staff at some?
18      A    Yeah.
19      Q    Of -- the providers you went to -- most of
20  the providers?
21      A    Yeah.
22      Q    Where do you go from there once you kind of
23  show up at the desk or the counter, do they let you
24  in the back, or who do you go to after that?
25      A    It varies from office to office but
```



Page 92

1  sometimes you might go into the doctor's office.

2  Sometimes you're standing just in the hallway waiting

3  for the doctor to come out of a room.  Sometimes

4  you're in the lunchroom.  Sometimes -- I mean, it

5  just varies, but you're, essentially, just waiting

6  for the doctor to come, and they're either given some

7  kind of notice that you're there for them, or they

8  just see you standing there hovering, but they

9  know -- they know the drill.

10      Q    Are they usually pretty busy -- the

11  doctors -- when you go in?

12      A    Most times, yeah, yeah.

13      Q    You're trying to grab them when they have a

14  free moment in between appointments or patients or

15  whatever; is that fair to say?

16      A    That's correct, yeah.  That's why always,

17  typically, the goal is to be able to get a lunch or a

18  breakfast because then you have them for a little bit

19  longer of a time, and they're not as distracted, I

20  guess, you know, from having to get in to the next

21  patient and see the next patient, but for the most

22  part, most doctors are easygoing and will give you

23  time.

24      Q    So during a period of time when you had to

25  do sort of remote calls, and there was a period of



Page 93

1    time you did that, right?

2        A    Correct.

3        Q    You had to make an appointment to speak to

4    somebody.  You couldn't just pop in on Zoom, correct?

5        A    Correct.

6        Q    Was it hard to get appointments?

7        A    I think, initially, it was difficult, not

8    necessarily because of the remote factor.  You have

9    to remember, I was hired February of 2021 -- I'm

10   sorry -- 2020, and then all of a sudden in March, we

11   were all shut down completely, and we went 100

12   percent remote.  I didn't get a chance to meet my

13   providers face to face or meet my staff members face

14   to face to be able to make it easier, I guess, to be

15   able to make phone it easier, I guess, to be able

16   then to make phone calls and work remotely or through

17   video or whatever.

18            Initially, they didn't actually have video.

19   It was pretty much all phone.  So I hadn't

20   established that prior because this territory was

21   brand new to me because I just finished training.  So

22   I think it was more difficult for me in that sense

23   since I hadn't already had pre-established

24   relationships, but not because of, quote, unquote, it

25   was remote work that made it more difficult, per se.



Page 94

1    Now, with that said --

2        Q    Did you have remote calls with the staff?

3        A    Yeah, um-hum.

4        Q    How would that work; you'd schedule -- how

5    much of time would you schedule with the staff, and

6    then you would have a separate appointment with the

7    doctor; how did that work?

8        A    Typically, I mean, it could be anywhere from

9    10 minutes to 30 minutes.  It was, basically, up to

10   them to decide how much time they wanted to give or

11   how much time they could give.

12       Q    Did you find that your providers liked doing

13   remote calls?

14       A    I really didn't get a sense -- at first in

15   my head, I thought doctors were going to hate it.  I

16   really did, and I thought that I wasn't going to like

17   it, either, because I didn't feel like they were

18   going to see my sparkle, and so -- and because I

19   hadn't really had a lot of pre-knowledge of my

20   providers for them before the whole remote world, so

21   I was worried about that, but surprisingly, the

22   doctors didn't mind it too much.

23       Q    They also didn't have a choice, either,

24   right?  If they wanted to see somebody, it had to be

25   remote at that period of time?



Page 95

1       A    Correct.

2       Q    And then by the time you left Takeda, had it

3    opened up yet such that, you know, doctors had the

4    option to do remote or in person?

5       A    Yeah.  September of that year, actually,

6    Takeda, I guess allowed some of us to go back into

7    the field and allowed us to go back to work, I guess

8    out there in the real world, and so I remember going

9    out in September.

10      Q    What were the -- at that point, what were

11   the providers, what was their preference in terms of

12   did they want to schedule remote meetings, were they

13   glad that you guys were back out in person?

14      A    Both.  I think there were some that had made

15   the adjustment that they didn't mind it, like, but

16   being remote more so, I think it may be -- if I'm

17   looking at it from a doctor's perspective, I think a

18   remote session made it easier for them to leave, I

19   guess, if that's the right word I'm looking for, like

20   to end; whereas if I'm there in person, it's harder

21   for them to leave the room or, you know, if I'm still

22   setting there versus, you know, remotely.  It just

23   makes it easier for them to say, "I've got to go

24   now," or whatever.

25      Q    When you were at Harry & David or



Page 96

```
 1  GlaxoSmithKline or Takeda, the whole goal is to keep
 2  it going rather than being sort of cut off, right;
 3  like, you want these engagements to last longer.  You
 4  want to take them to lunch.  You don't want them
 5  hanging up the phone on you when you're in the middle
 6  talking about the gooey, gooey brownies, or whatever
 7  you said before, right?
 8          MR. DeMATTEO:  Objection; form.  You can
 9  answer.
10  BY MR. RANJO:
11      Q    Is that fair to say?
12      A    Yes.
13      Q    All right.  Let's keep going here.  You
14  spent four years at GSK in respiratory sales; is that
15  correct?
16      A    That's correct.
17      Q    What sort of -- other than inhalers, was
18  there anything else you were selling?
19      A    No.  Just COPD and asthma medication.
20  Mostly COPD.
21      Q    And then in May of 2019, you moved to
22  Ironshore Pharmaceuticals?
23      A    That's correct.
24      Q    Why did you make that change?
25      A    Not my choice, because I loved GSK, and I
```



Page 99

1   doctors really liked me a lot.

2        Q    How did they get to like you?

3        A    I think over time, because there are some

4   doctors that are going to be gruff, and then there's

5   doctors that because you're calling on them every two

6   weeks regularly, so you're seeing them on a regular

7   cadence, and you get to know them.  You get to know

8   their personalities, what they like, what they don't

9   like, their family, their dogs, or whatever, and so

10  you're commiserating on a level like that and being

11  human and real.

12       Q    So you were good at building relationships?

13       A    I would say so, yes.

14       Q    Did the lunches help with that?

15       A    I think so, yeah.  Overall, generally, they

16  help.

17       Q    So you moved to Ironshore Pharmaceuticals.

18  What were you doing there?

19       A    So I was selling an ADHD, a brand-new,

20  new-to-market ADHD medication and --

21       Q    Go ahead.

22       A    And I was selling to -- mainly to

23  pediatricians, as well as psychiatrists.

24       Q    And your techniques and approach, did that

25  change at all from GSK to Ironshore Pharmaceuticals?



Page 101

```
 1            MR. DeMATTEO:  Fine with me.
 2            THE VIDEOGRAPHER:  Time is now 10:50 a.m.
 3  We're going off the record.
 4            (Break from 10:50 a.m. to 11:22 a.m.)
 5            THE VIDEOGRAPHER:  Time is 11:22 a.m.  We
 6  are back on the record.
 7  BY MR. RANJO:
 8      Q    Miss Amoson, we're back on the record from a
 9  lunch break.  You understand that you're still under
10  oath?
11      A    Yes, I do.
12      Q    A little muffled.
13      A    Leaning back more.  Is that better?
14      Q    It's a little better.  Thank you.  When did
15  Takeda hire you?
16      A    February 1st, 2020.
17      Q    I have 3rd; is that possible?
18      A    Yeah, February 3rd.  Yes, that was the
19  Monday, yeah.  Sorry.
20      Q    Yeah, no problem.  And what was your
21  position?
22      A    I was a sales representative.
23      Q    And what were your duties and
24  responsibilities as a sales representative for Takeda
25  when you were hired in February of 2020?
```



Page 102

```
 1        A    I was required to make sales calls to
 2   providers, to HCPs.  I had to utilize selling skills,
 3   had to know my products.  I sold both Trintellix and
 4   Vyvanse --
 5             THE REPORTER:  I'm sorry.  Kentellix?
 6             THE WITNESS:  I sold Trintellix, which is an
 7   antidepressant.  Do you need me to spell it,
 8   Rosemary?  Trintellix is T-R-I-N-T-E-L-L-I-X.
 9   Trintellix and Vyvanse, which is an ADHD medication.
10        A    And so I would need to precall plan.  I
11   would need to assess my call during the call,
12   post-call analysis.  I would have to, you know, look
13   up data and gauge where I should go in my territory.
14   I would need to gave out samples, you know, to
15   providers, and have them sign for those samples,
16   utilize different tools, you know, whether it's my
17   iPad to have them sign for sample, then work with my
18   colleagues and my manager, but basically, selling
19   Trintellix and Vyvanse.
20   BY MR. RANJO:
21        Q    What was your sales territory?
22        A    They called it Eugene -- Medford, Eugene,
23   but basically, I was Salem, Oregon all the way down
24   and Post and also Bend, Oregon.  So eastern Oregon,
25   so I had a very -- very large territory, a lot of
```



1    drive time.

2        Q    And did you help -- hold the same job

3    position in the same territory throughout your

4    employment with Takeda?

5        A    It did get bigger near the end, and that

6    ended up being pretty much the entire of Oregon.

7    They started to add in some -- a little bit of

8    Washington on the Coast, but that was very near to

9    the end.

10       Q    Otherwise, everything sort of stayed the

11   same --

12       A    Yeah.

13       Q    -- in terms of your job and territory?

14       A    Yes.

15       Q    Who was your first level of manager?

16       A    Steve Severino.

17            THE REPORTER:  Can you spell that?

18            THE WITNESS:  His last name, Severino,

19   S-E-V-E-R-I-N-O.

20   BY MR. RANJO:

21       Q    And did Steve supervise a team of sales

22   reps?

23       A    Yes.

24       Q    How many others were on that time?

25       A    Eight.



Page 104

1    Q    Was it based on sort of a region, like

2    geography based?

3    A    Yes.

4    Q    What was the geography for Steve's team,

5    just sort of generally?

6    A    Pacific northwest.

7    Q    What states was it, Washington and Oregon?

8    A    Yes, and actually, one of our teams did have

9    Montana, as well.

10    Q    When you traveled to sort of the farther end

11    of your state, did you have to stay overnight, or did

12    you always go back home when you were done?

13    A    It depended, but sometimes, I stayed

14    overnight, and sometimes I would just make the trek

15    back home.

16    Q    And so you were hired in February.  How long

17    was sort of the training period?

18    A    Basically, from February 3rd until middle of

19    March, like, March 16th-ish.

20    Q    And what did you do during the training

21    period?

22    A    We did -- like, we would do home study where

23    we would have to do modules, like, from the company

24    that they would set out, whether it was on compliance

25    or the product knowledge stuff, and then we would fly



1     Q     And when you were hired, the expectation was

2    that this position was a field-based position,

3    correct?

4     A     Correct.

5     Q     And that the vast majority of your job would

6    be traveling around, visiting providers in person,

7    correct?

8     A     Correct.

9     Q     And what was your expectation into -- as far

10   as the percentage of time you would be out and in the

11   field conducting in-person interactions with

12   providers?

13    A     Like, you want me to give a percent?

14    Q     Yes.

15    A     Probably 70 percent.

16    Q     What would the other 30 percent entail?

17    A     That would be, like, working on reports,

18   whether it be training, going to meetings, or things

19   like that.

20    Q     What kind of meetings?

21    A     Like, sales meetings or training.

22    Q     How often did you have sales meetings?

23    A     Maybe once every couple months, you know, we

24   would have, like, team meetings on a weekly basis,

25   like, virtually, like, over the phone; regional



1    meetings where we would go over people that were
2    doing well, strategies, the position of the
3    company.
4        Q    When you worked for Takeda, how many hours a
5    week did you spend in meetings?
6        A    Two hours, I want to say.
7        Q    So if you worked 40 hours a week, that was 5
8    percent of your time was in meetings; is that fair to
9    say --
10       A    I guess.
11       Q    -- is that fair to say?
12       A    Yes, I guess.
13       Q    So where did you get 30 percent?  You said
14   before, your expectation was 30 percent would be
15   things other than in the field engaging --
16       A    Well, because you're driving --
17       Q    -- providers in person?
18       A    So you're driving, and that's sometimes
19   hours, so not doing your job, I guess.
20       Q    Right.  But you wouldn't be driving if you
21   weren't going meeting these people in person,
22   right?
23       A    Right, but --
24       Q    So you combined the driving and the meeting,
25   what was your expectation in terms of the percentage



Page 108

1    of time you would be doing those two things in your

2    job with Takeda as a sales rep?

3        A    I still am going to say 70 percent because

4    you still have to do precall things.  You still have

5    to go get reports.  You have sometimes one-on-one

6    meetings with your manager, or sometimes that you're

7    meeting with your team, like, your own partner coming

8    up with, like, strategy or talking about, like, you

9    know, a doctor or something like that, or having to

10   do a sample audit or you have to do all these other

11   little -- we called them administrative tasks, I

12   guess.

13       Q    How many hours a day would you spend doing

14   administrative tasks as a sales rep; what would you

15   do?

16       A    Are you counting precall planning, like,

17   when you're sitting in the car getting ready to go in

18   to sell?

19       Q    I'm excluding any time in your car and any

20   time in a provider's office, anything else;

21   administrative time, how much time per day would you

22   spend doing that stuff?

23       A    I guess about an hour at most.

24       Q    So that's five hours a week; is that fair to

25   say?



Page 109

```
 1      A     Sure, yeah.
 2      Q     And a 40-hour week, that's less than 10
 3  percent?
 4      A     Okay.
 5      Q     Just so we're on the same page.  All the
 6  meetings you mentioned, by the time you got to your
 7  actual position after the training, Covid had already
 8  occurred; is that right?
 9      A     It was declared while we were in Boston, and
10  we were rushed home on the Thursday, and that's --
11  the next day it was declared by Takeda that we would
12  be 100 percent remote, that they would have a plan in
13  place, that they were -- no one was going to be in
14  the field, and that was the day after.
15      Q     Did you disagree with that decision?
16      A     I was disappointed, and I was upset because
17  I was just through with training, and I was excited
18  to get out in the field, and I was excited to meet my
19  customers and my doctors, and I just wanted to do my
20  job and work when I was disappointed.  Now, at the
21  time, we were under the impression it would only be
22  two weeks, so . . .
23      Q     When we're talking about providers in your
24  territory, are we talking about family medicine,
25  hospitals, pediatricians, who were you calling on
```



Page 110

1    exactly?

2        A    I was calling on psychiatrists.  I was

3    calling on family providers like HCP, which is, like,

4    regular family doctors, anybody that -- some

5    pediatricians.  Basically, anyone that would be

6    selling for -- or prescribing an antidepressant or an

7    ADHD medication.

8        Q    When you were going through training, did

9    they tell you whether there were requirements for the

10   number of calls that you were to make in a particular

11   period?

12       A    Well, the guidance was basically six to

13   eight calls a day.  Like, six to eight was kind of

14   the target.

15       Q    Did they train you to do phone calls or

16   virtual calls when you were training?

17       A    No.

18       Q    Was the expectation that you would do any

19   phone calls or virtual calls during the training?

20       A    Not during the training -- not during that

21   training.  We had subsequent training after, when it

22   became apparent that we were going to be out of the

23   field for a length of time, and then we got training.

24       Q    How long was Takeda telling you that you

25   couldn't go out into the field at all; do you



1    trainings, extra this or that, and then when we were

2    given the green light to then make calls, because

3    they came up with a whole new platform, a whole new

4    system for us, so then we had to be trained on that

5    and how to work the remote meetings and how to sign

6    in and get the, like, the screens like this that

7    we're on, to work, and to be able to have and conduct

8    meetings with providers.

9        Q    When was that?

10       A    I'm going to say end of April.

11       Q    Of what year?

12       A    2020.

13       Q    Okay.  So it was about a month where you

14   were totally shut down, and so it took Takeda a while

15   to figure out how to get you guys reengaged with your

16   providers, and their first effort at that was through

17   a new system; was that system called VEVA?

18       A    VEVA, um-hum.

19       Q    So when you guys started on VEVA, was there

20   a call requirement at that time?

21       A    I think -- I don't -- I remember there being

22   one.  I don't remember what the number is.  I

23   remember them wanting for us to make as many calls as

24   possible, maybe three or four calls an hour,

25   but . . .



1      Q    An hour?

2      A    Per hour, maybe.  Three or four calls per

3  hour.  Again, I'm -- that is me reaching.  I can't

4  remember completely.  I know there was some kind of

5  requirement that they wanted us to make certain

6  calls, but they were -- initially, I don't think it

7  was as firm, like, "Okay.  We want you to make this

8  many calls" because they were still trying -- they

9  were still figuring things out.  It took them

10 actually a lot longer than a month to figure things

11 out and ramp up to, like, a full-on remote remote.

12     Q    When you said three to four calls an hour,

13 on VEVO, these were cold causes, essentially, trying

14 to make appointments with people?

15     A    Yes, but like, it wasn't always like video

16 calls like this.  It would be just talking on the

17 phone.

18     Q    Well, how long were your -- how long would a

19 call last in the in-person environment when you're

20 making those calls?

21     A    It can last anywhere from a minute to 10

22 minutes, depends on the day, the time, the doctor's

23 mood, the office.  There are so many factors that go

24 into that.

25     Q    And when you were calling through the VEVA



Page 115

1  process, you were just cold calling offices and

2  asking if the doctor was available; is that what that

3  was?

4      A    Yes, or trying to set up -- like, trying to

5  set up an appointment, possibly.  Initially -- in

6  fact, actually, Takeda told us not to sell anything.

7  We were, more or less, in a support position and

8  trying to find out things like whether they would be

9  open to having a lunch via the video, and stuff like

10  that, and finding out if they needed samples, then we

11  would be able to mail them samples through the sample

12  thing on our iPad, and then we would translate that

13  to the computer, and then the doctor would be able to

14  sign it through the computer.

15          So more or less, it was like a support role

16  versus, like, we want you out there selling, selling,

17  selling.  I mean, it became that.  Obviously, that's

18  what our job is, to sell, but initially --

19      Q    When did your job go back to being about

20  selling?

21      A    About May of 2020 I guess.  I'm not exactly

22  sure of all the dates.

23      Q    So when you did go back to selling, was

24  there a call requirement at that point?

25      A    As I stated, yes, there was a call



Page 116

1    requirement.  I don't recall what the number was.

2        Q    Is there a period of time where you remember

3    the number you were required to make in terms of

4    calls?

5        A    My guess is 60 calls in a week.  I don't

6    remember.  I really just don't.

7        Q    I mean, did it ever get to the moment while

8    you were still there where there was a strict

9    requirement that they were enforcing, and things like

10   that?

11       A    Yeah.  I mean, definitely, there was because

12   at one point, I wasn't making as many calls as they

13   wanted.  So my manager, you know, asked me to pick up

14   the calls more so -- and because I was trying to

15   explain, you know, over and over that that was a

16   little bit harder because I was brand new.  None of

17   my doctors knew me, whereas I didn't have prebuilt

18   relationships already.  I was really cold calling,

19   essentially, in a way, whereas all my other

20   teammates, they had already had established

21   relationships, and then could talk to those

22   receptionists and gatekeepers and get information,

23   whatever; whereas I was, it was completely new to me,

24   the whole office and the doctors and everything

25   because I never had that time before pre-Covid with



1    them.

2            So it was a little more tricky.  So yeah, I

3    definitely, my manager had that conversation, like,

4    "You need to be making this many calls," or whatever,

5    but again, I don't remember the number.

6        Q    Was there a period of time where they

7    started pushing you away from virtual calls back to

8    in-person calls?

9        A    Pushing us?  I think there was a lead-up to

10   it that there was going to be a time when we were

11   going to be able to go back into the field, and when

12   they determined that, when they would look at the

13   state, based on what the state was, how many Covid

14   cases and stuff, and they were using, like I said, a

15   green, yellow, red type thing and trying to judge

16   certain areas of when people could go out.

17       Q    So when did they start encouraging people to

18   go back out?

19       A    I think we were all allowed to start going

20   back out, I believe it was, like, the beginning of

21   February of 2021.

22       Q    And would you that Takeda preferred that you

23   were out in the field conducting your calls in

24   person?

25       A    I never got that sense.  They seemed very



Page 122

1    in-person interactions, right?

2        A    Well, no, because they couldn't.  I hadn't

3    worked for them before.

4        Q    Understand.

5        A    I was under a non-remote position, so they

6    wouldn't be able to ever compare me anyway.

7        Q    Understood.  Any other reason you think you

8    were doing a great job?

9        A    In the pharma world, you're measured by your

10   sales numbers, and my sales numbers were doing

11   well.

12       Q    I just put in the chat another document.

13   It's a five-page document, Bates labeled Takeda 18676

14   through Takeda 18180.  Please take a look and let me

15   know if you recognize this document.

16       A    Yes.

17       Q    What is it?

18       A    So this is something that would be written

19   by my manager.  It's a year-end performance, and it's

20   like a review of the whole year as the whole scope, I

21   guess.

22       Q    Please take a look at Page 18678.  In the

23   left-hand column toward the top it says, "In the

24   virtual setting you struggled a bit to gain

25   engagements through the limited time and position;



Page 124

```
 1     Q    And then what does it mean, "prior to being
 2  approved for F2F"?
 3     A    Before face-to-face engagements, prior to
 4  being approved.  I'm not sure what you're asking.
 5     Q    What does it mean to be approved for F2F
 6  engagements?  Can you give us some context?
 7     A    I think that's what they were talking about
 8  when -- like, with the red, green, yellow, and
 9  whether they were allowed to go back out in the
10  field, but when Takeda made the decision --
11     Q    It was based on the color scheme you're
12  talking about; that's what you're referring to?
13     A    Yep.
14     Q    So "approved" means that the color turned to
15  green, and you -- you, and it's not just you, I
16  guess.  It would be based on the location, you were
17  authorized to go back in the field?
18     A    Right, when everything was lifted, I
19  guess.
20     Q    If you go down the same column, the last
21  paragraph, it says, "As we move flew FY2021, please
22  center your efforts on maximizing customer facetime
23  through reach and frequency"; see that?
24     A    Um-hum, yes.
25     Q    So they were encouraging you to increase
```



Page 125

1  your in-person interaction, correct?

2      A    Yep.

3      Q    If you were doing such a great job remotely,

4  why would they be pushing you to go out and increase

5  your in-person interaction findings if that wasn't

6  important to them?

7      A    Customer facetime, well, they were -- that's

8  just a general statement.  Like, that's for

9  everybody.  Like, we want to maximize as much as we

10  possibly can through reach and frequency.

11      Q    Why?

12      A    Because that's our job.

13      Q    So your job is to be in front of customers

14  as much as you can?

15      A    Yes.

16      Q    It says, "This will allow you increased the

17  broader impact of your extremely strong sales message

18  that will also allow you to build incremental gains

19  in your broader footprint"; do you see that?

20      A    Yes.

21      Q    Do you agree with that statement?

22      A    Yes.

23      Q    Show you another document.  I just sent you

24  another document through the chat.  It's been marked

25  as Exhibit 5.  Exhibit 5 is a one-page document,



Page 127

1    good.  Vyvanse could have been a little bit better,

2    but my Trentillix numbers were really, really good,

3    so, yeah.

4        Q    And the first sentence of the second

5    paragraph, it says, "As discussed, over the recent

6    quarter, you have remained active in your planning by

7    designing your FP routing to include all accessible

8    F2F customers, and have made reach and frequency

9    determinations based on potential accessibility and

10   the customer's level of partnership based on their

11   preferences."

12       A    Yes.

13       Q    Can you explain what that sentence means?

14       A    So we had to go through every one of our

15   customers, and I guess code them, so to speak.  Like,

16   code them whether they'd be open to face to face or

17   whether they were still wanting to work remotely and

18   see me remotely or via phone, and then we would just

19   have to code each of the customers, if I recall.

20       Q    Was the expectation that if a customer

21   wanted to meet face to face, that you would?

22       A    Yeah, we could.  I mean, I've never had a

23   customer say, "I only want to see you face to face."

24   I've never had a customer say that.

25       Q    I'm just asking you what the expectation



Page 128

1   was.  If a customer wanted to meet face to face, was

2   Takeda's expectation that you would meet them face to

3   face?

4        A    Yeah.

5        Q    Just preparing another document to show you.

6   This will be Exhibit 6.  Okay, Miss Amoson.

7   Exhibit 6 is a two-page document, Bates labeled 18587

8   to 18588; do you recognize this document?

9        A    Yeah.

10       Q    What does it say?

11       A    It's a coaching report.

12       Q    It looks like this one is from -- it was

13  delivered on September 1st 2021; is that correct?

14       A    That likely would have been the day of it,

15  probably.

16       Q    The day it was delivered to you?

17       A    Yeah.

18       Q    Because it says, "interaction type, face to

19  face"?

20       A    Correct.

21       Q    So you and Steve met face to face; he

22  delivered there on September 1st, 2022?

23       A    Correct.

24       Q    I'm looking at the very bottom of the first

25  page under, "competency coaching," and then "business



Page 130

1    prescribe a lot of our medications, so we would
2    definitely want to talk to them in some capacity.
3          So -- but we would just find other ways,
4    mostly through mailing --
5          THE REPORTER:  I'm sorry.  You're fading out
6    there.
7    A    Mostly through mailings, but by that time, I
8    was starting to get to know my offices a little more.
9    So I was, you know, able to -- then if I couldn't get
10   in to see them, then I was able to set up, like, a
11   virtual meeting instead.
12   BY MR. RANJO:
13   Q    At this time as of September of 2021, do you
14   have any sense as to the percentage of providers you
15   called on, what percentage were not allowing
16   in-person interactions?
17   A    In my territory, not that many.  I'm going
18   to say 80 percent allowed, 20 percent were still
19   restrictive or not allowed.  80-20, but of those 80
20   percent that were -- they were also willing to see me
21   remotely, as well.
22   Q    How do you know that?
23   A    Because they had previously.  They were ones
24   I was able to engage with them remotely, and they
25   were providers that were open to it and adaptive.



Page 132

```
 1      A    Yeah.
 2      Q    Do you believe that it can be difficult to
 3  give passionate and energetic engagement in a virtual
 4  setting?
 5      A    I would say that, initially, I believed
 6  that.  I really did.  But over time, I think I was
 7  still able to, and even Steve, at some point, would
 8  say positive things about that, that I was able to,
 9  you know, show my passion, and they talk about my
10  eyes a lot, that I'm very communicative with my eyes
11  or whatever.  So I think over time, I was able to do
12  that still, even remotely.
13      Q    Was it easier to be passionate and engaging
14  in person?
15           THE REPORTER:  I'm sorry.
16      A    I think it is easier, yes, to do in
17  person.
18  BY MR. RANJO:
19      Q    You consider yourself a member of a
20  particular religious group?
21      A    No.  I would say I'm Christian.
22      Q    Any particular denomination?
23      A    No.
24      Q    How long have you been Christian?
25      A    I would say my whole life I've believed in
```



Page 149

1    were going to Table Rock?

2        A    Every week.

3        Q    Every Sunday in person?

4        A    Every Sunday.  Well, not during Covid, but

5    every Sunday in person.  Then with that said, when we

6    moved out into the country, our Table Rock Fellowship

7    Church was much farther away.  It was like a

8    35-minute drive.

9            So I would watch online more so at that time

10    than I would going in sometimes, but I still made the

11    effort to go in as much as possible.

12        Q    Did Table Rock -- I'm sorry.  Before we get

13    into that, did your husband attend Table Rock with

14    you?

15        A    Yes, he did.

16        Q    Every Sunday that you were there?

17        A    Yes.  Typically, we would go separate.  He

18    didn't like the music portion, so the first half

19    hour, he would skip that because that's where the

20    worship music time, which is my favorite.  And so he

21    would skip that part and then come in for the word.

22        Q    Us Catholics aren't used to music in church

23    and -- okay.  Did Table Rock have a position on the

24    Covid 19 vaccination?

25        A    Not that I recall.  I don't ever remember



Page 150

1   hearing Pastor bill talk about it or anything like

2   that.

3        Q    Sorry.

4        A    I'm sorry.  I don't recall him ever taking a

5   stance or -- no.

6        Q    Who was Pastor Bill?

7        A    Pastor Bill was the senior pastor.

8        Q    Do you know if he was vaccinated?

9        A    I have no idea.

10       Q    Do you know if anybody at Table Rock was

11  vaccinated for Covid 19?

12       A    I have no idea.  I never asked.

13       Q    It sounds like the vaccine never came up

14  that church there?

15       A    No.

16       Q    How about at Summit, who was the head pastor

17  there?

18       A    Pastor William.

19       Q    Do you know if Summit has a position on

20  Covid 19?

21       A    I don't believe so.  I've only talked to

22  Pastor William once, and it never really came up or

23  never said anything.  He just basically welcomed me,

24  and asked me where I was from, just general

25  information, what church I'd gone to previously,



Page 151

```
 1   stuff like that, but nothing ever -- no.
 2        Q    Do you know if Pastor William is vaccinated
 3   against Covid 19?
 4        A    I have no idea.
 5        Q    Do you know the vaccination status of
 6   anybody at the Summit Church?
 7        A    I have no idea.  We're pretty private
 8   people, and we don't really get into other people's
 9   business --
10             THE REPORTER:  I'm sorry?
11             THE WITNESS:  I said, my husband and I are
12   pretty private people.  We don't get into anybody's
13   business or anything like that and talk about stuff
14   like that, or having a conversation, "Are you
15   vaccinated?  We aren't vaccinated are you?"  We just
16   don't talk like that, and people here in Wyoming,
17   they don't care.  They just don't.  It seems everyone
18   just does their own thing, willing to help out,
19   friendly.
20   BY MR. RANJO:
21        Q    Do you donate money to church?
22        A    Yes.
23        Q    How much?
24        A    I've sent in my tithings.  We get stuff at
25   the end of the year of what I've donated and stuff
```



Page 153

1    make exceptions for non-monetary acts?

2        A    I think God asks you to give with your

3    heart, and so what you feel you give, you give.  I

4    don't think He's angry because I don't give because

5    he knows my heart and knows that I give in other

6    ways.

7        Q    But that's not in the Bible anywhere, is

8    it?

9        A    No.

10       Q    Tell me how your religious views prevent you

11   from being vaccinated against Covid 19.

12       A    When all of this came about, I had a huge

13   sense of uneasiness.  I was uncomfortable, and I know

14   that God was speaking to me telling me that this was

15   not right for me to get this vaccine.  I prayed about

16   it.  I asked for guidance.  My husband and I prayed

17   together.  I prayed with my pastor because I knew

18   that that feeling that I was feeling, that was God

19   talking to me.

20       Q    Anything else?

21       A    No.

22       Q    So you're not saying you heard a voice from

23   God, are you?

24       A    I believe that He spoke to me through that

25   feeling of uneasiness.  I believe He spoke to me



Page 154

1  through songs on the radio because I only listen to

2  K-Love Radio.  So I believe He was talking to me,

3  yes.  That's how -- I am not hearing an audible

4  voice, per se.  It's when you can't sleep at night or

5  you're having that gut feeling.  That gut feeling I

6  know is God talking to me.

7          Some people call it a gut feeling.  I call

8  it a spiritual guidance when something's not feeling

9  right or uncomfortable.

10     Q    So every time you have a gut feeling, you

11  file uncomfortable, you think that's God talking to

12  you?

13     A    That's me praying for guidance, and then

14  that continual gut feeling, if it's constantly at me,

15  at me, then yes, that's a gut feeling.  It could be

16  just an overall sense of feeling of confusion even,

17  and so then you seek guidance from God for Him to

18  clear up that confusion, and then you know instantly

19  by praying about it, that that's -- that it's not

20  something that is right for you.

21     Q    How do you know the difference between a

22  personal feeling and God talking to you?

23     A    I think that when humans or people put their

24  own spin on things or ideas, then things can go wrong

25  because they're going against what God wants, and



Page 155

```
 1   that creates a whole nuther problem of feeling uneasy
 2   or confused.
 3           So to get rid of that, that's why you're
 4   seeking guidance from God to clear up that confusion.
 5   So when you pray about it, and then that confusion
 6   goes away, you know then that's the right decision.
 7       Q    So you don't know that the confusion or
 8   feeling was related to God until it goes away?
 9       A    Correct, when you have -- if you feel at
10   peace.
11       Q    Do you ever feel that peace without God's
12   intervention?
13       A    God makes me feel that peace feeling.
14   That's what He wants to work with in me.  I think
15   through all of this, He's wanting me to find peace in
16   what's happened here, you know.
17       Q    When did you first start feeling
18   uncomfortable or confused about the Covid 19
19   vaccine?
20       A    Probably when it got mandated, which I never
21   thought that it would.  Never.
22       Q    You didn't have any feelings about the
23   vaccination before Takeda announced that it was
24   implementing a policy in September of 2021?
25       A    I had a feeling in the sense of, if you want
```



Page 156

1    to get it, go ahead, but don't tell me I have to

2    think about it, too, I guess, and if people believe

3    that it helps them, all the more power to them.

4        Q    So you had already decided you weren't going

5    to take it before Takeda came out with the mandate?

6        A    I just -- I guess in a sense, but nothing to

7    do with get Covid vaccine or whatever.  I haven't

8    taken a flu vaccine.  I made up in my mind that I

9    wasn't in a category remotely in at-risk group, and I

10   wasn't someone that feared death.  You know, I had --

11   if God was going to call me home because I get Covid

12   and die from Covid, then okay.

13       Q    So you had decided before Takeda's policy

14   that you weren't going to take it, and that decision

15   was based on your own personal beliefs?

16       A    It was based on God saying that I didn't

17   need it.  I had him.

18       Q    Okay.  I asked you when you first had a

19   feeling of confusion or uneasiness about the vaccine,

20   and you said when it was mandated; remember saying

21   that?

22       A    Yes.

23       Q    Did you have a conversation with God about

24   the vaccine before that?

25       A    I've had lots of conversations with God



Page 157

1    before that, yes.

2        Q      About the vaccine?

3        A      Yes.

4        Q      What I asked you was, when was the first

5    time?

6        A      I don't recall.

7        Q      Do you recall the month?

8        A      July?

9        Q      July of what year?

10       A      That would have been 2021.

11       Q      Where were you when you had that

12   conversation with God?

13       A      I was probably laying in bed.

14       Q      How do you know you were conversing with

15   God?

16       A      Because I talk to Him daily and every single

17   night, and I reflect on my day, and I felt that

18   everything in the world was so chaotic.  I thought

19   the whole thing -- everything was evil, and that

20   things were going out of control, and I was seeking

21   guidance on, you know, help to understand everything

22   and why things were happening the way things were,

23   and just talking to Him in general.

24       Q      Was this an audible voice or feeling in your

25   stomach?



Page 158

 1       A     It's not an audible voice, no.

 2       Q     So how did you know you were talking to God

 3   when you were laying in your bed in 2021 thinking

 4   about the vaccine?

 5       A     It wasn't just about the vaccine.  That's

 6   what I'm trying to get across.  It was about

 7   everything, about the whole chaos of the whole world

 8   and everything, and why things were happening the way

 9   they were, and the whole division of people, you

10   know, vaccinated versus unvaccinated, and why this

11   was all happening, and what was the purpose in all of

12   this, what are we supposed to learn through this.

13       Q     Right, but my question is, how did you know

14   you were talking to God?

15       A     It is mysteries of faith.  That's just what

16   it is.  It's faith.  You're just talking.  You're

17   conversing with Him, and you -- it could be as simple

18   as all of a sudden, you can sleep that night really,

19   really well.

20       Q     How do you know the difference between

21   talking to God and thinking in your own mind?

22             THE REPORTER:  I'm sorry.  Talking to God

23   and what?

24             MR. RANJO:  Thinking in your own mind.

25             MR. DeMATTEO:  Objection; form.



Page 159

1        A    I guess not having doubt, not having more
2    questions, not having -- there's really no answer to
3    that because it's very personal.
4    BY MR. RANJO:
5        Q    After the conversation with God in July of
6    2021, you decided you weren't going to be vaccinated;
7    is that right?
8        A    I always knew I wasn't going to be
9    vaccinated.  I always knew.  I mean, it wasn't --
10   wasn't even necessarily about the vaccine.  It wasn't
11   even that, really.  I wouldn't be vaccinated or get
12   vaccinated because I hadn't even had a flu shot in
13   probably 20 years.  I didn't need it.  I didn't
14   believe I needed it.
15       Q    So you knew you weren't going to get
16   vaccinated before you had the conversation with God
17   in July of 2021?
18       A    I was not going to get vaccinated, no.  Then
19   the whole mandate happened, and then that was when I
20   was entering that state of even more confusion,
21   anger, and uneasiness because now I'm like, well, I'm
22   going to lose my job now.  Wait a minute.
23       Q    So Takeda made that announcement on
24   September 10th, 2021?
25       A    Yes.



Page 165

1    you know, work in us.

2        Q    Did Pastor Bill say anything else during

3    that conversation?

4        A    Unfortunately, he was heading to a meeting,

5    so if he told me that before, and he had said that he

6    didn't have a lot of time.  So he only had about -- I

7    think we were on the phone total of 15 minutes, maybe

8    20 minutes at most, and just talked about how I was

9    feeling, how do I hear from God and make sure that

10   it's him, and things like that, and then he gave me

11   examples of, you know, trials and suffering, and God

12   never promises us that we won't go through trials and

13   suffering.  He reminded me of that.  And then he

14   prayed for me, as well, and that was it.

15       Q    This was at the end of September, I think

16   you said?

17       A    That was about October, actually.

18       Q    I think there's an e-mail where you mention.

19   We'll talk about that shortly.

20       A    I think that was middle of October when I

21   talked to Pastor Bill, probably.

22       Q    Have you ever spoken to God or received a

23   sign from God about whether or not to consume

24   anything else, whether that's a medicine, a food, a

25   vaccine, or anything else, have you ever had a sign



Page 166

```
 1    or conversation from God about whether or not to
 2    consume it?
 3        A    Not that I recall, no.
 4        Q    Any idea why this was the one and only
 5    time?
 6        A    This was the only time that something like
 7    this came up.
 8             THE REPORTER:  I'm sorry?
 9        A    This was the only time that something like
10    this came up in particular about a vaccine in
11    general.  I mean, I've asked him about guidance on
12    other things, and he'd talk to me about it, you know,
13    marrying my husband, moving to the states, becoming
14    an American citizen, I mean, all of that.
15             So he gives guidance there.  It's not always
16    going to be about something like a vaccine or
17    something I put in my body, per se.
18    BY MR. RANJO:
19        Q    Well, you've been vaccinated before, right?
20        A    As a child, right, I had to get the required
21    vaccines, yes, and for my green card -- to get my
22    green card, I was required to get what I thought or I
23    thought it was the hepatitis B one, but come to find
24    out, it was actually tetanus, and MMP -- the measles,
25    mumps -- MMR, measles, mumps, rubella.  So I had to
```



Page 167

1  produce that for the government -- the immigration
2  department for me to get my green card to work in the
3  United States.
4      Q    We'll talk more about that, but you didn't
5  pray to God about any of those vaccinations, right?
6      A    No.
7      Q    Okay.  Aside from -- back to the Covid 19
8  vaccination.  Aside from praying to God, did you do
9  any research about the vaccination?
10     A    No.  Not -- nothing in particular, no.
11     Q    You didn't search the Internet to find out
12 whether it was safe or effective, or anything like
13 that?
14     A    Well, I knew that it was something that
15 didn't have any real safety data, any real trials, no
16 long-term studies.  I mean, that was not comforting
17 especially in the industry that we were in, which is
18 highly regulated and extremely trial based.  I mean,
19 when they have to present medications to the FDA and
20 long-term studies and long-term safety studies, and
21 things like that.
22          So in general, I wasn't very confident in
23 the vaccine especially since those of my friends and
24 that did get it, still got Covid, and sometimes even
25 twice got Covid.  So I wasn't real confident that it



Page 168

1  was something that was even working.

2     Q    I only asked you if you had done any

3  research.  Did you do any research?

4     A    No.

5     Q    And who in your family received the

6  vaccination?

7     A    My mother-in-law, two of my -- three of my

8  sister-in-laws, Robert and Sara.

9     Q    So on your husband's side, your husband's

10  mother and husband's sisters?

11     A    Um-hum.

12     Q    Is that a yes?

13     A    Yes.

14     Q    What is their religion?

15     A    Well, Robert or Sara don't really go to

16  church, per se, but his sisters and mom, they're

17  Catholic.

18     Q    Anybody else do you know who was

19  vaccinated?

20     A    Friends and colleagues you mean?

21     Q    How about anybody else in the family, step

22  children?

23     A    I just said that, yeah, Robert and Sara.

24     Q    Did you talk to them about that?

25     A    No.



1   moved out of the house?

2       A    It was always one week on, one week off.

3       Q    So there was split custody between --

4       A    Yes.

5       Q     -- your husband and their mother?

6       A    Yes.

7       Q    Did you ever go to church with them?

8       A    Robert came a couple times with us.

9       Q    How about Sara?

10      A    No.

11      Q    You said you think the vaccine is unsafe

12  because it wasn't tested; is that fair to say?

13      A    I didn't go through very many -- especially

14  long-term studies.

15      Q    Do you know how any of the Covid 19 vaccines

16  work?

17      A    The mechanisms of it?

18      Q    Yes.

19      A    No.

20      Q    And you've never had Covid 19?

21      A    Nope, not that I'm aware of.

22      Q    Were you -- did you think if you took it, it

23  would harm you -- the vaccine?

24      A    I didn't know.

25      Q    Other than your pastor and your husband, did



Page 175

```
 1      A    Only to say that I wasn't getting it, in
 2   general terms like that.
 3      Q    Did you tell her that it interfered with
 4   your freedom and your husband was in the military?
 5      A    Could have.
 6      Q    Miss Amoson, I just put in the chat a
 7   document that's been marked Exhibit 9.  It is a
 8   37-page document.  I will represent to you that these
 9   are the records that we received from Dr. Amato in
10   response to our records authorization.  Please turn
11   to Page 9, and just for the record, these are Bates
12   record Amoson Amato 1 through Amoson Amato 37.  Have
13   you seen those records before, ma'am?
14      A    Never.
15      Q    Do you have any reason to doubt that these
16   are the progress notes from your doctor?
17      A    No.  I'm going to assume.
18      Q    The third sentence in this paragraph says,
19   "The patient feels that this is an impingement on her
20   freedom, and her husband was in the military"; do you
21   see that?
22      A    Yes.
23      Q    This was about the Covid 19 vaccine, yes?
24      A    Right.  I assume that that's probably right,
25   um-hum.
```



Page 176

```
 1      Q    Do you remember telling your doctor this?

 2      A    I don't recall, but I mean, if it's there, I

 3  trust Dr. Amato, so if it's there.  Again, remember,

 4  I'm a pretty private person, even if I'm in a

 5  situation like this.  I don't talk about my religion

 6  to other people.  So this is a way for me to say it

 7  in another way, I guess, because religion is, I

 8  think, seen by people like something very taboo to

 9  talk about, and you're not supposed to talk about it.

10      Q    This is your therapist.  You're not having

11  honest conversations with your own therapist?

12      A    Of course, but I'm not sitting there telling

13  her, you know --

14      Q    The truth about why you were vaccinated or

15  not?

16           MR. DeMATTEO:  Objection; form.

17      A    I'm not saying all about my religious

18  beliefs and telling her all of that, no.  I mean, in

19  here it doesn't say that I tell her I go to church

20  every weekend, and things like that.  So no, I didn't

21  say that, but I do, you know.  So I don't think

22  that's a forgone conclusion that that's the only

23  reason why, or I mean, I guess that's part of it.

24  Yes, it's part of it.  We believe in our freedom,

25  freedom to choose.
```



Page 186

```
 1   accommodation to his or her manager and the employee
 2   resource center for review and approval"; you see
 3   that?
 4        A    Yes, I do.
 5        Q    And you went through a process similar to
 6   that in connection with the Covid 19 policy, right?
 7        A    Correct.
 8        Q    Ma'am, I just sent you via chat another
 9   document.  It's been marked as Exhibit 12.  Please
10   take a look and let me know if you recognize it.
11        A    Yes.
12        Q    What is this?
13        A    That is the religious accommodation form
14   that I sent in.
15        Q    And you had the opportunity to state the
16   basis for your religious accommodation in this form
17   and these attachments?
18        A    Yes.
19        Q    And the two attachments are a written letter
20   from you that's Bates labeled Takeda 18563, and the
21   other attachment is --
22        A    Letter from --
23        Q    I'm sorry.  Please let me finish my
24   question.  And the other attachment is Table Rock
25   letter Bates labeled Takeda 18564; do you see that?
```



Page 187

```
 1       A     Yes.

 2       Q     I'm sorry.  What were you going to say?

 3       A     I said, there's that letter that you were

 4  requesting.  There's the letter right there from

 5  Pastor Bill.

 6       Q     Yeah.  I didn't say I didn't have the

 7  letter; I didn't have the e-mail of Pastor Bill

 8  sending you the e-mail?

 9       A     Oh, no.  Yeah, this was sent by e-mail.

10  Sorry.  Yeah, that was sent by mail, like snail mail.

11            THE REPORTER:  I'm sorry.  What was that

12  last part?

13            THE WITNESS:  It's snail mail, like, I

14  believe actually now that I'm remembering.

15  BY MR. RANJO:

16       Q     I guess you submitted this, it looks like

17  October 22nd, 2021; is that right?

18       A     Yes.

19       Q     That's about six weeks or so after the

20  mandate was announced on September 10th, 2021,

21  right?

22       A     About that, yeah.

23       Q     Okay.  And then did you also meet with

24  anybody from Takeda in connection with this request?

25       A     An HR representative interviewed.
```



Page 188

```
 1      Q    Do you remember that person's name?

 2      A    I think -- was it Christina or Kristina?

 3      Q    Mealey?

 4      A    Yeah, that's her.  I think that's the name,

 5 yeah.

 6      Q    And that was after you submitted this

 7 request?

 8      A    Correct.

 9      Q    And how long did you meet with Miss Mealey

10 for?

11      A    Maybe a half an hour.

12      Q    And between that meeting and then this

13 submission, does that include everything that you

14 provided to Takeda in connection with your request?

15      A    Yes.

16      Q    Did you feel like you needed the opportunity

17 to submit anything more?

18      A    No.

19      Q    Did you tell Miss Mealey during your meeting

20 with her anything that wasn't in this letter?

21      A    In my letter or in Pastor Bill's letter?

22      Q    Both, combined.

23      A    I don't believe so, no.

24      Q    You know what, I think there was another

25 document.  Oh, let's see -- yeah, there's one more.
```



Page 189

1    Let me send this to you.  Okay.  Miss Amoson, I

2    dropped another document in the chat, Exhibit 13.

3    The Bates label, Takeda 18566 to Takeda 18567; do you

4    recognize this document?

5        A    No.

6        Q    At the top it says, "Date of interview,

7    10-25-21"; do you see that?

8        A    I see that.

9        Q    Was that the date of the interview with

10   Christine Mealey?

11       A    I think so.

12       Q    I'm sorry?

13       A    I believe so.

14       Q    Please read this, and let me know if there's

15   anything in here you disagree with in terms of what

16   you relayed to her during your interview.

17            (Pause.)

18       A    Okay.

19       Q    Is anything in there inaccurate in terms of

20   what you said to Miss Mealey?

21       A    No.  If that's what's recorded or stated,

22   that's what I said.

23       Q    I just want to clear up a couple of things

24   that seem a little inconsistent.

25            MR. DeMATTEO:  Objection to form.



Page 192

```
 1       A     Yes.
 2       Q     And I'm looking at your letter.  In the big
 3  paragraph in the middle it says, "I have prayed about
 4  how to respond to the Covid 19 shot directive.  In
 5  light of my religious beliefs.  As I have prayed, the
 6  holy spirit has moved on my heart and conscience that
 7  I must not accept the Covid 19 shot.  If I were to go
 8  against the moving of the holy spirit, I would be
 9  sitting in jeopardizing my relationship with God and
10  violating my conscience"; do you see that?
11       A     Yes, I do.
12       Q     Is that the basis for not seeking -- or not
13  taking the vaccine?
14       A     That is --
15             THE REPORTER:  I'm sorry?
16             THE WITNESS:  That is the main reason, yes.
17  BY MR. RANJO:
18       Q     These aren't your words, are they?
19             MR. DeMATTEO:  Objection; form.
20       A     They're not my exact words, no, but that's
21  how I --
22  BY MR. RANJO:
23       Q     Where did you get these words from?
24       A     I got them from, like, my brother-in-law.
25       Q     And this is your husband's brother?
```



Page 193

```
 1      A    Well, it's his brother-in-law.

 2      Q    So your husband's sister's husband?

 3      A    Yes.

 4      Q    Is he religious?

 5      A    I believe that that's -- that this a, you

 6  know, some guidance from him, yes, but this is

 7  exactly how I feel.

 8      Q    How did he share his guidance with you?

 9      A    Just talked about it.

10      Q    And then you -- was he sitting next to you

11  as you're writing this letter?

12      A    No.

13      Q    How did he share these words with you?

14      A    We were just talking about it.  He actually

15  was talking mostly to my husband, and then --

16           THE REPORTER:  I'm sorry, ma'am.  You're

17  going to have to speak up.

18           THE WITNESS:  He was talking with my

19  husband, and then this is what we came up with.

20  BY MR. RANJO:

21      Q    Was all these -- were these discussions in

22  person, over the phone?

23      A    Over the phone.  I never really had a

24  conversation, per se.  It was mostly my husband and

25  Steve.
```



Page 194

```
 1        Q     So your husband was helping you draft the
 2   letter?
 3        A     Yes.
 4        Q     And I take it this isn't the first draft,
 5   right?
 6        A     Probably not.
 7        Q     How many drafts were there?
 8        A     I don't recall.
 9        Q     Were the initial drafts typed or
10   handwritten?
11        A     In handwritten form.
12        Q     And whose handwriting were they?
13        A     Mine, like just taking, like, point form
14   notes.  I don't know, I don't remember.
15        Q     Did you keep those drafts?
16        A     No.
17        Q     You don't have any drafts?
18        A     No.
19        Q     I just put in the chat what's been marked
20   Exhibit 14.  This is a four-page document.  It's from
21   the Liberty Council.  It's available publicly
22   available on the Internet; have you ever seen this
23   before?
24        A     Probably.
25        Q     Probably?  What does that mean?
```



Page 195

```
 1      A      I've got to get to it first.
 2      Q      Do you know what Liberty Council is?
 3      A      I think an organization that is for
 4   religious freedoms.  I don't know.
 5      Q      Have you ever heard of them before today?
 6      A      I believe so.  I can't say for sure yes or
 7   no.  I believe I've heard of their name.
 8      Q      Have you ever seen this document before?
 9      A      I can't say for sure.
10      Q      It's a letter from Liberty Council dated
11   July 26, 2021.  It says, "Sample religious exemption
12   request for Covid shot mandates"; do you see that?
13      A      Okay.
14      Q      When you were drafting your letter, did you
15   take language from other sources and put it into your
16   communications with Takeda?
17      A      I guess, yeah.  It looks like some of it.
18      Q      So you took -- let's look at this.  Page 3,
19   the first full paragraph, in the middle of the
20   paragraph it says, "As part of my prayers, I have
21   asked God for direction regarding the current Covid
22   shot requirement.  As I have prayed about what I
23   should do, the holy spirit has moved on my heart and
24   my conscience that I must not accept the Covid shot.
25   If I were to go against the moving of the holy
```



Page 196

1   spirit, I would be sitting and jeopardizing my

2   relationship with God and violating my conscience";

3   do you see that?

4        A    Yes, I do.

5        Q    You took that almost verbatim, if not

6   verbatim, and put it in your letter to Takeda,

7   right?

8        A    All right.  Yeah.

9        Q    So does that refresh your recollection about

10  this letter; you've seen this before, right?

11       A    I guess.  I don't recall.  I really don't.

12       Q    Did you search the Internet for a sample of

13  religious accommodation language when you were

14  completing your form for Takeda?

15       A    I think I was searching for the right

16  verbiage to use to explain how I felt because, like

17  earlier today when you're talking about "How do you

18  know He talked to you, how do you know," and so for

19  me to just say, "I know that He talked to me.  I

20  know.  I felt it," that's not enough to write that in

21  a letter.  So for -- so I may have -- was guided to

22  give that example that explained it in a better way,

23  I guess.

24       Q    Who guided you to give that example?

25       A    I think it was my brother-in-law.  Like,  I



Page 197

1    think that's who it was.

2        Q    Did you consult any other sources when

3    completing your submission?

4        A    No.

5        Q    And even this document, if you look on the

6    second page, you see where it's bolded in the middle,

7    and says, "Do not copy and paste them verbatim"; do

8    you see that part in the middle of Page 2?

9        A    No.

10       Q    "We encourage each individual to prayerfully

11   consider what he or she believes and not why" -- "and

12   why each individual should seek God's will through

13   prayer of whether he or she should comply with the

14   Covid shot mandate directed toward them or whether

15   the holy spirit is leading, guiding, or moving their

16   spirit to refuse the Covid shot"; do you see that?

17       A    I see that.

18       Q    You ignored the guidance not to cut and

19   paste verbatim; you just cut and pasted it verbatim,

20   right?

21       A    I guess.  That's what you're saying, yes.

22            MR. DeMATTEO:  Objection; form.

23   BY MR. RANJO:

24       Q    Did you tell anybody at Takeda that you

25   plagiarized the sample letter on the Internet to use



Page 198

```
 1   as your request?
 2        A    No.
 3             MR. DeMATTEO:  Objection; form.  Come on.
 4   BY MR. RANJO:
 5        Q    And when you talk about in your letter and
 6   then in this sample about conscience and the holy
 7   spirit, those are, for you, the references we
 8   discussed about speaking to God and having the
 9   feelings you described earlier, right?
10        A    That's correct.
11        Q    And there was no other basis for your
12   religious accommodation claim other than what's in
13   your submission to Takeda and then what we talked
14   about before?
15        A    Correct.
16        Q    Did you decline to get a Covid 19
17   vaccination because you believe that fetal cells were
18   used in the testing of the vaccine?
19        A    No.
20        Q    Did someone tell you that -- did someone
21   tell you to say that?
22        A    Did someone tell me to say what?
23        Q    To deny that that was a reason?
24        A    My brother-in-law had mentioned that, you
25   know, in the Catholic church, that's what they're
```



Page 203

1  fetal cells have nothing to do with it?

2      A    Well, in this part, it doesn't say anything.

3  I'm talking about in general because Susan would keep

4  continually saying about the fetal cells, and

5  basically, we're trying to shut her down, that that's

6  not what this is about.

7      Q    Was it about the fact that it hadn't been

8  approved by the FDA through the full process?

9      A    There were a number of reasons, but for the

10 first one being God didn't tell me that this was

11 right.  I know that He had told me that, and it was

12 because they weren't approved, and it was because

13 they didn't have long-term studies, yes.  Did I not

14 feel -- Of course.  It's all of those things and the

15 safety efficacy.

16          Those are the reasons why God was telling me

17 not to get it, that I wasn't in a risk category, that

18 I wasn't someone that took vaccines.  I didn't have a

19 flu vaccine since I was probably 18 years old.  So

20 why would I all of a sudden get this one?

21     Q    Okay.  Let's talk about the other vaccines.

22 In your interrogatory responses -- I'll pull it up.

23 Ma'am, I just put in the chat Exhibit 17.  It's a

24 23-page document.  I'll represent to you that this is

25 the interrogatory responses that you provided to my



Page 207

```
 1      A    Yes.
 2      Q    Let's talk about the stuff you do say that
 3  you received.  I just put in the chat Exhibit 19.
 4  It's an eight-page document.  I'll represent to you
 5  these are the supplementary interrogatory responses
 6  that you served on Takeda.  Can you please just
 7  confirm that it's your signature on the last page,
 8  Page 8; is that a yes?  I'm sorry.  You broke up.
 9      A    Yes.
10      Q    Okay.  So I'm looking at your supplemental
11  response to Interrogatory 19, says, you would have
12  received a hep B shot interim 2010 or '11, and then
13  you would have received an HPV shot from your OB/GYN;
14  you see that?
15      A    Yes.
16      Q    When was the HPV shot?
17      A    I don't recall getting it.  That's what I'm
18  trying to say.  I said I think I did.  I'm not 100
19  percent sure.  I believe I got one, but I'm not sure,
20  and I don't know where I could find that out.  Maybe
21  from my most recent OB/GYN would get that information
22  that was passed on, perhaps.  I don't know, and the
23  hepatitis B one, that was a misunderstanding.  I
24  thought that it was hepatitis B, but it wasn't.  It
25  actually turned out to be the tetanus and then the
```



Page 208

1    measles, mumps, rubella.

2              So I was even wrong on that.  So my memory

3    isn't clear on that one.  This is over 10 years

4    ago.

5        Q    I wouldn't know because you haven't answered

6    my question about when you think you received the HPV

7    shot.  That was the only question I asked you.

8        A    I said, it says right there, "likely been

9    given in 2010 or 2011."  I don't recall.

10       Q    I'm talking about the second part where it

11   says, "I think the HPV was," that's the same; the HPV

12   and hep?

13       A    I stand by what I said previously.  That

14   would have given me.  The HPV, it would have likely

15   been given in 2010 or 2011.  That encompasses both of

16   those.

17       Q    So you would have -- you're only admitting

18   to getting two vaccines in 2010 or '11, right; that's

19   all you're admitting to?

20       A    Getting two vaccines.  I got a tetanus one.

21   On that same day, I got a TB test was given to me,

22   and I got the measles, mumps, rubella one, and I

23   believe, but I'm not a hundred percent sure, that I

24   was, at one point, given an HPV shot.  I don't

25   recall.  I'm not a hundred percent sure.



Page 209

1          I believe it was because I had a leak
2    procedure, which is some technical thing that was a
3    surgery, and that that was the reason why I had to
4    have the HPV, but I do not recall getting one at all,
5    but I believe it might have been given to me or
6    advised or something.  I don't really recall.
7          Q    Okay.  And just to confirm, you didn't pray
8    to God about getting any of these vaccines, right?
9          A    No.
10         Q    Why would you pray to God about a Covid 19
11   vaccine, but not these other ones?
12         A    Because the world was not in chaos.  I did
13   not feel, at this time, that things in the world were
14   evil.  At this time, I didn't -- wasn't going to be
15   losing my job over it.  This was for me to start a
16   new life.
17         These vaccines were and had been tested over
18   and over for many, many, many, many, many years, so I
19   deemed them to be safe and effective.  Those are the
20   reasons.
21         (Pause.)
22         Q    All right.  I want to show you just a couple
23   more things.  All right, Miss Amoson.  I've just put
24   in the chat a document again, Takeda 8479 to 8482.
25   Please take a look and let me know if you recognize



Page 212

```
 1   like, close up our work and make sure that we sent
 2   back stuff, and all that kind of stuff.  Official
 3   last day was November 1st, 2021.
 4        Q    Okay.  I have a list of medications that I
 5   pulled from your medical records.  I want to try to
 6   read them to you and confirm that these are all
 7   things that you've taken.  I can pull up the medical
 8   records if I have to, but it will just take a lot
 9   longer.  I'm going to try to read them.  Trintellix,
10   is that something you're taking?
11        A    I have tried it, yes.  Trintellix.
12        Q    Trintellix?  How about V-I-I-B-R-Y-D?
13        A    Viibryd, yes.
14        Q    What's that?
15        A    That is also an antidepressant.
16        Q    How about V-R-A-Y-L-O-R?
17        A    Vraylor, yes.
18        Q    What is that?
19        A    Another antidepressant.
20        Q    What about V-Y-V-A-N-S-E?
21        A    Vyvanse, yes.  That is an ADHD medication.
22        Q    Lorazepam?
23        A    Yes.  That's for panic or anxiety.
24        Q    What about G-U-A-N-F-A-C-I-N-E?
25        A    Say that one again?  Sorry.
```



Page 213

```
 1       Q      G-U-A-N-F-A-C-I-N-E?

 2       A      Guanfacine?

 3       Q      Yes.

 4       A      That is also an ADHD type medication if I

 5  remember correctly, I believe.  Yeah.

 6       Q      Trazadone?

 7       A      Trazadone for sleep.

 8       Q      Propanolol?

 9       A      That one I have a hard time with, too.  I

10  always just say, the P one.

11              THE REPORTER:  I'm sorry.  What?  Can you

12  repeat that?

13  BY MR. RANJO:

14       Q      I'll spell it.  P-R-O-P-R-A-N-O-L-O-L.

15       A      Propranolol or something like that, but yes,

16  it's for anxiety, as well.

17       Q      And then B-U-P-R-O-P-I-O-N?

18       A      Bupropion, which is the generic name for

19  Wellbutrin, which is an antidepressant.

20       Q      And those are things you've taken,

21  correct?

22       A      Those are things I've taken.  I am not

23  currently on any of those except buprorion.

24       Q      How about hydrochloride?

25       A      That one was discontinued, as well.
```



Page 214

```
 1        Q      How about hydroxyzine?

 2        A      I don't know.  I would say that one's

 3   discontinued, as well.

 4        Q      And then you said Wellbutrin already?

 5        A      Um-hum.

 6        Q      And then E-S-C-I-T-A-L-O-P-R-A-M?

 7        A      Escitalopram.  It's an antidepressant,

 8   yes.

 9        Q      Oxalate?

10        A      That one doesn't sound familiar, but . . .

11        Q      G-A-B-A-P-E-N-T-I-N?

12        A      Gabapentin.

13        Q      What's that?

14        A      It's -- she's actually using it off label

15   for sleep, but it's mainly for -- because I'm on a

16   very, very low dose, but it's mainly for people, I

17   think, that have, like, seizures or something.  I

18   don't really recall or remember what she said, but

19   it's used off label on occasion.

20        Q      Valtrex?

21        A      That is for as needed only, and that's when

22   I get cold sores and use that to treat my cold sores

23   so they go away faster.

24        Q      Naprosyn?

25        A      Naproxyn?
```



Page 215

1      Q     No X.   N-A-P-R-O-S-Y-N?

2      A     I think it's Naproxyn, but that's

3  basically --

4            THE REPORTER:  I'm sorry?

5            THE WITNESS:  It's kind of like an Advil.  I

6  take that for premenstrual pain.

7  BY MR. RANJO:

8      Q     Paxil?

9      A     No, I'm not on that, no.  That is an

10  antidepressant.  I might have been many, many, many

11  years ago.

12     Q     And there's -- it looks like there's more.

13  Did you ever look up these -- any of these

14  medications to see if they were safe?

15     A     I would usually talk about it with my

16  provider, and I've known many of these medications.

17  Some of them I've sold, so I know the PI very, very

18  well.  Also had confidence in those medications.

19     Q     Because you spoke to your health-care

20  provider about it?

21     A     Well, at the time, I'm saying that they had

22  recommended it, and then they would tell me what is,

23  like, a warning or what some of the side effects

24  would be or, you know, what's the intended outcome,

25  then we would go from there and make a decision.


MAGNA
LEGAL SERVICES

Page 216

1      Q    Did you do any independent research on any

2  of the medications you've taken?

3      A    Typically, I'll do, like, a Google search

4  and see, like, what the common side effects are.

5      Q    I've got a little bit more.  Do you want to

6  take a quick break and finish, or try to finish

7  without a break?

8      A    Let's finish.

9      Q    Miss Amoson, are you seeking emotional

10  distress damages in this case?

11      A    Yes, I am.

12      Q    What emotional effects do you allege were

13  caused by Takeda?

14      A    The fact that I had to completely uproot my

15  whole, you know, home life, sell our home, move to an

16  entirely different state.  As I mentioned previously,

17  this was never something that we thought about or

18  were planning on moving or anything like that.  We

19  had just built a brand-new home three years prior.

20          So -- and that Christmas, that sucked a lot.

21  I mean, having no job and having to sell my home,

22  living in an RV.  Probably the thing I'm most sad

23  about still is having to rehome my donkeys.  That was

24  pretty heartbreaking.

25      Q    Were you diagnosed with any sort of mental



Page 235

```
 1          MR. RANJO:  Of course.

 2          THE REPORTER:  And Chris, would you like a

 3  copy?

 4          MR. DeMATTEO:  Just a PDF, full copy.

 5          THE REPORTER:  And what about the exhibits?

 6  Do you want to forward them to me, do you not want

 7  them attached?  What's your preference?

 8          MR. RANJO:  They're all in the chat.

 9          THE VIDEOGRAPHER:  Time is now 3:26 p.m.

10  This concludes the deposition.  We're going off the

11  record.

12          (The video remote deposition of LISA AMOSON

13           concluded at 3:26 p.m., October 24, 2023.)

14                    *   *   *   *

15

16

17

18

19

20

21

22

23

24

25
```



Page 236

1  STATE OF WYOMING  )

2                   )ss.  REPORTER'S CERTIFICATE

3  COUNTY OF LARAMIE )

4      I, Rosemary Novario, do hereby certify that I am

5  a Registered Merit Reporter and Notary Public within

6  the State of Wyoming; that previous to the

7  commencement of the examination, the deponent was

8  duly sworn to testify to the truth.

9      I further certify that this deposition was taken

10 in shorthand by me at the time and place herein set

11 forth, that it was thereafter reduced to typewritten

12 form, and that the foregoing constitutes a true and

13 correct transcript.

14     I further certify that I am not related to,

15 employed by, nor of counsel for any of the parties or

16 attorneys herein, nor otherwise interested in the

17 result of the within action.

18     In witness whereof, I have affixed my signature

19 this _____ day of _____ , 2023.

20     My commission expires July 17, 2029.

21

22

23                      _____
                        Rosemary Novario, RMR, RPR
24                      4318 E. 8th Street
                        Cheyenne, WY  82001

25



**EXHIBIT**
**12**



## Religious Accommodation Request Form

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

**To be completed by employee**

Name: Lisa Amoson                    Position: Sales Rep

Date of request: October 22, 2021

Business/Function: USBU - Neuroscience

Immediate supervisor: Stephen Severino

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):

I am requesting a religious exemption from any of the Covid-19 vaccines

Frequency and duration of the accommodation requested: Indefinite

Describe religious belief or practice that necessitates this request for accommodation:

Please see attached letter describing my religious beliefs.

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.
Letter is attached

Please provide alternative accommodations that might address your needs:

1. I will continue to test 2x a week to ensure I am negative from the Covid 19 virus

2. I will continue to wear a mask in all healthcare settings or any on-site Takeda facilities

3. Work remotely if required

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: *Lisa Amoson*                    Date: October 22, 2021

Upon final determination the employee will receive a letter approving or denying the accommodation request.

Dear Employer,

I am writing to formally and respectfully apply for a religious exemption to the Takeda Pharmaceuticals Company Inc. Covid-19 vaccination policy that requires that all employees show proof of vaccination in order to stay employed by the company.

Based on my understanding of Title VII of the Civil Rights Act, the First Amendment to the United States Constitution, and other federal and state laws, I choose to exercise my right to demand a religious exemption to the requirement of the Covid 19 vaccines. This request for an exemption is based on my deeply held religious beliefs pursuant to my reliance on teachings in the Holy Bible.

I have been a Christian most of my life. My personal convictions are inspired by my study and understanding of the Bible, and personally directed by the true and living God. As a believer in Jesus, the Holy Spirit lives in me. Jesus said the Holy Spirit will guide each person who repents of their sin and believes upon Him into all truth. I seek God's will for my life through prayer, reading the Bible, and relying on the power of the Holy Spirit to help me to do God's will. I believe God's promise that "if anyone lacks wisdom, let him ask of God, who gives to all liberally." (James 1:5) I have prayed about how to respond to the Covid-19 shot directive in light of my religious beliefs. As I have prayed, the Holy Spirit has moved on my heart and conscience that I must not accept the Covid-19 shot. If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience. I do not turn my back on all 'modern' medicine and its practices and philosophies. There is a significant difference between a body in crisis needing help and a body that is healthy accepting a medical procedure. I believe God would accept the former, He would not accept the latter.

I ask that this request for exemption be shared on an as-needed basis only; that is, only those charged with approving the exemption request should read my words as it contains thoughts and sentiments of an extremely personal nature.

I am personally convicted that I should not receive any of the three Covid-19 shots available. I don't ask you, or anyone else to agree with these thoughts and personal translations but under the law, I request that they be honored as truthful and legally permissible based on my sincerely held religious beliefs. I ask that this religious exemption be approved.

Thank you,

Lisa Amoson

Lisa Amoson

TAKEDA_018563



**TABLE ROCK**
FELLOWSHIP

October 21, 2021

Re: Lisa Amoson

To Whom It May Concern:

I can affirm that Lisa Amoson is acting in accordance with her sincerely held religious beliefs in requesting a religious exemption.

As Lisa's pastor, I affirm that I have spoken with and prayed with Lisa Amoson about her request for an exemption. I can affirm that she is simply trying to follow her God-given conscience. Therefore, during these difficult times, I prayerfully request that Lisa's employer honors and respects her request for a religious exemption, just as I hope it would honor the beliefs of its other employees of faith who conscientiously object to receiving the vaccine.

In Him,

Bill Muir

Bill Muir
Sr. Pastor of Table Rock Fellowship

BM:mts

541-245-2612    answers@TableRockFellowship.org    TableRockFellowship.com    3610 N Pacific Hwy, Medford, OR 97501

CONFIDENTIAL    TAKEDA_018564

EXHIBIT

**13**

**RELIGIOUS ACCOMMODATION**
**Interactive Dialogue**

Employee Name: Lisa Amoson
Division:
Position:
Field or Office based: Field
ER Representative(s): Christine Mealey
Date of Interview: 10/25/21

Tell me more about your religious beliefs and religion or belief system generally.

Basically I believe, been a Christian for many, many years, did Sunday school, practiced my whole life, conscious as a whole and the idea is given to me by god and us by god, not for us to judge what is wrong, only for me to follow and decide, makes it not a good idea for me to take this vaccine, we are obliged to follow what god says, he has given us this conscious so I can't follow man and God at the same time, only God, for me the conscious is the most important thing to follow and guide us, conscious is Christ and that's what sets me apart. Is the law of the mind. It is a messenger from God. My judgements have to come from that basis, can't be judge right or wrong, no church or rule that states we have to take it really, that's why I decided not the right thing, not against vaccines, just deemed the risk is greater than the reward with this particular vaccine, I reviewed all the facts and information, it's just not right for me at this time, should be voluntary that's what the church teaches us and should be respected and a person is morally required to follow their own conscious because it was given to me by God

Are you a member of any particular church or religious organization?

Table Rock, Pastor Bill is my senior Pastor, spoken to him on several occasions about it

If so – What do your religion's leaders say about the vaccine?

Pastor believe we are suppose to follow our conscious, but they are not for or against (no)

Have your religious leaders specifically stated that you may not be vaccinated?

No they would not come out and say that

How long have you subscribed to this belief system?

Tell me more about how the company's policies/rules conflict with your beliefs.

CONFIDENTIAL

TAKEDA_018566

What is it specifically about this religious belief that prohibits you from being able to become vaccinated?

*If applicable:*
Please tell me more about the fetal cells (or substitute specific concern i.e. vegan) and how that connects to your request?

Have you taken any other vaccines in your life?  (do not ask for specifics)

I have, not as an adult

Besides vaccines, do your religious beliefs prevent you from being tested for COVID?

Nope been doing it twice a week already

Is there anything else we should know or consider as we review your request?

90 % of in the field – lot of face to face, work in rural type of community most do want to see me in person, very few offices that would want to do virtual but would do if I had to like before

CONFIDENTIAL                                                    TAKEDA_018567

# Exhibit D

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
LISA AMOSON, ROBB HUCK,      )
TROBY LANE PARRISH,          )
ALECIA RAMSEY, LARRY         )
HAROLD SAVAGE, JILLYN        )
SCHMIDT, SANDRA SALAZAR      )       CASE NO.:
SILVA, BRITT HAROLD          )    1:22-cv-11963-GAO
SINGLETON, SUSAN WELCH,      )
                             )
          Plaintiffs,        )
                             )
          -vs-               )     DEPOSITION OF
                             )       ROBB HUCK
TAKEDA PHARMACEUTICALS       )
U.S.A., INC.,                )
                             )
          Defendant.         )
- - - - - - - - - - - - - - -
```

VIDEOTAPED AND REMOTE DEPOSITION OF
ROBB HUCK, taken before Jane Malone, Registered
Professional Reporter, General Notary Public
within and for the State of Nebraska, beginning at
9:31 a.m., on October 2, 2023, via Zoom.



Page 2

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4    PATTIS & SMITH
      383 ORANGE STREET
 5    NEW HAVEN, CONNECTICUT 06511
      TELEPHONE:  (203)393-3017
 6
               BY:  MR. CHRISTOPHER DeMATTEO
 7                  cdematteo@pattisandsmith.com
 8
 9
10    FOR THE DEFENDANT:
11    MORGAN, LEWIS & BOCKIUS, LLP
      ONE FEDERAL STREET
12    BOSTON, MASSACHUSETTS 02110
      TELEPHONE:  (617)341-7700
13
               BY:  MS. KERI L. ENGELMAN
14                  keri.engelman@morganlewis.com
15             BY:  MS. CELINA ANTONELLIS
                    celina.antonellis@morganlewis.com
16
17
18    ALSO PRESENT:  MR. DALTON TERRELL, Videographer
19
20
21
22
23
24
25
```



```
                                              Page 3
 1              D E P O S I T I O N
 2                  I N D E X
 3                                              PAGE
 4  CASE CAPTION....................................1
    APPEARANCES.....................................2
 5  INDEX...........................................3
    STIPULATIONS....................................4
 6  REPORTER'S CERTIFICATE........................316
 7
 8                E X A M I N A T I O N
 9  DIRECT EXAMINATION
       BY MS. ENGELMAN: .............................6
10  CROSS-EXAMINATION
       BY DeMATTEO: ...............................303
11  REDIRECT EXAMINATION
       BY MS. ENGELMAN: ...........................312
12
13
14                E X H I B I T S
15  EXHIBITS:                           MARKED
16  EXHIBIT 1: Seeking Justice Signal Chat    315
17  EXHIBIT 2: Plaintiff's Signal Chat        315
18  EXHIBIT 3: Truth Social Screenshots       315
19  EXHIBIT 4: Archdiocese of Omaha Papers    315
20  EXHIBIT 5: Gross Catholic COVID Papers    315
21  EXHIBIT 6: Religious Accommodation Paper  315
22  EXHIBIT 7: Bioethics Center Letter        315
23  EXHIBIT 8: Interactive Process Notes      315
24  EXHIBIT 9: Medical Accommodation Email    315
25
```



Page 4

1                          E X H I B I T S

2    EXHIBITS:                                        MARKED

3    EXHIBIT 10: Lab Work Patient Report              315

4    EXHIBIT 11: Medical Records                      315

5    EXHIBIT 12: Medical Records                      315

6    EXHIBIT 13: Job Applications Log                 315

7    EXHIBIT 14: Email                                315

8    EXHIBIT 15: Email                                315

9    EXHIBIT 16: Interrogatory Responses              315

10   EXHIBIT 17: Quarterly Feedback                   315

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 5

```
 1              (Whereupon, the following proceedings
 2   were had, to wit:)
 3              VIDEOGRAPHER:  All right.  We are
 4   now on the record.  This begins the deposition of
 5   Robb Huck.  Today is Monday, October 2nd, 2023.
 6   The time is now 9:31 a.m.
 7              The videographer is Dalton Terrell
 8   of Magna Legal Services.  The court reporter is
 9   Jane Malone of Magna Legal Service.
10              Will counsel and all parties
11   present please state their appearances for whom
12   they represent.
13              MS. ENGELMAN:  Keri Engelman from
14   Morgan, Lewis & Bockius on behalf of Takeda.
15              MR. DeMATTEO:  Good morning.  This
16   is Chris DeMatteo from Pattis & Associates.  I
17   represent the deponent, Robb Huck.
18              COURT REPORTER:  All right.
19              MS. ENGELMAN:  I also have --
20              COURT REPORTER:  Go ahead.
21              MS. ENGELMAN:  Sorry.
22              VIDEOGRAPHER:  Okay.  Can I have
23   the court reporter --
24              MS. ENGELMAN:  I also have on the
25   line my colleague, Celina Antonellis, also from
```



Page 6

1    Morgan, Lewis on behalf of Takeda.

2                    ROBB HUCK

3              having been first duly sworn,

4          was examined and testified as follows:

5                  DIRECT EXAMINATION

6    BY MS. ENGELMAN:

7         Q.   Good morning, Mr. Huck.

8         A.   Good morning.

9         Q.   My name is -- my name is Keri Engelman.

10   I represent Takeda in this action.  How are you

11   doing this morning?

12        A.   Very well.  Your -- yourself?

13        Q.   Good.  Thank you.  Thank you -- thank

14   you for your time.  So the purpose of today is to

15   ask you questions regarding the lawsuit that you

16   brought against Takeda.  Do you understand that?

17        A.   Yes.

18        Q.   Okay.  Do you understand that you are

19   under oath just as if you were testifying in

20   court?

21        A.   Yes.

22        Q.   And so you understand that you must

23   answer all questions truthfully and that continues

24   after -- for the duration of the deposition after

25   breaks?



Page 14

1    exemption back in 2021.

2         Q.    And who did you speak with?

3         A.    Father Leo Rigatuso.

4         Q.    And when -- approximately when was that

5    conversation?

6         A.    I believe September of 2021.

7         Q.    And what did you speak with Father --

8    I'm going to -- I'm going to butcher it.

9         A.    Rigatuso.

10        Q.    Rigatuso?

11        A.    We'll just call him Father Leo.

12        Q.    What did you -- okay.  What did you

13   speak to -- with Father Leo about?

14        A.    I told him that there was a vaccine

15   mandate, mandated by Takeda Pharmaceuticals.  And

16   I was applying for religious exemption based on

17   the emergency use authorized -- authorized

18   vaccines using aborted-derived cell lines and

19   tissues.  And it was against my sincerely-held

20   belief, religious belief in carrying through with

21   that mandate.

22             And I asked for his blessing.  And he

23   signed off on that.  And he agreed that that

24   exemption should have been granted from Takeda.

25        Q.    And when you say "he blessed it," did he



Page 15

1    provide any more information to you about why he,

2    in your words, blessed the exemption request?

3          A.    Because he felt it was the right -- the

4    right thing to do as a practicing Catholic.

5    And he -- he personally believed that that

6    exemption should be granted.  That's why he signed

7    off on it.

8          Q.    Okay.  And what -- what church is Father

9    Leo associated with?

10         A.    St. Matthew, the Evangelist, in

11   Bellevue, Nebraska.

12         Q.    And how long have you had -- how long

13   have you known Father Leo?

14         A.    Since he arrived at St. Matthew, but

15   I -- I can't give the exact timeframe.  I could

16   estimate.

17         Q.    Approximately.  I mean, sure.

18         A.    Approximately eight years.

19         Q.    Okay.  And prior to this conversation

20   about the exemption request, had you ever had any

21   other conversations with Father Leo about COVID

22   generally?

23         A.    No.

24         Q.    Did you ever have any conversations with

25   him about the COVID vaccine before that



1      Q.    What about with Shannon?  Do your

2    religious beliefs generally align?

3      A.    Generally, yes.

4      Q.    Is -- sitting here today, is there any

5    differences in your religious beliefs that you can

6    identify?

7      A.    No.

8      Q.    Okay.  By the way, when did you decide

9    that you were not going to be vaccinated against

10   COVID-19?

11     A.    After doing my research and learning

12   that there were aborted fetus lines and cells used

13   in testing and manufacturing of the EUA vaccines

14   and --

15     Q.    Okay.

16     A.    -- that's it.

17     Q.    Okay.  And when is it that you did that

18   research?

19     A.    The summer of 2021.

20     Q.    And what prompted you to do the

21   research?

22     A.    Based on the speed of the way these EUA

23   vaccines were brought to market, I -- I felt was

24   unusual.  So I did quite a bit of research on the

25   vaccines and the EUA COVID-19 vaccines.



Page 60

```
 1              Coming from a pharmaceutical background,
 2   which I know there is extensive placebo-controlled
 3   testing and many, many years of placebo-controlled
 4   trials.  So that prompted me to do some research
 5   into the COVID-19 EUA vaccines.
 6         Q.   And where did you research?
 7         A.   Oh, medical papers, internet, podcasts,
 8   went to a speech by Dr. Peter McCullough.
 9         Q.   Okay.  And what -- anything else?
10         A.   I don't think so.
11         Q.   Okay.  And what -- to your recollection,
12   what medical papers did you rely on?
13         A.   Oh, I don't recall.  I -- I'd have to go
14   back and look.  And I also read a book by RFK,
15   Jr., or I listened to it.  It's called The Real
16   Anthony Fauci.
17         Q.   Okay.  Anything else?
18         A.   No, not that I can recall.
19         Q.   Okay.  Okay.  And so it's -- when you
20   say internet, do you remember what searches or
21   what internet sites that you looked at?
22         A.   I don't.
23         Q.   Do you have a copy of the medical papers
24   that you relied on?
25         A.   Physical copy, no.
```



1           (At 10:50 a.m., with all parties present

2    as before, the following proceedings were had,

3    to-wit:)

4                VIDEOGRAPHER:  All right.  We are

5    now back on the record at 10:50.

6    BY MS. ENGELMAN:

7       Q.   So just before the break, Mr. Huck, we

8    were talking about the event -- or I should say

9    the speech that you went to with Lynn.  And is the

10   last name Cousin?

11      A.   Kocian, K-O-C-I-A-N.

12      Q.   Okay.  And you mentioned she was one of

13   your healthcare providers.  What provider is she?

14      A.   She's a physician's assistant.  And she

15   is one of the providers in the clinic that I see.

16      Q.   And which clinic is that?

17      A.   Gretna Family Health.

18      Q.   And how long have you been seeing Lynn?

19      A.   Roughly -- I don't know -- three years.

20      Q.   Okay.

21      A.   Approximately.

22      Q.   And so -- okay.  And so you mentioned

23   that you had a conversation about the safety and

24   efficacy of the COVID-19 vaccine; is that right?

25      A.   Correct.



Page 66

1      Q.   Okay.  Can you tell me about that

2  conversation?

3      A.   Well, it was mainly with regards to the

4  VAERS system and the sudden uptick in adverse

5  events that were being reported.  And so we were

6  talking about that, having concern in the uptick

7  in those -- in those numbers with regards to the

8  COVID-19 EUA vaccine.

9      Q.   Okay.  And sorry.  Just to remind

10  myself.  This conversation was in the summer of

11  2021; is that right?

12      A.   Yes.

13      Q.   Okay.  And so around that time period,

14  did you have concerns about the safety of the

15  COVID-19 vaccines?

16      A.   Yeah.

17      Q.   Okay.  And what were those concerns

18  specifically?

19      A.   Well, just based on the VAERS, the

20  adverse events reported through the VAERS system,

21  which is through the -- I believe it's through the

22  CDC, and which included heart attack, stroke,

23  blood clots, and sudden deaths.

24      Q.   And so did you review this adverse event

25  data?



```
 1        A.    With Lynn or --
 2        Q.    No, just generally.
 3        A.    Yeah.
 4        Q.    Okay.  And -- and where did you review
 5   that data?
 6        A.    At the VAERS website.
 7        Q.    Okay.  And did you do any other research
 8   with respect to the safety of the COVID-19
 9   vaccine?
10        A.    Yes.
11        Q.    And what research was that?
12        A.    Well, like I said earlier, on -- online,
13   medical journals.  Substack is another one.
14        Q.    What is Substack?
15        A.    It's a -- it's a blog website,
16   independent writers.  And mainly on there, I
17   follow Steve Kirsch.
18        Q.    Okay.  And what does Steve Kirsch say
19   about the safety of the COVID-19 vaccine?
20        A.    That he has major concerns with regards
21   to safety and efficacy in -- with regards to the
22   vaccine.
23        Q.    And you share his concerns?
24        A.    After doing that research, yes.
25        Q.    Okay.  And did -- and what did Lynn say
```



Page 69

```
 1        A.   Well, with the data -- with the data and
 2   the information I had -- I had garnered at that
 3   time, yes.
 4        Q.   Okay.  Since you made your initial
 5   decision not to get the COVID-19 vaccine, have you
 6   ever reconsidered that decision?
 7        A.   No.
 8        Q.   Never.  Okay.  So you go to this talk
 9   with Peter McCullough.  And what does Peter
10   McCullough say in his speech thing about the
11   safety and efficacy of the COVID-19 vaccine?
12        A.   That -- if I recall correctly, that it
13   was neither -- comparatively speaking, to previous
14   vaccines over the past 20 years, the safety is --
15   it's not nearly as safe based on the VAERS data.
16             And efficacy was also of concern because
17   people that were being -- getting vaccinated were
18   still coming down with COVID-19 infection.
19        Q.   Okay.  And did you agree with him with
20   respect -- with respect to his concerns about the
21   efficacy?
22        A.   Yes.
23        Q.   And did you agree with him with respect
24   to his concerns about the safety?
25        A.   Yes.
```



MAGNA

LEGAL SERVICES

Page 76

1    aborted-derived fetus cells.  And, secondly, with

2    regards to the safety and efficacy, I would have

3    tried to persuade her not to do that.

4        Q.   And is there any reason you kept those

5    opinions to yourself?

6        A.   Because it was already done, and my mom

7    had enough -- has enough on her plate right now

8    dealing with my father.

9        Q.   Okay.  Sitting here today, do you

10   have -- do you still have concerns about the

11   safety and efficacy of the COVID-19 vaccines?

12       A.   Yes.

13       Q.   And what are those concerns?

14       A.   That -- that they're not very safe or

15   effective based on the VAERS data.  As far as

16   safety, efficacy, I know a lot of people that have

17   received the vaccine and the boosters, and they

18   keep getting infected.

19            And I, myself, got COVID in September of

20   2021.  And with my natural immunity and -- natural

21   immunity based on a quantitative blood test of

22   three times the antibodies, I -- knock on wood --

23   have been healthy ever since and not had let alone

24   a cold or COVID.

25       Q.   And when is the last time you reviewed



Page 77

1   the VAERS data -- safety data on the COVID-19

2   vaccines?

3        A.   Oh, I would say it's -- to estimate,

4   probably six months ago.

5        Q.   Any other times that you reviewed the

6   VAERS data on the COVID-19 vaccines?

7        A.   Oh, before that, I -- I would look at it

8   more regularly.  Back in 2021, I would look at it

9   probably every other week.

10        Q.   And since -- from 2021 to current,

11   you've maintained your view that the COVID

12   vaccines are not safe; is that correct?

13        A.   Correct.

14        Q.   And sitting here today, what are your

15   state -- what are your concerns about the safety

16   of the COVID-19 vaccines?

17        A.   Well, with regards to instances of turbo

18   cancer, blood clots, heart attacks, sudden death,

19   those are the major concerns as far as safety.

20   And that it's still under emergency use

21   authorization.  It's not even an approved vaccine

22   from the FDA.

23        Q.   Okay.  So you have an objection to the

24   COVID-19 vaccines because of the emergency use

25   authorization --



Page 78

```
 1        A.   That's part of --
 2        Q.   -- right?
 3        A.   That's part of it.
 4        Q.   But that's --
 5             MR. DeMATTEO:  Objection to form of
 6   the question.
 7             MS. ENGELMAN:  Sorry.
 8   BY MS. ENGELMAN:
 9        Q.   Tell me about your concern with respect
10   to that.
11        A.   With respect to what?  The EUA?
12        Q.   Yes.
13        A.   Well, an EUA is -- it's not an official
14   approved from the FDA.  It's under emergency use
15   authorization.
16             And the only way you can get an
17   emergency use authorization is if it's -- you
18   know, there is no other readily available
19   treatment protocol for -- for the said disease.
20             It's also -- should not be -- you should
21   be given all informed consent as well with an EUA.
22        Q.   What do you mean by that, you should be
23   given informed consent?
24        A.   Well, before you're given it, what the
25   safety and efficacy data shows.
```



Page 110

1        Q.   And you agree with that statement?

2        A.   Yes.

3             MS. ENGELMAN:   Celina, it's

4   June 3rd, 2022.  Nope.  Keep going.  Nope.  Yeah.

5   Right there.  Can you make that bigger?  Okay.

6   BY MS. ENGELMAN:

7        Q.   Mr. Huck, do you see this retruth from

8   June -- June 3rd, 2022?

9        A.   Yes.

10       Q.   Okay.  It says, "The war is not won

11  until the doctors, nurses, and administrators, and

12  politicians who participate in these vast crimes

13  against humanity are made to confess their crimes

14  in public."  Do you see that?

15       A.   Yes.

16       Q.   What does that statement mean to you?

17       A.   It means that -- to me, that the doctors

18  need to look at the VAERS information and

19  understand that there is some, if not a lot, of

20  harm being done by the EUA COVID-19 vaccines.

21       Q.   Okay.  And so is it fair to say that you

22  believe the COVID-19 vaccines are so unsafe that

23  those who administer them commit crimes against

24  humanity?

25             MR. DeMATTEO:   Objection.  Form of



Page 111

```
 1   the question.
 2   BY MS. ENGELMAN:
 3        Q.    You may answer.
 4        A.    If they're doing it knowingly.
 5                    MS. ENGELMAN:  Okay.  Going to
 6   August 2nd, 2022.  Right there.  Make it bigger.
 7   BY MS. ENGELMAN:
 8        Q.    Mr. Huck, do you see this retruth from
 9   August 2nd, 2022?
10        A.    Uh-huh.
11        Q.    And it says, "Moderna regulatory fraud
12   exposed."  Do you see that?
13        A.    Yes.
14        Q.    And you retruthed this as truth;
15   correct?
16        A.    Yes.
17        Q.    And do you believe that Moderna
18   committed regulatory fraud in connection with the
19   COVID-19 vaccine?
20        A.    What -- what's that other part say?
21   Products were --
22        Q.    I'm not sure.  We can -- certainly you
23   can read it.
24                    MS. ENGELMAN:  Celina, can you go
25   in a little bit.
```



Page 123

 1        Q.   Have you ever filed for unemployment

 2   compensation?

 3        A.   I did after I was terminated from

 4   Takeda.

 5        Q.   Okay.  Any other time in your lifetime

 6   that you applied for --

 7        A.   No.

 8        Q.   -- compensation?  Okay.  And did you go

 9   to college?

10        A.   Yes.

11        Q.   Where did you go to college?

12        A.   I graduated from the University of

13   Nebraska at Lincoln but started at the University

14   of Kansas; and also UNO, University of Nebraska at

15   Omaha; and Bellevue College.

16        Q.   Okay.  Are any of those

17   religious-affiliated schools?

18        A.   No.

19        Q.   So we established earlier that your

20   religious objection to taking the COVID-19 vaccine

21   is the -- is the use or testing of aborted fetal

22   cells; is that correct?

23        A.   Correct.

24        Q.   Is there any other basis for your

25   religious objection to taking the COVID-19



Page 124

1    vaccine?

2         A.    No.

3         Q.    Okay.  Prior to Takeda, where did you

4    work?

5         A.    Boehringer Ingelheim.

6         Q.    And what is that?

7         A.    Boehringer Ingelheim.

8         Q.    Yeah.  What is that?

9         A.    Oh.  It's a pharmaceutical company.

10        Q.    Okay.  How long did you work there?

11        A.    Thirteen years.

12        Q.    And what was your job?

13        A.    A sales representative.

14        Q.    And what were your job duties as a sales

15   representative there?

16        A.    To sell pharmaceutical products to

17   physicians in my territory.

18        Q.    Okay.  And what pharmaceutical products

19   did you sell in that job?

20        A.    I sold Mobic, Combivent, Flomax,

21   Micardis, Aggrenox.  And those are all that come

22   to mind.

23        Q.    Okay.  And -- and I don't know if they

24   vary, but what conditions do those drugs treat?

25        A.    Arthritis, COPD, high blood pressure,



Page 129

1      Q.    Ever make a complaint in that regard?

2      A.    No.

3      Q.    Okay.  And when you applied for your job

4  at Boehringer, did you ask whether that

5  pharmaceutical company ever used aborted fetal

6  cells in any of their research?

7      A.    I did not.

8      Q.    Okay.  Did you do research on your own

9  to determine whether or not that company ever used

10 fetal -- fetal aborted cells in any of their

11 medications or treatments?

12     A.    I did not.

13     Q.    Okay.  Did you do any research on

14 whether or not the products you promoted ever used

15 or manufactured or tested using aborted fetal

16 cells?

17     A.    I did not.

18     Q.    And why not?

19     A.    I -- I didn't think about it at that

20 time.

21     Q.    Okay.  Okay.  So when were you first

22 hired by Takeda?

23     A.    In 2013.

24     Q.    And you -- you applied for what job

25 there?



Page 130

```
 1        A.    A sales rep.
 2        Q.    Uh-huh.  So in 2013, did you inquire
 3    with Takeda, in connection with applying for a
 4    job, whether or not any of their -- their
 5    treatments or vaccines or research used aborted
 6    fetal cells?
 7        A.    I did not.
 8        Q.    Okay.  Did you do any research on your
 9    own to make that determination?
10        A.    No.
11        Q.    And why not?
12        A.    I didn't think about it at the time.
13        Q.    Okay.  And at the time you were
14    Catholic; correct?
15        A.    Correct.
16        Q.    Okay.  And were you Catholic during your
17    time at Boehringer?
18        A.    Yes.
19        Q.    Okay.  Is it safe to say you held the
20    same religious beliefs at your time at Boehringer
21    as you do now?
22        A.    Yes.
23        Q.    And is it safe to say you held the same
24    religious beliefs when you applied for your
25    position at Takeda as you do now?
```



Page 131

```
 1          A.    Yes.
 2          Q.    Okay.  So as part of your first job as a
 3    sales representative, what territory did you
 4    cover?
 5          A.    At what company?
 6          Q.    At Takeda.
 7          A.    Excuse me?
 8          Q.    At Takeda.  I'm only talking about
 9    Takeda here --
10          A.    Okay.
11          Q.    -- unless I say otherwise.
12          A.    I believe it was Omaha and Lincoln,
13    southeast Nebraska.
14          Q.    And what were your job duties as a sales
15    rep?
16          A.    To promote Takeda Pharmaceutical
17    products to physicians and healthcare providers.
18          Q.    And as a -- as a sales rep, what -- what
19    drugs did you promote?
20          A.    When I started or --
21          Q.    Yeah.  When you started, when you first
22    started at Takeda.
23          A.    Boy, I don't even remember back then.
24    I don't recall.
25          Q.    Okay.  Do you recall whether or not you
```



Page 132

1  researched or otherwise acquired knowledge about

2  the product -- whether the products you sold used

3  aborted fetal cells in any way?

4       A.   I did not.

5       Q.   Okay.  And do you -- do you think that

6  that's information that you should have known as a

7  person promoting that product?

8       A.   Looking back on it, yes.

9       Q.   And do you think that's information that

10 patients may have wanted to know?

11      A.   No.  Because in the pharmaceutical

12 world, all you can talk about is what is in the

13 prescriber information, or the PI, and that would

14 not be pertinent information for me to share or

15 legally to share.

16      Q.   Okay.  But you agree that it would be --

17 it would violate your religious beliefs to promote

18 products that used aborted fetal cells; correct?

19      A.   Correct.

20      Q.   But you never bothered to find out that

21 information?

22      A.   Did not.

23      Q.   Okay.  And when you were a sales rep,

24 what were -- again, going back to your first

25 initial time at Takeda, approximately how many



Page 133

1    healthcare providers or physicians were in your

2    territory?

3         A.   Approximately 150.

4         Q.   Okay.  And what was the --

5         A.   150 -- 150 targets.  There were numerous

6    physicians, but approximately 150 that I would

7    call on.

8         Q.   150 individuals?

9         A.   Yes.

10        Q.   Physicians?

11        A.   Correct.  Or --

12        Q.   Okay.

13        A.   -- nurse practitioners, physician

14   assistants.

15        Q.   Okay.  And what types of facilities were

16   they located -- located at?  Hospitals?  Family

17   offices?  What was the makeup?

18        A.   Probably 85 to 90 percent were primary

19   care offices.  And maybe -- I mean, they -- really

20   100 percent of them were primary care offices.

21   Some could be located in a hospital, but --

22        Q.   Okay.  And so were you -- were you doing

23   your sales calls in person at that time?

24        A.   Yes.

25        Q.   100 percent in person?



Page 134

```
 1          A.   Yes.
 2          Q.   Okay.  And were you interacting only
 3    with healthcare providers?
 4          A.   I was -- healthcare providers and
 5    support staff.
 6          Q.   Okay.  Were you ever interacting with
 7    patients?
 8          A.   No.
 9          Q.   Okay.  Were patients at the facilities
10    that you were visiting?
11          A.   Yes.
12          Q.   Okay.  And who was your manager at that
13    time when you were a sales rep when you first
14    started at Takeda?
15          A.   Gabe Compton.
16          Q.   Okay.  Were you then promoted to a
17    senior sales rep?
18          A.   Correct.
19          Q.   And when was that?
20          A.   I don't recall the exact date and time.
21          Q.   Approximate date?
22          A.   2016 approximately.
23          Q.   Okay.  And what's the difference between
24    a senior sales rep and a sales rep?
25          A.   Basically a different pay scale.
```



Page 136

1    what drugs did you promote?

2        A.    Vyvanse.

3        Q.    Vyvanse?

4        A.    Vyvanse.  V-Y --

5        Q.    Oh.

6        A.    -- V-A-N-S-E.

7        Q.    Uh-huh.

8        A.    And Trintellix, T-R-I-N-T-E-L-L-I-X.

9        Q.    And what -- what -- what conditions do

10   those drugs treat?

11       A.    Trintellix is major depressive disorder.

12   And then Vyvanse is ADHD and binge eating

13   disorder.

14       Q.    Okay.  And did you ever research or

15   otherwise find out whether either of these drugs

16   utilized aborted fetal cells either in the testing

17   phase or as part of any manufacturing?

18       A.    I did not.

19       Q.    Okay.  And sitting here today, do you

20   know one way or the other?

21       A.    I do not.

22       Q.    Sitting here today, do you know one way

23   or the other about whether any such drugs that you

24   promoted at Boehringer used aborted fetal -- fetal

25   cells?



Page 137

1          A.   I do not.

2          Q.   Okay.  And who was your manager as a

3     senior sales rep?

4          A.   Stacy Zach and Shannon Exner and then

5     finally Kelly Hanson.

6          Q.   Okay.  And what did your territory cover

7     geographically?

8          A.   Geographically from Omaha, as far north

9     as Norfolk, as far west as North Platte.

10         Q.   And I've -- I've -- I've never been to

11    Nebraska.  I don't -- I can't say I know anything

12    about Nebraska.  How -- how large of a

13    geographical area would you estimate that is?

14         A.   Oh, estimate, 300 -- 300 miles.

15         Q.   Okay.  How many approximately physicians

16    or healthcare providers did you target?

17         A.   Approximately 150.

18         Q.   And what types of facilities were those

19    individuals working at?

20         A.   Mainly family practice, healthcare

21    facility -- family practice, healthcare

22    facilities, general practitioners.

23         Q.   Anything else?  Hospitals?

24         A.   There was clinics in the hospital, but,

25    no, I would not call on hospital staff.



Page 138

 1      Q.   Okay.  And looking at entirely
 2  pre-COVID, pre-March 2020, were you doing
 3  100 percent of your sales calls in person?
 4      A.   Yes.
 5      Q.   Okay.  And so take me through a typical
 6  sales call.  How long would it last?
 7      A.   Well, face-to-face with the physician,
 8  it would last anywhere from 30 seconds to five
 9  minutes.
10           But, you know, in a medical office, I
11  could have three or four targets so that could
12  continue three or four or five times depending on
13  what targets were in each office.
14      Q.   Okay.  And so then --
15      A.   So -- so I would try and budget my time
16  roughly 30 minutes per office based on, you know,
17  work with the targets but also the supporting
18  staff within the office.
19      Q.   Okay.  And when you say "supporting
20  staff," you mean admins?
21      A.   Admin, nurses, prior authorization
22  staff.
23      Q.   And when you're in the visit, are you --
24  you're moving around the facility to speak to
25  these people?



Page 139

 1      A.    Yes.
 2      Q.    Okay.  And say on average in a typical
 3  visit, if you had multiple targets, how many
 4  people might you interact with?
 5      A.    Excuse me.  You broke up there.
 6      Q.    Sorry.  In a typical visit, assuming you
 7  had multiple targets, how many people on average
 8  might you interact with in one call in that
 9  30-minute time frame?
10      A.    Maybe four.
11      Q.    Okay.  And -- and there are patients at
12  these facilities?
13      A.    Yes.
14      Q.    Okay.  And although -- but you're not
15  interacting with patients; correct?
16      A.    Correct.
17      Q.    Would you see patients as you moved
18  around the facility?
19      A.    Yes.
20      Q.    Okay.  And would you be in proximity of
21  the patients as you moved around the facility?
22      A.    Yes.
23      Q.    And do you have any -- you wouldn't have
24  any knowledge about what those patients
25  particularly were suffering from; correct?



Page 140

```
 1        A.   Correct.
 2        Q.   No knowledge of their illnesses or why
 3   they were being treated at that facility?
 4        A.   No.
 5        Q.   Okay.  All right.  So then moving
 6   towards March 2020, COVID hits.  At that point in
 7   time what happened with respect to your in-person
 8   visits?
 9        A.   We were basically working remote for
10   pretty much the entire rest of the year.
11        Q.   Through 2020?
12        A.   Correct.
13        Q.   Okay.  And so how did that work with
14   respect to remote calls?  What was your practice?
15        A.   Well, starting out, it was phone calls
16   and e-mails and mailings --
17        Q.   Uh-huh.
18        A.   -- to the targeted physicians and/or
19   staff.  And then approximately mid-year, we were
20   able to virtually interact with staff and
21   physicians via a Zoom-like product within our
22   selling platform, database platform.
23        Q.   Okay.  And was that successful?
24        A.   Yes.
25        Q.   Okay.  Did you notice any change in your
```



Page 141

```
 1   sales numbers during that remote time period?
 2        A.   To my knowledge, my best recollection,
 3   sales did decline initially.  Because it was all,
 4   you know, basically shut down for a little bit,
 5   but then they rebounded eventually as technology
 6   got better and patients were able to return to
 7   visiting their physician.
 8        Q.   Okay.
 9        A.   I don't -- I don't have the exact
10   numbers though.
11        Q.   Okay.  And so at what -- at some point
12   in time did it move back to an in-person call
13   setting?
14        A.   Well, my best recollection, it was
15   beginning of 2021.  We went to -- back to
16   in-person.  I don't recall the exact date.
17             But we were able to go back into the
18   field, and we were required to wear a mask and
19   test two times per week for COVID-19.
20        Q.   Okay.  And did you comply with that
21   requirement?
22        A.   Absolutely.
23        Q.   Okay.  So you wore a mask in all of your
24   in-person visits?
25        A.   Yes.
```



Page 145

1        A.    No.

2        Q.    Did any of them -- any of the providers

3   that you visited ever express concern about you

4   coming in with a mask?

5        A.    No.

6        Q.    Okay.  And when this period happened

7   where it started to open up again, do you recall

8   how that impacted your sales?

9        A.    I don't have the exact numbers, like

10  I -- I can't answer that.

11       Q.    Okay.  And your in-person visits with a

12  mask, testing twice a week, were they generally

13  the same as your pre-COVID visits, meaning you

14  would move around the facilities and talk to

15  multiple people?

16       A.    Yes.

17       Q.    And you would see patients as you moved

18  around the facility?

19       A.    Yes.

20       Q.    And you would be in the vicinity of

21  patients?

22       A.    Yes.

23       Q.    And, again, you had no knowledge what

24  the patients were being treated for; correct?

25       A.    Correct.



Page 166

```
 1        A.   I try to.
 2        Q.   Okay.  Sitting here today, are there any
 3   decisions that you made where you have not used
 4   your moral conscience?
 5        A.   Not that I know of.
 6        Q.   Okay.  Do you know if St. Matthew's has
 7   an official view of the COVID-19 vaccine?
 8        A.   I don't know.
 9        Q.   Have you ever asked Father Leo?
10        A.   I have not.
11        Q.   Have you ever asked anyone at your
12   church?
13        A.   No, I have not.
14        Q.   Would that information be important to
15   you?
16        A.   It would be good to know.
17        Q.   Why would it be good to know?
18        A.   Because knowledge is -- is power, I
19   think.  And if -- if their official stance was
20   against my beliefs, I would try to discuss that
21   with Father Leo.
22        Q.   So you've been attending St. Matthew's
23   for 23 years; right?
24        A.   Approximately, yes.  I don't have the
25   exact date, but --
```



1 decision or could it -- could they have informed

2 your decision?

3        A.    Well, my decision was -- and I -- I said

4 this to Takeda -- that if there was a comparable

5 vaccine with no connection to abortion, like it

6 says in there, then I would be more apt to -- to

7 do the vaccine.  But this is still not saying it's

8 mandatory.  It's saying it's acceptable.  But to

9 me, it's not acceptable.

10        Q.    And why isn't it acceptable?

11        A.    Because the COVID-19 vaccine, like it

12 says right there, used cell lines of aborted

13 fetuses in their research and production.

14        Q.    Are you -- have you done any research to

15 see if there are vaccines that do not use aborted

16 cells, fetal cells?

17        A.    For COVID-19?

18        Q.    Yes.

19        A.    I -- I have.  And as of November 2021,

20 there were no such products out there.

21        Q.    And have you looked since November 2021?

22        A.    I have not.

23        Q.    Is it your testimony that you would take

24 the COVID-19 vaccine if it did not use aborted

25 fetal cells?

Page 172

 1      A.   I would consider it based on safety and
 2 efficacy data shown from placebo-controlled trials
 3 to make the most informed decision for myself.
 4      Q.   Okay.  So if you -- well, if you scroll
 5 down you see that the archdiocese refers to
 6 several resources.  Do you see that?
 7      A.   Yes.
 8      Q.   The first one is a 2020 -- a 2020
 9 statement from the Chairman of the Committee on
10 Doctrine and the Committee on Pro-Life Activities.
11 Do you see that?  United States Conference of
12 Catholic Bishops?
13      A.   Yeah.
14      Q.   Okay.
15           MS. ENGELMAN:  So if you scroll
16 down --
17 BY MS. ENGELMAN:
18      Q.   Have you ever seen this document before?
19      A.   I have not.
20      Q.   Okay.
21           MS. ENGELMAN:  Keep going.  Okay.
22 Stop.  Stop a little bit.
23 BY MS. ENGELMAN:
24      Q.   All right.  So starting here where it
25 says, the paragraph says, "The current COVID-19



Page 174

```
 1   infected."
 2            I don't necessarily agree with that
 3   because, like I told you, in September of '21, I
 4   was already diagnosed with COVID.  I have three
 5   times the antibodies that are needed to fight
 6   COVID.
 7            And if you look at present day data,
 8   those that have been vaccinated are the ones more
 9   likely to get sick or hospitalized than those that
10   are not vaccinated.
11       Q.   And what data are you referring to?
12       A.   Well, I'd have -- I don't have it in
13   front of me, but I could get it to you.
14       Q.   Okay.  And what's the basis of your
15   belief that having three times the antibodies
16   makes you -- is it -- is it your testimony that it
17   makes you immune -- immune from COVID-19?
18       A.   Yes.
19       Q.   Okay.  And what's the basis of that
20   statement?
21       A.   I can get you that data as well.  Can I
22   write this stuff down that I need to get you or --
23       Q.   Oh, we will follow-up, sir.
24            I'm asking you sitting here today, what
25   is the basis of that statement?  Is it based on a
```



Page 175

1   medical journal?

2        A.   Information, journal, and a key of --

3   oh, I guess it's more a -- key opinion leaders

4   that I have read or listened to.

5        Q.   And how long ago did you have COVID-19?

6        A.   September of '21.

7        Q.   Okay.  And when is the last time that

8   you were tested for antibodies?

9        A.   I believe it was October of '21.

10       Q.   Okay.  So a month after you had COVID?

11       A.   I believe so.

12       Q.   And you were never tested again?

13       A.   No.

14       Q.   So you have no idea what your antibodies

15  were one month, two months, three months, four

16  months after COVID?

17       A.   I do not know.

18       Q.   Okay.  So what's the basis for your

19  statement that you are currently immune from COVID

20  or were immune from COVID since your diagnosis in

21  September of 2021?

22       A.   The information that I have read shows

23  that that natural immunity is -- is long-term

24  compared to -- well, it's long-term.

25       Q.   Okay.  Generally speaking, do you



Page 177

1      Q.   Did you have an understanding of that
2  when you refused to get the COVID-19 vaccine?
3      A.   No.  That's --
4      Q.   Okay.
5      A.   It's my understanding -- because it goes
6  on to say, "Employing the commonly used, but
7  morally compromised cell line was performed on
8  both vaccines."
9      Q.   Correct.
10          MS. ENGELMAN:  Can you scroll down,
11  Celina.
12  BY MS. ENGELMAN:
13      Q.   Do you see here where it says, "In view
14  of the gravity of the current pandemic and the
15  lack of availability of alternative vaccines, the
16  reasons to accept the new COVID-19 vaccines from
17  Pfizer and Moderna are sufficiently serious to
18  justify their use, despite their remote connection
19  to morally compromised cell lines."  Do you see
20  that?
21      A.   I do see that.
22      Q.   And do you disagree with that statement?
23      A.   I do.
24      Q.   Okay.  And do you see here that the
25  Congregation of Bishops have said, "In addition,



1  receiving the COVID vaccine ought to be understood

2  as an act of charity towards other members of

3  community -- of the community"?

4      A.    I do see that.

5      Q.    Okay.  And you disagree with that

6  statement?

7      A.    I do.

8      Q.    Okay.  And why do you disagree with that

9  statement?

10     A.    Well, as I stated many a time, it's

11 because of the aborted-derived fetus cell lines,

12 but also due to my already being contracted with

13 COVID with my antibody levels.  And a patient

14 profile of mine with antibody levels has never

15 been tested in a placebo-controlled trial.

16     Q.    Okay.  If you hadn't had contracted

17 COVID, would your view be different?

18               MR. DeMATTEO:  Objection.  Form of

19 the question.  Hypothetical.

20 BY MS. ENGELMAN:

21     Q.    You may answer.

22     A.    No.  Because of the -- the vaccines

23 containing the aborted-derived fetus cell lines

24 and -- for testing and manufacturing.

25     Q.    Okay.  Do you think you're in a better



Page 191

1    the COVID-19 vaccine?

2        A.    That's for me -- not me to decide.

3        Q.    Okay.  Given that you now understand

4    that the -- the Gross Catholic High School is

5    encouraging the COVID-19 vaccine, do you intend to

6    continue to serve on the board?

7        A.    I will -- I don't know.

8        Q.    Okay.  Is that a decision you now need

9    to consult your moral conscience on?

10       A.    I will pray on it.  And -- but that's

11   something I can't decide right now.

12       Q.    Okay.  I'll get back to you about what

13   decision you make on that.

14               MS. ENGELMAN:  So, Celina, can you

15   remove that exhibit?

16   BY MS. ENGELMAN:

17       Q.    So, Mr. Huck, have you ever objected to

18   any other vaccine based on your religious views?

19       A.    No.

20       Q.    Have you ever objected to any other

21   medications or treatments of any kind based on

22   your religious views?

23       A.    No.  Other than when I went through the

24   religious exemption interview.  They brought up

25   Tylenol.  And I -- I mean, that was news to me.



Page 192

1   So I did some research on that and no longer
2   purchase Tylenol, but --
3        Q.   And so explain to you -- they brought up
4   Tylenol and what -- what about it?
5        A.   They -- I'm sorry.  They asked me if I
6   had ever used Tylenol because that is from derived
7   or tested fetus.  I didn't know anything about
8   that.  So I -- I researched that, and I no longer
9   purchase Tylenol.
10       Q.   Okay.  So I need to understand
11  something.  If the use of aborted fetal cells so
12  violates your religious beliefs, why have you not
13  bothered to research any medications that you've
14  taken --
15       A.   Well --
16       Q.   -- in the past?
17       A.   And -- and moving forward from when this
18  time started in --
19       Q.   That wasn't my question.
20            MR. DeMATTEO:  Well, but he just
21  started to answer.  I think you have to give him a
22  chance to answer before you say that's not an
23  answer.
24  BY MS. ENGELMAN:
25       Q.   Go ahead.



Page 194

```
 1        Q.    Were you otherwise aware outside of any

 2   training?

 3        A.    I was not.

 4        Q.    Is it generally important for you to

 5   educate yourselves on -- educate yourself on

 6   something that may violate your religious beliefs?

 7        A.    Yes.

 8        Q.    Okay.

 9        A.    If it's unknown, how do I know?

10        Q.    Do you have any understanding of how the

11   COVID-19 vaccines work?

12        A.    Other than using MRNA technology.

13        Q.    Do you believe the COVID vaccine has

14   helped to spread -- helped to stop the spread of

15   the virus?

16        A.    Unknown -- that's unknown.

17        Q.    Why?  Why is that unknown in your view?

18        A.    Because the narrative out there, it does

19   help stop the spread, but the data -- some data

20   that I have seen has shown that the majority of

21   people reinfected or hospitalized or dying are

22   vaccinated.

23        Q.    Do you have any --

24        A.    That's --

25        Q.    Sorry.
```



Page 195

1        A.    That's -- it's unknown to me.

2        Q.    Okay.  Do you have any knowledge about

3    whether or not there have been clinical trials on

4    individuals who had COVID to date?

5        A.    That have had COVID that have also

6    gotten a vaccine or --

7        Q.    Yes.

8        A.    I don't know if there's studies.

9    There's just data out there that more -- I don't

10   know if there has been studies.

11       Q.    With respect to the safety of the

12   COVID-19 vaccine, were you worried about

13   experiencing any -- experiencing any particular

14   adverse events?

15       A.    That was of concern, yes.

16       Q.    Okay.  Did you believe that the COVID-19

17   vaccine could alter your DNA in some way?

18       A.    No.

19       Q.    And which adverse events were you

20   concerned about?

21       A.    Heart attack, stroke, death.

22       Q.    Are you familiar with any other -- any

23   medications to treat COVID, such as Paxlovid?

24       A.    I've heard of it, yes.  I'm more

25   familiar with Ivermectin and Hydroxychloroquine.



Page 196

1     Q.   Okay.  What's your familiarity with

2 those drugs?

3     A.   Well, when I was diagnosed with COVID, I

4 was prescribed Ivermectin.

5     Q.   Uh-huh.

6     A.   And made a full recovery within a couple

7 of days.  And I know there's dozens of studies out

8 there on placebo-controlled Ivermectin trials with

9 COVID-positive patients.  And very similar to data

10 that shows many peer-reviewed placebo-controlled

11 Hydroxychloroquine trials as well.

12     Q.   So you believe those medications were

13 safe?

14     A.   Yes.

15     Q.   And did you research whether or not

16 either medication used aborted-fetal cells?

17     A.   To my research, there was no indication

18 that either one uses aborted fetal cells.

19     Q.   So you did do research?

20     A.   Did do -- I read that -- yes, I have

21 researched that.

22     Q.   And where did you research that?

23     A.   I don't remember.

24     Q.   Okay.  Did you go on the internet?

25     A.   I read it somewhere.  Excuse me?



Page 197

1    Q.    You read it somewhere?

2    A.    Yes.

3    Q.    Did you ever talk to a healthcare

4    provider?

5    A.    No.

6    Q.    And do you know where you read it?

7    A.    I don't.

8    Q.    Do you know what type of documentation

9    it was?

10    A.    I do not.

11    Q.    Okay.  And did you do that research

12    before you ingested the medication?

13    A.    I did not.

14    Q.    You did it after you ingested the

15    medication?

16    A.    Yes.

17    Q.    By the way, we talked to you about a

18    number of conversations that you had with your

19    healthcare providers about the COVID-19 vaccine.

20    Do you recall that testimony?

21    A.    Yes.

22    Q.    Were those -- were those all oral

23    discussions?

24    A.    Yes.

25    Q.    Do you have any written communications



Page 198

```
 1   with your healthcare providers?

 2        A.   That I -- no.

 3        Q.   Okay.

 4             MS. ENGELMAN:  Celina, can we grab

 5   28, please.  Jane, what exhibit number is this?

 6             COURT REPORTER:  I have no clue.

 7   Sorry.

 8             MS. ENGELMAN:  That's okay.  We'll

 9   figure it out at the end part.  Thank you.

10   BY MS. ENGELMAN:

11        Q.   Okay.  So, Mr. Huck, you obviously

12   sought a religious accommodation from Takeda; is

13   that correct?

14        A.   Correct.

15        Q.   Okay.  And do you recognize this

16   document as your religious accommodation request

17   form?

18        A.   Yes.

19        Q.   And that's dated 9/14/21.  Do you see

20   that?

21        A.   Yes.

22        Q.   Okay.  And you asked for a vaccination

23   exemption.  Do you see that?

24        A.   Yes.

25        Q.   And you say, "Frequency and duration of
```



Page 200

 1        A.    I think that those are similar as well.

 2        Q.    Okay.  And then it says here, "Please

 3   provide alternative accommodations that might

 4   address your needs."  And then this is a note from

 5   Pastor Leo it looks like?

 6        A.    Right.

 7        Q.    And it says, "Rob and Amy and the family

 8   are fully practicing Catholics."

 9        A.    Right.

10        Q.    Do you see that?

11        A.    Yes.

12        Q.    Okay.  So that was the -- the entirety

13   of Father Leo's support of your religious

14   exemption is to say you were a practicing

15   Catholic?

16        A.    According -- on this document, yes.

17        Q.    Okay.  And then if you scroll down, you

18   attached a number of documents.  We'll start with

19   the first one here.  Do you recognize this

20   document?

21        A.    Yes.

22        Q.    Dated 9/22/21?

23        A.    Right.

24        Q.    And it you scroll down, you'll see you

25   signed this document?



Page 201

```
 1        A.    Right.
 2        Q.    Okay.  Do you -- do you recall this
 3   letter?
 4        A.    Yes.
 5        Q.    Okay.
 6               MS. ENGELMAN:  Can you scroll up,
 7   Celina.
 8   BY MS. ENGELMAN:
 9        Q.    Did you draft this letter?
10        A.    No.
11        Q.    Okay.  Who did?
12        A.    It was off of a website.
13        Q.    Okay.
14               MS. ENGELMAN:  Can we grab 40,
15   Celina.
16   BY MS. ENGELMAN:
17        Q.    Do you recognize this document?
18        A.    Yes.
19        Q.    It's a National Catholic Bioethics
20   Center?
21        A.    Yes.
22        Q.    It's a vaccine exemption template
23   letter.  Do you see that?
24        A.    Right.
25        Q.    And how did you find this template
```



Page 202

```
 1   letter?
 2        A.   I don't recall.
 3        Q.   Did you put something into -- to Google?
 4        A.   I don't -- I don't recall.
 5        Q.   Okay.  And isn't it true that -- that
 6   you copied word for word this letter into -- into
 7   your religious exemption request?
 8        A.   I don't recall.
 9        Q.   Okay.
10        A.   But --
11        Q.   We can -- we can look at it.  I'll
12   represent to you that it is a word-for-word copy,
13   if you will.  Would that surprise you?
14        A.   Nope.
15        Q.   Okay.  And generally speaking, did you
16   do any research in connection with your religious
17   exemption request?
18        A.   As far as finding this letter or --
19        Q.   Anything.
20        A.   That it was aborted fetus cells used in
21   the production or manufacture of the vaccine.
22        Q.   I understand that.  In connection with
23   drafting and submitting your religious exemption
24   request to Takeda, did you do any research or talk
25   to anybody about what types of materials you were
```



Page 203

1    going to submit?

2       A.    No.

3       Q.    Okay.  And sitting here today, you have

4    no idea how you came across this template letter?

5       A.    No.  It was -- I'm sure it was through a

6    Google search.

7       Q.    Okay.

8              MS. ENGELMAN:  And if we go back to

9    the -- the religious exemption request, Celina.

10   I'm sorry.

11   BY MS. ENGELMAN:

12      Q.    Okay.  And so is it fair to say that you

13   believe everything in this letter?

14      A.    I have to reread it again, but --

15      Q.    Okay.  Go ahead and reread it.  Just let

16   Celina know when you need her to scroll.

17      A.    All right.  Scroll, please.  Okay.

18   Okay.  Okay.  Okay.

19      Q.    Are you done, sir?

20      A.    Yes.

21      Q.    Okay.  Is there anything in this letter

22   that you disagree with sitting here today?

23      A.    No.

24      Q.    Okay.  Do you -- why did you think it

25   was appropriate to -- to copy and paste this



Page 204

1  letter as part of your exemption request?

2      A.   Because it was basically stating clearly

3  my thoughts and feelings.  And it was on there for

4  that very reason, to use it in that -- in that

5  form.

6      Q.   Okay.  And so did you feel that you were

7  not able to articulate your thoughts and feelings

8  appropriately in your own words?

9      A.   Well, this articulated it much clearer.

10      Q.   Okay.

11           MS. ENGELMAN:  So if we go to -- if

12  we scroll to the top of the document -- oh,

13  actually, yes.  Stay there.  Going back to --

14  sorry.  I'm jumping around a little bit.

15  BY MS. ENGELMAN:

16      Q.   In your medical -- or excuse me -- in

17  your religious accommodation request form, is

18  there anything in here that is incomplete?

19      A.   No.

20      Q.   Okay.  So this fully describes the basis

21  for your religious beliefs in your exemption

22  request essentially?

23      A.   Yes.

24      Q.   Okay.  All right.

25           MS. ENGELMAN:  If you scroll down



Page 211

1  the right decision for me and my family in regards

2  to making sure not to -- after learning that these

3  were tested and manufactured from aborted fetal

4  tissues, my prayers were answered, and I am at

5  peace with -- with the decision that I made.

6      Q.    Okay.  So you testified to this earlier

7  that you have taken Tylenol before; is that

8  correct?

9      A.    Yes.  Yes.

10          MS. ENGELMAN:  Celina, can you drop

11  that exhibit just for one second so I can see.

12  Okay.

13  BY MS. ENGELMAN:

14      Q.    Have you ever taken Acetaminophen?

15      A.    Yes.

16      Q.    Ibuprofen?

17      A.    Acetaminophen is Tylenol, but --

18  ibuprofen, yes, I have taken it.

19      Q.    Benadryl?  Benadryl?

20      A.    I don't know.

21      Q.    Claritin?

22      A.    Yes.

23      Q.    Pepto Bismol?

24      A.    No.

25      Q.    Maalox?



Page 212

```
 1          A.    No.
 2          Q.    Sudafed?
 3          A.    Yes.
 4          Q.    What was that?
 5          A.    Yes.
 6          Q.    Zoloft?
 7          A.    No.
 8          Q.    Aspirin?
 9          A.    Yes.
10          Q.    Simvasta -- Simvastatin?  I butchered
11    that.
12          A.    Simvastatin.  What is that?
13          Q.    I'm not sure.  Maybe a statin of some
14    kind.
15          A.    Simvastatin?
16          Q.    Yes.
17          A.    I did -- I used to be on statin but no
18    longer.  I don't know if it was Simvastatin.
19          Q.    Albuterol?  Albuterol?
20          A.    Albuterol?
21          Q.    Uh-huh.
22          A.    No.
23          Q.    Tums?
24          A.    No.
25          Q.    Preparation H?
```



Page 213

```
 1        A.    Yes.

 2        Q.    Prilosec OTC?

 3        A.    No.

 4        Q.    Lipitor?

 5        A.    No.  I don't -- I don't know on that

 6   one.  That's a statin as well.

 7        Q.    Zocor?

 8        A.    What is it?  Zocor?

 9        Q.    Zocor.

10        A.    No.

11        Q.    Motrin?

12        A.    Yes.

13        Q.    And so, again, with respect to any of

14   those medications that you testified taking, did

15   you ever do any research to see if they used

16   aborted fetal cells?

17        A.    Not back then, but I have since stopped

18   using any and all of those.  I was unaware of it.

19        Q.    And you didn't think it was an important

20   enough religious belief for you to become aware?

21        A.    Well, it is now, yes.  It's --

22        Q.    It wasn't then?

23        A.    I was unaware of it.

24        Q.    Okay.

25              MS. ENGELMAN:  Celina, can we go
```



Page 215

```
 1        A.    To show that the Johnson & Johnson and
 2   the other vaccines were using abortion-derived
 3   tissues.
 4        Q.    You say here in the second paragraph,
 5   "If I have the opportunity to receive an
 6   alternative vaccine that has no connection to
 7   abortion, I will choose that vaccine instead of
 8   Johnson & Johnson's vaccine."  Do you see that?
 9        A.    Yes.
10        Q.    And is -- do you agree with that
11   statement?
12        A.    It -- I should have changed it to "I
13   would consider."
14        Q.    Okay.  So that was an inaccurate
15   statement that you submitted in connection with
16   your religious discrimination -- or religious
17   accommodation request?
18        A.    Excuse me?
19        Q.    That was an inaccurate statement that
20   you submitted --
21        A.    Yes, it was.  Yes.
22              MS. ENGELMAN:  All right.  Do you
23   want to scroll down to Mr. Huck's letter?
24   BY MS. ENGELMAN:
25        Q.    So, Mr. Huck, is this letter that you
```



Page 216

1  drafted and submitted in connection with your
2  religious accommodation request form?
3      A.    It's a form letter.
4      Q.    Oh, this is another form letter.  Okay.
5  So these are not your words?
6      A.    Correct.
7      Q.    Okay.  And so what did you Google to get
8  to this form letter or how did you find it?
9      A.    I don't recall.
10     Q.    Okay.  I mean, generally speaking, was
11 it your practice to Google form letters on -- on
12 the internet with respect to your religious
13 accommodation request?
14     A.    Not in general but to help me state
15 succinctly what needed to be stated.
16     Q.    Okay.  All right.  So in this letter, if
17 you look at -- well, I guess take the time to read
18 it.  Read it in full, please.
19     A.    Can you scroll, please.  Okay.  Scroll,
20 please.  Scroll, please.  Okay.  Scroll, please.
21 Scroll, please.  Okay.  Scroll, please.  Okay.
22     Q.    Is there anything, Mr. Huck, in this
23 letter that you disagree with sitting here today?
24     A.    I'd have to look at it in whole, but --
25 I mean, I agree with most of it.



Page 217

```
 1        Q.   Well, you submitted this and -- and
 2   signed this document as your own; is that right?
 3        A.   Right.  I did -- I told you it was a
 4   form letter.
 5        Q.   Okay.  Did you have the opportunity to
 6   make any changes if you wanted to?
 7        A.   I could have.
 8        Q.   And you chose not to?
 9        A.   Correct.
10        Q.   So what is it, sitting here today,
11   that -- that you disagree with or that does not
12   reflect your beliefs?
13        A.   Well, I need to see it in whole, but --
14        Q.   We can scroll as necessary.
15        A.   Can you enlarge it?  Thank you.  I agree
16   with the first three paragraphs.  "Therefore as a
17   faithful Catholic, I cannot according to the
18   church tenets on conscience, which are outlined
19   below, use a product that takes its origin --
20   origin -- origin in abortion.  The Vatican
21   document I outline below."
22             Scroll please.  "If necessary, to the
23   use of conscience objection" --
24                  (Court Reporter clarification.)
25        A.   I'll just read silently, and I'll go
```



MAGNA
LEGAL SERVICES

Page 218

1    paragraph by paragraph.

2            Okay.  I agree with that next paragraph.

3            Now up to, "It is up to the faithful and

4    citizens of upright conscience."  I'll do that

5    paragraph.  I agree with the next paragraph.

6            Scroll, please.  I agree with the first

7    paragraph on this page.

8            I agree with 1776, 1777.  Please,

9    scroll.  Bless you.

10            MR. DeMATTEO:  Thanks.

11       A.    Agree.  Please, scroll.  Please, scroll.

12    Please, scroll.  I agree with everything except

13    for the -- I think at this time the CDC had

14    declared the public health emergency.

15            Other than that, I agree with

16    everything.

17    BY MS. ENGELMAN:

18       Q.    Okay.  So sorry.  So the paragraph where

19    it says, "The Centers for Disease Control, which

20    is responsible for declaring public health

21    emergencies, has not attested to any sort of

22    significant risk to the health of the community at

23    this time."

24       A.    Right.

25       Q.    And at that time, the CDC had done so?



Page 221

1    Do you see that paragraph?

2          A.    Yes.

3          Q.    What does the FDA and the Emergency Use

4    Authorization Act have to do with the Catholic

5    religion?

6          A.    It has nothing to do with the Catholic

7    religion.

8          Q.    Okay.  Why is it in your request for

9    religious -- religious exemption?

10         A.    Well, because that's a secondary belief

11   of mine in regards to the emergency use

12   authorization and informed consent and the option

13   to refuse.

14         Q.    Okay.  And you thought that the -- that

15   was important enough to put in your religious

16   exemption form?

17         A.    At the time, yes.

18         Q.    Did you participate in an interview in

19   connection with -- the Takeda representative in

20   connection with your religion exemption request?

21         A.    Yes.

22         Q.    Okay.  And do you recall who that Takeda

23   representative was?

24         A.    Irving Forestier.

25         Q.    And do you remember how long that



Page 222

1   interview lasted?

2        A.   I don't recall, but I'll -- roughly

3   approximately 45 minutes.

4        Q.   Okay.  And were you truthful during that

5   interview?

6        A.   Yes.

7        Q.   Okay.

8              MS. ENGELMAN:  14.  Tab 14, I

9   think, Celina.

10  BY MS. ENGELMAN:

11       Q.   So this is the -- the notes from

12  Mr. Forestier in connection with your interview.

13  Do you see that?

14       A.   Can you expand them a little bit?  Okay.

15  Yes, I see it.

16       Q.   And have you ever seen these notes

17  before?

18       A.   No.

19       Q.   Okay.  And so, first of all,

20  Mr. Forestier asks you if you are currently

21  visiting clients.  Do you see that highlighted in

22  yellow?

23       A.   Yes.

24       Q.   You say "Yes."  Do you see that?

25       A.   Yes.



Page 223

```
 1         Q.   And he asked, "Approximately --
 2   approximately what percentage of your total
 3   clients' portfolio -- portfolio are you able to
 4   see now?"  Do you see that?
 5         A.   Yes.
 6         Q.   And you state approximately 80 percent.
 7         A.   Yeah.
 8         Q.   What does that -- what does the
 9   80 percent reflect?
10         A.   Doctors that we were able to see.
11         Q.   In person?
12         A.   Yes.
13         Q.   And so the other 20 percent you weren't
14   seeing at all or you were seeing remotely?
15         A.   Remotely or when they would call to get
16   product.
17         Q.   What do you mean "when they would call
18   to get product"?
19         A.   Like if they needed samples, they would
20   call, and then I would go to their office, but --
21         Q.   Okay.  But only 80 percent -- percent of
22   your targets were allowing in-person visits at
23   that time; is that right?
24         A.   Yes.
25         Q.   That's accurate.  Okay.  And so
```



Page 225

1    BY MS. ENGELMAN:

2        Q.    If his recollection -- Mr. Huck, if your

3    recollection is that you said something different,

4    feel free to tell me.

5        A.    Okay.  So -- well, as far as Pro-Life

6    and religious, that is -- goes hand-in-hand.

7        Q.    Uh-huh.  Okay.  And you mentioned the

8    emergency use -- use authorization in your

9    interview as well.

10        A.    Correct.

11        Q.    Okay.  And that was an important

12    objection that you had to the COVID-19 vaccine?

13        A.    Uh-huh.

14        Q.    And then in the paragraph below, you

15    also again mentioned the Food and Drug and

16    Cosmetic Act; is that correct?

17                MS. ENGELMAN:  Up, Celina.

18        A.    Okay.

19    BY MS. ENGELMAN:

20        Q.    And so the fact that this was not an

21    FDA-approved drug outside of the emergency

22    authorization was important -- an important

23    objection for you?

24        A.    Yes.

25                MS. ENGELMAN:  If you go -- if you



Page 229

```
 1        Q.    Okay.  And Mr. Forestier said, "He is
 2   reading all answers."  Do you see that?
 3        A.    Uh-huh.
 4        Q.    Were you reading from something during
 5   your interview?
 6        A.    Not that I'm aware of.
 7        Q.    Okay.  Did you have any documents or
 8   paperwork in front of you?  Do you recall?
 9        A.    I don't recall.
10        Q.    Okay.  Did you do any research in
11   preparation for your interview?
12        A.    I don't recall.
13        Q.    Okay.  And it says, "Have you ever taken
14   any other vaccines in your life?"  And you say,
15   "Yes, as a child."  Do you see that?
16        A.    Yes.
17        Q.    Okay.  Did you disclose to Mr. Forestier
18   other vaccines that you've taken as an adult?
19        A.    I don't recall.
20        Q.    Have you taken other vaccines as an
21   adult?
22        A.    Yep.
23        Q.    Okay.  And what vaccines are those?
24        A.    Hepatitis B.
25        Q.    Anything else?
```



Page 230

1      A.   That's it.

2      Q.   And why didn't you disclose that to

3  Mr. Forestier?

4      A.   I don't recall.

5      Q.   Okay.  And it says here, "Have you ever

6  taken and do you currently take any of the

7  following products."  And then it lists, "Tylenol,

8  Ibuprofen, Pepto Bismol, Claritin, Sudafed, Tums."

9  Do you see that?

10     A.   Right.

11     Q.   Those are the same medications that we

12 discussed earlier.  Do you see that?

13     A.   Right.

14     Q.   And you testified earlier that you have

15 taken Tylenol, Ibuprofen, I believe Pepto Bismol?

16     A.   Not Pepto Bismol.

17     Q.   Not Pepto Bismol.  Sudafed?

18     A.   Yeah.

19     Q.   Is that correct?

20     A.   Yeah.

21     Q.   And it says -- it says here, "No."

22     A.   Well, I -- I find that hard to believe

23 that I would say no to Tylenol, ibuprofen,

24 Claritin.

25     Q.   Okay.  So your testimony is that you



Page 231

1    told him that you had taken those medications?

2         A.   I believe so.

3         Q.   All right.

4              MS. ENGELMAN:  If you could scroll

5    down, Celina.

6    BY MS. ENGELMAN:

7         Q.   So it says here, "Are there any

8    alternative accommodations that might address your

9    needs."

10             And the note says, "Well, currently I

11   test two times a week.  I wear a mask.  I know

12   that future vaccines are coming, some without

13   aborted babies that will be a viable solution for

14   me based on safety.  I already had COVID.  I have

15   the antibodies."  Do you see that?

16        A.   Yeah.

17        Q.   And so do you agree that a vaccine that,

18   quote/unquote, doesn't use aborted babies is a

19   medical solution for you?

20        A.   Say that again.  I'm sorry.

21        Q.   Do you believe that a vaccine that,

22   quote/unquote, doesn't use aborted babies is a

23   viable solution for you?

24        A.   If there is quality placebo-controlled

25   trials with good adverse event -- efficacy



Page 232

 1  profile, yes.

 2      Q.    Then it says, "You have chosen to work

 3  for a company that has manufactured and/or

 4  marketed a long list of pharmaceutical products

 5  for which there is a chance that, at some point,

 6  fetal cells were used in development.  How do you

 7  reconcile that with your stated position on the

 8  COVID-19 vaccine?  Do you see this as

 9  inconsistent?"  Do you see that?

10      A.    Yes.

11      Q.    And you said, "I am dealing with that

12  right now.  I am praying on that.  It is a tough

13  position to be in.  My wife and I pray on that.  I

14  am doing more research on products developed in

15  this manner.  I sell Trintellix."  Do you see

16  that?

17      A.    Right.

18      Q.    Okay.  Is that -- is that your

19  recollection how you answered that question?

20      A.    Yes.

21      Q.    Okay.  And did you pray on that issue?

22      A.    Yes.

23      Q.    And what was the result of that prayer?

24  What is your view?

25      A.    Well, the prayer is I was terminated.



Page 234

1       Q.    And what research was that?

2       A.    On the internet.  I -- I don't have

3   documentation for it.

4       Q.    Okay.  So what research did you do on

5   the internet with respect to Takeda's products?

6       A.    If any Takeda products currently have

7   used fetal -- aborted-fetal tissue for

8   manufacturing or testing.

9       Q.    Uh-huh.

10      A.    And --

11      Q.    And when did -- and when did you do that

12  research?

13      A.    After this interview.  And as far as I'm

14  concerned, I came up with nothing.  And if they

15  were going to develop a vaccine with a -- I mean,

16  basically what the -- they were -- if I was asked

17  to sell a product, the answer to the prayer was if

18  I'm asked to sell a product that contains aborted

19  fetuses, I'm not going to do it.  And I would have

20  to resign.

21      Q.    Okay.  Were you willing to work for a

22  company that manufactured or marketed products

23  that used aborted-fetal cells, even if you didn't

24  personally sell it?

25      A.    I never really thought about it.



Page 236

1   healthcare providers or anyone at Takeda about

2   their products and whether or not they used

3   aborted fetal cells?

4       A.   I did not.

5       Q.   And to -- the best to your recollection,

6   what sources told you that Takeda's products did

7   not use aborted fetal cells?

8       A.   I don't recall.

9       Q.   Okay.  And just to be clear, that after

10  this interview was the first time that you thought

11  it important enough to research that question?

12      A.   Yes.

13      Q.   You also submitted a request for a

14  medical exemption; is that right?

15      A.   Correct.

16      Q.   Okay.  And -- and why did you do that?

17      A.   Because I had already contracted COVID

18  and had a quantitative blood test, three times the

19  COVID antibodies.

20      Q.   Uh-huh.  Okay.

21           MS. ENGELMAN:  Celina, tab 19,

22  please.

23  BY MS. ENGELMAN:

24      Q.   So this is an email between you and

25  representatives of Takeda regarding your medical



Page 237

1    exemption requests.

2                MS. ENGELMAN:  And you can scroll

3    down so you can see the request.

4    BY MS. ENGELMAN:

5        Q.   Do you see here?

6        A.   Right.

7        Q.   Does this look like the medical

8    accommodation request that you submitted?

9        A.   Yes.

10       Q.   And it's dated 9/14/21?

11       A.   Yes.

12       Q.   And that's the same date that you

13   submitted your religious accommodation requests;

14   correct?

15       A.   Correct.

16       Q.   Okay.  And you state here that you are

17   seeking a vaccine exemption because of previous

18   COVID diagnosis, plus antibodies present; correct?

19       A.   Uh-huh, yes.

20       Q.   And then -- and then you also say,

21   "COVID antibodies present.  Prior COVID infection,

22   which was excluded from the on-going trials."  Do

23   you see that?

24       A.   Yes.

25       Q.   And there you're referring to the safety



Page 238

1    of the vaccine because it didn't include, in your

2    view, individuals who had previously had COVID?

3        A.   Correct.

4        Q.   Okay.  So you were making a safety

5    objection to the COVID-19 vaccine there?

6        A.   I think an overall objection because

7    patient profile of my type was not included in any

8    of the trials.

9        Q.   Okay.  And then you said, "How long do

10   you anticipate the need for an accommodation."

11   And you say, "Indefinitely."  Do you see that?

12       A.   Yes.

13       Q.   So was it your view that you were

14   indefinitely immune from COVID based on your

15   antibodies?

16       A.   I think I later go on to say I would be

17   willing to mask and test two times per week.

18       Q.   That wasn't quite my question.

19            My question was whether or not you

20   believed that you were immune from COVID

21   indefinitely based on your -- the antibodies?

22       A.   Yes.

23            MS. ENGELMAN:  And then if we

24   scroll down.  Keep going, Celina.  Okay.

25



Page 242

1          Q.    Okay.   So -- so you talked about earlier
2    that you were in the field and that you were
3    within the vicinity of patients; is that correct?
4          A.    Yes.
5          Q.    And you don't know what those patients
6    were being treated for; is that correct?
7          A.    Correct.
8          Q.    And it's possible that those patients
9    were immunocompromised -- compromised; correct?
10          A.    Correct.
11          Q.    And -- or they had co-morbidity --
12    co-morbidities as you stated earlier; is that
13    correct?
14          A.    Correct.
15          Q.    And that they could be susceptible to
16    be -- to getting really sick from COVID; is that
17    correct?
18          A.    Correct.
19          Q.    And you were willing to be in the
20    vicinity -- the vicinity of those patients wearing
21    a mask, believing that that was not going to
22    prevent the spread of COVID-19; is that correct?
23                    MR. DeMATTEO:   Objection.   Form.
24          A.    Correct.
25



Page 247

```
 1   attempt to force anyone to take a COVID-19 vaccine
 2   is a violation of federal law and the conditions
 3   under which the COVID-19 vaccine has been
 4   authorized for use.  The law is clear,
 5   experimental medical treatment cannot be
 6   mandated."
 7        Q.   Okay.  And so is there anything in this
 8   letter that mentions your medical reason that
 9   you -- that prevents you from taking the COVID-19
10   vaccine?
11        A.   No.
12        Q.   Did you have a medical reason that
13   prevented you from taking the COVID-19 vaccine?
14        A.   I had three times the antibodies and
15   that was why that patient profile was never
16   included in not one trial.  They were actually
17   excluded from the trial.  Therefore, never been
18   tested on a patient with antibodies, known
19   antibodies.
20        Q.   Understood.  Is there any -- besides the
21   antibodies that you believe you had, is there any
22   other medical reason that supported your request
23   for medical exemption?
24        A.   Other than the antibodies I knew I had,
25   there were no other medical exemptions requested.
```



Page 248

```
 1        Q.   Okay.  And you knew you had the

 2   antibodies at the time that you submitted this

 3   request on 9/21 -- 9/14/21?

 4        A.   Yes.

 5        Q.   And how did you know that?

 6        A.   Because of the antibody test that was

 7   performed.

 8        Q.   Okay.  So based on this letter, is it

 9   fair to say that you refused the COVID-19 vaccine

10   because you thought it was experimental?

11        A.   Well, it was experimental.

12        Q.   And is that a reason that you refused

13   the COVID-19 vaccine?

14        A.   One of the reasons.

15        Q.   Okay.  And is it also one of the reasons

16   because you did not believe it was approved by the

17   FDA?

18        A.   It was under emergency use

19   authorization.  It was one of the reasons.

20        Q.   Okay.  And, again, one of the reasons

21   you refused the vaccine is because you believe it

22   did -- it lacked the requisite studies?

23        A.   Correct.

24        Q.   Okay.  Are you aware --

25        A.   I --
```



Page 250

 1          A.    She -- oh, sorry.

 2          Q.    That's okay.  So is it -- is it your

 3    position that if a medication or treatment is not

 4    approved by the FDA, you won't take it?

 5          A.    Without doing due diligence.

 6          Q.    Okay.  Under what circumstances would

 7    you take a medication that was not approved by the

 8    FDA?

 9          A.    Well, I guess it would have to -- I'd

10    have to know what the situation was.

11          Q.    Uh-huh.  Okay.  And have you researched

12    all of the medications that you've taken to see if

13    they have been approved by the FDA?

14          A.    I -- moving forward, I have.

15          Q.    What do you mean by "moving forward"?

16          A.    From this time forward.  That's why I'm

17    no longer -- that's why I've -- I've moved towards

18    more homeopathic medicinal practices.

19          Q.    Uh-huh.  Does anything in this letter

20    reflect your religious beliefs as it relates to

21    the COVID-19 vaccine?

22          A.    No.

23          Q.    Okay.

24                MS. ENGELMAN:  Celina, could we

25    grab the lab test?



Page 255

```
 1   studies are?
 2        A.   No.
 3        Q.   When disclosing to Takeda what other
 4   vaccines you had in the past, did you consult any
 5   of your medical records?
 6        A.   Was that a question?
 7        Q.   Yeah.
 8        A.   Did I -- did I disclose that I had taken
 9   other vaccines?
10        Q.   No.  When you disclosed that you had --
11        A.   Yeah.
12        Q.   -- taken other vaccines, did you consult
13   your record -- your medical records to learn that
14   information?
15        A.   No.
16        Q.   And how did -- how did you learn that
17   information?
18        A.   Well, I knew I took the Hepatitis B
19   vaccine.
20        Q.   Uh-huh.
21        A.   And I know I had taken a flu vaccine
22   here or there.
23        Q.   Uh-huh.
24        A.   And the rest of them were all childhood
25   vaccines.
```



Page 256

```
 1        Q.   Okay.  And when you took -- when you
 2   received -- do you know when you received the
 3   Hepatitis B vaccine?
 4        A.   I believe it was the spring of 2020 and
 5   the fall of 2020.
 6        Q.   Okay.  And why did you take that
 7   vaccine?
 8        A.   Because it was mandated by Takeda.
 9        Q.   And you had no objection to that
10   mandate; is that correct?
11        A.   After doing my research, I found that it
12   did not have any aborted-fetus tissue associated
13   with it.
14        Q.   Okay.  So in 2022 -- or I'm sorry --
15   2020, it was your practice to do research on
16   whether or not a vaccine had used aborted cells;
17   is that right?
18        A.   Correct.
19        Q.   Okay.  And you found research that
20   determined the Hepatitis B vaccine did not use
21   aborted fetal cells; is that right?
22        A.   Well, it was -- it was mandated, right.
23        Q.   Okay.  And what about the flu shot?  How
24   often did you get the flu shot?
25        A.   Oh, it -- it was almost -- it wasn't
```



Page 257

```
 1   yearly, but maybe two years.  And then I would
 2   take a year off.  And then I'm not -- I'm not for
 3   sure.
 4       Q.   Okay.  And -- and is that over the
 5   course of your adulthood?
 6       A.   Yes.
 7       Q.   Okay.
 8            MS. ENGELMAN:  Celina, could you --
 9   can you stop sharing your screen?  Sorry.  Thank
10   you.
11   BY MS. ENGELMAN:
12       Q.   And have you ever done research about
13   whether or not that flu shot ever used
14   aborted-fetal cells?
15       A.   No.
16       Q.   No, you don't know, or, no, you never
17   researched?
18       A.   Never researched.
19       Q.   Okay.
20            MS. ENGELMAN:  Can we do tab 23,
21   please.
22   BY MS. ENGELMAN:
23       Q.   Okay.  Mr. Huck, we -- you recall that
24   you authorized us to get some of your medical
25   records.  Do you recall that?
```



Page 259

```
 1                    MS. ENGELMAN:  Celina, can we turn
 2    to Bates labeled 0008.
 3    BY MS. ENGELMAN:
 4         Q.   Okay.  So these are your medical records
 5    from Dr. Istas.  Do you see -- it's one, two,
 6    three, four, five lines down.  You see encounter
 7    14 and 13?
 8         A.   Yes.
 9         Q.   Okay.  And do you see date 9/4/2020,
10    diagnosis, Hepatitis A and B vaccination?
11         A.   Right.
12         Q.   Do you see that?  And then do you see
13    encounter 13, 4/3/2020, Hepatitis A and B
14    vaccination?
15         A.   Can you zoom in?  I'm sorry.  Okay.  I
16    see encounter 14 and 13.  And what's the next one?
17         Q.   Just 14 and 13.  And then --
18         A.   Oh, yeah.
19         Q.   And the lines underneath that say --
20    that reflect that you received Hepatitis A and B
21    vaccination on 9/4/2020?
22         A.   Right.
23         Q.   And then a second shot of Hepatitis A
24    and B on 4/3/2020?
25         A.   Right.
```



Page 260

1          Q.    Okay.  And so do you have any
2    recollection sitting here today of getting the
3    Hepatitis A vaccination?
4          A.    No.  I thought it was just the B
5    vaccination.
6          Q.    Okay.  But these records reflect that
7    you received Hepatitis A as well?
8          A.    Right.
9          Q.    And you testified earlier that it was
10   your practice in 2020 to research whether or not
11   vaccinations from or using aborted-fetal cells; is
12   that right?
13         A.    Right.  Right.
14         Q.    Okay.  Would it surprise you to learn
15   that Hepatitis A uses aborted-fetal cells in its
16   manufacturing and testing?
17         A.    Yes.
18         Q.    Okay.  Did you ever research whether
19   Hepatitis A used aborted fetal cells in its
20   manufacturing and testing?
21         A.    No.  Because I thought it was just the B
22   vaccination.
23         Q.    Okay.  But you see here that it wasn't?
24         A.    Correct.
25         Q.    Okay.  You also received the TDAP



Page 261

1    vaccination on -- let's see.  Where is it?

2    Encounter 12.  Do you see date 2/21/20?

3         A.   Yeah.

4         Q.   And in the second line, you see TDAP

5    vaccination?

6         A.   Right.

7         Q.   Okay.  And, again, it was your practice

8    at this time period to research whether or not any

9    vaccinations that you received used fetal cells;

10   is that correct?

11        A.   Right.

12        Q.   And did you research whether or not the

13   TDAP vaccination used fetal cells?

14        A.   I did not.  I don't remember that one,

15   but --

16        Q.   Okay.  And sitting here today, do you

17   have any idea whether the TDAP vaccination uses

18   fetal cells?

19        A.   I don't.

20             MS. ENGELMAN:  Can we go to -- can

21   we go to 24?

22   BY MS. ENGELMAN:

23        Q.   You testified earlier that you received

24   testosterone pallets -- pellets; is that right?

25        A.   Correct.



Page 263

1    Dr. Stewart the one who -- who provided the
2    testosterone pellets to you?
3          A.    At one time, yes.
4          Q.    Okay.  And does she still do so today?
5          A.    No.
6          Q.    Okay.  And do you see here on the top
7    line where it says, "Bio-identical hormone pellets
8    are compounded and are FDA monitored but not
9    approved for male hormonal replacement."
10         A.    Right.
11         Q.    Did you have an understanding that the
12   pellets that you were ingesting were not FDA
13   approved?
14         A.    I did not.
15         Q.    Did you ever research it?
16         A.    I did not.
17         Q.    Okay.  The -- have you ever received --
18   received Botox?
19         A.    Yes.
20         Q.    And I'm not -- don't know how to
21   say this.  Juva injections?
22         A.    I don't know what that is.
23         Q.    Okay.  It's sort of an alternative to --
24   to Botox.  It doesn't matter.
25         A.    I --



Page 264

1      Q.   How long have you been receiving Botox
2   injections?
3      A.   Oh, maybe the last -- I don't know --
4   estimate five years.
5      Q.   Okay.  And are those for cosmetic
6   purposes?
7      A.   Yeah.
8      Q.   Okay.  Any medical reason for receiving
9   Botox?
10     A.   No.
11     Q.   Okay.  And what medical providers or
12  other providers did you receive Botox from?
13     A.   Dr. Glenn.  Dr. Stewart.  And I think
14  that's it.
15     Q.   Okay.  And have you ever researched
16  whether or not Botox uses aborted fetal cells?
17     A.   No.
18     Q.   Okay.  Ever asked any of your medical
19  providers?
20     A.   No.
21     Q.   Mr. Huck, I'm going to represent to you
22  that your medical records from Dr. Bishop show
23  that you were prescribed Telmisartan,
24  Rosuvastatin, and Vascepa.  Do those ring a bell?
25     A.   Yes.



Page 265

```
 1        Q.   Okay.  And did you ingest those
 2   medications?
 3        A.   I might have for a little bit, but
 4   there's leftovers that I've stopped taking.
 5        Q.   Okay.  And why did you stop taking them?
 6        A.   Because I'm -- told you I'm
 7   transitioning off --
 8        Q.   Okay.
 9        A.   -- pharmaceuticals to homeopathic
10   natural.
11        Q.   Okay.  Understood.  And so when -- prior
12   to ingesting these medications, did you ever do
13   any research or ask your medical provider whether
14   or not they used aborted fetal cells?
15        A.   I did not.
16        Q.   Okay.  And I'm going to represent to you
17   that your medical records from Dr. Matthew Glenn
18   reflect that you are on Vivonaze, Crestor,
19   Micardis, and Uloric.
20        A.   Correct.
21        Q.   And did you ingest those medications?
22        A.   At the time, yes.
23        Q.   And did you ever do any research or ask
24   your medical provider whether or not they used
25   aborted fetal cells in any way?
```



Page 266

```
 1          A.    No.
 2          Q.    I'll represent to you that your medical
 3    records from Kathy Archer and Lynn Kocian list the
 4    following medications, Basepuc, Crestor, Micardis,
 5    Ivermectin, and low-dose Naltrexone.  Do those
 6    ring a bell?
 7          A.    Yes.
 8          Q.    And did you ingest those medications?
 9          A.    At the time, yes.
10          Q.    Okay.  And did you ever do any research
11    about whether those used fetal cells --
12          A.    No.
13          Q.    -- in any way?
14          A.    No.
15          Q.    Ask your medical provider?
16          A.    No.
17          Q.    Okay.  And -- okay.  Have you applied
18    for any jobs since you separated from Takeda?
19          A.    Yes.
20          Q.    Where?
21          A.    Too many to list.  I applied at roughly
22    80 to 100 different companies.
23          Q.    Okay.  And are you currently working?
24          A.    Contracting, yes.
25          Q.    Okay.  Where are you contracting?
```



Page 270

1       A.   I did not.

2       Q.   Okay.  And did you apply to any other

3  pharmaceutical companies?

4       A.   Not to my knowledge.

5       Q.   Okay.

6            MS. ENGELMAN:  Can we grab 16, tab

7  16, Celina?

8  BY MS. ENGELMAN:

9       Q.   Does this document look familiar to you?

10      A.   Yes.

11      Q.   Okay.  And what is this -- then we can

12 scroll -- but what does this reflect?

13      A.   These were the jobs that I applied for

14 that were uploaded to the Nebraska Unemployment

15 website.

16      Q.   Got it.  Okay.  So if we scroll down,

17 we'll see Bristol Myers Squibb.  Do you see that?

18      A.   Yes.

19      Q.   And so did you apply for a job there as

20 a sales representative?

21      A.   Must have.  Must have, yes.

22      Q.   Okay.  And so it looks like 7/30/2022 is

23 the date.  Do you see that?

24      A.   Right.

25      Q.   Does that sound about right?



Page 271

 1       A.   Yeah, I see that.  I'm not -- I'm
 2   assuming that's correct.
 3       Q.   Okay.  And so before you applied to
 4   Bristol Myers Squibb, did you do any research to
 5   see whether or not they manufactured or produced
 6   any treatments that used aborted-fetal cells?
 7       A.   I did not.
 8       Q.   Okay.  And then Immunity Bio, right
 9   above that, is that a pharmaceutical company?
10       A.   Unknown.  I'm not sure.
11       Q.   Okay.  Ecolab underneath.  Do you know
12   what that is?
13       A.   They do, like, restaurant chemicals.
14       Q.   Oh, okay.  And so --
15            MS. ENGELMAN:  If you scroll down
16   to 007, Celina.
17   BY MS. ENGELMAN:
18       Q.   You see there that you -- Sanofi
19   Aventis.  Is that a pharmaceutical company?
20       A.   Yes.
21       Q.   And you applied there, it looks like, on
22   3/4/2022?
23       A.   Right.
24       Q.   And as a sales -- as an outside sales
25   representative?



Page 272

```
 1        A.    Correct.
 2        Q.    Did you research whether Sanofi
 3   manufactures or researches using aborted-fetal
 4   cells?
 5        A.    I did not.
 6        Q.    08, the next one.  You see here it says
 7   AstraZeneca?
 8        A.    Yes.
 9        Q.    Did you apply there on 2/25/2022?
10        A.    Yes.
11        Q.    Okay.  Does AstraZeneca have a COVID-19
12   vaccine?
13        A.    Unknown -- yes.
14        Q.    Okay.  And does it use aborted-fetal --
15   fetal cells?
16        A.    Yes.
17        Q.    Okay.  And you applied for a job there
18   anyhow?
19        A.    Yes.
20        Q.    What else did you do other than looking
21   at this Nebraska website to -- to look for jobs?
22        A.    Well, it was also through LinkedIn.
23        Q.    Uh-huh.
24        A.    Job boards.  LinkedIn job board.
25        Q.    Did you -- did you provide a resume to
```



Page 306

```
 1        Q.    What -- what do those activities
 2   include?
 3        A.    Marches, protesting, peacefully
 4   protesting outside of abortion clinics, and
 5   marching -- just creating awareness of -- that
 6   there are alternatives out there to abortion.
 7        Q.    And you said that that was a part
 8   through Gross Catholic High School?
 9        A.    Correct.
10        Q.    And also the Knights of Columbus?
11        A.    Yes.  And the Knights of Columbus, which
12   is through St. Matthew's Church.
13        Q.    So meaning that you're part of a
14   Knights' chapter at St. Matthew's?
15        A.    Yes.
16        Q.    So when did you become aware that HEK
17   cells, the -- the fetal tissue cells were used in
18   the development of various drugs?
19        A.    Upon researching the COVID EUA vaccines
20   that were fast tracked and that's when I noted --
21   or realized that those were a part of
22   manufacturing and/or testing of all the COVID EUA
23   vaccines that were being fast tracked in late 2020
24   for distribution in 2021.
25        Q.    Okay.  So I was asking when, meaning,
```



Page 314

```
 1        A.   And --
 2        Q.   I'm just trying --
 3        A.   Sorry.
 4        Q.   -- to understand.  When is it that you
 5   became aware that vaccines or medications of any
 6   kind could possibly involve the use of aborted
 7   fetal cells?
 8        A.   Well, if -- the Hepatitis B in 2020 and
 9   the COVID EUA vaccine in early 2021.
10        Q.   Okay.  So in 2020 you knew that this
11   existed; correct?
12        A.   For the Hepatitis B vaccine.
13        Q.   Correct.  And between 2020 and 2021, did
14   you ever do any research about any other
15   medications that you ingested to see if those
16   medications contained aborted fetal cell -- fetal
17   cells?
18        A.   No.
19             MS. ENGELMAN:  Nothing else.  We're
20   done.  I think we're all set.
21             MR. DeMATTEO:  Nothing further from
22   me.
23             MS. ENGELMAN:  Thank you, Mr. Huck.
24             VIDEOGRAPHER:  Okay.  We are now
25   off the record at 5:36.
```



```
                                              Page 315
 1                    (Video concluded.)

 2              COURT REPORTER:  (Request

 3   transcript orders be placed on record.)

 4              MS. ENGELMAN:  Original and pdf,

 5   full.

 6              MR. DeMATTEO:  Pdf, full size.

 7                 (5:37 p.m. - Adjournment.)

 8                  (Exhibits 1 to 17 marked

 9                  for identification.)

10

11                 **   **   **   **

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```





## Religious Accommodation Request Form

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

### To be completed by employee

Name: _Robb Huck_          Position: _Senior Sales Representative_

Date of request: _9/14/21_

Business/Function: _USBU_

Immediate supervisor: _Kelly Hanson_

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):
_Vaccination Exemption_

Frequency and duration of the accommodation requested: _indefinitely_

Describe religious belief or practice that necessitates this request for accommodation:
_I am a baptized Catholic - please see attached document. The use of fetal cells or tissues from aborted fetuses for development or testing of a vaccine is against my religious beliefs + my moral & Ethical views._

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.

Please provide alternative accommodations that might address your needs:

1. _Robb Amy + The family are fully Practicing Catholics_
2. _Good Standing_
3. _St Matthew - Pastor_

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: _____          Date: _9/14/21_

Upon final determination the employee will receive a letter approving or denying the accommodation request.

**R. Huck**
**6**
**10.02.23**

TAKEDA_017446

9/22/2021

To Whom It May Concern,

I am a baptized Catholic seeking an exemption from an immunization requirement. This letter explains how the Catholic Church's teachings may lead individual Catholics, including me, Robb Huck, to decline certain vaccines.

The Roman Catholic Church teaches that a person may be required to refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment. While the Catholic Church does not prohibit the use of any vaccine, and generally encourages the use of safe and effective vaccines as a way of safeguarding personal and public health, the following authoritative Church teachings demonstrate the principled religious basis on which a Catholic may determine that he or she ought to refuse certain vaccines:

·    <u>Vaccination is not morally obligatory in principle and so must be voluntary</u>.

·    There is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct

CONFIDENTIAL                                    TAKEDA_017447

abortions. It is permissible to use such vaccines only under certain case-specific conditions, based on a judgment of conscience.

· A person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Catholic moral teachings.

· A person is morally required to obey his or her sure conscience.

A Catholic may judge it wrong to receive certain vaccines for a variety of reasons consistent with these teachings, and there is no authoritative Church teaching universally obliging Catholics to receive any vaccine. An individual Catholic may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines. More generally, a Catholic might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality. Therapeutic proportionality is an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods. It can also extend to the good of others and the common good, which likewise entail spiritual and moral

TAKEDA_017448

dimensions and are not reducible to public health. The judgment of therapeutic proportionality must be made by the person who is the potential recipient of the intervention in the concrete circumstances, not by public health authorities or by other individuals who might judge differently in their own situations.

At the core of the Church's teaching are the first and last points listed above: vaccination is not a universal obligation and a person must obey the judgment of his or her own informed and certain conscience. In fact, the *Catechism of the Catholic Church* instructs that following one's conscience is following Christ Himself:

In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law: "Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; . . . [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ."

Therefore, if a Catholic comes to an informed and sure judgment in conscience that he or she should not receive a vaccine, then the Catholic Church requires that the person

TAKEDA_017449

follow this certain judgment of conscience and refuse the vaccine. The *Catechism* is clear: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.'"

Sincerely in Christ,

Robb Huck

CONFIDENTIAL

Johnson & Johnson
Jennifer Taubert, Worldwide Chair, Exec VP Pharmaceuticals
1 Johnson & Johnson Plaza
New Brunswick, NJ 08933

Dear Ms. Taubert:

I write to thank Johnson & Johnson for working to make its lifesaving COVID-19 vaccine available to the public. It is my understanding, however, that Johnson & Johnson uses a cell line derived from an aborted baby to manufacture its vaccine. I am respectfully urging Johnson & Johnson to stop relying on such cell lines.

Please understand that as one of your potential customers, I believe it is immoral to use abortion-derived tissues and/or cell lines in the production, testing or manufacture of vaccines and other pharmaceutical products. If I have the opportunity to receive an alternative vaccine that has no connection to abortion, I will choose that vaccine instead of Johnson & Johnson's vaccine.

It is my understanding that alternative, non-abortion-derived cell sources are available or could be made available. Had Johnson & Johnson instead chosen to use a cell line with no connection to abortion, it would have eliminated a significant moral dilemma now faced by substantial numbers of people.

As research and testing continue at Johnson & Johnson, I respectfully but strongly urge you to take note of my objections and discontinue the use of abortion-derived cell lines in the development and testing of your products. This is an issue of emerging importance and one about which persons of faith are becoming increasingly knowledgeable. Now and in the future, I will continue to seek out and support those pharmaceutical companies that avoid the use of abortion-derived cell lines.

Sincerely,

Date  9/22/21

Tal Zaks, M.D., Ph.D.
Chief Medical Officer
Moderna, Inc.
Global Headquarters
200 Technology Square
Cambridge, MA 02139

Dear Dr. Zaks:

I write to thank Moderna for making its lifesaving COVID-19 vaccine available to the public. It is my understanding, however, that in testing this vaccine, Moderna made use of a cell line derived from an aborted baby. I am respectfully urging Moderna to stop relying on such cell lines.

Please understand that as one of your potential customers, I believe it is immoral to use abortion-derived tissues and/or cell lines in the production, testing or manufacture of vaccines and other pharmaceutical products. If I have the opportunity to receive an alternative vaccine that has no connection to abortion, I will choose that vaccine instead of Moderna's vaccine.

While Moderna tested the current vaccine using abortion-derived cell lines, it is my understanding that alternative, non-abortion-derived cell sources are available or could be made available. Had Moderna instead chosen to use a cell line with no connection to abortion, it would have eliminated a significant moral dilemma now faced by substantial numbers of people.

As research and testing continue at Moderna, I respectfully but strongly urge you to take note of my objections and discontinue the use of abortion-derived cell lines in the development and testing of your products. This is an issue of emerging importance and one about which persons of faith are becoming increasingly knowledgeable. Now and in the future, I will continue to seek out and support those pharmaceutical companies that avoid the use of abortion-derived cell lines.

Sincerely,

DATE 9/22/21

Mikael Dolsten, M.D., Ph.D.
Chief Scientific Officer & President, Worldwide Research, Development & Medical
Pfizer, Inc.
235 East 42nd Street
New York, NY 10017

Dear Dr. Dolsten:

I write to thank Pfizer for making its lifesaving COVID-19 vaccine available to the public. It is
my understanding, however, that in testing this vaccine, Pfizer made use of a cell line derived
from an aborted baby. I am respectfully urging Pfizer to stop relying on such cell lines.

Please understand that as one of your potential customers, I believe it is immoral to use abortion-
derived tissues and/or cell lines in the production, testing or manufacture of vaccines and other
pharmaceutical products. If I have the opportunity to receive an alternative vaccine that has no
connection to abortion, I will choose that vaccine instead of Pfizer's vaccine.

While Pfizer tested the current vaccine using abortion-derived cell lines, it is my understanding
that alternative, non-abortion-derived cell sources are available or could be made available. Had
Pfizer instead chosen to use a cell line with no connection to abortion, it would have eliminated a
significant moral dilemma now faced by substantial numbers of people.

As research and testing continue at Pfizer, I respectfully but strongly urge you to take note of my
objections and discontinue the use of abortion-derived cell lines in the development and testing
of your products. This is an issue of emerging importance and one about which persons of faith
are becoming increasingly knowledgeable. Now and in the future, I will continue to seek out and
support those pharmaceutical companies that avoid the use of abortion-derived cell lines.

Sincerely,

TAKEDA_017453

Date: 9/22/2021

From: Robb Huck

To: Takeda Pharmaceuticals,

In that I am a member of the Catholic Church St. Matthew in Bellevue, Nebras! a. I am exercising my right to receive a religious exemption for vaccination. First and foremost, the vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on an aborted fetus from 1973.[1]

In regard to using such vaccines, the Vatican has instructed the faithful that:
*"As regards the diseases against which there are no alternative vaccines which are available and ethically acceptable, it is right to abstain from using these vaccines if it can be done without causing children, and indirectly the population as a whole, to undergo significant risks to their health."* (Moral Reflections on Vaccines Prepared From Cells Derived From Aborted Human Fetuses, Pontifical Academy for Life, June 2005).

Therefore as a faithful Catholic, I cannot according to the Church tenets on conscience which are outlined below, use any product that takes its origin in abortion. The Vatican document I outline below:

*"They should take recourse, if necessary, to the use of conscientious objection with regard to the use of vaccines produced by means of cell lines of aborted human fetal origin." "Such a duty may lead, as a consequence, to taking recourse to "objection of conscience" when the action recognized as illicit is an act permitted or even encouraged by the laws of the country and poses a threat to human life. The Encyclical Letter Evangelium Vitae underlined this "obligation to oppose" the laws which permit abortion or euthanasia 'by conscientious objection.'*

*"It is up to the faithful and citizens of upright conscience (fathers of families, doctors, etc.) to oppose, even by making an objection of conscience, the ever more widespread attacks against life and the "culture of death" which underlies them." "[T]here is a grave responsibility to use alternative vaccines and to make a conscientious objection with regard to those which have moral problems." "As regards those who need to use such vaccines* **for reasons of health***, it must be emphasized that, apart from every form of formal cooperation, in general, doctors or parents who resort to the use of these*

---

[1] *Fetal Cell Lines Were Used to Make the Johnson & Johnson COVID Vaccine—Here's What That Means* 3/4/2021, MSN.com

vaccines for their children, in spite of knowing their origin (voluntary abortion), carry out a form of **very remote mediate material cooperation**, and thus very mild, in the performance of the original act of abortion, and a **mediate material cooperation**, with regard to the marketing of cells coming from abortions, and **immediate,** with regard to the marketing of vaccines produced with such cells. However, in this situation, the aspect of passive cooperation is that which stands out most. It is up to the faithful and citizens of upright conscience (fathers of families, doctors, etc.) to oppose, even by making an objection of conscience, the ever more widespread attacks against life and the "culture of death" which underlies them. From this point of view, the use of vaccines whose production is connected with procured abortion constitutes at least a **mediate remote passive material cooperation** to the abortion, and an **immediate passive material cooperation** with regard to their marketing."

Further, the Catechism of the Catholic Church which Pope John Paul II declared to be the "sure teaching norm of the Catholic Church" contains the tenets of our faith and our duty to adhere to these teachings regarding the right of conscience objections states:

1776    Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment…. For man has in his heart a law inscribed by God…. His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths.

1777    Moral conscience, present at the heart of the person, enjoins him at the appropriate moment to do good and to avoid evil. It also judges particular choices, approving those that are good and denouncing those that are evil. It bears witness to the authority of truth in reference to the supreme Good to which the human person is drawn, and it welcomes the commandments. When he listens to his conscience, the prudent man can hear God speaking.

1778    Conscience is a judgment of reason whereby the human person recognizes the moral quality of a concrete act that he is going to perform, is in the process of performing, or has already completed. In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law:

Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; I mean that it was not a dictate, nor conveyed the notion of responsibility, of duty, of a threat and a promise…. [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ.

1779    It is important for every person to be sufficiently present to himself in order to hear and follow the voice of his conscience. This requirement of interiority is all the more necessary as life often distracts us from any reflection, self-examination or introspection.

CONFIDENTIAL

*Return to your conscience, question it.... Turn inward, brethren, and in everything ycu do, see God as your witness.*

1806   Prudence is the virtue that disposes practical reason to discern our true good in every circumstance and to choose the right means of achieving it.  Prudence is 'right reason in action,' writes St. Thomas Aquinas. It is called auriga virtutum (the charioteer of the virtues); it guides the other virtues by setting rule and measure. It is prudence that immediately guides the judgment of conscience. The prudent man determines and directs his conduct in accordance with this judgment. We are also taught through the teachings of Papal Encyclicals that conscience is the Divine Law which is inscribed into the heart and soul of man by God.  For example: *"The natural law is written and engraved in the soul of each and every man, because it is human reason, ordaining hi*,*n to do good and forbidding him to sin...But this command of human reason would not have the force of law if it were not the voice and interpreter of a higher reason to which our spirit and freedom must be submitted." (Leo XIII Libertas Praestantissimum, 597)*

*"On his part, man perceives and acknowledges the imperatives of the divine law through the mediation of conscience. It is through his conscience that man sees and recognizes the demands of divine law. He is bound to follow this conscience faithfully in all his activity so that he may come to God, who is his last end. Therefore he must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters.  The reason is that the exercise of religion, of its very nature, consists before all else in those internal, voluntary and free acts whereby man sets the course of his life directly toward God. Acts of this kind cannot be commanded or forbidden by any merely human authority." (Dignitatis Humanae, Pope Paul VI, 1965).*

**Synod of Bishops' address to the United Nations October 2, 1979:** *"In accordance with their dignity, all human beings, because they are persons, that is, beings endowed with reason and free will and, therefc re, bearing a personal responsibility, are both impelled by their nature and bound by a moral obligation to seek the truth, especially religious truth. They are also bound to adhere to the truth once they come to know it and to direct their whole lives in accordance with its demands" (Dignitatis humanae, 2). "The practice of religion by its very nature consists primarily of those voluntary and free internal acts of conscience by which a human being directly sets his course towards God. No merely human power can either command or prohibit acts of this kind"*

**Pope Paul VI, 1965  Gaudium et Spes:**  *"For its part, authentic freedom is an exceptional sign of the Divine image within man. For God has willed that man remain "under the control of his own decisions, so that he can seek his Creator spontaneously, and come freely to utter and blissful perfection through loyalty to Him. Hence man's dignity demands that he act according to a knowing and free choice that is personally motivated*

CONFIDENTIAL

TAKEDA_017456

and prompted from within, not under blind internal impulse nor by mere external pressure." **Fourth Lateran Council:**
*"The Divine Law," says Cardinal Gousset, "is the supreme rule of actions; our thoughts, desires, words, acts, all that man is, is subject to the domain of the law of God; and this law is the rule of our conduct by means of our conscience. Hence it is never lawful to go against our conscience; as the Fourth Lateran council says, 'Quidquid fit contra conscientiam, aedificat ad gehennam.'" ["Whatever is done in opposition to conscience is conducive to damnation."]*

The Centers for Disease Control, which is responsible for declaring public health emergencies, has not attested to any sort of significant risk to the health of the community at this time that would preclude our right to abstain in accord with this teaching. According to the Section 564 of the Federal Food, Drug, and Cosmetic Act, a lawful application of the terms of a lawful emergency use authorization ("EUA") pursuant includes the right of informed consent and the option to refuse[2]. The FDA's guidance on the right to informed consent and the option to refuse is highlights the right of informed consent and the option to refuse governing the administration of Emergency authorized "unapproved products."  https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained

Therefore as a faithful Catholic, opposed to abortion and raised in the old school catholic ways, I cannot according to the Church tenets on conscience which I outlined use any product that takes its origin in abortion.

In that the use of these vaccines would be both a violation of Catholic doctrine on the duty to adhere to moral conscience and also in contradiction with the instruction of the Vatican, therefore, under the teachings of the Catholic Church to which I follow, am religiously and morally bound, I submit this exemption for vaccination.

Sincerely,

Robb Huck

---

[2] 21 USCS § 360bbb-3

TAKEDA_017457



*Interactive Process Notes*

**RELIGIOUS ACCOMMODATION**

Employee Name: Huck, Robb
Division: Neuroscience
Position: Sr. Sales Representative
Field or Office based:
ER Representative(s): Forestier, Irving
Date of Interview: October 1, 2021

Please know you are not being recorded and I do not consent to being recorded.

What position do you hold?
Sr. Sales Representative

Do you work in the field/lab or are you office based?
Field. I am outside sales.

Are you currently visiting clients?
Yes.

Approximately what percentage of your total client portfolio are you able to see now?
Probably 80%

Tell me more about your religious beliefs and religion or belief system generally.
As stated, I am baptized Catholic and very pro-life. My moral conscience tells me that these vaccines approved under an emergency use authorization, are processed with tissue from aborted babies and to me it goes against my moral conscious.

I see in your request that you are making several arguments, one is the use of fetal line cells, moral ground, informed consciousness and the Food, Drug and Cosmetic Act, do I have this right or did I miss any?

You got them.

Are you a member of any particular church or religious organization?

**R. Huck**
**8**
**10.02.23**

CONFIDENTIAL                                                                 TAKEDA_017458



I am a member of Saint Mathew Catholic Church in Bellevue, Nebraska for about 20 years. I was brought up in catholic school from K through 12 grade and continued to practice Catholicism all my life. I go to pro-life rallies and walks through, I help those that have made conscious decisions, I work with those that have had abortions and I work in educating those that are considering an abortion. I believe so much in this that I am a member of the Knights of Columbus. I volunteer 100 hrs. to catholic schools. I am a firm believer in catholic education and in helping those who have made the decision to have an abortion.

If so – What do your religion's leaders say about the vaccine?
Well, Father Leo and I, we discussed it. He has the same feelings that I do. I did not ask him if he got the vaccine or not. His main point was, you can control what you do and what your family does there are a lot of things out of your control. You just need to make a moral decision of what you think it is morally right for you.

Have your religious leaders specifically stated that you may not be vaccinated?
No.

How long have you subscribed to this belief system?
All my life.

Tell me more about how the company's policies/rules conflict with your beliefs.
The use of these vaccines is immoral.

What is it specifically about this religious belief that prohibits you from being able to become vaccinated?
Stated above.

*If applicable:*
Please tell me more about the fetal cells (or substitute specific concern i.e. vegan) and how that connects to your request?
I oppose abortion so the use of any aborted baby I am against. ** He is reading all answers.

Have you taken any other vaccines in your life?  (do not ask for specifics)
Yes, as child.

Have you ever taken and do you currently take any of the following products:
Tylenol, Ibuprofen, Pepto Bismol, Claritin, Sudafed, Tums
No.

Are you aware that all of those products, (and probably the other vaccines that you have taken) were developed using fetal cells?
Not asked.

CONFIDENTIAL                                                    TAKEDA_017459



If Takeda accommodates you, would you be willing to attest to the fact that you have not and will not take any of those vaccines or products?
Yes.

What is the accommodation that you are requesting?
No vaccine. Continue to test.

Are there any alternative accommodations that might address your needs?
Well, currently I test 2 times a week, I wear a mask. I know that future vaccines are coming some without aborted babies that will be a viable solution for me based on safety, I had already had covid I have the antibodies.

You have chosen to work for a company that has manufactured and/or marketed a long list of pharmaceutical products for which there is a chance that, at some point, fetal cells were used in development.  How do you reconcile that with your stated position on taking the COVID vaccine?  Do you see this as consistent?
I am dealing with that right now. I am praying on that. It is a tough position to be in. My wife and I pray on that. I am doing more research on products developed in this manner. I sell Trintellix.

Besides vaccines, do your religious beliefs prevent you from being tested for COVID?
No.

*For body is a temple claim:*
Do you drink alcohol recreationally?
Not asked.

Do you have tattoos or piercings?
Not asked.

*If you found the same language used in request online*
I have reviewed your accommodation request, and I noticed that it is very similar to a few others we have received and I see some of the language online.  Can you help me understand this?
N/A

Is there any additional information regarding your beliefs, observances or practices that support your request for a religious accommodation?
No.

Is there anything else we should know or consider as we review your request?
No.

**From:**          US Occ Health ADA
**Sent:**          Wednesday, October 20, 2021 3:51 PM
**To:**            Mealey, Christine
**Subject:**       FW: Robb Huck Medical Exemption.
**Attachments:**   Image (2).jpg; Image (15).jpg; Image (16).jpg; Image (17).jpg; Image (18).jpg; Image
                   (19).jpg; Image (20).jpg; Image (21).jpg; Image (22).jpg; Image (23).jpg; Image (24).jpg;
                   Image (25).jpg

Christine Mealey
Employee Relations Partner – GMSGQ
Takeda Pharmaceutical Company Limited
christine.mealey@takeda.com
 (m) 508.331.5060

-----Original Message-----
From: Huck, Robb <robb.huck@takeda.com>
Sent: Friday, September 24, 2021 2:29 PM
To: US Occ Health ADA <US.Occ.Health.ADA@takeda.com>
Cc: Huck, Robb <robb.huck@takeda.com>
Subject: Robb Huck Medical Exemption.

Please let me know you are able to upload the 12 documents.

Thank you for your sincere consideration,

Robb Huck
Senior Professional Sales Representative Neuroscience Business Unit

Relator, Developer, Positivity, Includer, Adaptability

Takeda Pharmaceuticals America, Inc.
1000 Massachusetts Ave
Cambridge, Massachusetts, 02139
U.S.A.
M 402-578-6191
Robb.Huck@takeda.com
www.takeda.us



R. Huck
**9**
10.02.23

-----Original Message-----
From: Huck, Robb <robb.huck@takeda.com>
Sent: Friday, September 24, 2021 1:22 PM
To: Huck, Robb <robb.huck@takeda.com>
Subject: Emailing: Image (2).jpg, Image (15).jpg, Image (16).jpg, Image (17).jpg, Image (18).jpg, Image (19).jpg, Image
(20).jpg, Image (21).jpg, Image (22).jpg, Image (23).jpg, Image (24).jpg, Image (25).jpg

CONFIDENTIAL                                                                      TAKEDA_017461

## EMPLOYEE REQUEST FOR ACCOMMODATION BASED ON DISABILITY

*Please complete this form and return it via email at* US.Occ.Health.ADA@takeda.com *Please do not submit this form to your manager. Please note this form will not be placed in your personnel file but will be kept in a separate and secure confidential file. Contents of this request are confidential and will not be shared except as needed to consider any reasonable accommodation request.*

ALL QUESTIONS TO BE COMPLETED BY EMPLOYEE/APPLICANT ONLY:

Date: 9/14/21

Name: Robb Hult

Employee ID#: 5001 8800

Please explain which aspects of your employment responsibilities/duties are impacted by your condition.

What specific accommodation are you requesting (e.g., time off, additional equipment, etc.)? (Please submit Form B, completed by your medical provider, in support of your response to this question)

Vaccine Exemption because of previous Covid diagnosis+

What other accommodations may be responsive to your request? Antibodies present.

Covid Antibodies present/Prior Covid infection which was Excluded from the ongoing trials.

How long do you anticipate the need for an accommodation? If requesting time off, please provide an estimated return to work date.

indefinitely

I understand that my request for accommodation must be supported by medical documentation. I agree to provide that information as requested per the deadline required. I agree to fully cooperate with Human Resources in responding to my request. I understand I may not be provided with the specific accommodation that I have requested; however, I understand that good faith efforts will be made to consider my request.

Employee Signature: _____   Date: 9/14/21

Please note, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title 11 from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assist. ° reproductive services

Form A



## HEALTH CARE PROVIDERS INFORMATION
## CONFIDENTIAL RECORDS STATEMENT
AUTHORIZATION TO RELEASE MEDICAL RECORDS

**INSTRUCTIONS FOR EMPLOYEE:** Complete health care provider information and sign authorization release below. Make additional copies of this form for each of your health care providers, if you have more than one provider.

Sign and date all forms and return to:
US.Occ.Health.ADA@takeda.com

## *HEALTH CARE PROVIDER INFORMATION*

Attending Health Care Provider's Name: Jacquie Stewart, NP

Address: 6030 Village Dr

City: Lincoln      State: NE      Zip: 68516

Phone Number: (402) 413 0717      Fax Number: (949) 404 6828

## *AUTHORIZATION TO RELEASE MEDICAL RECORDS*

I have requested an accommodation from Takeda, my employer, under The Americans with Disabilities Act (ADA) of 1990.

**I hereby authorize the ADA Coordinator for Takeda and Takeda's Occupational Health Lead to communicate directly with the health care provider who completes this form, in order to obtain clarification of issues relating to the functional limitations for which I am seeking an accommodation.**

**A note about the Genetic Information Nondiscrimination Act of 2008 (GINA):**
**The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

**This authorization will automatically end within one year from the date the employee signs this form.**

CONFIDENTIAL      TAKEDA_017463

Employee's Signature: _____ *Takeda*    Date: 9/22/2/

CONFIDENTIALITY NOTICE: Medical-related information shall be kept confidential and maintained separate from other personnel records. However, supervisors and managers may be advised of information necessary to the determinations they are required to make in connection with a request for an accommodation. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations. Government officials investigating compliance with the ADA may also be provided relevant information as requested.

CONFIDENTIAL    TAKEDA_017464



# REQUEST FOR MEDICAL STATUS EVALUATION UNDER THE ADA AMENDMENTS ACT (the "ADAAA")

Employee Requesting Accommodation: Robb Huck

Position/Title: Senior Sales Representative  Department: USBU

Work Location:  Work Phone number: 4025786191

Immediate Supervisor: Kelly Hanson

The information below is treated confidentially, is not maintained in the employee's main personnel file, and will be used only by authorized individuals with a direct need to know and/or evaluate the information. Please return this form, once completed, to: US.Occ.Health.ADA@takeda.com.

**Supervisors and managers may be advised of information necessary to make the determinations they are required to make in connection with a request for an accommodation.**

## INSTRUCTIONS FOR EMPLOYEE

**Please provide this form to your healthcare provider along with your attached job description and your signed authorization form. Takeda will consider your request for accommodation upon receipt of your completed Medical Status Evaluation Form. If you have any questions, please do not hesitate to call Occ Health or Employee Relations. Thank you.**

---

## THIS SECTION TO BE COMPLETED BY HEALTH CARE PROVIDER:

Health Care Provider: Jacquie Stewart, NP

Office Address: 6030 Village Drive, Lincoln NE 68516

Office Phone Number: 402 4130717

1. Based on the job description, can the employee perform the essential functions of the position without an accommodation?

   ☒ Yes ☐ No

   *If no,* what essential job function(s) is the employee having trouble performing because of the impairment(s) (attach additional sheets of paper, if necessary)?

   ______________________________________________

2. Can the employee perform the essential functions of his/her position without being a direct threat to his or her own health and safety and/or the health and safety of others in the workplace?

   ☒ Yes ☐ No

3. *If no*, please explain the basis for your response; including objective medical or other factual evidence (attach additional sheets of paper, if necessary)?

______________________________________________

______________________________________________

**Questions to help determine effective accommodation options.**

4. ***Is there a reasonable accommodation*** that would enable the employee to perform the essential functions of the job as described in the attached job description? (Please note that the employer retains the discretion to determine whether an accommodation is reasonable.)

☒ Yes ☐ No

| Accommodation Being Requested: |
|---|
| - mask |
| - weekly testing |
| |
| |

5. How long do you estimate the accommodation(s) will be needed? Please comment on the estimated duration of the recommended accommodation and the frequency of accommodation if it entails time away from the employee's job:

Indefinitely

6. If your proposed accommodation is a leave of absence, when will the employee be able to return to work?

N/A

| Reason for Accommodation (functional limitation(s) for which you seek an accommodation): |
|---|
| |
| |
| |
| |
| |

7. Please provide any further information you feel would be useful to the Company in evaluating the employee's situation but do not identify the employee's specific medical condition and do not provide the details of your diagnosis of the employee.

Pt has covid antibodies.

**********************************************************************************************

[signature] DATE 9/22/21

SIGNATURE OF HEALTHCARE PROVIDER
(Please do not use signature stamp or designee signature)

Date: September 22, 2021

To: Takeda Pharmaceuticals
Re: Covid-19 Experimental Vaccine Candidates

Any compulsory Covid-19 vaccination requirement is a violation of federal law. I urge you to advise all employees that they have the right to refuse or to take any COVID-19 vaccine. Any other action is contrary to federal law.

Covid-19 Vaccines are Experimental. Covid-19 vaccines are not approved by the FDA. The Covid-19 vaccines are only approved under an Emergency Use Authorization, for invesigational use only.1 Covid19 vaccines lack requisite studies and are not approved medical treatment. The FDA's guidance on emergency use authorization of medical products requires the FDA to "ensure that recipients are informed to the extent practicable given the applicable circumstances … That they have the option to accept or refuse the EUA product …"2

Title 21, Section 360bbb-3 of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") vests the Secretary of Health and Human Services with the permissive authority to grant Emergency Use Authorizations ("EUAs") providing that appropriate conditions designed to ensure that individuals to whom the product is administered are informed:

1. that the Secretary has authorized the emergency use of the product;
2. 2. of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

3. of **the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks. 1

The right to avoid the imposition of human experimentation is fundamental, rooted in the Nuremberg Code of 1947, has been ratified by the 1964 Declaration of Helsinki, and further codified in the United States Code of Federal Regulations. In addition to the United States regarding itself as bound by these provisions, these principles were adopted by the FDA in its regulations requiring the informed consent of human subjects for medical research. It is unlawful to conduct medical research, even in the case of an emergency, unless steps are taken to secure **informed consent** of all participants.3

The following Emergency Use Authorizations have been issued for Covid-19 vaccinations:

12/11/20 Moderna - FDA issued an EUA for emergency use of the Moderna mRNA COVID-19 vaccine for recipients 16 years of age or older.

12/18/20 Pfizer/BioNTech - FDA issued an EUA for emergency use of the Pfizer/BioNTech mRNA vaccine for recipients 18 years of age or older.

2/27/21 Johnson & Johnson - FDA issued an EUA for emergency use of the Johnson & Johnson COVID-19 vaccine (aka Janssen vaccine) for recipients 18 years of age or older.

Each of the above EUAs was issued in conjunction with a similar Fact Sheet from the FDA. For example, the Janssen fact sheet contains the following notice:

"INFORMATION TO PROVIDE TO VACCINE RECIPIENTS/CAREGIVERS" As the vaccination provider, you must communicate to the recipient or their caregiver, information consistent with the "Fact Sheet for Recipients and Caregivers" (and provide a copy or direct the individual to the website to obtain the Fact Sheet) prior to the individual receiving the Janssen Covid-19 Vaccine, including:

- FDA has authorized the emergency use of the Janssen Covid-19 Vaccine, which is not an FDA approved vaccine.
- The recipient or their caregiver has the option to accept or refuse the Janssen COVID-19 Vaccine.

The significant known and potential risks and benefits of the Janssen Covid-19 Vaccine, and the extent to which such risks and benefits are unknown.4

Clearly, any attempt to force anyone to take a Covid-19 vaccine is a violation of federal law and the conditions under which the Covid-19 vaccine has been authorized for use. The law is clear, experimental medical treatment cannot be mandated.

**Businesses are not shielded from liability with experimental agents.**
Under the 2005 PREP Act enacted by Congress, pharmaceutical companies that manufacture EUA vaccines are shielded from liability related to injuries and damages caused by their experimental agents. However, any employer, public school, or any other entity or person who mandates experimental vaccines on any human being is not protected from liability for any resulting harm. While vaccine manufacturers may be shielded from liability, your institution is not protected, and neither are you. 5

You are hereby on notice that if you illegally or irresponsibly mandate EUA medical therapies on myself (Robb Huck), such as the experimental Covid-19 vaccine candidates, I may have no choice but to take legal action, and you may be personally liable for resulting harm.

I urge Takeda Pharmaceuticals to comply with the FD&C Act and the terms of the EUA and its accompanying Fact Sheet, and to advise all employees of their right to accept or refuse any Covid-19 vaccine. Any other course of action is contrary to federal law.

Thank you for your time and for protecting the best interest of your employees.

Sincerely,

Robb Huck

TAKEDA_017468

1 https://ca.childrenshealthdefense.org/wp-content/uploads/CDE-Superintendent-Letter0from-ChildrensHealth-Defense-California-Chapter.pdf
2 https://www.fda.gov/media/97321/download
3 21 CFR § 50.24
4 www.janssencovid19vaccine.com
5 https://childrenshealthdefense.org/defender/under-federal-law-can-your-employer-make-you-get-covidvaccine/

 TAKEDA_017469

 **COVID-19 Information** 

Public health information (CDC) | Research information (NIH) | SARS-CoV-2 data (NCBI) | Prevention and treatment information (HHS) | Español

NIH U.S. National Library of Medicine
*ClinicalTrials.gov*

Find Studies ▾
About Studies ▾
Submit Studies ▾
Resources ▾
About Site ▾
PRS Login

Trial record **16 of 34** for:   Covid19 | Pfizer

◄ Previous Study    |    Return to List    |    Next Study ►

# Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals

 The safety and scientific validity of this study is the responsibility of the study sponsor and investigators. Listing a study does not mean it has been evaluated by the U.S. Federal Government. Know the risks and potential benefits of clinical studies and talk to your health care provider before participating. Read our disclaimer for details.

ClinicalTrials.gov Identifier: NCT04368728

Recruitment Status ❶ : Recruiting
First Posted ❶ : April 30, 2020
Last Update Posted ❶ : August 26, 2021

See **Contacts and Locations**

**Sponsor:**

https://clinicaltrials.gov/ct2/show/NCT04368728?cond=Covid19&spons=Pfizer&draw=3&rank=16

CONFIDENTIAL                                                                TAKEDA_017470

*with your doctor and family members or friends about deciding to join a study. To learn more about this study, you or your doctor may contact the study research staff using the contacts provided below. For general information, Learn About Clinical Studies.*

Ages Eligible for Study:     12 Years and older   (Child, Adult, Older Adult)
Sexes Eligible for Study:    All
Accepts Healthy Volunteers:  Yes

**Criteria**

Inclusion Criteria:

• Male or female participants between the ages of 18 and 55 years, inclusive, 65 and 85 years, inclusive, or ≥12 years, inclusive, at randomization (dependent upon study phase). For the boostability and protection-against-VOCs subset: Existing participants enrolled to receive a third dose of BNT162b2 at 30 µg or BNT162b2SA; male or female participants between the ages of 18 and 55 years, inclusive, at rerandomization.

Newly enrolled participants enrolled to receive 2 doses of BNT162b2SA; male or female participants between the ages of 18 and 55 years, inclusive, at enrollment.

Existing participants enrolled to receive a third dose of BNT162b2 at 5 or 10 µg; male or female participants ≥18 years at rerandomization.

Note that participants <18 years of age cannot be enrolled in the EU.

• Participants who are willing and able to comply with all scheduled visits, vaccination plan, laboratory tests, lifestyle considerations, and other study procedures.

• Healthy participants who are determined by medical history, physical examination, and clinical judgment of the investigator to be eligible for inclusion in the study.

• Participants who, in the judgment of the investigator, are at risk for acquiring COVID-19.

• Boostability and protection-against-VOCs existing participant subset only: Participants who provided a serum sample at Visit 3, with Visit 3 occurring within the protocol-specified window.

• Capable of giving personal signed informed consent

Exclusion Criteria:

• Other medical or psychiatric condition including recent (within the past year) or active

CONFIDENTIAL                                    TAKEDA_017471

suicidal ideation/behavior or laboratory abnormality that may increase the risk of study participation or, in the investigator's judgment, make the participant inappropriate for the study.

- Phases 1 and 2 only: Known infection with human immunodeficiency virus (HIV), hepatitis C virus (HCV), or hepatitis B virus (HBV).

- History of severe adverse reaction associated with a vaccine and/or severe allergic reaction (eg, anaphylaxis) to any component of the study intervention(s).

- Receipt of medications intended to prevent COVID 19.

- Previous clinical (based on COVID-19 symptoms/signs alone, if a SARS-CoV-2 NAAT result was not available) or microbiological (based on COVID-19 symptoms/signs and a positive SARS-CoV-2 NAAT result) diagnosis of COVID 19

- Phase 1 only: Individuals at high risk for severe COVID-19, including those with any of the following risk factors:
  - Hypertension
  - Diabetes mellitus
  - Chronic pulmonary disease
  - Asthma
  - Current vaping or smoking
  - History of chronic smoking within the prior year
  - BMI >30 kg/m2
  - Anticipating the need for immunosuppressive treatment within the next 6 months

- Phase 1 only: Individuals currently working in occupations with high risk of exposure to SARS-CoV-2 (eg, healthcare worker, emergency response personnel).

- Immunocompromised individuals with known or suspected immunodeficiency, as determined by history and/or laboratory/physical examination.

- Phase 1 only: Individuals with a history of autoimmune disease or an active autoimmune disease requiring therapeutic intervention.

- Bleeding diathesis or condition associated with prolonged bleeding that would, in the opinion of the investigator, contraindicate intramuscular injection.

- Women who are pregnant or breastfeeding.

- Previous vaccination with any coronavirus vaccine.

- Individuals who receive treatment with immunosuppressive therapy, including cytotoxic

CONFIDENTIAL                                                                TAKEDA_017472

# THE NUREMBERG CODE

1.     The voluntary consent of the human subject is absolutely essential.

       This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved, as to enable him to make an understanding and enlightened decision. This latter element requires that, before the acceptance of an affirmative decision by the experimental subject, there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person, which may possibly come from his participation in the experiment.

       The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.

2.     The experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random and unnecessary in nature.

3.     The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study, that the anticipated results will justify the performance of the experiment.

4.     The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury.

5.     No experiment should be conducted, where there is an a priori reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects.

6.     The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment.

7.     Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability, or death.

8.     The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment.

9.     During the course of the experiment, the human subject should be at liberty to bring the experiment to an end, if he has reached the physical or mental state, where continuation of the experiment seemed to him to be impossible.

10.    During the course of the experiment, the scientist in charge must be prepared to terminate the experiment at any stage, if he has probable cause to believe, in the exercise of the good faith, superior skill and careful judgement required of him, that a continuation of the experiment is likely to result in injury, disability, or death to the experimental subject.

["Trials of War Criminals before the Nuremberg Military Tribunals under Control Council Law No. 10", Vol. 2, pp. 181-182. Washington, D.C.: U.S. Government Printing Office, 1949.]

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
LISA AMOSON, ROBB HUCK,         )
TROBY LANE PARRISH, ALECIA      )
RAMSEY, LARRY HAROLD SAVAGE,)
JILLYN SCHMIDT, SANDRA          )
SALAZAR SILVA, BRITT HAROLD )
SINGLETON, SUSAN WELCH,         )
                                )
            Plaintiffs,         )
                                ) Case No.:
v.                              ) 1:22-cv-11963-GAO
                                )
TAKEDA PHARMACEUTICALS          )
U.S.A., INC.,                   )
                                )
            Defendant.          )
_____)
```

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
ALECIA RAMSEY
10:03 a.m.
Tuesday, October 31, 2023
(Taken via Zoom)


REPORTED BY:  Christine A. Taylor, RPR

Magna Legal Services
866-624-6221
www.MagnaLS.com



                                                              Page 2
 1                      REMOTE APPEARANCES
 2
 3    For the Plaintiffs:
 4          PATTIS & ASSOCIATES, LLC
            BY:   CHRISTOPHER DeMATTEO, ESQ.
 5                383 Orange Street
                  New Haven, Connecticut  06511
 6                203.393.3017
                  cdematteo@pattislaw.com
 7
 8    For the Defendant:
 9          MORGAN LEWIS & BOCKIUS LLP
            BY:   KERI L. ENGELMAN, ESQ.
10                CELINA ANTONELLIS, ESQ.
                  One Federal Street
11                Boston, Massachusetts  02119
                  617.341.7700
12                keri.engelman@morganlewis.com
                  celina.antonellis@morganlewis.com
13
14    Also Present:
15                Peter van der Vlugt, Videographer
16                Matthew Crouse, Videographer
17
18
19
20
21
22
23
24
25



Page 3

1          VIDEOCONFERENCE DEPOSITION of ALECIA

2      RAMSEY, a witness in the above-entitled

3      action, taken pursuant to notice, pursuant

4      to the Federal Rules of Civil Procedure by

5      the Defendant, before CHRISTINE A. TAYLOR,

6      RPR, remotely, on the 31st day of October,

7      2023, at 10:03 a.m.

8                    - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1                    C O N T E N T S
 2                                                   PAGE
 3   EXAMINATION BY MS. ENGELMAN                        7
 4   EXAMINATION BY MR. DeMATTEO                       334
 5
 6
 7                        *  *  *
 8
 9                    E X H I B I T S
10     EXHIBIT           DESCRIPTION               PAGE
11   Exhibit 2    Signal Chat Messages              135
12   Exhibit 3    Truth Social media posts          138
13   Exhibit 4    Text Messages                     145
14   Exhibit 11   9/27/21 E-mail, Subject: Religious 171
15                COVID Vaccine Exemption, Bates
16                TAKEDA_018256 - 018263
17   Exhibit 12   Interactive Process Notes, Bates  223
18                TAKEDA_018266 - 018268
19   Exhibit 18   Plaintiff Alecia Ramsey's         285
20                Supplemental Responses to
21                Defendant's First Set of
22                Interrogatories
23   Exhibit 22   9/10/21 E-mail, Subject: COVID-19 157
24                update: Important USBU Vaccination
25                and Testing Requirements, Bates
```



                                                          Page 5

1                    Takeda 000021 - 22

2    Exhibit 23    9/23/21 E-mail, Subject: Fw: Fw:        217

3                   Exemption Letter, Bates

4                   TAKEDA_012166 - 012168

5    Exhibit 25    9/5/21 E-mail, Subject: Fwd:            199

6                   Letter, Bates TAKEDA_012019 -

7                   012021

8    Exhibit 26    9/8/21 E-mail, Subject: Thoughts???     219

9                   Bates TAKEDA_012028 - 012030

10   Exhibit 28    5/11/22 E-mail, Subject: Alecia         312

11                  Ramsey Religious Exemption, Bates

12                  RAMSEY 000013 - 19

13   Exhibit 29    Health Summary, Bates RAMSEY 000063     263

14   Exhibit 32    Seeking Justice messages               321

15   Exhibit 35    Seeking Justice documents, Bates        324

16                  RAMSEY 000309 - 320

17

18

19

20

21

22

23

24

25



Page 6

```
 1                   P R O C E E D I N G S
 2                         - - -
 3          THE VIDEOGRAPHER:  We are now on the
 4      record.  This begins videotape number 1 in
 5      the deposition of Alecia Ramsey in the
 6      matter of Lisa Amoson, Robb Huck, Troby
 7      Lane Parrish versus Takeda Pharmaceuticals
 8      U.S.A., Inc.
 9          Today is Tuesday, October 31st, 2023,
10      and the time is 10:03 a.m.  This deposition
11      is being taken virtually at the request of
12      Morgan Lewis & Bockius, LLP.
13          The videographer is Peter van der Vlugt
14      of Magna Legal Services, and the court
15      reporter is Christine Taylor of Magna Legal
16      Services.
17          Will counsel and all parties present
18      state their appearances and whom they
19      represent.
20          MS. ENGELMAN:  Keri Engelman for Morgan
21      Lewis & Bockius on behalf of Takeda
22      Pharmaceuticals.  And I also have with me
23      my colleague Celina Antonellis.
24          MR. DeMATTEO:  Good morning, Chris
25      DeMatteo from Pattis Associates
```



Page 7

```
 1              representing the plaintiff's deponent
 2         Alecia Ramsey.
 3              THE WITNESS:  My name is Alecia Ramsey.
 4              THE VIDEOGRAPHER:  Will the court
 5         reporter please swear in the witness.
 6                   - - -
 7              ALECIA RAMSEY,
 8         having first been duly sworn, was examined
 9              and testified as follows:
10                   - - -
11              EXAMINATION
12    BY MS. ENGELMAN:
13         Q.   Good morning, Ms. Ramsey.  My name is
14    Keri Engelman and I represent Takeda
15    Pharmaceuticals.  The purpose of today's
16    deposition is for me to ask you questions about
17    the lawsuit that you initiated against Takeda.
18              Do you understand that?
19         A.   Yes.
20         Q.   Okay.  Well, it's nice to meet you
21    this morning.  I am on the West Coast, so you are
22    going to see the sun rise behind me.  Just don't
23    be jarred by that.
24         A.   Okay.
25         Q.   So you are under oath today subject to
```



Page 56

1    don't do anything, you rest?

2            A.    Sundays, I typically do, yeah.

3            Q.    So what do you do on a Sunday?

4            A.    I worship God, and have maybe dinner

5    with my family and maybe watch a little TV.

6            Q.    Okay.  What did you do this past

7    Sunday?  Walk me through your day.

8            A.    I actually got up, church, bathed my

9    dog, took my brother -- took my dog to my

10   brother's house, actually had a couple of hours of

11   time with him, sit there talking with him, and I

12   came home and washed some clothes and went to bed.

13           Q.    Okay.  So tell me more -- well, strike

14   that.

15                 Is there any other way that we haven't

16   talked about today in which you use the Bible to

17   live your life on a day-to-day basis?

18           A.    Just besides, you know, the fact that

19   trying to read the scripture because it's a big

20   book and, you know, getting familiar more with

21   God's intention of living with me and through me.

22   Other than that, no.

23           Q.    Okay.  And so what is the biblical

24   verse that prohibits you from getting a COVID-19

25   vaccination?



Page 57

```
 1            A.   The first and foremost is the first
 2    two that I shared in my letter of why I was asking
 3    to be exempt from the vaccine which is, you know,
 4    the fact that, A, that my body is a temple.  The
 5    other one is that I must not rely on the word of
 6    man, that I must rely on the word of God, even if
 7    that means no going against what a government or a
 8    higher authority has said to me.  If I believe
 9    that this is what God has asked me to do, and
10    that's exactly what I will do.
11            Q.   Okay.  And so why is it that because
12    your body -- well, strike that.
13                 When did you become aware of the
14    biblical verse that your body is a temple?
15            A.   I've known about that biblical verse
16    for years.
17            Q.   Okay.  And so you testified earlier
18    that if you know about a biblical verse and you
19    read it, then you try to incorporate that into
20    your life; is that right?
21            A.   Yes.
22            Q.   And is that one of those verses that
23    you've incorporated into your life since you've
24    known about it for years?
25            A.   To treat my body as a temple?
```



Page 58

```
 1          Q.    Yes.
 2          A.    Yes.
 3          Q.    Okay.  And what does that mean to you?
 4          A.    That means to protect its integrity to
 5     protect who I am as a person to live an honest and
 6     truthful life, to live the word of God as much as
 7     the ability that has been put inside me to
 8     actually flow out of me.
 9          Q.    Okay.  So you think -- your testimony
10     is that your body as a temple is to live honestly
11     and truthfully?
12          A.    To the best of the ability that I can,
13     yes.
14          Q.    Okay.  So how does the receipt of the
15     COVID-19 vaccine violate the principles of living
16     honestly and truthfully?
17          A.    So, again, when you look at when
18     you're talking to God and you believe that God is
19     your creator, he is the person that has provided
20     you everything that made everything, he is living
21     inside of you, and you actually lean on him to
22     pray to say, hey, God, is this really what I need
23     to do because everything inside of me I feel like
24     you were telling me this is not what I need to do.
25     In order to be a Christian, listening to God is a
```



Page 59

```
 1   big part of being a Christian.  You know, and
 2   listening means that you believe your faith, that
 3   you believe that this is, you know, the person
 4   that is the person that has created you and what
 5   he wants of you.
 6           So, you know, if you're not willing to
 7   listen and if you don't believe that, you're never
 8   going to hear what God has to say to you.  And if
 9   you don't listen to God, you can be deceived.  And
10   deceit leads to sin.  So when I was presented with
11   this opportunity of do I take this shot or not,
12   that's what I prayed upon.  Should I actually have
13   this shot inside of me or should I not.
14       Q.   What does that have to do with your
15   body being a temple?
16       A.   Because I was protecting it.  If there
17   was any ability for anything to change inside of
18   my body that I could not take out of it that could
19   go against his will and what he had asked me to
20   do, and had led me to not want in my body, then
21   that would actually go against what he's asked and
22   called me to do.
23       Q.   Okay.  So I need to break this down,
24   Ms. Ramsey.  So you testified earlier that your
25   view of what it means for your body is a temple is
```



Page 60

1    that you live honestly and truthfully.  Does it

2    have anything to do with what you actually input

3    into your body on a day-to-day basis?

4         A.    Well, you know, if there are things in

5    the shot that actually can change some of the way

6    that your body is made up, that's a reason of

7    pause for me.  In addition to that, at the end of

8    the day, it's my decision to put in my body what

9    it is that I feel is appropriate through God.

10        Q.    Okay.  So, first of all, do you think

11   that the COVID-19 shot or did you think the

12   COVID-19 vaccine could change something in your

13   body in the way it was made up?

14        A.    It's possible.

15        Q.    Okay.  And what is that based on?

16        A.    Infinitive.  I mean, if there is any

17   way that it can alter any type of DNA within my

18   body, absolutely.  I'm not a scientist.

19        Q.    Okay.  Did you ever research whether

20   or not the COVID-19 vaccine could alter your DNA?

21        A.    Not substantially, but I do know that,

22   you know, the MRNA technology is something that

23   was, you know, out there on the TV.  They talked

24   about it, or on, you know, an article that you

25   could have come across.  I didn't specifically



Page 61

1    research it.

2          Q.    Okay.  And so you had concerns that

3    the COVID-19 vaccine could alter your DNA?

4          A.    Correct.

5          Q.    Okay.  And that's one of the reasons

6    why you didn't get the COVID-19 vaccine?

7          A.    If it could change the presence of my

8    Lord and Savior who created me, yes.  Correct.

9          Q.    So how is it that you determine

10   whether or not something you ingest in your body

11   could change what the Lord and Savior gave you?

12         A.    Again, it goes back to my faith.  When

13   I prayed upon it, that's what was led to me.  The

14   next one was led to me again to abide by what he

15   says, not the will of what man says.  So it's not

16   just one thing.

17         Q.    Okay.  But, Ms. Ramsey, I really want

18   to focus on this one thing.  So the one thing is

19   how you make a decision about whether something

20   alters or changes your body such that it violates

21   your belief that your body is a temple.  Do you

22   make that decision with respect to food?

23         A.    I would hope so, but I'm not aware of

24   food actually changing DNA.  I haven't heard or

25   seen anything.



1      Q.    Okay.  So is it your position that you

2    can only -- the only thing that would violate

3    the -- your principles of a body is a temple if it

4    changes your DNA?

5      A.    That's one, yes.  Correct.

6      Q.    Okay.  What are the others?

7      A.    That's the only thing I can think of

8    in regards to my DNA.

9      Q.    Well, you testified that it's your

10    DNA.  My question is what -- strike that.

11            My question is you said that your body

12    is a temple and you could not ingest anything that

13    would quote/unquote change your makeup; is that

14    right?

15      A.    I testified that if it was possible

16    for that shot to have changed my -- to alter my

17    DNA, that is enough for me to pause, correct.

18      Q.    Okay.  So my question is going back to

19    the idea that your body is a temple.  What does

20    that mean more broadly to you?  What can you not

21    put into your body because your body is a temple?

22      A.    I don't know of anything else offhand.

23    I don't know of anything else.

24      Q.    So it's only -- it's only materials

25    that may alter your DNA, that's what would violate



Page 63

1      the principle that your body is a temple?

2          A.   Yes.

3          Q.   Okay.  And where does that come from?

4      Is that a biblical verse?

5          A.   No.  It's the belief that if he is

6      your creator and it's my faith that if you do

7      anything to alter him, who created you, that that

8      is not what the Bible says that you are supposed

9      to do.

10         Q.   Okay.  But where does the Bible say

11     that?

12         A.   Specifically?

13         Q.   Uh-huh.

14         A.   I'd have to, you know -- again, I

15     can't tell you right offhand in the scripture.

16     But at the same time it starts in Genesis and ends

17     in Acts.

18         Q.   Okay.  But I'm looking for the

19     specific scripture that says you cannot ingest

20     anything that alters your DNA or otherwise changes

21     your makeup.  That's the basis of your religious

22     exception, so I'm hoping that you have that

23     scripture handy?

24         A.   Well, I mean, I can, you know, grab

25     that -- where my letter and I can give you exact



Page 64

1    thing.  But I can't tell you right offhand what

2    that is, no.

3         Q.    Okay.  So you believe that any

4    medications that you may take may alter your DNA

5    or otherwise change your makeup?

6         A.    Not that I'm aware of.

7         Q.    Okay.  And what research have you done

8    to see if any medications that you have taken in

9    the past could alter your DNA or otherwise change

10   your makeup?

11        A.    I haven't.

12        Q.    Okay.  And why is that?

13        A.    I haven't been compelled to do it

14   because I don't take a lot of medications that I

15   feel like I needed to go research.

16        Q.    Why not research any medication that

17   you ingest in your body if your body is a temple?

18        A.    Well, end of the day, like I said, I

19   don't take a lot of medications that I felt like I

20   would need to do that.

21        Q.    Well, what medications do you take?

22        A.    I take an ADHD medication and I take

23   several supplements.

24        Q.    Okay.  And why don't you feel like

25   it's necessary to determine whether or not those



1    medications could alter your makeup in some way

2    such that it may violate your religious beliefs

3    that your body is a temple?

4          A.    Because I don't believe they do.

5          Q.    What is your belief based on?

6          A.    My gut.

7          Q.    Okay.  So you mentioned that -- so

8    your second biblical reason for not getting the

9    COVID-19 is that you not rely on the word of man;

10   is that right?

11         A.    Man alone.

12         Q.    Okay.  And what does that mean?

13         A.    Meaning that if man tells you to

14   actually do it doesn't mean that you actually

15   should have to do it.

16         Q.    And you believe that getting the

17   COVID-19 vaccine violates the biblical principle?

18         A.    I believe that, you know, when the

19   world was in a place where it was with COVID that

20   it became very, very clear that this was something

21   that I needed to pray upon.  And that's when I saw

22   it was a scary place.  We were all very, very

23   scared.  And at the end of the day when, you know,

24   they were putting something that was very quickly

25   made, it became very clear to me that I needed to



Page 66

1    understand a little bit more about that and I

2    needed to pray upon that.

3                  And at that point in time, like I

4    said, I went to the Bible, I talked with Bible,

5    talked to my Lord, and at the end of the day that

6    was what the scripture came back to me was you

7    must not only rely on the word of man.

8        Q.    Okay.  So you mentioned that the COVID

9    vaccine was quickly made; is that right?

10       A.    Yes.

11       Q.    Did you have concerns about that?

12       A.    Yes, I did.

13       Q.    Okay.  Tell me about your concerns.

14       A.    My concerns is that it's not something

15   that has been tested to the extent of what I

16   believe that other vaccines and medications have

17   been tested.

18       Q.    And did you do any specific research

19   on the testing of the COVID-19 vaccine?

20       A.    I can't say specifically I sat there

21   and researched it, no.

22       Q.    Okay.  So where did you get the

23   information that it wasn't adequately tested in

24   your view?

25       A.    The news.  I mean --



1          Q.   Okay.  What news?

2          A.   It was put to market very quickly.  It

3     was common knowledge it was put to the market.

4     They created the vaccine and within months they

5     turned around and there it was.  That's not the

6     way it works in creating something of that sort in

7     the medical world.

8          Q.   Okay.  What's your basis for your

9     statement that's not the way it works?

10         A.   Because I work in an industry

11    obviously that I understand what it takes to put a

12    drug to a market and the testing that needs to be

13    required and the longevity that that takes.

14         Q.   Okay.  And you don't believe that was

15    done with the COVID-19 vaccine?

16         A.   I don't believe to the degree of the

17    other medications, no.

18         Q.   What -- sorry.  What other

19    medications?

20         A.   Well, any -- that's not the typical,

21    you know, path unless it's considered from what I

22    would understand would be, you know, speed to

23    approval of some sorts, I think the industry can

24    use some of that.  But, still, I think maybe in

25    essence this was like six months later they had



Page 68

1    created this vaccine.  That's not typical.

2              Q.   Okay.  Understood.

3              So going back to the biblical verse

4    that you shouldn't do something just because man

5    tells you to do it, are you -- who is -- who is

6    man in that circumstance?  Is that --

7              A.   Man -- the Bible uses many metaphors.

8    Man could be anything from the FDA to Takeda to

9    the CDC.  It can mean anything.

10             Q.   Okay.  What did it mean to you?

11             A.   Just like I said, man was that they

12   were telling me I needed to take this vaccine.  My

13   company, the FDA, the CDC, all these individual

14   people, man, was explaining that we needed to take

15   this vaccine.

16             Q.   Okay.  And you decided not to take it

17   because why?

18             A.   Just like I said, I was concerned

19   about the fact that it was so quick to be made and

20   pushed out.

21             Q.   Okay.  So tell me about the prayer --

22   well, strike that.

23             Is there any other biblical verse

24   sitting here today that forms the basis of your

25   decision not to get the COVID-19 vaccine?



Page 69

```
 1              A.    Those two are the most important and
 2    powerful ones that I actually relied heavily on.
 3    There's other two scriptures that I referenced as
 4    far as fetal cells.  And in addition to that, that
 5    this could possibly be seen as a mark of the
 6    beast, which is also in the documentation that
 7    I -- I provided.
 8              Q.    Okay.  So why are -- why are the body
 9    of the temple and must not rely on the word of man
10    the most powerful in your view?
11              A.    Because it's the thing that spoke to
12    me first.
13              Q.    Okay.  And so how -- so -- well,
14    strike that.
15              So you talked about fetal cells.  Did
16    that also form the basis of your decision not to
17    get the COVID-19 vaccine?
18              A.    That was one aspect of it.
19              Q.    Okay.  And when is it that you decided
20    not to get the COVID-19 vaccine?
21              A.    I can't remember the exact date.  I
22    would say that when it became available, it was
23    through that summer of what year, 2021, sometime
24    when I continued to pray upon it.  I knew before
25    that they had asked -- required us to get it that
```



Page 71

```
 1      what is this going to look like for me as a

 2      Christian and what it was that I was called to do.

 3                 And before -- before long you knew

 4      that they were coming to market.  I don't know,

 5      roughly was that end of 2020 maybe, they had

 6      announced that they were going to be making a

 7      vaccine.  And to your point again, 2021, it became

 8      very early in 2021 at some point in time that it

 9      was, you know, already -- it was ready to be

10      pushed out and marketed.

11                 And at that point in time I knew with

12      the length of time that they were actually

13      studying it and trying to push it to market, I had

14      very big concerns because, again, I go back to

15      this isn't typical.  I'm a healthy individual.  I

16      don't have comorbid conditions.  Why in the world

17      do I need to have another -- you know, something

18      put into my body if I felt like I was

19      physically -- and in addition to that, I was okay

20      if something was to happen to me, I was saved and

21      I was going to go home with my Lord and Savior.

22                 So I became very, you know, passionate

23      about understanding where it is that Alecia knew

24      in our heart this wasn't -- so roughly maybe

25      beginning of the 2021 year I had began to pray
```



Page 74

1    production and the studying of it.  It was

2    something that was aided to be able to do that.

3            Q.    What's the basis of your statement

4    that it was -- that fetal cells were used to speed

5    up the process?

6            A.    Because, again, in my industry I'm

7    aware that there are, you know, some things in the

8    past that fetal cells, it's been a controversy in

9    the medical community.

10           Q.    But you've been aware generally for a

11   long time that the pharmaceutical --

12           A.    Wouldn't say a long time, but I would

13   say several years I've known about fetal cells

14   from the standpoint of that they have been used in

15   different avenues in different ways.  I'm not here

16   to, you know, fight Roe versus Wade.  I'm just

17   here to say, hey, I believe that life is at

18   conception and don't agree with abortion.

19           Q.    So do you have a religious objection

20   to ingesting anything that uses the use of aborted

21   fetal cells in any way?

22           A.    Yes.  Something that I was not aware

23   of that there was a couple of medications like

24   Advil that was brought to my attention during my

25   interrogation of -- with my HR partner that I've



```
 1      continued to lean on.  And one thing that Advil

 2      has come back to and, you know, I go back to the

 3      fact that something that was made 70 years ago,

 4      I'm not going to back and undo.  Do I take Advil

 5      regularly?  No.  But that's the only medication

 6      that I'm aware of that I can say that I've put in

 7      my body outside that I'm aware of that uses fetal

 8      cells.

 9              Q.   Okay.  But I guess my question is if

10      you have a religious objection to ingesting

11      anything that use aborted fetal cells, have you

12      done any research to confirm that that's not the

13      case?  You've been aware for several years at

14      least that that's a possibility in the industry;

15      right?

16              A.   Yeah.  But, again, I take supplements.

17      I don't believe that there's a lot of medication

18      that I don't put in my body that I felt like I

19      needed to do the research on that.  But, no, I

20      have not researched that specifically.

21              Q.   Okay.  Why not?

22              A.   Again, because I just said I haven't

23      been called to do that yet.

24              Q.   Okay.  So you only have an objection

25      to the use of aborted fetal cells if you're called
```



Page 76

1    to do the research on whether or not the

2    medication has --

3            A.    No.

4            Q.    Okay.

5            A.    I actually spoke with my lawyer for

6    clarification and understanding if I was to

7    receive this vaccine, that specific situation.

8    And that is something that was brought to my

9    attention.   It was the fetal cells at that point

10   in time was another reason I begin -- like I said,

11   there were two other higher calling of biblical

12   senses of why I rejected using the --

13           Q.    Okay.  But just so I'm clear on the

14   aborted fetal cells that you only have an

15   objection to the use of aborted fetal cells with

16   respect to COVID-19 vaccine and not other

17   medications; is that right?

18               MR. DeMATTEO:  Objection.  Form.

19               THE WITNESS:  I didn't say --

20               MR. DeMATTEO:  You can answer, Alecia.

21               THE WITNESS:  That's not what I'm

22        saying, no.

23   BY MS. ENGELMAN:

24           Q.    Okay.

25           A.    What I'm saying is I'm not going to go



Page 77

1     back and study a 70-year-old medication of Advil

2     that literally I've taken, you know, a handful of

3     times here and there and go back and, you know,

4     say that, oh, my gosh, I shouldn't have not done

5     that.

6              This is a situation that is an ongoing

7     thing that I continue to look for guidance on with

8     my Lord.

9         Q.   Have you taken Advil in the last two

10    years?

11        A.   A handful of times, yes.

12        Q.   Okay.  So my question is if you are

13    aware that Advil uses aborted fetal cells and you

14    have voluntarily taken it, why does that not

15    violate your religious beliefs?

16        A.   One thing about the difference between

17    Advil and the COVID vaccine is I can't untake a

18    COVID vaccine.  I mean, I choose at the end of the

19    day that if I needed a situation where I had a

20    swollen knee and I needed some immediate relief,

21    that would be the situation where I would say, oh,

22    I needed a couple of Advil.

23             It's not something that I do on a

24    continuous basis and I continue to pray upon that

25    make to sure that if it comes down to it and that



Page 78

1   that's the thing that God needs me to do is to

2   walk away from Advil, that's what I'll do when I'm

3   called upon.

4        Q.   Okay.  Have you researched any of the

5   supplements that you take to see if those

6   medications --

7        A.   No.

8        Q.   Let me finish my question.

9             -- use aborted fetal cells?

10       A.   No.

11       Q.   Why not?

12       A.   Again, because I don't feel like I've

13  been called to do that.

14            MS. ENGELMAN:  Okay.  Can we take a

15       ten-minute break, please.

16            MR. DeMATTEO:  Yeah.  Sure.

17            THE VIDEOGRAPHER:  Off the record

18       11:19.

19   (Recess taken from 11:19 a.m. until 11:31 a.m.)

20            THE VIDEOGRAPHER:  On the record 11:31.

21  BY MS. ENGELMAN:

22       Q.   Hi, Ms. Ramsey, this lighting is a

23  little bit off.  Can you see me or is it --

24       A.   Yes, I can see you.

25       Q.   Sorry.  The sun is really coming in.



Page 83

```
 1           A.   Again, when you're talking about your
 2    relationship with Christ, it can -- you know, him
 3    speaking to you comes in different -- different
 4    ways.  It comes through your meditation, your
 5    daily scripture, like I've said.  It comes in, you
 6    know, conversation with another fellow believer
 7    where they share out of nowhere the same Bible
 8    verse, you know, I was reading this Bible verse
 9    and this is the Bible verse, and all of a sudden
10    you're like, wow, that's another example of the
11    way God can speak to you.
12           The most important thing when you hear
13    God speak to you is that you've got to believe and
14    you've got to have the faith.  You have to be
15    willing to want to take the word that you are
16    actually hearing and want to apply it to your
17    life.
18           Q.   What was the last biblical scripture
19    that you relied upon?  It was something about -- I
20    have it written down here.  Sorry.  There was the
21    fetal cells, and then there was a fourth one.
22    Mark of the beast?
23           A.   Yes.
24           Q.   Tell me about that biblical scripture
25    and why that -- that particular scripture does not
```



Page 84

1    allow you to take the COVID-19 vaccine?

2         A.   Well, if you think of the way my

3    beliefs are is that this could be the end of the

4    times and one of the things that is a sign of the

5    end of the times is when you're asked to actually

6    take something that possibly will mark you.  And

7    if you don't have that mark, then you won't be

8    able to buy, you won't be able to work, you won't

9    be able to sell.  You won't be able to actually

10   live in society as you -- as you normally would

11   know of it.

12        And that's something that I felt like

13   in addition to that was experiencing already

14   whether it was personal, you know, not being

15   invited to a wedding.  It was a lot of things that

16   were leading to me that this actual scripture

17   could actually be part of the reason why I, again,

18   do not want to have this vaccine in my body.

19        Q.   So when did you become a -- when did

20   you first come across the mark of the beast

21   biblical scripture?

22        A.   Revelations is a really hard book, but

23   I visit Revelations quite frequently.

24        Q.   Okay.  But in the context of this

25   month long decision process, do you remember when



Page 85

1    you started to study that particular scripture?

2         A.   No, I do not.

3         Q.   Okay.  And so, sorry, you said it

4    marks the end of times.  What do you mean by that?

5         A.   If I believe in the end of times

6    meaning if you don't have this mark, then you

7    actually will go to hell.  I mean, the mark of the

8    beast is that you will actually be put into a

9    situation where, again, you won't even be able to

10   participate in society.  You won't be able to do

11   if you don't receive this mark meaning the way

12   that I was interpreting that was that this COVID

13   vaccine could be a mark of the beast because it

14   was keeping me from living a normal life that I

15   had been living before.

16        Q.   Okay.  And what's the basis for your

17   belief that the COVID-19 vaccine could be a mark

18   of the beast?

19        A.   Well, because of the situation that I

20   was cast upon.  I wasn't able to attend meetings

21   live even though I was able to go into the field

22   with my representatives and lead them day to day.

23   I was asked just because, again, I was not

24   actually able to attend meetings.  I was not

25   invited to a wedding of a personal friend because



Page 86

1    I wasn't vaccinated.  There were a lot of

2    different things that pointed me to this reason of

3    why I believe it could have been the mark of the

4    beast.

5        Q.   Okay.  So let me just back up for a

6    second.  Is it your testimony that if you got the

7    COVID-19 vaccine, you would go to hell?

8        A.   The mark of the beast, if I did not

9    receive it, it could possibly have been a

10   situation where if it's end of the times, yes.

11       Q.   If you did not receive it or --

12       A.   If I received the vaccine.  Excuse me.

13   Excuse me.  If I received the vaccine.

14       Q.   Okay.  And your testimony is that

15   because you were not invited to a friend's

16   wedding, you believe that the COVID-19 vaccine was

17   the mark of the beast?

18       A.   No, this again --

19            MR. DeMATTEO:  Objection.

20            THE WITNESS:  -- this is the way Christ

21        works through my life.

22            MR. DeMATTEO:  You can answer.

23            THE WITNESS:  This is the way Christ

24        works through my life.

25   BY MS. ENGELMAN:



Page 87

 1          Q.    Okay.  I'm really having trouble

 2     understanding your testimony here.  So you believe

 3     that the -- do you believe that COVID-19 generally

 4     was the quote/unquote end of times, the pandemic?

 5          A.    Yes, it possibly could be leading us

 6     into a situation of the end of times.  Correct.

 7          Q.    What does the end of times mean to

 8     you?

 9          A.    The end of times is that we will not

10     be here on Earth like we know it.

11          Q.    Okay.  And do you have any particular

12     reasons for believing that the COVID-19 vaccine or

13     COVID-19 pandemic was potentially the end of

14     times?

15          A.    There's a lot of -- you know, pandemic

16     can excel to that magnitude that it impacted a lot

17     of the world, absolutely.

18          Q.    Uh-huh.  Do you believe that today?

19          A.    I believe that we are in a very

20     interesting part of our -- of the world that we

21     know it.  To sit here and say that is it the end

22     of times, only time will tell.

23          Q.    Okay.  Do you believe the COVID-19

24     vaccine helped stop the spread of the pandemic?

25               MR. DeMATTEO:  Objection.  Form.



Page 91

```
 1    continue to pray about it.
 2         Q.   Is there any other circumstance in
 3    which you did not ingest anything medication, food
 4    vaccine, otherwise because of the body is a
 5    temple, biblical scripture that you referred to
 6    earlier?
 7         A.   Not that I can sit here and remember.
 8    Not specifically.
 9         Q.   Okay.  You said you had aunts that
10    contracted COVID-19; is that right?
11         A.   I have an aunt that I'm speaking of
12    directly specifically, yes.
13         Q.   Okay.  What's her name?
14         A.   Sheryl.
15         Q.   And does Sheryl share your religious
16    beliefs?
17         A.   No.
18         Q.   Okay.  And is she vaccinated against
19    COVID-19?
20         A.   Yes.
21         Q.   Okay.  And did you ever speak with her
22    about your decision not to get vaccinated?
23         A.   Not to the depth.  She just knows I'm
24    not vaccinated.
25         Q.   Okay.  And you said that she
```



Page 92

1    contracted COVID-19 post-vaccination?

2          A.   She's contracted the COVID -- COVID

3    multiple times, correct.  Her and her entire

4    family that are all vaccinated.

5          Q.   Okay.  And is there anyone else who

6    contracted COVID after receiving the vaccine that

7    you're aware?

8          A.   I mean, there's several.  But, again,

9    those are the people that I know of, you know,

10   once again, you asked the original question of

11   do -- how do I know it's stopped the spread.  I'm

12   telling you how -- one way I figured out.

13         Q.   Do you believe that the COVID-19

14   vaccine limited the spread of COVID?

15              MR. DeMATTEO:  Objection.  Form.  You

16         can answer.

17              THE WITNESS:  I'm not a scientist.  I

18         can't speak to that data.

19   BY MS. ENGELMAN:

20         Q.   Did you have any concerns about the

21   efficacy of the COVID-19 vaccine?

22         A.   Not when I made the decision to not

23   take it, no.  That was nothing that was in my mind

24   of making the decision to take it if it was

25   efficacious or not.



Page 93

1          Q.    Okay.  And why is that?

2          A.    Because, again, I was seeking the Lord

3     for a specific, you know, reason and a specific

4     ask.  Should I take this vaccine or not based off

5     of what I believe.  It had nothing to do did it

6     work or not.  That's not the conversation I had

7     with Christ.

8          Q.    Okay.  Sitting here today, do you have

9     any opinions about the efficacy of the COVID-19

10    vaccine?

11         A.    I can say I don't believe it works.

12    But, again, it's totally up to the individual if

13    they think that that's appropriate for them.  I'm

14    not a doctor.  I'm not a scientist.  That's an

15    individual personal decision that I believe that

16    each and every person should make for their own.

17         Q.    I understand that.  What's the basis

18    of your belief that the COVID-19 vaccine doesn't

19    work?

20         A.    I mean, I don't have a basis of why it

21    doesn't work.  You would have to actually consult

22    the scientist that made it.

23         Q.    Well, you said that you don't believe

24    it works; is that right?

25         A.    Well, I mean, if it's a typical virus,



Page 94

```
 1    it still has -- it's still here.  So, you know, I
 2    walked in the doctor's offices every single day
 3    and COVID is still around us everywhere.  So, to
 4    me, whether vaccinated or not, that tells me it
 5    doesn't work.
 6           Q.   Okay.  Have you ever gotten the flu
 7    vaccine?
 8           A.   I have.
 9           Q.   Okay.  Do you believe the flu vaccine
10    works?
11           A.   I think that years ago my doctor told
12    me it was about a 30 percent chance that it would
13    actually keep you from contracting the flu.
14           Q.   Uh-huh.
15           A.   But --
16           Q.   Is that working, in your mind?
17           A.   Is that working?
18           Q.   Yeah.
19           A.   I haven't taken the flu vaccine in
20    quite sometime.
21           Q.   Okay.  Have you ever studied the -- or
22    done any research on the efficacy of the COVID-19
23    vaccine?
24           A.   I mean, not to the degree of knowing
25    the statistics, no.
```



Page 101

```
 1          Q.   Okay.  Does the Baptist Church that
 2     you attend have an official stance in the COVID-19
 3     vaccine?
 4          A.   He's never shared his official stance
 5     with the entire church that I heard.  Again, there
 6     are people in the church that have been vaccinated
 7     and some that have not.
 8          Q.   Okay.  Who has been vaccinated at your
 9     church that you're aware of?
10          A.   I don't know specifics.  I don't speak
11     to individuals.  I just know that there are,
12     again, people that have vaccinated and some that
13     have not.
14          Q.   How do you know some have been
15     vaccinated?
16          A.   Because that's what the pastor said.
17          Q.   Okay.  And did you speak about whether
18     or not those individuals -- well, strike that.
19               What did the pastor tell you about
20     other individuals being vaccinated?
21          A.   I mean, nothing except that there are
22     some that's going to be vaccinated and some that's
23     not going to be vaccinated.
24          Q.   And did he have a view on those who
25     are getting vaccinated?
```



Page 102

```
 1          A.   No.
 2          Q.   Did he explain anything else about or
 3     say anything else about those getting vaccinated?
 4          A.   No.
 5          Q.   Did you ask whether he is vaccinated,
 6     Pastor Chad?
 7          A.   I didn't ask him specifically, but I
 8     know my brother knew that his family and him was
 9     not actually vaccinated.  That's the only reason
10     why I know that.
11          Q.   Okay.  And do you remember anything
12     else from your conversation with Pastor Chad about
13     your decision not to get vaccinated?
14          A.   No.
15          Q.   Okay.  Do you know if the letter that
16     he supplied to you is the same letter that he
17     supplied to other individuals who were requesting
18     letters in support of their religious
19     accommodations?
20          A.   I can't answer.  I'm not 100 percent
21     sure of that, no.
22          Q.   Okay.  Did he draft the letter to the
23     best of your knowledge?
24          A.   Oh, yeah.
25          Q.   Okay.  Did you provide any edits or
```



Page 114

1    the taste.  Sore throat.

2         Q.   Okay.  Did you get any -- have any

3    medications or any treatments for COVID?

4         A.   No.

5         Q.   Okay.  We talked about earlier about

6    your concerns about the COVID -- the technology

7    used in COVID-19.  Do you remember that?

8         A.   Yes.

9         Q.   Okay.  So what is the basis for your

10   understanding or belief that the COVID-19 vaccine

11   could alter your DNA in some way?

12        A.   Again, I'm not a scientist.  I haven't

13   done extensive research on it.  But the fact that

14   if there's a layer of a shot that changes the cell

15   of a -- of your DNA to change what the DNA and the

16   way that the DNA would be, then that's a concern

17   of mine.

18        Q.   I guess what I'm trying to understand

19   is what is your -- the basis for your belief that

20   COVID-19 vaccine actually would change the makeup

21   of your DNA in some way?

22        A.   I think I go back to exact -- it's

23   knowledge that, you know, it's a new technology.

24   It's something that a messenger RNA is what I

25   believe it's called.  So when you've got new



Page 115

1      technology, it's always a cause for pause.

2           Q.   Okay.  And what -- did you review any

3      scientific or other articles about this new

4      technology?

5           A.   Nothing to the extent of, you know, a

6      journal or a medical journal or anything of that

7      sort, no, that I recall right offhand.  I mean,

8      the fact that they use MRNA technology that is

9      new, it's definitely something that was a concern

10     of mine.

11          Q.   Uh-huh.  Were you concerned about

12     adverse events?

13          A.   I would say definitely that, again, I

14     go back to what I stated earlier, that the speed

15     of when they produced this vaccine and pushed it

16     to market.

17          Q.   Okay.  So do you agree with me that

18     the vaccine was originally distributed under the

19     emergency use authorization?

20          A.   What do you mean?  I guess --

21          Q.   Are you aware of the term emergency

22     use authorization?

23          A.   I do believe that that's exactly what

24     it was pushed out under, yes.

25          Q.   Did you have concerns about that?



Page 116

```
 1            A.   The way that I understand that that
 2      would be a reason why they were able to actually
 3      get them -- the vaccine produced quickly was
 4      because of that in my knowledge.
 5            Q.   Right.  And my question is did you
 6      have concerns about the use of distributing the
 7      vaccine under the emergency use authorization act?
 8            A.   I wouldn't say concerns.  I would be
 9      more concerned about, again, the way that it was
10      tested and brought to market.
11            Q.   Okay.  And so describe to me in full
12      detail what were your concerns about the way it
13      was tested?
14            A.   Again, being in the field that I am,
15      it takes a long time for something of this
16      magnitude to actually be pushed out with years of
17      testing of safety and efficacy and, you know,
18      tried on a lot of different people and tested.
19      And in addition to that, rats.  I mean, you know,
20      understanding what it takes to put a medication to
21      market, it's lengthy and it's a long process where
22      this was something that was sped up very quickly
23      and in a very big rush with a new technology.
24            Q.   Uh-huh.  Did you ever review the VAERS
25      database in adverse events?
```



Page 120

```
 1    forced with this decision of a career that I've
 2    had for -- you know, had a great reputation and
 3    was seen as a big -- you know, a leader in the
 4    organization.
 5             Q.   No.  Understood.  I guess my question
 6    was a little bit different.  So let me try to
 7    rephrase that.
 8                  Did you -- did you understand that the
 9    CDC was recommending individuals get the COVID-19
10    vaccine?
11             A.   Well, that was what was spoke to us.
12    I understood that that's what their guidance was,
13    yes.
14             Q.   And did you disagree with that
15    guidance from the CDC?
16             A.   I disagree with the fact that if you
17    can't have the ability to make your decision about
18    your body and whether it is, you know, through
19    your religious interpretation of what you believed
20    to be put in your body, yes, I guess I disagreed
21    with that.
22             Q.   Okay.  Did you have concerns about the
23    way in which the CDC or the U.S. government was
24    messaging the recommendation to get the COVID-19
25    vaccine?
```



Page 171

1    believed was litigating -- you know, keeping it

2    from spreading by doing exactly what I was

3    supposed to do, which was testing and wearing PPE,

4    which was what we were asked to do.

5            Q.   No, I understand.  But, generally

6    speaking, do you agree with me that Takeda had a

7    responsibility to help mitigate the virus spread

8    considering that it had individuals interfacing

9    with customers and patients who could possibly

10   have comorbidities?

11           MR. DeMATTEO:  Objection.  Form.  You

12        can try to answer.

13           THE WITNESS:  I think that, you know,

14        the medical community feels like that's

15        exactly what they were supposed to do

16        including Takeda.

17           MS. ENGELMAN:  Okay.  Celina, can we

18        grab 11, please.

19           (Exhibit 11 marked for identification.)

20   BY MS. ENGELMAN:

21           Q.   So this is an e-mail from

22   September 27, 2021, from you to -- it looks like a

23   mass e-mail, U.S. religious accommodation.  Do you

24   see that?

25           A.   Correct.



Page 172

1          Q.    This is your e-mail providing your

2    religious accommodation request forms.  Do you see

3    that?

4          A.    Yes.

5          Q.    And so you say I have attached two

6    copies of a letter from my pastor, one without his

7    signature and his typed signature on the other

8    copy includes his real signature for legal binding

9    purposes.  Do you see that?

10         A.    Yes.

11         Q.    And so we looked at earlier the

12   communication from Takeda that came out

13   September 10, 2021, requiring the mandate, and

14   then you submitted your request on September 17.

15   So approximately 17 days had passed.  Do you

16   agree?

17         A.    On the timeline, this looks like

18   September 27, so on the 10th and then on the 27th,

19   yes.

20         Q.    Was that enough time for you to put

21   together what you felt you needed to support your

22   religious accommodation request?

23         A.    To fulfill what Takeda was asking me,

24   yes.

25         Q.    If we move down to the next page.



Page 174

```
 1          Q.   Okay.  And when you say, "my body is a
 2     vessel of the Holy Spirit and it is up to me to
 3     protect it," what does that mean?
 4          A.   My body is a vessel of Christ.  He
 5     lives in me.
 6          Q.   Uh-huh.
 7          A.   And he is a part of -- I am part of a
 8     temple because I believe in my Lord and savior.
 9     And with that, I'm a vessel.  It's a metaphor.
10          Q.   Okay.  And you say you must protect
11     it.  So what does it mean -- why would -- again,
12     just why would the COVID-19 vaccine violate the
13     principle of protecting your vessel?
14          A.   Because I didn't believe in putting
15     that into my body because of the many reasons, one
16     being some of the science and some -- again, the
17     rush for them to actually produce the vaccine.  In
18     addition to that, the RNA -- the new technology
19     that they were utilizing.  And at the end of the
20     day, again, when I prayed upon it, this is where
21     my conclusion was is that no.
22          Q.   Okay.  And it says, "I must rely and
23     trust on him to care for me and not that of
24     worldly wisdom."  Do you see that?
25          A.   Yeah.
```



Page 180

1  fundamental aspects of my Christian faith and why

2  I cannot therefore in good conscience take part in

3  it.

4           You said -- you used the word "good

5  conscience" there.  What does that mean to

6  you - --

7           A.   Good conscience means that if I was to

8  take it, I would be going against what my --

9  again, what I was called upon to do, which was not

10  take it.  That means that I would be sinning my

11  father, my Lord and Savior had asked me and sent

12  me word do not do that.

13          Q.    -- okay.  And so what are the

14  consequences in your view of going against your

15  good conscience or going against what the Lord and

16  Savior tells you to do?

17          A.   Excuse me?  I don't understand your

18  question.

19          Q.    Well, okay.  Strike that.

20          So you just testified that if the Lord

21  and Savior is telling you to do something, that

22  you can't in good conscience violate that; is that

23  right?

24          A.   Yes, after I received -- my situation

25  where I prayed about it and I have actually sought



Page 181

1    guidance and prayer and for meditation and

2    understanding of what it is that I am actually,

3    you know, living the -- the Lord and Savior who is

4    inside of me and protecting that temple, yes.

5        Q.   Okay.  And if you were to, for

6    example, get the COVID-19 vaccine or do something

7    that contradicts what the Lord and Savior has told

8    you, what would be the consequences in your view?

9            MR. DeMATTEO:  Objection.  Form.

10           THE WITNESS:  The consequences would be

11       that I would be seen as I'm a sinner.

12   BY MS. ENGELMAN:

13       Q.   Okay.  And if you're seen as a sinner,

14   what does that mean to you?

15       A.   It's not that I'm following the word

16   of God.

17       Q.   And do you repent for your sins?

18       A.   That's part of our beliefs that when

19   we do know that we do sin, it definitely is

20   something that we actually can ask forgiveness

21   for.

22       Q.   Okay.  And so do you believe that you

23   could have just gotten the COVID-19 vaccine and

24   then repented for forgiveness for your sin?

25           MR. DeMATTEO:  Objection.  Form.



Page 182

1              THE WITNESS:  No.  Not when you --

2     BY MS. ENGELMAN:

3          Q.    Why not?

4          A.    Because not when I can feel like I can

5     make a decision and actually move on with it.  I

6     didn't walk away from a job, you know, just

7     because I wanted to.

8          Q.    Have you ever sinned before?

9          A.    Of course.

10         Q.    Okay.  And so in those circumstances

11    where you sinned, were you violating your good

12    conscience or violating what the Lord and Savior

13    told you to do?

14         A.    Well, if -- yes, if that's part of

15    sin.  Correct.

16         Q.    Okay.  So why in those circumstances

17    were you willing to sin?

18         A.    Sometimes you don't even have any

19    control over it.  It's just something that

20    happens.  Something that there is no decision that

21    takes place.  It just -- you just did it without

22    even thought.  As a Christian, I continue to, you

23    know, walk with my faith and continue to work.

24    I'm not perfect.  I mean, there's only one that's

25    perfect.  And I continue to actually, you know,



1    challenge every day to live the Christian life

2    that I'm supposed to, that he's intending me to.

3             Q.    Sitting here today, can you think of

4    any circumstances where you knowingly sinned?

5             A.    I've said a swear word that I've not

6    been able to -- that not supposed to be seen or

7    heard.

8             Q.    Okay.  And what did you do as a

9    result?

10            A.    I asked for forgiveness immediately.

11            Q.    Do you think it was a sin to take

12   Advil even though you knew that it used aborted

13   fetal cells?

14            A.    Again, that's something that I can say

15   in good conscience that's something that was

16   established 60 years ago that I don't take on a

17   regular basis that I feel -- I'm okay with that

18   right there on this point.

19            Q.    You don't think that's a sin?

20            A.    My relationship -- my relationship

21   with Christ.

22            Q.    Okay.  So describe to me why that's

23   not a sin?

24            A.    Well, what do you mean?  Taking Advil?

25   Sorry?



Page 184

```
 1          Q.   Well, you described to me that you
 2    believe that the use of the aborted fetal cells
 3    violates your Christian faith and what God wants
 4    you to do because God doesn't believe in abortion;
 5    is that right?
 6          A.   I believe that's -- life happens at
 7    conception; correct.
 8          Q.   Okay.  And so you've also testified
 9    that you are -- have been aware that Advil uses
10    aborted fetal cells and you have taken Advil
11    knowingly since being aware of that; correct?
12          A.   Yes.
13          Q.   So explain to me why taking Advil in
14    those instances was not a knowing sin?
15          A.   I can't sit there and say it is not a
16    knowing sin in the content of what you're
17    explaining.  However, I have actually, like I
18    said, have felt like I have put my thought process
19    with taking a few Advil here and there, and I'm
20    okay with it.
21          Q.   Okay.  So you make the decision about
22    whether something is a sin or not?
23          A.   It's not what I'm saying.
24          Q.   Well, what is it that you're saying.
25    Because it sounds to me like you're saying it's up
```



Page 185

```
 1    to you to decide whether or not something is a sin
 2    or not?
 3                MR. DeMATTEO:  Objection.  Form.
 4                THE WITNESS:  It's not -- I'm not
 5           saying that it's not a sin.  I'm saying
 6           that my conscience has allowed me to be
 7           okay with that.
 8    BY MS. ENGELMAN:
 9           Q.   And why is that?
10           A.   Because at the end of the day, again,
11    that's something that's been made 60 or 70 years
12    ago, I'm not using it on an everyday basis for,
13    you know, for anything except for when a personal
14    situation pops up with a bad knee.  And at the end
15    of the day, I do believe that, you know, something
16    like a vaccine is something that you can't untake.
17           Q.   Okay.  So in the next sentence you
18    say, "As a Christian, I am guided in everything I
19    do by my faith in God and the Bible."
20                Do you see that?
21           A.   Yes.
22           Q.   So that does not include your decision
23    to take Advil?
24           A.   I have explained to you my thought
25    process in taking Advil.
```



Page 200

```
 1                    So this is an e-mail I think Shirley
 2      Luckadoo, is that who you spoke about with Candy
 3      earlier as your conversation?
 4             A.    Yes, my aunt who's also --
 5             Q.    Okay.
 6             A.    -- part of a church who was an
 7      assistant pastor.
 8             Q.    Okay.  And if you look down, Saturday,
 9      September 4, 2021.  Subject:  Letter.  She sends a
10      letter to Merry Lynn Ramsey.  Who's that?
11             A.    That is my mother.
12             Q.    And so Shirley says, "Here are the key
13      points we used in Heather's letter."
14                    Who's Heather?
15             A.    It's another one of her sister or
16      daughter-in-laws.
17             Q.    Okay.  And she said, "I removed the
18      first paragraph and last paragraphs which were
19      personal to her committee.  Please ask Alecia to
20      use only it as a template.  It is Heather's
21      letter, and she doesn't want it floating on the
22      Internet.  Perhaps Alecia can get some pointers on
23      what to include.  I pray she continues to be
24      exempt."
25                    Do you see that?
```



Page 201

```
1              A.   Yes.
2              Q.   And then it looks like Merry Lynn
3    Ramsey, your mother, forwarded this to you on
4    September 5, 2021.  Do you see that?
5              A.   Yes.
6              Q.   And then if you scroll down, do you
7    see this letter?
8              A.   I do see this letter.
9              Q.   Do you recognize this letter?
10             A.   It has a lot of the same verbiage that
11   I have used, but at the same time I have put my
12   own things in my own words.
13             Q.   Okay.  So if we go back to your
14   letter, there's a 1 bolded, it says, "I believe I
15   am given a vessel, my body, to provide a home for
16   the Holy Spirit within me, and it is my privilege
17   and responsibility to protect the physical
18   integrity of that body."
19             Do you see that?
20             A.   Yes.
21             Q.   And then let's go to Heather's letter.
22   You say I believe -- it says, "I believe I am a
23   given vessel, my body, to provide a home for the
24   Holy Spirit within me, and it is my privilege and
25   responsibility to protect the physical integrity
```



Page 202

1    of that body."

2              Do you see that?

3         A.    Yes.

4         Q.    Did you copy that word for word from

5    Heather's letter?

6         A.    I do not recall copying it verbatim.

7    I do recall reading this when my mother shared it

8    with me.  However, again, this is some of the same

9    people that I share the same viewpoints with in my

10   family.

11        Q.    Okay.  So sitting here today, let's

12   look at the back and forth.  Can you identify me

13   how these words are different?

14        A.    Well, the scripture is going to be the

15   scripture because it's from the same version of

16   the Bible.

17        Q.    Understood.  But I'm talking about the

18   language that you said came from Kings Bible and

19   that was your words.  That was your testimony

20   earlier.  So now I'm asking you is it still your

21   testimony that these were your words and this came

22   from Kings Bible?

23        A.    That comes from the King James Bible,

24   yes.

25        Q.    Okay.  So not the scripture, the



Page 203

1    bolded language that's not quoted.

2         A.    That is part of the lesson of the

3    scripture that it speaks to in the Bible, in the

4    learning Bible of the King James version, yes.

5         Q.    Okay.    Where -- what part of the Bible

6    does that come from?

7         A.    It comes from describing First

8    Corinthians.    First Corinthians is the scripture

9    that is being referenced right there.

10         Q.    Okay.    Is it a quote from the Bible?

11         A.    It is actually, again, you have

12    scripture on this type of Bible.    And you actually

13    have exactly what it says meaning it translates

14    the scripture for you.

15         Q.    Okay.    Ma'am, I'm going to be very

16    specific here.    We are talking about language that

17    is bolded under number 1.    You testified earlier

18    that these were your words and it came from Kings

19    Bible.    I am now presenting you with a letter from

20    Heather that has the exact same language.    I want

21    to know whether or not that language came from

22    Heather's letter or what you testified earlier

23    that it came from the Kings Bible and was your

24    words?

25         A.    Well, it came from my words because I



Page 204

1    wrote the letter.  However, the words come from

2    the same scripture.

3            Q.    Did you copy the letter from Heather?

4            A.    Not all of that letter did I copy, no.

5            Q.    Did you copy this portion that is

6    bolded under number 1?

7            A.    The words that similar, but, yes, I

8    mean I did not copy and paste it like you are

9    stating.

10           Q.    Okay.  Tell me what words are

11   different.  Let's look at the first -- let's look

12   at your letter.

13           A.    Uh-huh.

14           Q.    Read it for as long as you'd like, and

15   then let's look at Heather's letter, and you tell

16   me what words are different.

17           A.    Okay.  There's not a lot of difference

18   in the verbiage in itself again.

19           Q.    Is there any difference?

20           A.    Maybe a comma.

21           Q.    Okay.  Then we go to on to the

22   scriptures.

23                 Celina, let's look at Ms. Ramsey's

24   letter.

25                 You quote -- well, first of all, you



Page 205

1    the say the scriptures are very clear on this

2    point.  And then you quote First Corinthians 3:16,

3    First Corinthians 6:19-20, and those two -- those

4    two.  You testified earlier that you personally

5    chose which biblical scriptures to include in this

6    letter.  Do you agree with that?

7         A.   Yes, because I believe in the

8    scripture.

9         Q.   Okay.  Now look to Heather's letter.

10             Celina, do you mind.

11             Okay.  She quotes the exact same two

12   Corinthians.  Did you copy Heather's letter when

13   creating your letter?

14        A.   Again, these are scriptures that are

15   very similar in the fact because it's the exact

16   same scripture that I wrote with my letter.  Are

17   they the exact same scripture, absolutely, because

18   they're the same Bible verses.

19        Q.   Okay.  So is it still your testimony

20   that you personally went through the Bible and

21   picked out which verses you intended to include in

22   your letter?

23        A.   This is not something that I received

24   just to write my letter.  No.  Yes, this is

25   something that I went to the Bible and I actually



Page 206

1    did do my own understanding of the scripture and

2    actually my beliefs, and it supports it.

3          Q.   Okay.  So you went through and you

4    looked at the Bible, but it just so happens that

5    the exact same two Bible verses in Heather's

6    letter ended up in your letter?

7              MR. DeMATTEO:  Objection.  Form.

8              THE WITNESS:  Again, we share the same

9        beliefs.

10   BY MS. ENGELMAN:

11         Q.   Okay.  Do you find that ironic in any

12   way?

13            MR. DeMATTEO:  Objection.  Form.

14            THE WITNESS:  Not really.

15   BY MS. ENGELMAN:

16         Q.   Okay.  Let's go back to your letter.

17   You testified earlier that you authored this

18   language that says at the bottom which is

19   unquoted, "To take a vaccine that is unproven and

20   still experimental appears to be a clear violation

21   of this command.  Furthermore, I alone, under his

22   direction, should have the right to determine what

23   is injected into this vessel of the Holy Spirit."

24         Do you see that?

25         A.   Yes.



Page 207

```
 1          Q.   And if we look to Heather's letter, it
 2     says, "To take a vaccine that is unproven and
 3     still experimental appears to be a clear violation
 4     of this command.  Further, I alone under his
 5     direction should have the right to determine what
 6     is injected into this vessel of the Holy Spirit."
 7               Is it still your testimony,
 8     Ms. Ramsey, that you authored that portion of the
 9     letter?
10          A.   It's still my testimony that I
11     actually believe what I wrote in this letter;
12     correct.
13          Q.   Okay.  So is it that you copied the
14     letter?
15          A.   I wouldn't say I copied the letter.  I
16     think that there are parts that I used from the
17     letter because it's the same thing that I believe
18     in my -- in my Christian faith.
19          Q.   I understand that.  You testified
20     earlier that these were your words?
21          A.   They are my words.
22          Q.   Okay.  So how is it that they are your
23     words, but they appear in a letter that you
24     received ten days before you submitted your letter
25     to Takeda?
```



Page 208

```
 1                    MR. DeMATTEO:  Objection.  Form.
 2      BY MS. ENGELMAN:
 3             Q.   Can you explain that to me?
 4             A.   Because, again, we share the same
 5      faith and the same beliefs.
 6             Q.   Okay.  Okay.  Do you understand what
 7      copying means?
 8                    MR. DeMATTEO:  Objection.  Form.
 9                    THE WITNESS:  Yes, I understand what
10             copying means.  But I also understand what
11             scripture means and that scripture is
12             scripture.  The scripture is the scripture.
13      BY MS. ENGELMAN:
14             Q.   Did you copy these words and insert
15      them into your letter?
16             A.   I don't recall copying.  Are they the
17      same words?  Yes.
18             Q.   Okay.  Can you explain to me how it
19      would be that they are the same words if you did
20      not copy them into your letter?
21             A.   Because it's the same scripture and
22      the same viewpoint that we hold in my entire
23      family.
24             Q.   Okay.  We're not talking about the
25      quoted scripture.  We're talking about the
```



Page 209

1    language that you testified earlier you personally

2    authored.

3              "To take a vaccine that is unproven

4    and still experimental appears to be a clear

5    violation of this command.  Further, I alone under

6    his direction should have the right to determine

7    what is injected into this vessel of the Holy

8    Spirit."

9              That is unquoted and you testified

10   earlier you authored it; is that accurate?

11        A.   I authored it because I wrote it on

12   paper and I literally put it on a piece of paper

13   and I signed it.  So, yes, that is my authoring.

14        Q.   And you copied it from Heather's

15   letter; is that correct?

16        A.   I don't recall copying anything from

17   Heather's letter.

18        Q.   Okay.  Let's move on.  So the second

19   section says, "As a follower of Christ, I must

20   trust him to care for me rather than rely on

21   worldly wisdom that is often flawed."

22              That is your letter.  Do you see that?

23        A.   Yes.

24        Q.   You also testified earlier that this

25   bolded unquoted language is one that you quoted



Page 210

```
 1    and you authored.  Do you recall that testimony?
 2            A.   Again, it is the words that literally
 3    in the Bible -- the Bible verses and it walks you
 4    through exactly some of the verbiage that I have
 5    used in the Bible of the King James version and
 6    the study Bible.
 7            Q.   Okay.  So I'm going to ask you to
 8    produce to me the version of King James Bible that
 9    says these exact words.  We'll make that request,
10    Chris.
11            But if we can go move to Heather's
12    letter.  It says, "As a follower of Christ, I must
13    trust him to care for me rather than rely on
14    worldly wisdom that is often flawed."
15            Do you see that?
16            A.   Yes.
17            Q.   Do you agree that is identical
18    language?
19            A.   I do believe that they are similar,
20    correct.
21            Q.   In what ways are they dissimilar?
22            A.   Maybe a comma.  I don't see anything
23    where it stands out to me.  Yeah, similar.
24            Q.   So is it still your testimony that you
25    personally authored this language and it's your
```



Page 211

```
 1    words?

 2          A.   It is my testimony that I believe

 3    these words, yes.

 4          Q.   Not that you believe these words.

 5    That you personally authored these words?

 6          A.   Yes.  I personally typed them in and I

 7    signed a piece of paper this is my beliefs.

 8          Q.   Okay.  When you say you typed them in,

 9    does that mean you looked at Heather's letter and

10    typed what was in Heather's letter into your

11    letter?

12          A.   I wouldn't say I actually, you know,

13    verbatim, but it looks like that the words were

14    very similar because, again, our beliefs are the

15    same.

16          Q.   Okay.  What conversation have you had

17    with Heather about her beliefs?

18          A.   Again, this is a person that is part

19    of my family that she also sought a religious

20    exemption.

21          Q.   And what -- tell me about the

22    conversations that you had with Heather about

23    these particular scriptures?

24          A.   Well, we go to church when I'm in town

25    with her, the same church that we got to and
```



Page 212

```
 1     attend.  We've shared scripture.  We share prayer.
 2     We share, you know, work in the same -- she's a
 3     nurse, like I said.  And in addition to that,
 4     she's my family.  So we talk a lot about scripture
 5     and the fact that our beliefs and where we stand.
 6          Q.   Okay.  Celina, can you scroll up.
 7     There's two Corinthians scriptures here.  When
 8     have you spoken with Heather about those
 9     particular scriptures?
10          A.   I haven't talked to her recently.  The
11     last time I spoke with her about the temple
12     probably would have been when we had another
13     family member going through cancer.
14          Q.   Did you ever speak to her about these
15     particular scriptures in connection with the
16     COVID-19 vaccine?
17          A.   I don't recall specifically speaking
18     to her about this particular one, no, in regards
19     to the COVID vaccine.
20          Q.   Scroll down Celina, please.
21               When we look at the particular
22     scriptures that you have cited -- here, let's go
23     back to Ms. Ramsey's letter, please.
24               So here you cite multiple scriptures.
25     Psalm -- is it Psalm 1:18, First Corinthians 3:18,
```



Page 213

```
 1    Acts 5:29.
 2                We scroll down.  Is there one more?
 3    No, that's it.  Okay.
 4                You testified earlier that you
 5    personally went through the Bible and decided
 6    which scriptures to use and to include in this
 7    letter?
 8         A.   I do -- yes, I testified that I
 9    believe in the scripture that I provided.
10         Q.   No.  I think you testified that you
11    personally reviewed the Bible to determine --
12         A.   Yes, I did.
13         Q.   -- to determine which scriptures you
14    would include in your letter; is that correct?
15         A.   Absolutely.
16         Q.   Is it still your testimony that that's
17    what you did?
18         A.   It's my testimony that I believe in
19    the scripture that I produced for my actual
20    religious exemption.
21         Q.   Are you changing your testimony that
22    you did not actually go through the Bible and
23    determine which scriptures to include --
24         A.   No, I --
25         Q.   I'm going to try to let -- I'm going
```



Page 214

```
 1    to try to let you finish.  I know I'm interrupting
 2    you.  You need to try to let me finish.  So let's
 3    start over.
 4              You testified earlier, ma'am, that you
 5    personally reviewed the Bible and determine which
 6    scriptures you were going to include in your
 7    letter for religious accommodation; do you agree
 8    with that?
 9         A.   Yes.
10         Q.   Are you changing that testimony now?
11         A.   No.  Because I read the Bible when I
12    was putting together this letter and I support
13    every single verse -- and believe every single
14    verse that I put in that paper that that is my
15    religious convictions.
16         Q.   Okay.  So we look to Heather's letter.
17    She also cites the exact same Psalm 1:18, First
18    Corinthians 3:18, and Acts 5:29.  Do you see that?
19         A.   Yes.
20         Q.   Can you explain to me how the exact
21    same Bible verses ended up in Heather's letter and
22    also ended up in your letter?
23         A.   Again, we both go Baptist.  We both
24    believe in the same things, and that's her
25    religious belief as well.
```



Page 215

```
 1          Q.   Okay.  If we go down to 3.  Your
 2     letter.  Sorry.  Just go to 4.  You testified
 3     earlier that this bolded language was your
 4     language that you drafted.  Do you remember that
 5     testimony?
 6          A.   Yes.
 7          Q.   Okay.  And it states here, "As a
 8     follower of Christ, I believe we are at the end of
 9     times.  The insistence from government that we
10     mark our bodies with this vaccine could be what is
11     called in Revelation, 'the mark of the beast,'
12     especially since it is being required to earn a
13     living or buy and sell in the marketplace."
14               Do you see that?
15          A.   Yes.
16          Q.   And then if we look to Heather's
17     letter, it is the exact same language.  Happy for
18     you read it and it you want to identify any
19     differences, please do so.
20          A.   Yes.
21          Q.   Okay.  And so can you explain to me
22     why the exact same language that you said you
23     authored came from Heather's letter is also in
24     your letter?
25          A.   Again, it goes back to the scripture
```



Page 216

1     and exactly what the scripture is explaining and

2     our beliefs.

3          Q.   This language come from King James

4     Bible?

5          A.   Yes.

6          Q.   Okay.  This exact language?

7          A.   Again, when you look at the actual way

8     this Bible is put together, you have scripture and

9     then underneath it you have verbiage that explains

10    what it means.

11         Q.   Okay.  So is it your testimony that

12    this exact language is coming from King James

13    Bible?  Why is the not in quotes?

14         A.   It's not word for word.  It's a

15    paraphrasing of what the scripture encompasses.

16         Q.   Okay.  But you agree for -- agree with

17    me that your letter is word for word to Heather's

18    letter with respect to number 4?

19         A.   Looking at this, yes.

20         Q.   Okay.  And then she also quotes

21    Revelation 13:15-17 as the scripture that supports

22    her belief there?

23         A.   Uh-huh.

24         Q.   If we look to your letter, that's the

25    exact same scripture that you quote?



Page 217

1           A.    Yes.

2           Q.    Okay.  Did you ever speak with Heather

3     about Revelation 13:15?

4           A.    We've talked about the fact last time

5     we were together, you know, the world is an ugly

6     place and the fact this could be still the end of

7     times.

8           Q.    Is that with respect to the COVID-19

9     pandemic?

10          A.    No.  It's just general of what's going

11    on in this world.

12          Q.    Have you ever spoken to her

13    specifically with respect to the end of times as

14    it relates to COVID-19?

15          A.    I don't recall having any conversation

16    with her verbatim about this, no, about COVID

17    vaccine.  In regards to the COVID vaccine, no.

18               MS. ENGELMAN:  Can we go to 23, please,

19          Celina.

20               (Exhibit 23 marked for identification.)

21    BY MS. ENGELMAN:

22          Q.    So do you see this e-mail?

23          A.    Yes.

24          Q.    Do you recognize this e-mail?

25          A.    It is the e-mail that I know my



Page 222

1    wouldn't, but --

2         Q.   Do you recall doing an interview in

3    connection with your request for a religious

4    exemption?

5         A.   Do I recall -- excuse me, I'm sorry --

6    what?

7         Q.   Doing an interview in connection with

8    your request for a religious exemption?

9         A.   Yes.

10        Q.   And do you recall when that took

11   place?

12        A.   I remember I had to reach out to him

13   to make sure that they received my information.

14   I'm assuming sometime in October, I think, maybe

15   when that conversation took place.  It was -- I

16   was -- I know that I was not told -- I knew that I

17   had heard everybody had gone through some process,

18   the couple of people that I knew, and that I had

19   still not heard anything and I was nervous and I

20   reached out.

21        Q.   Who did you reach out to?

22        A.   I believe it was Irving, if I'm

23   remembering correctly.  Yeah.

24             MS. ENGELMAN:  So could we pull up 12,

25        Celina, please.



Page 223

```
 1                (Exhibit 12 marked for identification.)
 2      BY MS. ENGELMAN:
 3           Q.   So these are notes from your interview
 4      with Mr. Irving.  We produced them to you, but I
 5      don't think you would have seen them in real time
 6      in connection with at your employment at Takeda.
 7      Is this a document that you recall seeing in
 8      connection with this litigation?
 9           A.   I have not seen this.
10           Q.   Okay.  And do you recall the various
11      questions that Mr. Irving -- or some of the
12      various questions Mr. Irving asked you during the
13      interview?
14           A.   Yes.
15           Q.   And so he -- if we scroll down, he
16      asks you to tell you more about his -- your
17      religious beliefs if we go to the sort of second
18      to last paragraph in this page.  And his notes
19      state that you said that, again, you're guided in
20      everything you do in your faith and God and the
21      Bible.  And you say here again the scripture, as I
22      said, are just a few of the many that have
23      justified my religious convictions regarding my
24      physical and spiritual health that I live by.
25                Do you see that?
```



Page 233

```
 1              A.   A few years is a few years is a few

 2     years.

 3              Q.   Okay.  And so when you applied for

 4     your new position -- well, let me -- strike that.

 5              When you submitted your religious

 6     accommodation request form and you cited the use

 7     of aborted fetal cells as a reason for your

 8     religious accommodation, did you at that time

 9     research whether or not Takeda used aborted fetal

10     cells in any of its products in manufacturing or

11     testing?

12              A.   I don't recall any research that I did

13     specifically to Takeda's products, no.

14              Q.   And would that -- wouldn't that have

15     been important for you to know to determine

16     whether or not you would want to continue working

17     for a company that may use aborted fetal cells in

18     its products?

19              A.   You know what, with all due respect,

20     the thing is, is that given the circumstances I

21     was asking for a religious exemption.  If I was

22     honored that religious -- I can't speak to what I

23     would have done afterwards in my walk with Christ.

24              Q.   That's not what I'm asking you.  You

25     were seeking a religious exemption, so you were
```



Page 234

1    seeking to work for Takeda; correct?

2         A.   Yes.

3         Q.   And now you are aware, generally

4    speaking, that aborted fetal cells are you used in

5    some medications and vaccines; correct?

6         A.   Yes.

7         Q.   So wouldn't it have been important for

8    you to understand whether Takeda, the company for

9    which you were trying to continue to work, used

10   aborted fetal cells in the production and

11   manufacturing of any of its products or

12   medications?

13        A.   At the time I did not think that it

14   was the most important thing for me to be

15   researching.

16        Q.   Okay.  So would you agree with me that

17   you have no religious objection to working for a

18   company that uses aborted fetal cells in its

19   products or vaccines or medications?

20        A.   I cannot say yes or no on that when I

21   don't know what you're speaking of as far as the

22   decision to be making right now about my future in

23   pharmaceuticals.  I can't say that I would work

24   for a company that's using fetal cells, no, for

25   the research and development.



Page 235

```
 1              Q.   I'm saying at the time that you were
 2    making the religious accommodation request, you
 3    appeared to have no religious objection to working
 4    for a company that used aborted fetal cells?
 5              A.   I was not aware of the -- of the
 6    amount of this exact situation of what we're
 7    talking about in the research.
 8              Q.   You never bothered to find out whether
 9    Takeda actually used aborted fetal cells in the
10    production and manufacturing of its products?
11              A.   Which product are you speaking of?
12    No, I --
13              Q.   Any product.
14              A.   I never researched Takeda's products.
15    No, I did not.
16              Q.   Okay.  And so when you went to search
17    for new employment, where's your new employment?
18              A.   Corium.
19              Q.   Did you research whether or not Corium
20    uses aborted fetal cells in any of its
21    manufacturing, testing, or production of its
22    products?
23              A.   No.
24              Q.   Why not?
25              A.   Because I don't believe they did.
```



Page 239

1              Q.    And prior to that, you worked for

2     Shire?

3              A.    Correct.

4              Q.    Okay.  And in 2019, what was your job

5     responsibility?

6              A.    I was absorbed into the field as a

7     psychiatric neuroscience sales representative.

8              Q.    And what products did you promote as a

9     sales representative?

10             A.    I promoted Trintellix at the time and

11    Vyvanse.

12             Q.    And what geographical area did you

13    cover?

14             A.    I covered the Winston-Salem area as a

15    representative.

16             Q.    And how long were you a sales

17    representative?

18             A.    I was a sales representative to --

19    toward the end of that year.  So maybe eight, nine

20    months, ten months -- not even ten months.  Ten

21    months maybe, yeah.  Eight.

22             Q.    And then what was your job?

23             A.    I was promoted in 2020 as a regional

24    sales trainer for the southeast where I supported

25    representatives in Georgia and Florida.  Then I



Page 240

1    was asked to -- which is an extension of the

2    leadership team, the management team.  And then I

3    was asked to transfer back to the Carolinas after

4    the regional sales trainer left Takeda and went to

5    another opportunity.

6              Then I was asked to actually step into

7    district business manager roles managing

8    psychiatric team that I once worked on, and in

9    addition to that, a pediatric primary care team in

10   Richmond, Virginia.

11         Q.   So from, I guess, starting in -- so I

12   just want to break that down a little bit.  So

13   when you were -- when COVID started in March 2020,

14   what was your role?

15         A.   I was the regional sales trainer for

16   the southeast which -- and I lived in North

17   Carolina, but I served the Georgia and Florida

18   teams.

19         Q.   And did you travel to Georgia and

20   Florida --

21         A.   Yes.

22         Q.   -- as part of your job

23   responsibilities?

24         A.   Yes.

25         Q.   Okay.  And then -- so then did your



Page 241

1    job title stay the same, but your region changed?

2         A.   Yes.  Correct.  I went back to the

3    Carolinas where I was a representative because the

4    regional sales trainer had left and they wanted me

5    to accommodate me being in the area that I lived

6    in, would be better served.  And I was seen as a

7    really good employee and a regional sales trainer.

8    And my old boss wanted to provide me the

9    opportunity to come back to the Carolinas.

10        Q.   So how long did you cover the

11   Carolinas?

12        A.   I covered the Carolinas until I was

13   terminated.

14        Q.   Okay.  So approximately when did that

15   start?

16        A.    I think I transferred back to the

17   Carolinas in May, maybe April, May of that year,

18   2020, that would be, yeah.  April, May 2020.  And

19   I served in that regional sales trainer.  It was,

20   you know -- it was -- I was doing two jobs, in

21   essence, basically because they weren't hiring

22   anybody else.  And as a regional sales trainer,

23   you also fill in as a manager, you will do stints

24   when they need a manager.  It's kind of like a

25   role that is designed to, you know, give you



Page 242

1    opportunities and management, but also train

2    representatives as well.

3         Q.   Okay.  So as far as the sales trainer

4    portion of the job, can you just explain to me

5    what your day-to-day responsibilities were?

6         A.   As a regional sales trainer, I was

7    responsible for upscaling representatives that the

8    management team that I worked alongside of would

9    ask me to work with, whether it was on products,

10   clinical knowledge, messaging, and the sales side

11   of things, and I would -- I was representatives as

12   an extra set of eyes for the managers and maybe

13   help them actually be able to find opportunities

14   that can, you know, elevate them in their

15   performance, but also in addition to their

16   professional aspirations and careers and

17   representing both products.

18             So some days I'd be in the field

19   working with representatives and some days I would

20   be leading the initial sales training class

21   because there were times that I would have to go

22   to Boston and work before an initial sales trainer

23   and onboard the new hires in neuroscience.

24        Q.   So approximately how many sales

25   representatives were under your purview in -- when



Page 243

1    you were in the Carolinas?

2         A.    Let's see.  That's a good question.

3    There was -- we covered Virginia, too.  So it

4    wasn't just the Carolinas.  It was North, South

5    Carolina, Virginia.  I'd probably say -- there

6    were maybe eight managers, seven managers, and

7    probably maybe 100 employees roughly.

8         Q.    Sales reps?

9         A.    Yeah, that they had.

10         Q.    And were the managers reporting to

11    you?

12         A.    No.  I was seen as a peer on their

13    level.  I mean, I was a part of the leadership

14    team and that I worked side by side with their

15    boss, our boss, which is the regional director

16    role.  So they were district business managers,

17    regional sales trainer like I was.  There was 11

18    regional sales trainers in the country.  One in

19    every area, if you will.

20         Q.    Okay.  And was it your job

21    responsibility to work basically one on one with

22    the sales representatives?

23         A.    Yes.  And support the leadership -- my

24    leadership team any way I could, whether it was

25    upscaling like I said running workshops for some



Page 244

     1      of their teams or helping them, you know, elevate

     2      themselves from the clinical knowledge of the

     3      products and selling.

     4           Q.   Okay.  And so when you're working one

     5      on one with the sales representatives, are you

     6      riding along with them?  Is that generally the

     7      idea?

     8           A.   Yeah.

     9           Q.   Okay.  So one on one in person at the

    10      time?

    11           A.   Most of the time until COVID it was

    12      always one on one in the car.  You know, we

    13      weren't virtual until COVID happened, so yes.

    14           Q.   So just going back to the pre-COVID

    15      days when it was one on one, in a typical day

    16      would you be -- you would be one on one with the

    17      sales rep and you would visit their healthcare

    18      providers in their area and work with them on

    19      selling techniques.  Is that generally the idea?

    20           A.   Yeah.  Yes.

    21           Q.   In a typical day, how many sales

    22      representatives would you work with, typically?

    23           A.   Typically, we would actually only --

    24      I'd only meet with one representative for a day.

    25      And I would set up a schedule where I'd be maybe



Page 245

1    with one and maybe the next town over the next day

2    I would be with one.  We would be in the field

3    anywhere from, depending on the week, again, you

4    know, extension, anywhere from three to four days,

5    maybe two days some weeks.  It wasn't always the

6    same.

7            Q.   Okay.  And then if you're in the field

8    with the rep for one day, approximately how many

9    targets are you hitting healthcare facilities?

10           A.   It could be anywhere from three to ten

11   calls where we'd see customers.

12           Q.   Okay.  And, again, prior to COVID,

13   this is all happening in person?

14           A.   Sure.  Yes.

15           Q.   And are you -- are you going along

16   with the sales representative during each part of

17   their day, meaning like if they're navigating

18   through a particular healthcare facility, you

19   know, going from the waiting room back to the

20   doctor's office to the receptionist, are you

21   tagging along the whole way?

22           A.   Yes.  Correct.

23           Q.   Okay.  And when you were not with a

24   sales rep in any particular day, you mentioned

25   that you might be doing workshops of some kind; is



Page 248

1    training around that.

2         Q.    And what was the particular, you said

3    neuroscience, were you limited to certain drugs?

4         A.    Neuroscience, I worked in mental

5    health.

6         Q.    Okay.  So what were the particular

7    drugs that the sales reps were promoting?

8         A.    Vyvanse for the ADHD and Trintellix

9    for MDD for depression.

10        Q.    Okay.  And the various healthcare

11   facilities that you would -- that you would go to

12   as part of your one-on-one training, did they

13   vary?  Were they hospitals?  Were they family

14   medical -- like family clinics?  Pediatricians?

15   What were the types of facilities?

16        A.    Yeah.  The majority of the facilities

17   that we called upon were psychiatrists, mental

18   health facilities, pediatricians, family medicine,

19   internal medicine, every now and then

20   neurologists.

21        Q.    Okay.  So it varied?

22        A.    Yeah.  Development of pediatrics,

23   yeah, depending on the area.

24        Q.    And when you were visiting these

25   facilities with the sales representatives, again



1    pre-COVID, were you seeing patients, like not

2    seeing them medically, but were they in your

3    purview as you walked through the facility?

4         A.    Depending on the office dynamics, I

5    mean, that kind of varied.  Sometimes you would

6    walk by patient rooms and walking back to a -- you

7    know, a setting where you would wait for them in a

8    sample closet or you would wait for them.  I mean,

9    did you physically see a patient?  Yeah, of

10   course, you would see a patient every now and

11   then.  But it wasn't, you know, interaction where

12   you were sitting there having discussions with

13   patients and coming in close contact with them.

14        Q.    Right.  But patients were in the

15   general vicinity of the building; is that right?

16        A.    Correct.  Yeah.

17        Q.    And did you have any knowledge one way

18   or the other what those patients were being

19   treated for?

20        A.    Well, a mental health, usually it, you

21   know, was designed mental care, but in primary

22   care and pediatrics and internal medicine, it

23   could be from anywhere to well checks to, you

24   know, blood pressure, cardio -- I mean, you know,

25   just normal things that people would go to their



Page 250

1    pediatrician to take their kids and internal

2    medicine people would go see their internal

3    medicine or family medicine doctor.

4          Q.    Right.  Okay.  But you didn't have any

5    personal knowledge of any particular patient --

6    patient illness or what they were being treated

7    for their -- being treated by their doctor for; is

8    that right?

9          A.    No.  I mean, unless you were literally

10   in like a mental health setting, like a

11   psychiatrist, obviously they were being seen for

12   mental health issues but not specific to like a

13   disease state, no.

14         Q.    Okay.  And, again, this is a pre-COVID

15   and this is sort of an approximation, and I

16   understand that.  But if you were in one

17   particular facility seeing one doctor or two

18   doctors or three doctors, I mean, how many

19   individuals are you interacting with throughout

20   that visit approximately in terms of admin and

21   nurses, staff, and doctors, et cetera?

22         A.    Obviously, you know, it varied from

23   office to office and the relationship that maybe

24   the representative had in the office.  Sometimes

25   you could walk in a back door and not have anybody



Page 251

```
 1    walk in, you know, a doctor -- tell the doctor,
 2    hey, they're back there, they're ready for you.
 3    You would walk in the front door and you go past
 4    the front staff and they would, you know -- either
 5    you knew where to go or there could be anywhere
 6    from one or two to, you know, three or five, I
 7    guess, in essence.
 8           Q.    Okay.  And then so that was that many
 9    people and then times however many doctors you
10    were visiting or facilities you were visiting in
11    one particular day?
12           A.    Uh-huh.  Depending on the -- yeah, the
13    day.
14           Q.    So walk me through once COVID hits,
15    what happens to your job?
16           A.    Well, for the first couple of months
17    when we decided to be -- we were all 100 percent
18    remote and virtual.  We were still onboarding
19    people.  So for the first month or so I did
20    nothing but train three classes of virtual
21    salespeople in neuroscience coming to Takeda.  So
22    that took a couple of months to get through that.
23    After that, then I was asked to manage the team,
24    so then I became a district manager.  We still
25    were, you know, working remotely and was leading a
```



Page 255

1    field ride with a representative in the training

2    role.  If I was in the field in my recollection,

3    it was in a manager role, and I was supporting

4    that team as a manager.

5         Q.   Okay.  And so -- and what

6    circumstances would you be in a field again

7    post-COVID in a manager role, like what is the

8    role that you're playing there?

9         A.   So our requirements were, you know,

10   that we would get into the field and we would go

11   see customers again where we would be face to face

12   in offices with doctors where they would let us

13   come in and, you know, speak with them about our

14   medications and things that we actually could

15   provide patients that had depression and ADHD.

16   And I would be there help supporting and help, you

17   know, managing the representatives one on one and

18   coaching them and doing reports again to help

19   elevate them in their performance, but also in

20   their knowledge and disease state and selling

21   abilities.

22        Q.   Okay.  So if a sales rep was in the

23   field and you were either in a manager role or a

24   trainer role and you wanted to accompany them

25   virtually, was there a way to do that?



Page 256

1          A.   So there were times that I would

2     attend the -- if they had a lunch, for example,

3     and maybe they were live.  I would jump on the

4     call with them virtually.  There was like -- it

5     was just such a different time.  We just were kind

6     of doing where we could go to support where we

7     could lend ourselves and to be there.  There were

8     times when, you know, doctors weren't seeing

9     representatives, but they would see you virtually.

10    So, you know, you'd sit out in the parking lot and

11    you would do a virtual call even though you were

12    sitting outside of their office, they wouldn't let

13    you in because they weren't seeing any

14    representatives at the time.  So -- but they still

15    wanted to, you know, see you and hear about the

16    information and, obviously, provide them some type

17    of support.

18          Q.   Okay.  But if a sales rep is allowed

19    to be in office, work is navigating through a

20    healthcare provider's office to sell, there was no

21    way for you to do that follow along remotely; is

22    that right?

23          A.   Not from office to office, no.  No.

24          Q.   Okay.

25          A.   Yeah.



Page 260

1          A.   Yes.  Yeah.  Roughly.  Again, like I
2     said, it was staged where representatives got to
3     go in the field earlier than I was, yes.
4          Q.   Do you generally agree with me that
5     performing your job as a sales trainer is best
6     done in person?
7          A.   You know, it's interesting that you
8     say that because I think that there was a lot that
9     we learned through COVID.  I think that generally
10    speaking that, you know, face to face is a great
11    way to conduct business, but I can sit there and
12    say that remote -- there's still providers now
13    that we'll still only see you remotely because
14    that's the way the business has evolved.
15         Q.   What providers are you aware that will
16    only see you remotely?
17         A.   There's still some psychiatrists that,
18    you know, maybe work from home that have not moved
19    into the office.  COVID changed the landscape of a
20    lot of things from a provider standpoint in the
21    way that they provide care.
22         Q.   Okay.  To the best of your knowledge,
23    are most providers in the area that you covered
24    allowing in-person selling?
25         A.   Currently speaking, are you speaking



Page 261

1    of?

2         Q.   Yes.

3         A.   Yes.  Currently speaking, the

4    majority, yes.

5              Can we take a break so I can plug up

6    this computer before it --

7              MS. ENGELMAN:  Sure.  Let's take ten

8         minutes.

9              THE VIDEOGRAPHER:  Off the record,

10        3:36.

11    (Recess taken from 3:36 p.m. until 3:50 p.m.)

12             THE VIDEOGRAPHER:  On the record,

13        3:50 p.m.

14   BY MS. ENGELMAN:

15        Q.   Ms. Ramsey, are you aware of any

16   vaccines that do not use aborted fetal cells?

17        A.   No.

18        Q.   No, you're not aware.  Have you ever

19   researched whether or not there are any vaccines

20   available that do not use aborted fetal cells?

21        A.   No.  I rarely -- I mean, I don't do a

22   lot of vaccines in my life.

23        Q.   Are you -- have you -- I mean a

24   COVID-19 vaccine?

25        A.   I'm sorry, what?



Page 262

1          Q.   I meant a COVID-19 vaccine.

2          A.   Am I aware of any that are not using?

3          Q.   Yes.

4          A.   No, I'm not aware of any of them.  I

5     haven't looked into that.

6          Q.   Are you aware if there's any COVID

7     vaccines that do not use MRNA technology?

8          A.   From my knowledge of understanding

9     what other vaccines and their mode of delivery,

10    their delivery system, that this -- that they're

11    not MRNA vaccines.

12         Q.   Sorry.  They are not?

13         A.   That they are not MRNA vaccines.  The

14    only ones that I know of and what I do know, I

15    mean, I've not done extensive research, is that

16    COVID vaccines have this type of technology.

17         Q.   Right.  No.  Understood.  I guess my

18    question is are you aware whether or not there are

19    any COVID-19 vaccines that do not use MRNA

20    technology?

21         A.   I think there was one that was

22    available, but I don't know of anything that's on

23    the market currently right now, no, I don't.

24         Q.   Okay.  What was the one that is

25    available that you're speaking about?



Page 263

```
 1          A.   Maybe I thought it was the Johnson &
 2   Johnson one.  But, again, I can't recall if they
 3   actually do the MRNA delivery or not.
 4          Q.   Okay.  Would you know be willing to
 5   take the COVID-19 vaccine if it did not use the
 6   MRNA technology?
 7          A.   Based off of right now where I'm
 8   sitting today, unless there's something that I
 9   feel like would protect me better with the safety,
10   no.
11          Q.   Okay.  And why not?
12          A.   Because, again, this is, you know,
13   very early into the disease state where they're
14   actually continuing to, you know, put out a
15   vaccine that I don't believe has gotten the time
16   test stamp of approval from a standpoint of
17   efficacy and, of course, you know, the
18   tolerability of it.
19               MS. ENGELMAN:  Can we go to 29, please,
20          Celina, please.
21               (Exhibit 29 marked for identification.)
22   BY MS. ENGELMAN:
23          Q.   This is a document here -- excuse me,
24   a health summary of yours from, I think, your PCP
25   Thomas Lessaris, M.D.  Do you see that?
```



Page 265

1    When did your father become ill?

2           A.   Well, he passed in 2018.  And the last

3    six, seven years of his life was not very good.

4           Q.   Okay.  So why was it important for you

5    to get the flu vaccine because of your father's

6    illness?

7           A.   Because I didn't want to be

8    responsible for anything that I could actually

9    possibly hurt him any further with him dealing

10   with what he was dealing with.

11          Q.   Okay.  And so with respect to the flu

12   vaccine, did you do research to see if it used

13   MRNA technology or any technology --

14          A.   No.

15          Q.   Let me finish my question.

16               -- that could alter your DNA in any

17   way?

18          A.   No.

19          Q.   Okay.  And why is it that you didn't

20   believe that you needed to consult God for that

21   particular decision?

22          A.   Well, because first and foremost is

23   that I was trying to protect my father first and

24   foremost.  It was not a decision that I felt like

25   I needed to consult with my Lord and Savior on



Page 266

1    because I think that's what he would have wanted

2    me to do.

3           Q.    Sitting here today, do you have any

4    idea whether or not the flu vaccine -- well,

5    strike that.

6              I guess my -- so if you were to know

7    that the flu vaccine altered your DNA in some way,

8    would that have changed your decision to get the

9    flu vaccine in those three occasions?

10          A.    Yes.

11          Q.    Okay.  But you didn't bother to find

12   that out at the time?

13          A.    No.

14          Q.    Okay.  And so do you think that the

15   general healthcare providers generally advocate

16   that you get flu vaccines?

17          A.    I think they do obviously recommend it

18   to some degree, yes.

19          Q.    Okay.  So does getting the flu vaccine

20   then violate the principle of going against

21   worldly wisdom, so to speak?

22          A.    I don't understand the question.

23          Q.    So I think -- and I agree that wasn't

24   a good question.  Let me change and just ask.

25              So one of your -- so you agree with me



Page 267

```
 1    that flu vaccines are pretty commonplace?
 2         A.   Yes.
 3         Q.   And that generally --
 4         A.   I do.
 5         Q.   -- healthcare providers generally
 6    recommend that you get a flu vaccine every year.
 7    Do you agree with me?
 8         A.   Yes.  I think they do recommend it.
 9    Majority of them do recommend it.
10         Q.   Okay.
11         A.   Some more than others, yes.
12         Q.   Right.  And so we talked earlier about
13    your religious objection to the COVID-19 vaccine
14    and the principle that you stated.  The first
15    principle that you stated is that your body is a
16    temple; right?
17         A.   Yes.
18         Q.   And so you just testified I believe
19    now that you didn't consult God about whether or
20    not getting the flu vaccine would violate the
21    principle that your body is a temple; is that
22    right?
23         A.   For those flu shots in the three years
24    that you're asking me about, I do not recall
25    actually praying about it or actually seeking the
```



Page 268

1    Lord's guidance on that, no.

2          Q.    Do you believe that flu vaccines are

3    generally safe?

4          A.    To my knowledge, I believe they are.

5    I don't know how efficacious they are.

6          Q.    Okay.  And what's the basis for your

7    knowledge that flu vaccines are safe?

8          A.    The doctor that just -- that you're

9    showing right now that I was under his care told

10   me that it's the best vaccine.  It's only got such

11   a small amount of efficacy, on average maybe

12   30 percent of the time it will work for you.

13         Q.    Okay.  But despite the 30 percent

14   efficacy, you were willing to take the flu

15   vaccine?

16         A.    For those particular years I was,

17   correct.

18         Q.    And did you have any particular

19   conversations with this healthcare provider about

20   the COVID-19 vaccine?

21         A.    No.  He no longer treats me.

22         Q.    Did you have any conversations with

23   any healthcare provider about the COVID-19

24   vaccine?

25         A.    No.



Page 270

```
 1    vaccine that you received on these three
 2    occasions, so do you generally agree with me that
 3    the worldly view of the man is to get the flu
 4    vaccine?
 5           A.    No, not necessarily.  I don't know a
 6    lot of people that get the flu vaccine.  So I
 7    don't think that it's the worldly view.  Those are
 8    your words, not mine.
 9           Q.    Okay.  So moving on to the hepatitis B
10    vaccine that you got on 10/4/2015.  Do you see
11    that?
12           A.    Uh-huh.
13           Q.    Did you consult God about your
14    decision to get that vaccine?
15           A.    No.
16           Q.    And why not?
17           A.    Again, because my father's healthcare
18    situation, I was not going to actually have any
19    fact that I would actually give my dad something
20    that he was already dealing with a leg amputation
21    and with the amount of blood that I was surrounded
22    by caring for him.
23           Q.    Okay.  So were you -- what did your
24    father suffer from?
25           A.    He had diabetes.  He had his leg
```



Page 271

1    amputated and he had foot ulcers for several years

2    he dealt with.  So there was a lot of healthcare

3    people in and out and there was also myself that I

4    was providing care for him.

5         Q.   Okay.  And so is it your testimony

6    that you were willing to violate your religious

7    beliefs to care for your father?

8         A.   Again, I wasn't seeking medical

9    doctor -- God's opinion at this point in my life

10   on this particular topic.

11        Q.   Okay.  Well, I'm just trying to -- I'm

12   just trying to understand when you seek God's

13   guidance and when you decide not to seek God's

14   guidance because your religious exemption request

15   states that you seek it for every aspect of your

16   life.

17        A.   I strive to, yes.

18        Q.   Okay.  So why did you not strive to

19   seek God's guidance with respect to these

20   particular decisions?

21        A.   Because a walk with your Christian

22   faith can change.  It continues to evolve and you

23   continue to have beliefs that are deeper than what

24   you believe a year ago, two weeks ago, five months

25   ago.  So again from that standpoint I'm answering



Page 272

1    you honestly, I did not.

2         Q.   Okay.  So you also got the hepatitis B

3    adult vaccine twice in 2016.

4         A.   Yes.

5         Q.   Did you consult God about those

6    decisions?

7         A.   No.

8         Q.   Okay.  Do you have any idea sitting

9    here today whether or not the hepatitis B vaccine

10   has an ability to alter your makeup in some way?

11        A.   No, I do not.

12        Q.   Okay.  Do you have any idea sitting

13   here today whether or not the hepatitis B or the

14   flu vaccine uses aborted fetal cells in any way?

15        A.   No, I do not.

16        Q.   Okay.  Have you bothered to look at

17   that information since becoming aware that you got

18   these vaccines?

19        A.   I haven't gone back and looked at

20   that, no.

21        Q.   Why not?

22        A.   Because there's nothing I can do about

23   this at this point in time.  It's in me, it's

24   done.  If you notice that one of the things that

25   happened in that situation with hep B is that



Page 273

```
 1    there was a medical error where they gave me a
 2    pediatric and I had to go back.  I was upset about
 3    that.
 4          Q.   Okay.  Well, I just want to make sure
 5    I understand your religious belief.  So if it
 6    turns out that the flu vaccine, the hepatitis B,
 7    or the hepatitis B adult vaccine contains some
 8    sort of ability to alter your DNA or contained
 9    aborted fetal cells, my understanding is that
10    would currently violate your religious beliefs?
11          A.   Yes, it would currently violate that,
12    and that would be a discussion that I would have
13    with my Lord and Savior for forgiveness.
14          Q.   Okay.  So you would qualify that as a
15    sin; is that correct?
16          A.   Based on the scripture unknowingly,
17    yes.
18          Q.   Okay.  And so why is it not that you
19    were trying to find out whether or not you
20    actually sinned and whether you should repent for
21    those sins?
22          A.   Again, it comes down to where I was
23    with my walk with my Christian life.  In addition
24    to that, what I was doing with my father and
25    focusing on him.
```



Page 274

```
 1              Q.   I'm talking about today.  You've seen
 2     this document.  You've testified that you produced
 3     it to us.  You know that you got these vaccines
 4     and, yet, you haven't done any research to figure
 5     out whether or not these vaccines may have
 6     violated your religious beliefs such that you
 7     repent your sins to your Lord and Savior Jesus
 8     Christ?
 9              THE WITNESS:  No, I have not.
10              MR. DeMATTEO:  Objection.
11     BY MS. ENGELMAN:
12              Q.   You have not?
13              A.   No, I have not.
14              Q.   Okay.  What about the MMR vaccine, did
15     you consult God with respect to that vaccine?
16              A.   No.
17              Q.   Okay.  Why not?
18              A.   Again, I was doing what I felt like
19     was the most important thing was protecting my
20     father.
21              Q.   Okay.  Would it surprise you to learn
22     that the MMR vaccine uses aborted fetal cells in
23     its production and testing?
24              MR. DeMATTEO:  Objection.  Form.
25              THE WITNESS:  No.
```



Page 275

1    BY MS. ENGELMAN:

2         Q.    Okay.  And so now that you're aware of

3    that, do you intend to repent for your sin for

4    taking the MMR vaccine?

5         A.    Yes, I'll --

6              MR. DeMATTEO:  Objection.  Form.

7              THE WITNESS:  -- have a conversation

8         with my Lord and Savior.

9    BY MS. ENGELMAN:

10        Q.    Okay.  What about the PPD test?  You

11   received that on 2018, 2017, and 2015.  Did you

12   consult your Lord and Savior Jesus Christ with

13   respect to that decision?

14        A.    No.

15        Q.    Why not?

16        A.    Again because of the situation of

17   where I was and with my father's.

18        Q.    What about Tdap, you received that

19   vaccine in 2015.  Did you consult your Lord and

20   Savior Jesus Christ with respect to that decision?

21        A.    No.

22        Q.    And why not?

23        A.    Again, because of where I was with the

24   situation with my father.

25        Q.    Uh-huh.  You testified earlier that



Page 276

1    you're on ADHD medication; is that right?

2         A.    Yes.

3         Q.    What medication is that?

4         A.    Azstarys.

5         Q.    And how long have you been on that

6    medication?

7         A.    A year.

8         Q.    And so prior to ingesting that

9    medication, did you consult with God?

10        A.    No.

11        Q.    Why not?

12        A.    Because this is a known disease state

13   that I've had for quite sometime and that that's

14   the treatment regimen that I had decided on and,

15   again, believed that I was making the best

16   decision for me based off of what I know about the

17   medication.

18        Q.    Okay.  But, again, you testified

19   earlier that you essentially make all of your

20   decisions based on your relationship with God.  So

21   I'm trying to understand why --

22        A.    I've been on ADHD medication for

23   20 years.

24        Q.    Okay.

25        A.    I didn't think that I needed to



Page 277

1        actually have the conversation with my Lord and
2        Savior about continuing to take a medication that
3        I've been taking for 20 years.
4              Q.    Understood.  But it seems to be this
5        is a different medication that you got on a year
6        ago; is that right?
7              A.    I did change over to the medication;
8        correct.
9              Q.    Okay.  So wouldn't it have been
10       important to consult God with respect to that
11       particular medication since you're concerned about
12       potentially, you know, your body's a temple,
13       you're concerned about potentially altering your
14       DNA or your makeup in some way and you wanted to
15       make sure that God approved of that decision?
16             A.    Again, I didn't believe that was
17       something that I needed to consult at that point
18       in time.
19             Q.    Okay.  Do you have any idea sitting
20       here today whether or not the medication you're on
21       has the ability to alter your makeup in any way?
22             A.    I do not.
23             Q.    Okay.  Sitting here today, do you have
24       any idea whether or not that medication uses
25       aborted fetal cells?



Page 278

```
 1            A.    I do not.
 2            Q.    Okay.  What medication were you on
 3     prior to the one that you got on a year ago?
 4            A.    Vyvanse.
 5            Q.    And that's a medication that you
 6     promoted at Takeda?
 7            A.    Yes.
 8            Q.    Or oversaw the promotion of at Takeda.
 9     And sitting here today, do you have any idea where
10     Vyvanse has the ability to alter your makeup in
11     any way?
12            A.    No.
13            Q.    Do you have any idea whether Vyvanse
14     uses aborted fetal cells in any way?
15            A.    No.
16            Q.    Do you take any other medications?
17            A.    Besides supplements?
18            Q.    Correct.
19            A.    I take an Allegra D when needed for my
20     allergies.
21            Q.    Okay.  And do you have any idea
22     whether Allegra D contains aborted fetal cells?
23            A.    No.
24            Q.    Have you researched it?
25            A.    No.
```



Page 279

```
 1              Q.    Do you have any idea whether it has
 2      the ability to alter your makeup in any way?
 3              A.    No.
 4              Q.    Did you consult God before taking
 5      Allegra?
 6              A.    No.  I've been taking Allegra D for,
 7      again, a long period of time that I did not think
 8      it was something that I needed to have a
 9      conversation with him about.
10              Q.    Okay.  So do you only think that you
11      have to have conversations with God when it's a
12      new decision?
13              A.    Not necessarily.
14              Q.    Okay.  Again, I'm just trying to --
15      I'm trying to -- I'm really trying to understand
16      when it is that you consult with God and when you
17      don't.  Because I'm not understanding the
18      thinking.  It seems as though -- well, strike
19      that.
20                    Could you explain it to me because I'm
21      not understanding?
22              A.    I think that when you have a walk with
23      Christ that there are things that 20 years ago
24      that you might not have been actually walking in
25      that -- in the same level of where you are with
```



MAGNA ◗
LEGAL SERVICES

1    through the years, but currently that's all I'm

2    taking right now today.

3         Q.   And do you -- have you done any

4    research on any of those supplements to see if

5    they can alter your makeup and/or use aborted

6    fetal cells in any way?

7         A.   No.

8         Q.   Have you ever objected to any

9    recommended medication or other medical treatment

10   based on your religious beliefs other than the

11   COVID-19 vaccine?

12        A.   Right off the top of my head, no.

13        Q.   Have you ever smoked cigarettes?

14        A.   No.

15        Q.   Marijuana?

16        A.   In college.

17        Q.   Do you drink soda?

18        A.   I drink Ginger Ale occasionally.

19        Q.   Okay.  Does that violate your

20   religious beliefs that your body is a temple?

21        A.   No.

22        Q.   Why not?

23        A.   There's nothing that I've seen in the

24   scripture that says I can't drink Ginger Ale.

25        Q.   What have you seen in the scripture



Page 319

1          A.    I saw my body language, yes.  I would

2     say that, yes.

3          Q.    Okay.  Do you agree with what

4     Mr. Singleton was saying there with respect to the

5     blank pages?

6          A.    I think that this is exactly one of

7     the things that I've spoke about already.  You

8     know, in our conversation here is that, you know,

9     the fact that it was so speedy to be produced and

10    pushed out that there was, you know, again

11    information that most people should have access to

12    which gave me cause to even think about this

13    because of, again, the way it was produced and new

14    technology and all that.  That was something that

15    wasn't going to be supplied.  That's enough to

16    actually, yeah, I agree with that's alarming to

17    me.

18             MS. ENGELMAN:  Okay.  Celina, the next

19          clip, if you have it available.

20             (Video playing.)

21    BY MS. ENGELMAN:

22         Q.    Ms. Ramsey, did you hear Brian say

23    that we know that COVID -- very clearly that COVID

24    is a bioweapon?

25         A.    I heard him say that, yes.



Page 335

1    protocol that was put in place.

2          Q.   Is that something you were willing to

3    continue doing?

4          A.   Yes.  It was something I included in

5    my accommodation to work PPE and continue weekly

6    testing.

7          Q.   So you just said that you were willing

8    to continue testing.  So does that mean that you

9    didn't have a religious objection to testing

10   either?

11        A.   No.

12              MR. DeMATTEO:  I don't have anything

13        else.  Thank you.

14              MS. ENGELMAN:  Okay.  Nothing from me.

15              THE VIDEOGRAPHER:  Do you want to go

16        off the record?

17              MR. DeMATTEO:  Yes.

18              MS. ENGELMAN:  Yeah.

19              THE VIDEOGRAPHER:  Off the record,

20        5:43 p.m.

21              THE COURT REPORTER:  Counsel, do you

22        both want the transcript?

23              MR. DeMATTEO:  Yes, please.  PDF only.

24              MS. ENGELMAN:  Yes, please.

25          (Deposition concluded at 5:43 p.m.)



Page 336

1                    (Signature not reserved.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 337

```
 1    STATE OF NORTH CAROLINA )

                             )   CERTIFICATE OF TRANSCRIPT
 2    COUNTY OF UNION         )

 3               I, CHRISTINE A. TAYLOR, RPR, a Notary

 4    Public within and for the State of North Carolina,

 5    do hereby certify:

 6               That ALECIA RAMSEY, the witness whose

 7    deposition is hereinbefore set forth located in

 8    Iredell County, having produced satisfactory

 9    evidence of identification and having been first

10    duly sworn by me, according to the emergency video

11    notarization requirements contained in G.S.

12    10B-25, and that such deposition is a true record

13    of the testimony given by such witness.

14               I further certify that I am not

15    financially interested in the outcome of this

16    action, a relative, employee, attorney or counsel

17    of any of the parties, nor am I a relative or

18    employee of such attorney or counsel.

19               IN WITNESS WHEREOF, I have hereunto

20    set my hand this 14th day of November, 2023.

21

22    _____Christine A. Taylor_____

23               CHRISTINE A. TAYLOR

                 Registered Professional Reporter

24               Notary Public 19960530077

25
```



EXHIBIT

**11**

| | |
|---|---|
| **From:** | Ramsey, Alecia |
| **Sent:** | Monday, September 27, 2021 6:40 PM |
| **To:** | US ReligiousAccomm |
| **Cc:** | Ramsey, Alecia |
| **Subject:** | Religious COVID Vaccine Exemption |
| **Attachments:** | Alecia Ramsey Religious Accommodation Request Form.pdf; Vaccine Mandate Exemption.docx; Untitled; Terrell Member Document.docx |

To Whom it May Concern,

Please accept this for your review. I have attached 2 copies of a letter from my Pastor. One without his signature and his typed signature and the other copy includes his real signature for legal and binding purposes.

Sincerely,



**Alecia Ramsey**

Interim District Business Manager - Richmond

Regional Sales Trainer – Carolina's

Neuroscience Business Unit

Cell: 910.262.3992

alecia.ramsey@takeda.com



CONFIDENTIAL                                                                                 TAKEDA_018256



**Religious Accommodation Request Form**

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

**To be completed by employee**

Name: Alecia Ramsey                    Position: Regional Sales Trainer / Interim DBM

Date of request: 9/27/21

Business/Function: NSBU

Immediate supervisor: Rachel Rohrbach

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):

Vaccination exemptions / COVID 19 Vaccine Exemption

To continiue what I am currently doing - weekly COVID testing while in the field with field reps / HCP's

Frequency and duration of the accommodation requested: Permanent

Describe religious belief or practice that necessitates this request for accommodation:

As a Christian - I strongly oppose abortion , my body is a given vessel of the Holy Spirit and it is up to me to protect it, I must rely and trust on Him to care for me and not that of worldly wisdom, this request /vaccine is the Mark of the Beast especially it is required to earn a living. Please see my letter for more support.

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.

Please provide alternative accommodations that might address your needs:

1. _____

2. _____

3. _____

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: Alecia Ramsey                    Date: 9/27/21

Upon final determination the employee will receive a letter approving or denying the accommodation request.

To Whom It May Concern:

I respectively seek to provide this notice, and request that you recognize my First Amendment Constitutional Right to a Religious exemption from the COVID-19 vaccine. I am writing to formally request a religious exemption from our company's COVID-19 vaccine directive. I am providing reasons why this policy violates the fundamental aspects of my Christian faith – and why I cannot, therefore, in good conscience take part in it.

As a Christian, I am guided in everything I do by my faith in God and the Bible. These Scriptures below are just a few of many that have justified my religious convictions regarding my physical and spiritual health that I live by, including my sincere religious objection to receiving any of the COVID vaccines.

1.   **I believe I am given a vessel, my body, to provide a home for the Holy Spirit within me, and it is my privilege and responsibility to protect the physical integrity of that body.**

The Scriptures are very clear on this point:

"Know ye not know that you are the temple of God and *that* the Spirit of God dwells in you? If anyone defiles the temple of God, God will destroy him. For the temple of God is holy, which *temple* you are." (1 Cor. 3:16-17KJV)

"What? Know ye not know that your body is the temple of the Holy Ghost, which is in you, which ye have of God, and ye are not your own? For ye are bought with a price; therefore glorify God in your body and in your spirit, which are God's." (1 Cor. 6:19-20 KJV)

To take a vaccine that is unproven and still experimental appears to be a clear violation of this command. Furthermore, I alone under His direction should have the right to determine what is injected into this vessel of the Holy Spirit.

2.   **As a follower of Christ, I must trust Him to care for me rather than rely on worldly wisdom that is often flawed.**

*"It is* better to trust in the LORD
Than to put confidence in man.
*It is* better to trust in the LORD
Than to put confidence in princes." (Psalm 118:8-9 KJV)

"Let no one deceive himself. If any man among you seemeth to be wise in this world, let him become a fool that he may become wise.  For the wisdom of this world is foolishness with God."

(1 Cor. 3:18-19 KJV)

"Then Peter and the other apostles replied, "We must obey God rather than man."  (Acts 5:29 KJV)

3.  **As a Christian, I strongly oppose abortion and believe life begins at conception.**

The sanctity of life is precious to God and that it is morally wrong to destroy innocent human life. The experimental COVID-19 injections manufactured by Moderna and Pfizer both used aborted fetal tissue in the testing process, and those manufactured by AstraZeneca and Johnson & Johnson used aborted fetal tissue in every step of the process – development, production, and lab testing. It violates my Christian faith to be injected with a Vaccine that makers have used fetal cell lines in the development, confirmation, and production of vaccines. This is a clear violation of the Scriptures which proclaim:

"Thou shall not murder." (Exodus 20:13 KJV)

4.  **As a follower of Christ, I believe we are in the end times. The insistence from government that we mark our bodies with this vaccine could be what is called in Revelation "the mark of the Beast," especially since it is being required to earn a living or buy and sell in the marketplace.**

"And he had the *power* to give life unto the image of the beast, that the image of the beast should both speak and cause as many as would not worship the image of the beast should be killed. And he causeth all, both small and great, rich and poor, free and bond , to receive a mark on their right hand or on their foreheads, *and that no one may buy or sell except one who has the mark or the name of the beast,* or the number of his name." (Revelation 13:15-17KJV)

As I have prayed, the Holy Spirit has moved on my heart and conscience that I must not accept the COVID vaccine. While I at times I have failed my Lord in many ways, I also endeavor to follow Him to the best of my ability in everything the Bible teaches. If I were to go against the proclamation of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience. I want to thank you in advance for honoring my sincerely held religious convictions.

Sincerely,


Alecia Ramsey

9/25/2021

TAKEDA_018259



## EXPLANATION AND DOCUMENTATION OF
## RELIGIOUS BELIEFS IN THE CLERGY
## OF REV. CHAD WARNER

DATE: Sept 23, 2021

I am a Christian and ordained minister of Terrell Baptist church where The Ramsey Family are members. These tenants and doctrines are the foundation of the evangelical church.

As a Christian and an ordained minister, I believe that the Covid-19 vaccines violate God's will as revealed in the Bible. The Bible clearly teaches human beings are made in the image of God (Genesis 1:26-27) and thus human life is sacred. The Bible also teaches that human life begins at conception (Psalm 139:13-16).

Vaccines that use fetal cell lines in any part of the process of development, confirmation, and production of the vaccines I oppose. These vaccines are dependent upon the cells of murdered babies which I believe is forbidden by God.

We oppose the Covid-19 vaccines because they used fetal cell lines in a part of the process of development, confirmation, and/or production of the vaccines. These vaccines are dependent upon the cells of murdered babies which is forbidden by God.

Documentation: According to the Michigan Department of Health and Human Services, the Johnson & Johnson (Janssen) COVID-19 vaccine used a fetal cell line to produce and manufacture their vaccine. Pfizer and Moderna COVID-19 vaccine used a fetal cell line in a very early phase to confirm efficacy prior to production and manufacturing. We believe that any use of a fetal cell line violates God's will.

This is my sincerely held belief and that of my congregation that prevents taking and warrants an exemption from taking the vaccine as well as any other vaccination using fetal cell tissues in production.

Sincerely in Christ,

Rev. Chad Warner
Terrell Baptist Church

TAKEDA_018260

# COVID-19 VACCINES & FETAL CELLS



## DO COVID-19 VACCINES CONTAIN FETAL CELLS?

COVID-19 vaccines do not contain fetal cells. However, some COVID-19 vaccines use a historic fetal cell line in production and manufacturing.

- Johnson & Johnson (Janssen) COVID-19 vaccine **used a fetal cell line** to produce and manufacture their vaccine.
- Pfizer and Moderna COVID-19 vaccine **did not** use a fetal cell line to produce and manufacture their vaccine. However, a fetal cell line was used in a very early phase to confirm efficacy prior to production and manufacturing.

COVID-19 Vaccines **do not** contain fetal cells, even if a fetal cell line is used during any part of development.

## WHERE DO FETAL CELL LINES COME FROM?

Cells that make up the "cell lines" used for certain COVID-19 vaccine development came from two elective pregnancy terminations that occurred in the 1970s and 1980s:

- These same cells from the '70s and '80s continue to grow in a lab as a cell line.
- Fetal cell lines are used in other medical technologies – this process is not new.

## WHY ARE FETAL CELL LINES USED IN MAKING VACCINES?

Viruses that infect humans tend to grow better in cells from humans than animals. Historic cell lines can be used to grow the vaccine virus because:

- Fetal cells can divide many times and can be used longer than other cell types.
- They are stored at low temperatures, allowing a cell line to be used from decades ago.
- **Once the virus is grown, any cellular debris is removed. Vaccines do not contain fetal cells.**

*Source: https://www.michigan.gov/documents/coronavirus/COVID-19_Vaccines_and_Fetal_Cells_031921_720415_7.pdf*

TAKEDA_018261

Case 1:22-cv-11963-GAO     Document 52-1     Filed 08/12/24     Page 413 of 939

**From:** Ramsey, Alecia <alecia.ramsey@takeda.com>
**Sent:** Monday, September 27, 2021 6:27 PM
**To:** Ramsey, Alecia <alecia.ramsey@takeda.com>
**Subject:**

CONFIDENTIAL                                                                                          TAKEDA_018262



## Terrell
BAPTIST CHURCH

### EXPLANATION AND DOCUMENTATION OF
### RELIGIOUS BELIEFS IN THE CLERGY
### OF REV. CHAD WARNER

DATE: Sept 23, 2021

I am a Christian and ordained minister of Terrell Baptist church where The Ramsey Family are members. These tenants and doctrines are the foundation of the evangelical church.

As a Christian and an ordained minister, I believe that the Covid-19 vaccines violate God's will as revealed in the Bible. The Bible clearly teaches human beings are made in the image of God (Genesis 1:26-27) and thus human life is sacred. The Bible also teaches that human life begins at conception (Psalm 139:13-16).

Vaccines that use fetal cell lines in any part of the process of development, confirmation, and production of the vaccines I oppose. These vaccines are dependent upon the cells of murdered babies which I believe is forbidden by God.

We oppose the Covid-19 vaccines because they used fetal cell lines in a part of the process of development, confirmation, and/or production of the vaccines. These vaccines are dependent upon the cells of murdered babies which is forbidden by God.

Documentation: According to the Michigan Department of Health and Human Services, the Johnson & Johnson (Janssen) COVID-19 vaccine used a fetal cell line to produce and manufacture their vaccine. Pfizer and Moderna COVID-19 vaccine used a fetal cell line in a very early phase to confirm efficacy prior to production and manufacturing. We believe that any use of a fetal cell line violates God's will.

This is my sincerely held belief and that of my congregation that prevents taking and warrants an exemption from taking the vaccine as well as any other vaccination using fetal cell tissues in production.

Sincerely in Christ,

Rev. Chad Warner
Terrell Baptist Church

---

## COVID-19 VACCINES & FETAL CELLS



### DO COVID-19 VACCINES CONTAIN FETAL CELLS?
COVID-19 vaccines do not contain fetal cells. However, some COVID-19 vaccines use a historic fetal cell line in production and manufacturing.
- Johnson & Johnson (Janssen) COVID-19 vaccine **used a fetal cell line** to produce and manufacture their vaccine.
- Pfizer and Moderna COVID-19 vaccine **did not** use a fetal cell line to produce and manufacture their vaccine. However, a fetal cell line was used in a very early phase to confirm efficacy prior to production and manufacturing.

> COVID-19 vaccines **do not** contain fetal cells, even if a fetal cell line is used during any part of development.

### WHERE DO FETAL CELL LINES COME FROM?
Cells that make up the "cell lines" used for certain COVID-19 vaccine development came from two elective pregnancy terminations that occurred in the 1970s and 1980s.
- These same cells from the '70s and '80s continue to grow in a lab as a cell line.
- Fetal cell lines are used in other medical technologies – this process is not new.

### WHY ARE FETAL CELL LINES USED IN MAKING VACCINES?
Viruses that infect humans tend to grow better in cells from humans than animals. Historic cell lines can be used to grow the vaccine virus because:
- Fetal cells can divide many times and can be used longer than other cell types.
- They are stored at low temperatures, allowing a cell line to be used from decades ago.
- Once the virus is grown, any cellular debris is removed. Vaccines do not contain fetal cells.

*Source: https://www.michigan.gov/documents/coronavirus/COVID-19_Vaccines_and_Fetal_Cells_031921_720415_7.pdf*

CONFIDENTIAL

TAKEDA_018263

EXHIBIT

**12**



*Interactive Process Notes*

<u>**RELIGIOUS ACCOMMODATION**</u>

Employee Name: Ramsey, Alecia
Division: Neuroscience East
Position: Regional Sales Trainer
Field or Office based: Field Interim Business Management role
ER Representative(s): Forestier Irving
Date of Interview: October 5, 2021

Not being recorded and no consent to being recorded.

What position do you hold?
Regional Sales Trainer

Do you work in the field/lab or are you office based?
I work in the field.

Do you see clients in the field?
<mark>Yes. I see both pediatric and primary care customers in a face to face setting.</mark>

Approximately how many of your clients are you able to see now?
Right now, there's a lot of restricting in my district. HCPs are allowing only one person at a time, not a COVID thing it is just a policy they have of only one person at the time. <mark>Still, probably 60% of my customers I see face to face. Last week I was in front of probably 30 customers in 3 days in the field. It varies from area to area. But I am not held back from visiting offices. They have not asked for vaccine. I do less remote or virtual work.</mark>

Tell me more about your religious beliefs and religion or belief system generally.
Like I said in my letter, I am a Christian and as a Christian, I am guided in everything I do by my faith in God and the Bible. The Scriptures I cited are just a few of many that have justified my religious convictions regarding my physical and spiritual health that I live by, including my sincere religious objection to receiving any of the COVID vaccines.

Are you a member of any particular church or religious organization?
Yes, Terrell Baptist Church in North Carolina.



If so – What do your religion's leaders say about the vaccine?
We hold the believe that there is a reason he is challenging us to not challenge us. He has clearly stated he has not vaccinated his family has not vaccinated and he has clearly told us not to vaccinate.

Have your religious leaders specifically stated that you may not be vaccinated?
Yes.

How long have you subscribed to this belief system?
About 20 years as a Southern Baptist

Tell me more about how the company's policies/rules conflict with your beliefs.
Clearly in my letter I stated multiple reasons why I feel a conflict in the ways I practice my religion. My body is my vessel made and created by god. It is up to me to protect that. I rely in the wisdom provided in prayer this is not an easy decision because of my livelihood and of that I listen to god.

What is it specifically about this religious belief that prohibits you from being able to become vaccinated?

Vaccination being used was created from fetal cell line and I strongly opposed abortion and believe live begins at conception. Genesis is the foundation it all starts there. Adam and Eve, they are our creators, and I am a descendent of them. It is my responsibility to protect my DNA and my vessel that is my body.

*If applicable:*
Please tell me more about the fetal cells (or substitute specific concern i.e. vegan) and how that connects to your request?
Not asked, clearly stated in her documents.

Have you taken any other vaccines in your life?  (do not ask for specifics)
Yes, as a child. As a grown up, no. I do not engage currently, I don't even get a flu shot. I have not taken a vaccine since I went to college.

Have you ever taken and do you currently take any of the following products:
Tylenol, Ibuprofen, Pepto Bismol, Claritin, Sudafed, Tums
No, not recently. I could say I have taken some.

Are you aware that all of those products, (and probably the other vaccines that you have taken) were developed using fetal cells?
No, I am not very interesting.

If Takeda accommodates you, would you be willing to attest to the fact that you have not and will not take any of those vaccines or products?



Yes.

What is the accommodation that you are requesting?
Exempt form vaccination permanently. I am testing every week or twice a week we are wearing PPE.

Are there any alternative accommodations that might address your needs?
Testing 2 times a week.

You have chosen to work for a company that has manufactured and/or marketed a long list of pharmaceutical products for which there is a chance that, at some point, fetal cells were used in development.  How do you reconcile that with your stated position on taking the COVID vaccine?  Do you see this as consistent?

I can challenge myself. I worked in Neuroscience all my career. I came from the legacy shire side and they did things for which I continue to pray for forgiveness.

Besides vaccines, do your religious beliefs prevent you from being tested for COVID?
No.

*For body is a temple claim:*
Do you drink alcohol recreationally?
Occasionally and socially

Do you have tattoos or piercings?
No just earrings.

*If you found the same language used in request online*
I have reviewed your accommodation request, and I noticed that it is very similar to a few others we have receive and I see some of the language online.  Can you help me understand this?

Is there any additional information regarding your beliefs, observances or practices that support your request for a religious accommodation?
No.

Is there anything else we should know or consider as we review your request?

No.

# Exhibit F

                IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


LISA AMOSON, ROBB HUCK, TROBY )
LANE PARRISH, ALECIA RAMSEY,  )
LARRY HAROLD SAVAGE, JILLYN    )
SCHMIDT, SANDRA SALAZAR SILVA,)
BRITT HAROLD SINGLETON, SUSAN )
WELCH,                        )
                              )
            Plaintiffs,       )    CASE NO.
                              )
       vs.                    )    1:22-cv-11963-GAO
                              )
TAKEDA PHARMACEUTICALS U.S.A.,)
INC.,                         )
                              )
            Defendant.        )

                        - - -

        Remote Videotaped Videoconference Deposition
    of LARRY HAROLD SAVAGE, located in Acworth, Georgia
    taken on behalf of the Defendant, before Kimberly
    S. Bennett, RPR, CRR, CRC, Certified Court
    Reporter, on the 5th day of October 2023,
    commencing at the hour of 9:30 a.m. EST.
                        - - -


                 Magna Legal Services
                    866-624-6221
                   www.MagnaLS.com



Page 2

```
 1                INDEX TO EXAMINATIONS
 2  LARRY HAROLD SAVAGE                          PAGE
 3  Examination by Ms. Engelman................   5
 4  Examination by Mr. DeMatteo................ 277
 5
 6               DEFENDANT'S EXHIBITS
    EXHIBIT            DESCRIPTION               PAGE
 7    1     5/26/23 E-Mail, Savage 000007        118
 8    2     @KimDotcom Twitter Link, X-Files     120
            video
 9
      3     Résumé, Takeda 017953-955            126
10
      4     Signal Chat Excerpts                 168
11
      5     Plaintiff Larry Savage's             174
12          Supplemental Responses
13    6     Defendant's First Set of             176
            Interrogatories Directed to
14          Plaintiff Larry Harold Savage
15    7     9/10/21 E-Mail, Takeda 000021-22     217
16    8     9/21/21 E-Mail With Attachments,     219
            Takeda 017923-926
17
      9     E-Mail String, Takeda 017927-930     227
18
     10     E-Mail String, Takeda 017944-946     238
19
     11     Medical Records, Savage 000009-10,   247
20          99-101
21   12     Cover Letter and Medical Records,    249
            Savage Ford 0001-28
22
     13     Biogen Reporting & Principles        266
23
     14     Danaher Cell Culture                 267
24
     15     Seeking Justice Signal Chat          270
25
```



Page 3

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiffs:

 3        CHRISTOPHER DeMATTEO, ESQ.

 4        Pattis & Smith, LLC

 5        383 Orange Street

 6        New Haven, Connecticut 06511

 7        (203) 393-3017

 8        cdematteo@pattislaw.com

 9

10   On behalf of the Defendant:

11        KERI L. ENGELMAN, ESQ.

12        CELINA ANTONELLIS, ESQ.

13        Morgan, Lewis & Bockius LLP

14        One Federal Street

15        Boston, Massachusetts 02110

16        (617) 341-7700

17        keri.engelman@morganlewis.com

18        celina.antonellis@morganlewis.com

19

20   Videographer:

21        Jacob Smith

22

23   Also present:

24        Sonali Das, Esq., Takeda Pharmaceuticals U.S.A.

25
```



Page 4

```
 1                       -  -  -
 2          (Pursuant to Article 10.B of the Rules and
 3      Regulations of the Board of Court Reporting of the
 4      Judicial Council of Georgia, the court reporter
 5      disclosure statement is tendered at the end of the
 6      transcript.)
 7                       -  -  -
 8          COURT REPORTER:  Counsel, can you let me
 9      know your preference for ordering the transcript:
10      hard copy, electronic or some combination?
11              MR. DeMATTEO:  Just a PDF is fine.
12              MS. ENGELMAN:  Electronic works for me.
13                       -  -  -
14          VIDEOGRAPHER:  We are now on the record.
15      This begins video number 1 in the deposition of
16      Larry Savage in the matter of Lisa Amoson, Robb
17      Huck, Troby Lane Parrish v. Takeda Pharmaceuticals
18      U.S.A., Inc.
19              Today is October 5, 2023, and the time is
20      9:30 a.m.  Counsel and all parties present will be
21      noted on the stenographic record.  Will the court
22      reporter please swear in the witness.
23              COURT REPORTER:  Do all counsel agree to
24      the remote swearing of the witness?
25              MR. DeMATTEO:  Yes.
```



Page 5

```
 1              MS. ENGELMAN:  Yes.
 2              LARRY HAROLD SAVAGE,
 3   having been first duly sworn remotely, was examined and
 4   testified as follows:
 5                     EXAMINATION
 6   BY MS. ENGELMAN:
 7        Q    Good morning, Mr. Savage.
 8        A    Morning.
 9        Q    My name is Keri Engelman and I represent
10   Takeda in this action.  How are you doing this morning?
11        A    Doing good.  How are you?
12        Q    Good.  Thank you.  So today the purpose of the
13   deposition is for me to ask you questions about the
14   lawsuit that you initiated against Takeda.  Do you
15   understand that?
16        A    Yes.
17        Q    And have you ever been deposed before,
18   Mr. Savage?
19        A    I have not.
20        Q    Okay.  So I'm just going to go over a couple
21   preliminary rules for the deposition at the outset.  So,
22   first of all, you just took an oath subject to the
23   penalty of perjury.  Do you understand that?
24        A    Yes.
25        Q    Okay.  And so obviously we're in a remote
```



Page 22

```
 1      A    I believe it was before we filed our religious

 2 accommodation request.

 3      Q    Okay.  Did you speak at all about your

 4 preparation for filing your accommodation requests?

 5      A    No.  No.

 6      Q    Okay.  And then did you have any subsequent

 7 conversations with Britt after that while you were

 8 employed by Takeda?

 9      A    Yeah.  I think I knew through Britt -- we

10 spoke about the process where you had a one-on-one call

11 with a HR representative.

12      Q    Okay.  And when was that conversation?

13      A    I don't recall the exact date.

14      Q    Okay.  And what did you speak about in terms

15 of that process?

16      A    He had gone through it.  We had both submitted

17 our exemption requests and then the next step was to

18 schedule the one-on-one calls.

19           And he and I spoke about are you going to do

20 the one-on-one call.  I expressed to him that I was not

21 going to do it.  He decided to go forward and have the

22 one-on-one call.

23      Q    And did you explain to him -- well, strike

24 that.

25           Why is it that you decided not to go through
```



Page 23

1   with the one-on-one call?

2       A    I felt like it was designed to kind of harass,

3   harass us on our religious beliefs to kind of, quote,

4   cross-examine us.

5            I had expressed to my HR representative that I

6   felt uncomfortable with the fact that there was no

7   oversight to it.  It was a one-on-one call with and

8   essentially they would just take notes, and those notes

9   would be Takeda's record of that conversation.

10      Q    How were you aware that it would be a

11  one-on-one call and they would take notes and that would

12  be the record?  How did you come to --

13      A    My HR representative told me.

14      Q    Okay.  And so did you speak to anybody about

15  your -- other than Britt -- about your decision not to

16  participate in the one-on-one call?

17      A    Natalie Bland.

18      Q    Okay.  And what was the conversation with

19  Natalie Bland?

20      A    Very similar to Britt's.  Just that I believe

21  both of them went forward with having that interview,

22  and I had chosen to not.  And I expressed to them why I

23  felt like it was harassing at that point.  It wasn't --

24  I didn't think the process was on the up-and-up.  That

25  was my opinion.  But they wanted to move forward.



Page 52

1    kind of documentation with you.

2        Q    What is your date of birth?

3        A    January 31, 1986.

4        Q    And what's your current address?

5        A    5234 Dewberry Road Northwest, Acworth, Georgia

6    30101.

7        Q    Okay.  And how long have you lived there?

8        A    We moved here in June or July of 2022.

9        Q    And where did you live before that?

10       A    1602 Fernstone Drive Northwest, Acworth,

11   Georgia 30101.

12       Q    And how long did you live at that address?

13       A    We bought the house in 2016.  So almost six

14   years.

15       Q    Okay.  And have you ever gone by any other

16   names?

17       A    No.

18       Q    And where were you born?

19       A    I'm sorry.  What?

20       Q    Where were you born?

21       A    Fort Lauderdale, Florida.

22       Q    When did you move to Georgia?

23       A    I was 5.  1991.

24       Q    And so I think you've stated here today that

25   you are a Christian; is that correct?



Page 53

```
 1        A    Yes.

 2        Q    And how long have you been Christian?

 3        A    I was raised Christian.  My dad's a pastor.

 4        Q    And were you raised in any specific

 5   denomination?

 6        A    My dad's a pastor for the Church of Christ,

 7   which is -- they would consider themselves

 8   nondenominational Christian.

 9        Q    Do you consider them a nondenominational

10   Christian?

11        A    Yeah.  I mean, they, just like any Christian,

12   they kind of have their specific, you know, theological

13   beliefs that make them a little bit different from the

14   next Christian church.

15        Q    And did you go to the Church of Christ as a

16   child?  Did you attend?

17        A    I did.  Yeah.

18        Q    Okay.  And did you attend any sort of

19   Christian school?

20        A    I went to a Christian -- a Southern Baptist

21   Christian college on scholarship.  I played basketball.

22        Q    And what's the name of that college?

23        A    It's now called Shorter University, but it was

24   called Shorter College at the time I was there.  It's in

25   Rome, Georgia.
```



Page 59

1    Q    All right.  Is there any other differences

2  between the Church of Christ and other Christian

3  denominations besides the baptism issue?

4    A    Not doctrinally.  My parents church, the

5  Church of Christ, they don't use musical instruments in

6  worship, which isn't really a big deal.  That's more of

7  a preference of worship than what you might call a

8  salvation issue.

9    Q    Anything else?

10    A    No.

11    Q    Okay.  So you have this sort of I guess

12  disagreement with the Church of Christ with respect to

13  baptism when you were 24 and 25, right, around that

14  time?

15    A    Mm-hmm.

16    Q    Okay.  And then so then what happens to your

17  sort of religious beliefs?

18    A    Yeah.  So I moved out of the house 24, 25 and

19  definitely was going through a tough time.  And I've

20  always said that I became a Christian shortly

21  thereafter.

22         I recognized in that time that -- I had always

23  believed there was a God.  I just hadn't really

24  committed my life to him.

25         And so I became a Christian around 25, 26.  So



Page 60

1    I was baptized at 14.  I would say I really became a

2    Christian in that 25, 26 shortly after that incident

3    occurred.

4        Q    Okay.  So what year was this?  What year are

5    you 25, 26?

6        A    Let's see.  I'm going to be thirty -- it would

7    have been 2011, 2012.

8        Q    Okay.  And so you testified that you grew up

9    going to the Church of Christ, your dad's a pastor, you

10   were baptized.  Why is it that you say you didn't become

11   a Christian until you were 25?

12       A    Yeah.  So my belief is that it's faith that

13   saves you and not an acknowledgment that there is a God.

14   I think when you're a kid and you grow up in a church

15   you kind of grow up with the acknowledgment that there's

16   a creator and there's a God, but at some point you have

17   to recognize that the real malady of the human condition

18   is sin and that in order to be forgiven of your sins you

19   need a savior.

20            And so it becomes more of a what is the --

21   what's going to be the driving force in your life.  Is

22   it going to be, you know, yourself or is it going to be

23   Christ?  Is it going to be God?

24            And I really -- I had grown up as a child

25   understanding Christianity.  So I had always been going



Page 61

1    to a church and always been a good person.

2            So regular church attendance I would say

3    doesn't necessarily make you a Christian.  Just means

4    you go to church a lot.

5            So for me I became a Christian when I was 25

6    or 26.  And that was when I really committed my life to

7    Christ.

8        Q    Okay.  When you say you committed your life to

9    Christ, what does that mean?

10       A    I'd say I no longer -- you begin to live your

11   life completely for him, you know, as much as you

12   possibly can versus doing whatever you want and saying

13   there's a God, which is kind of what I had done before

14   that.

15       Q    So when you live your life completely for

16   Christ, again what does that mean?  Does that mean every

17   decision is one that you make for Christ?

18       A    As best you can.  You realize that you are

19   here a reflection of him and that you should try to be

20   that in the relationships that you have, in the job that

21   you do, and you do everything for his glory, not for

22   your own glory.

23       Q    And so how is it that you came to this

24   realization at 25 and 26, age of 25, 26?

25       A    Yeah.  I think I realized that I was pretty



Page 69

```
 1              In particular in the case of the COVID
 2    vaccines it was a particular cell line, HEK 293 I think.
 3         Q    Okay.  So are you -- when you say
 4    "confirmation," do you mean testing essentially?
 5         A    Yeah.  Yeah.  Absolutely.
 6         Q    Okay.  Any other religious basis for your
 7    objection to receiving the COVID-19 vaccine?
 8         A    Yeah.  I mean, for me the body is a temple of
 9    the Holy Spirit.  And so, you know, the Bible teaches
10    that when you're in Christ you're a body of Christ and
11    your body is not your own, you know, that you're to
12    honor God with your body.
13              And I felt like, you know, coerced medical
14    treatment, certainly coerced medical treatment with an
15    aborted fetal cell line would not be honoring to God
16    with my body.
17         Q    Okay.  You said that the Christian church is
18    against murder; is that right?
19         A    Yes.
20         Q    Do you believe in the death penalty?
21         A    I personally don't, no.
22         Q    Okay.  Do you know if there's a religious --
23    do you have any religious objection to the death
24    penalty?
25         A    Well, I mean, other than the fact that, I
```



Page 70

1    mean, every life we want to be redeemed in Christ, so we

2    don't want to execute people in their sin.  That's a

3    death sentence worse than the actual death sentence from

4    an eternal standpoint.

5        Q    Have you ever voted for a political official

6    who believes in the death penalty?

7        A    I may have.  But I didn't vote for them based

8    on that particular opinion or policy.

9        Q    So when you say you have an objection based on

10   your body is a temple, are you equating that to the fact

11   that it was coerced as you said, that's the basis for

12   your objection?

13       A    Well, I felt like it was coerced.  And I feel

14   like it was also coerced in something that had benefited

15   from aborted fetal cells.  So I would say both, and.

16       Q    So what is your understanding of how the

17   Moderna vaccine uses aborted fetal cells?

18       A    My understanding is that all three of the

19   vaccines used them either in confirmation, so testing,

20   or in production.  I can't recall at this point which

21   one used it in production and which one was only

22   confirmation.  I would have known that at the time of

23   all that.

24       Q    Okay.  And how would you have known that?

25       A    Just through research.  It kind of became a



Page 74

1       A     I would have had an objection if I had known

2    it had been -- it had benefited from the use of aborted

3    fetal cells.

4       Q     So when would you say that your religious

5    objection to the use of aborted fetal cells began?

6       A     It began in the spring or summer of 2021 when

7    I learned that the COVID vaccine had benefited from

8    that.

9       Q     So again prior to that you had no religious

10   objection to the use of aborted fetal cells.  Has your

11   view of the use of aborted fetal cells changed over

12   time?

13      A     No, it has not.  My view would have been the

14   same.  My awareness of that being a topic was -- I did

15   not have that awareness on it.  I didn't realize so many

16   products used -- I didn't know what the HEK cell line

17   was, where it came from, that it had been used.  So it

18   was a topic I was unaware of.  I was aware of abortion.

19   Unaware of aborted fetal cells in medications.

20      Q     Okay.  So prior to 2021 what was your view of

21   abortion?

22      A     I'm against abortion.  I hope that no child

23   would be aborted.

24      Q     And so prior to '21, 2021 is it fair to say

25   that you would have been against the use of fetal cells



Page 75

1    in any vaccine or product had you been aware of it?

2        A    That's right.

3        Q    Okay.  Would you agree that your objection to

4    abortion is a strongly held religious belief?

5        A    Would I agree with that?

6        Q    Mm-hmm.

7        A    Yes.

8                MS. ENGELMAN:  Can we take a quick break,

9        maybe five minutes.

10               VIDEOGRAPHER:  The time is 10:58 and we

11       are off the record.

12               (A recess was taken from 10:58 to 11:06

13       a.m.)

14               VIDEOGRAPHER:  The time is 11:06 a.m. and

15       we are back on the record.

16       Q    (By Ms. Engelman) Mr. Savage, you mentioned

17   that you're married, correct?

18       A    Yes.

19       Q    And who is your -- who are you married to?

20       A    Her name is Andrea, maiden name was Knouff.

21       Q    And how long have you been married?

22       A    Ten years.

23       Q    And have you ever had any other marriages?

24       A    No.

25       Q    Okay.  And where does Andrea work?



Page 79

```
 1      Q    Do you make the healthcare decisions for your
 2  daughter?
 3      A    I participate in the discussions around those.
 4  I don't make all of them myself personally.
 5      Q    Who does?
 6      A    (No response.)
 7      Q    Who does?
 8      A    Oh, I'm sorry.  My wife and I.
 9      Q    So your wife and you together make your
10  daughter's healthcare decisions?
11      A    Yes.
12      Q    Okay.  Has your child ever received any
13  vaccines?
14      A    She has.
15      Q    And which are those?
16      A    There's a number of them.  I can get her
17  schedule.  She's had everything up until -- her last
18  vaccination was in March of 2021.
19      Q    And do you know what vaccine that was?
20      A    I don't recall that exact one.
21      Q    And did you before she received that
22  vaccine -- strike that.
23           Were you aware that she was receiving the
24  vaccine in March of 2021?
25      A    Yes.
```



Page 80

```
 1      Q    Okay.  And did you do any research to see if
 2  that vaccine contained aborted fetal cells?
 3      A    I did not.
 4      Q    Have you ever done research on any vaccines
 5  that your child has received as to whether or not they
 6  contained aborted fetal cells?
 7      A    I have not.
 8      Q    Okay.  Have you made any religious objection
 9  to any recommendation by your child's health care
10  provider for your child to receive a vaccine?
11      A    She hasn't been upgrading vaccines since March
12  of 2021.  We certainly moving forward would do that.  So
13  that's in our future for sure.
14      Q    Okay.  But prior to today essentially you
15  never made any religious objection to any vaccine that
16  your child has received?
17      A    Correct.
18      Q    Okay.  What about medications.  Has your child
19  received any prescribed medications in her life?
20      A    She has.
21      Q    What medications are those?
22      A    Basic antibiotics for ear infection, cold,
23  things like that.
24      Q    Okay.  What about nonprescription medications,
25  has she ingested any in her lifetime?
```



Page 81

1       A    Yes.

2       Q    And what medications are those?

3       A    She's had children's Tylenol.  She's had,

4    like, a -- oh, goodness.  Like cold and flu, the Mucinex

5    like cold and flu congestion one.

6       Q    And have you ever done any research on whether

7    any of the medications your daughter has taken,

8    prescription or otherwise, to see whether or not they

9    used aborted fetal cells?

10      A    I'm aware that a lot of the over-the-counter

11   painkiller medications do, have also benefited from use

12   of aborted fetal cells.

13      Q    And when did you become aware of that?

14      A    Around the time that I was going through the

15   kind of revelation on the COVID-19 vaccine.

16      Q    So when was that again?

17      A    Spring, summer of 2021.

18      Q    Okay.  And so since the spring and summer of

19   2021 have you researched all of the medications that

20   your daughter has received to see if they contain

21   aborted fetal cells?

22      A    I've not researched all of them, no.

23      Q    What ones have you researched?

24      A    I'm aware that Tylenol is one that has

25   benefited from aborted fetal cells.



Page 82

```
 1        Q     Okay.

 2        A     Sorry.

 3        Q     And so when did you research specifically

 4  Tylenol?

 5        A     Around the time spring and summer of 2021.

 6        Q     And has your daughter ingested Tylenol since

 7  that time?

 8        A     She has.

 9        Q     And why have you not objected to her receiving

10  Tylenol?

11        A     I do object.  There's not a good way to lower

12  a child's high fever without one of those products.

13  I've yet to be able to find a pain reliever that hasn't

14  benefited from it.

15        Q     Hasn't benefited from what?

16        A     Use of aborted fetal cells.

17        Q     Have you talked to your child's healthcare

18  provider about that?

19        A     I haven't.

20        Q     Okay.  Why not?

21        A     I don't know.  I haven't reached out to ask

22  that question.

23        Q     Has your wife reached out to ask that

24  question?

25        A     Not that I know of.
```



Page 83

1    Q    What other painkillers did you research to see
2  if you could replace Tylenol?
3    A    I know that the active ingredient in Aleve, as
4  well as ibuprofen, I believe its separate, Tylenol.  All
5  three of the main ones are all in the same situation
6  with the aborted fetal cell lines.
7    Q    Prior to the spring of 2021 had you ever
8  researched or otherwise asked your child's healthcare
9  provider about any of the medications that she had been
10  receiving?
11    A    No.
12    Q    Did your wife?
13    A    No.
14    Q    So is it fair to say that you made the
15  decision that it was important enough to lower your
16  child's fever to ingest a medication that had aborted
17  fetal cells?
18              MR. DeMATTEO:  Objection.  Form of the
19       question.
20    Q    (By Ms. Engelman) You may answer if you
21  understand.
22    A    I feel like I had to do that.
23    Q    And why do you feel like you had to do that?
24    A    Because I felt like it would put her at
25  long-term risk if I didn't intervene with such a



Page 85

1    based on my research.

2         Q    Okay.  And again what research is that?

3         A    Lists of other household items or medications

4    that regularly use -- that also use HEK cell lines.

5         Q    Where did you find this research?

6         A    On the Internet.

7         Q    Do you know what specific sites?

8         A    Not offhand.

9         Q    Okay.  Did you look at your Google history to

10   see what research you had done on the COVID-19 vaccines

11   or the use of the aborted fetal cells generally?

12        A    I did not look at my history.

13        Q    Why not?

14        A    I didn't think it would be relevant or --

15        Q    Okay.

16        A    -- think it needed to be kept, you know, kept.

17        Q    Okay.  Have you taken any Tylenol since the

18   spring of 2021?

19        A    I have one time, yes.

20        Q    And when was that?

21        A    Summer of 2022.

22        Q    For what reason?

23        A    An extremely bad fever.

24        Q    Would you say it violated your religious

25   beliefs to take the Tylenol at that time?



Page 86

```
 1        A     Yes.  I only did it 'cause I felt like I had
 2   to do it.
 3        Q     Okay.  And why did you feel like you had to do
 4   it?
 5        A     I had an extremely bad fever and I thought my
 6   brain might boil if I didn't lower my fever.
 7        Q     Okay.  Did you go to the doctor in connection
 8   with that fever?
 9        A     I did not.
10        Q     Why not?
11        A     It was --
12        Q     You thought your brain would boil.
13        A     I'm sorry.  What?
14        Q     You thought your brain would boil, but you
15   didn't feel the need to go to the doctor?
16        A     That's how it felt.  I mean, it was a normal
17   fever that was just extremely high and extremely
18   painful.
19              We were on vacation at the time out of town.
20   And I made the sacrifice to take an NSAID to lower my
21   fever, and I was kind of over it 48 hours later.
22        Q     Okay.  And so how high was your fever?
23        A     It was in the 103, 104 marker.
24        Q     And did you call your healthcare provider
25   about this fever?
```



Page 87

1        A    I did not.

2        Q    Okay.  You didn't think to inquire with your

3   healthcare provider whether or not there was an

4   alternative medication that you could take that didn't

5   contain aborted fetal cells?

6        A    No.

7             MR. DeMATTEO:  Objection to form of the

8        question.  You can answer.

9        Q    (By Ms. Engelman) You can answer.

10       A    Yeah.  No.  I did not think to wake him or to

11  reach out.  It was kind of middle of the night type of

12  situation.

13       Q    And who is your healthcare provider?

14       A    I haven't seen a primary care doctor for a

15  number of years, so I don't really have one.

16       Q    Okay.  So when you say "them" you're not

17  talking about anyone in particular?

18       A    Like a urgent care type of situation would be

19  what I would have used for a situation like that if I

20  had to.

21       Q    Did you contact your pastor about your

22  decision to take Tylenol containing aborted fetal cells?

23       A    I did not.

24       Q    Why not?

25       A    'Cause, I mean, ultimately I knew -- I mean,



Page 88

1    it was my decision ultimately.  It's my responsibility.

2    I'm the one who will bear the responsibility of my

3    decisions, not my pastor.  So it didn't seem relevant to

4    wake him in the middle of the night about it either.

5             And in the Christian faith that I'm in, we

6    don't really do, like, confession like Catholics do

7    where you go in front and proactively confess your sins

8    or mistakes that you made to your pastor.  It's not...

9        Q    Okay.  Outside of a confession, just having a

10   conversation about whether or not you should make that

11   decision, you didn't consult your pastor in any way?

12       A    No.  I did not consult my pastor about using

13   the NSAIDs that day.

14       Q    Okay.  Have you talked to him since about your

15   decision to use the NSAIDs that day?

16       A    Not that I recall.

17       Q    Why not?

18       A    I don't know.  I guess either he'd be

19   disappointed or he would think it was silly that I even

20   brought it up.

21       Q    Why would he think it was silly?

22       A    He may not be aware that fetal cells are used

23   in those types of products.  I don't know.

24       Q    Okay.  Have you ever had a conversation with

25   your pastor about the use of fetal cells in any type of



Page 91

1        A     I said, Hey, I don't know if you know this,

2    there's aborted fetal cells that are used in the

3    confirmation of this product and possibly the production

4    of it.  And I said, I'm going to, you know, file this

5    religious exemption request and I need your support as

6    far as a letter goes.  And he said, Hey, I didn't know

7    that that was -- that was an issue.  And but he said,

8    I'll support you.

9             So he didn't -- previous to me telling him

10   about the use of aborted fetal cells, he wasn't aware

11   that that had been used in the vaccines.

12       Q     Do you know whether or not he was vaccinated

13   against COVID-19?

14       A     I don't believe he is.

15       Q     Did you ask him?

16       A     No.  His wife expressed to Andrea and I both

17   that after doing my letter he decided not to get it for

18   the same reason.

19       Q     Okay.  Did he tell you that the use of aborted

20   fetal cells violated the Christian faith?

21       A     He didn't tell me that.  He agreed with my

22   stance on it.  He didn't prompt that I guess.

23       Q     And does the church that you attend have any

24   official position on the COVID-19 vaccine?

25       A     They don't.



Page 92

```
 1        Q    Okay.  And do you know why that is?

 2        A    Probably because it's a -- or at the time it

 3   was an extremely heated issue and would have caused

 4   unnecessary division within the church 'cause a lot of

 5   people were very afraid of COVID and were getting the

 6   vaccine and had gotten it right out of the gate before a

 7   lot of things had come out about it.

 8        Q    And you're talking about members of your

 9   congregation or members of your church had gotten the

10   COVID-19 vaccine?

11        A    Yes.

12        Q    Okay.  And do you know specifically who those

13   people are?

14        A    I know who some of them are.

15        Q    And who are they?

16        A    Some of them are members of my wife and I's

17   small group.  I don't know of anyone in church

18   leadership that got it.  But I haven't asked everyone's

19   vaccination status either.  So...

20        Q    So who are the members of the small group

21   that -- what are their names?

22        A    I know that my friend Dan Smith and his wife

23   Kelly got it.  I know that Michael Wostbrock and Karie

24   Wostbrock, members of our small group, also got it.  I

25   don't know of anyone else offhand for sure that got it
```



Page 93

1    that I can say for sure.

2       Q    Okay.  And do they share your religious

3    beliefs?

4       A    My religious beliefs about abortion or about

5    using aborted fetal cells in --

6       Q    Well, I guess -- strike that.

7            Generally speaking.  Generally speaking do

8    they share your religious beliefs?

9       A    They do.  Generally speaking.

10      Q    And do they share your religious beliefs about

11   aborted fetal cells?

12      A    Not that I'm aware.

13      Q    Okay.  And did you ever ask them?

14      A    I didn't go out of my way to ask them.

15      Q    Okay.  Is your religious belief about aborted

16   fetal cells, is that your personal belief or is that a

17   belief that is grounded in the church that you attend?

18      A    I think that it's not a church policy that's

19   listed on the website, but I think that every Christian

20   that I know would think abortion is a bad thing on the

21   whole.

22           Some people I know got the vaccine right away.

23   I didn't -- I didn't want to make them feel guilty about

24   it for my own personal conviction reasons.  I didn't see

25   the reason for someone who had already decided to make



Page 94

1    that decision to say, hey, don't you know that it has

2    benefited from this and you're against abortion, how

3    could you do that.  I chose not to do that.

4         So some discussions I didn't have with those

5    folks that had already decided to make that choice.

6    Q    Okay.  Have you had any discussions with

7    anyone in your church about the COVID-19 vaccine?

8    A    You mean like in general about, like, did you

9    get the vaccine, did you not get it, or how do you feel

10   about it, those types of things?

11   Q    Any conversations.

12   A    Yes, I've had conversations.

13   Q    And what conversations -- who have you had

14   those conversations with?

15   A    I've had conversations with the group of

16   friends that I mentioned before.  Andy Woodward, Philip

17   Greene, Ethan Burquist, obviously Pastor Matt who's

18   another pastor of the church, and then Tom, Pastor Tom.

19   Q    So let's start with Philip.  What was your

20   conversation with Philip?

21   A    Yeah.  So Philip's a close friend.  We do

22   breakfast every, you know, once in a while and, I mean,

23   as a group.  And generally speaking my conversation with

24   Philip around it is, hey, my company has mandated this,

25   this is why I don't want to take it, here's why my



1    guess Tom had shared with him what I was going through,

2    and he had just reached out to offer me support and all

3    that.

4         So he also agreed with my stance on it and had

5    been, you know, said, Hey, I'll be praying for you as

6    you go through it.  But I haven't talked much to Matt

7    about it since it was denied and I was let go.  So he

8    knew I had been let go.  That was about it.

9    Q    Okay.  And so when you say Matt agreed with

10   your stance on it, what do you mean by that?

11   A    The basis of my objection, the fetal cell line

12   and all that.

13   Q    Did he say anything about the church's view on

14   the use of fetal cell lines?

15   A    No.  He doesn't really speak for the church as

16   a pastor.  He doesn't -- you know, speak for himself.

17   But, I mean, his personal interpretation as a pastor was

18   in agreement with mine.

19   Q    Okay.  So he wasn't speaking on behalf of the

20   church?

21   A    No.

22   Q    Was Tom speaking on behalf of the church?

23   A    I wouldn't interpret it that way.

24   Q    He was speaking based on his personal beliefs?

25   A    Yeah.  I think he was -- he read my exemption



Page 98

1    letter and agreed with the content of it and, you know,

2    was willing to do, you know, do a letter for me in

3    support.  So...

4        Q    Okay.  So you wouldn't say his letter in

5    support reflected the views of the church to which

6    you --

7        A    I would say that Tom wouldn't take my stance

8    and his agreement with it and make it into a church

9    issue.  That would be controversial.  He probably

10   wouldn't take that path.

11       Q    And again, why would it be controversial?

12       A    Because a lot of people had already gotten the

13   vaccine.

14       Q    Going back to your decision to take Tylenol.

15   So you didn't reach out to Tom or Matt, either of your

16   pastors, to talk about that decision?

17       A    I didn't.

18       Q    Before or after?

19       A    No.

20       Q    Okay.  And I think you testified earlier that

21   you would sort of have to live with the repercussions of

22   that decision; is that right?

23       A    Yeah.  I think the guilt of it or the

24   dissatisfaction with having to make that compromise in

25   that moment.



Page 99

```
 1       Q    Okay.  Any other repercussions that you can
 2  think of that happened as a result of your decision to
 3  take Tylenol?
 4       A    No.
 5       Q    Okay.  And have you taken Aleve since 2021?
 6       A    I have not.
 7       Q    Ibuprofen?
 8       A    I have not.
 9       Q    Any other painkillers?
10       A    No.
11       Q    Have you taken any other medications since
12  2021?
13       A    I have not, no.
14       Q    And prior to 2021 did you ever take Tylenol?
15       A    Yes.
16       Q    Did you ever take any other painkillers?
17       A    Advil.
18       Q    Any others?
19       A    No.  Mostly Advil was my go-to painkiller
20  before all this.
21       Q    And what about prescription medications?
22       A    None that I can recall.  I haven't had a lot
23  of health issues, luckily.
24       Q    And at that point in time when you were taking
25  Advil and Tylenol had you researched or done any
```



Page 100

1  research about whether or not those medications might

2  contain fetal aborted cells?  Aborted fetal cells.

3  Excuse me.

4      A    I had not.

5      Q    And never talked to any healthcare provider

6  about it?

7      A    Huh-uh.

8      Q    Is your daughter vaccinated against COVID-19?

9      A    She's not.

10      Q    Have you ever had COVID?

11      A    Not that I know of.

12      Q    Has anyone in your family?

13      A    Not that we know of.

14      Q    Have you ever taken a test?

15      A    Yes.  I took many tests.

16      Q    And they never came back positive?

17      A    Never.

18      Q    Okay.  Your parents.  Your father, is he

19  vaccinated against COVID-19?

20      A    He's not.

21      Q    Is your mother?

22      A    No.

23      Q    Do you have siblings?

24      A    My sister.

25      Q    And what's your sister's name?



Page 129

1   called Xiidra.

2           It was announced that Takeda was going to buy

3   Shire.  And it was obvious from the medical -- or from

4   journals that they had no interest in the eye care

5   division within Takeda.  That wasn't going to be one of

6   their core businesses.  So I knew that they were going

7   to sell Xiidra off.  It was the only product and they

8   were going to sell it to a eye care company.

9           I had a friend that had moved from the Xiidra

10  Shire sales force into Alpha 1 in the immunology

11  division within Takeda -- or within Shire.  And she

12  called and said, hey, if you're about to get fired, you

13  should come interview for this position that's open in

14  Atlanta.

15          And I did.  I got the job.  Started in

16  October, November 2018.  And I did that up until I was

17  terminated November 2nd of 2021.

18      Q    Okay.  So, sorry, what did you do for Freedom

19  Meditech?

20      A    I sold a novel diagnostic that was scanning

21  the crystalline lens of the eye for the earliest signs

22  of type II diabetes.

23      Q    Okay.  And so is it fair to say your first job

24  Alcon -- well, after Architectural Signing -- Alcon and

25  Sauflon you were selling eye care products; is that



Page 130

1    right?

2        A    Yes.  Contact lenses.

3        Q    Contact lenses.  And in connection with your

4    sale of contact lenses did you ever do any research to

5    see if those lenses were tested or made with any aborted

6    fetal cells?

7        A    I did not.

8        Q    And then Lumenis you sold lasers; is that

9    right?

10       A    Mm-hmm.

11       Q    Okay.  And then Shire you sold -- is it called

12   Xiidra?

13       A    Xiidra, yeah.

14       Q    And is that like an eye drop?

15       A    Yes.

16       Q    Okay.  And did you ever do any research about

17   whether Xiidra used aborted fetal cells in any way?

18       A    I did not.

19       Q    And so October 2018 you said Alpha 1.  Can you

20   explain to me what that is.

21       A    Yeah.  So Alpha-1 antitrypsin deficiency is a

22   genetic condition.  Patients are -- it's a liver disease

23   where patients livers secrete a -- either they don't

24   secrete a protein or they secrete a deformed version of

25   it.  It affects their lung effectiveness.



Page 131

1          So you have patients that have COPD, you know,
2   they've either not smoked very much or basically their
3   lungs are much more damaged by smoking or environmental
4   contaminants than the average person because they don't
5   have this Alpha-1 protein in their lungs.
6          So we sold an infusion therapy that would
7   essentially put that protein back into their bodies.
8   Kind of like iron deficiency.  You're deficient in iron.
9   You put -- we give you more iron.  Same with Alpha-1.
10         So if you don't have Alpha-1 protein or you
11  have a deformed version of it that isn't functional, we
12  can give you that function with an infusion.
13     Q    Okay.  So what was the name of the infusion?
14     A    We sold two.  Aralast NP and Glassia.
15     Q    Can you spell that for me.
16     A    Glassia is just G-l-a-s-s-i-a and Aralast is
17  A-r-a-l-a-s-t and then NP, capital N-P.
18     Q    Okay.  And so you said that this was in the
19  immunology team; is that right?
20     A    Yes.
21     Q    And what is immunology?
22     A    It's the group of I guess products related to
23  immunological disorders or diseases.  They also called
24  it the plasma-derived therapies unit.  The vast majority
25  of it was derived from blood plasma.



Page 134

 1    of the next generation on the neuroscience side.

 2            Of course, all the plasma-derived therapies

 3    came over with Shire.  Shire had bought a company called

 4    Baxalta which had bought a company called Baxter.

 5    That's where the plasma-derived therapies came through

 6    at Takeda came from Shire.  So they had -- it was a

 7    pretty large biotech company.

 8    Q    Okay.  (Inaudible) Vyvanse, Adderall, any of

 9    the plasma-derived therapies used aborted fetal cells?

10    A    I couldn't hear the beginning of that

11    question.  I'm sorry.

12    Q    Had you done any research whether or not

13    Vyvanse, Adderall, or the other plasma-derived products

14    involved aborted fetal cells in any way?

15    A    I did not.

16    Q    So as a sales rep -- is that the title that

17    you held throughout the duration of your employment?

18    A    Yes.

19    Q    Okay.  And did your job responsibilities ever

20    change throughout the duration of your employment?

21    A    No, not as far as responsibilities go.  I

22    mean, I guess things changed with COVID, I mean, as far

23    as the day-to-day thing, but my responsibilities were

24    the same.

25    Q    Okay.  And so during your entire time at



Page 135

1    Takeda, Glassia and -- I'm going to butcher it.

2        A    Aralast.

3        Q    Aralast NP.  Are they the only two products

4    that you were responsible for selling?

5        A    Yes.

6        Q    And did you ever do any research about whether

7    or not Glassia or Aralast NP involved or used fetal

8    cells in any way?

9        A    I did not.

10        Q    Sitting here today do you have any idea

11    whether or not those products used fetal cells in any

12    way?

13        A    I don't.  Since I don't sell them I haven't

14    looked back.

15        Q    Okay.  And when you came to become employed

16    with Takeda, did you research whether or not Takeda used

17    fetal cells in any of the medications, vaccines or other

18    products that it develops and sells?

19        A    I did not.

20        Q    And why not?

21        A    I wasn't aware of the issue until the COVID-19

22    vaccine kind of became the topic of conversation in

23    popular culture spring and summer of 2021.

24        Q    Okay.  And so tell me about your job

25    responsibilities as a sales rep.



Page 136

1      A    Yes.  My job was, you know, education with

2  doctors and staff around how to identify patients that

3  may have Alpha-1 antitrypsin deficiency, help them

4  identify who are good patients to test for such a

5  disease.  And then to help them once they've made a

6  diagnosis and want to treat, it was my job to kind of

7  help quarterback that process with usually a specialty

8  pharmacy.

9          So a company outside of Takeda would be

10  involved in helping that patient get managed care

11  coverage.

12          And then they would actually do the infusion,

13  so they would buy the therapy from Takeda and do the

14  infusion usually at a patient's home, sometimes an

15  infusion suite.  So I kind of was there for different

16  levels of that process.

17      Q    Okay.  So prior to COVID -- let's talk about

18  the 2018 to beginning of 2020 time period.  Were you

19  having face-to-face interactions with pharmacies and

20  other healthcare providers?

21      A    Yes.

22      Q    Okay.  And how often would you say you had a

23  face-to-face interaction or would you call it a sales

24  call with a pharmacy or other healthcare provider?

25      A    Usually six to ten times a day.



Page 137

```
 1        Q    And how many different -- you can correct me
 2   if I am wrong -- targets did you have in your sales
 3   territory?
 4        A    I don't remember the exact number.  I had a
 5   pretty decent geography.  I would say I had probably
 6   between a hundred and 150 sites that I could walk into
 7   and there would be more physicians.  Some physicians
 8   would -- or have some sites would have multiple
 9   physicians.
10        Q    Was it your goal or was it your job
11   responsibility to hit all 100, 150 in a certain time
12   period?
13        A    No.  We weren't managed in that way.  Because
14   of the nature of the disease itself you'd have certain
15   areas that Alpha-1 antitrypsin deficiency was more
16   prevalent.  So naturally you would spend more time in
17   those areas.
18             But it was definitely expected that you were
19   calling on all of your accounts, but we were allowed to
20   choose the frequency with which we made those calls.
21        Q    And so what population or what areas would
22   this be -- would Alpha-1 be more prevalent?
23        A    So in not particular -- you would just find
24   areas where population hadn't turned over as much.
25   Because it's a genetic trait, you would have different
```



Page 138

1    areas where you saw more of it.  So areas that were

2    historically Caucasian.  It's very unusual for it to be

3    outside of a Caucasian race that you would have Alpha-1

4    antitrypsin deficiency.

5              And there were places that were known to have

6    more patients that would test positive.  In my instance

7    Chattanooga, there was a lot of Alpha-1 patients in

8    Chattanooga.  We had -- there was a known place in

9    Alabama.  I didn't cover it, but there was a lot of

10   patients down there.

11             So kind of just depended on, you know, what

12   the genetic demographic looked like and also which

13   doctors would test, would actually follow the protocol

14   and test 'cause it's a very rare condition.

15             So a lot of doctors would get tired from

16   testing all the patients and get negatives and think,

17   oh, I'm looking for a needle in a haystack.  So those

18   kind of things factored in.

19       Q    Okay.  And so what were the -- what were the

20   makeup of the types of facilities that you were

21   visiting?  Is it pharmacies?  Clinics?  Hospitals?  Sort

22   of what is the makeup?

23       A    Mostly not in a hospital.  Mostly physician

24   office buildings.  Sometimes connected to hospitals, but

25   kind of where they did their -- in their own clinics



Page 139

1    versus doing rounds in the hospital.  So mostly clinic

2    settings.

3         Q    Okay.  And were you visiting pharmacies or

4    not?

5         A    Some people did.  I didn't do a lot of

6    pharmacy work in my time.  We weren't allowed to have

7    any obviously conversation with patients or in

8    connection with the patient end user at all.  So

9    everything normally functioned through the doctor and

10   then his staff, his medical assistants.

11        Q    And what type of doctor generally speaking

12   would you be seeing?

13        A    A pulmonary and critical care doctor.

14        Q    So these physician office buildings were

15   critical care facilities?

16        A    They were just medical office buildings where,

17   you know, on the same floor that you had an aesthetician

18   or a dermatologist, you might have a pulmonary group

19   that has a clinic there where they see patients.

20             So those doctors normally have kind of clinic

21   hours and then, like, ER or hospital hours for their

22   on-call, to be the on-call pulmonologist or critical

23   care specialist at a hospital.  We wouldn't call on them

24   in that capacity.

25        Q    Okay.  But there were patients in the



Page 140

1    physician building that you were visiting generally

2    speaking?

3         A    You mean waiting to see the doctor like in

4    those clinics?

5         Q    Yes.

6         A    Yes.

7         Q    Okay.  And so tell me about a typical office

8    visit to a physician building preCOVID.  How long would

9    it last?

10        A    Depends on the doctor.  Normally if you don't

11   have a lunch or a meeting scheduled they're pretty

12   short.  You're checking in with -- usually there's a

13   medical assistant who's kind of a point person for each

14   doctor.

15             So each doctor kind of has a right-hand person

16   that kind of helps them.  So once the doctor has seen a

17   patient and then kind of run down all the to do's of

18   medications and that kind of thing, testing.

19             So it was just as important to call on the

20   medical assistants as opposed to the doctors.  So

21   oftentimes once you had a relationship with the clinic,

22   you knew when was appropriate to be there and you could

23   go in and visit with the MAs between patients and

24   usually see a doctor, you know, between patients.  Not a

25   lot of time.



Page 141

1    So maybe you're in an office, if they have

2  four or five physicians, you're in there for half an

3  hour, you talk to multiple medical assistants, multiple

4  doctors and then you're on to the next.

5    Q    Okay.  Are you moving around the facility as

6  you're talking to these various people?

7    A    You're normally -- the medical assistants

8  normally have little hubs where they have computers and

9  where they do a lot of their order entry after meeting

10  with the doctor.

11    And so normally you kind of you get in there

12  where they would keep drug samples from the drug reps

13  and things like that where you could -- you kind of knew

14  where each doctor would come out, he'd be close to that

15  particular station with two or three exam rooms that

16  he'd be working out of.

17    And so you'd go to those stations, talk to

18  that MA, meet with that doctor, move to the next

19  station.  Not in the waiting room so much.  Never in the

20  exam room.

21    Q    Understood.  And how big were these station

22  areas?

23    A    Depends on the facility.  I mean, large enough

24  for a couple cabinets, maybe a couple computers.

25    Q    Okay.  And so is it fair to say if you're



Page 142

1    visiting a doctor's office with multiple doctors you're

2    seeing about half a dozen people, you're speaking

3    interactive with a half a dozen people or more?

4        A    I think so.

5        Q    And would you walk by patients as you would

6    move in and out of the facility if they were in the

7    waiting room or moving about to go see the doctor?

8        A    Well, you would walk in and out of the same

9    door that the patients did to enter the facility.  So

10   you would walk past the waiting room most likely.

11       Q    Okay.  And do you have any understanding -- or

12   did you have any understanding of what the patients were

13   being treated for in any of the facilities that you

14   visited?

15       A    Almost always a pulmonary lung-related, you

16   know, matter of some kind.

17       Q    And you said on average you would have six to

18   ten of these visits per day?

19       A    Yeah.  Depending on where the offices where

20   and what the drive time was, things like that, yeah.

21       Q    Okay.  And did you have any other job

22   responsibilities?

23       A    I mean, no, my primary responsibility was to

24   promote those products in that region with those

25   physicians.



Page 145

1    wanted to.  If you were afraid of COVID, you didn't have

2    to go.  And so you could still continue to work

3    virtually if you wanted.

4          So we began to go back out based on

5    availability of the geography based on case rates.

6       Q    Okay.  How many of your accounts were you

7    seeing in person at that point in time?

8       A    I mean, maybe it started out at 40 percent

9    like in the early days.  Not because they wouldn't see

10   us but just because of the case rate map that the

11   company put together.

12      Q    And then did it change from 40 percent?

13      A    Yeah.  It began to increase as I guess case

14   rates diminished or then more areas were, quote-unquote,

15   green, which is what it looked like on the map, you

16   could go into those areas in person.

17      Q    And so did you receive information from Takeda

18   about which areas or which healthcare providers you

19   could go visit in person?

20      A    Yeah.  There was a map of your geography that

21   would show kind of what was red and green.

22      Q    Okay.  From 40 percent to the time that you

23   were separated from Takeda do you know what the

24   percentage of healthcare providers were that you were

25   allowed to see?



Page 146

```
 1        A    As I recall it was pretty much back to normal.
 2   I don't remember there being any restrictions at the end
 3   there.
 4        Q    And were you required to test for COVID during
 5   this time period?
 6        A    Yes.  To be in the field you had to test
 7   negative once a week.
 8        Q    Once a week.  And did you comply with that
 9   requirement?
10        A    Yes.
11        Q    Okay.  And were you also required to wear a
12   mask?
13        A    Yes.
14        Q    And did you comply with that requirement?
15        A    Yes.
16        Q    Okay.  Do you believe that masks help to stop
17   the spread of COVID?
18        A    I believe certain masks help to stop COVID.
19        Q    And which masks are those?
20        A    N95s and KN95 masks.
21        Q    And is that the mask that you wore in the
22   field?
23        A    Yes.
24        Q    Okay.  Did you ever have any conversations
25   with any of your target healthcare providers about the
```



Page 147

1  COVID-19 and in-person visits?

2      A    You mean like if I could have a visit with

3  them in person during COVID-19?

4      Q    Right.  Yeah.

5      A    Yeah.  I mean, I think -- by the time we were

6  allowed to go back in the field from Takeda's standpoint

7  Georgia was mostly open, so those doctors were already

8  seeing reps regularly.  Most of them had masking

9  protocols in the office.

10     Q    Did any of the healthcare providers in which

11  you called not allow you to visit in person?

12     A    Not that I recall.

13     Q    So as before COVID when you started to visit

14  your healthcare providers in person again you were

15  wearing a mask; is that correct?

16     A    Yes.

17     Q    Okay.  And but your -- was your practice still

18  the same, meaning you would spend about half an hour in

19  the office, you would go in and out the same door as

20  patients, see a half a dozen folks or so?

21     A    Yeah.  It was pretty similar to before.  We

22  just were wearing masks.

23     Q    Okay.  So no changes other than the mask

24  wearing; is that right?

25     A    No.



Page 150

1       A    Not to the reps or not to me personally.  So

2   there was no -- I never had a office that had a policy

3   requiring or asking patients to get vaccinated -- or

4   salespeople.

5       Q    Okay.  Did you ever ask any of the healthcare

6   providers what their view was on the COVID-19 vaccine?

7       A    I did not.

8       Q    Okay.

9            MS. ENGELMAN:  Is it a good time to take

10      about a 20-minute lunch break?

11           MR. DeMATTEO:  That works for me.

12           THE WITNESS:  Sure.

13           VIDEOGRAPHER:  The time is 12:48 p.m. and

14      we are off the record.

15           (A luncheon recess was taken from 12:48

16      to 1:15 p.m)

17           VIDEOGRAPHER:  The time is 1:15 p.m. and

18      we are back on the record.

19      Q    (By Ms. Engelman) Mr. Savage, would you agree

20  with me that during your time at Takeda that you were

21  sort of the face of Takeda to the healthcare providers

22  in your territory?

23      A    Yes.

24      Q    Did they interact with anyone else from Takeda

25  during your time there?



Page 152

1    quote-unquote, fired?

2        A    I don't think so.  I think probably after.

3        Q    Do you think it was important to understand,

4    given the objection that you were raising, whether or

5    not Takeda used aborted fetal cells?

6        A    I think it would have become important to know

7    if the products I in particular was selling were

8    regularly involved with aborted fetal cells.

9            The research that I did led me to believe that

10   the products I was working with were -- did not benefit

11   from the HEK cell line or aborted fetal cells.

12       Q    Okay.  So let's just walk through.  So when

13   did you do the research about the products that you

14   promoted?

15       A    I mean, some probably after the firing.  I

16   mean, I think the issue came up, the mandate was

17   released, we filed exemptions, they were denied, we were

18   let go.

19           You know, at some point I remember thinking,

20   man, I wonder if I was selling aborted fetal cell

21   product all along.  And I did some basic research.

22   Nothing heavy into it.

23       Q    So would you have a religious objection to

24   promoting products that used aborted fetal cells?

25       A    Yeah.  I think so.



Page 153

1      Q    And would you have a religious objection to

2 working for a company that used aborted fetal cells?

3      A    I think it would be tough.  I don't think -- I

4 don't think that I would have quit Takeda if I hadn't

5 been fired if I wasn't directly selling a product

6 related to aborted fetal cells.

7      Q    Okay.  So because when you were making the

8 religious accommodation request you were hoping to

9 continue your employment; is that correct?

10      A    That's correct.

11      Q    Okay.  And so at that point in time you had

12 presented -- you had presented to Takeda that you had a

13 religious objection to the use of aborted fetal cells;

14 is that correct?

15      A    Yes.

16      Q    Okay.  But at that point in time did you

17 decide to research whether or not the products you were

18 promoting used aborted fetal cells?

19      A    I don't recall if that happened before I was

20 terminated or after I was terminated.  At some point in

21 that window of time I did look, but I can't recall

22 exactly when.

23      Q    Okay.  But wouldn't that have been really

24 important information for you to know moving forward if

25 you wanted to continue to work for Takeda given your



Page 154

1    religious beliefs?

2        A    Absolutely.

3        Q    So is it -- well, strike that.

4             And sitting here today you have no

5    recollection about whether or not you actually did the

6    research prior to your separation from Takeda; is that

7    right?

8        A    I don't recall exactly when that happened.

9        Q    And why is it that you wouldn't quit if you

10   found out that Takeda used aborted fetal cells in other

11   products?

12       A    It's hard to say what I would have done then

13   if things had been completely different than they

14   actually were.

15            But I think for the same reason I wasn't

16   offended by physicians giving the COVID vaccine to their

17   patients, I wouldn't be offended by a company that has

18   some products that have been used in that capacity if I

19   wasn't directly involved.

20            I think for the same reason, you know, it's

21   not going directly into my body, it's not my conscious

22   that has to give an answer for it.  It would have been

23   reasonable to say I'm not directly benefiting from this

24   in my capacity as an employee.

25       Q    Even though you're the face of Takeda?



Page 155

```
 1        A     If I was the face of Takeda for products that

 2    didn't benefit from aborted fetal cells I would be okay.

 3        Q     Okay.  I think you mentioned your manager at

 4    some point in time was Corey Bush; is that right?

 5        A     Yes.

 6        Q     Did you ever have a different manager at

 7    Takeda?

 8        A     No.

 9        Q     Okay.  And geographically what did your

10    territory cover?

11        A     I covered the northern part of the state of

12    Georgia and Chattanooga, Tennessee.  I had one town in

13    South Carolina just on the other side of Augusta.  So I

14    kind of covered from Augusta over to Columbus, Georgia,

15    all the way north to Chattanooga.

16        Q     You said before that you had no direct report;

17    is that right?

18        A     Correct.

19        Q     Have you ever made a religious accommodation

20    request to any of your other employers for any reason?

21        A     No.

22        Q     Have you ever made any complaints or felt as

23    though you were discriminated against in any way from

24    any of your other employers?

25        A     I don't.  I haven't.
```



Page 157

1   diet?

2        A    I mean, I try to eat a healthy, clean diet.  I

3   can't say that's driven by my faith.  I don't -- I don't

4   drink alcohol to excess.  So I do drink alcohol, but I

5   don't get drunk.  That's driven by my faith.  And I'm

6   too old to feel bad now.

7             And I think generally just caring for your

8   body, you know, as a temple of the Holy Spirit, like I

9   mentioned before, kind of incorporate different things.

10       Q    So what does it mean to you that your body is

11  a temple of the Holy Spirit?

12       A    I think you honor God with your body.  And so

13  what your body conveys, what goes into your body, what

14  comes out of your mouth.  That's probably the biggest

15  struggle is, you know, the Bible says out of an overflow

16  of the heart and mouth speaks.

17            And so you make mistakes all the time with bad

18  attitudes and things like that.  So that's a constant

19  struggle in the life of a Christian.

20            But I think just to honor what God's given you

21  is to take good care of it in a way that honors him.

22       Q    Do you think that the receiving the COVID

23  vaccine violated the principle that your body is a

24  temple?

25       A    I do.  I feel like the Holy Spirit -- when the



Page 158

1   whole thing came up and learning about the aborted fetal

2   cells I just didn't feel right about it.  I prayed about

3   it.  I still didn't feel right about it.

4           And I chose to go the path of the exemption

5   process in order to satisfy that -- that kind of

6   religious conviction.

7       Q    Okay.  And so just so I'm clear, the only

8   objection you have on the fact that your body is a

9   temple is the fact that the COVID-19 vaccine contained

10  aborted fetal cells; is that right?

11      A    Well, yeah.  And I think that people ought to

12  be able to -- we have to give an answer for what we do

13  to our body.  So I feel that bodily autonomy is

14  extremely important.

15          So I think the fact that it was coerced to me

16  still is a -- you know, you can make the argument it's

17  just a policy disagreement, but it's I think religious

18  in nature.

19      Q    What is your basis for, quote-unquote, coerced

20  treatment is religious in nature?

21      A    Oh, well, I think that -- I think that if your

22  body is the Holy Spirit and the Bible says that you were

23  a body of Christ, you're not your own, to honor God with

24  your body.

25          And if you're putting something in your body



Page 161

```
 1   the time of the --

 2        Q    Both.

 3        A    At the time of the mandate I didn't know if it

 4   did or not.  Now I do not think that the COVID-19

 5   vaccine stops the spread of COVID-19.

 6        Q    And what is that belief based on?

 7        A    I mean, basically all the public officials

 8   admitting that it doesn't stop transmission.  I mean

 9   publicly.  And observational reality of friends that

10   were vaccinated that then got COVID.  Sometimes multiple

11   times.

12        Q    What public official are you talking about?

13        A    Fauci, Deborah Birx, like the main folks.

14        Q    So you believe because -- well, strike that.

15             And when is it that you came to believe that

16   the vaccine did not help to stop the spread of COVID?

17        A    Sometime late 2021, early 2022.  I mean, I

18   think, you know, these were initially rolled out as 100

19   percent effective, if you get this vaccine you will not

20   get COVID nor will you pass COVID to another person.

21             I think that was the scientific basis for

22   mandates across the country.  That's, you know,

23   observably not the reality.

24        Q    When you made the -- so is it fair to say that

25   you don't believe the COVID vaccines are effective?
```



Page 162

```
1        A    I don't think they're effective in stopping
2    the spread of COVID-19.
3        Q    What do you think they're effective at?
4        A    I think they've been shown and they were
5    tested to show reduction in mild to moderate symptoms
6    and may, in fact, help a patient manage through COVID-19
7    better.
8        Q    Do you know anyone who got really sick or was
9    hospitalized from COVID?
10       A    I mean, my father was hospitalized, but they
11   weren't sure if it was flu or COVID.  So...
12       Q    Did he receive a test?
13       A    Yeah, but they -- yeah, multiple tests but he
14   didn't -- he never tested positive.
15       Q    Okay.  How long was he in the hospital?
16       A    I want to say ten days, 14 days.
17       Q    Did he receive any medication?
18       A    He did.  I'm not sure what.
19       Q    Okay.  Did you ask him about what medication
20   he received?
21       A    He was -- he was pretty out of it.  I think he
22   received kind of what was the regular treatment at the
23   time remdesivir, five days of remdesivir I think is what
24   they were giving people at that time.  I haven't
25   specifically talked to him about what he got.
```



Page 163

1    Q    Okay.  Did you-all talk about whether or not

2  he was going to make sure that whatever he received

3  didn't contain, didn't use fetal -- aborted fetal cells?

4    A    Yeah.  I don't think that when he was

5  hospitalized that there was a lot of conversation in his

6  condition.

7    Q    At the time that you made your request for

8  religious exemption what was your knowledge about the

9  effectiveness of the COVID-19 vaccine?

10   A    Say that first part again.

11   Q    At the time when you submitted your request

12  for religious exemption what was your knowledge of the

13  effectiveness of the COVID-19 vaccine?

14   A    I didn't have any -- it was pretty new.  I

15  didn't have any knowledge of the effectiveness.

16  Everybody said positive things about it at the time as I

17  remember.

18        I remember being aware that uneasy as a

19  medical sales rep that they were claiming long-term

20  safety because they hadn't tested it long-term.  And so

21  I remember being aware of that being kind of an odd

22  product claim to make at the time.  But as far as

23  effectiveness, no.

24   Q    Okay.  So what research did you do when the

25  vaccines came out about the safety?



Page 164

1      A    Well, I mean, I've launched a fair number of

2  drugs and so, you know, they're real careful that you

3  can only speak to what's in the prescribing information

4  'cause that's what the FDA has approved.

5           And so there's certain thresholds for certain

6  claims, long-term safety being one, that in the case of

7  other vaccines I do know were tested much longer before

8  they claimed or even made it on the market, long-term

9  safety.

10          Some safety signals don't show up in the first

11  30, 60 or 90 days.  It can take a long time.  So I

12  remember thinking at the time that's kind of strange,

13  you know, that they're claiming long-term safety on it.

14  Couldn't possibly know that, it was so new.

15     Q    Did you review any of the safety data that was

16  published at the time?

17     A    I did.

18     Q    What data was that?

19     A    Whatever data they had out at the time.  I

20  mean, it's more and more the basis of those trials has

21  trickled out since then, but I looked at whatever they

22  had at the time.

23     Q    And what conclusions did you draw about the

24  safety of the COVID-19 vaccines?

25     A    That they didn't test them for long enough to



Page 188

1    fetal cell issue at that time.

2        Q    Okay.  So you say here the last sentence in

3    that second paragraph, it says, "Also, these childhood

4    vaccinations were not available exclusively under

5    Emergency Use Authorization (and by definition

6    experimental) at the time of their administration."  Is

7    that correct?

8        A    Yes.

9        Q    Did you have an objection to taking the

10   COVID-19 vaccine due to the use of the Emergency Use

11   Authorization Act?

12              MR. DeMATTEO:  Objection to form.

13              THE WITNESS:  I'm sorry.  No.  My

14       objection to it was not based on that.

15       Q    (By Ms. Engelman) Okay.  Did you consider the

16   COVID-19 vaccine experimental?

17       A    Yeah.  I think I guess I consider it the

18   policy illegal because they were only available under

19   EUA.  And by definition I think it makes it experimental

20   to my understanding.

21       Q    So if you didn't have an objection to the use

22   of the COVID-19 vaccine on this basis, why did you

23   include it here in this interrogatory response?

24       A    The interrogatory is asking what makes my

25   prior vaccinations different from the COVID one.  And



Page 199

1  object to taking a flu shot now?

2       A    I mean, the use of aborted fetal cells which

3  are in a lot of medical treatments.

4       Q    Okay.  Have you researched whether or not

5  they're in any flu shots?

6       A    I have and they are in some of them.

7       Q    Okay.  And do you, sitting here today, do you

8  have any idea whether or not they were in the flu shot

9  that you received in 2019?

10      A    I don't know if they were.

11      Q    Okay.  Have you bothered to check?

12      A    No.

13      Q    Okay.  Are you interested to know whether or

14 not you took something in 2019 that contained aborted

15 fetal cells?

16      A    My assumption is that it probably did have

17 them.  So I guess if I went back to find out and found

18 out that there wasn't I don't know if I would pat myself

19 on the back or not.  Doesn't seem like a good use of

20 time.

21      Q    Okay.  So you say in here in the third

22 sentence, "At the time of this flu shot I was ignorant

23 of the regular use of aborted fetal cell tissue in

24 vaccine development and I recall feeling upset that I

25 was putting something in my body for the sole purpose of



Page 201

1        A     Yeah.

2        Q     So if that's the case, can you explain to me

3    why you didn't pray or consult the Holy Spirit in

4    connection with receiving the flu shot in 2019?

5        A     I mean, I can't give you a fantastic stellar

6    reason other than the fact that I didn't pray and I

7    probably should have.  And because of this situation

8    it's something that has influenced me on medical

9    treatments moving forward but in particular, you know,

10   the vaccine issue.  This was really the first time I

11   ever took a medical intervention and felt weird about

12   it.

13       Q     Were your religious beliefs any different in

14   2019 than they are today?

15       A     No.  My views weren't any different my

16   awareness of fetal cells as part of the manufacturing

17   process for these I was unaware of that.  I still

18   wasn't, you know, a fan of abortion.

19       Q     So in the second sentence you said, "My

20   decision to take this vaccine under these conditions was

21   a contributing factor to my choice to seek an exemption

22   from the COVID-19 vaccine."  Do you see that?

23       A     Yes.

24       Q     Can you explain what you mean by that?

25       A     Well, I think in my exemption letter I



Page 202

1    highlighted both the fetal cell issue, but also one's

2    ability to choose their own medical treatment free of

3    coercion or anything like that.  And that's kind of my

4    genesis on that feeling comes from this situation.  Kind

5    of my conviction over this.  So I cited both of those

6    reasons in my exemption letter.

7         Q    Okay.  And so your belief that you should

8    choose your own medical treatment, do you characterize

9    that as a religious belief?

10        A    I think that you're responsible for your own

11   body so you do have to give an account for it.  But is

12   it a religious belief in that way like in the same way

13   that abortion is?  It's not as direct I don't think.

14        Q    Why did you include it in your religious

15   exemption request?

16        A    'Cause I felt convicted by it spiritually.  So

17   it was religious in nature and I included it because I

18   didn't -- I didn't want to take it based on the fetal

19   cells, but I also didn't -- I wasn't thrilled that my

20   company was mandating it either.  It felt analogous to

21   this situation.

22        Q    Okay.  But you made no religious exemption to

23   the 2019 flu shot; is that right?

24        A    I did not.

25        Q    Do you think that there are certain



Page 203

1    populations of individuals who should get the COVID-19

2    vaccine who maybe are susceptible to getting really

3    sick?

4                    MR. DeMATTEO:  Objection to form.

5                    THE WITNESS:  I mean probably.  If it

6         does have some sort of personal protection.  There

7         are people who are more at risk, older individuals,

8         people with a lot of comorbidities, multiple

9         comorbidities.  We know that to be one of the

10        really fragile populations for COVID.

11                    For those people it might make sense to

12        take it if they don't have a religious objection to

13        it I guess or medical objection.

14        Q    (By Ms. Engelman) Would that fragile

15   population include the patients at the clinics you were

16   seeing who were suffering from pulmonary lung

17   complications?

18        A    It could include those people.

19        Q    All right.  So if we go to interrogatory 12.

20   You say here that you have not spoken or corresponded

21   with any healthcare provider in regard to the safety or

22   effectiveness of the COVID-19 vaccine.  Do you see that?

23        A    Yes.

24        Q    Is that accurate?

25        A    Yes.



Page 216

1      Q      Were you hospitalized?

2      A      I was.

3      Q      Did you receive any medication in connection

4   with that rupture?

5      A      I'm sure I did.

6      Q      Do you know what -- sitting here today, do you

7   know what it was?

8      A      I don't recall.

9      Q      Do you know whether or not you asked whether

10  it had used fetal -- aborted fetal cells?

11     A      Once again wasn't aware of the issue at the

12  time.  I did not ask about that.

13            (Brief pause)

14     Q      Do you know if anyone in your family, your

15  wife, your parents or siblings have ever sought a

16  religious accommodation for any reason for any of their

17  employers?

18     A      None that I'm aware of.  I would say none.

19            MS. ENGELMAN:  Can we take a five-minute

20     break, please.

21            VIDEOGRAPHER:  The time is 2:43 p.m. and

22     we are off the record.

23            (A recess was taken from 2:43 to 2:51

24     p.m.)

25            VIDEOGRAPHER:  The time is 2:51 p.m.  We



Page 219

1      Q    Did you agree with that statement then?

2      A    I think so.  Yeah.

3      Q    And then it says, "The more layers of

4  protection that we utilize, the greater our defense.

5  Therefore, we've added back the layer of protection

6  provided by testing."  Do you see that?

7      A    Yes.

8      Q    Okay.  Do you agree generally that Takeda

9  should have used all methods to provide the greatest

10  protection to the population at large that its sales

11  reps were visiting?

12           MR. DeMATTEO:  Objection to form.

13           THE WITNESS:  Yeah.  I think that -- I

14      think that it's different.  Vaccination is

15      different than testing and masking.

16      Q    (By Ms. Engelman) That wasn't my question.  My

17  question is whether or not you believe Takeda should

18  provide all layers of protection that it could to

19  protect the population.

20      A    Sure.  Yeah.

21           MS. ENGELMAN:  If we go to tab 9, Celina.

22           (Defendant's Exhibit No. 8 was marked for

23      identification.)

24      Q    (By Ms. Engelman) The document we just looked

25  at was dated September 10, 2021.  Do you recall that?



Page 220

```
 1       A     Yes.

 2       Q     Okay.  This here -- do you recognize this

 3  document, Mr. Savage?

 4       A     It looks like that's my submission of the

 5  vaccine exemption request.

 6       Q     Okay.  So that's dated September 21, 2021.  Do

 7  you see that?

 8       A     Yes.

 9       Q     So eleven days passed between the time that

10  you got the communication from Takeda and the time you

11  submitted your request.  Do you agree?

12       A     Yes.

13       Q     Okay.  And was that sufficient time for you to

14  put together your religious accommodation request?

15       A     Yeah, I felt like it was fine.

16       Q     Okay.  And if we scroll down.  So this is your

17  request for a religious accommodation; do you see that?

18       A     Yes.

19       Q     And under "Frequency and duration of the

20  accommodation requested" you said "ongoing/indefinite."

21       A     Yes.

22       Q     What was your basis for the request being

23  ongoing/indefinite?

24       A     I didn't want to take the vaccine 60 days

25  later or 90 days later.  I wanted to be completely
```



Page 222

1    A    I don't.

2    Q    Is it a scientific organization?

3            MR. DeMATTEO:  Objection.  Form.

4            THE WITNESS:  Yeah.  I mean, it might be.

5    Q    (By Ms. Engelman) Is it a medical

6    organization?  Do you have any idea?

7            MR. DeMATTEO:  Same objection to form.

8            THE WITNESS:  I haven't been to the

9        website in a long time.  So I don't follow them

10       outside of having found -- I wanted to find

11       evidence or something I could demonstrate for the

12       basis of my -- of my belief.

13   Q    (By Ms. Engelman) Okay.  And you said,

14   "Partaking in a vaccine made from aborted fetuses makes

15   me complicit in an action that offends my religious

16   faith."  Do you see that?

17   A    Yes.

18   Q    And then you say, "As such, I cannot, in good

19   conscience and in accord with my religious faith, take

20   any such COVID vaccine at this time."  You see that?

21   A    Yes.

22   Q    And so when you took Tylenol in 2021 after

23   being aware that aborted fetal cells were used, did that

24   offend your religious beliefs?

25   A    Yes.  I did not want to take it, but I did



Page 223

1    take it.

2         Q    It says, "In addition, any coerced medical

3    treatment goes against my religious faith and the right

4    of conscience to control one's own medical treatment,

5    free of coercion or force."  Do you see that?

6         A    Yes.

7         Q    Okay.  And again can you explain to me how

8    this is a religious belief?

9         A    Once again, I think the concept of a person's

10   free will is a Biblical concept for which they are

11   responsible, and you're responsible based on the Bible

12   and the Bible writings that your body is a temple of the

13   Holy Spirit for which you're responsible and you want to

14   honor God with your body.

15             And so I think being forced or coerced into

16   doing something that's against your belief system or

17   against your body possibly is grounds for a religious

18   objection.

19        Q    Okay.  What Biblical verse are you referring

20   to?

21        A    There's a verse in First Corinthians 6, You're

22   not you're own, you're a body of Christ, don't you know

23   that your body is a temple of the Holy Spirit;

24   therefore, honor God with your bodies.

25        Q    Okay.  And so the fact that you denied the



Page 224

1    COVID vaccine did you comply with that religious belief?

2        A    Say that again.

3        Q    The fact that you denied -- or excuse me.  You

4    declined to have the COVID vaccine, did you comply with

5    that religious belief?

6        A    I felt like I avoided dishonoring God with my

7    body by not taking the vaccine.

8        Q    Okay.  And so did you believe that Takeda was

9    coercing you to take the vaccine?

10       A    I mean, they fired me for not taking it.

11       Q    But they didn't force -- Takeda didn't force

12   you to take the vaccine, correct?

13                MR. DeMATTEO:  Objection to form.

14                THE WITNESS:  You asked about coercion.

15       You know, take it or get fired seems coercive to

16       me.

17       Q    (By Ms. Engelman) Okay.  Did Takeda force you

18   to take the COVID-19 vaccine?

19       A    No.

20       Q    So did you have the right to of consciousness

21   to control your medical treatment?

22                MR. DeMATTEO:  Objection.  Form.

23                THE WITNESS:  I mean, it cost me my job,

24       but yes.

25       Q    (By Ms. Engelman) Okay.  You stated earlier



Page 225

1   that you also had a religious objection based on the

2   fact that your body is a temple.

3       A    Yes.

4       Q    Where in here does it say that?

5       A    I'm sorry.  I didn't cite it in this exact

6   letter.  But I guess I'm referring to that verse and

7   that belief in the faith, in the right of conscience to

8   control the medical treatment free of coercion or force.

9   Essentially I'm responsible for my body at the end of

10  the day.  So...

11      Q    Is that kind of a separate religious belief

12  from the right to control your own medical treatment?

13      A    I link them together in this context, yes.

14      Q    Got it.

15              MS. ENGELMAN:  If you then scroll down,

16      Celina.

17      Q    (By Ms. Engelman) This is the letter from Tom

18  Gray, your pastor; is that right?

19      A    Yes.

20      Q    Did you ask anyone else to submit a letter on

21  your behalf?

22      A    Just Tom.

23      Q    Okay.  And here he says that, "I have read

24  Larry's reason for requesting religious exemption to

25  your vaccine mandate."  Do you see that?



Page 227

1    all those things and affirming them in this letter.

2    He's not repeating them verbatim.

3                    MS. ENGELMAN:  If we go, Celina, to 18,

4        please.

5            (Defendant's Exhibit No. 9 was marked for

6        identification.)

7        Q    (By Ms. Engelman) Okay.  Mr. Savage, this is

8    an e-mail communication between you and Christine Mealey

9    between September 27th and September 29th.  We can

10   scroll through it.  Do you recognize this document?

11       A    Yes.

12                   MS. ENGELMAN:  So if you scroll to the

13       bottom, Celina.

14       Q    (By Ms. Engelman) On September the 27th --

15   well, first of all, who is Christine Mealey?

16       A    Employee relations partner.  I had never heard

17   of her before the mandate policy came out.

18       Q    So she writes to you and asks to set up a

19   meeting to discuss your request for an exemption to the

20   vaccine requirement.  Do you see that?

21       A    Yes.

22       Q    Okay.  And you respond the next morning

23   saying -- if you scroll up -- "I am very uncomfortable

24   with your request to further discuss my religious

25   exemption.  What is your objective in having this call?



Page 228

1    Who else (if anyone) would be in attendance?  What is

2    your/their interest in my religious objection to the

3    vaccine requirement?"  Do you see that?

4          A     Yes.

5          Q     And what made you uncomfortable?

6          A     I mean, just the fact that, you know, already

7    you're wanting to mandate the medical treatment.  Kindly

8    you've allowed us religious exemption request.  We've

9    already had to fill that out and then have a pastor

10   confirm it with a letter.  So it's already a lengthy

11   process.  And then at this point they want to get you on

12   a call to -- in an environment with no oversight

13   cross-reference your religious beliefs.

14         Q     And how do you know at this point in time

15   there's, quote, no oversight?

16         A     I don't know.  I suspect that there's not.

17         Q     And what type of oversight would you be

18   expecting?

19         A     Well, like this call is recorded.  So as you

20   pick apart my religious beliefs it's recorded and you

21   have it to look at later.

22               In this case it would be a one-on-one call

23   where someone would write down notes and those notes

24   would then house the proof of what happened in that

25   conversation later on down the line.  And I wanted to



Page 229

1    keep everything reviewable.

2         Q    Did you ask whether or not the interview could

3    be recorded?

4         A    I didn't ask.

5         Q    Why not?

6         A    'Cause I felt like the process itself was

7    harassment.  And I -- and I expressed that I was

8    uncomfortable.  I asked, hey, any questions you have for

9    me, let me know, I'll write them.  I'll submit

10   everything.  And...

11        Q    So you understand that you were requesting an

12   exemption from the policy; is that not right?

13        A    Yes.

14        Q    And you were doing so based on your religious

15   beliefs?

16        A    Yes.

17        Q    Do you understand that Takeda had a right to

18   understand the basis of your religious objection?

19             MR. DeMATTEO:  Objection to form.

20             THE WITNESS:  I mean, they have the right

21        to request a meeting with me or work with me to get

22        those answers in whatever way is pleasing to both

23        of us.

24        Q    (By Ms. Engelman) And you refused to

25   participate in that process; is that right?



Page 230

1      A    Yes.

2      Q    You said that, "I find that Takeda is already

3    on uneven legal footing as it relates to the vaccine

4    requirement."  What is your basis for that statement?

5      A    I think the policy itself is illegal.

6      Q    Based on what?

7      A    Based on the fact that the vaccines were only

8    available under emergency use authorization.  Based on

9    the fact that the policy itself put something permanent

10   in someone's body.  That it tramples on people's

11   religious rights, you know, if it's not -- if you're not

12   allowed to be exempt from it.  So on a number of reasons

13   I think it's a illegal policy.

14     Q    Okay.  Well, at this point in time there was

15   no decision on your religious exemption, right, so you

16   didn't know whether or not you would be exempt or not?

17     A    Correct.

18     Q    Right.  So at that point in time why would you

19   think it was just a blanket illegal policy?

20     A    I mean 'cause you're mandating a medical

21   treatment that can't be undone.  It's not the same as

22   saying can you wear a mask for us and when masking was

23   over you can take it off.  This is something that can't

24   be undone.

25     Q    You said, "I do not wish to open myself up to



Page 231

1    a phone call where my religious beliefs might be

2    questioned."  Do you see that?

3        A    Yes.

4        Q    Again, did you have an understanding that

5    Takeda had a right to understand your religious beliefs

6    in connection with this accommodation request?

7                    MR. DeMATTEO:  Objection to form.

8                    THE WITNESS:  I understand that and I

9           wanted to continue it, but not in this forum.

10                   MS. ENGELMAN:  So if we scroll back up,

11          Celina.

12       Q    (By Ms. Engelman) So you can obviously read

13   these e-mails, but essentially Christine responds that,

14   you know, a conversation is an important part of the

15   interactive dialogue and then it would just be you and

16   her on the call.  Right?

17           And she lets you know if you choose not to

18   engage we will review and make a determination based on

19   the information you presented only.  Is that right?

20       A    Yes.

21       Q    Okay.  So do you agree that the only

22   information Takeda had regarding your religious

23   exemption request was the form that we looked at earlier

24   and your pastor's letter?

25       A    That's correct.



Page 232

```
 1      Q    And no other information?

 2      A    They wouldn't submit me the questions they

 3 wanted to ask me on the phone in writing.

 4      Q    Okay.  And so on September 28 --

 5              MS. ENGELMAN:  Celina, if we could scroll

 6      up.

 7      Q    (By Ms. Engelman) -- Christina had explained

 8 that the meeting would just be you and her.  And then

 9 she explains again that it's just simply a request, that

10 you're not required to participate, that it's a well

11 accepted and essential component of the dialogue and the

12 purpose of the meeting is to have a conversation.  Do

13 you see that?

14      A    Yeah.  May I add some context to this

15 particular e-mail?

16      Q    You may.

17      A    There was an e-mail sent out stating that the

18 interactive process was required.  And then that e-mail

19 was recalled from my e-mail bank.

20              So I had asked for, hey, I saw this e-mail

21 coming through stating this, what's up.  And she --

22 that's when she -- that's what I'm referring to.  There

23 is a missing e-mail that was recalled by Takeda in this.

24      Q    It's in this exchange if you scroll down.

25 It's an e-mail that is being recalled because it was
```



Page 233

1    intended for inside counsel.

2         A    It was addressed to me.

3         Q    She explains here that it was -- she

4    apologizes that she was writing to her counsel and

5    mistakenly put you in there as you have the same first

6    name.  Do you see that?

7         A    Okay.

8         Q    Do you remember reading that in realtime?

9         A    Yes.

10        Q    Okay.

11             MS. ENGELMAN:  So, Celina, if you could

12        scroll up.

13        Q    (By Ms. Engelman) And so you respond, "I

14   choose not to participate in the interactive process."

15   Do you see that?

16        A    Yes.

17        Q    And so you never asked here whether or not

18   others could be involved in the interactive process if

19   that's what you -- that would be beneficial to you?

20        A    I didn't but I did ask for them to submit the

21   questions in writing several times.

22        Q    Mm-hmm.

23        A    So that I could get them the information they

24   wanted.

25        Q    Okay.  You also say here, "I believe



Page 234

1    everything you need to assess my religious exemption

2    request is included in the paperwork already provided."

3    Do you see that?

4         A    Yes.

5         Q    Okay.  Sitting here today we just went over

6    your religious exemption request.  Do you believe

7    everything that Takeda needed to make the decision was

8    included in that request?

9         A    I believe so.

10        Q    Okay.  Sitting here today is there anything

11   that you would have added to the request that you think

12   would have been important to the evaluation?

13        A    I would have answered whatever questions they

14   were to submit to me in writing so that I could make

15   them feel great about approving my exemption.

16        Q    Mr. Savage, do you believe that there were --

17   there could be a false negative COVID-19 test?

18        A    It's possible, yeah.

19        Q    And so would you agree that even with a

20   negative COVID-19 test and a mask you could -- one could

21   still spread COVID to another human?

22             MR. DeMATTEO:  Objection to form.

23             THE WITNESS:  If they had COVID, they

24        could potentially get a false negative and pass it

25        even with masking.



Page 235

1      Q     (By Ms. Engelman) We talked earlier about some

2  of the painkillers that you may have ingested.  Do you

3  recall that testimony?

4      A     Yes.

5      Q     Have you ever taken Benadryl?

6      A     I'm sure I have.  Not any time recently.

7      Q     Okay.  When is the last time you think you may

8  have taken Benadryl?

9      A     I don't remember a specific occasion.  I can

10 just assume that at some point I probably took Benadryl.

11     Q     Okay.  What about Claritin?

12     A     Not any time recently for the same reason it's

13 one of the, you know, stem fetal cell products.  So I

14 haven't been using Claritin since learning all this, but

15 I probably took one in my life at some point.

16     Q     When did you become aware that Claritin used

17 aborted fetal cells?

18     A     Same time as everything else.  During the

19 COVID vaccine time when I was learning about the COVID

20 vaccines' use of fetal cells and a lot of common

21 over-the-counter medications also used it.

22     Q     What about Pepto-Bismol?

23     A     I haven't used Pepto-Bismol.

24     Q     Ever?

25     A     I don't think so.  Ever.



Page 240

1      A     No.

2      Q     Okay.  So did you agree with that statement in

3   the e-mail from Christine Mealey?

4      A     What in particular about the statement?

5      Q     That your essential job functions require

6   in-person attention and involve direct contact with

7   co-workers and patients who may be contagious and/or

8   particularly vulnerable to COVID-19.

9      A     I think that's the most ideal way to do the

10  job, although I have done it virtually for almost a year

11  at one point pretty successfully.  But I think in person

12  is ideal.

13     Q     So you respond and you say, "I do have a

14  question.  As part of this new company policy and

15  mandate does Takeda assume the liability of an adverse

16  event occurring as a result of the vaccination?  Either

17  at the time of the vaccination or at any time in the

18  future, should there be currently unknown long-term

19  risks that exist -- excuse me -- health risks that

20  exist?"  Do you see that?

21     A     Yes.

22     Q     And then you say, "I am concerned that since

23  the FDA approved vaccine -- I don't how to pronounce

24  this at all -- Comirnaty is not available in the US, the

25  only available options are vaccines for which the



Page 248

1   document?

2       A    Yeah.   That's -- my parents found that at the

3   house.   I asked them to see if they had any of my old

4   immunization records.

5       Q    And this is the one that you produced to us?

6       A    Yes.

7            MS. ENGELMAN:   One second.   So if we go

8       to I guess page 101, Celina.

9       Q    (By Ms. Engelman) Do you see here in the

10  middle on 6/22/2004 you received the TD IM, TD

11  immunization?

12      A    Yes.

13      Q    Do you recall that?

14      A    I don't.

15      Q    Okay.  Were you over the age of 18 in 2004?

16      A    I would have turned 18 January of '04.

17      Q    So is it fair to say that you made the

18  decision to get this vaccine in 2004?

19      A    I mean, it probably was for college, I guess

20  to go to college.  It's June of '04.  I probably would

21  have gone to college in August of that year.  So it

22  would have been part of whatever vaccination schedule

23  was required for higher education.

24           MS. ENGELMAN:   Celina, can you go to tab

25      24, please.



Page 249

1          (Defendant's Exhibit No. 12 was marked for

2      identification.)

3      Q    (By Ms. Engelman) Do you recall that you

4  filled out an authorization for us to receive your

5  medical records?

6      A    Yes.

7      Q    So these are medical records that we received

8  from Dr. Ford in response to that request.  Who is

9  Dr. Ford?

10      A    She was the only physician in the area that

11  still had flu shots on hand when I got this.  I don't

12  know what the date was.  It wasn't even during flu shot

13  season.  Like I said, I only needed it for the

14  credentialing.  April -- April 2019.  I just -- I called

15  around to Walgreens.  Nobody had any flu shots.

16      Q    So you just found Dr. Ford?

17      A    Yes.

18      Q    Okay.  And when was that?

19      A    It looks like 4/23/2019.

20          MS. ENGELMAN:  Celina, can you scroll

21      down.

22      A    Yeah.  April 23, 2019.

23          MS. ENGELMAN:  Can you scroll down,

24      Celina.

25      Q    (By Ms. Engelman) Do you recall ever seeing



Page 250

1   Dr. Ford prior to 2019?

2       A    No.  I was just -- I just needed to find a

3   person that had a flu shot.

4       Q    Okay.  Do you see here where it says this is

5   from Georgia Registry of Immunization Transactions and

6   Services and it says Immunization History?

7       A    Yes.

8       Q    Okay.  Do you see at the bottom here where it

9   says that you received the TD vaccine on 1/25/2016?

10      A    I have no recollection of that.

11      Q    Okay.  And what about the Tdap on 1/25/2016 as

12  well?

13      A    No recollection.

14      Q    Okay.  And you also see that you received the

15  hepatitis B vaccine 6/22/2004?

16      A    Yeah.  That was on the other form I think.

17      Q    Okay.  And again, you were over the age of 18

18  in all of these vaccinations?

19      A    Yes.

20      Q    And is it safe to say that you made the

21  decision to have the vaccination?

22      A    Yeah.  I mean, I guess the 2004 ones are

23  school.  I have no recollection of the ones in 2016.  So

24  I don't even know who gave those to me.

25      Q    Okay.  Is it fair to say that you didn't do



Page 251

1    any research to see whether or not these vaccines

2    contained aborted fetal cells?

3        A    I did not do any research about aborted fetal

4    cells.

5        Q    Mr. Savage, you testified earlier that you're

6    working at your wife's clinic or office.

7        A    Yeah.

8        Q    And what are you doing there?

9        A    I help manage the staff.  I do a lot of

10   finishing of glasses, lenses.  We have a finishing lab

11   so I do a lot of that work.  We expanded the clinic a

12   couple years ago.  So she manages the doctors; I manage

13   the staff.

14       Q    And when did you start working for her?

15       A    I came on board beginning of 2022.

16       Q    Do you remember the exact date?

17       A    I think I went on payroll in January of 2022.

18       Q    Okay.  And how much are you earning?

19       A    I think we pay me at about $140,000 a year.

20       Q    Okay.  Are you entitled to any bonus or

21   commissions or other compensation?

22       A    If the company does well, we usually have

23   enough for a 401(k) like at the end of the year,

24   whatever the maximum amount is you can do.

25       Q    A contribution to your 401(k) account?



Page 276

1    your, based on current science, what is your belief of

2    the safety of the COVID-19 vaccine?

3         A    I think it remains to be seen.  There's a lot

4    of false information out there.  There is no long-term

5    testing going on still.  There's no control group.  So

6    there's no way to know really what the long-term safety

7    is of the vaccine.  You just have anecdotal reports.

8         Q    And what false information are you referring

9    to?

10        A    Well, the Internet is full of all kinds of

11   bizarre stuff.  It's obviously not all true.

12        Q    What do you rely on for your safety data?

13        A    Well, I'd like a long-term placebo controlled

14   trial with a lot of candidates in it.  That would be --

15   that's kind of the gold standard.

16        Q    Mr. Savage, you testified earlier that you are

17   seeking $750,000 in lost income; is that correct?

18        A    Yes.

19        Q    Are you seeking anything else in this lawsuit?

20        A    I don't know much about punitive damages and

21   things like that.  My understanding is that's something

22   that's determined by a judge at a later time.  But I'm

23   just seeking the loss of income in that amount.

24             (Brief pause).

25        Q    Since filing this lawsuit have you been in



Page 280

1   were the ones who were taking care of their patients?

2       A    Correct.

3       Q    Okay.  And presumably had knowledge of their

4   own patients' health status in crafting those policies?

5       A    Yes.

6       Q    So just to reiterate.  Were there any -- were

7   there any healthcare providers to which you were

8   conducting business that prohibited unvaccinated

9   individuals -- or individuals who are not vaccinated

10  against COVID-19 into their offices?

11      A    There wasn't in my territory.  I didn't have

12  any, no.

13      Q    Those are the only questions I had.  So thank

14  you for your time.

15              MS. ENGELMAN:  Nothing else for me.

16              VIDEOGRAPHER:  The time is 4:38 p.m.  And

17      we are off the record.

18              COURT REPORTER:  Signature, reserve or

19      waive?

20              MR. DeMATTEO:  We'll waive signature.

21              COURT REPORTER:  Waive?

22              MR. DeMATTEO:  Yes.

23              (The reading and signing of the deposition by

24      the witness was waived.)

25              (Deposition concluded at 4:38 p.m.)



Page 281

```
 1                      DISCLOSURE
 2   Deposition of: Larry H. Savage
 3   Date: October 5, 2023
 4            Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
 5   Judicial Council of Georgia, I make the following
     disclosure:

 6
            I am a Georgia Certified Court Reporter.  I am
 7   here as a representative of Magna Legal Services.
 8            Magna Legal Services was contacted by the
     offices of Morgan, Lewis & Bockius LLP to provide court
 9   reporting services for the deposition.
10            Magna Legal Services will not be taking this
     deposition under any contract that is prohibited by
11   O.C.G.A. 15-14-37 (a) and (b).
12            Magna Legal Services has no exclusive contract
     to provide reporting services with any party to the
13   case, any counsel in the case, or any reporter or
     reporting agency from whom a referral might have been
14   made to cover this deposition.
15            Magna Legal Services will charge its usual and
     customary rates to all parties in the case, and a
16   financial discount will not be given to any party to
     this litigation.
17
18            This, the 13th day of October 2023.
19
20   _____
21            Kimberly S. Bennett, RPR, CRR, CRC
22                   CCR No. B-1172
23
24   _____
25                Magna Legal Services
```



EXHIBIT

8

exhibitsticker.com

**From:**        Savage, Larry
**Sent:**        Tuesday, September 21, 2021 9:52 AM
**To:**          US ReligiousAccomm
**Cc:**          Savage, Larry
**Subject:**     Larry Savage - Religious Exemption Request 9/21/21
**Attachments:** Religious Exemption.pdf

Please see attached paperwork for religious exemption from Covid-19 vaccine mandate.

Thanks,



Better Health, Brighter Future

## Larry Savage

Alpha 1 Sales, US Immunology
**Takeda Pharmaceutical Company Limited**
1200 Lakeside Drive
Bannockburn, IL 60015
Mobile: 404-409-2558
Larry.savage@takeda.com

CONFIDENTIAL                                    TAKEDA_017923



## Religious Accommodation Request Form

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

**To be completed by employee**

Name: _Larry Savage_                    Position: _Territory Business Manager – Alpha 1_
Date of request: _9/20/2021_
Business/Function: _Field Sales Representative_
Immediate supervisor: _Corey Bush_

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):
_Covid – 19 Vaccine exemption_

Frequency and duration of the accommodation requested: _on going / indefinite_

Describe religious belief or practice that necessitates this request for accommodation:
_( SEE ATTACHED )_

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.

Please provide alternative accommodations that might address your needs:

1. _continued access to weekly Covid testing_
2. _continued access to KN-95 masks for field interactions_
3. _continued access to digital selling tools for when symptomatic_

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: _____ Date: _9/20/2021_

Upon final determination the employee will receive a letter approving or denying the accommodation request.

CONFIDENTIAL                                                      TAKEDA_017924

**Describe religious belief or practice that necessitates this request for accommodation.**

Each of the manufacturers of the Covid vaccines currently available developed and confirmed their vaccines using fetal cell lines, which originated from aborted fetuses. ( http://lozierinstitute.org/an-ethics-assessment-of-covid-19-vaccine-programs/ ). For example, each of the currently available Covid vaccines confirmed their vaccine by protein testing using the abortion-derived cell line HEK-293. ( http://lozierinstitute.org/an-ethics-assessment-of-covid-19-vaccine-programs/ ). Partaking in a vaccine made from aborted fetuses makes me complicit in an action that offends my religious faith. As such, I cannot, in good conscience and in accord with my religious faith, take any such Covid vaccine at this time. In addition, any coerced medical treatment goes against my religious faith and the right of conscience to control one's own medical treatment, free of coercion or force. Please provide a reasonable accommodation to my belief, as I wish to continue to be a good employee, helpful to the team.

TAKEDA_017925



**Tom Gray**
Sr. Pastor, MHCC
(678) 468-9187 · tjjgray@mac.com
109 Mars Hill Rd., Powder Springs, GA 30127

To Whom It May Concern,

I am the lead pastor at Mars Hill Community Church in Powder Springs, Georgia. Your employee Larry Savage has been a member of our church since 2016 when he and his family moved to our community. He and his family have been consistently active members of our church family and even found multiple occasions to serve as volunteers.

I have read Larry's reason for requesting religious exemption to your vaccine mandate. The beliefs he holds and reasons he cites are both consistent with the views of our Christian church and the Bible's teachings. That it is wrong to take the life of another, that God loves and values every human life, and that life begins at conception.

It would be my recommendation that you honor his request for religious exemption and work with him to make reasonable accommodation.

Thanks,

Tom Gray
Lead Pastor
Mars Hill Community Church

TAKEDA_017926

EXHIBIT

9

exhibitsticker.com

| | |
|---|---|
| **From:** | Savage, Larry |
| **Sent:** | Wednesday, September 29, 2021 11:29 AM |
| **To:** | Mealey, Christine |
| **Subject:** | RE: ER Discussion - Larry Savage - CONFIDENTIAL |
| **Sensitivity:** | Private |

Christine,

I choose not to participate in the interactive process. I believe everything you need to assess my religious exemption request is included in the paperwork already provided. However, I am still happy to continue the dialogue in writing. The reasonable accommodation requests I made as part of my original admission includes things Takeda is already providing. Nothing new has been requested (by me) from Takeda apart from exemption from an invasive vaccine requirement policy that offends my faith and denies me control over my own body and medical treatment.

I look forward to hearing the decision on my religious exemption request.

Thanks,



**Larry Savage**

Alpha 1 Sales, US Immunology
**Takeda Pharmaceutical Company Limited**
1200 Lakeside Drive
Bannockburn, IL 60015
Mobile: 404-409-2558
Larry.savage@takeda.com

---

**From:** Mealey, Christine <christine.mealey@takeda.com>
**Sent:** Tuesday, September 28, 2021 5:12 PM
**To:** Savage, Larry <larry.savage@takeda.com>
**Subject:** RE: ER Discussion - Larry Savage - CONFIDENTIAL
**Sensitivity:** Private

Hi Larry,

Yes my apologies I was writing to our counsel and mistakenly put you on there as you have the same first name. I recalled the message immediately upon realizing my mistake and that's why you saw it disappear.

Please understand that the meeting request I sent to you is simply that – a *request*.  You are not required to participate.  By way of background, meeting to discuss an employee's accommodation request is a well-accepted and often essential component of the dialogue between employee and employer about potential accommodation, commonly referred to as the interactive process.  The purpose of the meeting is to have a conversation aimed at more fully understanding the employee's request to help determine whether accommodation is necessary and if so, what specific accommodation should be considered.

CONFIDENTIAL

TAKEDA_017927

Unlike requests for medical accommodation, requests for religious accommodation depend heavily on an individual employee's sincerely-held religious beliefs.  Because this is a matter of what is in the employee's mind and heart, the best way to understand those beliefs and fully understand the basis for a request like this is to ask questions and have them explain.  I will not be sending questions for you in advance of the meeting, but can assure you that this brief discussion is intended only to more thoroughly understand your beliefs, their basis and how they conflict with Takeda's vaccination requirement.

Please let me know if you will be participating in this meeting.  If not, please understand as I stated before that we will review and make a decision based on the information you have already provided.

Thanks.

*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

---

**From:** Savage, Larry <larry.savage@takeda.com>
**Sent:** Tuesday, September 28, 2021 10:36 AM
**To:** Mealey, Christine <christine.mealey@takeda.com>
**Subject:** RE: ER Discussion - Larry Savage - CONFIDENTIAL
**Sensitivity:** Private

Hi Christine,

I saw your initial response come through stating that the interactive dialogue was a "required" part of the exemption review process. I also noticed that email quickly disappeared from the server.

Thank you for your most recent response. I would prefer to continue the dialogue in writing so we both have an accurate account of the content and merit of the religious exemption request and review process. I believe my already provided documents accurately convey my position on the topic. As I have already stated your request for an interactive dialogue makes me uncomfortable as I will not be subjected to cross examination on the merit of my religious beliefs. However, if anything in my paperwork requires clarification or if you have additional questions, I am happy to respond in writing.

Thank you,


Better Health, Brighter Future

## Larry Savage

Alpha 1 Sales, US Immunology
**Takeda Pharmaceutical Company Limited**
1200 Lakeside Drive
Bannockburn, IL 60015
Mobile: 404-409-2558
Larry.savage@takeda.com

CONFIDENTIAL    TAKEDA_017928

**From:** Mealey, Christine <christine.mealey@takeda.com>
**Sent:** Tuesday, September 28, 2021 10:16 AM
**To:** Savage, Larry <larry.savage@takeda.com>
**Subject:** RE: ER Discussion - Larry Savage - CONFIDENTIAL
**Sensitivity:** Private

Hi Larry,

A conversation with interactive dialogue regarding any accommodation request from an employee is an in important and standard part of the process. The information we gather helps us fully understand the request and evaluate whether an accommodation is possible. It would only be yourself and me on the call. If you choose not to engage, we will review and make a determination on the information you presented only.

Thanks.

*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

**From:** Savage, Larry <larry.savage@takeda.com>
**Sent:** Tuesday, September 28, 2021 9:25 AM
**To:** Mealey, Christine <christine.mealey@takeda.com>
**Subject:** RE: ER Discussion - Larry Savage - CONFIDENTIAL
**Sensitivity:** Private

Hi Christine,

I am very uncomfortable with your request to further discuss my religious exemption. What is your objective in having this call? Who else (if anyone) would be in attendance? What is your/their interest in my religious objection to the vaccine requirement?

I find that Takeda is already on uneven legal footing as it relates to the vaccine requirement policy. I do not wish to open myself up to a phone call where my religious beliefs might be questioned or I might feel harassed or discriminated against on the basis of my faith or my vaccination status.

I have completed the paperwork with my explanation of exemption request, confirmation from my pastor, and request for reasonable accommodation. If there is something in my initial documentation that requires clarification or an additional request, please submit that in writing and I will respond in a timely manner.

Thanks,


Better Health, Brighter Future

Larry Savage
Alpha 1 Sales, US Immunology
**Takeda Pharmaceutical Company Limited**
1200 Lakeside Drive

3

TAKEDA_017929

Bannockburn, IL 60015
Mobile: 404-409-2558
Larry.savage@takeda.com


-----Original Appointment-----
**From:** Mealey, Christine <christine.mealey@takeda.com>
**Sent:** Monday, September 27, 2021 1:59 PM
**To:** Savage, Larry
**Subject:** ER Discussion - Larry Savage - CONFIDENTIAL
**When:** Wednesday, September 29, 2021 2:30 PM-3:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting
**Sensitivity:** Private

Hi,

I am setting up this meeting to discuss your request for exemption from Takeda's Covid vaccine requirement on a basis
of religious accommodation. Please let me know if this time works.


*Christine Mealey*
Employee Relations Partner – GMSGQ
**Takeda Pharmaceutical Company Limited**
christine.mealey@takeda.com
(m) 508.331.5060

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
takeda@m.webex.com
Video Conference ID: 124 282 787 1
Alternate VTC instructions

**Or call in (audio only)**
+1 312-549-8473,,899607233#    United States, Chicago
Phone Conference ID: 899 607 233#
Find a local number | Reset PIN

Learn More | Meeting options

---

CONFIDENTIAL                                    TAKEDA_017930

# Exhibit G

LISA AMOSON, ROBB HUCK, TROBY LANE PARRISH, ALECIA
RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA
SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH

vs.                    CASE NO. 1:22-cv-11963-GAO


TAKEDA PHARMACEUTICALS U.S.A., INC.




VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

JILLYN SCHMIDT

Taken October 10, 2023



REPORTED BY KELLY L. GUILLIAMS, CCR


MAGNA LEGAL SERVICES

866-624-6221


www.MagnaLS.com



Page 2

1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3

4    LISA AMOSON, ROBB HUCK, TROBY LANE PARRISH, ALECIA

5    RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA

6    SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH,

7             Plaintiffs,

8    vs.                 Case No. 1:22-cv-11963-GAO

9    TAKEDA PHARMACEUTICALS U.S.A., INC.,

10            Defendant.

11

12       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JILLYN

13   SCHMIDT, produced, sworn and examined on the 10th

14   day of October, A.D., 2023, between the hours of

15   8:00 a.m. and 6:00 p.m. of that day, via Zoom

16   videoconference, each party at their respective

17   locations, before Kelly L. Guilliams, a Certified

18   Court Reporter within and for the State of Missouri,

19   in the above-styled certain cause now pending in the

20   United States District Court, District of

21   Massachusetts; on behalf of the Defendant.

22

23

24

25



Page 3

1              APPEARANCES OF COUNSEL VIA ZOOM:

2

3    FOR THE PLAINTIFF:

4     Mr. Christopher DeMatteo

5     (cdematteo@pattisandsmith.com)

6     Pattis & Associates, LLC

7     383 Orange Street

8     New Haven, CT  06511

9     (203) 393-3017

10

11    FOR THE DEFENDANT:

12     Ms. Keri L. Engelman

13     (keri.engelman@morganlewis.com)

14     Ms. Celina Antonellis

15     (celina.antonellis@morganlewis.com)

16     Morgan, Lewis & Bockius, LLP

17     One Federal Street

18     Boston, MA  02110

19     (617) 341-7700

20

21    THE VIDEOGRAPHER:

22     Mr. Bob Behrens

23     Magna Legal Services

24     1635 Market Street

25     Philadelphia, PA  19103



```
 1                        * * * * *
 2                  INDEX OF EXAMINATION
 3               WITNESS: JILLYN SCHMIDT
 4                                          PAGE
 5   Examination by Ms. Engelman           6
 6   Examination by Mr. DeMatteo           278
 7                        * * * * *
 8                  INDEX OF EXHIBITS
 9   DEPOSITION EXHIBIT                     PAGE
10   No. 1 - Signal chat excerpt           76
11   No. 2 - Various Facebook posts        88
12   No. 3 - September 10, 2021 E-mail     162
13   No. 4 - September 14, 2021 E-mail     164
14   No. 5 - Religious Exemption Letter
15   Request                               171
16   No. 6 - Religious Accommodation
17   Interactive Dialogue                  177
18   No. 7 - Medical history of J. Schmidt 195
19   No. 8 - May 10, 2022 E-mail           247
20   No. 9 - Interrogatory responses       252
21   No. 10 - Supplemental responses       260
22        (Exhibits attached with transcripts.)
23
24
25
```



Page 5

1            THE VIDEOGRAPHER:  Good morning.  We are
2   now on the record.  Today's date is Tuesday,
3   October 10th, 2023, and the time is now
4   approximately 9:03 a.m. central time.  This begins
5   the videotaped deposition of Jillyn Smitt -- Schmidt
6   in the matter of Lisa Amoson, et al. versus Takeda
7   Pharmaceuticals U.S.A., Inc.  Will counsel please
8   identify yourselves for the record.
9            MS. ENGELMAN:  Keri Engelman from Morgan,
10   Lewis & Bockius on behalf of Takeda.
11            MR. DeMATTEO:  Good morning.  Chris
12   DeMatteo of Pattis & Associates.  We represent
13   Jillyn Schmidt, the deponent/plaintiff.
14            THE VIDEOGRAPHER:  Will the court reporter
15   please swear in the witness.
16
17                JILLYN SCHMIDT,
18   of lawful age, being first duly sworn to tell the
19   truth, the whole truth, and nothing but the truth,
20   deposeth and saith on behalf of the Defendant as
21   follows:
22            MS. ENGELMAN:  I should also just note for
23   the record that Celina Antonellis from Morgan, Lewis
24   & Bockius also on behalf of Takeda is present.
25   Apologies for that.



Page 6

```
 1                    DIRECT EXAMINATION
 2   QUESTIONS BY MS. ENGELMAN:
 3        Q    Good morning, Miss Schmidt.  How are you
 4   today?
 5        A    Doing well, thank you for asking.
 6        Q    Good.  My name is Keri Engelman as you
 7   just noted on the record.  I represent Takeda
 8   Pharmaceuticals, the defendant in this action.  Do
 9   you understand that?
10        A    Yes.
11        Q    Okay.  And the purpose of the deposition
12   today is to ask you questions about the lawsuit that
13   you brought against Takeda.  Do you understand that?
14        A    Yes.
15        Q    You just took an oath subject to the
16   penalty of perjury.  Do you understand that?
17        A    Yes.
18        Q    And that means that you must answer
19   questions truthfully and fully, no different as if
20   you were testifying in court.  Do you understand
21   that?
22        A    Yes.
23        Q    The court reporter is taking down
24   everything that we say today.  So she cannot capture
25   on the record nods or nonverbal answers, so both you
```



Page 28

```
 1          Q     And how old is Bodey?

 2          A     Twelve.

 3          Q     And how old is Tripp?

 4          A     Seventeen.

 5          Q     And you said you asked for a religious

 6    exemption for your child.  What are you referring to

 7    there?

 8          A     A -- we did it for their schooling or for

 9    my son's schooling.  Tripp, that is 17, he went to

10    public school kindergarten, 1st and 2nd, and we

11    asked for religious exemptions for vaccines.

12          Q     For which vaccines?

13          A     All of them.

14          Q     And why is that?

15          A     Because we hold sincerely held religious

16    beliefs that we are not going to do vaccines.

17          Q     And why aren't -- why aren't you going to

18    do vaccines, what's your religious belief against

19    vaccines generally?

20          A     The fact that God has made us -- immune

21    systems for us and the fact that that's something

22    that we don't feel is something we want to do.  Our

23    child -- our child, if they would like to get them

24    when they're older, they can do that.

25          Q     Okay.  So let me just back up for a
```



Page 30

1  different people back -- back then, young, not as

2  well -- obviously, we weren't Christians back then

3  and then in the same stances we are now.

4       Q    Okay.  And when approximately was that,

5  when your son received those shots?

6       A    Well, he's going to be 18 years old, so

7  that would have been in 2005.

8       Q    Okay.  And so you testified earlier that

9  you -- you and your husband have an objection to

10 vaccines generally, because God has made an immune

11 system for you; is that right?

12      A    Well, that's just one of the reasons, yes.

13      Q    Okay.  What are the other reasons?

14      A    The fact that vaccines are something that

15 can never come out of the body, once they're in,

16 they're in.  It's just a choice that we chose to

17 make, that we were going to let their bodies build

18 their own immune -- build an immune system, so...

19           And we just feel that it also is just

20 something that we didn't want to introduce into

21 their -- into their -- into their bodies at such

22 little ages.

23      Q    And explain to me what the religious basis

24 is for that view.

25      A    Because, and I'm not going to quote it



Page 31

1    correctly, but, you know, God -- we're made in God's

2    image and our bodies are temples, so...  I mean

3    we're carefully and wonderfully made in the womb,

4    so...  I mean I -- I mean that's our beliefs.

5          Q    Okay.  And -- and so have you ever given

6    your children any medications?

7          A    Yes.

8          Q    What medications have you given your

9    children?

10         A    I'm trying to think.  So a couple times

11   when they were little and had fevers, we gave it to

12   them, but we don't -- we don't do that anymore,

13   so...  And then my other son was on some medication

14   for acne, but we pulled him off of that after we did

15   more research.

16         Q    All right.  So back up.  I didn't hear the

17   first medication that you mentioned with the fevers?

18         A    I don't -- we gave them some fever

19   medications.  I don't know, that was back when they

20   were like -- he would have been like four, five

21   maybe.

22         Q    And that's the only time you remember ever

23   giving your child medication?

24         A    I think we've given them ear drops for

25   swimmer's ear until we started using alcohol after



Page 35

1    Sorry.  Forgive me.

2         Q    If you -- so do you believe medications

3    impact your immunity in any way?

4         A    I think they can, yeah.

5         Q    How so?

6         A    Well, I don't know every single medication

7    in the world, I'm sure there's some that can.

8         Q    And so if your objection to a vaccine is

9    the fact that God gave you natural immunity, why

10   don't you have an objection to giving your children

11   medications?

12        A    Well, No. 1, medications -- I'm not

13   against science, just FYI.  My God is the author of

14   science, I truly believe that, and I truly believe

15   he gave us immune systems.

16             Now, there are times where there might be

17   some medications needed.  But those are short-lived,

18   and they're also different for the fact that, A,

19   we -- we have a choice to take those medications or

20   not.  There's no repercussions if -- you know, in a

21   workplace if I don't take my, you know, whatever or

22   if someone doesn't take their whatever.

23             I wasn't getting fired for not taking --

24   you know, Takeda didn't tell me, "Hey, you need to

25   take these medications," they said, "No, you need to



Page 36

1   take this vaccine," and specifically, that vaccine,

2   not any other vaccines, but just this vaccine.

3           So there's a difference between taking

4   medications.  You can -- I can take a medication or

5   not, I can take a vaccine or not, but I'm not going

6   to take a vaccine, because I'm sincerely held

7   religious belief against those.  But I don't get

8   fired for medications, I get fired for not taking a

9   vaccine.  There's -- that's the difference we're

10  here about.

11      Q    So the -- so your objection is that it was

12  mandated?

13      A    The vaccine?

14           MR. DeMATTEO:  Objection, form.

15      Q    (By Ms. Engelman)  Your objection is that

16  the COVID-19 vaccine was mandated by Takeda?

17      A    Well, yeah, it -- I don't -- they can

18  mandate it all they want, but they also have to

19  respect that people have religious beliefs, and if

20  you say you're going to offer religious exemptions

21  and then deny them, what's the point of even

22  offering them?

23      Q    Okay.  So I don't think you answered my

24  question at all.  So my question --

25      A    Okay.



Page 37

```
 1        Q    -- was if -- you testified earlier that
 2   your religious objection to vaccines generally is
 3   that God gave you an immune system; is that correct?
 4        A    Correct.
 5        Q    Okay.  You also testified that medications
 6   can infringe upon your immune system; is that
 7   correct?
 8        A    I'm sure they could.  I don't know every
 9   medication.
10        Q    Right.  And we haven't gotten to your
11   medications yet, but we talked about medications
12   that your children have taken; is that correct?
13        A    Yes.
14        Q    Okay.  And so my question is,
15   Miss Schmidt, if you have an objection to vaccines
16   because they impact your immune system and
17   medications can also impact your immune system, why
18   do you not have a religious objection to giving your
19   children medications?
20        A    Well, No. 1, there's a big difference
21   between medications that you give a child and a
22   vacc -- and the vaccine, there is a difference.  I
23   don't give my kids vaccines, but I gave them some
24   medications for an allergy or an acne.
25             They are not -- and after learning of all
```



Page 38

```
 1    of this stuff, they don't get -- they don't take
 2    anything unless we pray about it, talk about it.  We
 3    stopped using the Proactiv and started using an
 4    aesthetician, which is, what's the word I'm trying
 5    to think of, a more like holistic, natural approach
 6    diet, change of diet.
 7              So the difference is the fact that him
 8    taking that medication is out of his system.  It
 9    didn't have any, you know, issues.  Sorry, my screen
10    keeps going.  There we go.  But we were not going to
11    give them vaccines until their immune systems were
12    better.
13              So I don't know, I guess medications and
14    vaccines are just -- are totally different in my
15    mind, so -- and in my beliefs.  I think that there
16    are medications that can be used for good in a
17    certain patient and they may need to be used.  But
18    there's --
19         Q    Okay.
20         A    -- a choice to take them or not take them.
21         Q    But there's a choice to take a vaccine and
22    not take a vaccine; correct?
23         A    Well, but there's consequences if you
24    don't in -- when I worked for Takeda.
25         Q    Okay.  And what is the difference between
```



Page 39

1    medications and vaccines, I'm just not sure I

2    understand your testimony?

3          MR. DeMATTEO:  Objection, form.

4      A    So medications are used to help,

5    there's -- they have been tested, they go -- I

6    actually can read what's in them.  They -- I mean

7    lots of them have been around for a long time, and

8    you have a choice to take them or not.

9          They're usually -- once they're in your

10   system, you can use them and then they're gone, and

11   you just -- that's the thing, it's a choice.

12         Vaccines are -- you know, in this

13   situation, I don't -- I did not vaccinate my kids.

14   I'm not going to give myself a COVID shot.  I'm not

15   going to get a vaccine.  They are different.

16   Vaccines are in your body, you cannot untake a

17   vaccine.  You can stop taking a medication.  So --

18     Q    (By Ms. Engelman)  So --

19     A    -- that's the difference I see.

20     Q    Okay.  So how do you make the decision

21   about whether or not a medication comports with your

22   religious beliefs?

23     A    Well, there's -- you know, I pray about it

24   and see -- you know, just ask, you know, if -- if

25   this is something I should be doing or not.  I mean



Page 40

```
 1   talk about it, what are the repercussions if I do or
 2   don't take a medication or if anyone in the family
 3   does or doesn't take medication, I mean --
 4        Q    Okay.  And you said that you -- that
 5   they've been tested and you know what's in them; is
 6   that right?
 7        A    Well, medications have -- you can read the
 8   ingredients, you can see studies and stuff, so yeah.
 9        Q    Okay.  And have you researched every
10   medication that you've ingested or that your
11   children have ingested?
12        A    I've looked into all of them.  Am I like
13   an expert on it, no.
14        Q    Okay.  And how is it that you looked into
15   them?
16        A    Read their PIs, read adverse events,
17   looked at information about it, so...
18        Q    And did you study their half-lives?
19        A    I looked at -- yeah, I looked at that
20   stuff.  I couldn't say it off the top of my head of
21   anything.
22        Q    So you made a determination of how long
23   the medication lives in the body?
24        A    Well, usually, if you take a medication
25   daily, then it's usually a 12-hour half-life, you
```



Page 41

1    know, because it would be peaking at -- I believe

2    it's peaking at 12, and then it goes down, but I

3    could be wrong, it's been a long time since I looked

4    into that stuff, so...

5        Q    Okay.  And so you testified earlier that

6    our bodies are made in the image of God; right, and

7    so our body's a temple.  So how is it that you make

8    a decision about whether or not to ingest a

9    medication given that your body's a temple or not?

10        A    Well, because sometimes we need -- I

11    mean -- so if I have a choice to not take a

12    medication or to take one, I'm going to go with not

13    taking one.

14            I believe that, you know, my God is the

15    author of science.  I don't have any issues with

16    medication.  One of his -- Luke was a physician.  So

17    it's not about doctors, it's not about physicians,

18    it's just about what is going to go in my body.  I'm

19    going to pray about it, and I'm going to think about

20    it and is it -- is it something that I can -- I can

21    be okay with.

22            And there has to be reasons why I would

23    take a medication that are more than just one is I

24    have chil -- so I have children.  So I want to be

25    there for my children, administer to them, and raise


MAGNA
LEGAL SERVICES

Page 43

1    science?

2         A    I think it's interesting that it's not --

3    there's -- there's only one that is -- it's still

4    under Emergency Use Act.  Science wise, I -- you

5    know, that's -- I'm not a -- you know, what I think

6    is -- is I guess -- I just have my beliefs.

7         Q    And what are your beliefs, that's what

8    we're here to talk about today?

9         A    My beliefs are that I'm not going to take

10   the COVID vaccine.

11        Q    Okay.

12        A    That's my belief.

13        Q    Okay.  So sitting here today, why is it

14   that you are not willing to take the COVID-19

15   vaccine?

16        A    Because it's -- No. 1, I had COVID before

17   the vaccines came out, so I didn't need it.  No. 2,

18   this is the only vaccine that I've seen change

19   throughout the entire process that's been around.  I

20   mean -- I mean, first, it was you can't get -- you

21   can't get COVID if you get the vaccine.  Oh, well,

22   okay, you can get COVID.  Oh, you can't get it as

23   bad.

24             Oh -- you know, oh, you only need one

25   shot.  No, then you need your booster.  Oh, okay,



Page 44

```
 1    that's all you're going to need.  Oh, now you're
 2    going to need it every year.
 3            And the effic -- efficacy has gone from
 4    supposedly 100 percent to now it's 50 percentish or
 5    something like that.  So it is different.  It's
 6    different than other vaccines.  It's mNRA (sic) as
 7    well, so...  It -- it's different, I mean --
 8        Q    I'm sorry, did you say it's mNRA?
 9        A    Well, there -- I mean that's a
10    different -- that's a different mechanism of action
11    now that it's been using mRNA, sorry.
12        Q    And what's your objection to that?
13        A    Just a different -- different way of
14    delivery.  I wouldn't say I have an objection to it,
15    but I'm not going to do it, so...  I don't -- yeah,
16    I'm not -- I'm just not going to do it.
17        Q    Okay.
18        A    That's all I can say.
19        Q    Any other reason sitting here today that
20    you're not going to take the COVID-19 vaccine?
21        A    It just -- it's produced in -- in ways
22    that I'm not going to -- I'm not going to con --
23    condone and do, so...
24        Q    In what ways is that?
25        A    Well, A, it's under Emergency Use Act and
```



Page 45

1    it's not FDA approved.

2         Q    So the fact that it was under Emergency

3    Use Act is the primary reason why you wouldn't take

4    the COVID-19 vaccine?

5         A    That was one of them, yeah.

6         Q    And -- and why is that?

7         A    Well, because it's not -- it's not been

8    tested, and, you know, the -- in -- in my letter to

9    Takeda, it -- it was designed using aborted baby

10   cells, so...

11        Q    And when did you become aware that it was

12   designed using aborted baby cells?

13        A    When it started coming out and I read

14   about it.

15        Q    And where did you read it?

16        A    I read it in a lot of forums that I

17   follow, and my husband shared some information.  We

18   just kind of researched it and looked at it and

19   watched it.

20        Q    What forums do you follow that you're

21   referencing there?

22        A    Well, there is -- Liberty Counsel had a

23   lot of information about it, and you could just --

24        Q    What is Liberty Counsel?

25        A    What is Lib -- it's just a forum that has



Page 48

```
 1        A     No. 1, some of the stuff I didn't agree

 2  with, that natural immunity is just as effective as

 3  vaccine immunity.  That would be one.

 4        Q     So you concluded that CDC was putting out

 5  not truthful information; is that right?

 6        A     That's not what I said.  I said --

 7        Q     Well --

 8        A     -- that I didn't agree with the fact that

 9  they didn't take into account that natural immunity

10  is -- has any bearing as much or as much as vaccine

11  immunity.

12        Q     Okay.  Anything else that you thought

13  about the information CDC put out in 2020?

14        A     Well, it seems like a lot of stuff that

15  was put out in 2020 changed throughout the process

16  of where we are today.

17        Q     And what specifically are you referring to

18  that changed?

19        A     The efficacy of the vaccine.

20        Q     Anything else?

21        A     Masks.

22        Q     What about masks?

23        A     Well, I'm just saying masks.  They can be

24  effective, but in the long run, they're -- they're

25  not as effective as they thought they were.  I mean
```



Page 49

```
 1    that's -- but that's not about vaccines, that's

 2    about COVID molecules.

 3              THE COURT REPORTER:  COVID what?

 4         Q   (By Ms. Engelman)  Anything else?

 5              THE COURT REPORTER:  I'm sorry, I didn't

 6    hear the word after "COVID."

 7              THE WITNESS:  Oh, COVID molecules.

 8              THE COURT REPORTER:  Thank you.

 9              THE WITNESS:  Forgive me.

10         Q   (By Ms. Engelman)  Anything else that --

11    any other information that the CDC put out that has

12    changed over time in your view?

13         A   I couldn't -- you know, I couldn't tell

14    you unless I did a deep -- a deep dive into it

15    again, so...

16         Q   Did you --

17         A   But that's the things that are coming to

18    my head right now.

19         Q   And did you follow CDC guidance?

20         A   Of getting vaccinated, no.

21         Q   Why is that?

22         A   Because I have a sincerely held religious

23    belief that I'm not going to get vaccinated with the

24    COVID-19 vaccine.

25         Q   Okay.  Do you believe generally that the
```



Page 50

1    COVID-19 vaccine stopped the -- helped -- helped to
2    stop the spread of COVID?
3        A    You know, I'm not sure.
4        Q    You have no opinion of that sitting here
5    today?
6        A    I think that natural immunity helped more
7    than anything.
8        Q    If you didn't have a religious -- a
9    religious objection to taking the COVID-19 vaccine,
10   would you have gotten it?
11            MR. DeMATTEO:  Objection, form.
12       A    That's something I can't answer, because I
13   can't take Christ out of my heart and answer that
14   question.  I only see things through the lens of the
15   Bible and through Jesus.  So I have no idea what --
16   what -- what would happen.
17       Q    (By Ms. Engelman)  Okay.  Going back to
18   your preparation for your deposition, you talked to
19   your husband.  Did you talk to any of the other
20   plaintiffs in this case, specifically, in
21   preparation for the deposition?
22       A    You know, I don't -- I think just making
23   sure that I -- information, I don't -- I can't -- I
24   don't know.  I don't -- I'm like trying to think
25   back specifically like questions now.  I don't know.



Page 58

1    specifically about their decision to take the

2    COVID-19 vaccine in your study group?

3        A    I'm sure there was a -- I'm sure we had a

4    conversation.  I don't know, I don't really

5    remember.  I mean -- I mean I just made my -- I just

6    made my -- my decisions and voiced what I thought,

7    so...

8        Q    And is Stacey vaccinated?

9        A    I believe so.  She -- I believe she did

10   one shot and said she'd never do it again.

11       Q    Okay.  And why is that?

12            MR. DeMATTEO:  Objection, form.

13       A    I don't know.  She just -- I mean my --

14   from what I remember of our conversation, she just

15   said, "I would never do it again."  I don't remember

16   anything other than that.  She may have said

17   something, I don't know.

18       Q    (By Ms. Engelman)  Okay.  And did any -- do

19   you believe -- well, strike that.  Anyone else in

20   your religious -- I'm sorry, Bible study group who's

21   vaccinated?

22       A    I'm sure there are quite a few of them

23   vaccinated.  I don't know all -- I mean off the top

24   of my head, I could name a few of them that I know

25   are.



1      Q    Okay.  And did the Bible study group ever
2  specifically discuss how your study of the Bible and
3  your collective religions would impact a decision to
4  get the COVID-19 vaccine?
5      A    No, we don't -- we don't take it as -- the
6  Bible study is not to be a group think about
7  vaccines.  Our vacc -- our Bible study is to be a
8  group think about God.  So they're free to do
9  whatever they want to do with their bodies.
10          It was never about, you know -- I -- I
11  don't tell them what to do with their bodies, and
12  they don't tell me what to do with my bodies, we
13  just talk about God and learn about God and study
14  the Bible.  So --
15     Q    But doesn't God have an opinion about what
16  you do with your body, isn't that what you testified
17  earlier?
18     A    God has an opinion --
19          MR. DeMATTEO:  Objection, form.
20     A    God has an opinion like -- well, I don't
21  know if God has an opinion what I -- I mean he puts
22  it in the Bible, and I read it, and that's my
23  opinion of what I think God's telling me.
24     Q    (By Ms. Engelman)  Okay.  And so do you
25  believe that the -- the folks' decision to get the



Page 60

```
 1   COVID-19 violated the religious docrin -- doctrine
 2   that your body's a temple?
 3       A    What I think they do with their own bodies
 4   is not my -- is -- they can do whatever they want.
 5       Q    Okay.  So you --
 6       A    I -- they -- that's -- sorry.  I'm not
 7   going to tell them what to do with their bodies.
 8   And -- and they can interpret the Bible how -- how
 9   they want to interpret it.  I interpret -- when I
10   read it, I'm going to interpret it for myself and --
11   and apply it to my life.
12       Q    Have you ever been married to anyone other
13   than Tray?
14       A    No.
15       Q    And where does Tray work?
16       A    He's a realtor.
17       Q    Does he work for a company or does he work
18   for himself?
19       A    Well, he's -- he is a independent realtor
20   and -- for a company I guess, so...
21       Q    You testified earlier that you sought
22   religious exemptions for your children from their
23   schools; is that right?
24       A    Correct.
25       Q    When is it that you sought religious
```



Page 85

```
 1   COVID vaccines, any vaccine, any medicine.
 2        Q    Do you read the VAERS report --
 3        A    And I can't --
 4        Q    -- of other medicines?
 5        A    I can't say I have.  I don't know.
 6        Q    Okay.  So I'm asking why you read the
 7   VAERS report for the COVID-19 vaccine?
 8        A    Well, you can -- you can read it.
 9   There's -- I've seen tables more -- I've seen tables
10   of the VAERS report in articles, so...
11        Q    Have you read the VAERS -- any VAERS
12   report independently on the CDC website?
13        A    Not to my recollection that I can
14   remember, but I might have.
15        Q    So you've just seen excerpts of it in
16   articles; is that right?
17        A    Yeah.
18        Q    Okay.  Did you have concerns that people
19   were dying from the COVID-19 vaccine?
20        A    Yeah, I -- I have concerns if anyone's
21   dying from something.
22        Q    Okay.  And when did you come to -- well,
23   strike that.  What other adverse events were you
24   aware of of the COVID-19 vaccine?
25        A    Well, there's pericarditis, myocarditis
```



Page 86

1   that's happening in a lot of young people.  There's

2   an increase in healthy people dying, and when I say

3   "healthy people dying," that has been on the news

4   that I've seen.

5        Q     Anything else that you're aware of?

6        A     There's blood clots.  I mean I'm sure

7   there's more I could find if -- if I think about it.

8        Q     Okay.

9        A     I think if I'm -- I'm sure there's -- I'm

10  sure there's stuff I've read, I just can't -- at

11  this time, can't recollect right now everything.

12       Q     Okay.  And when the COVID-19 vaccine came

13  out, were you concerned about the safety of the

14  vaccine?

15       A     I -- of course, I'm concerned about the

16  safety of a vaccine that people are going to take

17  and probably -- and people that I love that took.

18  But I -- that wasn't why I didn't take the vaccine.

19  I didn't take the vaccine, because I had a sincerely

20  held religious belief that I wasn't going to take

21  the vaccine, just like I haven't taken any

22  vaccines --

23       Q     Okay.

24       A     -- since childhood.

25       Q     Okay.  Celina, can we scroll down.  So



Page 137

```
 1   of the Bible as like a guide to life if you want.  I
 2   mean that's how I look at it.  It's a -- it's a, you
 3   know, how to -- how to live life.
 4        Q    Does the Bible say anything about how you
 5   should eat?
 6        A    It says to -- to keep yourself clean,
 7   yeah, and eat right, because your body is a temple.
 8   So you would want to not be -- you know, can you go
 9   eat a bad food, yeah.  You can do whatever you want,
10   you have free will, God gave you free will.  But you
11   should take care of your body, because God gave it
12   to you.
13        Q    What does eating clean mean?
14        A    Well, like not -- not clean as far as -- I
15   mean like you wouldn't -- I probably wouldn't down
16   like 50 cheeseburgers, because that wouldn't be good
17   for me, so...
18        Q    What is the biblical scripture that speaks
19   to how you should eat?
20        A    Well, I wouldn't say eat, it's -- it's I
21   believe something on the lines of, you know, "Your
22   body's a temple, and you're wonderfully made in my
23   image," so...
24        Q    Okay.  So that's what you're referring to
25   when you -- when you speak about eat -- eating?
```



 1       A    Yeah.

 2       Q    So how does that affect your diet on a

 3  day-to-day basis?

 4       A    I try to eat pretty healthy.  I try to

 5  exercise.  I do a lot of vitamins.  I mean --

 6       Q    What did you eat today?

 7       A    Right now, I've had oatmeal and carrots.

 8       Q    Okay.  Anything else today?

 9       A    Coffee.  No, oatmeal, carrots, coffee, and

10  a seltzer water that I'm drinking on.

11       Q    And so you drink caffeine?

12       A    I do.

13       Q    Okay.  And do you think that violates your

14  religious beliefs that your body's a temple?

15       A    No.

16       Q    Okay.  Do you drink diet soda?

17       A    I've had diet soda, but I don't drink diet

18  soda.

19       Q    Or soda of any kind?

20       A    I can drink Pepsi, and I'll drink the --

21  we buy the zero sugar Pepsi.

22       Q    Do you eat fried food?

23            THE COURT REPORTER:  Do you what?  I'm

24  sorry, I didn't hear the end of that, do you?

25       Q    (By Ms. Engelman)  Fried food?



Page 139

1       A    Yes, I -- I've had fried food, and

2  there's -- I eat french fries, yeah.

3       Q    Have you consulted with God about your

4  decisions to eat unhealthy food and drink?

5       A    I've talked to God about just making sure

6  that I stay -- you know, I want to be as healthy as

7  I can.  But that's not like a conversation that I

8  have, it's more of like I'm just trying to -- trying

9  to just be healthier and to stay healthier.  Just,

10  A, it's better for your body, it helps your immune

11  system when you eat healthy.  You don't have to --

12  you know, you can prevent a lot of diseases by

13  eating healthy.

14            We know that if you eat a lot of fried

15  foods, fattening foods, you can get Type 2 diabetes,

16  I mean that kind of stuff.  So I mean I think eating

17  healthy isn't a godly thing, I think it's -- I think

18  people that aren't godly eat healthy too, so...

19       Q    So eating healthy has nothing to do with

20  your belief that body's -- your body's a temple?

21       A    Well, okay, you're changing my words, but

22  there are people that -- for me, I eat healthy to

23  honor God, but there are people who don't believe in

24  God that eat healthy, so...

25       Q    You're honoring God when you drink soda;



Page 140

```
 1   is that right?
 2        A    Where does it say that I can't drink soda
 3   in the Bible?
 4        Q    Well, your body is a temple.  Do you think
 5   soda is a healthy -- well, strike that.  Do you
 6   think soda is healthy for your body?
 7        A    I don't think it's going to kill you to
 8   have one.
 9        Q    Okay.  Have you smoked in the last
10   10 years?
11        A    No.
12        Q    Do you have any tattoos?
13        A    Nope.
14        Q    Have you ever done any drugs?
15        A    No.  When I was in high school, I smoked
16   pot once or twice.  But I wasn't a Christian then.
17        Q    Okay.  So do you research all of the food
18   that you put in your body, since you're honoring God
19   every time you eat, to see what's in it?
20        A    Well, there's a -- okay.  So, no, I don't.
21   And there's probably times where I'm eating
22   something that is probably -- like candy, probably
23   not the greatest.  But it's one of those things
24   where we know that if I eat it, I digest it, it
25   comes out.
```



Page 141

```
1               So I mean I am thankful when I eat a meal.
2    We give thanks every time that we eat.  So I mean I
3    think that's -- I think you're kind of going to a
4    really crazy -- I guess taking words out of my mouth
5    and changing it.
6         Q    Is it your testimony that it doesn't
7    matter what you put into your body as long as it
8    comes out of your body?
9         A    No, that's not my testimony.
10        Q    And can you explain to me what the
11   justification is that candy and fried food and
12   alcohol comes out of your body, and that therefore,
13   it does not violate your religious beliefs that your
14   body is a temple?
15        A    Well, I think you're -- you're missing the
16   point is I'm not saying I'm perfect, that's why I
17   have Jesus Christ as my savior, because he covers
18   all my sins.  So if God was unhappy with me doing
19   something, it -- you know, if I felt that I needed
20   to repent from eating a cheeseburger, I would -- I
21   would know to repent.
22              We're not perfect, I'm not perfect, but I
23   try to live a life that would be honoring and treat
24   my body as a temple.  So, yes, there's times where
25   I'm going to probably eat something that's not the
```



MAGNA ▶
LEGAL SERVICES

Page 142

1    greatest for me.  You got me on that.

2        Q    And have you ever repented for eating

3    something that's unhealthy?

4        A    Not that I -- I mean I don't know.  I mean

5    there's probably where I've overeaten, and I'm like,

6    oh, man, that wasn't smart, forgive me for

7    overeating.

8        Q    Have you ever donated money to any of your

9    online churches?

10       A    We do -- places that we do -- donate money

11   are to the, what's it called, oh, my gosh, Life

12   Choice Ministries, which is to help women to -- that

13   want to keep their babies instead of having an

14   abortion.  We give money there.

15            We do a -- you know, kind of our tithing,

16   I mean I don't call it our -- it's -- tithing's kind

17   of a word, but the way we give money is, you know,

18   if -- if it arises a time that someone is in need

19   and we see that, we -- we do that.  Other things

20   that we do is -- I mean we have given money to David

21   Jeremiah I believe.

22            One of our things is we pay -- you know,

23   our -- our homeschooling is part of my -- our

24   mission for our kids, so that's something that we

25   spend money on.  What else?  Flint Hills Christian



```
 1       A    I'll have to think about that.  I'd have
 2  to talk to my husband.  I know we've talked about
 3  it, that we wanted to give it to find something that
 4  if it's his or somewhere else, what's the best use
 5  of the money, do we want to keep it local, do we
 6  want -- you know, or give it to him, so...
 7       Q    Have you ever given to J.D. Farag?
 8       A    I don't recall.
 9       Q    Do you know if any of the online churches
10  that you attend have an official stance on the
11  COVID-19 vaccine?
12       A    They -- I know that J.D. Farag believes
13  that his parishioners are able to make the decision
14  for themselves, and if they don't want to take it,
15  he had -- because we listen to him.  He wrote a
16  letter for -- you know, it was a letter that we
17  could use.  And I know Pastor Jack has the same
18  thing, that it is a personal decision and -- but
19  they support that decision.
20       Q    They support the decision not to get
21  vaccinated or they support the decision to get
22  vaccinated?
23       A    Either way.  It's -- it's -- it's the
24  parish -- it's their parishioners' decision to do
25  whatever they want to do.
```



Page 149

1    not get vaccines started way before COVID came out.

2        Q    Right, okay.

3        A    Because my -- because my kids were born in

4    '05, and I haven't had a vaccine since I was a

5    child.  So, you know, there's that, kids.

6            I also got a religious exemption to not

7    get a flu shot to get into a doctor's office during

8    my time as a pharmaceutical rep., and that was a

9    religious exemption.  We didn't -- our children were

10   religious exemptions.

11           So COVID didn't change my views on not

12   getting vaccinated, because I had a sincerely held

13   religious -- religious belief.  The outcome is the

14   only thing that changed is that I was fired.

15       Q    Understood.  But just remind me what --

16   what precisely is your religious objection to

17   vaccines in general, which would include the

18   COVID-19 vaccine?

19       A    Because I hold a sincerely held religious

20   belief that I don't need to get a vaccine, my

21   children do not need to get a vaccine.

22           I prayed -- you know, we prayed, something

23   we weren't going to do.  We were going to let their

24   immune systems, we're going to let our immune

25   systems take care of it.  God created us, he created



Page 150

1  immune systems.  And some of those medications -- or
2  some of those vaccines are made in ways that are not
3  what we would consider something we would want to
4  put in our body.
5      Q    So when did you -- when is it that you
6  became aware that the COVID-19 vaccines used aborted
7  fetal cells?
8      A    Probably when they came out or even in
9  production possibly.  I don't -- I can't give you an
10  exact date.
11      Q    Prior to becoming aware that the COVID-19
12  vaccine used aborted fetal cells, were you aware
13  generally that some vaccines use aborted fetal
14  cells?
15      A    Yes, because the -- I mean I --
16  researching -- well, my husband and -- researching
17  and sharing stuff with me, yes, I knew that there
18  were some other vaccines that used it.
19      Q    Okay.  So by the time you researched
20  whether or not the COVID-19 vaccine contained
21  aborted fetal cells, you had already decided that
22  you weren't going to take the vaccine; is that
23  right?
24      A    I wasn't going to take the vaccine,
25  because I don't take vaccines, and that hap -- that



Page 151

1    stance started way before COVID.

2        Q    So could you just answer my question, had

3    you already decided that you wouldn't take the

4    vaccine before you became aware that the COVID-19

5    vaccines used aborted fetal cells?

6        A    Well, I -- I guess that would -- I wasn't

7    going to take the vaccine, because it goes against

8    my sincerely held religious belief made with fetal

9    cells as well, but that's not --

10       Q    Well, that's what I'm trying to

11   understand.  You testified earlier that you had made

12   the decision not to get the COVID-19 vaccine as soon

13   as there was even talk of a vaccine; is that right?

14       A    Okay.  So I don't believe in vaccines, so

15   me -- I never was going to get a vaccine, and I

16   haven't gotten a vaccine.  So really, I guess I

17   was --

18       Q    You were never going to get a vaccine

19   regardless of whether or not the vaccines contained

20   aborted fetal cells or not; is that correct?

21       A    Well, that's -- okay.  Can you -- can you

22   restate your question then so I understand

23   what you're wanting?

24       Q    You were never going to get a vaccine

25   regardless of whether or not the COVID vaccine



Page 152

```
 1   contained aborted fetal cells or not; correct?
 2        A    I was never going to get a vaccine --
 3   sorry.  I guess I'm kind of confused of how you're
 4   saying that.
 5        Q    You testified earlier that you were never
 6   going to get the COVID vaccine; is that correct?
 7        A    Yes, correct, because I don't get
 8   vaccines.
 9        Q    Okay.  And you made that decision prior to
10   becoming aware that the COVID-19 vaccine actually
11   used aborted fetal cells; is that correct?
12        A    Well, that's just coinci -- I mean that's
13   just -- I mean --
14        Q    It's a yes or no question.
15        A    That's the chicken and the -- okay.  So I
16   didn't -- okay.  So, yes, I would not get a vaccine
17   that had aborted baby cells in it.
18        Q    That wasn't my question.
19             MS. ENGELMAN:  Kelly, can you --
20        A    Okay.  I guess I don't -- I guess I don't
21   understand what you're asking.
22        Q    (By Ms. Engelman)  Okay.  Let's take a step
23   back.
24        A    My apologies, I'm sorry.
25        Q    That's fine.  I believe you testified
```



Page 153

1    earlier that you were never going to get a vaccine,

2    the COVID-19 vaccines, because you don't get

3    vaccines generally; is that right?

4        A    I don't -- so generally, I don't get -- I

5    have not had a vaccine since I was a kid, so I would

6    not get a vaccine, yes.

7        Q    And is that a decision that you would make

8    regardless of whether or not the COVID vaccine

9    contained aborted fetal cells?

10       A    Correct.

11       Q    So your decision not to get the COVID

12   vaccine predated your realization that the COVID

13   vaccine contained aborted fetal cells; is that

14   correct?

15       A    So I guess my -- how would I -- okay.  I'm

16   trying to understand is if I'm -- I have never

17   gotten a vaccine because of my sincerely held

18   religious beliefs, so how would I know that COVID

19   was going to come and I would pre-say I wouldn't get

20   the COVID vaccine when I wouldn't get COVID

21   vaccines -- or I wouldn't get a vaccine anyway.

22            So it doesn't matter that it was COVID.

23   I -- so I guess that's -- I guess I'm not

24   understanding what you're saying, but how would I --

25   how would I know in the future that a COVID and



Page 154

1    COVID vaccines were coming.  My stance has always

2    been the same.

3         Q    Okay.  That's fine.  Are there certain

4    groups of people that you believe are more likely to

5    get serious symptoms or -- or side effects from

6    COVID?

7         A    They say there are.  I don't -- I don't

8    know, I've never -- I'm not a medical clinician that

9    treated people, so I don't know.  I could -- they

10   said people that were elderly have a harder time and

11   people with compromised immune systems.  So I'm

12   going with what was relayed on news channels and

13   saying and hearing.

14        Q    Okay.

15        A    So that's what I'm hearing -- what I've

16   heard, that's what I've heard.

17        Q    Okay.  Do you have any understanding about

18   how the COVID-19 -- the COVID-19 vaccines work?

19        A    I used to be better at it and kind of

20   understood it.  It's been a while since I have

21   researched or even looked at like -- or I guess I

22   would say not researched or kind of, but heard and

23   like kind of read about it.

24             So I couldn't tell -- I couldn't give you

25   a good -- I mean from -- from my understanding, the



Page 164

1    God to honor my decision, and -- and to help me stay

2    strong and --

3        Q    What information did your husband provide

4    to you?

5        A    My husband and I got the J.D. Farag E-mail

6    letter, so we looked into that, because that's who

7    we were looking at at the time, and also, just

8    looking at religious exemptions and how they worked,

9    so...

10        MS. ENGELMAN:  Okay.  Celina, can we grab

11    14, please.

12        Q    (By Ms. Engelman)  Do you see this E-mail

13    from September 14th, 2021 from you?

14        A    Yeah.

15        Q    And this is you're sending it to the U.S.

16    Religious Accommodations E-mail address?

17        A    Correct.

18        Q    So four days have passed between the

19    E-mail requesting a religious exemption should you

20    so seek one and the time that you actually submit

21    your religious exemption form; is that right?

22        A    I -- it looks like the dates, yes.

23        Q    Okay.  And did you feel that was enough

24    time to prepare your Religious Accommodation Form?

25        A    Well, I had already prepared a Religious



Page 165

1    Accommodation Form before and knew of my stance on

2    taking vaccines, so that was already done.  So yeah.

3        Q    Okay.

4        A    And I -- also, the other -- one other

5    thing is that I think everyone knew that this was

6    going to be mandated, so also pre -- I mean me and

7    my -- if I'm remembering correctly, me and my

8    husband were preparing for this to happen or if it

9    was going to happen.

10            So, yeah, I mean we -- we could -- we

11   figured this was going to happen, so we started

12   prepping and thinking about it and praying about it

13   and doing a little bit of I would say looking at

14   what religious exemptions are in this case, so yeah.

15       Q    Okay.  So needless to say, you -- you had

16   enough time to collect all the information that you

17   wanted Ta -- Takeda to include to consider in your

18   religious exemption request; is that right?

19       A    The best -- to the best of my knowledge,

20   yes, that's what I thought I would need.

21       Q    Okay.  And you say here, "Attached to this

22   E-mail, you will find my Religious Accommodation,

23   exemption letter describing my religious beliefs,

24   and spiritual leader letter per your request.

25   Sincerely, Jillyn."  You see that?



```
 1    what you represented to Takeda first.  So you say in
 2    the first paragraph, "I cannot and will not be able
 3    to receive a COVID-19 vaccine because to do so would
 4    violate my sincerely held religious beliefs."  Do
 5    you see that?
 6        A    Yes.
 7        Q    And you agree with that today?
 8        A    Yes.
 9        Q    Okay.  And you say, "All the currently" --
10        A    Yes.
11        Q    -- "available COVID-19 vaccines used cell
12    lines originating from aborted children in their
13    manufacturing, development and/or testing.  My
14    religious beliefs combel -- compel me to abstain
15    from accepting or injecting any of these products
16    into my body, regardless of the perceived benefit --
17    benefits or rationales."  Do you see that?
18        A    Yes.
19        Q    And that was your belief at the time?
20        A    That's my be -- that's my belief, yes.
21        Q    And that's your belief sitting here today?
22        A    Yes, that's --
23        Q    Okay.
24        A    -- my belief.
25        Q    Okay.  So you testified earlier that you
```



Page 168

1    would have made the decision not to get vaccine --
2    the vaccine, the COVID-19 vaccine, because you are
3    against all vaccines; is that right?
4        A    Yes, I'm against vaccines, so yeah.
5        Q    Okay.  And you testified earlier that you
6    made the decision to get -- not to get the COVID-19
7    vaccine prior to your realization that it used
8    aborted fetal cells; is that right?
9        A    Because -- yes, because it's a vaccine,
10   and I don't get vaccines because of my sincerely
11   held religious beliefs.
12       Q    Okay.  Where does it say that in this
13   letter?
14       A    That I do not get vaccines because of my
15   sincerely held religious beliefs?
16       Q    Uh-huh.
17       A    Well, I guess my religious beliefs compel
18   me to abstain from accepting or injecting any of
19   these products into my body, regardless of perceived
20   benefits or rationale.  So I guess this would be
21   specific to COVID.
22       Q    What I guess I'm trying to understand is
23   your testimony earlier that you had made the
24   decision to -- not to get the COVID-19 vaccine prior
25   to your understanding that it contained aborted



Page 169

1    fetal cells; correct?

2         A    Well, here's the thing is I -- I guess

3    it's -- I don't get vaccines, because it goes

4    against my sincerely religious belief.  That was set

5    precedent way before COVID came out.  So I guess I

6    should have been more specific in this letter and

7    said, "I don't get vaccines, period."  So shame on

8    me for not being perfect in writing this letter.

9         Q    Okay.  And so your sincerely held

10   religious beliefs that prevent you from getting any

11   vaccines is -- relates to the fact that God gave you

12   immunity; correct?

13        A    Yes, God gave me immunity.

14        Q    Okay.  And you didn't say anything about

15   immunity in this letter; is that right?

16        A    Correct.

17        Q    Okay.  And why is that?

18        A    Because I'm not a professional person that

19   is going -- knows the ins and out of the legalities

20   of this stuff.  I wrote it from my heart.

21        Q    But you understood what your -- you

22   understood what your beliefs were at the time;

23   right?

24        A    Well, I wrote it from my heart.  So, you

25   know, if I could go back and write it again and



Page 170

1  explain it better, I would.

2      Q    So why is it that you chose to include the

3  fact that the COVID-19 contained aborted fetal cells

4  if that wasn't your objection at all?

5      A    Well, it -- it is still my objection,

6  because I don't believe in the fact that these would

7  contain that, but it -- but it kind of -- it negates

8  the fact that I -- that I don't -- that vaccines are

9  something that I don't -- I didn't use and haven't

10  used, you know.  That's my decision of sincerely

11  held religious belief that I'm not going to do

12  vaccines.  So I guess --

13      Q    But you didn't explain that to Takeda, did

14  you, in this letter?

15      A    In this letter, no, I did not.

16      Q    You said that you've "included a letter

17  from my family's pastor, J.D. Farag, at your request

18  and in good faith, even though it is not legally

19  required to affirm my religious beliefs."  Do you

20  see that?

21      A    Correct.

22      Q    And -- and you said you weren't familiar

23  with the legalities.  Where did you get -- where did

24  you get that information that it wasn't legally

25  required?



Page 171

1      A    Well, you don't have to prove your

2  religious -- from a pastor or anything, you can

3  just -- I mean you don't have to, you don't have to

4  do that.

5      Q    How do you know that?

6      A    Because my husband researched that fact.

7      Q    Okay.  So you were familiar --

8      A    And we talked about --

9      Q    -- with those legalities?

10     A    Well, I was familiar with that legality,

11  not the fact that I had to testify about or put in

12  there about my previous vaccine requirements.

13     Q    And how is it that you came to request the

14  letter from J.D. Farag?

15     A    Because we had been listening to him about

16  just, you know, COVID in general, and he talked

17  about it a little bit in his sermons, and so -- and

18  he -- it was on his website that anybody who is

19  asking for an exemption, that if you are a member of

20  his online community, that he has a letter that he

21  will send, because he believes that we have the

22  right to a religious exemption.

23         MS. ENGELMAN:  So Celina, can we go to 43,

24  please.

25     Q    (By Ms. Engelman)  Is -- do you recognize



Page 172

1  this, Miss Schmidt?

2       A    Actually, my husband did it for me and --

3  and helped me out on that.

4       Q    Okay.

5       A    I do recognize -- I do recognize the

6  letter, yes.

7       Q    Okay.  So you didn't actually go on and

8  request the -- the letter?

9       A    Well, my husband -- my husband said he

10  would help me with that and get that done for me.

11       Q    Okay.  And so looking here today, it looks

12  like you can fill out your information and then it

13  will generate this letter, which we will look -- we

14  will look at in a second.  Is it your understanding

15  that anyone could go on here and request a letter?

16       A    Yeah, anyone could do that.

17       Q    Okay.  Can you scroll down, Celina.  And I

18  don't know if there's a way to make that bigger.

19       A    I have mine, so...

20       Q    And do you recognize this letter?

21       A    Yes.

22       Q    And so is this a form letter that was

23  created by J.D. Farag?

24       A    Yeah.

25       Q    Okay.  Did you --



Page 173

```
 1          A     It's a form letter.
 2          Q     Okay.  Did you speak with him directly
 3     about your religious beliefs or explain -- explain
 4     your religious beliefs at all to J.D. Farag before
 5     he provided you this letter?
 6          A     No, because I -- as I previously said, I
 7     have never contacted or talked to either of them --
 8          Q     Okay.
 9          A     -- or had contact with them.
10          Q     Okay.  And so did you read this letter
11     before you submitted it to Takeda?
12          A     Yes, I did.
13          Q     Okay.  And do you agree with everything in
14     this letter?
15          A     Yeah, for the --
16          Q     Okay.
17          A     -- most part I think for the -- yeah.
18          Q     Is there anything sitting here today that
19     you would change in this letter?
20          A     Let me read it, please.  I think it states
21     that -- I think it states how I feel pretty well,
22     yes.
23          Q     Is there anything sitting here today that
24     you would change or that doesn't reflect how you
25     feel?
```



Page 176

1    it.

2        Q    (By Ms. Engelman)  All right.  And what's a

3    conscientious objection?

4        A    We must follow the word of God, and we

5    also exhort others to a conscientious objection to

6    these vaccines.  So if our conscience tells us that

7    is something that we aren't going to take, which if

8    we prayed about it, then -- then we should be able

9    to say no to mandatory vaccines.

10       Q    Okay.  Did you say anything about a

11   conscientious objection in your letter to -- to

12   Takeda?  You can scroll back up, Celina.

13       A    I -- yeah, back up, can you?  Well, I said

14   because to do so would violate my sincerely held

15   religious beliefs, so yeah, I did.

16       Q    How was Takeda supposed to know that

17   that -- that means a conscientious objection?

18       A    Well, it's my belief, so...  And it says

19   my sincerely held religious beliefs, so...

20       Q    Okay.  Do you --

21       A    I wrote what I wrote.

22       Q    Do you remember having an interview about

23   your religious accommodation request?

24       A    Yes.

25       Q    And do you remember who that was with?



Page 177

```
 1        A     Christine Mealey I believe.
 2        Q     And what do you remember telling Christine
 3   during that interview?
 4        A     That it's my sincerely held religious
 5   belief to not take the vaccine, because -- and also,
 6   the fact that I have a problem with aborted fetal
 7   cells being used.
 8              MS. ENGELMAN:  Okay.  Celina, can we grab
 9   15.
10        Q    (By Ms. Engelman)  So this is a document
11   that I don't think that you've seen before,
12   Miss Schmidt, but I will represent to you that it's
13   the notes of Christine Mealey of your interview.  Do
14   you see that?
15        A     Uh-huh.  Yes.
16        Q     And in black is the questions that she
17   asked, and in red are her notes of what -- how you
18   responded.  Do you see that?
19        A     Yes.
20        Q     Okay.  And so if we scroll down, she asks
21   you:  "Tell me more about the company's policies,
22   then rules that conflict with your beliefs," and she
23   noted that it's -- the vaccine is derived, tested
24   from using aborted fetal children.  Do you see that?
25        A     Yes.
```



Page 178

```
 1        Q    Do you have any recollection of telling
 2   Miss Mealey about your objections to vaccines
 3   generally, because God gave you immunity?
 4        A    No.
 5        Q    Okay.  And why didn't you explain that to
 6   her during your interview?
 7        A    Because I was scared and nervous and
 8   probably a little overwhelmed with the situation.
 9        Q    So then if you scroll down, Celina, she
10   asks:  "Have you ever taken any other vaccines in
11   your life?"  And Christine notes that you said your
12   medical history is private, and basically, your past
13   doesn't affect your beliefs; is that right, do you
14   see that?
15        A    Well, the thing is I don't feel like I
16   should have to tell my medical beliefs for a
17   religious exemption.  And as you can see with the
18   documentation that I have sent to you, I have had no
19   vaccines.
20        Q    Okay.
21        A    And --
22        Q    But do you believe --
23        A    And that this here --
24        Q    -- that's medical?
25             THE COURT REPORTER:  One at a time.
```



Page 182

1  when your children were young and you were objecting

2  to giving them vaccines, that you generally were

3  aware that pharmaceutical companies used aborted

4  fetal cells in their research and production of

5  vaccine and medications?

6      A    No, because I didn't -- that wasn't the

7  reason that I didn't do that for my children.  It

8  wasn't about the aborted fetal cells, it was because

9  I had a sincerely held religious belief, and I

10  wanted them to have their God given immune system,

11  not inhibited.

12      Q    Okay.  I'm just trying to understand when

13  approximately, is it 10 years ago, is it five years

14  ago, that you've become generally aware that

15  pharmaceutical companies for whom you worked used

16  aborted fetal cells in the manufacturing and

17  production of some medications and vaccines?

18      A    I would say it was when -- I said it was

19  when COVID started coming out and the mandates were

20  coming out is when I really realized what was going

21  on.

22      Q    Okay.  So have you -- have you taken

23  Tylenol in the last two years?

24      A    I -- I don't know.  I don't -- I don't

25  believe so.



Page 183

1      Q      But you don't know for sure sitting here
2   today?
3      A      If anything, I know I have aspirin.
4      Q      Okay.  Have you taken aspirin in the last
5   two years?
6      A      Yes.
7      Q      Okay.  And have you researched whether or
8   not aspirin uses aborted fetal cells?
9      A      Well, aspirin came out before -- the HEK
10  cells came out in 1977, and aspirin's been around
11  since the 1800s.
12     Q      That wasn't my question.  Have you
13  researched specifically whether or not aspirin
14  uses aborted --
15     A      Yes.
16     Q      -- fetal cells in its manufacturing --
17     A      Well, I --
18     Q      -- and testing?
19     A      Well, I -- I saw that, I've looked at it
20  since, and it said that it's one of those that was
21  produced and made before HEK cells were even a
22  thing, so -- but I don't know -- but I've -- I don't
23  know if it's produced now with it, so...
24     Q      So you made no effort to determine that
25  one way or another before taking it?



Page 184

```
 1      A    Well, aspirin's been around since the
 2  1800s, and abortion HEK cells were 1977, so I guess
 3  I just did math and figured that it wasn't used.
 4      Q    Sitting here today, Miss Schmidt, have you
 5  done any research to confirm whether or not aspirin
 6  is used -- uses aborted fetal cells in any way,
 7  manufacturing, testing, or in its production?
 8            MR. DeMATTEO:  Objection, form.
 9      A    I've only -- I've only looked at -- to see
10  if it was, and that was -- my research showed that
11  aspirin had been produced before HEK cells was used.
12  So if it's used in the manufacturing now, then I did
13  not see that information.
14      Q    (By Ms. Engelman)  Where did you research
15  this?
16      A    I looked under it was God's Children I
17  believe is where it -- I Googled.  I did Google some
18  stuff like in that aspect of seeing through --
19  throughout and then medications in general, PIs,
20  so...
21      Q    Have you ever taken Pepto Bismol?
22      A    I've -- as a kid, yes, I took Pepto
23  Bismol.
24      Q    Have you ever taken Claritin?
25      A    No, I don't have allergies.
```



Page 185

1       Q      Have you ever taken Ibuprofen?

2       A      I have taken Ibuprofen.

3       Q      When have you taken Ibuprofen?

4       A      I probably took an Ibuprofen last year.

5       Q      Okay.  And have you researched whether or

6   not Ibuprofen uses aborted fetal cells?

7       A      I'm assuming it does, because it was after

8   the -- they were used or --

9       Q      Okay.  And -- and why is it that you

10  didn't confirm that information before you ingested

11  it into your body that you view as a temple?

12      A      Because my whole sincerely held religious

13  belief isn't also -- completely reliant on aborted

14  fetal cells, that's just one thing.

15      Q      Okay.  So you have no objection to taking

16  medications that contain aborted fetal cells; is

17  that correct?

18             MR. DeMATTEO:  Objection, form.

19      A      No, I do have -- I do have objections to

20  it --

21      Q      (By Ms. Engelman)  Okay.  You just tes --

22      A      -- but there are times when --

23      Q      You just testified you took Ibuprofen, so

24  why do you not have a religious objection to taking

25  Ibuprofen?



Page 186

```
 1       A    I have taken it once.  You know, here's
 2  what it comes down to is it's a medication, and I
 3  have actually tried to change and not take stuff
 4  that is considered -- that has had some -- that I
 5  know contains aborted fetal cells and trying to --
 6  I'm trying to change my -- you know, change like my
 7  body and live what I say.  So, yes, I took an
 8  Ibuprofen, so...
 9       Q    I don't think you answered my question.
10  Why is that not -- does that not violate your
11  religious beliefs?
12       A    Well, because -- well, it does violate
13  my reli -- in the -- in the -- in the thought of the
14  fact that I -- if I -- let me strike that.
15            So there's a difference between me taking
16  something out of my own free will compared to a
17  company mandating something.  I wasn't fired for
18  taking Ibuprofen, for not taking Ibuprofen, but I
19  was fired for not taking a vaccine.
20            So I guess -- I guess in -- in the scheme
21  of things, that I shouldn't -- I need to be more
22  careful of what I put into my body and do more
23  research.
24       Q    Have you ever taken Tums?
25       A    I have taken Tums.  And again, those
```



Page 187

1  were -- what?

2      Q    When's the last time you took Tums?

3      A    Probably six months ago.

4      Q    Okay.  Did you research whether or not

5  Tums contained aborted fetal cells?

6      A    Tums were, again, produced before HEK

7  cells were even invented and used, and it's sodium

8  bicarbonate with sugar.  So I guess I don't know

9  where -- and it's not in the PI, so I don't know

10 where -- where that came from.

11     Q    Sitting here today, do you have any

12 knowledge one way or another whether or not Tums is

13 manufactured or tested using aborted fetal cells?

14     A    I -- I've read two things of -- that one I

15 did look up, because I do suffer from Barrett's

16 esophagus, so I've seen that it was produced before

17 HEK cells were even become invented, but there's --

18 PI does not state it, and I don't know where did the

19 manufacturing, where to find that.

20     Q    Okay.  Did you ever ask your healthcare

21 provider?

22     A    No.

23     Q    Okay.  Since becoming aware that

24 medications and vaccines sometimes use aborted fetal

25 cells in their manufacturing, testing, and/or



Page 188

1    production, have you researched every medication

2    that you've ingested in your body to confirm that it

3    doesn't contain such aborted fetal -- fetal cells?

4         A    I have tried, yes, to find it.  There --

5    the three medications I'm on, it's not in the PIs,

6    the manufacturing or how it's done.  I was on more

7    medications before, and I've come off of those.  My

8    goal is to completely get off all medications when

9    it's safe to do so for my medical health.

10        Q    What medications are you currently on?

11        A    I take hormones, and I did talk to an

12   employee at the company, and they said that they are

13   not -- they don't test on -- he doesn't -- he did

14   not believe there was anything that had to do with

15   fetal cells in the hormones, so there's that.

16             And then I take Esomeprazole and -- for my

17   Barrett's esophagus, and the reason I take that is

18   because I had -- I've had issues with acid reflux

19   ever since I had chemotherapy and radiation as a

20   child.  And then the other is it's -- I'm trying to

21   think of the name.  It's a -- it's a diuretic and

22   calcium channel, Tria -- it's -- it's in my stuff.

23   I can look it up if -- if you give me a second, I

24   can give you the name.

25        Q    No, that's not necessary.  Who did you



1    not sure if I asked her about it.

2        Q    Okay.  And I'm sorry, the second

3    medication I couldn't quite get down, it's some sort

4    of acid?

5        A    Esomeprazole.

6        Q    Okay.  And what specific research have you

7    done on that drug to confirm it doesn't contain

8    abete -- aborted fetal cells?

9        A    I -- I think that it -- well, in the PI,

10   it doesn't say anything that it does.

11       Q    Is this -- is that information typically

12   in a PI?

13       A    I don't know.  I mean it should be.

14       Q    And what's your basis that it should be in

15   the PI?

16       A    Well, if people are looking for that

17   information and it's -- then I think they should be

18   transparent about it.

19       Q    Okay.  Other than looking at the PI, did

20   you do any other digging to see if it was

21   manufactured and used?

22       A    I did -- I did try to find some

23   manufacturing.  I could not find any on

24   Esomeprazole.  But I am -- I would guess since it's

25   so rapid -- rampant through the pharmaceutical



Page 191

1    community, it probably has had one way or another

2    been -- been used.

3        Q    Okay.  And you continue to take that

4    medication today?

5        A    I do for the fact that there -- it's a

6    medication that I can stop at any time.  The reason

7    I am taking it is because I had chemotherapy and

8    radiation as a child, and I have Barrett's

9    esophagus, which is precancerous cells of the --

10   as -- of the esophagus.

11       Q    And have you ever had --

12       A    So --

13       Q    Go ahead.

14       A    No, go ahead.

15       Q    Did you ever ask your healthcare provider

16   if there was another medication you could take that

17   did not contain aborted fetal cells?

18       A    Well, I do take some of that.  As I said,

19   I'm trying to go a more natural path.  I take aloe

20   supplements, I've been taking enzymes, I'm eating

21   more fermented vegetables to work with my stomach

22   acids.  I'm also doing apple cider vinegar.  So I'm

23   trying to do a more holistic approach as far as to

24   get that down so that I eventually can come off of

25   them.



Page 192

1      Q    Okay.  And so is it your testimony that
2   you take the, I can't pronounce it, Es --
3   Esopramedic (sic) acid, because it provides some
4   sort of health benefit to you?
5      A    Well, it does at this time, yes.
6      Q    Okay.  And what about the calcium?
7      A    So, no, it's -- it's a blood pressure
8   medication.
9      Q    What's it called?
10     A    It's -- do you care if I look it up real
11   quick?
12     Q    No, I don't need you to look anything up.
13     A    Okay.  It's in my paperwork.
14     Q    Okay.
15     A    It's a blood pressure medication.
16     Q    The blood pressure medication that you
17   currently take today, did you do any specific
18   research to see if that contained or otherwise used
19   aborted fetal cells in manufacturing or testing?
20     A    I did not.  And just FYI, the Esomeprazole
21   I've been on pre -- for the last 15 years, or no,
22   I'm sorry, 17 years, the Esomeprazole, which is the
23   acid reflux.
24     Q    And did you ask your -- did you ask your
25   healthcare provider if the blood pressure medication



Page 193

1  contained or otherwise used aborted fetal cells?

2       A    No, not at this time.

3       Q    Okay.  So if that's an important piece of

4  information to you regarding your religious beliefs,

5  why did you not collect that information?

6       A    Well, because I'm taking -- I mean, No. 1,

7  I -- I am choosing to take it.  It's a -- it's a

8  medication, not a vaccine.  If -- I'm taking it for

9  medical problems that I have no control over.  I

10 have family history of blood pressure.  I've tried

11 to get off of it multiple times.  That's why I eat

12 right, exercise.

13           So I also take supplements to try to help

14 with blood pressure, so...

15      Q    So have you asked your healthcare provider

16 whether or not there were any other medications that

17 you could take that may not contain aborted fetal

18 cells?

19      A    Not at this time, no.

20      Q    Okay.  Celina, can you scroll back up?

21 Actually, I'm sorry, go back to the religious

22 exemption request, I'm sorry.

23           Okay.  So Miss Schmidt, the last line of

24 the first paragraph says, "My religious beliefs

25 compel me to abstain from accepting or injecting any



Page 196

1    us?

2         A    I did.  It comes from my medical history

3    from my previous healthcare provider.

4         Q    Okay.  So if we scroll down, this is is it

5    Karen Graves, was that your healthcare provider?

6         A    Correct, before I changed to Dr. Amy

7    Hogan.

8         Q    Okay.  Scroll down, Celina.  And then,

9    sorry, you got to flip that again.  So here, it

10   says, "Medications:  Nebivo" -- I don't know how

11   to -- I'm going to butcher all of these names,

12   Nebivolol, that was prescribed on January 3rd, 2022.

13   Do you see that?

14        A    Yeah.  Yes.  I don't take that --

15        Q    Is that one of the medications that we

16   discussed today?

17        A    No, I don't take that anymore.

18        Q    Okay.  Did you take that in 2022?

19        A    Yes.

20        Q    Okay.  And what is that for?

21        A    For blood pressure issue -- blood

22   pressure.

23        Q    Okay.  And did you ever research whether

24   Nebivolol contained or otherwise used aborted fetal

25   cells?



Page 197

```
 1        A     I didn't.  But I don't take it anymore,
 2   because I -- knowing what's going on, yeah, so...
 3        Q     You had the same --
 4        A     I don't --
 5        Q     -- religious objection in -- in 2022;
 6   right?
 7        A     You what?
 8        Q     You had the same religious objection in
 9   2022; correct?
10        A     Yeah.
11        Q     And you didn't do any research or ask your
12   healthcare provider at that time?
13        A     I did not ask her, no.
14        Q     Okay.  The next is Triamterene?
15        A     That's the one I'm on right now.
16        Q     Okay.  So we already discussed that one.
17   The next one is Valacyclovir.  Do you see that?
18        A     Yeah, but it's Valacyclovir.
19        Q     Okay.  Did you -- is -- did we discuss
20   that medication today?
21        A     No.  That is for cold sores.
22        Q     And that was prescribed on October 4th,
23   2021, do you see that?
24        A     Yeah.
25        Q     And on October 4th, 2021, did you have an
```



Page 198

1    objection to aborted fetal cells?

2         A    I always have an objection, but I did not

3    ask about it.

4         Q    Okay.  Did you do any other research?

5         A    No, but I haven't taken that in a long

6    time.

7         Q    If we go down to Nitrofurantoin --

8         A    I don't -- I don't take that.

9         Q    Okay.  It was prescribed in July 16th,

10   2021.  Do you see that?

11        A    Yeah.  I think that's for a bladder

12   infection.

13        Q    Okay.  Did you do any research to see if

14   that medication contained or otherwise used aborted

15   fetal cells?

16        A    No.

17        Q    Okay.  Did ask Miss Karen -- Dr. Graves

18   whether it did?

19        A    I did not.

20        Q    Okay.  Then we go to Dexilant,

21   prescribed --

22        A    I don't take that.

23        Q    Okay.  Prescribed January 11th, 2022.  Do

24   you see that?

25        A    Yes.



Page 199

```
 1        Q      What was that for?

 2        A      Acid reflux.

 3        Q      And did you speak with your doctor about

 4   whether or not that medication contained or

 5   otherwise used aborted fetal cells?

 6        A      No.

 7        Q      Okay.  Did you do any independent

 8   research?

 9        A      Well, I used to sell it, and I was never

10   told that it was used by -- I used to promote it for

11   Takeda, and I was never told it had manufactured or

12   used baby cells in it.

13        Q      Did you ask?

14        A      I was trained on it, so...  It wasn't in

15   any of the literature.

16        Q      Is that something you would have

17   specifically looked for when you were promoting it

18   at Takeda?

19        A      You know, I just did my job, so no, I

20   didn't.  I should have researched it.

21        Q      Okay.  All right.  We can move on.  What

22   was your role at Takeda?

23        A      Sales.

24        Q      And when did you get a job there?

25        A      It was April 8th or something, 2021 --
```



Page 206

1    people -- people have a choice to take the

2    medication or not, I'm not forcing them, whereas I

3    was forced to take something that I didn't believe

4    in.

5        Q    Okay.

6        A    And I --

7        Q    So just so I'm clear, the products that

8    you were promoting violated your religious beliefs;

9    is that right?

10       A    Well, it's -- I have -- or I would need to

11   look to see.  I mean if it -- if they did, I mean

12   I'm guessing they -- from what I was told, yes, they

13   do.

14       Q    Okay.  But you were seeking a religious

15   exemption so that you could continue to promote

16   those products; is that right?

17       A    I was seeking a religious exemption so

18   that I could continue to provide for my family and

19   have a job.

20       Q    And that would include promoting the

21   products that violated your religious beliefs?

22            MR. DeMATTEO:  Objection, form.

23       A    Well, so yes, I -- yes.

24       Q    (By Ms. Engelman)  Okay.  In your role as a

25   sales -- well, let's go back to pre-COVID, so early



Page 207

1   2020.  How big was your geographic area?

2        A    Well, I had mul -- I had multiple

3   different territories, so I'm -- it was pretty big,

4   from like Kansas City to Goodland I think.  No, I

5   think it was -- I can't remember.

6        Q    Okay.  And I understand that -- that as a

7   sales rep., you have a certain number of target

8   quote unquote healthcare providers; is that right?

9        A    Correct.

10       Q    And, again, I'm talking about the

11  pre-COVID sort of early 2020 time frame.  Can you

12  estimate approximately how many targets you had?

13       A    I -- I -- I don't know, 2 -- I would --

14  200 maybe, I don't know.  I have no idea.

15       Q    Okay.

16       A    I don't remember.

17       Q    And -- and was it your job to visit those

18  healthcare providers in person?

19       A    Yes.

20       Q    Okay.  So can you walk me through a

21  typical day pre-COVID in terms of your visits to

22  these healthcare providers and how -- kind of what

23  that would look like and how much time you would

24  spend with each?

25       A    Sure.  I mean it -- you'd drive to an



Page 209

1    bit distracting.

2         Q    (By Ms. Engelman)  Okay.  So can you tell

3    me, Miss Schmidt, the types of healthcare providers

4    or healthcare facil -- facilities that you were

5    visiting pre-COVID, was it doctors' offices,

6    hospitals?

7         A    Doctors' offices.  Some doctors' offices

8    were technically connected to maybe some hospitals,

9    I don't -- I'm trying to think.  Usually, the

10   doctors' offices are on -- not in the hospital, but

11   may be in the same -- in a building.  Clinics.  I

12   mean I don't -- that's -- can you repeat the

13   question just because I was thinking about it?  Does

14   that explain it?

15        Q    I'm just trying to understand what --

16   yeah, that's fine.  I'm just trying to understand

17   what types of facilities you were visiting, again,

18   pre-COVID?

19        A    Yeah, I mean doctors' offices of -- yeah.

20   I didn't -- we didn't do hospitals, so...  There

21   were some doctors' offices that were connected to

22   hospitals, but they were not in the hospital

23   setting.

24        Q    Okay.  And when you were visiting a

25   doctor's office, were you interacting with just the



Page 210

```
 1   doctor or other individuals at the office as well?
 2        A    Their staff and nurses and -- and you
 3   would sit in the waiting room sometimes, so...
 4        Q    And is that where the patients were
 5   sitting?
 6        A    Yeah.
 7        Q    And then when you were meeting with the --
 8   the doctors or the nurses or the admin. staff, were
 9   you moving around the -- the doctor's office as
10   you -- as you met with various people?
11        A    It depends on the doctor's office.
12   Sometimes you could walk in and have -- and hit
13   multiple I would say like areas.  Some where you
14   were not -- you were only allowed to go into one
15   area, stay there until someone came to you.  So it
16   was both, you could move and stay.
17        Q    Okay.  And approximately, again, an
18   estimation, how long would a visit at one particular
19   doctor's office last from start to finish?
20        A    It all -- honestly, it depended on the
21   day, how busy the provider was, how many providers
22   are in the office, if you have to wait for any
23   reason.  I mean it could be -- it could be 2 minutes
24   to 20 minutes to an hour, I mean it just depends.
25             If you're bringing lunch, then that's a
```



Page 211

1    different time frame.  We were at the -- timing was,

2    you know, at -- at their availability, so...

3        Q    Okay.  And during a typical day again

4    pre-COVID, did you interact with anyone from Takeda

5    in person typically?

6        A    Sometimes I would have lunches or

7    breakfasts or snacks with my counterpart.

8        Q    And who was your counterpart?

9        A    It was Gaye Rinehart Duffy.

10            MS. ENGELMAN:  Okay.  Can we just take a

11   three-minute break?

12            THE WITNESS:  Three -- three-minute?

13            MS. ENGELMAN:  Five minutes, does that

14   work?

15            THE WITNESS:  Oh, five, yeah, that's fine.

16            MR. DeMATTEO:  Sure.

17            THE VIDEOGRAPHER:  This ends media unit

18   No. 4 in the deposition of Jillyn Schmidt.  The time

19   is 2:46 p.m.  We're going off the record.

20        (Thereupon, a brief recess was taken.)

21            THE VIDEOGRAPHER:  This begins media unit

22   No. 5 in the deposition of Jillyn Schmidt.  The time

23   is 2:52 p.m.  We're back on the record.

24        Q    (By Ms. Engelman)  Okay.  Miss Schmidt, at

25   the doc -- at the healthcare providers or doctors'



Page 212

1    offices that you were seeing, again, pre-COVID, was
2    it -- were you selling Vyvanse and is it Trintellix
3    in early 2020 then as well?
4         A    I believe so.
5         Q    Okay.  And what were the -- the types of
6    illnesses that the doctors were treating at the
7    facilities you were -- you were going to, are you
8    aware?
9         A    Well, they were primary care and pedi --
10   and then pediatrics.
11        Q    Okay.  So you didn't have any knowledge
12   one way or another what the patients were being
13   treated for in the facilities you were visiting?
14        A    Like can you re -- like expand on that?
15        Q    Did you have any knowledge of any of
16   the -- of what the patients were being treated for
17   in the facilities you were visiting?
18        A    Well, primary care providers kind of take
19   care of a whole host of diseases, and -- and then
20   pediatrics treats children's, so general health and
21   illnesses.  So I mean I don't -- I don't know -- I
22   mean I can just assume that it was a range of
23   everything.
24        Q    But you have no specific knowledge sitting
25   here today; is that right?



Page 213

1      A    Well, I guess -- I guess I really don't

2  understand the question that you're asking me, like

3  they treated their patients and everything that

4  their patient would have dealt with.  I mean every

5  patient's different, so there would have been

6  multiple things they were -- everyone was getting

7  treated for.

8           So I mean I had the knowledge that they're

9  probably getting treated for any host of things.  I

10 mean so, yeah, I mean their general practice -- I

11 guess I don't know what kind of answer you want from

12 me.

13          But, yeah, I know -- I know that they -- I

14 know general practitioners treat patients for medi

15 -- medicines, disease, chronic diseases, non-chronic

16 diseases.  I don't -- I mean does that answer your

17 question well enough?  I guess I --

18     Q    That's fine.

19     A    Okay.

20     Q    So when we move on -- we move to COVID,

21 March 2020 occurs, what happens to your in-person

22 visits?

23     A    They decided to go virtual only.

24     Q    Okay.  And how long were you in a virtual

25 only environment?



Page 216

1        A     It -- it might, but it -- it doesn't

2    explain why one goes up and one goes down.

3        Q     Okay.  Did you have any talks with your --

4    with -- well, who was your manager at the time?

5        A     Kelly Hanson.

6        Q     Did you ever speak with -- is Kelly a male

7    or a female?

8        A     A male.

9        Q     Did you ever speak with him about why the

10   numbers were going up and down during that time

11   period and the impact on the virtual environment?

12       A     No, actually, we got kudos for having the

13   most virtual lunches, and we were asked to speak on

14   our regional conference call kind of explaining how

15   we were doing it.  So we actually were -- were given

16   praise for our abilities.

17       Q     Okay.  And when did it move away from a

18   virtual environment back to an in-person

19   environment?

20       A     I believe it was around late March 20 --

21   or March 2022 area, February or March 2022 area.  It

22   was almost a full year.

23       Q     A full year of --

24       A     Virtual.

25       Q     So do you mean 2021?



Page 217

```
 1        A     I'm sorry, 2021 to 2022.  So 2022.  March
 2   of 2022 is when we came back.  No, wait.  I'm
 3   getting -- I'm way off, forgive me.  When did we --
 4   2020, we went virtual, came back out 2021.  I'm
 5   sorry, I was a year off.  Circumstances were the
 6   same, but it was 2020, we went virtual, we came back
 7   out March of 2021.  There you go.  Sorry about that,
 8   my confusion of dates.
 9        Q     That's okay.  And so in 2021, you start to
10   see individual -- or healthcare providers in person;
11   is that correct?
12        A     Correct.
13        Q     And is it my -- it's my understanding that
14   you were testing twice a week and wearing a mask?
15        A     Correct.
16        Q     Okay.  And did you do that from 2021 until
17   your separation from Takeda?
18        A     Correct.
19        Q     Okay.  And did you comply with the weekly
20   testing?
21        A     Yes.
22        Q     Okay.  And what type of mask did you use?
23        A     N95.
24        Q     Okay.  And do you believe that use of a
25   mask helps to prevent the spread of COVID?
```



```
 1        A    I was told to wear one, so I wore one.
 2        Q    Okay.  Well, that didn't answer my
 3   question.
 4        A    Well --
 5        Q    Try again.
 6        A    -- they say there was a study showing that
 7   it does help, but then if you look at the actual
 8   size of a COVID molecule, it's equivalent to -- it's
 9   very small and would probably go through the masks.
10        Q    Okay.  And does that include an N95 mask?
11        A    Yes.
12        Q    And when you started to go back in person,
13   did any of the healthcare providers say that you
14   could not come back in person and demand a continued
15   remote environment?
16        A    There -- there were a couple facilities
17   who shut it down to all pharmaceutical reps., yes.
18        Q    Regardless of the fact that you were
19   wearing a mask and testing; is that right?
20        A    Correct.  That was a -- that was a --
21   would have been a provider or, I'm trying to think
22   of what they're called, like -- it wasn't just
23   Takeda, it was all -- all pharmaceuticals, it was --
24   that was their new policy.
25        Q    Understood.  What -- what healthcare
```



Page 219

1  providers were those?

2      A    Cotton O'Neil in Topeka, Lawrence, and I

3  think Manhattan.

4      Q    So were you ever -- ever able to visit

5  them in person again?

6      A    We could go in and leave stuff,

7  literature.  And I be -- I think unless they called

8  a pacif -- called for a pacif -- specific rep. to

9  come in for something, that would be the only time.

10     Q    And did you ever have any conversations

11 with anyone at those facilities about their policy

12 and why they implemented it?

13     A    No.

14     Q    Do you know whether or not any of the

15 healthcare providers in your area required

16 vaccination of individuals who entered the facil --

17 facilities?

18     A    There was one if -- if you wanted to do a

19 lunch.

20     Q    And what facility was that?

21     A    Stonecreek.

22     Q    And did you ever talk to them -- what was

23 it called again?

24     A    Stonecreek Family Physicians.

25     Q    Doan Creek?



Page 220

```
 1        A     No, Stone as in S-T-O-N-E.
 2        Q     Got it.  And did you speak with anyone at
 3   Stonecreek about their decision to only let
 4   vaccinated individuals --
 5        A     I did not.
 6        Q     -- go to lunch?  Okay.  And did you
 7   explain to Stonecreek your religious objection to
 8   the COVID-19 vaccine?
 9        A     I did not.
10        Q     Okay.  Why is that?
11        A     Because I chose not to talk about that.
12        Q     Okay.  And any other healthcare providers
13   in your territory that required vaccination of
14   individuals who came to its facility?
15        A     That was the only one, and it was for
16   lunches only.
17        Q     Well, what do you mean for lunches only?
18        A     You could -- you could only come in if you
19   were vaccinated, you could -- you could come in and
20   sample, but you couldn't do a lunch.
21        Q     Okay.  And what's a -- what's a lunch in
22   these circumstances, what -- what does that look
23   like?
24        A     You come in and sit and -- at a table, and
25   they come in and get their lunch and talk to you and
```



Page 221

1    then leave.

2        Q    And how long would a lunch typically last?

3        A    An hour, hour and a half maybe.

4        Q    Okay.  And is that something that you did

5    often in your territory with healthcare providers?

6        A    Yes.

7        Q    Okay.  How often would you say you

8    participated in lunches?

9        A    We tried to do them as much as possible,

10   because that was the time where you get the most

11   time with them.

12       Q    Did you have any conversations with any

13   other healthcare providers in your territory

14   regarding the COVID-19 vaccine generally?

15       A    There was -- people would talk about it,

16   but I didn't.  I just listened to them about it.  I

17   didn't talk about my religious exemption or anything

18   like that, so...

19       Q    Okay.  Do you know if any of the

20   healthcare providers in your territory were

21   providing vaccines to patients?

22       A    I don't know if they -- oh, actually, I

23   think some of them did have clinics maybe, maybe,

24   vaccine clinics.

25       Q    Okay.  Did you have any religious



Page 222

1   objections to visiting a healthcare provider that

2   was also a vaccine clinic?

3       A    No, visits, not -- that's under their

4   purview.

5       Q    Okay.  And so when you're back -- when

6   you're back in person masking sort of in the 2021

7   time frame and testing, is it still the same

8   scenario, you would visit multiple healthcare

9   providers a day, interact with multiple individuals

10  at the healthcare providers, and move around the

11  facility in the way that you described earlier?

12      A    It -- some got a little more -- would say,

13  "Stand here."  It wasn't as much -- some of them --

14  some of them it was business as usual, and some of

15  them wanted you to -- just to stand in one spot, and

16  the provider would come to you.

17      Q    Okay.  How many -- approximately how many

18  would you say it was business as usual versus stand

19  in one spot?

20      A    Oh.  Honestly, it was probably -- well,

21  minus the one that shut down, but they -- I would

22  say probably 75 percent was business as usual --

23      Q    Okay.

24      A    -- and that includes the ones that -- that

25  included the one that shut down.  The others were --



Page 223

1    you could sample, but stay in one spot where you

2    still see the providers, but you needed to stay in

3    an -- an area.

4         Q    Okay.  And so for the 75 percent that was

5    business as usual, you were sort of moving around

6    the facility interacting with multiple people; is

7    that right?

8         A    For the most part, yeah.  I mean but -- I

9    mean they still -- you still had the distance, you

10   know, you were still keeping distance and respecting

11   of individual rules per office.

12        Q    And -- and were you sometimes still

13   sitting in the patient waiting rooms at this time?

14        A    Yeah, we did sometimes sit in the waiting

15   rooms.  It all depended on if -- how quickly we were

16   to get back or not -- or get back to -- to the area.

17   So I mean that -- that kind of was about the same --

18        Q    Okay.

19        A    -- I would say.

20        Q    And during this time, you, Miss Schmidt,

21   were really the -- the conduit between Takeda and

22   the healthcare providers, you were sort of the face

23   of Takeda; is that right?

24        A    Correct.

25        Q    Okay.  Was anyone else from Takeda



Page 279

1    offices, were those policies that were set by the

2    offices themselves?

3         A    Yes.  Some of the offices set policies

4    that -- of masking, and then the one we spoke of

5    for -- to do lunch, vaccine, but most of them did

6    not have any policies for people coming -- coming in

7    that I -- that I -- that were affecting me when I

8    was still in the -- when I was in the field.

9         Q    How did you handle the -- that lunch

10   policy that I believe Stonecreek had?

11        A    Yeah.  Well, we -- you could do virtual

12   lunches.  My partner, it was a -- it's -- it's an

13   office that was very important, so my partner would

14   also set up a virtual lunch there so that it would

15   be on, you know, virtual, and her and there.  If

16   there -- if I couldn't go, then she would take the

17   office.  So that -- you know, that's kind of it.

18   And then -- so yeah.

19        Q    Did you have any religious objection to

20   wearing a mask?

21        A    I -- I don't.  I don't like it, but

22   that -- that's not going to -- I don't -- I don't

23   like it, but it's not in -- injecting something in

24   me that I can never -- I can take the mask off, I

25   can't take a vaccine out of me.



Page 281

1    need a copy?

2            MR. DeMATTEO:  Yeah, I'll type my E-mail

3    address into the box, I know your company probably

4    has it, but I don't think I gave it to you yet

5    today.  Obviously, Keri and I can follow up with any

6    odds and ends of whether we need to schedule another

7    day.

8            MS. ENGELMAN:  Yeah, we'll follow up with

9    you.

10            THE COURT REPORTER:  What do you like to

11    get transcript wise?

12            MR. DeMATTEO:  I prefer just full size

13    PDF.  We don't need a hard copy.

14            THE COURT REPORTER:  And what about do you

15    want the exhibits?

16            MR. DeMATTEO:  Oh, yes, please.

17            THE COURT REPORTER:  Keri, you had said

18    the whole package?

19            MS. ENGELMAN:  Yeah, I think we said we

20    would just figure out what -- I don't know what

21    we're ordering across all these depositions, so we

22    just need to be consistent.

23      (Thereupon, the deposition of JILLYN SCHMIDT

24              concluded at 4:53 p.m.)

25    [Signature Waived By Agreement Of Counsel & Witness]



Page 282

```
 1              - REPORTER'S CERTIFICATE -

 2   State of Missouri   )

 3   County of St. Louis )

 4       I, Kelly L. Guilliams, a Certified Court

 5   Reporter within & for the State of Missouri, do

 6   certify that pursuant to Notice there came before me

 7   via Zoom videoconference, each party at their

 8   respective locations, JILLYN SCHMIDT, of lawful age,

 9   who was by me first duly sworn to testify the whole

10   truth of her knowledge touching the matters in

11   controversy herein; thereafter, the witness was

12   examined and said examination was reduced to

13   shorthand by me on the day and in that behalf first

14   aforesaid, and later transcribed into typewriting,

15   that the signature of the witness was waived by

16   agreement of counsel for the respective parties

17   hereto and with the consent of the witness; and said

18   deposition is now herewith returned to and filed

19   with this court.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21   this 19th day of October, A.D., 2023.

22

23   _____/s/ Kelly L. Guilliams, CCR #792___

24   Certified Court Reporter within and for the State of

25   Missouri
```



| | |
|---|---|
| **From:** | Schmidt, Jillyn |
| **Sent:** | Tuesday, September 14, 2021 7:14 PM |
| **To:** | US ReligiousAccomm |
| **Cc:** | Schmidt, Jillyn |
| **Subject:** | Jillyn Schmidt Exemption request |
| **Attachments:** | Jillyn Schmidt  Exemption Letter.docx; Religious Accommodation Request Form Jillyn Schmidt.pdf; Pastor JD Covid Exemption Letter Jillyn Schmidt 37225_210914_174003.pdf |

To Whom It May Concern:

Attached to this email you will find my Religious Accommodation Request, exemption letter describing my religious beliefs, and spiritual leader letter per your request.

Sincerely,
Jillyn Schmidt



Jillyn Schmidt

Sr. Sales Representative

Neuroscience Business Unit, NSF

**Takeda Pharmaceutical Company Limited**

95 Hayden Ave.
Lexington, MA
Mobile: +1- 785-341-5703
jillyn.schmidt@takeda.com

1

EXHIBIT

Schmidt 4

September 14, 2021

To Whom It May Concern:

I cannot and will not be able to receive a COVID-19 vaccine because to do so would violate my sincerely held religious beliefs. All the currently available COVID-19 vaccines used cell lines originating from aborted children in their manufacturing, development and/or testing. My religious beliefs compel me to abstain from accepting or injecting any of these products into my body, regardless of the perceived benefits or rationales.

I am requesting a religious exemption, under Title VII of the Civil Rights Act of 1964, that will excuse me from having to receive a COVID-19 vaccine, and further request that no adverse employment action be taken against me on account of my religious beliefs. I would appreciate an opportunity to discuss my listed accommodations that were presented on my religious accommodation request form.

I have included a letter from my family's pastor J.D. Farag at your request and in good faith, even though it is not legally required to affirm my religious beliefs.

Thank you for your time and thoughtful consideration of my exemption request.

Sincerely,

Jillyn Schmidt

TAKEDA 000029



**Religious Accommodation Request Form**

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

**To be completed by employee**

Name: JILLYN SCHMIDT                     Position: USA- Sr. Sales Representative

Date of request: September 14, 2021

Business/Function: USBU Neuroscience- PC

Immediate supervisor: Kelly Hanson

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):
Vaccination exemption for COVID-19 and its variants.

Frequency and duration of the accommodation requested: Daily and Indefinitely.

Describe religious belief or practice that necessitates this request for accommodation:
See attached letter.

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.

Please provide alternative accommodations that might address your needs:

1. Weekly testing to see HCPs in-person. As long as it does not violate any office/ business protocols.

2. Hybrid in-person/ virtual interactions with HCPs using weekly testing.

3. Virtual working enviroment agreed upon by Takeda and Jillyn Schmidt

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: _____    Date: September 14, 2021

Upon final determination the employee will receive a letter approving or denying the accommodation request.



**Calvary Chapel**
**Kaneohe**

47-525 Kamehameha Hwy, Kaneohe, Hawaii 96744

Phone: 808.262.8800
Fax: 808.262.8809
www.calvarychapelkaneohe.com
www.JDFarag.org

1649*4**G50**0.382**1/1*********AUTOMIXED AADC 990
TRAY G SCHMIDT
6813 CHRIS CT
MANHATTAN KS 66503-9154

August 30, 2021

To Whom It May Concern:

I am writing on behalf of Jillyn K Schmidt, a member of our online congregation at Calvary Chapel Kaneohe, in Hawaii, regarding their religious conviction against forced vaccines.

We do not wish to be labeled as anti-vaccine or anti-science, however, the well-documented process of vaccines developed from animal and aborted human fetal tissue has compelled us to stand by our congregants who refuse to comply with mandatory vaccinations.

We strongly support their deeply held Biblical conviction as a believer in, and follower of Jesus Christ and any of our congregants to resist the pressure for vaccinations, while at the same time seeking an alternative for their safety and the safety of others.

We are convinced that the nature of many other contaminants within vaccines should be a reason to grant exemptions to believers whose bodies are, as the Scripture states, the "temple of the Lord."

- 1 Corinthians 3:16-17 – "Don't you know that you yourselves are God's temple and that God's Spirit dwells in your midst? If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple."
- 2 Corinthians 7:1 – "Therefore, since we have these promises, dear friends, let us purify ourselves from everything that contaminates body and spirit, perfecting holiness out of reverence for God."

We must follow the Word of God and we also exhort others to a conscientious objection to these vaccines. Yet, our deep love and care for others makes us more determined to exercise whatever alternatives possible to ensure others' safety in each individual case.

We thank you for granting this religious exemption and as such respecting religious freedom.

Sincerely,

J.D. Farag
Senior Pastor
Calvary Chapel Kaneohe

JDF:gl

8-18-21_v1

1649  1/1



CONFIDENTIAL

TAKEDA 000031

Calvary Chapel Kaneohe Religious Exemption Letter Request

Please enter your name, address, and letter requirement information below: *

| | | |
|---|---|---|
| First | Middle | Last |

If you would like a Printed and Mailed Letter Fill out:

Address Line 1

| | |
|---|---|
| City | State / Province / Region |

| | |
|---|---|
| Postal Code | United States of America |
| | Country |

By filling out Email address we will send a PDF version of the letter *

| | |
|---|---|
| Email | Confirm Email |

If you are requesting this letter on behalf of a family member, and want their name to appear on the letter instead of yours, please enter their name below. If you also need a letter, please submit a separate request.

| | | |
|---|---|---|
| First | Middle | Last |

**Please confirm and acknowledge the below to proceed with your letter request:**

Calvary Chapel Kaneohe Membership: *

☐ Local   ☐ Online

☐ I am requesting this letter for myself, my spouse, or another member of my immediate family.

☐ I am a born again believer in, and follower of, Jesus Christ.

[ ] I'm not a robot    reCAPTCHA
                       Privacy - Terms

SUBMIT

**Expect 1 – 5 days for delivery via US mail. Expect next business day delivery for email.** * Double check junk mail and search for "Exemption Calvary Chapel" if you don't receive the email within a couple days. **If you have questions or problems, please contact us via** our Support Center.

You are welcome to request both email and US mail.

Letter that you will receive:



## RELIGIOUS ACCOMMODATION
### Interactive Dialogue

Employee Name: Jillyn Schmidt
Division:
Position: Sr. Sales Rep
Field or Office based: Field
ER Representative(s): Christine Mealey
Date of Interview: 9/28/21

Tell me more about your religious beliefs and religion or belief system generally.

<span style="color:red">Everything in letter that I sent – read letter to me</span>

Are you a member of any particular church or religious organization?

<span style="color:red">Letter is from family pastor, online church I attend</span>

If so – What do your religion's leaders say about the vaccine?

<span style="color:red">All in letter</span>

Have your religious leaders specifically stated that you may not be vaccinated?

<span style="color:red">Letter says church is not anti-vaccine or anti science, but stand by congregants who refuse to comply with mandatory vaccines</span>

How long have you subscribed to this belief system?

<span style="color:red">Been watching this church for the last year, doing church stuff forever, I am a Christian, don't need to go to church to be a Christian, just documentation in good faith, have a sincerely held religious belief against the vaccine</span>

Tell me more about how the company's policies/rules conflict with your beliefs.

<span style="color:red">Derived tested developed from using aborted children</span>

What is it specifically about this religious belief that prohibits you from being able to become vaccinated?

<span style="color:red">Derived tested developed from using aborted children</span>

EXHIBIT

Schmidt 6

CONFIDENTIAL

TAKEDA 000047

*If applicable:*

Please tell me more about the fetal cells (or substitute specific concern i.e. vegan) and how that connects to your request?

Derived tested developed from using aborted children

Have you taken any other vaccines in your life?  (do not ask for specifics)

Medical history is private. I've used exemption to get into other stuff like schools daycare etc. my past doesn't affect my beliefs

Have you ever taken and do you currently take any of the following products:
Tylenol, Ibuprofen, Pepto Bismol, Claritin, Sudafed, Tums

I don't need to answer that, asked if she should bring lawyer on call – said no

Are you aware that all of those products, (and probably the other vaccines that you have taken) were developed using fetal cells?

I'm sure there a lot of meds that have

If Takeda accommodates you, would you be willing to attest to the fact that you have not and will not take any of those vaccines or products?

Would have to discuss with my lawyer

You have chosen to work for a company that has manufactured and/or marketed a long list of pharmaceutical products for which there is a chance that, at some point, fetal cells were used in development.  How do you reconcile that with your stated position on taking the COVID vaccine?  Do you see this as consistent?

People have choice to take product Takeda has, you are not providing a choice in a mandate so I have no choice, one is by force and not by choice so it's different

Besides vaccines, do your religious beliefs prevent you from being tested for COVID?

No I have been doing that following procedures

CONFIDENTIAL                                                    TAKEDA 000048

Is there any additional information regarding your beliefs, observances or practices that support your request for a religious accommodation?

I want to do a good job for Takeda, always felt I've been a great employee and want to work hard and do what is right, not against anyone else doing it, just a religous conviction for myself about the covid vaccine in my body, everyone else has a choice
Hybrid model with weekly testing is good and can continue on and use standard PPE, want to do well for Takeda, pray you will accept my belief
You guys pride yourself on DE&I and we should be our whole selves at work and I stand by mine, god made and created me and those little babies just speaking from my heart

Is there anything else we should know or consider as we review your request?

Started crying, charity of choice is life choice ministries that helps women who become pregnant, do go to church in my hometown too
I listen to bible studies and stuff daily

Wondering if these questions are legal  (let her know yes, vetted by lawyers)
Hard to put your whole life out there … I trust in him the lord to make the right decision

CONFIDENTIAL                                                            TAKEDA 000049

# Exhibit H

Sandra Silva                                          October 25, 2023

1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2
     LISA AMOSON, ROBB HUCK,      )
3    TROBY LANE PARRISH,          )
     ALECIA RAMSEY, LARRY         )
4    HAROLD SAVAGE, JILLYN        )
     SCHMIDT, SANDRA SALAZAR      )
5    SILVA, BRITT HAROLD          )
     SINGLETON, SUSAN WELCH,      )
6                                 )
              Plaintiffs,         )
7                                 ) Case No.:
     VS.                          ) 1:22-cv-11963-GAO
8                                 )
     TAKEDA PHARMACEUTICALS       )
9    U.S.A., INC.,                )
                                  )
10            Defendant.          )

11
     **********************************************************
12
                 ORAL AND VIDEOTAPED DEPOSITION OF
13                       SANDRA S. SILVA
                        OCTOBER 25, 2023
14              (Taken Via Remote Videoconference)

15   **********************************************************

16        ORAL AND VIDEOTAPED DEPOSITION OF SANDRA S. SILVA,

17   produced as a witness at the instance of the DEFENDANT,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 25th of October, 2023, from

20   9:06 a.m. to 2:44 p.m., before Mona S. Whitmarsh,

21   Certified Shorthand Reporter, in and for the State of

22   Texas, reported by machine shorthand via Zoom

23   videoconference, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.



```
 1                      A P P E A R A N C E S

 2                  (ALL APPEARING VIA ZOOM)

 3
      FOR THE PLAINTIFFS:
 4          Mr. Christopher DeMatteo
            PATTIS & SMITH, LLC
 5          383 Orange Street
            New Haven, Connecticut 06511
 6          203-393-3017
            203-393-9745 (fax)
 7          cdematteo@pattisandsmith.com

 8
      FOR THE DEFENDANT:
 9          Ms. Keri L. Engelman
            Ms. Celina Antonellis
10          MORGAN, LEWIS & BOCKIUS LLP
            One Federal Street
11          Boston, Massachusetts  02110
            617-341-7700
12          617-341-7701 (fax)
            keri.engelman@morganlewis.com
13          celina.antonellis@morganlewis.com

14
      VIDEO TECHNICIAN:
15          Mr. James Taylor
            MAGNA LEGAL SERVICES
16

17

18

19

20

21

22

23

24

25
```



Sandra Silva

October 25, 2023
Page 3

1                              INDEX

2                                                     PAGE

Appearances.................................   2

3
Stipulations................................   5

4
SANDRA S. SILVA

5       Examination by Ms. Engelman........   6
        Examination by Mr. DeMatteo........ 174

6
Reporter's Certificate...................... 182

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                          EXHIBITS
        NO.  DESCRIPTION                              PAGE
 2
        Exhibit 1......................................  35
 3           Text Chain Titled "P&S Info Only"
        Exhibit 2......................................  62
 4           Diocese of Corpus Christi, Office of the
             Bishop COVID-19 Spike Response Regarding
 5           Reimposing Restrictions; August 9, 2021
        Exhibit 3......................................  79
 6           Sandra Salazar Silva's Supplemental
             Responses to Defendant's First Set of
 7           Interrogatories
        Exhibit 4......................................  89
 8           Ms. Silva's Social Media Posts
        Exhibit 5......................................  90
 9           Text Messages; Bates-Labeled SILVA 000085
             through 000262
10      Exhibit 6...................................... 104
             Takeda Request for Medical Status
11           Evaluation Under the ADA Amendments Act
             for Sandra Silva
12      Exhibit 7...................................... 106
             October 13, 2021, Letter from Christine
13           Mealey to Ms. Silva
        Exhibit 8...................................... 108
14           Takeda Religious Accommodation Request
             Form for Sandra Silva
15      Exhibit 9...................................... 119
             Texas Catholic Conference of Bishops
16           Statement on Vaccines and Abortion
        Exhibit 10..................................... 136
17           Defendant's First Set of Interrogatories
             Directed to Plaintiff Sandra Salazar Silva
18      Exhibit 11..................................... 167
             Ms. Silva's Records from Obstetrical &
19           Gynecological Associates of Corpus
             Christi; Bates-Labeled SILVA_SHELTON
20           0001 through 0037

21

22

23

24

25
```



1            THE VIDEOGRAPHER:  We are now on the

2    record.  This begins media number one in the deposition

3    of Sandra Salazar Silva in the matter of Lisa Amoson,

4    et al., versus Takeda Pharmaceuticals U.S.A.,

5    Incorporated, in the United States District Court,

6    District of Massachusetts, Case No. 1:22-cv-11963-GAO.

7            Today is October 25th, 2023, and the time

8    is 9:06 a.m. Central.  This deposition is being taken

9    remotely at the request of defendant.  The videographer

10   is James Taylor and the court reporter is Mona Whitmarsh

11   of Magna Legal Services.

12           Will counsel please state their

13   appearances and whom they represent.

14           MS. ENGELMAN:  My name is Keri Engelman

15   from Morgan, Lewis & Bockius on behalf of Takeda

16   Pharmaceuticals.  I also have with me Celina Antonellis

17   from my office.

18           MR. DeMATTEO:  Good morning.  Chris

19   DeMatteo from Pattis & Associates.  I represent the

20   plaintiff/deponent Sandy Silva.

21           THE VIDEOGRAPHER:  Will the court reporter

22   please swear in the witness.

23           THE REPORTER:  Yes.  First, counsel, are

24   there any stipulations?

25           MR. DeMATTEO:  No.  We will do the usual



```
 1  stipulations, I think.
 2              THE REPORTER:  All right.  Pursuant to the
 3  Federal Rules?
 4              MR. DeMATTEO:  Yes.
 5              MS. ENGELMAN:  Yes.  That's fine.
 6              THE REPORTER:  All right.  Ms. Silva, if
 7  you would please raise your right hand.
 8                  SANDRA S. SILVA,
 9  having been first duly sworn, testified as follows:
10                  EXAMINATION
11  BY MS. ENGELMAN:
12      Q    Good morning, Ms. Silva.  My name is Keri
13  Engelman and I represent Takeda.  It's nice to meet you
14  this morning.
15      A    Good to meet you.
16      Q    So today's -- the purpose of today's
17  deposition is for me to ask you some questions about the
18  lawsuit that you have initiated against Takeda.  Do you
19  understand that?
20      A    Yes.
21      Q    And do you understand that you are under oath
22  subject to the penalty of perjury?
23      A    Yes.
24      Q    Okay.  So we are obviously in a remote
25  setting, of course, here, but what that means is that
```



1    A    -- assuming that it is, but I -- I'm not sure.

2    I'm not sure.

3    Q    You have never had a conversation with him

4    about why he decided not to get vaccinated?

5    A    I think I... I mean, yes, we have had

6    conversations, but I am not sure that I actually really

7    discussed with him why he chose not to do it.  I

8    don't -- I don't know.

9    Q    Okay.  Well, tell me about your conversations

10   with him about the COVID-19 vaccine.  Stevan.

11   A    Well, I know when CO- -- when we were going

12   through the whole thing with COVID and trying to figure

13   out -- at least, for me, trying to figure out if I was

14   going to get vaccinated, I mean, we would discuss it as

15   a family.

16        I mean, and they knew -- they all know -- my

17   husband and my son who live here with me know that I

18   pray a lot.  And I just told them for me it wasn't the

19   right decision.  And there was -- I mean, there is also

20   that I just wasn't sure also regarding the safety of the

21   medication as well.

22        So I am assuming that is probably why he

23   decided not to get the vaccine is -- I guess they follow

24   my lead but, I mean, it's not something that I say that

25   they have to do because I do it.



Sandra Silva                                          October 25, 2023
                                                          Page 26

 1      Q    So you said that you prayed and it wasn't the
 2   right decision for you; is that right?
 3      A    That's correct.
 4      Q    Can you explain to me why it wasn't the right
 5   decision?
 6      A    It's hard to explain that.  It's just -- it's
 7   just like a gut feeling.  It's...  When the Spirit
 8   speaks to you, the Spirit speaks to you in different
 9   ways and, for me, it was just a sense of don't do it,
10   kind of, thoughts in my head.
11          It's hard -- it's hard to explain.  In fact, I
12   really don't know how to explain it, to tell you the
13   truth.  I just -- I just know that it's just a feeling
14   inside that you just know.
15      Q    Okay.  So no specific reason.  It's just a --
16   it was a gut feeling when you spoke to the Spirit that
17   you shouldn't get it?
18      A    Correct.
19      Q    Okay.
20      A    I know that sounds crazy, but that's the
21   truth.
22      Q    Okay.  And what about -- did you have any
23   conversations with Roland about your decision not to get
24   vaccinated?
25      A    I did.



 1  about it before he made that decision.

 2      Q    And, generally, just -- generally speaking, at

 3  a high level, does Roland share your religious beliefs?

 4      A    He grew up Catholic.  I believe he still does.

 5  He doesn't attend church.  He says he prays so I'm -- I

 6  am not sure, really, where he stands right now because

 7  he doesn't go to church, but he says he prays and he

 8  still believes in the Catholic religion.

 9      Q    Okay.  What about your conversations with Mark

10  about the decision not to get vaccinated against

11  COVID-19?

12      A    So my husband, he thinks -- because I was a

13  pharmaceutical rep, he thinks that I have all this vast

14  knowledge of how medications work and that kind of

15  thing.  And I tell him that I don't; you know, I just

16  know about medications that I sold.

17           But, I mean, he did trust -- trust me and,

18  like, when -- he would ask me questions, you know, like

19  why do you -- why aren't -- what do you think, you know?

20  Besides -- because he does pray.  He is Catholic.  He

21  does attend church with me.

22           So I know that he makes his own decisions, but

23  when he was asking me, like, medical-wise, I mean, I

24  just told him the only concern I had, really, is that

25  there was no safety data.



1      Q     Uh-huh.

2      A     So that's really the only thing that I shared

3   with him about it --

4      Q     Okay.

5      A     -- that was my concern.  That was my concern.

6      Q     Uh-huh.  And did you share specific articles

7   or journals or data with him regarding that?

8      A     No.

9      Q     Okay.  And what was the basis for your belief

10  that there was no safety data around the COVID-19

11  vaccine?

12     A     Basically, just being in pharma, we know that

13  it typically takes 10 to 15 years for a drug to come to

14  fruition through research, development, trials to come

15  to market.  And the vaccine, it just came out so

16  quickly, and then there was no -- no data to back it.

17  And there was no prescribing information either.

18           So that was a big concern for me because

19  knowing -- you know, working in pharma, anything we left

20  behind in doctors' offices had to be accompanied by a

21  prescribing information piece.  So that was concerning

22  to me.

23     Q     Uh-huh.  And do you think -- do you -- well,

24  strike that.

25           Was one of the reasons Mark didn't get



1  vaccinated is because of your concerns around the safety

2  of the COVID-19 vaccine?

3       A    I mean, I can't speak for him, but possibly.

4       Q    Okay.  Is that one of the reasons that you did

5  not get vaccinated?

6       A    Yes.

7       Q    And so I think -- did you ever talk about your

8  concerns around the safety -- lack of safety data with

9  your sons?

10      A    I am thinking I probably did.  I am not a

11  hundred percent sure.

12      Q    Do you know if your sons have received any

13  other vaccines?

14      A    Yes.  They have, as children.

15      Q    Okay.  Do you recall which ones?

16      A    No, I don't.

17      Q    Generally speaking, did you ever make an

18  objection to your sons receiving a vaccine of any kind

19  on a -- on a religious basis?

20      A    Can you repeat that again?

21      Q    Sure.

22           Did you ever make any objections to either of

23  your sons getting a vaccine of any kind on the -- for

24  religious reasons?

25      A    Did I -- based on my religious --



1   receiving a vaccine based on his religious beliefs?

2       A    I don't know that he has done that before.

3       Q    Okay.  Sitting here today, have you made any

4   objection to receiving any vaccine other than the

5   COVID-19 vaccine based on your religious beliefs?

6       A    That is the only one.

7       Q    Okay.  And sitting here today, why -- why is

8   that the only one that you made a decision to object to

9   on a religious basis?

10      A    I can't -- I don't have an answer, really.  I

11  mean, just -- for me it was just -- I mean, not that I

12  was influenced by anyone.  I mean, it was -- because I

13  feel like everybody around me was getting vaccinated.  I

14  just knew when I prayed that it was just not right for

15  me.

16      Q    It was that gut feeling?

17      A    It was that gut feeling.

18      Q    Ms. Silva, do you use social media?

19      A    Not a lot.

20      Q    What social media accounts do you have?

21      A    Facebook, Twitter.  Oh, my gosh.  I probably

22  have them all downloaded, but I don't really get on them

23  or use them very much.

24      Q    Okay.  Do you have an understanding sitting

25  here today that you were to collect information that



 1  relationship with my God.  So it's an ongoing thing.

 2       Q    Is there any tenet of the Catholic religion

 3  that you do not agree with?

 4       A    I can't think of anything right now.

 5       Q    Do your religious beliefs affect your diet?

 6       A    No.  Oh, sometimes, yes.  During Lent.

 7       Q    Other than Lent, do your religious beliefs

 8  impact your diet?

 9       A    No.

10       Q    Do your religious beliefs impact whether or

11  not -- or, well, strike that.

12            Do you take a day of rest?

13       A    I do my best to take a day of rest on Sunday.

14  It's not always perfect, but I do.

15       Q    Okay.  Sitting here today, are there any other

16  specific religious or specific Catholic sort of tenets

17  that drive your everyday -- sort of your day-to-day

18  activities?  That's what I am trying to understand.

19       A    I guess I am not following.  I'm sorry.  Could

20  you repeat that again?

21       Q    No.  We can move on.

22            Do your religious beliefs impact the -- any

23  medical treatment that you have ever received?

24       A    No.

25       Q    Okay.  Do your religious beliefs -- have they



1    ever impacted any medication you have ever taken?

2          A      No.

3          Q      Or decided not to take?  No?  No?

4          A      Not in the past, no.

5          Q      Is there a leader of your religion?

6          A      We have the pope.  And then, of course, in our

7    church parish we have our pastor, and then in the city

8    we have our bishop.  So we have those leaders.

9          Q      And who is your pastor at your church?

10         A      Pastor John Xavier.

11         Q      And how long has he been a pastor there?

12   Pastor.

13         A      Maybe three, four years.  So a lot of times

14   they rotate around to different parishes.

15         Q      Uh-huh.  And what about your bishop?  Do you

16   know who that is?

17         A      No, I don't.  I can't think of his name right

18   now.

19         Q      Okay.  And how long have you been going to

20   this church?  I'm sorry.  I forget the name of it.

21         A      St. Philip the Apostle.  Probably -- I don't

22   know.  12, 14 years.

23         Q      Okay.  And do you go to church every Sunday?

24         A      I do my best to go to church every Sunday.

25         Q      And do you go to church any other day of the



1   week?

2       A    So if I am not able to make it on Sunday, I

3   will go on Saturday evenings.  If I have something going

4   on on Sunday, I will go on Saturday evenings.

5       Q    Okay.

6       A    And I'm sorry.  And then I also -- I will go

7   to adoration on Mondays and then on Tuesdays I will go

8   to church as well because we have Bible study.  I attend

9   in the morning and in the evening as well.

10      Q    And do you tithe?

11      A    I do.

12      Q    Okay.  And how much have you contributed to

13  your church?

14      A    I try to tithe a hundred dollars a month so,

15  on average, about 1200.  And I believe I submitted that

16  information as well.

17      Q    Okay.  And sitting here today, is that

18  consistent with what the Catholic Church expects of its

19  members?

20      A    I believe.  I mean, it's anywhere -- I mean,

21  I -- it is basically, you know, what you can afford.  I

22  mean, they ask you to try to tithe 5 to 10 percent of

23  your earnings.

24      Q    Okay.  Do you have -- do you know whether or

25  not St. Philip the Apostle had a view of the COVID-19



 1  vaccine?

 2       A     I don't know.

 3       Q     Did you ever ask?

 4       A     I did ask.

 5       Q     Who did you ask?

 6       A     I actually called the church and left a

 7  message, but I never got a call back.

 8       Q     Okay.  Have you ever spoken with Pastor Xavier

 9  about the COVID-19 vaccine?

10       A     No, I have not.

11       Q     Okay.  Do you think it would have been an

12  important part of your decision to know what the

13  church's view was on the COVID-19 vaccine?

14       A     Sure.  But it's not going to impact -- because

15  Father Xavier said, you know, the vaccine -- you know,

16  it's something that you should do or shouldn't do, I

17  mean, it's -- it's not going to impact me because, I

18  mean, my Spirit tells me what's best for me.  So even

19  though they are leaders of our church, I first have to

20  follow what God says.

21       Q     Okay.  Do you have an understanding of what

22  the Catholic -- the larger Catholic church's view was of

23  the COVID-19 vaccine?

24       A     I don't believe they were against it from what

25  I remember.  The pope, he was probably recommending it.



```
 1              [Simultaneous crosstalk.]
 2      A    Catholicism believes in pro-life and they
 3  don't believe in abortion.
 4      Q    Okay.  And so when you testified earlier about
 5  your religious objection to -- well, strike that.
 6              So it's based on the fact that you don't
 7  believe in abortion?
 8      A    Correct.
 9      Q    Okay.  So -- and we are going to get to some
10  medications that you have taken in your lifetime but --
11      A    Yes.
12      Q    -- have you ever objected to a medication
13  before the COVID-19 vaccine because it used aborted
14  fetal cells in its production or development?
15      A    No, because I didn't know.  I mean, I didn't
16  even think about when I took medication that I had to
17  think about something like that.  I didn't know that a
18  lot of medications did research or development using the
19  fetal cell lines.
20      Q    How long have you worked in the pharmaceutical
21  company industry?
22      A    20 years.
23      Q    And that never came up ever in 20 years, the
24  use of aborted fetal cells?
25      A    No.
```



Sandra Silva                                    October 25, 2023
                                                      Page 55

```
 1        Q    Okay.  And so going back to sort of the
 2   tying -- the timing of this, when did you make the
 3   decision that you would not get the COVID-19 vaccine?
 4        A    I believe that was, I think, right when the
 5   vaccine came out.  I want to say it was February, March.
 6   I know people were anxious about -- when the vaccine
 7   first came out, people were rushing or trying to get
 8   their appointments to get their vaccine.  I know my
 9   in-laws were.  My coworkers were.
10             I don't know -- I -- I didn't -- I didn't
11   think to...  I didn't know.  I feel like I weighed my
12   options because everybody else was doing it.  But just,
13   I mean, through prayer, I mean, it was just something
14   that wasn't for me.  I mean, and so many people would
15   ask me like, "Why?  We don't understand; we are
16   concerned for your safety."
17        Q    Okay.  So -- so you weighed your options.  So
18   as I understand this, the COVID-19 vaccine comes out,
19   you weigh your options.  So at some point in time, you
20   are considering that you may get the COVID-19 vaccine;
21   is that right?
22        A    I thought about it because everybody else was.
23   I mean, yeah, I did.  I thought about it.  But I had --
24   I had to take a lot of time and prayer and quiet time.
25   I mean, it was a difficult decision.
```



1              And, of course, a lot of times I would

2     second-guess, you know, my feeling of not getting it,

3     but I would just continue in prayer and just continue to

4     get that gut feeling confirmation that it was not for

5     me.

6         Q    Okay.  And so you got the gut feeling and

7     confirmation it was not for you and you made the

8     decision that you were not going to get it; is that

9     right?

10        A    Correct.

11        Q    And you never changed that decision since that

12    time, right?

13        A    Correct.

14        Q    Okay.  Was the COVID-19 vaccine's use of

15    aborted fetal cells ever part of your decision -- that

16    initial decision you made upon prayer not to get the

17    COVID-19 vaccine, sitting here today under oath?

18        A    Sure, it played a decision.

19        Q    Okay.  How?

20        A    Because I do believe in pro-life.  I mean,

21    when I heard about that, I mean, it made me sad.  I

22    mean, I -- and then -- I mean, I guess -- I guess you

23    could say that was maybe a confirmation for me that it

24    was not the right thing for me.

25        Q    So when you learned that it used the COVID --



1     Q    Okay.  And when did you become aware of that?

2     A    I became aware of that, like I said, right

3  around when I was working on my religious accommodation.

4     Q    Uh-huh.  Okay.

5     A    My interview with the human resource

6  coordinator also brought that up --

7     Q    Okay.

8     A    -- too.

9     Q    And so sitting here today, do you know which

10  medications use aborted fetal cells?

11     A    So I don't know them all, but I know there is

12  like Pepto-Bismol, Tums, the Advil, the Tylenol.  So --

13  but I also -- I mean, I know that there is many that

14  they say use the fetal cell lines in their research.

15     Q    Uh-huh.  Have you taken Tylenol in the last

16  two years?

17     A    I have not.

18     Q    Have you taken Pepto-Bismol?

19     A    I have not.

20     Q    Advil?

21     A    I did once.

22     Q    Okay.  And tell me why that did not violate

23  your religious beliefs.

24     A    It did.

25     Q    Okay.  And why is that acceptable to you?



1    A    It wasn't acceptable.  It was --

2    Q    But you did it anyway?

3    A    -- not acceptable.  I did.

4    Q    Okay.  Have you taken Pepto-Bismol?

5    A    No.  Can I -- can I say why, also, I -- so

6  it's my understanding in the research and the articles

7  that I have read, also, that the use of fetal cell lines

8  in research and development wasn't available to use

9  until 1977.  So a lot of the medications that are on the

10  market came out before that date.  So, I mean, there

11  wasn't really any way for those certain medications to

12  have used the fetal cell lines as well.

13          So -- so I know, like, some antibiotics are on

14  there.  What else is on there.  Like, for example,

15  Tylenol Cold, I know it has like four ingredients in

16  there.  Those came out prior to 1977.  So the use of the

17  fetal cell lines in research and development for that

18  was -- I mean, you weren't able to do that.

19          So I do my best to try to -- like, any type of

20  medication that I do take, I do my best to try to look

21  to see, like, when it was manufactured and possibly to

22  see, you know, if they did use the fetal cell lines in

23  their research and development.

24          And so while I believe that article or that

25  information that I have read about what I just shared



1   with you, do I know that any of that is a hundred

2   percent true?  I don't.  But that's kind of what I use

3   my basis on when I take medication.

4           Q    What article are you referring to?

5           A    I can't think of it at the top of my head, but

6   I can look for it and share it with you later.

7           Q    Okay.  And so it's your testimony today that

8   you have researched every single medication that you

9   have taken in the last two-plus years to confirm that

10  there has been no use of aborted fetal cells?  Is that

11  your testimony today?

12          A    I have not researched every single medication,

13  but the ones that I am concerned with, yes.

14          Q    And how do you make a decision about whether

15  or not you are concerned with it or whether or not you

16  are going to research it?

17          A    I don't know.

18               MS. ENGELMAN:  Can we pull 16, Celina?

19               (EXHIBIT 2 WAS MARKED.)

20          Q    By the way, Ms. Silva, are you aware that --

21  or have you researched to see if there is any vaccines

22  that do not contain aborted fetal cells?

23          A    No, I have not.

24          Q    You don't know one way or the other?

25          A    No.  The COVID vaccines, do I know if --



1    Q    Yeah.

2    A    -- there is one that doesn't?

3    Q    Correct.

4    A    I heard that possibly Pfizer did not, but I am

5    not a hundred percent sure.

6    Q    Okay.  If there was a COVID-19 vaccine that

7    did not use aborted fetal cells, would you take it?

8    A    That just depends.  I mean, it just depends

9    on -- I would have to pray about it.

10    Q    Okay.  Ms. Silva, this is from the Diocese of

11    Corpus Christi, Office of the Bishop.  Do you see that?

12    A    Yes.

13    Q    And is that the diocese of your -- your

14    church, St. -- is it St. Philip?

15    A    Yes.

16    Q    St. Philip the Apostle?

17    A    Yes.

18    Q    Have you ever seen this document before?

19    A    No, I haven't.

20    Q    Okay.  Did you ever look to see the stance of

21    the diocese of Corpus Christi on the COVID-19 vaccine?

22    A    No.

23    Q    Okay.  And why not?

24    A    I -- I should have, but I -- I don't know.  I

25    just didn't.



Sandra Silva                                          October 25, 2023
                                                      Page 65

```
 1        Q    Okay.  And it says, "A question has arisen
 2   whether we should reimpose restrictions to protect those
 3   who have not been vaccinated.  At this time, we will not
 4   impose the restrictions of the past year."
 5             Do you see that?
 6        A    Uh-huh.
 7        Q    Do you know what restrictions they are
 8   speaking of?
 9        A    Probably not attending church.
10        Q    Okay.  And it says, "The reason not to
11   reimpose restrictions is because the vaccine is
12   universally and readily available and is highly
13   effective against the disease."
14             Do you see that?
15        A    Yes.
16        Q    Do you agree that the COVID-19 vaccine was
17   highly effective against COVID?
18                  MR. DeMATTEO:  Objection, form.
19        A    I don't know.  I guess maybe it was for some
20   people.  But I know when it first came out, they talked
21   about the efficacy being super high and then it started
22   to die down.
23        Q    Did you have concerns about the efficacy of
24   the COVID-19 vaccine when making your decision?
25        A    Sure.
```



Sandra Silva                                          October 25, 2023
                                                              Page 71

1           Do you see that?

2      A    Yes.

3      Q    And it also says, "Every person who becomes

4  ill with COVID-19 places an additional burden on the

5  healthcare systems, which in certain cities, states, and

6  nations have been in danger of being overwhelmed."

7           Do you see that?

8      A    Yes.

9      Q    So do you understand, sitting here today, that

10 the United States Conference of the Catholic Bishops

11 considered it a moral responsibility and an act of love

12 to get the COVID-19 vaccine?  Do you see that?

13     A    Yeah.  Yes.

14     Q    And do you disagree with that?

15     A    For me?  Yes.

16     Q    Okay.  And why?

17     A    Because I -- because I first answer to my God.

18 I don't answer to them first.  I mean, first it's God in

19 my life and what he tells me to do.

20     Q    Okay.  And so when you took Advil, what did

21 God tell you to do?

22     A    That was a mistake.

23     Q    Well, did you pray to God about it?

24     A    I asked for forgiveness.

25     Q    Did you pray to God before you took it?



1        A      I did.

2        Q      And what did God tell you?

3        A      I didn't listen.

4        Q      Okay.  So that was -- okay.

5               So backing up.  So do you agree with me

6    sitting here today that there is no Catholic religious

7    doctrine that would have prevented you from taking the

8    COVID-19 vaccine?

9                    MR. DeMATTEO:  Objection, form.

10       A      So you are asking me that there is no

11   religious doctrine that would prevent me from taking the

12   COVID vaccine?  Is that what --

13       Q      Yes.

14       A      -- you are asking?

15       Q      Yes.

16       A      Yes.

17       Q      What is the doctrine?

18       A      Is that what you are asking me?

19       Q      Yes, that's what I'm asking you.

20       A      I mean, there isn't.  I mean, the only thing I

21   can explain to you, even though it's the bishop saying

22   this, I mean, I don't think they could argue that if God

23   is telling me to do something, I can't -- I can't go

24   against that will.

25       Q      Did God say why He didn't want you to get the



Sandra Silva                                    October 25, 2023
                                                Page 73

 1    COVID-19 vaccine?

 2        A    No.  Just it wasn't right for me.

 3        Q    No reason why?

 4        A    No reason why.

 5             MS. ENGELMAN:  Celina, you can take that

 6    off.

 7        Q    You testified earlier that you had some

 8    concerns about the efficacy of the vaccine; is that

 9    right?

10        A    Yes.

11        Q    Can you tell me more about the basis of those

12    concerns and what research you did to --

13        A    I mean, I didn't do any research.  I mean, I

14    just knew that there wasn't a prescribing information

15    sheet for it.  I didn't know anything about the research

16    and development of it.  I mean, that was just a big

17    question.  I know when I was at Takeda that a lot of --

18    a lot of reps were asking about that.

19        Q    Uh-huh.  Did you do any specific research on

20    the efficacy of the COVID-19 vaccine before you decided

21    not to get it?

22        A    Yes, and I couldn't find anything.

23        Q    Okay.

24        A    I mean, they had -- they had articles, like,

25    stating, oh, you know, you have 98 percent efficacy or



1    whatever, but, I mean, there was no data behind it.

2    There was no trials or anything like that.

3          Q     Uh-huh.  Do you believe the COVID-19 vaccine

4    helped to stop the spread of the virus?

5                      MR. DeMATTEO:  Objection to form.

6          A     I have no idea if it did or didn't.

7          Q     Okay.  Do you have any reason to dispute,

8    sitting here today, that it did not?

9          A     No.

10                     MR. DeMATTEO:  Objection, form.

11         Q     Okay.  Did you -- do you understand that there

12   are certain types of people who are more likely to get

13   sick from COVID-19?

14         A     Yes, I understand that.

15         Q     And what type of people do you believe are

16   more likely to get sick?

17         A     Well, just from what I heard, it's people that

18   have heart conditions, diabetes, that are obese.

19         Q     Uh-huh.  Do you fall into any of those

20   categories?

21         A     No, I don't.

22         Q     Do you know anybody who got -- who was

23   hospitalized from COVID-19?

24         A     I do.

25         Q     Who was that?



Sandra Silva                                          October 25, 2023

```
 1   used in the vaccine?
 2        A    Was I worried about the technology of the
 3   vaccine?
 4        Q    Yeah.
 5        A    Like the mRNA?  That --
 6        Q    Yeah.
 7        A    -- technology?  At the time, no.  No.
 8        Q    Okay.  Since the time, has your view changed?
 9        A    I mean, no, my view has not changed.  I mean,
10   I -- that didn't impact my decision.
11        Q    Okay.  Were you worried about adverse events?
12        A    Sure.
13        Q    What adverse events were you worried about?
14        A    I don't know.  I mean, I don't know.  I just
15   was worried.  I mean, I -- I just knew that listening to
16   my Spirit, I was told it's not for me.  So I don't
17   know --
18        Q    Well --
19        A    -- what that meant.  I don't know if that
20   meant I was going to have -- get sick, some type of
21   adverse event.  I don't know if I was going to die.  I
22   have no idea.
23        Q    Are you aware of what's called the VAERS
24   database?
25        A    Yes.
```



1        Q    Did you ever review safety data or adverse

2    event data on the VAERS database?

3        A    I think I looked at -- yes.  That was a long

4    time ago, but yes.

5        Q    Do you remember when you looked at that

6    information?

7        A    It was around the COVID time frame.

8        Q    Do you remember any of the specific

9    information that you reviewed or any conclusions that

10   you drew?

11       A    Yes.  I was looking at side effects, adverse

12   events, deaths, that kind of thing.

13       Q    What side effects do you remember reading

14   about?

15       A    That, I don't remember.  Oh, I -- I think it

16   was -- I don't remember.  I can't remember if it was

17   that or a different article that I was thinking of

18   but --

19       Q    Okay.

20       A    -- I don't remember.

21            MS. ENGELMAN:  Celina, can we grab -- I

22   guess it's 6.

23            (EXHIBIT 3 WAS MARKED.)

24       Q    Ms. Silva, do you remember submitting

25   interrogatory responses to Takeda?



1    that?

2         A    Yes.

3         Q    Okay.  And if you scroll down, the third

4    paragraph, it says, "The vaccines I received under the

5    age of 18, I received as a minor.  Those vaccines were

6    tested and proven that came with prescribing information

7    and were published in peer-review journals and came with

8    years of experience as well."

9              Do you see that?

10        A    Yes.

11        Q    Okay.  So why is it that you are including

12   this information in your answer?

13        A    Why is it that I am what?

14        Q    Including this information in your answer here

15   about other vaccines.

16        A    Well, because, yes, I believe you asked if I

17   had gotten vaccinated -- had any other vaccine, if I had

18   taken any other vaccines.

19        Q    Uh-huh.  Is it your -- is it your belief that

20   the COVID-19 vaccine did not fall into this category?

21   It was not tested and proven and had not come with

22   prescribing information that was published in

23   peer-review journals?

24        A    I mean, that's not the main reason I didn't

25   get vaccinated but, I mean, I shared that.  I mean -- I



Sandra Silva                                    October 25, 2023
                                                Page 82

1   mean, that was a concern of mine.

2        Q    Okay.  It says here, [reading] The COVID-19

3   vaccine differs from other vaccines because it does not

4   provide any prescribing information and there are no

5   peer-review studies.  The COVID vaccine was authorized

6   as an emergency-use vaccine and is not customary -- and

7   it is not customary to receive like getting the flu

8   vaccine.

9             Do you see that?

10       A    Uh-huh.

11       Q    Was it a concern for you that the COVID-19 was

12  authorized as an emergency use vaccine?

13       A    I mean, I believe with emergency use -- I

14  mean, I guess -- my understanding is that if it's

15  emergency use, they are going to push something through.

16  But, again, I mean, my concern was that -- I mean, I

17  just -- I didn't see any data to back up the safety and

18  efficacy of it.

19       Q    It says here, "Another differentiating factor

20  is the technology.  mRNA in the COVID vaccine is

21  different from" -- "than traditional vaccines.  The

22  COVID vaccine is a modified live viral vaccine and the

23  adjuvant" -- I don't know if I'm saying that right --

24  "again, is for emergency use."

25            Do you see that?



```
 1              And then you see here the -- it's the date
 2    September 10th, 2021.  Do you see that?
 3         A    Uh-huh.
 4         Q    Does that refresh your memory that you had
 5    COVID in September of 2021?
 6         A    Yes.
 7         Q    Okay.  So at this point in time, you had
 8    already made a decision not to get the COVID-19 vaccine,
 9    right?
10         A    Correct.
11         Q    Okay.
12              MS. ENGELMAN:  Scroll down, Celina,
13    please.
14         Q    And then you said -- then she says, "Have you
15    gotten the Regeneron yet?"
16              Did you ever get Regeneron?
17         A    I did when I was diagnosed, which was on a
18    Friday.  I got an appointment the following day and got
19    the Regeneron.
20         Q    And what is Regeneron?
21         A    Just an fusion of -- of, I guess, like good
22    antibodies.
23         Q    Uh-huh.  And did you at that point in time ask
24    any questions about whether or not Regeneron used
25    aborted fetal cells in any way?
```



1        A    Yes.  And it was my understanding that they

2   had not.

3        Q    Okay.  Who did you ask that information of?

4        A    The nurse practitioner that was seeing me for

5   COVID.

6        Q    Uh-huh.  And you specifically remember asking

7   that question?

8        A    I asked about Regeneron and if it was -- you

9   know, if she recommended it.

10       Q    Okay.

11       A    And she said yes.

12       Q    Did you ask whether or not it used aborted

13  fetal cells in production, manufacturing, or testing?

14       A    I am trying to remember.  Okay.  I will go

15  back.  I don't remember.

16       Q    Okay.  Do you remember doing any research on

17  your own about whether or not Regeneron used aborted

18  fetal cells in the production, manufacturing, or

19  testing?

20       A    I know I...  I can't remember.

21       Q    Wouldn't that be really important information

22  for you to know, if you had a religious objection to

23  using aborted fetal cells at this point in time -- you

24  are aware that they are used in medications?

25       A    You are correct but --



1    Q    And sitting here today, you have no idea
2  whether or not you researched it or asked the question?
3    A    Correct.
4            MS. ENGELMAN:  Can we go to 179?
5    Q    Who is Lisa Trevino?
6    A    She is a friend.
7    Q    Is she vaccinated against COVID-19?
8    A    Yes, she is.
9    Q    And is she religious?
10   A    Yes, she is.
11   Q    What religion does she subscribe to?
12   A    I believe she is also a Christian.
13   Q    Okay.  Is she Catholic?
14   A    No.
15   Q    Okay.  Do you know if she -- what type of
16  Christian she is?
17   A    I believe that she is nondenominational.
18   Q    Okay.  We can obviously look at this text
19  here, but the text chain is, you know, she seems to be
20  encouraging you to take -- to get the COVID-19 vaccine.
21  Is that your recollection?
22   A    Yes.
23   Q    And why is that?
24   A    I mean, that's just her feeling that she is
25  encouraging me to do that.  I mean...



1    me aware of it.

2         Q    Okay.  And why do you think that?  What's that

3    based on?

4         A    Why do I think what?

5         Q    Why do you think that you were already aware?

6    What's that based on?

7         A    Just the talk among reps at Takeda about the

8    vaccine.

9         Q    So you just discussed that you -- or you just

10   mentioned that you submitted a medical and a religious

11   exemption request; is that right?

12        A    Yes.

13        Q    And why did you submit a medical exemption

14   request?

15        A    Because I got COVID.  I -- when the letter

16   came out that Takeda was going to require the vaccine

17   mandate, that's the day that I got COVID.  And so they

18   wanted me to get the COVID vaccine and I was -- the

19   nurse practitioner that was taking care of me said if I

20   was going to -- she just mentioned -- she says, You know

21   you can't get the COVID vaccine.  You would have to

22   wait.  And, then, if you are going to get the Regeneron,

23   you can't get the COVID vaccine.  You would have to wait

24   a few months.

25        Q    Okay.



```
1        A     So that's why I submitted the medical as well.

2        Q     Okay.

3              MS. ENGELMAN:  Celina, if we could go to

4   tab 24, please.

5              (EXHIBIT 6 WAS MARKED.)

6        Q     Okay.  So if we scroll down to the request --

7   okay.  Yeah.

8              So, Ms. Silva, this is your medical exemption

9   request.  Do you recognize this document?

10       A     Yes.

11       Q     Is that your signature at the bottom dated

12  9/16/2021?

13       A     Yes.

14       Q     Okay.  And so here you say -- it's a little

15  bit hard to read but you say, "My request is to postpone

16  inoculation due to current COVID illness and recent

17  monoclonal antibody therapy."

18             Is that the Regeneron you just --

19       A     Yes.

20       Q     -- spoke about?

21       A     Yes.

22       Q     Then you say, "My healthcare provider advised

23  me not to get vaccinated until six months following my

24  COVID illness and the monoclonal antibody therapy."  And

25  then you say, "I anticipate a six-month accommodation."
```



MAGNA
LEGAL SERVICES

1      Q    Okay.

2                MS. ENGELMAN:  If we could go to 25,

3    Celina.

4                (EXHIBIT 7 WAS MARKED.)

5      Q    So...

6            So here -- this is October 13th, 2021.  The --

7    your manager -- is Christine Mealey your manager?  Or

8    I'm sorry.  Is she from HR?

9      A    HR.

10     Q    And so it says that "Your request has been

11   reviewed and we are pleased to inform you that we are

12   able to approve your request.  Specifically, we will

13   accommodate a delay in obtaining the required

14   vaccination for a 90-day period post the date provided

15   in your medical document" -- "documentation."

16           Do you see that?

17     A    Yes.

18     Q    And it says, "You will then have the

19   opportunity to comply with the policy by becoming

20   partially vaccinated and recording this as directed in

21   the VaxDMS system by December 9th, 2021."

22     A    Uh-huh.

23     Q    And then it says, "Failure to report your

24   first dose and upload your vaccine record in VaxDMS by

25   this date will result in the separation of your



Sandra Silva                                      October 25, 2023
                                                  Page 107

 1   employment."

 2          Do you see that?

 3      A   Yes.

 4      Q   Okay.  So you understood that at this time,

 5   once the expiration of the medical exemption came to be,

 6   December 9th, 2021, you would need to get vaccinated; is

 7   that right?

 8      A   That's what the letter states, yes.

 9      Q   Okay.  And did you feel that you were being

10   untruthful to Takeda by accepting the exemption and

11   continuing to work when you knew all along that you

12   never intended to comply with the policy?

13      A   No.

14      Q   That you were not being truthful?

15      A   I never -- I never thought that I was being

16   dishonest.

17      Q   Well, on October 13th when you received this

18   letter, you knew that you never intended to get

19   vaccinated; is that right?

20      A   I -- that's what I -- yeah.  That's true.

21      Q   And did you write back to Christine Mealey and

22   say that you never intended to get vaccinated and would

23   not comply --

24      A   No.

25      Q   -- with the policy?



1      A    She never asked.  She never asked, so I
2  never -- I mean, I didn't even think about sharing that.
3      Q    But why?  Don't you think it's important to be
4  truthful with your employer that you never intended to
5  comply with the vaccination requirement?
6      A    I mean, I think they knew.  I mean, my manager
7  knew.  I just...  I just don't feel like I was dishonest
8  in any way.  I mean, it was -- I didn't think I had to
9  tell them that.
10     Q    Okay.  So were you separated after the
11 December 9th, 2021, period expired?
12     A    Correct.
13             MS. ENGELMAN:  Can we go to 14?
14             (EXHIBIT 8 WAS MARKED.)
15     Q    This is your religious accommodation request
16 form.  Do you see that?
17     A    Yes.
18             MS. ENGELMAN:  And if we scroll down,
19 Celina.
20     Q    We can see your signature and it's dated
21 9/20/2021?
22     A    Yes.
23     Q    And that's two days after Victoria A. sent you
24 a religious exemption article on fetal aborted cells.
25 Do you remember that?



 1          A     No, I have not.

 2          Q     Okay.  Have you ever spoken to her about the

 3   COVID-19 vaccine generally?

 4          A     No.

 5          Q     Okay.  Do you know whether your pastor is

 6   vaccinated?

 7          A     Say that again.

 8          Q     Do you know whether your pastor is vaccinated?

 9          A     Oh, I have no idea.

10          Q     Do you know whether Sister Rosa is vaccinated?

11          A     I don't know.

12          Q     Okay.  So when you were doing research and you

13   came across Catholic articles, sitting here today,

14   what -- what did you use from those articles to include

15   in your request?

16          A     I used the information about the fetal cells,

17   the use of it in research and development.

18          Q     Anything else?

19          A     Top of my head, that's all I can remember.

20          Q     Okay.  And so why is it -- why is it that you

21   decided to use that information from the Catholic

22   articles that you came across?

23          A     Honestly, I have no idea.  I -- like I said, I

24   couldn't explain that gut feeling of why I shouldn't get

25   the vaccine so I was trying to find something that would



1    align with Catholicism that I could put down.

2         Q    Do you have a search -- did you look for your

3    search history to see if you could find the articles

4    that you relied on?

5         A    Do I have a search history?  From like --

6         Q    Like your Google -- or your Google search

7    history, your internet search history to try to find the

8    articles that you relied on in preparing your request?

9         A    I guess I could look.  I mean, I don't -- I

10   have no idea if I....

11        Q    Okay.  So you never looked to date?

12        A    No.

13        Q    Okay.

14             MS. ENGELMAN:  I want to scroll down,

15   Celina.

16        Q    So you say here, "As a Bible-believing

17   Christian, I follow the God of Israel, Abraham, Isaac,

18   and Jacob."

19             Do you see that?

20        A    Uh-huh.

21        Q    What -- what does that -- what does that mean?

22        A    So it just specifies what God I follow.  I

23   mean, I think people have different Gods and that's the

24   God I follow.

25        Q    Is that one God or is that one, two -- four



1    Gods?

2         A    So I follow the God of Israel.  And in the

3    Bible, the Bible mentions Abraham, Isaac, and Jacob.

4    And the God that I believe in is the God that they

5    believe in.

6         Q    Which is Israel?

7         A    The God from Israel.

8         Q    Okay.  Is there any Biblical verse that you

9    can point to that -- from the God of Israel or

10   otherwise, that prevents you from taking the COVID-19

11   vaccine?

12        A    No.

13        Q    Okay.  And you said, "The Word of God states

14   that my body is the temple of the Holy Spirit who is in

15   me.  I have chosen to honor God with my body and

16   spirit."

17             Do you see that?

18        A    Yes.

19        Q    What does that mean?

20        A    That means the Holy Spirit lives in my heart,

21   mind, and soul, and I choose to honor -- like, when I

22   hear from the Holy Spirit, I choose to honor that.

23        Q    And so is there -- is there something about --

24   well, let's just take the fact that you believe that

25   your body is a temple --



1          What does "moral conscience" mean?

2      A    My moral conscience, like the Holy Spirit.

3  Like I said, the Holy Spirit lives in my heart, mind,

4  and soul and so I would not want to go against what the

5  Holy Spirit speaks to me --

6      Q    Okay.  So --

7      A    -- in telling me what is right and what I

8  shouldn't -- what I should do and what I shouldn't do.

9      Q    Okay.  So how do you -- and just generally

10 speaking, how do you differentiate when you are going to

11 go against your moral conscience and when you are not

12 going to go against your moral conscience?

13         So in the example earlier we talked about when

14 you took Advil.  I am assuming that went against your

15 moral conscience, but you did it anyway.  So how do you

16 differentiate that situation from the COVID-19 vaccine?

17     A    I was in pain.  And usually I try to pay --

18 like, pray through my pain.  And this pain wasn't going

19 away and I just -- I fell weak to it.  I did it.  And I

20 think, like, with knowing, you know, that the Holy

21 Spirit speaking to me and telling me that the vaccine is

22 not right for me, I mean, that -- that was an ongoing

23 thing of prayer -- daily prayer every day.  And just

24 knowing, you know, over and over and through my daily

25 prayer that I was doing the right thing.



```
 1   did.

 2       A    Well, just being in pharma, I know that

 3   medications -- it takes, again, 15, 20 years to come to

 4   fruition.  They go through research and development.

 5   They go through trials.  I never saw any information on

 6   trials of, you know, how did people respond.  Did they

 7   respond favorably?  Was there efficacy?  Was there

 8   safety or was there not safety?  Did it cause cancer in

 9   five or ten years?  I never saw any of that information.

10   And there is no prescribing information.

11       Q    Okay.  Ms. Silva, can you walk me through

12   your -- where did you go to college --

13       A    [Inaudible.]

14       Q    -- or did you go to college?

15       A    Yes.

16       Q    And --

17            THE REPORTER:  I'm sorry.  Ms. Silva, I

18   missed the college.

19            THE WITNESS:  Southwest Texas.

20            THE REPORTER:  Thank you.

21       Q    And what was your first job out of college?

22       A    First job out of -- I worked for Graber

23   Industries selling custom blinds.

24       Q    What did you do after that?

25       A    Then I worked for a company called SOP and I
```



```
 1   Amarin?
 2        A    Sold Vascepa.  It's an Omega 3.
 3        Q    Okay.  And you were there for, it looks like,
 4   a little over a year.  And then you came back to Takeda
 5   back in March of 2020?
 6        A    Correct.
 7        Q    Okay.  And why did you come back to Takeda?
 8        A    My district manager had an opening in Corpus
 9   and called me and asked me if I would come back.
10        Q    Okay.  And so when you came back in March
11   2020, were you -- you were a sales rep?
12        A    Yes.
13        Q    Okay.  And what drugs did you sell?
14        A    Trintellix and -- oh, my gosh.  Vyvanse.
15   Sorry.  I couldn't think of it.
16        Q    That's okay.  And what does Trintellix treat?
17        A    Trintellix is an antidepressant.
18        Q    And what about -- what is it?  Vy- --
19        A    Vyvanse.
20        Q    Vyvanse.
21        A    It's for ADHD.
22        Q    Okay.  So you are coming back to Takeda in
23   March 2020.  So right -- that's right when COVID is
24   hitting, right?
25        A    Correct.
```



Sandra Silva                                          October 25, 2023
                                                      Page 127

1    Q    So tell me about kind of the start of your

2    career back at Takeda in March 2020 and -- well, strike

3    that.

4         What is the geographic area that you covered?

5    A    Corpus Christi and the surrounding areas.

6    Q    And about how many doctors' offices or

7    healthcare providers were you targeting in that area?

8    A    Probably about 2- -- about 200.

9    Q    Okay.  And did you have anyone -- you alone

10   were targeting 200 or did you have a counterpart?

11   A    I had a counterpart.

12   Q    And who was that?

13   A    Ersulyn Casady.

14   Q    Okay.  So how did it work?  Did you split it

15   up a hundred and a hundred or how did you guys work

16   together to --

17   A    Initially, yes, we would split up the targets.

18   And so she was responsible for half and I was

19   responsible for the other half.

20   Q    Okay.  And how did you decide who was

21   responsible for which?

22   A    I think we might have done A through the

23   middle of the alphabet and the other person took the

24   remainder.

25   Q    Okay.  And what types of facilities were you



```
1   visiting?  Hospitals?  Clinics?  Pharmacies?
2        A    So family practice, primary care.
3        Q    Okay.
4        A    Psychiatrists and pediatricians.
5        Q    Okay.  And, again, you are starting in March
6   2020, but initially were you visiting in person 100
7   percent?
8        A    No.  So when I started, COVID -- the news of
9   COVID started spreading.  And I was supposed to go to
10   training and that got canceled because we couldn't fly
11   anywhere.
12        Q    Uh-huh.
13        A    So basically my training was done at home.
14   And then once I was done with my training, from there, I
15   really never got to go out in the field and I really
16   never got to go out and meet any of the new customers
17   that I didn't know.  So it was all done --
18        Q    Okay.
19        A    -- before me.
20        Q    Okay.  So just backing up to sort of your
21   previous tenure at Takeda before you were laid off --
22        A    Uh-huh.
23        Q    -- in your position as a sales rep, was that
24   traditionally a hundred percent in person?
25        A    Yes.
```



Sandra Silva                                    October 25, 2023
                                                Page 129

1        Q    Okay.  Did you have an understanding from

2   Ersula [sic] -- is it Ersula -- or otherwise that but

3   for COVID starting in March 2020, your job would have

4   been to go visit these healthcare providers in person?

5        A    Yes.

6        Q    Okay.  And so when you start -- you finish

7   training and you start contacting healthcare providers,

8   are you doing it 100 percent remotely like we are today?

9        A    Yes.

10       Q    Okay.  Were you visiting anyone in person with

11  masks or otherwise?

12       A    Not -- I guess we stayed at home -- probably

13  about a year and a half, I think, we worked virtually.

14  A year to year and a half; somewhere around there.

15       Q    Okay.  And do you recall when you started to

16  go back -- did you ever start to go back in person?

17       A    Yes.

18       Q    And when was that?

19       A    Oh, my gosh.  I don't know if it was somewhere

20  between March and May.  I am not sure.  I can't

21  remember.  Somewhere around there.

22       Q    Okay.  And it -- was that when -- after the

23  COVID-19 vaccines had come out?  Do you recall?

24       A    Yes.  When they came out, we were still

25  working virtually, if I remember correctly.



1        A    Honest, I can't -- I can't remember.

2        Q    Okay.  So when you started to go in person,

3    can you sort of explain to me what that sales call would

4    look like?  If you go into a healthcare provider and you

5    want to see two or three doctors, for example, like how

6    often -- how much time are you spending in one facility

7    for a sales call, on average?

8        A    Initially when we went back out in the field,

9    it was really hard to get into an office because they

10   wouldn't let reps back.  Just -- really, they were just

11   trying even like to keep, you know, patients -- like,

12   they didn't want to keep patients in the waiting room.

13           It was -- it was just really rare if we were

14   able to go back into an office, but I would say that

15   I -- at that time, maybe spending ten minutes maybe

16   chatting with the receptionist or a nurse, if they would

17   talk to me, if they had time to.

18           And if I was able to get back -- that would be

19   like through the window.  But if I was able to get back,

20   I mean, you could spend any time -- my guess, 20, 30

21   minutes back there waiting -- waiting to speak to

22   somebody.

23       Q    Okay.  So just going back to your earlier

24   testimony, were there multiple facilities who were not

25   allowing in person at all -- like at all?



```
 1        A    Before COVID?  Before?

 2        Q    No.  No, no, no.  Like, once you guys -- once

 3   Takeda was back in person with masks and testing, were

 4   there still facilities in your area that were not

 5   allowing in-person visits?

 6        A    Oh, yes.  Several offices.

 7        Q    Okay.  Approximately how many?

 8        A    It's hard to say because the timing of it was

 9   just so different.  Like, after more reps got in the

10   field, the access got somewhat better, but initially it

11   was -- it was pretty bad.  They didn't want anybody to

12   come back.  I don't know.  That's a hard -- that's a

13   hard one to -- I can't -- I don't want to give a number

14   because I just -- I really don't know.

15        Q    Okay.  Did it change over time, meaning like

16   the more --

17        A    Yes.

18        Q    -- they had eased up restrictions and more and

19   more facilities started to open up to allow in person as

20   time went on?  Is that right?

21        A    Yes, yes.

22        Q    Okay.  And so if you are in a facility, for --

23   for example, a half an hour, how many people would you

24   say that you would be interacting with within that

25   facility?
```



1              MR. DeMATTEO:  Objection, form.

2      A     Not -- not a lot.  Just because -- even like

3  the places that we would hang out before COVID, like a

4  lot of times we were now put into different rooms.  We

5  were more isolated from patients and from other people.

6      Q     Okay.  Are you talking about two people?  Ten

7  people?  Somewhere in between?  More than ten?

8      A     Two or three.  Two -- two to three maybe.

9      Q     Okay.  And are you seeing or passing patients

10  as you navigate the facility?

11      A     Every office is different.  I mean -- yes, I

12  mean, in some offices.

13      Q     Okay.  And in any of the offices, do you have

14  any knowledge of what the patients are being treated

15  for?

16      A     No.

17      Q     Okay.  Did you have any discussions with any

18  of the healthcare providers in your area about the

19  COVID-19 vaccine?

20      A     Regarding like?

21      Q     Did any of them require vaccination status

22  before allowing someone to enter the facility?

23      A     Yes.

24      Q     Okay.  And who --

25      A     Actually, I had one.



1        Q    Okay.  And who -- what was that?  What office?

2        A    Dr. Frank Martinez.  And that was actually my

3   primary care practitioner's office.

4        Q    Okay.  And did you have a conversation with

5   him or his office that you were not vaccinated?

6        A    Yes.

7        Q    And what did they say?

8        A    I was not allowed to go back.  I could -- I

9   could come to the window.  If they needed samples or

10  anything like that, then they would come to the window

11  and sign for samples.

12       Q    Okay.  Any other facilities that you had

13  conversations with about the COVID-19 vaccine or

14  otherwise required vaccine status?

15       A    Okay.  Say that again.

16       Q    Any other facilities that required vaccine --

17  a vaccination before entering the facility?

18       A    Not that I remember, no.

19       Q    Okay.  Any other conversations that you had

20  with healthcare providers in your area about the

21  COVID-19 vaccine generally?

22       A    No.  I mean -- I mean, if they brought it up

23  to me, but no.  I mean, I -- no.  I -- I -- it wasn't

24  something that I -- I mean, it was, you know, a

25  conversation when you haven't seen somebody in a long



```
 1    that.
 2         Q     Okay.
 3              MS. ENGELMAN:  Can we go back to 4,
 4    Celina?  I'm sorry.  So if we go to 6, please.
 5         Q     So this asks for communications between you
 6    and Takeda basically regarding this lawsuit or any
 7    allegations.  Do you see that?
 8         A     Yes.
 9         Q     And so you named Christine Mealey?
10         A     Yes.
11         Q     And so you say the substance of the
12    communication is regarding your interview for the
13    religious and medical accommodations.  Do you see that?
14         A     Yes.
15         Q     Do you -- can you recall specifically the
16    conversations or discussions that you had with Christine
17    Mealey?
18         A     Regarding my accommodations?
19         Q     Yes.  Or otherwise related to this lawsuit.
20         A     So we had the religious accommodation
21    interview.  We had -- I don't remember what we talked
22    about.  We had the medical accommodation.  I think we
23    just basically went over the accommodation sheet that I
24    submitted and she just kind of shared like what would
25    happen if the accommodation was denied.
```



 1   field, you know, to take a remote call with Christine

 2   Mealey or anything like that that was going on, I would

 3   have to -- I let her know about it.

 4        Q    Okay.

 5             MS. ENGELMAN:  And then we go to 8,

 6   Celina.

 7        Q    And you list medical counseling that you

 8   received.  And are there any individuals or healthcare

 9   providers listed on this list with whom you had a

10   conversation with about the COVID vaccine that we have

11   not mentioned today?

12             MS. ENGELMAN:  Scroll through them.

13        A    It looks like the first few practitioners are

14   the ones that I had the COVID vaccine discussion with

15   because -- when I was either sick with COVID or, like,

16   Jessica was talking to me about the COVID vaccine.  But

17   the others at the end, like Dr. VanFrank and Shelton, I

18   didn't have conversations with them about COVID.

19        Q    Okay.  And if we go to Juan Garcia, that's who

20   you treated -- treated you for COVID.  Do you see that?

21        A    Yes.  It was Juan Garcia and Angela Drake.

22   Because I -- Juan Garcia, I believe, is the one that

23   treated me and Angela Drake, I believe, did my

24   follow-up.

25        Q    It says here, prescribed Albuterol.  Do you



1    see that?

2         A    Yes.

3         Q    Do you do any research to see whether

4    Albuterol used fetal cells?

5         A    I didn't.

6         Q    And what about ivermectin?

7         A    I think I did.  I believe it -- I believe -- I

8    remember that ivermectin didn't.

9         Q    You remember that it didn't?

10        A    Correct.

11        Q    And what's that based on?

12        A    Just an article that I read.

13        Q    What article was that?

14        A    I -- I don't know.  I mean, it's been a while.

15   I don't know.

16        Q    Okay.  Do you remember talking with a medical

17   professional about whether ivermectin uses aborted fetal

18   cells?

19        A    No.  I didn't ask.

20        Q    Okay.  Would it surprise you sitting here

21   today that ivermectin actually does use aborted fetal

22   cells?

23             MR. DeMATTEO:  Objection --

24        A    Okay.

25             MR. DeMATTEO:  -- form.



1       Q    Would that surprise you, Ms. Silva?

2       A    It wouldn't surprise me.

3       Q    Okay.  Medrol Dosepak.  Did you do any

4   research or ask any healthcare provider about whether

5   that used aborted fetal cells?

6       A    No, I did not.

7       Q    What about vitamin C, zinc, or the Z-Pak?

8       A    I mean, it's my understanding that antibiotics

9   didn't use the fetal cells.

10      Q    Remind me what that understanding is based on.

11      A    Again, an article that I read.

12      Q    Any specific conversations with healthcare

13  providers to confirm that information?

14      A    No.

15      Q    So if we go to 11, these are the verbal

16  conversations that you had regarding your religious

17  beliefs.  I think we have discussed Ersulyn Casady.

18  Ashley Griggs we have discussed as well.  Anything else

19  that you have discussed with her regarding your

20  religious beliefs and the COVID-19 vaccine?

21      A    No.

22      Q    Okay.  What did you discuss with Victoria

23  Anderson about your religious beliefs and the COVID-19

24  vaccine?

25      A    I mean, I just told her how I felt, you know,



Sandra Silva                                              October 25, 2023
                                                          Page 164

 1      Q    And do you have any idea where he got this
 2  so-called recording?
 3      A    No.
 4      Q    So if we go down to 19, we ask for your
 5  vaccination history and you say that you haven't
 6  received vaccines since you were a minor.  You have
 7  received the flu shot four or five times but cannot
 8  recall any specific dates or where the shot was
 9  administered; is that right?
10      A    That's correct.  I - I thought I had received
11  the flu shot, but I don't -- I don't understand.  I
12  thought I had.
13      Q    And do you believe now you haven't?
14      A    I don't know.  I guess, based on that
15  information -- I guess -- I mean, I guess it's true.  I
16  never was against getting the flu vaccine.
17      Q    And why is that?  Why aren't you against
18  getting the flu vaccine?
19      A    There is data regarding the flu vaccine.
20           MS. ENGELMAN:  All right.  Can we take a
21  ten-minute break, please?
22           MR. DeMATTEO:  Sure.
23           THE VIDEOGRAPHER:  Okay.  This will mark
24  the end of media number two.  We are going to go off the
25  record.  The time now is approximately 1:54.



Sandra Silva                                October 25, 2023
                                                   Page 166

```
 1        A     No, I did not.
 2        Q     Did you limit the jobs for which you were
 3   searching to a certain geographical area?
 4        A     Yes.
 5        Q     And what was that?
 6        A     Corpus Christi.
 7        Q     When you had conversations with your former --
 8   former colleagues or other folks about jobs, did you
 9   keep notes of any of those conversations?
10        A     No.  I did hear about the Tris job from Grace.
11   I mentioned her name.  She has a pharmaceutical job.
12   And then the Bayer job through my friend Della.
13        Q     Uh-huh.  Okay.  Were you concerned that the
14   COVID-19 vaccine was not approved by the FDA?
15        A     That was a concern, yes.
16        Q     And why was that a concern for you?
17        A     Because most medications are.
18        Q     Do you have a general objection to taking
19   medications that are not approved by the FDA?
20        A     You know, I think before COVID I -- you know,
21   I was in pharma.  I pretty much felt that most
22   medications were approved by the FDA.
23        Q     If something was not approved by the FDA,
24   would that be a reason that you would not take a
25   medication or a vaccine?
```



 1                    MR. DeMATTEO:  Objection, form.

 2        A    I don't know.  I mean, I can't say.  I have

 3   never been in a situation where I have had to make that

 4   decision.

 5        Q    Okay.

 6                    MS. ENGELMAN:  Celina, can we go to 28,

 7   please?

 8                    (EXHIBIT 11 WAS MARKED.)

 9        Q    These are the records from your OB/GYN,

10   Associates of Corpus Christi.  Do you see that?

11        A    Yeah.

12        Q    Do you see that, Ms. Silva?

13        A    Yes.

14        Q    Okay.  And do you have a recollection of

15   taking hormone pellets?

16        A    Yes.

17        Q    Okay.

18                    MS. ENGELMAN:  Can you scroll down to 5,

19   Celina.  Do you want to make this bigger?

20        Q    So in this visit, which I believe is dated --

21   I am surprised they don't have a date on this particular

22   one.

23             Oh, okay.  I'm sorry.  This is July 27th,

24   2020.  If we see the middle of the pack here -- and this

25   is -- this is your doctor or practitioner saying, "We



1    discussed that compounded hormones are not FDA regulated

2    or monitored, which is why they are not required to have

3    the same warning labels."

4            Do you see that?

5    A    No.

6    Q    It's in the middle of the paragraph.

7    A    Oh, okay.

8    Q    Do you have a recollection that the hormone

9    pellets that you took were not FDA regulated?

10   A    Yes.

11   Q    And you had no objection to taking those

12   hormone pellets?

13   A    Correct.

14   Q    Do you have any recollection of praying about

15   that or consulting your conscience about that decision?

16   A    No, I don't.

17   Q    Okay.  So if we look through -- and we can --

18   we can certainly go through this particular medical

19   record, but I can represent to you that you have been

20   prescribed Vascepa.  Does that sound familiar to you?

21   A    Yes.

22   Q    And how long have you been taking Vascepa?

23   A    I took it for a short period of time.

24   Q    Do you recall when?

25   A    When I started working for Amarin.



Sandra Silva                                        October 25, 2023
                                                    Page 169

1    Q    Okay.  And what about estradol -- estradiol?

2    A    Uh-huh.

3    Q    Do you know when you took that medication?

4    A    It's been a while.  It's been a few years.

5    Q    How about Vynyan [phonetic]?

6    A    Say that again.

7    Q    Vynyse [phonetic]?

8    A    I am not understanding what you are saying.

9    Q    Vyvanse, V-y-v-a-n-s-e.

10   A    Oh, yes.

11   Q    What is that medication?

12   A    It's for ADHD -- ADD.

13   Q    And how long did you take that medication?

14   A    That one has been a couple of years.

15   Q    Been a couple of years since you have taken

16   it?

17   A    No.  Since I started taking it.  Since I --

18   Q    Are you still taking that medication?

19   A    I can't -- I can't remember the exact date

20   when I started taking that.

21   Q    Do you still take that medication?

22   A    No.  I got a prescription for it, but I have

23   not gotten the medication.

24   Q    When is the last time you took it?

25   A    Maybe when I was working at Takeda, I am



 1  thinking.

 2      Q    Okay.  And for any of the medications that we

 3  just discussed, did you ever do any research or ask a

 4  healthcare provider if they used aborted fetal cells in

 5  any way?

 6      A    No.  I didn't even think about asking that

 7  question.

 8      Q    Okay.  We talked before about some of the

 9  medications -- I think you testified that you took

10  Advil; is that right?

11      A    Yes.

12      Q    Okay.  What about ibuprofen?

13      A    No.

14      Q    Have you ever taken ibuprofen?

15      A    Before, yes.

16      Q    Before what?

17      A    Before COVID.

18      Q    Okay.  What about Benadryl?

19      A    Okay.  Again, that one was my understanding

20  that it didn't use the fetal cell lines because that was

21  manufactured before 1977.

22      Q    What's your basis for your understanding that

23  Benadryl was manufactured before 1977?

24      A    Through an article that I read.

25      Q    Okay.  And so have you taken Benadryl in the



Sandra Silva                                        October 25, 2023
                                                    Page 171

```
 1   last two years?

 2        A    Yes.

 3        Q    Okay.  And have you ever asked anyone -- a

 4   medical professional or anyone else whether or not

 5   Benadryl used aborted fetal cells?

 6        A    No.

 7        Q    What about Claritin?

 8        A    No.

 9        Q    No, you haven't taken it?

10        A    I don't take Claritin.  I take Xyzal.

11        Q    Okay.  And have you confirmed whether Xyzal

12   has -- used aborted fetal cells?

13        A    No.

14        Q    What about Maalox?

15        A    Maalox?  No.

16        Q    Have you ever taken Sudafed?

17        A    Yes, I have.

18        Q    In the last two years?

19        A    No, not --

20        Q    Okay.  What about Zoloft?

21        A    No.

22        Q    Simvastatin?  Simvastatin?

23        A    What is that for?  Sounds familiar.

24        Q    I am actually not sure.  It's a statin of some

25   sort.
```



1        A    No.

2        Q    All right.  Are those things that you were

3   doing?

4        A    Yes.

5        Q    Are those things that you were willing to

6   continue doing in order to maintain your employment?

7        A    Yes.

8        Q    I would like to just focus on -- direct you to

9   some questions and answers regarding some of the

10  facilities that you would visit and sell to.  And I

11  believe you said there was one that required a COVID

12  vaccine?

13       A    Yes.

14       Q    Okay.  So could you just -- so how many

15  facilities were in your -- I guess, your client roll?

16       A    So we were on a two-week cycle.  So I think

17  after -- after we went virtual, we had a huge list, but

18  when we started going face-to-face, we probably called

19  on 50 healthcare providers.  And we were on a two-week

20  cycle so it got dwindled down to about a hundred, more

21  or less.

22            And when I would go up to the window, I mean,

23  they would ask, have you had COVID?  Are you vaccinated?

24  And I would tell the truth.  I would tell them that I

25  wasn't.  And the only office that stated they wouldn't



```
 1   let me in was Dr. Frank Martinez's office because I was
 2   not vaccinated.
 3        Q    All right.  So, again, how did you handle that
 4   particular office?
 5        A    I just asked if I could reach out virtually to
 6   the providers --
 7        Q    Okay.
 8        A    -- and made contact that way.
 9        Q    How did that work out?
10        A    It was fine.  It worked out fine.  And then I
11   asked as well if they needed samples, that I could come
12   in -- and I would come in wearing a mask -- and that I
13   didn't need to go to the back.  I mean, as long as the
14   provider came up to the front and signed for samples,
15   that was fine.  I could leave them samples.
16        Q    Okay.  So you were still able to meet with
17   them?
18        A    Yes.  And then eventually that policy went
19   away.
20        Q    Oh, when you say the policy went away, was --
21        A    After -- after some time.
22        Q    So that office rescinded its own policy?
23        A    After -- yeah.
24        Q    Okay.  And --
25        A    After a while.
```



1    Q    And that was -- you were still working at

2  Takeda when that policy changed?

3    A    Yes.

4    Q    So, then, when you left Takeda, there were no

5  such policies in place that prohibited an unvaccinated

6  individual from visiting your clients?

7    A    So -- correct, but there were -- there were

8  facilities that wouldn't allow any reps in.

9    Q    And when you say, "any reps," you mean

10 regardless of vaccine status?

11   A    Correct.

12   Q    Okay.  Thanks.

13   A    But that was the only office that I found

14 that, you know, I wasn't able to go back.

15   Q    And, then, just tell me:  What was your

16 territory again?

17   A    It was Corpus Christi and the surrounding

18 areas.  There is a lot of little towns around Corpus

19 Christi.

20   Q    Right.  And I know Texas is definitely a big

21 place, but how much -- and what was the -- the land

22 area, population area for your territory, if you could

23 approximate it?

24   A    300 to 350 people.  I guess the farthest I

25 would go out was maybe -- 16 miles, maybe --



```
 1        Q    Oh, okay.

 2        A    -- was the farthest destination from Corpus.

 3             MR. DeMATTEO:  I don't have any other

 4   questions.

 5             MS. ENGELMAN:  Nothing from me.

 6             THE VIDEOGRAPHER:  Okay.

 7             THE REPORTER:  All right.  Still real

 8   quick, just on the record, Mr. DeMatteo, do you need to

 9   purchase a copy of this transcript?

10             MR. DeMATTEO:  Yes, yes.  We will take

11   just a PDF e-mailed.

12             THE VIDEOGRAPHER:  Mr. DeMatteo, do you

13   need a copy of the video?

14             MR. DeMATTEO:  No, not right now.

15             THE VIDEOGRAPHER:  Thank you.

16             This will mark the end of media number

17   three and concludes today's deposition.  We are going to

18   go off the record.  It is now 2:44 p.m.

19             (DEPOSITION CONCLUDED AT 2:44 P.M.)

20

21

22

23

24

25
```



Sandra Silva                                              October 25, 2023
                                                          Page 182

1    THE STATE OF TEXAS:

2    COUNTY OF HARRIS:

3        I, Mona S. Whitmarsh, a Certified Shorthand

4    Reporter, hereby certify that the foregoing testimony

5    was given before me after the Witness had been first

6    duly sworn.

7        I further certify that this deposition was

8    transcribed under my direction and is a complete and

9    correct transcript of the proceedings; and that it is

10   being filed with the Court in accordance with the

11   Stipulation of Counsel contained in this deposition.

12       I further certify that I am neither attorney for,

13   related to, nor employed by any of the parties to the

14   lawsuit in which this deposition was taken.  Further, I

15   am neither related to nor employed by any attorney of

16   record in this cause; nor do I have a financial interest

17   in the matter.

18       GIVEN UNDER MY HAND AND SEAL OF OFFICE this 6th

19   day of November, 2023.

20



21   _____

     Mona S. Whitmarsh
22   Texas CSR No. 3986
     Expiration Date:  04/30/24
23
     MAGNA LEGAL SERVICES
24   Firm Registration No. 633
     866-624-6221
25   www.MagnaLS.com



**REQUEST FOR MEDICAL STATUS EVALUATION**
**UNDER THE ADA AMENDMENTS ACT (the "ADAAA")**

Employee Requesting Accommodation: _Sandra Silva_

Position/Title: _Senior Sales Representative_ Department: _Field Sales -Neuroscience_

Work Location: _Corpus Christi, TX._   Work Phone number: _361-947-8700_

Immediate Supervisor: _Veronica gallegos_

The information below is treated confidentially, is not maintained in the employee's main personnel file, and will be used only by authorized individuals with a direct need to know and/or evaluate the information. Please return this form, once completed, to: US.Occ.Health.ADA@takeda.com.

Supervisors and managers may be advised of information necessary to make the determinations they are required to make in connection with a request for an accommodation.

### INSTRUCTIONS FOR EMPLOYEE

Please provide this form to your healthcare provider along with your attached job description and your signed authorization form. Takeda will consider your request for accommodation upon receipt of your completed Medical Status Evaluation Form. If you have any questions, please do not hesitate to call Occ Health or Employee Relations. Thank you.

............................................................................................

### THIS SECTION TO BE COMPLETED BY HEALTH CARE PROVIDER:

Health Care Provider: _Angela Drake, NP-C_

Office Address: _7330 S. Staples St. Corpus Christi, TX. 78413_

Office Phone Number: _361-336-0136_

1. Based on the job description, can the employee perform the essential functions of the position without an accommodation?

   ☑ Yes        ☐ No

   *If no,* what essential job function(s) is the employee having trouble performing because of the impairment(s) (attach additional sheets of paper, if necessary)?

   _____

   _____

2. Can the employee perform the essential functions of his/her position without being a direct threat to his or her own health and safety and/or the health and safety of others in the workplace?

   ☑ Yes        ☐ No

August 20, 2018 SC
US.Occ.Health.ADA@takeda.com

CONFIDENTIAL

**EXHIBIT**
**SILVA 6**

TAKEDA_019475



3.  *If no*, please explain the basis for your response; including objective medical or other factual evidence (attach additional sheets of paper, if necessary)?

**Questions to help determine effective accommodation options.**

4.  *Is there a reasonable accommodation* that would enable the employee to perform the essential functions of the job as described in the attached job description? (Please note that the employer retains the discretion to determine whether an accommodation is reasonable.)

    ☒ Yes          ☐ No

| Accommodation Being Requested: |
|---|
| Appropriate social distancing |
| wear a face covering when around others |
| (opt) Covid test weekly |

5.  How long do you estimate the accommodation(s) will be needed? Please comment on the estimated duration of the recommended accommodation and the frequency of accommodation if it entails time away from the employee's job:
    Endaccomidations either after natural innoculation is proven by drawing titer antibodies to prove to be sufficient for immunity or relevlived 6 months past Regeneron infusion (9-11-21).

6.  If your proposed accommodation is a leave of absence, when will the employee be able to return to work?
    N/A

| Reason for Accommodation (functional limitation(s) for which you seek an accommodation): |
|---|
| Not recommended following Regeneron infusion therapy and |
| not recommended following natural innoculation with the |
| Covid virus. This individual DID test positive for the |
| Covid virus on Sept 10th, 2021, conferring natural immunization |
| making the vaccine unnecessary. |

7.  Please provide any further information you feel would be useful to the Company in evaluating the employee's situation but do not identify the employee's specific medical condition and do not provide the details of your diagnosis of the employee.

    Autoimmune Issues, plaque psoriasis being one of them

    *****************************************************************

    NPC                    9-14-21
    _____
    **SIGNATURE OF HEALTHCARE PROVIDER        DATE**
    **(Please do not use signature stamp or designee signature)**

CONFIDENTIAL                                                          TAKEDA_019476



## HEALTH CARE PROVIDERS INFORMATION
## CONFIDENTIAL RECORDS STATEMENT
AUTHORIZATION TO RELEASE MEDICAL RECORDS

**INSTRUCTIONS FOR EMPLOYEE:** Complete health care provider information and sign authorization release below. Make additional copies of this form for each of your health care providers, if you have more than one provider.

Sign and date all forms and return to:
US.Occ.Health.ADA.@takeda.com

## *HEALTH CARE PROVIDER INFORMATION*

Attending Health Care Provider's Name: Angela Drake, NP-C

Address: 7330 S. Staples St.

City: Corpus Christi   State: TX   Zip: 78413

Phone Number: (361) 236-0136   Fax Number: (361) 993-0240

## *AUTHORIZATION TO RELEASE MEDICAL RECORDS*

I have requested an accommodation from Takeda, my employer, under The Americans with Disabilities Act (ADA) of 1990.

**I hereby authorize the ADA Coordinator for Takeda and Takeda's Occupational Health Lead to communicate directly with the health care provider who completes this form, in order to obtain clarification of issues relating to the functional limitations for which I am seeking an accommodation.**

**A note about the Genetic Information Nondiscrimination Act of 2008 (GINA):**
**The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

**This authorization will automatically end within one year from the date the employee signs this form.**

August 20, 2018 SC
US.Occ.Health.ADA.@takeda.com

TAKEDA_019477

Employee's Signature: _Sandra Silba_ _____     Date: _9 - 15 - 21_

**CONFIDENTIALITY NOTICE:** Medical-related information shall be kept confidential and maintained separate from other personnel records. However, supervisors and managers may be advised of information necessary to the determinations they are required to make in connection with a request for an accommodation. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations. Government officials investigating compliance with the ADA may also be provided relevant information as requested.

August 20, 2018 SC

US.Occ Health.ADA@takeda.com

## EMPLOYEE REQUEST FOR ACCOMMODATION BASED ON DISABILITY

*Please complete this form and return it via email at US.Occ.Health.ADA@takeda.com Please do not submit this form to your manager. Please note this form will not be placed in your personnel file but will be kept in a separate and secure confidential file. Contents of this request are confidential and will not be shared except as needed to consider any reasonable accommodation request.*

**ALL QUESTIONS TO BE COMPLETED BY EMPLOYEE/APPLICANT ONLY:**

Date: 9-16-21

Name: Sandra Silva

Employee ID#: 50002160

Please explain which aspects of your employment responsibilities/duties are impacted by your condition.

None

What specific accommodation are you requesting (e.g., time off, additional equipment, etc.)? (Please submit Form B, completed by your medical provider, in support of your response to this question)

My Request is to postpone innoculation due to current covid illness and recent monoclonal antibody therapy. My health care provider advised me not to get vaccinated until 6 months following my covid illness and the monoclonal antibody therapy.

What other accommodations may be responsive to your request?

None

How long do you anticipate the need for an accommodation? If requesting time off, please provide an estimated return to work date.

I anticipate a 6 month accommodation.

I understand that my request for accommodation must be supported by medical documentation. I agree to provide that information as requested per the deadline required. I agree to fully cooperate with Human Resources in responding to my request. I understand I may not be provided with the specific accommodation that I have requested; however, I understand that good faith efforts will be made to consider my request.

Employee Signature: Sandra Silva    Date: 9-16-21

Please note, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title 11 from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services

Form A



Better Health, Brighter Future

October 13, 2021

Sandy Silva
6010 King Trail
Corpus Christi, TX 78414

Dear Sandy,

As you know, you provided Occupational Health Services (OHS) with a formal request for a reasonable accommodation under the Americans with Disabilities Act (ADA) and/or state equivalent. Specifically, you requested that you delay receiving a Covid-19 vaccine.

Your request has been reviewed and we are pleased to inform you that we are able to approve your request. Specifically, we will accommodate a delay in obtaining the required vaccination for a 90-day period post the date provided in your medical documentation. You will then have the opportunity to comply with the policy by becoming partially vaccinated (i.e., receiving the first of a two-shot series) and recording this as directed in the the VaxDMS system by **December 9, 2021**. Failure to report your first dose and upload your vaccination record in VaxDMS by this date will result in the separation of your employment. You will be provided additional time for the second does, if applicable. Failure to report your second dose, if applicable, in VaxDMS by **December 23, 2021** will result in the separation of your employment. It is important to keep your manager informed of your vaccine schedule.

Your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated, per the VaxDMS system, and are able to re-engage face-to-face in the field.

If you have any questions, or wish to discuss this further, please let your manager know.

Sincerely,


Christine Mealey


Cc: HRBP
    Manager
    OHS

**EXHIBIT**

**SILVA 7**

CONFIDENTIAL                                                          TAKEDA_019483



## Religious Accommodation Request Form

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

**To be completed by employee**

Name: _Sandra Silva_  Position: _Field Sales_
Date of request: _9-20-21_  _Senior Sales Representative_
Business/Function: _Sales_
Immediate supervisor: _Veronica Gallegos_

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):
_Vaccine Exemption_

Frequency and duration of the accommodation requested: _Life of Employment_

Describe religious belief or practice that necessitates this request for accommodation:
_Attached on next page_

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.
_Member of St Phillips the Apostle Catholic Church 10/2006 - Present._

Please provide alternative accommodations that might address your needs:

1. _None_
2. _____
3. _____

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: _Sandra Silva_  Date: _9-20-21_

Upon final determination the employee will receive a letter approving or denying the accommodation request.

**EXHIBIT**

**SILVA 8**

**Describe religious belief or practice that necessitates this request for accommodation:**

As a bible believing Christian, I follow the God of Israel, Abraham, Isaac and Jacob. The Word of God states that my body is the temple of the Holy Spirit who is in me. I have chosen to honor God with my body and spirit. Based on the use of fetal cell tissue lines to test the efficacy of covid vaccines or its use for research, development or manufacturing, I choose not participate with any part of the covid vaccine in my body. I believe that this vaccine would violate my moral conscience in light of my religious belief. As a bible study leader in my parish, I in good conscience could not take the vaccine. I respectfully ask for an accommodation not to take the covid vaccine.

Thank you for your consideration.

TAKEDA_019481

# Exhibit I

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA AMOSON, ROBB HUCK, TROBY )
LANE PARRISH, ALECIA RAMSEY,  )
LARRY HAROLD SAVAGE, JILLYN    )
SCHMIDT, SANDRA SALAZAR SILVA,)
BRITT HAROLD SINGLETON, SUSAN )
WELCH,                         )
                               )
          Plaintiffs,          )    CASE NO.
                               )
     vs.                       )    1:22-cv-11963-GAO
                               )
TAKEDA PHARMACEUTICALS U.S.A.,)
INC.,                          )
                               )
          Defendant.           )

                    - - -

        Remote Videotaped Videoconference Deposition

    of BRITT HAROLD SINGLETON, located in Canton,

    Georgia, taken on behalf of the Defendant, before

    Kimberly S. Bennett, RPR, CRR, CRC, Certified Court

    Reporter, on the 6th day of October 2023,

    commencing at the hour of 10:06 a.m. EST.

                    - - -


                Magna Legal Services
                   866-624-6221
                  www.MagnaLS.com



Page 2

```
 1                  INDEX TO EXAMINATIONS

 2   BRITT H. SINGLETON                             PAGE

 3   Examination by Mr. Ranjo...................     7

 4   Examination by Mr. DeMatteo................    199

 5

 6                  DEFENDANT'S EXHIBITS
     EXHIBIT              DESCRIPTION               PAGE
 7
         1      Babylonbee.com Thread, Singleton      29
 8              000132-157

 9       2      CV, Singleton 000017-19               44

10       3      2022 W-2, Singleton 000052            58

11       4      6/20/19 Letter, Takeda 000579-581     60

12       5      Job Description, Takeda 000637        74

13       6      2019 Year End Performance Review,     76
                Takeda 000795-800
14
         7      9/16/21 E-Mail with Attachments,      97
15              Takeda 000473-477

16       8      9/13/21 E-Mail, Singleton 000076-77  108

17       9      E-Mail String, Singleton 000073-74   110

18      10      US HR & Compliance Policies &        129
                Procedures, Takeda 000023-26
19
        11      Religious Accommodation Policy,      131
20              Takeda 000027

21      12      9/10/21 E-Mail, COVID-19 Update,     132
                Takeda 000021-22
22
        13      Seeking Justice Thread               142
23
24      14      Defendant's First Set of             152
                Interrogatories Directed to
25              Plaintiff Britt Harold Singleton
```



Page 3

1              DEFENDANT'S EXHIBITS (CONTINUED)
     EXHIBIT              DESCRIPTION                    PAGE
2

3      15    10/4/21 E-Mail, Takeda 000480              153
             (confidential)
4
       16    Immunization Records, Singleton            158
5            000121-125

6      17    Podcast Transcript, Inside Big             161
             Pharma, WTP USA Files New Takeda
7            Employee Lawsuit, Ep. 42, Takeda
             000917-935
8
       18    Podcast Transcript, Sam Sorbo, How         169
9            To Stand Up Against the Mandates,
             The Marxist Indoctrination And The
10           Monkeypox Mania, Takeda 000936-940

11     19    Complaint                                  185

12     20    2021 1099-G, Singleton 000046              194

13     21    2022 1099-G, Singleton 000063              194

14     22    Supplemental Responses                     196

15     23    E-Mail String, Takeda 000500-504           196

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1    APPEARANCES OF COUNSEL:
 2    On behalf of the Plaintiffs:
 3         CHRISTOPHER DeMATTEO, ESQ.
 4         Pattis & Smith, LLC
 5         383 Orange Street
 6         New Haven, Connecticut 06511
 7         (203) 393-3017
 8         cdematteo@pattislaw.com
 9
10    On behalf of the Defendant:
11         JASON J. RANJO, ESQ.
12         Morgan, Lewis & Bockius LLP
13         502 Carnegie Center Drive
14         Princeton, New Jersey 08540
15         (609) 919-6600
16         jason.ranjo@morganlewis.com
17
18    Videographer:
19         Chris Allen
20
21
22
23
24
25
```



```
 1                        - - -
 2            (Pursuant to Article 10.B of the Rules and
 3       Regulations of the Board of Court Reporting of the
 4       Judicial Council of Georgia, the court reporter
 5       disclosure statement is tendered at the end of the
 6       transcript.)
 7                        - - -
 8            COURT REPORTER:  Counsel, is your
 9       transcript order for today's deposition the same as
10       yesterday's: electronic transcript?
11            MR. DeMATTEO:  Yes.  We'll do the same
12       for all of them.
13            COURT REPORTER:  Counsel, what is your
14       preference for the copy of your transcript: hard
15       copy, electronic or some combination?
16            MR. RANJO:  I've never received a hard
17       copy, so electronic seems fine to me.
18                        - - -
19            VIDEOGRAPHER:  We are now on the record.
20       This begins video number 1 in the deposition of
21       Brit Singleton in the matter of Lisa Amoson, Robb
22       Huck, Troby Lane Parrish vs. Takeda Pharmaceuticals
23       U.S.A. in the United States District Court, the
24       District of Massachusetts.
25                   Today is Friday, October 6, 2023, and the
```



Page 6

1      time is 10:06 a.m.  This deposition is being taken

2      remotely via video conferencing software at the

3      request of Morgan, Lewis & Bockius.

4              The videographer is Chris Allen of Magna

5      Legal Services, and the court reporter is Kimberly

6      Bennett also of Magna Legal Services.

7              Will counsel and all parties present

8      state their appearances and whom they represent.

9              MR. RANJO:  Jason Ranjo for Morgan, Lewis

10     & Bockius on behalf of defendant Takeda.

11             MR. DeMATTEO:  Good morning.  Chris

12     DeMatteo, Pattis Associates.  I represent the

13     plaintiff deponent.

14             VIDEOGRAPHER:  Will the court reporter

15     please swear in the witness and then counsel may

16     proceed.

17             COURT REPORTER:  Do all counsel agree to

18     the remote swearing of the witness?

19             MR. DeMATTEO:  Yes.

20             MR. RANJO:  Agreed.

21                     - - -

22             BRITT HAROLD SINGLETON,

23  having been first duly sworn remotely, was examined and

24  testified as follows:

25                     - - -



Page 48

1       A    Yes.  So if you go to that top line there

2  underneath Professional Experience where it says

3  Baxter/Baxalta/Shire/Takeda, those are the four

4  companies that I worked for in the same role just, like

5  I said, because of the spinoffs and the buyouts.

6       Q    Do you recall when you were formally a Takeda

7  employee, when you finally became one?

8       A    I don't remember the exact day, no.  2019, mid

9  2019 but that's as precise as I can be.

10      Q    Was that when you took the patient access job?

11      A    It was right around the same time.

12      Q    So did you perform a sales rep job for Takeda?

13      A    I honestly don't remember the exact date the

14  transition happened.  I mean, I would say it's very

15  possible; but, like I said, I don't remember, like, the

16  exact dates of the hire to the patient access manager

17  role versus the day that Takeda actually purchased

18  Shire.

19      Q    So it was all pretty seamless, the transition

20  from Shire to Takeda in terms of who you reported to,

21  what your duties and responsibilities were, such that

22  you didn't even really notice the acquisition?

23      A    I would say that -- I would agree with that.

24  It was pretty seamless.

25      Q    Okay.  As a sales rep both at Pfizer and



Page 49

1    Baxter and Baxalta and Shire, how much time did you

2    spend conducting in-person interactions with folks?

3         A    Pretty much all day every day.

4         Q    Why was that?

5         A    So my job was to go to the offices and try to

6    meet with nurses and doctors to educate them on the

7    products that I represented and, you know, drop off

8    material.  That was pretty much the gist of it.

9         Q    Why was that education in person?

10        A    Well, I would meet with them in person

11   whenever I could to talk with them.  You know, I often

12   brought lunch or occasionally bring coffee.  That was

13   always nice.  If I couldn't meet with them in person, I

14   would occasionally text or e-mail them.  So it was

15   mostly in person and, you know, beyond that it was --

16   that was just kind of the expectation.

17        Q    Okay.  Why was it nice to bring coffee and

18   lunch to the folks with whom you interacted?

19        A    'Cause I could usually sit and have a meal

20   with them or have a cup of coffee with them.

21        Q    Was that helpful in your business?

22        A    I think so.

23        Q    Why?

24        A    It -- for me personally I think it's because

25   it helps them to not be so rushed, you know.  Kind of



Page 50

1    feel like they had to slow down for a little bit and
2    visit, which helped me get to know them and them get to
3    know me.
4         Q    So you were building relationships.  That's
5    what it sounds like.  Is that accurate?
6         A    I would say that's accurate.
7         Q    You also said it was the expectation.  Whose
8    expectation was it that you as a sales rep would be
9    conducting in-person interaction?
10        A    It was just like the cultural norm.  That
11   was -- that was just the way things were done.
12             It's interesting because, you know, I've
13   worked with inside sales reps before who do not go out,
14   who actually work from an office and they do -- you
15   know, they make it work as well.  But I like the
16   personal interaction.
17        Q    In terms of the expectations, that was the
18   same from Pfizer to Baxter to Shire to Takeda in terms
19   of people in the field having in-person interaction; is
20   that right?
21        A    Yes.
22        Q    Okay.  Do you think that those employers
23   believe that that was the most effective way to build
24   relationships with people?
25        A    I would say so, yes.



Page 63

1          A     Yes.

2          Q     And what was your territory as a PAM?

3          A     When I first started it was north Georgia, the

4     state of South Carolina, and Birmingham, Alabama.

5          Q     And were you part of a larger team of PAMs?

6          A     Yes.

7          Q     Do you remember roughly how many others were

8     in your team?

9          A     I think altogether there were 21 patient

10    access managers, and they were divided up among three

11    directors who were our direct supervisors.

12         Q     Were those 21 all around the country or part

13    of a particular region?

14         A     Spread out all around the country.

15         Q     Was this team of 21 specific to a particular

16    disease state?

17         A     When I first started, yes, there were two --

18    let me back up.

19               Yes.  It was two particular disease states.

20    One was called hereditary angioedema, and the other was

21    primary immunodeficiency.

22         Q     Did you have a shorthand for either of those

23    or did you call them --

24         A     No.  Yeah.  So typically we refer to the first

25    one as HAE and the other one as PI.



Page 64

```
 1      Q    Perfect.  Okay.  Did you work on a particular
 2  disease state, or did you have both of these?
 3      A    When I was first hired I had both and around
 4  that time that I changed managers there was a
 5  reorganization that allowed for two different teams with
 6  a more specific focus.  So I then, you know, wound up on
 7  the team that dealt only with PI and the other team
 8  dealt only with HAE.
 9      Q    So when you moved to PI, that was around the
10  time that Pete Fresca became your manager around early
11  2021; is that accurate?
12      A    Yes.
13      Q    Okay.  What is PI?
14      A    Primary immunodeficiency.
15      Q    What does that mean?  For a layperson how do I
16  understand what that disease is?
17      A    That means there's some sort of a defect in
18  the body's ability to mount an immune response to a
19  pathogen.
20      Q    So people with PI are immunocompromised; is
21  that a way to put it?
22      A    Yes.
23      Q    Are they always sick or just susceptible to
24  being sick?
25      A    I guess it could be both.  But they're
```



Page 65

1    definitely susceptible.

2         Q    And during your time as a PAM working with PI

3    folks did you deal with some of them who were actually

4    sick?

5         A    I don't think I -- I never intentionally

6    worked with anybody who was actively sick, no.  You

7    know, they might have had something developing that

8    they, you know, they didn't know about.  I would still

9    work with them.

10        Q    Got you.  And as a PAM in PI what were your

11   duties and responsibilities?

12        A    My duties were to on an as-needed basis

13   communicate with doctors' offices, nurses, infusion

14   centers and sometimes hospitals to help them get

15   insurance approval for the therapies required to prevent

16   or help prevent illness in patients with primary immune

17   deficiency.

18        Q    So did you -- when you were interacting with

19   people, were you interacting with patients?

20        A    Sometimes.

21        Q    And who else?

22        A    Doctors, nurses, insurance coordinators,

23   caregivers.

24        Q    And the whole goal is to eliminate barriers to

25   receiving whatever medication that Takeda had for that



Page 67

1      Q    Okay.  And did your role as a sales rep
2   prepare you, do you think, to perform well at this job?
3      A    I think that, yes, because I had been in the
4   primary immune deficiency space for a number of years.
5   So I already knew a lot of the people, at least in
6   Georgia, who would be important to know in working with
7   insurance companies to get approval for the drugs.
8      Q    You said that building relationships was a big
9   part of your prior role.  Was it important in this role
10  as well?
11     A    It was -- it was certainly important, but it
12  was not nearly as important as being a sales rep.
13     Q    What were the relationships doing for you in
14  this PAM position?
15     A    It was -- usually it was people recognizing
16  who I am and what I can do for them because of their
17  previous interactions with people in the PAM role and,
18  you know, replying to my e-mails for one thing,
19  answering my calls would be another thing or my texts,
20  and if I needed to be there in person on the relatively
21  rare occasion that I needed to be there in person that
22  they would see me.
23     Q    What do you mean by that?  It was important
24  that they saw you?
25     A    Yeah.  And it was because if I went to the



Page 68

1    office and I had access to the information I needed
2    right there literally at my fingertips, I could get more
3    done quickly.
4              And I always wanted to see them in person
5    again to build the relationship, but it certainly was
6    not a requirement of the job.
7              I guess the best way to put it was I was a
8    second level support, and I was only to go to offices if
9    someone asked me to come see them to help them out.
10             Otherwise my job would be -- I could do my job
11   via phone, fax, and e-mail for those people who just
12   were not willing to see me.
13        Q    You said it was more efficient to be there
14   with the information at your fingertips; is that right?
15        A    In some cases, yes.
16        Q    And would -- I'm sorry.
17        A    A number of nurses that were very savvy that
18   were very, you know, on top of things and they would
19   reply, they would call, they would fax things in when
20   they said they were going to fax things in, and they
21   were, you know, they were very light touch.
22             And then there were some that basically
23   required a lot of help, and I would go to see them and I
24   would try to train them as I would visit them on how to
25   be more efficient.



Page 69

```
 1        Q     Okay.  So at the doctors' offices or
 2   hospitals, whatever the case may be, some of the
 3   employees, nurses for example, needed more handholding
 4   than others and so in that instance it was helpful to be
 5   there; is that what I heard you say?
 6        A     In general, yeah.
 7        Q     And then you said some people would want to
 8   see you.  Why would they want to see you?
 9        A     I mean, it could be just because they knew me
10   from when I was a sales rep and they liked me, or it
11   could be because they needed me to come in and basically
12   do the job for them, you know, as much of it as I could
13   do.
14        Q     Right.  So in that sense you're sort of
15   customer service and if they need you down there to kind
16   of make life easy for them, you would do that if you had
17   to?
18        A     Yes.
19        Q     Any other reasons that the doctors or nurses
20   would want you there other than to do the job for you
21   [sic] or if they otherwise weren't very helpful
22   remotely?  Any other reasons the medical professionals
23   wanted you in person?
24        A     None that really come to mind.  When I took --
25   when I took the promotion into the PAM role, I
```



Page 71

1              And so I typically worked with the nurse whose

2    job was also to make the doctor's wishes come to

3    fruition.

4         Q    Did you ever --

5         A    Follow doctor orders basically.  Sorry.

6         Q    Did you ever have nurses request in-person

7    training?

8         A    Probably a couple of times specifically for

9    training, but that was -- usually I tried to fit it

10   in -- like if I actually visited with a nurse, I would

11   take the opportunity to try to provide some training to

12   help make them more efficient for the next patient.

13        Q    And did you ever meet in person with the

14   patients?

15        A    Yes.

16        Q    What would you do in those in-person meetings?

17        A    We would talk about their insurance situation.

18   I would tell them what -- let me back up just a second.

19              I actually was part of -- the division that I

20   was part of, the service that we offered was referred to

21   as OnePath.  So I would share with them the services

22   that OnePath could offer and how I would be able to

23   specifically help them with their insurance approval.

24   And then also educate on the things that they needed to

25   do to help themselves.



Page 72

```
 1          Q    And how was it that you would end up in person
 2    with them?  Is that something they would have to
 3    request, or could you do that on your own?
 4          A    So usually -- you know, I only responded to
 5    requests.  If someone wanted to meet, they would let me
 6    know and I would go meet with them.  But I didn't
 7    proactively call people and say, hey, can I meet with
 8    you.
 9          Q    So some patients did reach out and say they
10    wanted to meet with you in person --
11          A    Mm-hmm.
12          Q    -- correct?
13          A    Yes.
14          Q    And what were the reasons for that from your
15    understanding?
16          A    Usually it was personality driven I would
17    guess.  I mean, I don't really know why they
18    specifically wanted to meet with me.  I didn't usually
19    ask that question.  I just was -- I was glad to meet
20    with them.
21          Q    Why were you glad?
22          A    Say that again.
23          Q    Why were you glad?
24          A    Just, you know, because it gave me an
25    opportunity to help somebody and share with them what I
```



Page 73

1  knew.

2      Q    Was it important to build relationships with

3  patients that you were -- with whom you were working?

4      A    I would say so, yeah.

5      Q    Why is that?

6      A    Again, just putting a face with a name so

7  they're not talking to some anonymous person.

8      Q    The patients that you did visit with in

9  person, do you think they benefited from seeing you

10  face-to-face?

11      A    Well, the only benefit I looked at was whether

12  or not they got their insurance to agree to approve

13  therapy or not.  It wasn't -- you know, some people were

14  more fun to visit than with other people.

15      Q    Well, do you think it was easier for you to

16  instruct and direct these people in person versus in

17  e-mails or over the phone?

18      A    I don't think one was necessarily any easier

19  than the other.  There's not a whole lot of show and

20  tell when it comes to insurance information.

21      Q    You think some patients, like some nurses,

22  required more in person handholding than others?

23      A    Yep.  Sure.  And I was always there to try to

24  meet that if that was the case.

25      Q    Was it Takeda's expectation that you meet in



Page 74

1    person if someone requested it?

2        A    Yes.

3        Q    Why do you think that was?

4        A    Because we were there to provide the service

5    and we were -- we were the field-based representative

6    for the OnePath program.

7        Q    So were you the face of Takeda for that

8    program?

9        A    Yeah.  I think so.

10        Q    Okay, sir.  I want to show you another

11    exhibit.

12            (Defendant's Exhibit No. 5 was marked for

13            identification.)

14        Q    (By Mr. Ranjo) I've just sent over chat what's

15    been marked Exhibit 5.  It's a one-page document marked

16    Takeda 637.  Do you know what this is?

17        A    Looks like the job description for a patient

18    access manager.

19        Q    Okay.  And do you -- take a look through this

20    and let me know if this is accurate in terms of the

21    requirements and the competencies in your opinion.

22            MR. DeMATTEO:  Objection to form.

23        Q    (By Mr. Ranjo) Let me know when you finish

24    reviewing and are able to answer that question.

25        A    And can you repeat the question?



Page 75

1      Q    Yes, sir.  Take a look at the requirements and

2  competencies and let me know if there's anything in here

3  you disagree with in terms of the expectations of a

4  patient access manager.

5      A    That looks like pretty much the job that I was

6  hired to do.

7      Q    Okay.  And in this job preCOVID how much of

8  your interactions with folks was in person?

9      A    Let's see.  The -- that's not an easy question

10  to answer because, you know, like for example, if I'm

11  driving to a location, even though I can be more

12  efficient once I get to the location, I'm very

13  inefficient while I'm driving there.  So I'm just trying

14  to think.  Face-to-face with a human being, maybe 50

15  percent.

16      Q    But then if you tack on the driving piece --

17  because you're not driving unless you're going to meet

18  them, right, and Takeda's paying you to go out there, so

19  that's part of the in-person interaction?

20      A    Right.  But, I mean, I could drive, you know,

21  five hours to meet with one person.

22      Q    Well, that's fine.  I can do the math myself.

23  How much of your job was driving to patients to meet in

24  person?

25      A    Anywhere from an hour a day to eight hours a



Page 76

1    day.

2        Q    Okay.  So preCOVID the majority of your time

3    was spent meeting in person or driving to meet in

4    person?

5        A    Probably 50 percent.

6        Q    All right, sir.  I'm going to throw another

7    exhibit in there.  This is a document marked Exhibit 6.

8            (Defendant's Exhibit No. 6 was marked for

9            identification.)

10       Q    (By Mr. Ranjo) It is a six-page document Bates

11   labeled Takeda 795 to 800.  Please open it up, take a

12   look and let me know if you recognize it.

13       A    Looks like my first performance review as a

14   PAM.

15       Q    Okay.  Please turn to page 796.

16       A    Okay.

17       Q    At the bottom under number 3 where it says,

18   "Provide support for immunology patient target goals

19   (30%)," do you see that?

20       A    Yes.

21       Q    And then it says, "Description:  Facilitate

22   one-on-one meetings documented (through Service Cloud)

23   with consented patients as appropriate to address access

24   concerns that may include, but are not limited to," and

25   then it provides a list of things.  Do you see that?



Page 78

1       A    Yes.

2       Q    In this time period, I guess this was 2019

3    when you first started the PAM role, how many calls or

4    meetings did you have with patients in a week on

5    average?

6       A    With patients specifically?

7       Q    Yes, sir.

8       A    That first several months maybe -- I'm just

9    spitballing here.  I don't have a number.  But it's

10   probably between five and ten.

11      Q    And how many of those were in person versus

12   remote or telephonic at that point?

13      A    On a weekly basis probably between zero and

14   one.

15      Q    Okay.  So on a weekly basis if you had -- I'm

16   sorry.  What was the number you said?  Ten?  If you had

17   ten calls, one of them was telephonic?

18      A    No.  Just the opposite.  If I had ten

19   interactions, possibly ten interactions, one of them

20   might have been face-to-face.

21      Q    That's your -- it took you longer to make the

22   in-person interactions, right?

23      A    Yes.

24      Q    All right.  Let's turn to page 798, please.

25      A    Yep.



Page 79

1      Q    At the bottom it says, "I have field -- a
2  field ride scheduled already with Jay C., Takeda RAM.
3  Will need funding for one trip per quarter to meet with
4  other RAMs and PAMs as the opportunity arises."  Do you
5  see that?
6      A    Yeah.
7      Q    It says, "Trips will require a plane ticket
8  and 1-2 nights in a hotel."  Do you see that?
9      A    Yep.
10     Q    What were these field rides for?
11     A    That was for me to interact with other people
12 who are also in the access world for them to mentor me
13 and provide some additional training.
14     Q    And why were you going to meet them in person?
15     A    Well, because -- I mean, you know, that's a
16 good question.  I mean, we could have done it virtually,
17 I mean, but it was part of our training program to go
18 meet other people in person.
19     Q    And the goal is to build relationships with
20 these people, right?
21     A    I suppose so.
22     Q    And as you testified before, it's better to
23 build relationships in person, right?
24     A    Yes.
25     Q    Okay.  On page 799 right-hand side toward the



Page 82

1    to phone, fax, and e-mail.

2        Q    And how long would you say you were completely

3    unable to meet with people in person?

4        A    I never met with -- I don't think I -- I don't

5    think I ever met with another patient after that or even

6    a doctor's office.

7        Q    Why is that?

8        A    The primary reason that I was given by -- even

9    when we were allowed to travel again with, you know,

10   testing weekly and wearing masks, again I was only in a

11   responsive role.

12            So if an office contacted me to assist them, I

13   would still certainly assist, but not once did I have an

14   office ask me to come visit with them in person.

15       Q    So from the time COVID hit in March of 2020

16   through the termination of your employment in November

17   of 2021 not a single patient or provider asked to meet

18   with you in person?

19       A    Correct.  And I will say that for the people

20   that I had previous relationships with when I had

21   occasion to speak with them I would let them know that I

22   am now able to travel and, nevertheless, not one of them

23   asked me to come visit face-to-face.

24       Q    Do you know if that was a comparable situation

25   to the other 21 or so folks in your group?



Page 94

```
 1        Q     Does Mt. Zion church have a position on the
 2   COVID-19 vaccination?
 3        A     No.
 4        Q     Why not?
 5               MR. DeMATTEO:  Objection to form.
 6               THE WITNESS:  You'd have to ask them
 7        that.  There's nothing in Scripture that references
 8        COVID-19.  So, you know, it's not something that
 9        the church made a decision to comment on.
10        Q     (By Mr. Ranjo) Did you ever speak to the
11   leaders of your church about that?
12        A     I spoke to the people that -- like the head
13   pastor, one of the associate pastors.  And I just let
14   them know my views, and I asked if they would be willing
15   to write a letter in support of my views.
16        Q     Well, did you ever ask them if the church was
17   going to take a position on the vaccine?
18        A     Yes.  And the answer was no, they will not
19   take an official position on the vaccine.
20        Q     Did they say why?
21        A     Basically because it's -- well, I'm really
22   guessing.  I didn't get an exact answer.  But it's
23   because it's not something that is specifically
24   referenced in Scripture and that's really it.  I mean,
25   anything else would be speculate on my part.
```



1          colleagues were doing.  I'm doing the job of one my

2          colleagues too in this case.

3                    MR. RANJO:  Tell my boss, please.

4                    MR. DeMATTEO:  Tom.

5                    MR. RANJO:  If you can get ahold of him.

6          Let's see.

7                    MR. DeMATTEO:  I don't think the

8          transcript will note how long it's taking to load

9          the exhibit.

10                    MR. RANJO:  That's what I tell witnesses

11         all the time.  Take your time; no one knows.  Sorry

12         about that.  Here it is again.

13         (Defendant's Exhibit No. 7 was marked for

14         identification.)

15         Q    (By Mr. Ranjo) This, Mr. Singleton, is a

16    document marked Exhibit 7.  It is a five-page document

17    Bates labeled Takeda 473 to 477.  Please take a look and

18    let me know if you recognize this.

19         A    There we go.  Yeah.  Yeah.  Recognize this.

20    Yep.

21         Q    What is it, sir?

22         A    This is the package that I submitted for my

23    religious accommodation request.

24         Q    Okay.  Please take a look at page 477.  This

25    is a note from Zion Church, correct?



1        A      Mm-hmm.

2        Q      Is that "yes"?

3        A      Yes.  Yeah.  Sorry.

4        Q      Thank you.  And you said you requested this

5    note from your pastor; is that right?

6        A      Yes.

7        Q      Who drafted this language; do you know?

8        A      As far as I know it was Doug Mulkey.

9        Q      Did you help him write this?

10       A      Well, possibly gave some just based on our

11   conversations that we had, but -- so I would say yes,

12   possibly some.

13       Q      Okay.  Do you know if he provided similar

14   letters for other folks in your congregation?

15       A      I know that he -- when I talked to him, he

16   said there was somebody else working on a situation

17   similar to mine and that was it.  We didn't go into any

18   more details than that.

19       Q      So to the best of your knowledge it was just

20   one other letter and you're not sure what it said?

21       A      Right.

22       Q      Okay.  In the last sentence it says, "His

23   decision to reject the Covid-19 vaccine is a matter of

24   his personal conscience that is borne out of Britt's

25   active faith and understanding of the Scriptures."  Do



Page 99

1    you see that?

2        A    Yep.

3        Q    What Scriptures is he referring to?

4        A    Well, there's -- I mean, I can give you a

5    couple of references that just come to the top of my

6    mind.  But ultimately it was based on the doctrine of

7    the sovereignty and the providence of God, that God is

8    sovereign in the lives, in the affairs of people and

9    that he is providential in that he does orchestrate and

10   arrange things as he sees fit.

11            And so in my prayer life, in my reading of

12   Scripture I prayed about it earnestly 'cause obviously

13   losing a job is no easy thing.  But I prayed about it

14   earnestly and the still small voice of God that came to

15   me was that the vaccine is not for me.

16       Q    Why did you start praying about it?

17       A    When did I start praying about it?

18       Q    Why.

19       A    Why?  Because it's a serious thing to take an

20   irreversible medical treatment.  And so it -- I went to

21   it in humility for greater counsel from my creator.

22            And when I say that God is both sovereign and

23   providential in the affairs of men, that he directs

24   different people to different conclusions that are not

25   inconsistent with Scripture.



Page 102

1    to repeat anything.  I'm asking you to answer my

2    question.  Did God tell you not to get vaccinated?

3          A    God told me to -- that the vaccine was not for

4    me or my family.

5          Q    How did he tell you that?

6          A    Through a still small voice that many

7    Christians will recognize as the voice of God.

8          Q    When did you first hear that voice?

9          A    When I started praying about it.

10         Q    When was that?

11         A    I don't remember the exact day.  Sometime in

12    probably mid 2021.

13         Q    Did anybody else hear the voice?

14         A    Well, in their own prayer life they may have

15    heard an answer from God, but they certainly didn't hear

16    God speaking to me personally.

17         Q    When you heard this voice, were you by

18    yourself or were you praying with others?

19         A    I don't recall.

20         Q    You don't recall anything else about -- what

21    did you call it?  The still slow voice?

22         A    The still small voice.

23         Q    Small voice.  Anything else you remember about

24    that?

25         A    No.



Page 103

```
 1        Q     How many times did you hear it?

 2        A     Well, every time I went back and asked.

 3        Q     How many times was that?

 4        A     I don't know.

 5        Q     Can you give me an estimate?

 6        A     Dozens possibly.

 7        Q     You referred to taking the COVID-19

 8   vaccination as an irreversible medical treatment.  Is

 9   that what you said?

10        A     Yes.  That is what I said.

11        Q     What do you mean by that?

12        A     Something that's very important and something

13   that should be seriously considered.

14        Q     What's irreversible about it?

15        A     Once it's taken it can't be untaken.

16        Q     How is that different than anything else you

17   consume?

18        A     Well, when I turn on a light switch, I can

19   turn it back off.

20        Q     I didn't ask you about a light switch.  I

21   asked about things you consume.

22        A     Well, how is that different than anything

23   else?  It's something that is -- it's something that

24   just bears more weight than what I'm going to eat for

25   lunch today or which pair of shoes I'm going to wear
```



Page 104

1    into the office.

2        Q    I want to understand what's irreversible about

3    it.

4        A    What is irreversible about -- if you know how

5    it's not, I would love to hear it.

6        Q    That's not my question.  You used the word

7    irreversible medical treatment.  What is irreversible

8    about the COVID-19 vaccine?

9        A    Like a tattoo or jumping off a bridge or, you

10   know, something that you can't undo once it's been done.

11   So that is one of the reasons why I prayerfully

12   considered it.

13            And I will -- at this point I will reference

14   another well-established Scriptural reference in that we

15   are commanded to not be afraid.

16            And so the fear that was widespread during the

17   time of COVID was something that I was praying earnestly

18   against.

19            And so in spite of how dire everything was

20   seeming to be, I chose to not be afraid of COVID.

21       Q    Were you afraid of the vaccine as an

22   irreversible medical treatment?

23       A    Well, only insofar as my heavenly father had

24   told me that the vaccine was not for me.

25       Q    Okay.  So you were afraid of the virus and you



Page 106

1      A     I suppose so.

2      Q     How about alcohol, is that irreversible?

3            MR. DeMATTEO:  I'm going to object to

4      form.

5            THE WITNESS:  You know what, I'm not sure

6      what definition you're using of irreversible

7      because if you drink alcohol obviously, you know,

8      it goes out of your system.  If you drink -- or if

9      you take Tylenol there's a period of time in which

10     it goes out of your system.

11     Q     (By Mr. Ranjo) I'm using your definition, sir.

12  You're the one that used the word, not me.  So is

13  consuming alcohol irreversible like the COVID-19

14  vaccination?

15     A     Well, so, in the manner of have you done it,

16  yes, you have done it.  Can you undo it?  No.  You can't

17  undo that alcohol once you've drunk the alcohol.  You

18  can't undo the Tylenol once you've taken the Tylenol.

19  You can't undue the vaccine once you've taken the

20  vaccine.

21     Q     So did you pray to God every time prior to

22  consuming alcohol?

23     A     No.

24     Q     Why not?

25     A     Because it's -- you know, drinking a glass of



Page 107

1    wine with dinner or having a beer with a friend is not

2    something that's going to -- you know, it's just -- it's

3    something to have with a meal.  It's not something I

4    really particularly concern myself about.

5              I do pray earnestly about the people that I

6    should be having meals with or drinks with and focus on

7    people who are going to support me in my walk.

8              And but I can honestly say I pray about every

9    day, I pray that every day goes well, and I thank God at

10   the end of every day, but I don't pray over every single

11   detail of every day.

12        Q    Do you pray before you take Tylenol?

13        A    Sometimes.

14        Q    Why?

15        A    I just pray that God would deliver me from a

16   headache or that he would -- you know, sometimes he

17   does; sometimes he doesn't.

18        Q    Well, do you pray and ask God whether you

19   should take the Tylenol?

20        A    No.

21        Q    How is Tylenol different than the COVID-19

22   vaccination?

23        A    Well, it's different in that it's something I

24   never prayed about.

25        Q    I'm sorry.  What does that mean?



Page 116

1    what you're asking for them is something that was very

2    personal to you and not necessarily supported by the

3    church itself.  Is that right?

4                    MR. DeMATTEO:  Objection to form.

5                    THE WITNESS:  No.  No.  They were

6            supportive within the constraints that they faced

7            as members of a body.  And the fact that there was

8            no official position by that body meant that they

9            could not come out to my defense.  That's A.

10                   And B, they couldn't actually explain

11           what I believed because then it would be their

12           sincerely held religious beliefs instead of my

13           sincerely held religious beliefs which is

14           different, you know, it's very personal to each

15           person, but they were certainly willing to agree

16           that what I had based my decision on, which was the

17           power and -- or the providence and the sovereignty

18           of God and, you know, those couple of verse

19           references that I mentioned were solid grounds for

20           basing a decision, a life decision.  And in this

21           case specifically the COVID-19 vaccine.

22       Q    (By Mr. Ranjo) Okay.  I'm going to turn back

23    to Exhibit 7.  This is your accommodation request.  And

24    I'm looking at page 476.  Please take a look at that and

25    let me know what that is.



Page 117

```
 1        A    You said Exhibit 7?

 2        Q    Yes, sir.

 3        A    That's my request.

 4        Q    Page 476.

 5        A    Yep.

 6        Q    What is that?

 7        A    This is a letter from an older man who has

 8   been a long time believer and who is someone I consider

 9   a spiritual mentor.

10        Q    And that's Robert Lester?

11        A    Yes.

12        Q    How long have you known him for?

13        A    Probably over ten years.

14        Q    And what do you know him from?

15        A    Participation in Trail Life USA.

16        Q    And what is that?

17        A    Trail Life USA, it's a Christ-centered,

18   boy-focused, outdoor-oriented character and leadership

19   development program in all 50 states.

20        Q    And you asked him to, Mr. Lester, to write

21   this for you?

22        A    Yes.

23        Q    And it says here he's a reverend; is that

24   right?

25        A    Well, he signed it chaplain.  Let's see.
```



 1        Q    At the top.  Sorry.

 2        A    Oh, yeah.  Mm-hmm.

 3        Q    Do you know what church he's affiliated with?

 4        A    Presbyterian church.

 5        Q    The one he mentions there in Woodstock,

 6   Georgia?

 7        A    Mm-hmm.

 8        Q    Is that a "yes"?

 9        A    Yes.  Sorry.

10        Q    No problem.  Okay.  And when did you approach

11   him about providing a letter?

12        A    Probably around the same time that I

13   approached Doug Mulkey.

14        Q    And how did you ask him?

15        A    Would you help me.  Here's the situation I'm

16   in.  And could you attest that, you know, my beliefs are

17   sincere and that, you know, you would write a letter on

18   my behalf.

19        Q    Did you meet with him to ask him this?  Did

20   you call him on the phone?

21        A    Both.

22        Q    Did you speak to him in text or e-mail about

23   it?

24        A    I don't think so.

25        Q    Is it possible?



Page 120

```
 1      A    No, not -- nothing.  Nothing that I can think

 2   of.  We're good friends and we have an open and honest

 3   communication and discussions about faith issues and,

 4   you know, when it came time to talk about the COVID

 5   vaccine he got it and I didn't.

 6      Q    It doesn't mention -- there's no Scriptures

 7   mentioned in here in support of the religiousness of

 8   your belief, is there?

 9      A    No biblical references, no.

10      Q    There is a quote from Dr. Martin Luther King.

11      A    No.

12      Q    Martin Luther.

13      A    Yes.

14      Q    What does that mean to you, that quote?

15      A    So, well, it's kind of a summary of what I

16   mentioned earlier with the reference in the Book of

17   Kings and then the other reference that I mentioned.

18   And that was that if something is placed on my heart

19   that it is not for me by God that that is -- that

20   becomes my conscience.

21           And that is bound because I believe that the

22   word of God is true and that God has spoken to me and to

23   do anything different would be -- in this specific

24   instance it would not be right nor would it be safe and

25   it would also be sin.
```



Page 128

1    on this request are 474 which is the form that they gave

2    you.

3         A    Mm-hmm.

4         Q    Is that "yes"?

5         A    Yes.

6         Q    Okay.  And then you basically just refer to

7    the three documents we already discussed, right?

8         A    Yes.

9         Q    And then you also met with an employee

10   relations investigator in connection with your request,

11   right?

12        A    Yes.

13        Q    Do you remember who that was?

14        A    Christine -- I can't remember if it's Healey

15   or Mealey off the top of my head.

16        Q    And then other than -- oh, I'm sorry.  When

17   was that meeting with her; do you recall?

18        A    Sometime in September or October of 2021.

19        Q    And how long did it last?

20        A    Maybe 45 minutes.

21        Q    Do you think it needed to be any longer, or

22   was that sufficient time to say what you needed to say?

23        A    I don't really have an opinion on that.  I

24   think I said what I needed to say and she heard what she

25   needed to hear and that was it.



Page 135

1          Q    So we looked at your request form already.

2    That was Exhibit 7.  And we talked about your meeting

3    with Christine Mealey after submitting that form.  And I

4    want to pull up another document.

5               Before I do, the Exhibit 7 is -- the first

6    page is the e-mail that you submitted to the religious

7    accommodation in-box and it's dated September 16th.  So

8    is that the date you submitted everything to Takeda?

9          A    Yeah.  The 16th or a day or two on either side

10   of that.  I mean a day or two after that.

11         Q    Well, the e-mail is the 16th.  So --

12         A    Okay.

13         Q    -- did you submit it some other way or --

14         A    No.  Just, you know, I filled it out with a

15   date of September the 16th, but, you know, I don't

16   remember exactly the day I submitted it.

17              I'm assuming it's the 16th, but I'm under oath

18   so I'm making sure that I don't say anything that might

19   actually be perceived as being duplicitous.

20         Q    Sure.  But if you look at the first page which

21   is your e-mail which you attached everything to, that's

22   on the 16th, correct?

23         A    Yes.  Okay.  True.

24         Q    And then the vaccine policy we looked at

25   before is dated September 10th.



Page 138

1              MR. DeMATTEO:  Object to form.

2         Q    (By Mr. Ranjo) Okay.  What's not accurate

3    about it?

4         A    That I said the vaccine was the best way to

5    protect employees.  I never said that.

6         Q    I read to you from the policy, "Vaccination

7    provides the most effective layer of protection against

8    COVID-19 and its variants," and you agreed with that

9    statement.  Are you changing your testimony?

10        A    No.  I agree that that's what it said.  That's

11   not -- I'm not agreeing with the policy.

12        Q    Okay.  So do you believe that vaccination

13   provides the most effective layer of protection against

14   COVID-19 and its variants?

15        A    That they may have believed that at the time,

16   but I do not believe that.

17        Q    Okay.  Did you believe it when this policy

18   came out?

19        A    No.

20        Q    Why not?

21        A    Well, because for a number of months, for like

22   18 months we had been allowed to work remotely from home

23   and traveling using weekly testing and masks.  And

24   that --

25        Q    You testified you worked at home.  So you



Page 139

1  weren't in contact with people.  What does that have to

2  do with whether COVID-19 vaccination provides the most

3  effective layer of protection against COVID-19?

4        A    I'm not even sure what you're asking there.

5        Q    What studies or documentation do you have to

6  support your belief that the COVID-19 vaccination did

7  not provide the most effective layer of protection

8  against the COVID -- against COVID-19 and its variants?

9        A    Well, sample size of one, I've never been

10  vaccinated and I've never had COVID.

11        Q    Did you ever do any research on this issue,

12  the efficacy of the COVID-19 vaccination?

13        A    I read some articles from numerous sites.

14        Q    Okay.  What sites?

15        A    Let's see.  The usual news sites.  I would say

16  FOX News.  Let's see.  Lucianne.com which is an

17  aggregation site.  So I don't remember what sites those

18  links to.  Theconservativetreehouse.com.  And then those

19  are the only ones I can think of.  There's probably

20  others.

21        Q    Any medical studies or research?

22        A    There was a study that was published that came

23  out of Israel.  I don't remember the journal it was

24  published in, but it was the one that showed that

25  vaccinated Israelis were getting COVID and being


MAGNA ▶
LEGAL SERVICES

Page 140

1    hospitalized just as much as unvaccinated Israelis.

2         Q    And when did you read that study?

3         A    I believe late 2021.  I don't remember exactly

4    when it came out.

5         Q    Before or after you declined to get vaccinated

6    at Takeda?

7         A    Before.

8              VIDEOGRAPHER:  Excuse me, counsel.  The

9         witness's video feed is freezing up a little bit.

10        Does that present a problem for you?

11             MR. RANJO:  I haven't really noticed and

12        frankly I'm not monitoring his movements.  So...

13             VIDEOGRAPHER:  All right.  That's fine.

14        I think we have a clean audio track so we can

15        proceed.  I just wanted to bring it to your

16        attention.

17             MR. RANJO:  That's what matters to me.

18        Thank you.

19        Q    (By Mr. Ranjo) Okay, sir.  Other than Fox

20   news, the aggregation site, and The Conservative

21   Treehouse and this one study, what other research did

22   you do regarding the efficacy of the COVID-19

23   vaccination?

24        A    You know, I didn't really do a whole lot of

25   research purposefully.  I didn't set out to see if it



Page 141

1    was efficacious or safe or not 'cause my mind at that

2    point had been made up.

3        Q    So you disagree with the policy and you didn't

4    think the vaccine worked.  Is that why you didn't agree

5    with it?

6        A    Well, you know, at the point in time it was so

7    early we didn't know if the vaccine -- I didn't know if

8    the vaccine worked or it didn't work.  I just know that

9    it wasn't for me and my family.

10        Q    Sir, you testified you read the Israeli study

11    before you got the policy.  Right?  So and you testified

12    you didn't agree with the policy.  So why don't you

13    agree with the policy?

14        A    Well, now we are two years on and it's pretty

15    clear from the other stuff that's coming out in the news

16    that the vaccines do not work as advertised.

17        Q    It's pretty clear to me that you believe the

18    vaccine didn't work and doesn't work.  That's not what

19    I'm asking.

20            I'm asking:  When this policy came out you

21    testified you did not agree with it.  Why didn't you --

22    why didn't you agree with it?

23        A    Because the vaccine is one way to mitigate the

24    spread of COVID-19.  It's only one way.

25        Q    Okay.  So you get to decide for the company



Page 153

1        Q     (By Mr. Ranjo) Okay.  I just want to -- I'm

2   throwing in Exhibit 14 headed your way.  Just scroll

3   through it.  It's a 22-page document not Bates labeled.

4   I just want to get this into the record.

5              When you've had a chance to scroll through it

6   or you can tell me whether you recognize it, please let

7   me know.

8        A     Yeah, I recognize it.

9        Q     What is it, sir?

10       A     It's the interrogatories.

11       Q     Okay.  These are your responses to Takeda's

12  first set of interrogatories; is that correct?

13       A     Yes.

14       Q     And if you scroll down to the last page, is

15  that your signature on the verification page?

16       A     Yes.

17       Q     And did you read your responses before you

18  signed the verification page?

19       A     Yes.

20       Q     I'm going to send you another document.

21             (Defendant's Exhibit No. 15 was marked for

22       identification.)

23       Q     (By Mr. Ranjo) Sir, I just sent you via chat a

24  document marked Exhibit 15.  It's a one-page document

25  Bates labeled Takeda 480.  Do you recognize this e-mail?



Page 154

1         A     Yes.  Mm-hmm.

2         Q     What is it?

3         A     It's an e-mail response that I sent to

4    Christine Mealey.

5         Q     And is everything in here accurate?  I'm

6    sorry.  Let me back up.

7               You say here that these are your notes from

8    the meeting you had with her on Friday.  And you sent

9    this on Monday.  So I assume the meeting was the Friday

10   before you sent this, right?

11        A     Yeah.

12        Q     I'm sorry.  Was that "yes"?

13        A     Yes.

14        Q     Okay.  Are your notes here accurate to the

15   best of your knowledge of what was discussed with

16   Ms. Mealey on Friday?

17        A     To the best of my knowledge, yes.

18        Q     Did you tell Ms. Mealey that God whispered to

19   you that you shouldn't get vaccinated?

20        A     I am pretty sure that I've been pretty

21   consistent all throughout.

22        Q     It's not in here, is it?

23        A     No.

24        Q     In fact, it's not in your written statement

25   either to Takeda, correct?



Page 158

1        A    Not that I can recall.

2             (Defendant's Exhibit No. 16 was marked for

3        identification.)

4        Q    (By Mr. Ranjo) Okay.  Sir, I just put in the

5   chat a document marked Exhibit 16.  It is a five-page

6   document that my law firm labeled Singleton 121 to 125.

7   Please take a look and let me know if this looks

8   familiar.

9        A    I am having an issue with the file.  Okay.

10  There it came.  All right.  Yes.  Shot records.

11       Q    These are your shot records from the Air

12  Force; is that right?

13       A    Yes.

14       Q    Okay.  Did you pray to God before receiving

15  any of these shots?

16       A    Well, considering that the last one was many

17  years ago I don't remember, but at the same time I was a

18  completely different person at a different level of

19  maturity in my faith as well.

20       Q    So the answer is "no;" is that right?

21       A    All I'm going to say is I don't remember.

22  It's possible.

23       Q    Okay.  So you don't remember praying to God

24  for advice on whether to take any of these vaccines,

25  right?



Page 159

1      A    Specifically should I take this vaccine or

2  should I not take this vaccine, that, no, I don't.  But

3  praying, you know, God, please, you know, help me take

4  this vaccine without any side effects or help me take

5  this vaccine and, you know, not have any issues, that's

6  something that I could have prayed for at that point in

7  time in my life.

8      Q    Understood.  And the flu vaccine since then,

9  do you recall having prayed to God to ask whether or not

10  to take those vaccines?

11      A    No.

12      Q    Do you recall praying to God to ask him if you

13  should get an antibiotic injection?

14      A    Let's see.  You know, I usually pray before I

15  go see a doctor and then -- but, no, I don't remember

16  praying specifically about an antibiotic injection.

17      Q    Did you pray to God to ask whether or not you

18  should receive a steroid injection in that one instance

19  you said?

20      A    I said no.

21      Q    I'm sorry.  Did you say "no"?

22      A    Correct.

23      Q    Okay.  So how do you determine when you're

24  going to pray to God about whether to put something into

25  your body?



Page 160

```
1        A    Well, that's again a very spiritual question
2   and it's -- if I feel hesitation or doubt, if I feel
3   like, you know, there's something not quite right about
4   the situation, I pray for guidance.
5        Q    So you didn't have any hesitation or doubt
6   when you got the flu vaccines, the three that you
7   mentioned before?
8        A    Not that I can recall.
9        Q    And no hesitancy or doubt when you got a shot
10  of antibiotics, right?
11       A    Correct.
12       Q    And none when you took the steroid injection,
13  correct?
14       A    Correct.
15       Q    Okay.  So what hesitancy or doubt did you have
16  about the COVID-19 vaccine?
17       A    We are commanded in Scripture a believer
18  should not be afraid and we should not live in fear.
19  And as I mentioned earlier, the whole country was really
20  afraid.
21            And I asked for -- I asked for proper guidance
22  in a world that was filled with fear, and I was given a
23  great deal of peace and a great deal of -- although not
24  complete assurance, I was given a great deal of comfort
25  that everything would work out for me and my family in
```



Page 161

1     the end.

2          Q     Have you ever prayed to God about whether or

3     not to ingest something into your body other than the

4     COVID-19 vaccination?

5          A     Yes.  Regularly.  Regularly during communion.

6          Q     Okay.  Other than communion.

7          A     I think -- I think the way it stands right now

8     at this point in my life I will not be taking any more

9     vaccines in the future.

10         Q     Right.  But other than the COVID-19

11    vaccination and communion have you ever prayed to God to

12    determine whether or not you were going to take

13    something that you had the decision about whether or not

14    to take it?

15         A     Nothing comes to mind.

16         Q     And just for clarity for the record, and by

17    "communion" you mean a wafer presented as the body of

18    Christ at church, right?

19         A     Yeah.  And a little glass of wine.

20         Q     We talked about your podcasts before and

21    you-all provided links to the two that you disclosed.

22    And we had the content of those podcasts transcribed.

23              (Defendant's Exhibit No. 17 was marked for

24         identification.)

25         Q     (By Mr. Ranjo) If you could, please take a



Page 163

```
 1        Q    And above it is looks like it's the 26th
 2   minute and 27th second of the recording.  Do you see
 3   that part?
 4        A    Yeah.
 5        Q    Can you please read to yourself the first
 6   three sentences.
 7        A    First three sentences say, "Well --
 8        Q    Read to yourself.  To yourself is fine.
 9        A    I'm sorry.
10        Q    Yeah.  No problem.
11        A    (Witness complies.) Okay.
12        Q    And then read the next couple sentences all
13   the way up to where it says "upside down" and stop
14   there.
15        A    (Witness complies.) Okay.
16        Q    So on page 923 in the middle of the paragraph
17   you say, "Upside down, a complete upheaval of everything
18   that we're taught as representatives of the industry,
19   that we must come to market with a label."  What are you
20   talking about there?
21        A    An approved FDA label that will allow the
22   product to be used safely by healthcare providers.
23        Q    And you're talking about the vaccine not
24   having an approved label?
25        A    Yes.
```



Page 164

1        Q    Did you have an issue with that?

2        A    From the standpoint of just an American

3   citizen, everybody should have an issue with that.

4        Q    I'm asking if you had an issue with that.

5        A    Yes.

6        Q    Okay.  Is that part of what gave you pause in

7   taking the vaccine?

8        A    No.  My words were "gave them pause," other

9   people.

10       Q    I asked you if that's what gave you pause.

11       A    I didn't have any pause.  I had the clear

12  guidance of the Holy Spirit.

13       Q    Before you prayed about it, sir, is that --

14  you said, you testified before that what caused you to

15  pray was that you had concern about the vaccine.

16            And what I want to know is, is part of that

17  concern have to do with the fact that it was emergency

18  use authorization and didn't have an approved label?

19       A    No.  In fact, it was just the opposite.  When

20  it was clear to me that the vaccine was not for me and

21  my family as informed by the leading of the Holy Spirit,

22  everything that happened after that was purely

23  confirmatory.

24            The fact that there was no label, the fact

25  that, you know -- I mean, that was just one more piece



Page 165

1    of confirmatory evidence that --

2        Q    Sir, you're under oath.  We're going to

3    continue to read this.  Okay?  Just remember that you're

4    under oath and we're going to continue to read your

5    comments here and they speak for themselves.  So let's

6    continue.

7            You go on after the two sentences I read

8    before.  "It's almost like the -- the -- the DNA of a

9    drug in black and white.  You don't deviate from that.

10   And here we still don't have labels for these drugs.

11   And for me personally, that was one of the things -- one

12   of the things that led me to think, you know, that this

13   is something that I'm not right about this.  Something

14   is really just not right.  Like, Alecia will attest that

15   a lot of our medical professionals at Takeda told us ad

16   nauseam that the vaccines are safe and effective.

17   They're safe and effective, and they're safe and

18   effective, but would never really take questions.  And

19   the answer was always they're safe and effective.  And

20   that's one of the things that initially led me to

21   consult my heavenly father in prayer about this vaccine

22   and there have been few times in my life when prayer has

23   been answered so clearly and that was this vaccine is

24   not for you."  Those are your words, aren't they, sir?

25       A    Those are my words.



1    Q    Okay.  So you're under oath.  Are those

2    accurate in terms of how you came to pray about whether

3    or not to take this vaccine?

4    A    I will say it again.  The decision to not take

5    the vaccine was made before this podcast was made.  The

6    decision not to take the vaccine was made before there

7    was even the conversations with our leaders at Takeda

8    that the vaccines were safe and effective.

9         And at the time for all I knew the vaccines

10   were safe and effective, but we had no label, we

11   couldn't ask questions, which again was just

12   confirmation that I had been led in the right direction.

13   And many things that have come out since then has been

14   confirmation that the Holy Spirit led me in the right

15   direction.

16   Q    Sir, are you lying now or were you lying

17   during this podcast?

18             MR. DeMATTEO:  Objection.  Form.

19   Q    (By Mr. Ranjo) You say, "And that was one of

20   the things that initially led me to consult my heavenly

21   father in prayer."  Is that a lie?

22   A    No.  It's not a lie at all.

23   Q    Okay.

24   A    I told you earlier I've been praying about

25   this -- I prayed about it dozens of times over the span



Page 167

1    of months.  And every time I prayed about it the answer
2    was clear, the vaccine is not for you.
3        Q    So the statements in this podcast --
4        A    Regardless --
5        Q    -- are correct, right?
6        A    What's that?
7        Q    Are your statements in this podcast true or
8    are they a lie?
9             MR. DeMATTEO:  Objection to form.
10       Q    (By Mr. Ranjo) 'Cause they speak for
11   themselves.  I just need you to confirm whether they're
12   true or not.
13       A    These are my words, yes.  I stand by what I
14   said earlier about how the decision was made for me
15   previous to the vaccine even being available.
16            The decision was made for me even after the
17   decision was made that our company leaders would come
18   out and tell us how safe and effective it was.  And the
19   decision was made for me before I lost my job.  And
20   certainly before I was on this podcast.
21            So if there's anything that is incorrect, one
22   of the things that first initially led me to consult my
23   heavenly father was all of everything else combined
24   together that led to the uncertainty and the caution
25   that led me to want to consult him in the beginning.


MAGNA
LEGAL SERVICES

Page 171

1    Independence Day, and if we could wrap this up on Flag

2    Day, that would be just a perfect symbolic finish to our

3    fundraising efforts and ties everything in together.

4    And think of it not as a donation, think of it as an

5    investment, so that at some point in the future a

6    company would think twice about impacting the health

7    choice freedoms for you and your children moving

8    forward."  Do you see that?

9         A    Yes.

10        Q    Did you make that statement?

11        A    Yes.

12        Q    You don't mention anything about religion in

13   that statement, do you, sir?

14        A    No.

15        Q    You don't mention anything about Jesus in that

16   statement, do you?

17        A    No.

18        Q    You talk about the health choice freedoms.  Do

19   you see that?

20        A    Yes.

21        Q    What do you mean by that?

22        A    Being able to make the choices for yourself

23   that you deem best rather than being pressured, coerced

24   or threatened with the loss of employment.

25        Q    Do you think the vaccine is unsafe?



Page 172

1       A    I think that the last two years has borne out
2    the fact that the vaccines are not nearly as effective
3    or safe as we were initially told.
4       Q    Okay.  I don't think that answered my
5    question.  Do you think it's unsafe?
6       A    The vaccine -- well, in hindsight with, you
7    know, like I said earlier, everything, all the
8    information that has come out since I was -- since I
9    made the decision based on the enlightenment of the Holy
10   Spirit to not get the vaccine, the information that has
11   come out has helped to confirm my decision rather than
12   to weaken my decision.
13      Q    Why are you having such a tough time answering
14   this pretty simple question?  Do you think the vaccine
15   is unsafe?
16      A    Well, because unsafe is a really broad term.
17      Q    I'm asking for your opinion.  This isn't
18   trying to trick you.  It's a very simple question.  And
19   you're being evasive, being dishonest while under oath,
20   and it's not appreciated.
21           MR. DeMATTEO:  Objection to the form as
22       well as the commentary.
23      Q    (By Mr. Ranjo) Do you think it's unsafe?
24      A    The vaccines -- you know, I don't have a
25   study.  Do I think -- is my personal opinion that the



Page 173

 1    vaccines are unsafe?  Two years ago I would not have
 2    been able to answer that question.  But now we can see
 3    that the vaccines have a whole host of side effects that
 4    make them worthy of much more consideration than just
 5    give it to everybody.
 6            And that's a question that bears a much more
 7    lengthy response than just a simple yes or no.
 8        Q    Do you know how any COVID-19 vaccination
 9    works?
10        A    Not technically, no.
11        Q    Okay.  So what do you base your belief that
12    it's not is safer?  What do you base that belief on?
13        A    People who I know who have been injured by the
14    vaccine.  News stories that talk about people that were
15    injured by the vaccine.  A whole raft of young people
16    who are dying suddenly with no other known cause except
17    proximity to the vaccine.
18            But that's all irrelevant to the fact that two
19    years ago roughly when I lost my job none of this
20    information was available.
21            Like I said earlier, all the information
22    that's come out has confirmed my choice.  And I am so
23    thankful that God steered me and my family away from the
24    vaccine two years ago.
25        Q    Why do you think the vaccine is not effective?



Page 174

1          A    Again, two years ago I would have had no way

2    to know that.  The vaccines were new.  There was a lot

3    of optimism around the vaccines.  I've never had COVID.

4    I've never been vaccinated.  I know many people who have

5    been vaccinated and who have COVID.  That's also

6    irrelevant because two years ago we had no way to know

7    that.

8               But again, all the information that has come

9    out since then has confirmed my choice that I made that

10   led to my rights being violated as a citizen of this

11   country and a employee of Takeda in violation of my

12   religious freedoms.

13        Q    Did you ever read -- do you ever read CDC

14   guidelines in connection with COVID-19?

15        A    I read the ones that were kind of sent to us

16   by the company.

17        Q    Did you believe them?

18        A    Well, whether or not I believed them, I

19   followed them.  I wore a mask.

20        Q    That's not what I asked you.  Did you believe

21   them?

22        A    Did I believe a recommendation?  I'm not --

23   I'm not following that question.

24        Q    Okay.  Did you think -- do you know who

25   Dr. Fauci is?



Page 175

1        A     Yes.

2        Q     What do you think of him?

3        A     I think he's --

4              MR. DeMATTEO:  Objection to form.

5              THE WITNESS:  I think I'm glad he's

6        retired.  I think he was a very bad influence on

7        the country for a long time.

8        Q    (By Mr. Ranjo) How is that?  Why do you

9   believe that?

10       A     Because he kept saying that the only way to

11   avoid lock-downs was to get everybody vaccinated.  And

12   again, you know, I can keep going with this.  It's

13   irrelevant.  Because two years ago nobody really knew a

14   whole lot about Dr. Fauci.  Everybody believed that he

15   was correct.

16             I was led a different direction by the

17   enlightenment of the Holy Spirit.  And all the

18   information that has come out since then has, in fact,

19   confirmed my choice.

20       Q     Yeah.  We have your statement with the -- on

21   the podcast.  It's pretty clear about what caused you to

22   pray.

23             MR. DeMATTEO:  Objection to form.  I

24       didn't even think that was a question.

25       Q    (By Mr. Ranjo) Okay.  Did you ever call Fauci



Page 176

1    a liar?

2         A    I don't know.  Probably.

3         Q    Do you think he's a liar?

4         A    In many ways, yes.

5         Q    When did you start thinking he was a liar?

6         A    I think I first started to get suspicious when

7    it was like everything was only vaccines -- in my

8    opinion.  Now I don't remember everything he said.  But

9    his -- his response to different questions was, you

10   know, we got to go with the vaccine, vaccine is the only

11   way for things to return to normal.  Vaccines are

12   really, you know, the only thing that's going to protect

13   everybody from COVID.

14        Q    Please take a look at Exhibit 13, the second

15   page.

16        A    Number 13?

17        Q    Yes, sir.  Second page.

18        A    Yes.

19        Q    You refer to -- well, for the record this is

20   the Signal chat with you and your colleagues, right?

21        A    Yes.

22        Q    And you say, "And we know who the father of

23   lies is."

24        A    Yes.

25        Q    You're referring to Dr. Fauci there, right?



Page 179

1    been posting for five years, and there's nothing on here

2    older than a year and a half.  So I'm going to call for

3    production of all that stuff.

4         A    Well, at that point I'm going to tell you I

5    don't know when I started posting.  If there is

6    additional production or whatever, I'll be glad to do

7    that.  But to my knowledge I -- I'm not even --

8         Q    How did you go about pulling this data, by the

9    way?

10        A    There's a way to do it in the website.

11        Q    Do you recall limiting the date in any way?

12        A    No.

13        Q    Did you turn over everything to your lawyer

14   that was generated as a result of whatever process you

15   went through --

16        A    Yes.

17        Q    -- on the --

18        A    Mm-hmm.

19        Q    Sir, what medications have you been on in the

20   last ten years?

21        A    Antibiotics.  I don't really take any

22   prescription medications.  I take some vitamins.

23        Q    What vitamins do you take?

24        A    A B12, vitamin D, and something called AREDS2,

25   A-R-E-D-S-2 for eye health.



Page 180

```
 1        Q     I'm sorry.  You said eye health?
 2        A     Eye health.
 3        Q     Were you scared to take any of those things?
 4        A     No.
 5        Q     Did you pray to God to ask whether you should
 6   take them?
 7        A     I don't recall.
 8        Q     Have you ever suffered from any sort of
 9   illness other than a cold?
10        A     Probably flu at various points or other types
11   of respiratory infections.  Other stuff that I mentioned
12   in my medical records.  Chronic prostatitis.  Let's see.
13   Occasional bouts with GERD.
14        Q     Either of those things require medication?
15        A     Occasionally, yes.
16        Q     What medication?
17        A     GERD I take like a -- something like a
18   Prilosec or something like that.  For the chronic
19   prostatitis I take the -- sometimes take saw palmetto.
20   I tried something called Flomax, but I couldn't stand
21   the side effects.
22        Q     Did you pray to God before taking any of those
23   things to ask God if it was okay to do so?
24        A     You know, I prayed that he would take away my
25   discomfort and my malady and in whatever way he chose.
```



Page 181

```
 1        Q    That's not what I asked you.  You want me to
 2   have the question read back to you?
 3        A    Ask me again.
 4             MR. RANJO:  Kim, can you please read it
 5        back for him.
 6             (Whereupon, the court reporter read back the
 7        requested portion of the record as follows:
 8             "Question:  Did you pray to God before taking
 9        any of those things to ask God if it was okay to do
10        so?")
11             THE WITNESS:  No, not typically.
12        Q    (By Mr. Ranjo) So the answer is "no"?
13        A    No.
14        Q    Thank you.  All right, sir.  Other than
15   your -- other than what we talked about so far, are
16   there any other reasons why you decided not to get
17   vaccinated with the COVID-19 vaccine?
18        A    Nope.  The reason is the sincerely held
19   religious belief that God is both sovereign and
20   providential in the affairs of people and that when
21   consulted that he will guide our steps and that --
22        Q    This isn't a news interview.  I didn't ask you
23   what your reason was.  I said other than what we
24   discussed is there anything else?  It's not a pulpit to
25   just say whatever you want.  It's a deposition.
```



Page 205

1        A      Mm-hmm.  Most closely, probably the closest

2    thing was when I asked my wife to marry me.  Sorry.  No.

3    No.  When I first started to ask my wife to go out on a

4    romantic basis.  Not just as friends.  And then it was

5    clear at that point that I was to proceed with that.

6              And then based on, you know, continuing, you

7    know, going out with her, praying about her, praying

8    about our future together, it became again clear that

9    that was the course that I was to take was to ask her to

10   marry me.

11              MR. DeMATTEO:  All right.  I don't have

12         any other questions.  Thank you for your time.

13         Attorney Ranjo might have something else to ask.  I

14         guess not.

15              MR. RANJO:  Not for me.  Thanks.

16              MR. DeMATTEO:  All right.  Thank you.

17              VIDEOGRAPHER:  The time is 4:48.  We are

18         going off the record.  That concludes today's

19         deposition.

20              COURT REPORTER:  Signature, waive or

21         reserve?

22              MR. DeMATTEO:  Yeah.  We'll waive.

23         (The reading and signing of the deposition by

24         the witness was waived.)

25         (Deposition concluded at 4:48 p.m. EST.)



Page 206

1                    DISCLOSURE

2    Deposition of: BRITT H. SINGLETON

3    Date: October 6,2023

4            Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
5    Judicial Council of Georgia, I make the following
     disclosure:

6
             I am a Georgia Certified Court Reporter.  I am
7    here as a representative of Magna Legal Services.

8            Magna Legal Services was contacted by the
     offices of Morgan, Lewis & Bockius LLP to provide court
9    reporting services for the deposition.

10           Magna Legal Services will not be taking this
     deposition under any contract that is prohibited by
11   O.C.G.A. 15-14-37 (a) and (b).

12           Magna Legal Services has no exclusive contract
     to provide reporting services with any party to the
13   case, any counsel in the case, or any reporter or
     reporting agency from whom a referral might have been
14   made to cover this deposition.

15           Magna Legal Services will charge its usual and
     customary rates to all parties in the case, and a
16   financial discount will not be given to any party to
     this litigation.

17

18           This, the 10th day of October 2023.

19

20   _____

21              Kimberly S. Bennett, RPR, CRR, CRC

22                   CCR No. B-1172

23

24   _____

25                Magna Legal Services



Page 207

1                    C E R T I F I C A T E

2

3

4            I hereby certify that the foregoing transcript
    was taken down, as stated in the caption, that the
5    witness was first duly sworn, and the questions and
    answers thereto were reduced to typewriting under my
6    direction; that the foregoing pages 1 through 206
    represent a true, correct, and complete transcript of
7    the evidence given upon said hearing, and I further
    certify that I am not of kin or counsel to the parties
8    in the case; am not in the regular employ of counsel for
    any of said parties; nor am I in anywise interested in
9    the result of said case.  The witness did not reserve
    the right to read and sign the transcript.

10

11           Pursuant to Article 10.B. of the Rules and
    Regulations of the Board of Court Reporting of the
12    Judicial Council of Georgia and O.C.G.A. 15-14-37 (a)
    and (b), written disclosure is attached herein.

13

14           This, the 10th day of October 2023.

15

16

17

18

19

20

21

22           _Kimberly S. Bennett_____

23           Kimberly S. Bennett, CCR-B-1172

24           My commission expires the

25           1st of April 2024



| | |
|---|---|
| **From:** | Singleton, Britt |
| **Sent:** | Thursday, September 16, 2021 9:05 PM |
| **To:** | US ReligiousAccomm |
| **Subject:** | Britt Singleton Accommodation Request |
| **Attachments:** | Singleton Exemption.pdf |

**EXHIBIT**

**7**

Attached please find my letter and supporting documentation requesting a religious accommodation for the COVID-19 vaccine.





Better Health, Brighter Future

**Britt Singleton**

Patient Access Manager

USBU, Patient and Market Access

**Takeda Pharmaceutical Company Limited**

300 Shire Way

Lexington, Massachusetts, 02421 USA

Tel +1 678-787-6776

britt.singleton@takeda.com

For complete Prescribing Information, click the links below:

Takhzyro

Firazyr

Cinryze

Kalbitor

Cuvitru

HyQvia

Gammagard Liquid

CONFIDENTIAL

TAKEDA 000473



## Religious Accommodation Request Form

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

### To be completed by employee

Name: **Britt Singleton**    Position: **Patient Access Manager**

Date of request: **9/16/21**

Business/Function: **USBU   Patient and Market Access**

Immediate supervisor: **Pete Fresca**

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):

**COVID-19 vaccine exemption**

Frequency and duration of the accommodation requested: **permanent**

Describe religious belief or practice that necessitates this request for accommodation:

**See attached letter and supporting documentation**

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.

Please provide alternative accommodations that might address your needs:

1. **see attached letter**
2. 
3. 

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: _____    Date: **9/16/21**

Upon final determination the employee will receive a letter approving or denying the accommodation request.

TAKEDA 000474

To whom it may concern,                                                9/16/2021

      I am requesting an exemption to the recent Takeda vaccine mandate based upon my deeply held religious beliefs.  As a follower of Christ, I believe in both the sovereignty and providence of God, and the leading of the Holy Spirit who works in the hearts of believers.  I firmly and sincerely believe that taking this vaccine would violate my own conscience as enlightened by the Holy Spirit.  Romans 14:23 states, "But whoever has doubts is condemned if they eat, because their eating is not from faith; and everything that does not come from faith is sin."  Taking the vaccine would be like the one who doubts but does it anyway, and based on my sincerely held religious beliefs, that would be a sin and a violation of my conscience.

I request accommodation in the following ways:

1.  Continue to work from home as I have been doing for the last 18 months.

2.  Interface with customers using 100% electronic means for those who are unwilling to see me in person.  There are currently no customers in my geography who are allowing patient access managers into their facility in person, whether vaccinated or unvaccinated.

3.  For those who are willing to allow patient access managers into their facilities in person at some point in the future, I would test myself in accordance with Takeda's COVID-19 testing protocol prior to meeting with them.  I would wear an authorized mask during 100% of these in-person customer interactions.

I admire and appreciate Takeda's values of PTRB. I love my job at this company and very much want to continue my employment here.

Thank you for your consideration.


Britt Singleton

# Rev. Robert T. Lester, Sr.

313 Devon Ct.; Woodstock, GA 30188
678-860-1138
Robert.lester@cheokeechristian.org

September 13, 2021

To Whom It May Concern,

I am the assistant pastor of Christ Covenant Presbyterian Church in Woodstock and the Chaplin of Trail Life Troop GA-0184 to which Britt Singleton holds a leadership position. He has asked me to write a letter attesting to his sincerely held conviction concerning vaccines.

I became aware of his convictions at the first outbreak of Covid 19 here in Woodstock in 2019. He has maintained a consistent objection to the vaccine as a violation of his Christian convictions as he understands the Bible to teach. To be required to receive this vaccine would be a fundamental violation of his conscience and his fidelity to God.

As Martin Luther said, "My conscience is bound by the Word of God; To go against conscience is neither right nor safe.. . . here I stand, I can do no other." This pretty much summarized my understanding of Brit's request for a religious accommodation.

Sincerely,

Robert Lester
Chaplin, Trail Life Troop GA-0184

CONFIDENTIAL

TAKEDA 000476



**MT ZION BAPTIST CHURCH**

*Glorifying God by Making Disciples of All Nations*

To Whom It May Concern,

This letter is to confirm that Britt Singleton is an active member of Mt. Zion Baptist Church. He and his family have been members since 2012. Britt's views regarding the Sovereignty of God and leadership of the Holy Spirit are in agreement with the teaching and preaching of Mt. Zion Baptist Church. We affirm that he must follow his personal conscience in all matters of life as he feels led by the Holy Spirit's guidance. His decision to reject the Covid-19 vaccine is a matter of his personal conscience that is borne out of Britt's active faith and understanding of the Scriptures.

Sincerely,

Doug Mulkey
Senior Pastor

MT. ZION BAPTIST CHURCH
4096 East Cherokee Drive, Canton, GA 30115  ·  (770) 479-3324  ·  mtzb.org

CONFIDENTIAL                                                                 TAKEDA 000477

EXHIBIT

15

exhibitsticker.com

| | |
|---|---|
| **From:** | Singleton, Britt |
| **Sent:** | Monday, October 04, 2021 10:02 AM |
| **To:** | Mealey, Christine |
| **Subject:** | Notes from the meeting last Friday |

Good morning Christine,

As promised, here are my notes from the meeting we had last Friday:

-
- You stated the call is not recorded and it is against Takeda policy to record calls.
- I stated that exemption is required by law; discussion is about accommodation.
- Asked about my faith—Christian.
- How long have I gone to church? Years.
- Reiteration and reinforcement of my statement of belief from the accommodation form.
- Asked about my church doctrinal stance on vaccines; as stated in the letter from my pastor, the church does not have a stance—this is my sincerely held religious belief informed by my personal prayer life and enlightened by the Holy Spirit.
- Have I ever had other vaccines—yes but it's been years ago and I will never have another; not sure how that's relevant to the current situation.
- I stated that line of question is uncomfortable and creating a hostile environment.
- You stated that this is a fact-gathering process to determine if this is a sincerely-held belief.
- You mentioned "Time-bound virtual opportunities" as a possible accommodation but didn't have any other details.




Better Health, Brighter Future

**Britt Singleton**

Patient Access Manager

USBU, Patient and Market Access

**Takeda Pharmaceutical Company Limited**

300 Shire Way
Lexington, Massachusetts, 02421 USA
Tel +1 678-787-6776
britt.singleton@takeda.com

CONFIDENTIAL                                                                 TAKEDA 000480

# Exhibit J

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. 1:22-cv-11963-GAO

_____

VIDEO REMOTE DEPOSITION OF SUSAN WELCH

October 27, 2023

_____

LISA AMOSON, ROBB HUCK, TROBY LANE PARRISH, ALECIA

RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA

SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH,

Plaintiffs,

vs.

TAKEDA PHARMACEUTICALS U.S.A., INC.,

Defendant.

_____



Page 2

```
 1   APPEARANCES:
 2        PATTIS & SMITH, LLC
               By Christopher DeMatteo, Esq.
 3             383 Orange Street.
               New Haven, CT   06511.
 4             cdematteo@pattisandsmith.com.
                    Appearing remotely on behalf of
 5                  Plaintiffs.
 6        MORGAN, LEWIS & BOCKIUS LLP
               By Jason J. Ranjo, Esq.
 7             502 Carnegie Center
               Princeton, NJ  08540
 8             jason.ranjo@morganlewis.com
                    Appearing remotely on behalf of
 9                  Defendant.
10   ALSO PRESENT:
          Peter van der Vlugt, Legal Video Specialist
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

1        Pursuant to Notice and the Wyoming Rules
2   of Civil Procedure, the remote video deposition of
3   SUSAN WELCH, called by MORGAN, LEWIS & BOCKIUS, LLP
4   was taken on Friday, October 27, 2023,
5   commencing at 8:06 a.m. before
6   Rosemary Novario, Registered Merit Reporter, and
7   Notary Public within and for the State of Wyoming.
8
                    I N D E X
9
    REMOTE VIDEO DEPOSITION-SUSAN WELCH
10
    EXAMINATION BY:                         PAGE
11
        Mr. Ranjo                             5
12      Mr. DeMatteo                        231
13
14
    EXHIBITS                        INITIAL REFERENCE
15
    No. 1 .... Plaintiff Susan Welch's Supplemental
16            Responses to Defendant's First Set
              of Interrogatories-10/23/23 .......... 19
17
    No. 2 .... E-mail dated May 24, 2023 from
18            Susan Welch to Jonathan Bruce ........ 68
19  No. 3 .... Resume ............................. 98
20  No. 4 .... NBSU Representative Behaviors ........138
21  No. 5 .... 2020 Year End Performance Review,
              Overall Ratings and Comments .........147
22
    No. 6 .... NS Award Report-PCP Rep .............149
23
    No. 7 .... Manager Quality Conversations,
24            Quarterly Feedback ...................152
25  No. 8 .... North Dakota Catholic Conference .....187



Page 4

1    EXHIBITS CONT'D:
2    No. 9 .... Mechanism of Ivermectin Facilitation
             of Human P2X Receptor Channels .......199
3
     No. 10 ... Letter dated October 5, 2021 from
4              Susan Welch to Bishop Kagan ..........203
5    No. 11 ... North Dakota 67th Legislative
               Assembly, Pioneer Room, Special
6              Session Joint Technical Corrections
               Committee ............................208
7
     No. 12 ... Seeking Justice, E-mail Chain,
8              March 25, 2022 ......................212
9    No. 13 ... EEO Policy/Non-Discrimination/
               Affirmative Action ..................212
10
     No. 14 ... Religious Accommodation .............214
11
     No. 15 ... E-mail dated September 10, 2021 from
12             USBU Communications to All USBU
               Employees and Contractors ...........215
13
     No. 16 ... Letter dated 9/30/2021 from Susan Welch
14             to Human Resources Manager ..........216
15   No. 17 ... Religious Accommodation ..............
16   No. 18 ... Redacted E-mail dated October 25, 2021
               from Forestier, Irving to Susan Welch 228
17
     No. 19 ... Redacted E-mail dated October 31, 2021
18             from Welch, Susan to USBU
               Communications ......................229
19
     No. 20 ... Letter dated November 30, 2021 from
20             Susan H. Welch to Human Resources
               Manager .............................230
21
     No. 21 ... E-mail dated October 25, 2021 from
22             Welch, Susan to Forestier, Irving ....231
23   No. 22 ... E-mail dated October 28, 2021 from
               Welch, Susan to Forestier, Irving ....231
24
     No. 23 ... Medical Records ......................232
25



Page 5

1   EXHIBITS CONT'D:

2   No. 24 ... E-mail dated October 17, 2023 from
                Susan Welch to Amy Bourdon ...........236
3
    No. 25 ... Defendant's First Set of Interrogatories
4               Directed to Plaintiff Susan Welch ....239
5   No. 26 ... Job Contacts Record ..................245
6   No. 27 ... P&S Only E-mail Chain, Wed. May 24 ...254
7   No. 28 ... Document 106 .........................255
8   No. 29 ... Plaintiff Susan Welch's Supplemental
                Responses to Defendant's First Set of
9               Interrogatories ......................255

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 6

1                   P R O C E E D I N G S

2          THE VIDEOGRAPHER:  We are now on the record.

3     This begins Videotape No. 1 with the deposition of

4     Susan Welch in the matter of Lisa Amoson, Robb Huck,

5     Troby Lane Parrish, versus Takeda pharmaceuticals,

6     USA, Inc.  Today is Friday, October 27th, 2023, and

7     the time is 9:12 a.m.  This deposition is being taken

8     virtually at the request of Morgan Lewis Bockius,

9     LLP.  The videographer is Peter van der Vlugt, and

10    the court reporter is Rosemary Novario of Magna Legal

11    Services.

12          Will counsel and all parties present state

13    their appearances and whom they represent?

14          MR. RANJO:  Morning.  My name is Jason Ranjo

15    from Morgan Lewis on behalf of the defendant, Takeda

16    Pharmaceuticals USA, Inc.

17          MR. DeMATTEO:  Good morning.  Chris DeMatteo

18    representing the Plaintiff/Deponent Susan Welch.  I'm

19    from Pattis & Associates.

20          THE VIDEOGRAPHER:  Will the court reporter

21    please swear in the witness?

22                    SUSAN WELCH,

23       having been first duly sworn, was examined and

24       testified as follows:

25



Page 14

```
 1   and she was targeted around the September time frame.
 2   She was just posting where, you know, she thinks that
 3   she's been poisoned.
 4         So yeah.  I mean, I do.  I feel like I'm up
 5   against something very sinister and evil.
 6      Q    I think I understand what you're saying.  So
 7   you oppose the Covid 19 vaccination?
 8      A    And I am out there, absolutely.
 9      Q    And you are afraid that if you spoke about
10   your opposition to the vaccination during today's
11   deposition, someone would harm you?
12      A    Absolutely.
13      Q    And who did you think might harm you if you
14   testified today?
15      A    I don't know, but I mean, I'm going up
16   against the manufacturer, right, or at least the
17   partner of the manufacturer.  So Takeda is -- has a
18   partnership with Moderna, and they also have a
19   partnership with Novavax.
20      Q    So if you believe that you were going to be
21   harmed testifying today, why did you appear?
22      A    I almost wasn't, like I said.  In fact, so
23   I -- I really had made up my mind that I wasn't going
24   to appear, and then on Tuesday -- last Tuesday, I
25   went and I gave you the document on that or when I
```



Page 25

```
 1      Q     Now, let me jump in.  Do you believe that --
 2      A     Yes.
 3      Q     -- the Covid 19 vaccination --
 4      A     Well, no.
 5      Q     -- can I finish?
 6      A     Oh, I'm sorry.
 7            MR. DeMATTEO:  He has to finish the
 8   question.
 9   BY MR. RANJO:
10      Q     You'll make it really difficult for
11   Rosemary, talking over each other.  Do you believe,
12   Miss Welch, that any of your mother's cancers were
13   related to her having taken the Covid 19 vaccination?
14      A     I am -- you know, I jump to the decision,
15   maybe, maybe.  I don't know for sure.  Okay.  I don't
16   know for sure.  One thing I do know for sure -- and I
17   submitted this to Takeda because I found a medical
18   and religious exemptions simultaneously, and I
19   submitted my mother -- immediately when she got the
20   second dose, landed her in the hospital with cardiac.
21   Same with my sister.
22      Q     Okay.  So you believe that--
23      A     I submitted the VAERS reports for that.
24      Q     Okay.  So you believe that your mother and
25   sister both had cardiac issues as a result of the
```



Page 26

1   vaccination?

2       A    Yes, and the one that really scared me --

3   and I'll be, you know, truthful with you.  My mother

4   was the one to first get it, right, because she was

5   the age, and she was -- she already had three

6   cancers, right, so that puts her right in the front

7   of the line, boom, to get it.  And she had the

8   cardiac issue, and I'm like, you know, she hasn't had

9   that before, but who knows.  I mean, you have three

10  cancers, and she's has the maximum of chemo, you

11  know.  In fact, they can't even give her.  She's --

12  so -- maybe, but I mean something -- well, I will say

13  this.

14          Something happened immediately after she got

15  that second vaccine.  She was -- she was

16  hospitalized, and you know, you're in town to go up,

17  but then when my sister, who is younger -- she is an

18  owner of physical therapy clinics, very healthy.  She

19  gets it, and boom, she is in the hospital.  She still

20  struggles with myocarditis today, and she had to

21  greatly reduce her -- I don't know the timing, but

22  she certainly had to reduce her patient load, and

23  because she cannot -- and it's a physical job.  She's

24  a physical therapist, right.  She doesn't take on the

25  patients that she used to, and there are times where



Page  27

1    she'll be treating a patient, and she has to

2    literally lay on the floor and try to get her heart

3    to come back.

4        Q    So do you think, your sister having taken

5    the Covid vaccine, caused the cardiac issues that

6    she --

7        A    Absolutely.  That one I am very strongly on.

8    Absolutely.  I submitted a fairs report.

9            THE REPORTER:  I'm sorry.  What kind of

10    report?

11           THE WITNESS:  It's called a VAERS, so it's a

12    vaccine -- can't remember what the acronym stands

13    for, but a vaccine adverse event form.

14    BY MR. RANJO:

15        Q    Did any doctor tell your sister or you that

16    the Covid 19 vaccination was the cause of her cardiac

17    issues?

18        A    I did, for sure.  Her doctor is a

19    former -- he is a former -- what is it?  Director or

20    former -- former head of the Minnesota Medical

21    Association.  So he certainly told her not to take

22    any more, right.  Do I -- do we have anything in

23    writing that says that he thinks that's what caused

24    it?  I don't know, and you know, VAERS -- and I have

25    to look at -- I have to pull the VAERS report.



Page 30

1    years, and I knew who he was.  We knew each other.

2            And so when I testified, the controversy is

3    that -- that they were getting their licenses -- or

4    their licenses were threatened because they were

5    writing a drug that didn't have the official

6    indication for Covid treatment, and so you know, I've

7    been in the industry forever, and it's like if you

8    are an MD, you have every right to write -- and it is

9    a drug that is cleared by the FDA, you have every

10   right to use it, even if it doesn't have the specific

11   indication, and I know that because I lost of -- I

12   lot a lot of business.  There was a drug that I

13   launched -- I didn't launch it, but there's a drug I

14   sold called Altace, and we had the indication for

15   coronary artery disease, and I was getting

16   substituted all over the place with another drug in

17   the class that didn't have the indication.

18           So that's been a long established -- it's

19   been established for a long time.

20   Q    Let me stop you -- let me stop you right

21   there.  So you think doctors would lose their

22   licenses if they spoke out about the safety issues

23   related to the Covid 19 vaccination?

24   A    Unless -- unless they are so high up that

25   you can't touch them, and so I refer, and I submitted



```
 1    the links, but I often direct people to the frontline
 2    critical care physicians.  They are so big, you can't
 3    take away their license.
 4          Dr. Paul Berrick, he is, like, the second
 5    most published critical care physician in the world,
 6    and there's no way they're going to take his license
 7    away, and I often referenced people, like, if they
 8    don't want -- you know, I reference that website, and
 9    I say -- and they have protocols, and I say, "Print
10    up the protocol, print up the name of who was this
11    website, and take it to your doctor."  This is not
12    kookville.
13          This is -- so if you're on the lower tier,
14    you're going to get targeted.  They're going to take
15    away your license.  If you're on the upper tier, they
16    are not -- there is another name you can check I
17    submitted.  His name is Dr. Ted Fogerty.  He is on
18    our local radio station, but it powers out to, like,
19    four states, and he has been just pounding out, you
20    know, warning about the Covid vaccine, and they went
21    after his license.
22    Q    When you say that people were going after
23    doctors' licenses, who is it that's trying or taking
24    their licenses?
25    A    I don't know for sure, but I think it's
```



Page 32

1    probably reasonable to say that, follow the money,

2    you know.

3        Q    What do you mean by that?

4        A    Whoever feels like, you know, where it's

5    going to impact their financial situation is probably

6    behind it, but you have Dr. Fogerty's name, and feel

7    free to reach out to him, and you can.

8        Q    When you say, "follow the money," who do you

9    think has a financial interest in the Covid 19

10   vaccination?

11       A    Manufacturers.

12       Q    So you think the manufacturers are the ones

13   taking doctors' licenses for speaking out against the

14   safety of the vaccines?

15       A    I don't -- you know what, I just -- maybe I

16   should pull that back and say, I don't know.

17       Q    Okay.  Ma'am, when did your mother -- when

18   do you believe your mother got sick due to taking the

19   Covid vaccine?

20       A    Immediately, because she --

21       Q    I'm sorry.  I'm just trying to understand

22   the time frame.  Like, the month, the year?

23       A    She immediately had cardiac issues right

24   after the vaccine.  I mean, within 24 hours.

25       Q    Right, but what month, but ma'am, what month



Page 33

1  and year was that?

2     A    I'm guessing, I would say February or March

3  of 2021.

4     Q    And what about your sister, when do you

5  think she got sick because of Covid?

6     A    The best thing to do is I submitted to

7  Takeda the VAERS report, like, she was very early, as

8  well.  I want to say March or April of 2021.

9     Q    So when you saw them get sick, did it worry

10  you that you would get sick if you took the

11  vaccination?

12     A    Initially, when my mother got sick, not

13  really because, you know, she's had everything.  I

14  mean, you know, when my sister got sick, absolutely.

15  Absolutely.  Scared the crap out of me.

16     Q    What did you think would happen?

17     A    That I would also get myocarditis.

18     Q    I want to shift gears a little bit.  Other

19  than reviewing the documents you mentioned before for

20  about an hour, did you do anything else to prepare

21  for your deposition?

22     A    Well, I just think that maybe when I made

23  the decision to follow through, just a lot of

24  thinking, I guess.  I don't know.  Not necessarily

25  looking at documents, but a lot of thinking.



Page 38

 1          I keep my Covid opinions out of
 2    professional -- out of the professional world,
 3    although about two weeks ago, he mentioned that he's
 4    going to go in, "Oh, I'm going to go in and get my
 5    current Covid shot."  I'm like, okay, you know, so
 6    I'm like, "Let's talk about this."  And so I just
 7    verbally -- and oh, here's the other thing.
 8          So I got the job because my brother-in-law
 9    is really good friends with my current employer, and
10    so he knows the situation as far as what happened
11    with my sister and the myocarditis.
12          I went a step further verbally to tell him
13    and describe the two pieces of legislation that I
14    submitted to you, and that's the PREP Act and the
15    Cures Act.  The PREP Act says that under
16    emergency-use authorization, nobody's checking those
17    files.  Don't know what you're getting.  It's an
18    absolute crapshoot, and I submitted this website, as
19    well, and it's called, How Bad Is My Batch.
20      Q    So is that another reason, ma'am, that you
21    think taking the Covid 19 is dangerous?
22      A    Say that again?
23      Q    Is the fact that it was authorized under
24    emergency-use authorization another reason you think
25    taking the Covid 19 vaccination is dangerous to



Page 39

1    people's safety?

2        A     Yes, and -- and authorized under

3    emergency-use authorization is really a nice way of

4    saying, "experimental drug."  It is experimental, and

5    under emergency-use authorization.  Nobody's checking

6    those vials.  All good manufacturing practices are

7    waived.  Michael Yaden, who was the former president

8    of Pfizer in the UK is calling this out, and this is

9    true, and I know this as the many years I've been a

10   pharmaceutical rep that lot number one -- the one

11   thing pharmaceutical companies are very good at is

12   making sure those lot numbers match.  If they don't

13   match, you go pull them.  And so every drug rep,

14   every time I've had to leave a sample, I've had to

15   have documentation of who I left it with and what the

16   lot number was, and then on the other end, under JAH

17   JAYCO regulations, the physicians had to keep a

18   record of who got what sample and what lot number

19   they got because if there was ever a situation where

20   the FDA said, "Whoa, that lot number doesn't match

21   what it's supposed to," then I have to notify the

22   doctor, and the doctor has to go in and notify the

23   patient, and they have to pull those lot numbers.  So

24   it's kind of --

25       Q     Let me stop you right there.  Let me just



Page 40

1    stop you.  Did you urge your boss not to get

2    vaccinated --

3        A    Yes.

4        Q    -- when he told you that?  And why did you

5    urge him not to be vaccinated?

6        A    Because he is -- we are a small company.  If

7    anything happens to him, then we have to close the

8    doors, and the man that I work for is the nicest man

9    in the world.  He employs -- not Alzheimer's

10   -- autistic people.  In fact, if you want to talk

11   about DE and I, this is DE and I situation.  He

12   employs people that otherwise would not be able to

13   get a job, to be honest with you, and if anything

14   happened to him, there would be a lot of people and

15   families struggling.

16         So I'm not -- how do I say it?  I'm not

17   playing doctor.  I'm telling him about the

18   inconsistency of those lot numbers.  I verbally told

19   him that they do not have to give informed consent.

20   That's a direct violation of Nuremberg Code and that

21   -- and referenced the FLCCC -- the frontline critical

22   care physicians website -- if he doubts me.

23       Q    All right, ma'am.  Other than your family,

24   your lawyer, and your boss, have you spoken to

25   anybody else about today's deposition?



Page 49

1  public school because he is on that autism spectrum.

2  Then we put him back into Catholic school.

3        So there is a two-year stint where he was in

4  public school where we were trying to get more

5  therapy for him.

6    Q    And other than that two-year gap, did both

7  children go to Catholic school from elementary school

8  through high school?

9    A    Yes, and then even my son, all the way

10  through college.  He went all the way through

11  University of Mary with a double major.

12    Q    And where does your daughter live now?

13    A    Started one year at University of Mary, but

14  she was concerned she wouldn't get into the nursing

15  program there.  So just so happened my neighbor

16  recommended her for the hospital's program.  It's

17  affiliated with NDSU, and so she got in there.

18        She didn't think -- well, first of all, she

19  had an ACT that -- they had preselected a lot of kids

20  based on ACT.  Her ACT score was not great, and she

21  was doing well, but she was just concerned she wasn't

22  going to make it into the program.

23    Q    Let's shift gears, ma'am, to social media.

24  What social media sites do you use?

25    A    Telegram is the -- well, Telegram, and then



Page 50

1    Rumble because I have a conservative interest, and it
2    seems like a lot of this stuff I want to hear gets
3    pulled from YouTube, but Truth Social.  I mean, I
4    have an account there.  I've never posted anything
5    there, and it's not -- I don't even really use it
6    anymore because I find it hard to -- I don't think
7    it's laid out very good.
8            Let's see -- what else.  LinkedIn, but that
9    is totally professional.  There is nothing that is
10   going to be vaccine related there, and I started
11   thinking about things.  Twitter, I would have had a
12   Twitter document back in the day when -- but -- and I
13   just only for to see what Trump --
14           THE REPORTER:  I'm sorry, ma'am.  You faded
15   out there.
16           THE WITNESS:  Oh, sure, sure.  I have a
17   Twitter account only to see what Trump was posting.
18   I never posted anything on there, and then it went to
19   X, and I don't have an X account.
20   BY MR. RANJO:
21       Q    Anything else?
22       A    That's -- and I've never been on Facebook.
23   I've never ever been on Facebook or anything else.
24   Those are the ones.  So the Telegram is the heavily
25   used one for me.



Page 51

```
 1      Q     What is Rumble?  I don't understand.  What
 2   is the setup?
 3      A     Right, right.  Rumble is kind of like
 4   YouTube only they -- so I'll give you an example.
 5   There's a lot of people that I listen to that if they
 6   say even the word "vaccine", they're pulled.
 7            So YouTube will tell them that they're
 8   breaking their rules or whatever, and they get
 9   pulled.  Rumble, you can still say the word
10   "vaccine."
11      Q     And do you have the ability to like the
12   videos that are --
13      A     Yes.
14      Q     -- coming through?
15      A     Yes.
16      Q     Do you have the ability to comment on videos
17   that are coming through?
18      A     You do.
19      Q     Do you have the ability to post your own
20   videos?
21      A     You do, but I wouldn't know how to do it,
22   and I submitted a snapshot showing that I've never
23   done anything like that.
24      Q     Have you ever commented on Rumble?
25      A     Yeah, I may have.  Nothing vaccine -- first
```



Page 53

1    using Rumble?

2        A    I don't really recall.  Maybe a year ago,

3    but I'm not 100 percent.  I don't know.  I can't be

4    precise about it.  About a year ago.

5             THE REPORTER:  I'm sorry.  What was that

6    last --

7             THE WITNESS:  Maybe a year ago, but I'm not

8    a hundred percent.  I'm not -- I don't know -- I

9    can't be precise on it.  About a year ago.

10   BY MR. RANJO:

11       Q    And when did you start using Truth Social?

12       A    Probably the same time frame, and that's

13   more -- and I just didn't like the layout of it.  You

14   know, I thought Telegram was the most -- the easiest

15   to utilize.

16       Q    Can you describe for me what Truth Social is

17   and how it's laid out?

18       A    Right.  So that is the one that Trump put

19   out.  So once he got canned from Twitter, he came out

20   with his own social media called Truth Social.  So

21   that's a good way -- that's another place, too, where

22   if anybody mentions -- it's a -- nothing -- if they

23   mention vaccine or anything like that, it's not going

24   to get pulled.

25       Q    Got you.



Page 54

```
 1      A     And I will say this just so you know, just a
 2   little bit more documentation, but Robert Kennedy,
 3   Jr., he filed a lawsuit in February against the
 4   social media platforms because he was getting so
 5   heavily censored, and so I know that, and the reason
 6   why I know that is that just once -- but I subscribe
 7   to -- or I won't say, "subscribe," because I get it
 8   for free, right, every day his newsletter, which is
 9   Children's Health Defense, he's -- I get an e-mail
10   from him daily.
11            And this one time in February, I just
12   participated, and I just remember at that time that
13   he was -- they were very excited because a lot of
14   people have been blocked from the truth as far as
15   what's going on with these, and so he does have some
16   sort of lawsuit filed in the State of Texas against
17   social media and blocking everything.
18      Q     So I think what I heard you say is that
19   Truth Social is like Twitter?
20      A     Yeah, yeah.  It's like Twitter, only
21   it's -- it's Trump's version, I guess.
22      Q     Did you ever --
23      A     Well, I don't -- you know what, it's
24   not -- I find it very hard to use.  I don't think
25   it's laid out very good.
```



Page 77

1  administrator for sure, you know, the full name was

2  provided.

3      Q    Well, I don't know necessarily if I have an

4  issue with not having the names, but without the

5  content on the left side, it's really hard to get a

6  sense of the contacts of most of this stuff.

7           I'll say this on the record again.  I sent a

8  letter to your lawyer requesting the rest of this

9  stuff.  We didn't receive a response back.  I'm just

10 now getting the explanation of why all this stuff is

11 cut off and hard to use.  We'll move on.

12          Let's -- let's look at page Bates label 108,

13 the Alex Azar post.  Why didn't you put -- why did

14 you cut that off and not produce the whole thing?

15     A    That is just my mistake, and I can produce

16 -- I can produce that for you.

17     Q    Who's Alex Azar?

18     A    He is -- he's a government -- I can't

19 remember.  He's actually called out in that attorney

20 general document and --

21     Q    For United States Secretary of Health and

22 Human Services?

23     A    That's him.  Yeah, that's it.

24     Q    It says, "Alex Azar is the perpetrator of

25 the largest genocide this country has ever seen"; you



Page 78

1    see that?

2        A    That is correct, yes.

3        Q    And this is a video from TikTok?

4        A    Yeah, but who is presenting in that video is

5    Dr. David Martin, and he's the one that produced the

6    attorney general document where it called out.

7    Alex Azar for eight felony counts, and I stand by

8    everything that Dr. David Martin says, and also

9    anything that Dr. -- not Dr. --  but Robert Kennedy,

10   Jr. says, and the reason is --

11       Q    Let's not get ahead of ourselves.  I didn't

12   ask you all that.  This is something that you posted

13   onto this Signal platform, right?

14       A    Well, this is -- this is Telegram.

15       Q    I'm sorry, Telegram.  My apologies.  You

16   posted this on Telegram.  Why?

17       A    I posted a lot of Dr. David Martin because

18   he's got the facts to back everything up.

19       Q    And what does it mean that "Alex Azar is the

20   perpetrator of the largest genocide this country has

21   ever seen"?

22       A    Again, I submitted the document that backs

23   this up, and it's the attorney general document that

24   calls Alex Azar out for eight felony counts.

25       Q    Right, but that doesn't help me understand



Page 79

1   what you're getting at.  What is the largest genocide

2   this country has ever seen?

3       A    Well, that is -- I can't put it in a

4   nutshell.  That's actually a video where Dr. David

5   Martin lays all this information out.

6       Q    Do you know what the word, "genocide,"

7   means?

8       A    Yep.

9       Q    What does it mean?

10      A    It means trying to kill people.

11      Q    Who was trying to kill people?

12      A    Alex Azar, I believe, is one of them.

13      Q    How was he trying to kill people?

14           MR. DeMATTEO:  Objection.  You can answer.

15      A    I can answer.

16           MR. DeMATTEO:  Yes.

17      A    You know, I'm not -- everything is

18  documented on the attorney general document that I

19  submitted that was put together by Dr. David

20  Martin.

21  BY MR. RANJO:

22      Q    You think Alex Azar was trying to kill

23  people?

24      A    Yes.

25      Q    Why?



Page 80

```
 1      A     I don't know why.  I don't know why.

 2      Q     How was he trying to kill them?

 3            THE REPORTER:  What's that?

 4            THE WITNESS:  Through the vaccine.

 5  BY MR. RANJO:

 6      Q     So you believe the former secretary of the

 7  department of health and human services --

 8      A     Yes.

 9      Q     -- was intentionally trying to kill

10  people?

11      A     Yes.

12      Q     Through -- the Covid 19?

13      A     Yes.

14      Q     Wait until I finish the question, please,

15  ma'am.  Can us please read back the question,

16  Rosemary?

17            THE REPORTER:  "So you believe the former

18  secretary of the department of health and human

19  services --

20            "Answer:  Yes.

21            "Question: -- was intentionally trying to

22  kill people?

23            "Answer:  Yes.

24            "Question:  Through -- the Covid 19?

25            "Answer:  Yes."
```



Page 81

1   BY MR. RANJO:

2       Q    So you see what happens when you try to

3   respond --

4       A    Yeah.

5       Q    -- to my questions in the middle?

6       A    Um-hum.

7       Q    Did you understand the question I was trying

8   to ask, Miss Welch?

9       A    Yes.

10      Q    And the answer to that question is yes?

11      A    Um-hum, yes.

12      Q    Thank you.  Let's take a look at Page Takeda

13  110?

14      A    Two pages down?

15      Q    Yes, ma'am.

16      A    Okay.  That's Dr. David Martin again.

17      Q    And if you look as in April 28th indicator,

18  just above that it says, "I literally took all my

19  data and put it on thumb drives and sent or

20  personally handed them all over in case something

21  mysteriously happened to me"?

22      A    Yes.

23      Q    What are you talking about?

24      A    I have been afraid for my actions that my

25  life is at risk.  That is true.



Page 82

1      Q      And who do you think is putting your life at

2  risk?

3      A      Whoever wants this -- I don't know.  I don't

4  know.  I just know that people that speak out against

5  this, they are -- as Robert Kennedy, Jr., they try

6  and censor him.  I've seen mysterious -- I got two

7  deaths now;  One with my attorney general, one with

8  my district senator, and then you have the contact

9  for Jeff Holverson, who again, very active, same

10 belief system as I do with the Covid vaccine, he

11 was -- when he ran for office again, he was severely

12 targeted with a bunch of lies, and you can go and ask

13 him.  You have his contact information.  You can ask

14 him.

15             And a lot of the people that I was

16 politically active with were targeted, and a lot of

17 them are not even there anymore.

18     Q      And you think you're being targeted --

19     A      Yes.

20     Q       -- because you're speaking out about the

21 safety of the vaccine?

22     A      Yes.

23     Q      Okay.  Can you please turn to page Takeda

24 123?

25     A      123?



Page 86

1    patent?

2        A    Um-hum.

3        Q    Do you see that?

4        A    Yep.

5        Q    And then below it, it says --

6        A    Okay.

7        Q    I'm sorry.  I'm looking in the black text

8    where it says, "This Pfizer patent application was

9    approved August 21st, 2021, and is the very first

10   patent that shows up in a list of over 18,500 for the

11   purpose of remote contact tracing of all vaccinated

12   humans worldwide who will be or are now connected to

13   the Internet of things by a quantum link of pulsating

14   microwave frequencies of 2.4 gigahertz or higher from

15   cell towers and satellites directly to the graphene

16   oxide held in the fatty tissues of all persons who've

17   had the death shot"; do you see that?

18       A    Yes.

19       Q    Where did that language come from?

20       A    So -- well, there is the patent.  There is

21   concern that there is graphene oxide in the vaccines.

22   There's another document that I submitted, and it was

23   an Associated Press article where the health minister

24   of Takeda -- health minister of Japan went to Takeda,

25   and --



Page 87

```
 1      Q    Ma'am, I didn't ask that.  I just asked you
 2 where the language came from.  Is this something that
 3 you typed, or did you pull it from another source?
 4      A    Oh, I didn't type this.  This is just a
 5 repost.
 6      Q    Got you.  And the theory is that Pfizer is
 7 using the vaccine to trace people through cell phone
 8 towers and some mineral inserted into their bodies;
 9 is that what this is --
10      A    A metal called graphene oxide that does
11 that, yes.
12      Q    And is this something that you believe that
13 Pfizer is tracking people in this manner?
14      A    It's plausible.  I don't know.  It's
15 plausible because when you look at the PREP Act and
16 how it's written, they could put anything in it, and
17 nobody is checking that lot number, and they don't
18 have to tell you.
19      Q    Is there any way to tell when this post is
20 from?  Like it says, "February 14th," but I don't see
21 a year.
22      A    Oh, that be this year, February 14th of
23 2023.
24      Q    How far back to these posts go?
25      A    You have all of them, so . . .
```



Page 92

1    and he was actually just most recently in the news,

2    and again, they think that they found a -- what do we

3    call it? -- a way to penetrate the PREP Act that's

4    been protecting the manufacturers against -- against

5    damages caused by the vaccine.

6           So I'm not such a fan of Stu Peters, but

7    when I look at Peter McCollough -- and I guess to be

8    honest with you, to be on the real safe side, I'd

9    like to click on that and make sure -- well, it just

10   says, though, Dr. McCollough gives impassioned

11   testimony against federal agency's reckless behavior.

12   He's one of them that he's too big to take away his

13   license.

14        Q    Okay.  What's the --

15        A    And in fact, he actually came to Fargo,

16   North Dakota at one time to try and alert

17   our -- our -- our state about what's going on.

18        Q    I'm going to stop you right there.

19   What -- now that you've kind of reviewed this, what

20   does, "incinerate every single vial" mean?

21        A    I don't know.  I don't know.  Maybe he's --

22   again, it says, "He gives an impassioned testimony

23   against the federal agency's reckless behavior," so

24   he's probably saying incinerate every darn Covid 19

25   vaccine vial.  That's his statement.



Page 93

```
 1      Q    Do you think every vial should be
 2   incinerated?
 3      A    Yeah.
 4      Q    Do you think the Covid 19 vaccine, any of
 5   them, serve any public benefit?
 6      A    No.
 7      Q    Do you think they serve any medical
 8   benefit?
 9      A    No.
10      Q    Any health benefit?
11      A    No.
12      Q    Have you always felt that way?
13      A    No.
14      Q    When did you not feel that way?
15      A    Well, initially, and I kind of forgot about
16   that, actually.  So when I was going through my
17   e-mails about vaccines, I recommended them, which
18   really breaks my heart, and I sold vaccines, right.
19           And this was different because everything I
20   sold was either a dead virus, a piece of a dead
21   virus, or a weakened virus, and you know, when you
22   inject it, and the body looks at it, and they go, Oh,
23   my God, that doesn't belong here, and it develops an
24   antibodies.  It cleans it out, and then whenever you
25   get exposed to it again, then you're protected.
```



Page 94

```
 1      Q    Hold on.  I think we're going down the wrong

 2   track.  That's not what I asked.  What I asked is did

 3   you always feel that way about the Covid 19

 4   vaccination?

 5      A    Not always.

 6      Q    When did you start believing that the Covid

 7   19 vaccination served no -- no community or health or

 8   safety benefit?

 9      A    When I saw the PREP Act and the Cures Act.

10      Q    When was that?

11      A    Summer of 2021, and you know, you can say

12   conspiracy all you want, but when you're actually

13   looking at the law, and see that Takeda is following

14   that same law in dealing with me and my concerns

15   about the vaccine, that's when I am convinced that

16   there is nothing good about this.

17      Q    Okay.  So what -- what is the PREP Act, and

18   what is your concern?

19      A    So the PREP Act is done in 2005, and what I

20   submitted to you is the manufacturer's

21   responsibility.  It's very interesting when you read

22   it because it starts out -- it describes how you get

23   emergency-use authorization.

24           So you do have to submit studies to the FDA.

25   The concerning part is is once the -- once the
```



Page 95

1    emergency-use authorization is granted, you

2    essentially have a bait and switch in that it says

3    you do not -- once there's an emergency-use

4    authorization granted, then it's a bait and switch,

5    and you do not have to follow good manufacturing

6    processes or practices.  So nobody's checking that

7    vial.

8              Then you combine it with the Cures

9    Act -- I'm sorry.  Is it the -- I submitted it to

10   you -- I think it's the Cures Act, December 13th,

11   2016, and it says, "Under emergency-use

12   authorization, you do not have to give informed

13   consent even if it's not in the best interests of

14   such human beings."  I'm a pro-life person.  That

15   scared the hell out of me when I saw that.

16   Q    So when you saw that in the summer of 2021,

17   there was no way you were getting vaccinated after

18   that?

19   A    That's right, and I'm thinking it's

20   genocide.  I'm going to call it out.  I think it's

21   genocide.  I am a pro-life -- long-time pro-life, and

22   you know, you know me not by my words, but by my

23   actions, and so I sought to not -- to protect my

24   community or do whatever I could.

25              This is not a tetanus shot, and to think



Page 96

1    that people go, well, why would the government do it?

2    I don't know.  Why did they do the Tuskegee

3    Experiment?  Why did they give Native Americans

4    blankets laced with small pox?  We've done it before.

5    This is pretty disguised, though.

6              My two biggest pieces that I submit are

7    those two laws, and it's even hard to put it together

8    because we're talking an 11-year difference of when

9    they were passed, but Takeda knows those two laws

10   because they used them on me, and I submitted the

11   e-mail communications back and forth.  So I know

12   Takeda knows this, as well.

13       Q    You think if you got vaccinated, you would

14   die?

15       A    Yes.

16       Q    Okay.  I want to shift gears a little

17   bit -- I'm sorry -- not a very personal transition.

18       A    That's okay.

19       Q    Have you ever been arrested for anything?

20       A    No.  Well, okay.  I don't know if I'd say

21   arrested, but because I drove on the road so

22   much -- I don't know if I was arrested, but I had a

23   lot of speeding tickets, and I lost my license for a

24   while, and I had to go take a class, you know, to get

25   one point back on my driver's license so I could



Page 103

1   had -- they gave their pharmaceutical reps one drug,

2   and then they had, like, three different people going

3   in to see the same doctor once a week with the same

4   drug, and it was just stupid.

5          That's when things got really stupid, and

6   pharmaceutical reps got shut out of offices.  I had

7   good access just because I came from the old school,

8   right, and I didn't like the way the industry was

9   going.

10         So I always had better access than most

11  people because I came from the old times, and

12  I -- and even, like, 30 years later, I still had a

13  good reputation because a lot of the doctors that --

14  that the new -- even the new, younger doctors trained

15  under were doctors that I knew.  So they would even

16  kind of do a, hey, you know, this gal is legit.

17  She's not going to just give you a one liner, you

18  know.  She's just -- she's not, you know -- although

19  I look like an idiot.  I know.  I back up everything

20  I say, and that when I say something, they know that

21  I'm not going to give them a bad direction or hurt a

22  patient or anything like that.

23     Q    You said you -- you were in the same --

24     A    I guess I --

25     Q    -- in the same general territory for a great



Page 104

```
 1   period of time --

 2        A     Yes.

 3        Q     Do you have relationships --

 4        A     Since 1990.

 5        Q     Do you have good relationships --

 6        A     Absolutely.

 7        Q     Please let me finish.

 8        A     Absolutely.

 9        Q     Please let me finish.  Do you have good

10   relationships with providers in your territory?

11        A     Absolutely.

12        Q     Are relationships important in

13   pharmaceutical sales?

14        A     Absolutely.

15        Q     How do you build relationships as a

16   pharmaceutical salesperson?

17        A     Being consistent and -- you know what.  I'm

18   going to pull back a little bit and say this, too.

19   Because when I started with Lederle, we didn't have

20   money like the other companies did.  Like, I was

21   selling up against Pfizer and things like that.  Even

22   Wyeth didn't have the money, and I did also have

23   partners that were -- like, one of my partners in the

24   early '90s started with Wyeth, for example, in

25   the '70s.  So again, just kind of coming from that
```



1  reputable time frame, I guess, and still being

2  associated with that and even -- and those doctors

3  then training the newer doctors, and that I

4  definitely had -- you know, was regarded as

5  credible.

6      Q    How do you build relationships with new

7  doctors?

8      A    Just by example and -- or I'll have a

9  conversation like, "Oh, where did you go to school?

10 Oh, well, I know Dr. so and so," and "Hey, you know,

11 he should know me.  Call him and ask him what he

12 thinks about me," and I do tell them I'm very much

13 patient first, and that you know, I'm here to help

14 the patient, you know, and you.

15     Q    When you have a new doctor do you sort of

16 pay more attention to them in order to establish that

17 relationship, at least at first?

18     A    Yes.

19     Q    And what would you do in a typical case in

20 order to start building the relationship?

21     A    Well, now that you mention it, nothing

22 special, and the reason is, is that when I present

23 our drugs, all the drug reps are supposed to --

24          THE REPORTER:  Excuse me, ma'am.  You faded

25 out there.



Page 106

1              THE WITNESS:  Oh, sure.

2        A    I think, you can tell me -- you can tell by

3    my actions, okay.  So every time I present a drug, I

4    present it fair-balanced.  So we are required as

5    pharmaceutical reps to present the material, but then

6    to also present the precautions and warnings.

7              I don't -- they -- all pharmaceutical reps

8    should do that.  I don't think they necessarily do,

9    but I always did, and so I think that the -- when

10   there was a new doctor that came around, that I would

11   always do that, and I think they probably thought,

12   well, you can judge somebody by not what they say,

13   but what they do.

14   BY MR. RANJO:

15       Q    Is it important to also have relationships

16   with office staff?

17       A    Absolutely.

18       Q    Who else in the office would you want to

19   have a good relationship with?

20       A    Receptionist because if you can't get past

21   the receptionist, you're not seeing a doctor or a

22   nurse.

23       Q    In a typical situation, how would that work?

24   You kind of walk in; can you kind of describe how it

25   happens?



Page 107

```
 1        A     Sure.  You know, it comes kind of natural to
 2   me in that everybody's important.  Everybody has a
 3   role in life, and so you know, just how are they
 4   doing, and you know.  And then with the conversation,
 5   just kind of try and pull out, you know, little bits
 6   and pieces.  If they mention something about, oh, my
 7   daughter --
 8             THE REPORTER:  Excuse me.  You're fading out
 9   again.
10             THE WITNESS:  Oh.
11        A     So just sometimes, they'll have a picture of
12   their family or just kind of conversations there, you
13   know.  I always -- in fact, as a mother, I always
14   teach my kids, nobody likes a hotshot, you know.  I
15   don't go in and demand, you know.  I sometimes -- and
16   I still to this day feel this way is, you know, it's
17   important to treat everybody with respect and
18   importance.
19             And I remember I had a manager long ago that
20   said that he would not hire somebody.  He would
21   always take them out to eat, and he would observe how
22   they treated the waiter or the waitress, and if they
23   treated them disrespectfully, he would not hire them,
24   and I think that's how I got the job, is because I
25   think he observed that I treated them respectfully.
```



Page 108

1    Q    When you were calling on providers, did you

2  make an appointment?

3    A    Yes.

4    Q    Do you have to make an appointment every

5  time you go in somewhere?

6    A    I would say 90 -- 95 percent of the time,

7  yes, and on top of that, because I traveled so

8  much -- I traveled -- I drove anywhere from a

9  thousand to 1200 miles a week.  I wasn't going to

10  drive, you know, 200 miles only to hope someone would

11  see me, right.  I would have an appointment.

12    Q    So when you said if you're not nice to the

13  receptionist, you're not going to get in to see the

14  doctor.  Why wouldn't you get in if you had an

15  appointment?

16    A    Well, that's a good point.  Yeah, that's a

17  good point.  It still doesn't mean I would not treat

18  them as I would treat, you know, anybody.  I suppose

19  if I was nasty -- let's say I had an appointment,

20  right, and then I was nasty to them or nasty to the

21  doctor, then I guess I wasn't coming back.

22    Q    So you wouldn't be able to get an

23  appointment if you were not nice to those folks?

24    A    Well, I'm sure if I was a jerk to them,

25  yeah, that I probably would not get back in the



Page 109

1  door.

2      Q    How else would it help to be friendly with

3  the staff?

4      A    I guess access is the only thing I could

5  think of.

6      Q    Could they provide you information about

7  what's going on in the office or anything --

8      A    That's a good point, yeah.  That's a good

9  point, yeah.  "Hey, you know, your competitor was

10  just here yesterday."  Oh, okay, well that would be

11  nice to know.

12     Q    Did stuff like that happen to you throughout

13  your career?

14     A    Oh, heck, yeah.

15     Q    But you think because you had a good

16  relationship with the staff, that it was beneficial

17  to you being a successful sales rep?

18     A    Yes.

19     Q    So then if you had the appointment, would

20  you go in the back and sort of sit down with the

21  doctor in his office, or how would it work once you

22  got beyond the receptionist?

23     A    Every office was different.  Some had rooms.

24  Some would take you to their office.  Some had a

25  special room.  So every office was different.



Page 110

```
 1      Q     And did they -- how long were these
 2   appointments scheduled for together?
 3      A     Varied.
 4      Q     What was the range?
 5      A     Sometimes they were -- a lot of times they
 6   were over the lunch hour, and so I'd go to a clinic,
 7   and I'd be in their breakroom, and then the doctors
 8   would come in over their lunch hour and spend time
 9   with me, and that would vary.  Some would be there
10   the whole hour.  Some would come in five minutes, you
11   know, "What do you have for me today?"
12      Q     Did you ever get providers try to cut you
13   short --
14      A     Oh --
15      Q      -- end the meeting really fast?
16      A     Absolutely.
17      Q     What did you do if that was about to
18   happen?
19      A     Well, you know, be respectful of that.  You
20   know, when you think about it, they -- they have a
21   tough job too, right.  I mean, they come in -- and
22   especially just most recently, I was selling in the
23   psych -- psychiatric -- to psychiatrists and stuff,
24   and they have some tough days.  So you have to be
25   understanding about that.
```



Page 111

```
 1      Q    From a sales perspective, what's better, a
 2  short meeting or a long meeting?
 3      A    Depends on where you're at in the stage of
 4  the sale.  So if -- if the product is new to the
 5  doctor, then I would want a long meeting.  If the
 6  doctor is familiar with the product, and we've had a
 7  bunch of discussions before, then I only want to just
 8  make a certain point.  Like, a new study that came
 9  out, a change in the package insert, something like
10  that.
11      Q    I hear that -- sometimes when people try
12  sell me stuff, I'm trying to -- and I'm not
13  interested, I'm trying to end the conversation as
14  quickly as I can, and the really good salespeople are
15  able to kind of keep me around somehow.  Has that
16  been your experience, that it can be hard keeping the
17  conversation going with somebody?
18      A    Yes.
19      Q    And that's a skill that's helpful during the
20  pharmaceutical sales --
21      A    Yes.
22      Q    -- process?  If you're in an in-person
23  meeting, how do you keep the conversation going?
24      A    Well, I think the most important thing is
25  that when I am in a conversation with a doctor, it's
```


MAGNA ▶
LEGAL SERVICES

Page 112

```
 1   not about me; it's about them.  So they have a lot of
 2   pressure, you know.  So I try and make it a situation
 3   where they can kind of decompress, and a lot of
 4   times, they will decompress, and then they're almost
 5   kind of thankful, "Thank you for doing that.  What
 6   have you got today?"
 7       Q    Did you find those conversations more
 8   difficult in the remote setting?
 9       A    No.
10       Q    Why not?
11       A    I don't know.  I kind of think that our Zoom
12   meeting here today I think is just as effective as if
13   we were to meet in person.
14       Q    So you can't hang up on me, right, if you're
15   kind of annoyed --
16       A    No.
17       Q    -- and you want to get out of the meeting,
18   right?
19       A    Right, right.
20       Q    And doctors can do that --
21       A    Yeah.
22       Q    -- say, "I got to go"?
23       A    Yeah, yeah.
24       Q    Is it easier for providers to end calls on
25   Zoom versus in person?
```



Page 113

1      A    I'm not going to go chase them down the

2   hall.  I'm not going to -- I'm not going to -- I

3   mean, if they want to end the call, and I'm in

4   person, I'm not going to step over that line.

5      Q    Well, I mean, there is a middle ground,

6   right.  There is kind of a gray area between them

7   getting up and running away and just looking like

8   they don't want to be there and they want the call to

9   end, right?

10     A    And a lot of times I feel, though, like I

11  can read their facial expressions --

12          THE REPORTER:  Excuse me.  Can you repeat

13  that?

14     A    Oh.  Well, a lot of times I feel I can read

15  their facial expressions, and you know, if I detect

16  that, I try to give them an out.

17  BY MR. RANJO:

18     Q    And you said before that many doctors

19  scheduled their calls during lunch?

20     A    Yes.

21     Q    Did they do that when you were in a virtual

22  setting?

23     A    Yes, and breakfasts, too.  Breakfast or

24  breakfasts.

25     Q    So they would eat in front of you --



Page 114

```
 1      A    Yes.

 2      Q    -- when this was going on?

 3      A    Yes.

 4      Q    I think we have to take a break.  I need to

 5  take care of something.  This, like I said, will be a

 6  30-minute break; does that work?  I'll see you guys

 7  back around 1:30.

 8           THE VIDEOGRAPHER:  Off the record.  12:02.

 9           (Break from 12:02 p.m. to 12:34 p.m.)

10           THE VIDEOGRAPHER:  On the record, 12:34.

11  BY MR. RANJO:

12      Q    All right.  Miss Welch, we're back from a

13  lunch break; you understand you're still under oath?

14      A    Yes.

15      Q    Great.  Let's go back to your resume, which

16  is Exhibit 3, talks about your time at Lederle,

17  Wyeth, and Pfizer?

18      A    And technically, I've never was employed by

19  Pfizer.  I guess I was just kind of taught when I --

20  to say, "formerly" -- or how do I say it?  Pfizer

21  formerly Wyeth.  I never ever once received a

22  paycheck from Pfizer, just so you know.

23      Q    Okay.  Thanks for clarifying.  So you left

24  Wyeth after Pfizer acquired that company; is that

25  right?
```



Page 120

```
 1      Q     And did you know anybody in western
 2   Minnesota?
 3      A     No.  That was brand new to me.
 4      Q     So was that challenging to work a new
 5   territory where you didn't know anyone?
 6      A     Yeah, but then you're approaching it with
 7   experience.  So again, you know -- again, I guess,
 8   you know, the way -- in a way, I always present,
 9   right, as patient first, fair-balanced presentations,
10   and so you know, people -- people pick up on that.
11      Q     So how far was western Minnesota from where
12   you lived?
13      A     Well, let's see -- I had Bemidji, a 12-hour
14   drive, so I would have to overnight at least one
15   night just to get there.
16      Q     Why didn't you just call them on the
17   phone?
18      A     You can't really sell over the phone, but it
19   would have been great if we had Zoom, and at that
20   time, we were not -- AstraZeneca was not doing Zoom
21   meetings, so the Zoom presentations didn't come until
22   Covid.
23      Q     Why can't you sell over the phone?
24      A     It's just not effective.
25      Q     How do you know that?
```



Page 121

1    A    Well, I just should say it's not as

2  effective because -- actually, I sell over the phone

3  right now.  So I -- so what I do is I -- I do cold

4  calling, and then the next step is to get a demo for

5  them to see the product.

6         So there is a part where they have to see

7  everything.  In effect, in all of sales, they show

8  that if you can show them while they're -- while

9  you're verbally communicating to them, that the

10  chance for a successful sale is synergistic.  I don't

11  know what the number is, but clearly, if you can show

12  and verbalize, that that is the most effective.

13    Q    Did you ever take providers out to eat or

14  buy them lunch, or something like that?

15    A    You cannot take them -- because of the

16  Sunshine Act, you cannot take them out.  You can only

17  bring in the office.  So what -- so after Covid --

18  and this was typical of all pharmaceutical companies,

19  we would have lunch catered, and then we would do the

20  Zoom meeting.

21         It would have been really -- like back when

22  I was working for TouchPoint publicists it would have

23  been made my life so much easier and I would have

24  been so much more effective if I could have just had

25  the Zoom thing and not drive two days to get out



Page 124

1    A    Well, the person that was working for Takeda

2    called me up, and I knew the drug that they had.

3    They had Trintellix, and I remember seeing this drug,

4    and I just thought it was the most outstanding drug

5    for depression I'd ever seen, and so the gal that was

6    selling it called me.  She said, "Hey, I'm leaving,

7    and if you're interested, I'll put your name in."  So

8    she did.  You know, she put my name in.  I

9    interviewed, got the job.

10          I was still employed with TouchPoint at that

11   time, and in that particular situation, you know, it

12   was me that initiated the departure, not TouchPoint,

13   to go work for Takeda.

14   Q    And you were hired by Takeda on March 23rd,

15   2015; does that sound right?

16   A    Yeah, yeah, because I said -- yeah.  So I

17   said March 2015, yeah.

18   Q    And what was your formal title when you were

19   hired?

20   A    It was sales representative, territory

21   sales.  Not 100 percent sure.  I defer to whatever

22   Takeda called me.

23   Q    Did that -- did your title change at all --

24   A    No.

25   Q    Please let me finish just because I want --



1   I don't want to torture Rosemary.  Were you ever

2   elevated to, like, senior sales representative?

3       A    Yeah, that's right.  I would have been,

4   sure, because of the sales awards, yeah, and then

5   that got me a higher salary.  So you're right.  I

6   just don't -- I just don't remember the terminology,

7   and to be honest with you, every company is a little

8   different how they -- what they call it, but I recall

9   I was probably the highest level that a sales

10  representative would be.

11      Q    And you were a sales representative

12  throughout your employment?

13      A    Always, yep.  I was never in a management

14  position.

15      Q    And your duties and responsibilities

16  remained the same that entire time?

17      A    Correct.

18      Q    And what was your territory called for

19  Takeda?

20      A    Well, actually, they called it, "a

21  footprint," and what was I called?  I don't remember.

22  Dakota -- I don't even think it could say Dakotas.

23      Q    Mountain West, does that sound right?

24      A    That could be.  Okay.  Okay.

25      Q    Who was your -- no problem.  Was the



1  territory the same the entire time you were at

2  Takeda?

3      A    I'm not a hundred -- I don't recall for

4  sure.  I may have had part of South Dakota.  I think

5  so, but I'm not a hundred percent.

6      Q    Okay.  And what was -- to your recollection,

7  what areas did you cover at Takeda?

8      A    Okay.  Now, I'm starting to recollect a

9  little bit more.  Okay.  So I would have had the

10  whole state except from Fargo to Grand Forks, but

11  then I had south of Fargo.  So I had Wahpeton, and I

12  had a part of South Dakota, and I just can't remember

13  how far south for them.  I think I had Aberdeen.  In

14  fact, I'm pretty sure now, I think I had Aberdeen.  A

15  significant chunk of northern South Dakota.

16      Q    And almost all of North Dakota?

17      A    Except for Fargo and Grand Forks and the

18  little strip of I-29, but the big cities were Fargo

19  and Grand Forks.

20      Q    Who was your first level manager in 2020?

21      A    So 2020, Jason Falso, maybe.

22      Q    Did you have any managers after that?

23      A    Yeah.  We had a lot -- around that time

24  frame, we had a lot of turnover.  There was a lot of

25  flux there.  If you want to say a name to spur my



Page 129

```
 1      Q    Did you have a company car?

 2      A    Yes, and very scary inclement weather.  I

 3   mean it's North Dakota.

 4      Q    I've seen Fargo, the movie.

 5           MR. DeMATTEO:  So have I.

 6           THE WITNESS:  In the winter, though.  You

 7   know what's scary -- I'm just going to say this.

 8   What's very scary out here, different from, like, the

 9   East Coast, is that there isn't a lot of trees,

10   right.  So when we get a blizzard, it's a whiteout,

11   and if the ditches are full, and the -- so you can --

12   it's, like, if it's a blizzard, you're going to stay

13   home, right, but if the ditches are full, and the

14   wind comes up, you're going to have a whiteout, and

15   sometimes it's so bad that you can't even see the

16   windshield wipers going on your car.  It's that bad.

17           So it's very treacherous.  To this day,

18   honestly, I can't believe I made it, I don't know,

19   whatever the official number is -- I don't know, 27

20   years on the road.  I can't believe I survived that,

21   to be honest with you.

22      Q    As a salesperson for Takeda, did you have

23   in-person meetings for any reason?

24      A    With our district -- meetings with doctors

25   or meetings with who?
```



Page 130

```
 1        Q     With people on -- other Takeda employees?

 2        A     I would really have to defer to Takeda, but

 3   I tell you, with the whole Covid thing, that

 4   really --

 5        Q     Other than that part, other than that time,

 6   just normally when you started.

 7        A     Oh, yeah, we'd have -- we would have

 8   meetings, yes, in person, yes.

 9        Q     What kind of in-person meetings did you

10   have?

11        A     They would be district meetings in, you

12   know, various areas, I guess.  I remember North

13   Dakota for sure -- not North Dakota.  They were never

14   in North Dakota.  So it was either Minnesota or South

15   Dakota.

16        Q     How often did you have district meetings?

17        A     Quarterly.

18        Q     Any other type of meeting?

19        A     So we would have national meetings once a

20   year.  Periodically regional, but boy, I couldn't put

21   a -- you know, I couldn't put a specific -- I

22   couldn't even tell you if we did a regional meeting

23   annually or not.  It would be district meeting and

24   then a national meeting annually.

25              I would say district meeting quarterly and
```



Page 131

1   national meeting annually would be pretty

2   consistent.

3       Q    Did you have any one-on-one meetings with

4   your supervisor?

5       A    Yeah, I did.  To be honest with you, usually

6   with representatives, it's like once a month.  I

7   typically didn't because there's a tendency for

8   managers to focus on people that are caboosing it, so

9   to speak, plus I live out in the middle of nowhere.

10  If you come working with me, you're going to have to

11  drive the crappy roads.  So there was a tendency,

12  well, she's got everything under control.

13           So there's a tendency that I wasn't --

14           THE REPORTER:  I'm sorry.  That you what?

15           THE WITNESS:  That managers wouldn't work

16  with me as much just because I was experienced, the

17  numbers were good, and you know, if you come out and

18  work with me, it was not an easy workday.  You were

19  going to go on -- you were going go on some very

20  crappy roads.

21      Q    Were those one-on-one meetings considered,

22  like, field rides?

23      A    Yes.

24      Q    What was the requirements in terms of the

25  number of field rides that you had?



Page 132

1        A    I don't know.  That was really up to the

2    district manager.  I will say this, though:  The most

3    field ride I've ever had with any manager was Takeda

4    manager, and her name was Melissa Pauley.  That gal

5    was the hardest working manager I have ever seen, and

6    she rode with me and in all the terrible dog roads

7    and everything.

8        Q    What was the point of field rides?

9        A    Make sure that, you know, to judge my sales

10   skills.  Also to make sure that I'm compliant, right,

11   because my job was to protect the pharmaceutical

12   company from lawsuits, from liability.  I had to make

13   sure that I was compliant with our package insert.

14       Q    In 2020 time frame, what kind of providers

15   were you calling on; was it like family doctors,

16   psychiatrists?

17       A    Yes, and pediatricians.

18       Q    So ever any hospitals?

19       A    Have to think.  I don't think so, at that

20   time.  I mean, the clinics -- the physicians might be

21   located in the hospital, but I wasn't really dealing

22   with hospital formulary and stuff, so no.  Really the

23   clinics.  So psychiatrists, pediatricians, and

24   primary care.

25       Q    Were these, like, little offices or part of



Page 133

1    bigger offices; what was that?  What's the bigger

2    office contacts; why would, like, a family care be a

3    big office?

4        A    Because they're under a health system.

5        Q    What percentage were you calling on

6    providers in big institutions versus little doctors

7    offices?

8        A    I would say 80 percent big institutions, 20

9    percent smaller offices.

10       Q    And did those big institutions have a lot of

11   sick people in them?

12       A    Yes.

13       Q    And by, "institution," is it something other

14   than a hospital?

15       A    Well, I would call them a health system.  So

16   like Trinity Health System, Sanford Health System,

17   CHI Health System.

18       Q    And I guess the patients in these places

19   probably vary, right?  I mean, in a psychiatrist's

20   office, there might not be any sick people, but a

21   family practice, you might have all types of

22   illnesses; is that fair to say?

23       A    Right.

24            MR. DeMATTEO:  Object to form.  You can

25   answer.



Page 134

1        A       But you know -- yeah.  But you know -- yeah.

2    Some of the psychiatry clinics were, you know, in a

3    hospital, so yeah, I would be exposed to sick people

4    for sure.

5    BY MR. RANJO:

6        Q       When you first started at Takeda, was there

7    a requirement on how many calls you would have to

8    make in a certain period of time?

9        A       Oh, I'm sure.  It's typically eight.

10       Q       What's the period of time for the eight?

11       A       Oh, a day.

12       Q       Did you always meet that requirement?

13       A       Yeah.

14       Q       What happens if you had to drive 12 hours,

15   how would you meet it?

16       A       Right.  So if I'm driving 12 hours, then I

17   have an appointment in a clinic.  So I might not get

18   it on that day, but you know, that appointment might

19   have six targeted physicians.  So I'd get six, and

20   then maybe, you know, can make it up, you know, on

21   the way back.  So overall, it would -- I would

22   average about eight.  I didn't fall below that.

23       Q       When you first started, how many of the

24   eight would be in person versus remote?

25       A       Oh, 100 percent.  The remote didn't happen



Page 135

1   until during and after Covid.

2       Q    Let's talk about Covid.  So Covid happened,

3   and I guess you guys were not doing anything at all

4   for a certain period of time, maybe a couple weeks,

5   where you just kind of sat --

6       A    Yes.

7       Q    -- at home and did nothing?  And then what

8   happened after that period of time?

9       A    Well, what I recall is that -- the one thing

10  that I recall is that our competitors were out there

11  when we weren't.  So I really recall being

12  frustrated, being pulled back, and concerned that my

13  business was going to get hurt.

14           And on top of that, I started thinking about

15  it.  I started looking at the documents I submitted,

16  so I recall that -- let's see -- was it March of

17  2020? -- is when we got pulled back, and our fiscal

18  year ended April of 2020.  So I'm trying to protect

19  my -- at that time, I think I was -- I think I was

20  gold Cresset, you know, top -- the top payout, the

21  top award, and I remember not being happy about being

22  pulled back because my competitors are out there, and

23  I'm at home because of Takeda's concern over Covid.

24      Q    And then did you think that -- I mean, was

25  Takeda pushing you to get back out there at a certain



Page 137

1    time.

2        Q    When did you start going back into the

3    field, I mean, after the period of time where you

4    were fully remote?

5        A    I don't recall.  I'd have to -- you know,

6    Takeda -- you know, I went out in the field as soon

7    as Takeda let us, but I don't know exactly when that

8    was.  But they would have -- they would have that

9    policy.  They would be able to do that.

10       Q    Why did you go out in the field as soon as

11   Takeda let you?

12       A    Because I wanted -- I wanted my numbers.  I

13   wanted my sales.

14       Q    Why couldn't you get them remote?

15       A    Both.  So I did both remote and in person,

16   and in fact, I wish -- that is the ideal way to work

17   the territory is both because it's so big, and it

18   crosses two time zones.  So a smart rep would maybe

19   do a lunch in person, and then in another time zone,

20   do a Zoom lunch; same with breakfast.  That's the

21   smartest.

22       Q    Right.  You said you needed to go back into

23   the field to make your sales, and I asked you why.  I

24   didn't ask you why you could do both.  I asked you

25   why you needed to get back into the field to make



Page 138

1    your sales.

2        A    Okay.

3        Q    So what's the answer?

4        A    Because I wanted to get my -- sustain my

5    numbers.

6        Q    Right.  But why did you need to be in the

7    field to do that?

8        A    Well, that's a good -- because I wanted to

9    say -- it had been a while since I'd seen them.

10       Q    I'm going to show you another document.

11   Okay, Miss Welch, I just sent to you a document

12   marked Exhibit 4.  It's actually two documents, but

13   they're in consecutive Bates numbers, Takeda 17352 to

14   Takeda 17356.

15       A    Okay.  Okay.

16       Q    Do you have it up?

17       A    Yes.

18       Q    Do you know what this is?

19       A    It must be some sort of review.  It

20   certainly isn't a document -- I don't think it's a

21   document that I submitted.  VEVA would be our Zoom.

22   Yeah, that's -- we called Zoom --

23            THE REPORTER:  You called Zoom?  What.

24            THE WITNESS:  VEVA, V-E-V-A.

25



Page 143

1    field representatives on September 10th, 2010; does

2    that sound right?

3        A    Yes.

4        Q    So that would be the third quarter?

5        A    Wait, wait, wait, 2000 --

6        Q    I'm sorry, 2021?

7        A    2021, yes.

8        Q    So that would be third quarter -- the

9    beginning of the third quarter of 2021, yes?

10       A    Yes.

11            THE REPORTER:  I'm sorry.  Was there an

12   answer?

13            THE WITNESS:  Yes.

14   BY MR. RANJO:

15       Q    When you went back into the field during

16   Covid, was your area -- were the places open or was

17   it sort of closed in terms of --

18       A    Mostly open, but some were closed, and if

19   they were closed, to me, they were closed to

20   everybody.  So it was -- yes, we are going to see

21   reps, or no, we're not going to see reps at all.

22       Q    What percentage would you say was open

23   versus --

24       A    80 percent was open.

25       Q    And was it that way, I guess, through the



Page 144

1    termination of your --

2        A    Yes.

3        Q    -- employment?  And during that period of

4    time, how many calls were you making in person, like,

5    what was the percentage of in-person calls versus

6    Zoom calls?

7        A    I'm guessing, but about 50-50 because at

8    that time, I'm utilizing -- I'm trying to do both,

9    right.  I'm trying to maximize those two time zones,

10   so I'd say 50-50.

11       Q    Did any of your providers at any point

12   require you to be vaccinated to show up there in

13   person?

14       A    No, and then on top of that, about two weeks

15   after termination -- and I was part -- that's one of

16   the bills that I testified to, that what North Dakota

17   decided is that if you -- let's see -- an alternative

18   that you could test once a week.  If an employee

19   didn't want to take the vaccine, they would just have

20   to test once a week to make sure that they're not

21   carrying Covid, and Takeda's policy was twice a week,

22   but that was about two weeks after termination.

23            So in all fairness, Takeda was not aware --

24   they couldn't have possibly known that because it

25   didn't happen until about two weeks after.



Page 153

```
 1      A    It is tough to read there.  Okay.

 2      Q    Do you know how to zoom in?

 3      A    Yeah, I do.

 4      Q    Do that.  It makes it a lot easier.

 5      A    Yeah.  I have such a large screen.  Oh, here

 6  we go.  I just say not only am I an old bat, but I'm

 7  blind as a bat, too, so okay.  So this is 10-6-2021.

 8  Okay.

 9      Q    What is this document?

10      A    So this would be -- this looks like a

11  manager field ride.

12      Q    From second quarter of 2021?

13      A    2021, um-hum.

14      Q    That would have been sometime between July

15  and September?

16      A    Yes.

17      Q    And if you scroll down, about halfway down

18  the page it says, "Opportunities," and the first one

19  it says, "We agree that the first opportunity for you

20  is to increase your F2F activity"; what is F2F?

21      A    Face to face.

22      Q    Says you had 130 F2F interactions, which was

23  seven out of seven on the team, so that's last?

24      A    Okay.

25      Q    Is it?  I'm asking you.
```



Page 154

```
 1      A     That would be the last, yes.
 2      Q     "The goal was" -- "The goal we set was to
 3   improve from seven out of seven on the team."  Was
 4   that typical that you were last in terms of in-person
 5   interactions on your team?
 6      A     I don't recall that ever being a hot point
 7   or anything.  I guess what I would toss out is what
 8   was my overall call average compared to -- compared
 9   to my peers.  So I -- you know, I would bet that my
10   overall call average was higher, and again, that
11   would have been done by a manager that is -- you
12   know, he came from Denver, not very familiar with my
13   territory, and that's his observation, and I accept
14   it, but . . .
15      Q     Ma'am, it's not an observation.  You were
16   seven of seven.  It's a fact.  It's not an
17   observation.  So why were you last?
18      A     Well, because I was utilizing both remote
19   and in-person sales.  So is there somewhere on this
20   document that says --
21      Q     We'll get there.  We're not there yet.
22   That's kind of off the topic.  Let's finish this
23   piece of it up.  Your manager wanted you to conduct
24   more in-person meetings engagements, right?
25      A     Okay.
```



Page 155

```
 1      Q    I'm asking you; did he?

 2      A    It looks like it.  It looks like it from

 3   what you're showing me.

 4      Q    And were you typically last in your -- on

 5   your team in in-person interaction, or was this

 6   something that was new in this particular period of

 7   time?

 8      A    It must have been new.  I don't recall that

 9   ever being a problem, but I will say this:  That

10   Jason Falso was -- after he left, there was a lot of

11   nonconsistency with management.  So -- and I don't

12   know when he left.  I just remember it was after

13   Covid, so 2021.

14           So that year, I had, like, a manager come in

15   that was temporary, and then Shannon Exener would

16   have been the full time, but again, had maybe, you

17   know, one or two field rides with him.  So.  He would

18   have been new to my territory.

19      Q    Why were you utilizing more remote means

20   than your teammates during this particular period of

21   time?

22      A    Because I -- I -- I had the relationships,

23   and I could get the calls in.  So I guess what I

24   would overall divert to is -- okay.  I'm going to go

25   back.
```



Page 156

1              In 2020 when we were totally at home, that
2    we could not go out into field, I had the most -- I
3    was, like, top three in the region for remote calls.
4    So I had the relationships.  I sat down and trained
5    those clinics to do it, and they did.

6              And so other territories were not receptive
7    to that.  Mine was, and I utilized it.  I would still
8    think that this observation -- I mean, you're right.
9    The number is the number, and -- but I think people
10   would be -- I think my peers were envious of how many
11   remote meetings I was able to schedule and complete
12   and have people show up, and those are probably
13   recorded, and you can probably see their faces and
14   see the whole presentation and conversation.

15      Q    Did you have a larger territory than your
16   other teammates in terms of geographical --

17      A    Yes.

18      Q    -- size?  Did you have the largest on your
19   team, to your knowledge?

20      A    I believe so.

21      Q    How about number of providers, did you have
22   more or less than other people or at or around the
23   same?

24      A    I don't know about providers, but I think
25   that the volume -- the dollar volume of business was



Page 157

1    lower.  The dollar potential was lower.

2        Q    You don't know if you had fewer providers in

3    your territory?

4        A    Yeah, I think that it would be about the

5    same, but I'm not -- I'm not a hundred percent.  I

6    don't recall.  I just don't.

7        Q    Please scroll to the second page.  There's,

8    like, a purple or blue chart.

9        A    Okay.  Okay.

10       Q    It looks like you had pretty low mail?

11       A    Right.

12       Q    Why was that?

13       A    Because I thought they were ineffective.

14   Basically, I think people that were in territories

15   where they didn't have good access, that if they sent

16   out a mail, that that would be considered a call,

17   okay.  So that's why I kind of say people were very

18   envious of the situation that I had because, clearly,

19   when you look at -- there's mail.  So I didn't do

20   mail because I was getting in front of them.  Now,

21   I'm trying to figure out from this, engage with

22   meal --

23       Q    What is an engage meeting HCP; what does

24   that mean?

25       A    That's health-care provider.  So what I'm



Page 158

1    trying to figure out --

2         Q     Does that mean Zoom, engage meeting?

3         A     That's what I can't remember.  It might very

4    well be, but I bet you that's what it is, and again,

5    that's where I shined.  That's where I was the envy

6    of the region is because I could do this when other

7    people couldn't.

8              I had the relationships, and my clinics, you

9    know, took the time to learn -- to get uncomfortable

10   and learn a new way of doing things with these VEVA

11   engagements, and so yeah.  So clearly, I had more

12   than anybody else and --

13        Q     You also, ma'am, had six -- I'm talking.

14   I'm talking.  You also had six times more in-person

15   meetings than Zoom meetings; is that right?

16        A     I mean, I'm just -- I'm trying to read like

17   you are, too, and we'd almost have to go back to

18   Takeda.

19        Q     I mean, it says, In office HCP 130, engage

20   meeting HCP 22.  That's six times more.

21        A     Okay.

22        Q     Does that sound right?

23        A     Well, I know that I have -- I have better

24   access both in office and with Zoom meetings.  I had

25   the best access.



Page 159

1    Q    If Zoom -- if you were so good at Zoom, and
2    it was so effective, why were you doing six times
3    more in person?  Why were you doing 130 in-person
4    meetings versus just 22 by Zoom?
5    A    Probably because I had been -- what is the
6    time frame on this?
7    Q    It's the second quarter of 2021.
8    A    Second quarter, so a few reasons.  So we're
9    talking --
10   Q    July through September.
11   A    Yeah.  A few reasons.  That when it's
12   summertime, I have a tendency to really just go balls
13   out, right, because I know winter is coming, and I
14   know I can't get to them.  So that might be why.  And
15   then once winter would come in, I would probably do
16   more remote.
17   Q    You talked about phone being ineffective.
18   Looks like you did 57 of those; does that seem like a
19   lot?
20   A    That does seem like a lot.
21   Q    Any reason why it would be so high?
22   A    The only thing I can think of is for setting
23   up a meeting, maybe that's why I was doing those
24   phones.  Again, I don't want to be going -- I don't
25   want to be driving to the middle of Timbuktu if I



1    don't have an appointment and something scheduled.

2    So that might be a scheduling thing, too.  I'm not

3    sure, and I'm just not -- I don't recall.

4        Q    So if you look at your in-person visits

5    versus everyone else, the next person has more than a

6    hundred more than you.  That's why you ranked last

7    because you were last by about a hundred?

8        A    So okay.  So say that again?  So the

9    person --

10       Q    I'm looking at -- I'm looking at the

11   in-office HCP.  You're last on the list, as we

12   discussed, seven of seven.  You had 130.  Number six

13   of seven, the next person up, has 234.  That's over a

14   hundred more than you.  That's a pretty big gap to

15   get from seven to six.  Why did you have so few

16   compared to everybody else?

17       A    Well, I will say this:  In the industry,

18   sometimes your calls are as good as your type, and I

19   really -- when I recorded a call, I was there, and I

20   would -- I would venture that if, honestly, with some

21   of these -- with some of the people in the industry,

22   that if there was a tracker on them -- you know, if

23   you could track, you know, when that person recorded

24   that call, where they were at, I bet -- I think that

25   the numbers would be different.



Page 161

```
 1     Q    Are you suggesting that some of these people
 2  lied about their calls?
 3     A    Yeah.
 4     Q    Did anyone on your team have as much
 5  seniority as you --
 6     A    Oh, yes.
 7     Q    -- in this territory?  Who on this list was
 8  a senior person?
 9          THE REPORTER:  I'm sorry.  Who?
10          THE WITNESS:  Minnesota, and I'm not seeing
11  Minnesota here.
12  BY MR. RANJO:
13     Q    Well, I'm looking at the names.  You see the
14  owner name?
15     A    Oh, wait, what page are you on?  What's the
16  end and what's the end of it?
17     Q    I mean, I'm on the blue chart.
18     A    Oh, okay.
19     Q    See those names?
20     A    Right.  Okay.  Oh, this is interesting
21  because this is a new group of people.  So I am new
22  to this.  I'm not in this -- I'm in a different area,
23  and I must be new to this area.  So Matt Doan is the
24  only one that would be --
25          THE REPORTER:  I'm sorry.  That would be a
```



Page 177

1    been guided as a Catholic when you don't read the

2    Bible.  You don't consult your priest, and you don't

3    listen to the Pope?

4          MR. DeMATTEO:  Same objection.

5      A    I listen to the Pope.  Who says I don't

6    listen to the Pope?

7    BY MR. RANJO:

8      Q    Didn't the Pope advise Catholics to be

9    vaccinated from Covid 19?

10     A    This is where we differ.  The Pope's

11   definition of a vaccine and Takeda and my definition

12   of a vaccine are two different things.  That's where

13   the PREP and the Cares Act come into play.

14     Q    What do statutes have to do with what the

15   Pope is saying?

16     A    So let me put it to you this way:  What

17   Takeda and I know -- so defining a vaccine is our

18   wheelhouse, Takeda and mine.  It is not the Pope's,

19   okay.  So how Takeda defines it and how they treated

20   me and is through the PREP and the Cures Act.  So

21   what they did is they coerced me to take an

22   experimental drug against my will.  That is a

23   violation of Nuremberg Code.

24     Q    Okay.  You didn't get vaccinated --

25     A    Wait, wait, wait, wait.  Wait, wait, wait.



Page 178

```
 1   If you were to go ask the Pope, "Okay, Pope, to your
 2   pulpit, do you advise all of your constituents to
 3   take an experimental drug against their will?  And if
 4   they get injured, there is no recourse."
 5            I tell you, if the Pope said, "yes," to
 6   that, you have -- you'd have people leaving more than
 7   when Martin Luther was in -- you know, left and took
 8   a ton of people.
 9            So I think that Takeda is putting words into
10   our Pope's mouth when he says this.  So what our
11   Pope is -- what our Pope's perception is, is that it
12   is an act of love, and he said that it would be
13   considered suicide if you didn't do it.
14            So preservation -- so Catholics believe --
15   and I think this is a little different than
16   Christians.  Catholics believe that suicide is a sin,
17   and we believe that we are put on this earth to do --
18   you know, to do what God tells us to do.  I don't
19   know if you say, "tell," but we're here for a reason,
20   and if we commit suicide, then we are not completing
21   what God had intended for us to do.
22   Q    What does taking the vaccine have to do with
23   committing suicide?
24   A    Well, I guess if you want to bring up the
25   bishop's letter, I can kind of help direct that.
```



Page 179

```
 1      Q    I just want you to answer my question.
 2      A    Well, then, I'm going to quote the bishop's
 3   letter, and that they say that it is important to
 4   follow your conscience, and you've got to take two
 5   things into consideration:  One is your own health
 6   and safety, and the second is the safety of others.
 7      Q    And you believe --
 8      A    And that's --
 9      Q    And you believe that the Covid 19 vaccine
10   will kill you?
11      A    Yes, or it could severely injure me, and
12   okay, but you know, you meet think that's crazy town,
13   right, but I've got an only sister that dropped like
14   a rock and is still struggling, and something I
15   didn't submit to Takeda is her only daughter months
16   after that, but you guys have e-mails, my -- her only
17   child lost the head of her pancreas and had to go to
18   the Mayo Clinic for a whipple procedure.
19      Q    Miss Welch, how often do you go to church?
20      A    Weekly.
21      Q    Every week?
22      A    And extra on holidays.
23      Q    You ever skip a Sunday?
24      A    Yeah, but it has to be a good reason, like,
25   caring for my parents.  So when I was in -- when my
```



Page 184

1    again where you think you're donating --

2        Q    Now you're going a little too far off topic.

3    I got to rein you in.  Did you ever do any research

4    before Covid to see if vaccines or anything else

5    whether their development included the use of fetal

6    cells?

7        A    No.

8        Q    When did you first --

9        A    I didn't --

10       Q    When did you first learn with respect to

11   Covid 19 vaccination?

12       A    Say that again?

13       Q    When did you first learn of the connection

14   between fetal cells and the Covid 19 connection?

15       A    Okay.  So I submitted, first of all, a

16   document from NPR -- National Public Radio -- that

17   talks about it, and that there were a lot of Catholic

18   hospitals and everything that were concerned because

19   somehow -- that's the first I ever heard about it --

20   fetal cell lines were utilized in the J & J vaccine.

21            Now, I didn't find out this back in March.

22   I didn't find out about it until the summer of 2021,

23   and that's when my friend, Maria, out in Denver was

24   telling me this, and then she said, You know what, go

25   check the Denver Diocese and see what they



Page 185

1  are -- what they are -- what they are saying.  And

2  I'm like, "Oh, wow."

3          And then I went as far to send -- and I

4  submitted that e-mail to you, as well -- that I sent

5  that link and statement from the Denver Diocese,

6  actually, over to my bishop.

7      Q    Did you ever talk to -- who's your priest,

8  by the way?

9      A    At that time, Father Sattler.

10     Q    How do you spell it?

11     A    S-A-T-T-L-E-R.

12     Q    Did you ever speak to Father Sattler about

13  getting vaccinated?

14     A    Yes, and he -- interesting enough, he told

15  me at the time that he didn't want to get it, either,

16  but he really didn't want to hear anything more.  It

17  was almost like he was -- he didn't want to get

18  involved, and at the time, too, his mother was dying

19  of leukemia, and she did ultimately die.

20     Q    Your own priest was vaccinated -- your

21  priest was vaccinated over Covid 19?

22     A    No.

23     Q    He has not been?

24     A    At the time that I talked to him, no, and I

25  don't think he is, but you can ask him.



Page 186

1    Q    You don't know whether he's vaccinated or

2    not?

3    A    At the time I talked to him, he said, "no,"

4    and he didn't want to be.

5    Q    You told me he didn't want to be, but he was

6    going to be because he didn't want --

7    A    No, no.

8    Q    -- apparently, had a sick mother.  You

9    brought that whole thing up.

10   A    No, no.  Well, then, you misunderstood.  He

11   doesn't want to deal with, like, a letter or a

12   discussion on it because he was so overwhelmed with

13   grief about his mother being sick.  So you have his

14   contact information, and you're welcome to call and

15   ask him about --

16   Q    I don't understand what you're talking about

17   a letter.  What letter are you talking about?

18   A    A letter to submit to Takeda.

19   Q    I didn't ask about the letter.  I asked if

20   you talked to him about whether you should be

21   vaccinated or not?

22   A    I -- well, I didn't ask him if I should be

23   vaccinated or not.  I knew that I do not want to be

24   vaccinated.

25   Q    So you made up your mind before you spoke to



1    any religious leader about getting vaccinated?

2        A    Well, okay, yes, because at that time, I

3    knew that it was an experimental drug that I could

4    not find out what was in it, and that if I got

5    injured, that I'd have no financial recourse.

6            So it didn't you know even if he said, "You

7    should," then I would have had a conversation with

8    him on, Wait a minute.  We're talking a situation

9    like Nazi Germany where people were forced into an

10   experimental drug without their informed consent, and

11   if they were injured, they had no recourse.

12       Q    Other than the fetal cell connection, do you

13   have any religious basis for not taking the Covid 19

14   vaccine?

15       A    Yes, because again, in the bishop's letter

16   that if your conscience tells you that your body is

17   at risk or you are at risk of hurting somebody else,

18   then -- then that -- then somebody -- an employer

19   trying to make you do that is considered coercion.

20   That is at the end of his first page.

21       Q    So did Kagan weigh in on this issue other

22   than the letter you submitted?

23       A    That's the only -- that's the only weigh-in

24   that I am aware of.

25       Q    Take a look at Exhibit 8, which I just sent



Page 188

1    to you.

2         A    I take it it's his letter?

3         Q    Let me know when you have it open.  It's a

4    one-page document.  Okay.  The document has "North

5    Dakota Catholic Conference" at the top.  It says,

6    "The statement from the Catholic bishops in North

7    Dakota on the Covid 19 vaccines and vaccination."

8              The second paragraph says, "Guided by the

9    principles of solidarity and the common good, we

10   encourage people to safely and timely vaccinate

11   against Covid 19.  Vaccines not only help protect

12   ourselves, but they also help protect others.  When

13   vaccinated, we essentially become barriers against

14   further transmission of the virus.  This is

15   essentially important for those more susceptible to

16   contracting and succumbing to Covid 19, which has

17   most affected the medically vulnerable and

18   disproportionately impacted racial and ethnic

19   minorities"; do you see that?

20        A    Yes.

21        Q    Do you know who signed this letter?

22        A    The bishop.

23        Q    Bishop Kagan, right?

24        A    Um-hum.

25        Q    And he's encouraging people to take the



Page 189

1   vaccine, correct?

2       A    Um-hum, um-hum.

3       Q    And you went against his encouragement,

4   right?

5       A    Yeah.

6           MR. DeMATTEO:  Objection; form.  You can

7   answer.

8       A    No, I want to answer this.  Again --

9   BY MR. RANJO:

10      Q    It was a yes or no question -- or answer.

11      A    No, I'm going to answer this, and I'm going

12  to go on the record.  So there are two things that

13  his letter provided.  One, to protect myself because,

14  you know, to protect myself because I have a job to

15  do.  Number two is to -- and this is what you're

16  alluding to here, is to protect others.

17           So his understanding is that if you get

18  vaccinated, that you are going to protect others if

19  you go in front of somebody who has elderly or like

20  my mother, who has all these four cancers; that by

21  doing it, you're going to protect them; however --

22  and I testified to this -- that this is different

23  from the other vaccines.

24           It is message RNA, and how it works is you

25  inject yourself with the instruction sheet to make



Page 190

1   the spike protein, and as a result of that, you are

2   actually shedding spike protein.  I testified to

3   this, and I also wrote to the frontline doctors and I

4   said, "Okay.  If people that are vaccinated and are

5   shedding, how long do they shed?"  And you guys have

6   this from me.  They got back to me, and they go, "The

7   studies have been about six months, and even at the

8   end of six months, they're still shedding."  So we

9   don't know how long it will be until after they're

10  done shedding.

11          Then one of the physicians came up after I

12  testified to this, and he said -- he said, "Yeah,

13  they're shedding, but not as much.  People that are

14  vaccinated will shed, but not as much as somebody

15  that has Covid."  That's what his response was.  So

16  it's like, well, if I have Covid, I'm not like

17  Typhoid Mary, right.  I'm going to haul that into

18  everybody, but somebody who is vaccinated is actually

19  shedding on the very people that are -- that their

20  immune systems are certainly compromised.  So it's a

21  total --

22          So I can see why the bishop appropriate what

23  he did.  Morality is his wheelhouse; the science of

24  the vaccine is mine, and Takeda's -- and for Takeda

25  to try and twist his words and understanding and hide



Page 191

1    under this, is not acceptable.

2        Q    All right.  So let's talk about the fetal

3    cell piece.  Here's what the third paragraph says:

4    "Some people may have concerns about whether the

5    Covid 19 vaccines are ethically acceptable.  Some

6    vaccines are developed, produced, or tested using

7    fetal cell lines that were originally obtained from

8    aborted fetal tissue.  The original act of obtaining

9    tissue from an aborted child for research was morally

10   wrong.  Nevertheless, we agree with ethicists and the

11   United States Conference of Catholic Bishops that the

12   Pfizer and Moderna Covid 19 vaccinations are

13   ethically acceptable because any connection with the

14   use of abortion-derived cells is sufficiently remote.

15   Neither Pfizer nor Moderna used morally-compromised

16   cell lines in the production of the vaccine, and the

17   vaccines do not contain fetal cells.  A Catholic can

18   in good conscience receive either of these vaccines";

19   do you see that?

20       A    Yes, I see that, and however, they advised

21   against the J&J one, okay.  Again, so where everybody

22   is confused is that under emergency-use

23   authorization, they do not have to give you a package

24   insert.  They do not have to tell you what's in it.

25   Kagan knows this because I submitted an e-mail



Page 192

1    conversation back and forth with HR.  I said, "I want

2    to know what's in this," and they would not tell me.

3    So Takeda knows that they don't have to tell anybody.

4        Q    What do you think's in there that you don't

5    know about?

6             It could be anything, and you know what the

7    latest -- you know what the latest is, and this is in

8    the news right now, there is a judge in Michigan

9    that's looking at this.  It's called SV40.  It's

10   some, like, simian monkey thing that actually causes

11   cancer.  Dr. Peter McCullough and Dr. Robert Malone,

12   who's actually -- Dr. Robert Malone is the inventor

13   of the MRNA vaccine.  They are going -- they think --

14   and I think they're wrong, but they think now that

15   that's the silver bullet to break the liability field

16   of the PREP Act.

17       Q    Have you ever objected to taking anything

18   else that you believed contained fetal cells or was

19   used with fetal cells?

20       A    Well, here's the thing.  This is the first

21   time that I ever known of fetal cell line in

22   something.  It's never even -- and like I said, I

23   come from a community that's very pro-life active,

24   and we've never heard of it before.  This is the

25   first time.



Page 193

```
 1      Q     You never researched it before, right?

 2      A     I never researched it before --

 3            THE REPORTER:  Excuse me.  When you sit

 4   back, I can't hear you.

 5      A     Oh, okay.  I've never researched it before,

 6   but the antenna -- the antenna weren't up, either.

 7   This is the first I ever heard of this occurring

 8   and --

 9      Q     Did Takeda or Pfizer or Wyeth or any of the

10   other pharmaceutical companies that you worked for

11   use fetal cells in testing any of the drugs that you

12   sold?

13      A     If they did, I was not aware of it.  It is

14   not in the package insert, and I'm telling you,

15   package inserts in our industry, you know that back

16   and forth, upside down all of that.  You will see,

17   like, hamster -- hamster cell or something like that,

18   but they conveniently do not put in fetal cell line,

19   and to be honest with you, I'm still in the -- I

20   thought, well, maybe it's in the patent.  I started

21   pulling the patents, and I can't find it in the

22   patents, either.

23            So I don't know where this is because,

24   apparently, Takeda told one of my -- one of my -- I

25   don't know what you call -- co-plaintiffs or whatever
```



1    Physicians, and they have protocols that I direct

2    people to go print and bring to their doctor, and in

3    the state of North Dakota, I was the only one to

4    testify to make sure that if doctors and pharmacists

5    wrote and dispensed it, that they would not lose

6    their license.

7        Q    Ma'am, have you taken that?

8        A    Yes.

9        Q    What did you take it for?

10       A    For the symptom -- I don't know if I had

11   Covid, but it was certainly symptoms, and the key is

12   ideally that you take it as early as possible, so I

13   got a prescription of it from Nick Peterson, and I

14   kept it on hand.  So just in case I started feeling

15   symptoms, that I would take it right away and head it

16   off at the pass before it got too out of hand.

17       Q    So when did you actually take it?

18       A    I don't remember.  Because I got it a

19   prescription -- when would I have gotten it from him?

20   Probably in November of 2021.  Probably in that

21   winter of 2022 or February, somewhere along that

22   line, and I always keep it on hand in case, you know,

23   we start coming down with symptoms.  So yeah, Covid's

24   something to be taken seriously.

25       Q    Do you know that Ivermectin was developed



Page 197

1   using the same fetal cell lines as Covid 19

2   vaccinations?

3          MR. DeMATTEO:  Objection form.

4   BY MR. RANJO:

5      Q    HEK293 is the fetal cell one.

6      A    HEK293 is the big one that everybody that

7   I'm find out.  I did not know that, and I would like

8   to see -- here's where I don't understand.  Where do

9   you find this information?

10     Q    I mean, I Googled it.

11     A    No.  I'm seriously.  You guys are lawyers

12  right.

13     Q    I'm not a scientist.

14     A    Well, okay.

15         MR. DeMATTEO:  I'm definitely not a

16  scientist.

17     A    Yeah, you guys aren't scientists, but you

18  guys know how to read a patent.

19  BY MR. RANJO:

20     Q    I don't.

21     A    A pull-up -- okay.  Then you know what, if

22  you guys aren't, then have Takeda produce the

23  document.  I want Takeda to produce the document

24  because they're shooting out to my co-parts that they

25  used it in cold medicine, and all that, and I'm like,



Page 198

1  we want to know.  Like I said, we've got a community

2  here that sure as heck would like to know, and my

3  bishop did take the J&J -- and how the J&J came out,

4  I have no clue, but our bishop takes it seriously,

5  and I honestly, it would help me out because I don't

6  want that damn thing.  I don't want HEK239.  I don't,

7  and I will look for an alternative, and you know

8  what, there is an alternative.  I even looked at

9  that.  You know what it is?  It's called black cumin

10  seed, and actually, when you go to the frontline

11  critical care physicians website, they say if you

12  can't get Ivermectin, then use black cumin seed.

13        So I'm starting to find that there are a lot

14  of other alternatives other than -- you know what it

15  almost feel like a little to me?  It almost feels a

16  little bit disingenuous that you take the damn thing,

17  and then they go and kind of laugh in your face going

18  go, Oh, ha, ha, by the way, we put HEK 239 in there.

19  It's like taking somebody who's Hindu, and then they

20  take a medicine, and then they, oh, by the way, we

21  put some cow cells in there.

22    Q    How many times did you take Ivermectin?

23    A    Twice.

24    Q    And did you ever look to see whether it

25  contained fetal cells?



Page 199

1      A      Yeah.

2      Q      Where did you look?

3      A      I went and looked on everything that I take

4  now to see if that is, and I cannot find it.  So

5  produce it.

6      Q      What did you do a search for that

7  information as it relates to Ivermectin?

8      A      I searched a website called, Scribed.

9             THE REPORTER:  Called what?

10            THE WITNESS:  Scribd, S-C-R, I as in boy, D.

11     A      And that's a website that actually has

12  documents that get pulled from the Internet.  So I go

13  to that site when other things get pulled.

14            So I looked under patent -- I tried to bring

15  up the patent on it.  I just would do a general

16  search on Ivermectin and fetal cell line.  I cannot

17  find it.  I would love for you guys to give me the

18  documents on where this is and how to do it.  I am

19  willing to learn, and I'm going to take that

20  information to my parish because we want to know.

21  BY MR. RANJO:

22     Q      Okay.  I just put in the chat a document

23  that's been marked as Exhibit 9.  It is a 13-page

24  document.  It is an article from the Journal of

25  General Physiology.  It is on Ivermectin --



Page 216

1  variances"; do you see that?

2      A    Yes.

3      Q    Do you remember reading that when you got

4  this policy?

5      A    They did a lot of stuff to try and convince

6  us.

7      Q    Did you agree at the time you received --

8      A    No.

9      Q    -- this?  We're done with that one.  Ma'am,

10  I just put in the chat what's been marked Exhibit 16.

11  It is a five-page document.  It's actually several

12  documents.  The Bates range is Takeda 20351 to Takeda

13  20355.  Are these the documents that you submitted to

14  Takeda in connection with your religious

15  accommodation request?

16      A    Probably, but I'll take a look at it here.

17  Okay.  So I'm just going to note here, too, it's

18  dated 9-30-21 that I am filing for both medical and

19  religious exemptions, so it's not --

20      Q    We'll look at the medical one later.  This

21  is just -- this is the packet you submitted for a

22  religious, right?

23      A    I just want Chris to know that, yes, I filed

24  this simultaneously.  It wasn't like I tried medical

25  first.  Oh, that didn't work, and you know, went



Page 217

```
 1  religious.  This was at the same time.

 2      Q    Well, this isn't commentary to talk to your

 3  lawyer.  This is me asking you questions and you

 4  providing answers so we can get moving here.

 5      A    Yes.  Okay.

 6      Q    So there's a form that's at Takeda 20353;

 7  you see it?

 8      A    353, Okay.

 9      Q    And then there's a letter that you drafted,

10  which is Takeda 20351 to 352, right?

11      A    352, okay, yeah.

12      Q    And there's the bishop letter, Takeda 020354

13  to 355, right?

14      A    Yes.

15      Q    That's the letter we talked about before?

16      A    Yes.

17      Q    Let's talk about the bishop letter first.

18  This is the letter you're saying you got back in

19  response to your letter to Bishop Kagan?

20      A    Correct.

21      Q    Okay.  When did you get the letter back; do

22  you recall?

23      A    No, but I guess I would use -- is the minute

24  I got it, I submitted it to Takeda.  So maybe I used

25  Takeda as a guideline, you know, as far as when they
```



MAGNA
LEGAL SERVICES

Page 221

1  and Moderna because there is nothing out there that's

2  saying that there's fetal cell lines in there, but

3  again, most people don't realize the PREP Act is

4  protecting that.

5        "They may still waive ethical considerations

6  and in good conscience choose to receive or choose

7  not to receive the vaccine.  In doing so, however,

8  they are making the choice on the grounds of their

9  own prudent judgments based on informed and certain

10  conscience" -- okay.  So that's not the part I wanted

11  to --

12        Okay.  Here's where he says, "Two moral

13  considerations.  Number one, protect one's self, and

14  number two, to pursue the common good."  So my

15  conscience, number one, protect myself, right,

16  because my sister -- my family's dropping over like

17  flies; number two, to pursue the common good.  I

18  don't want to be a shedder.  I don't want to go and

19  shed all over everybody.  He does not know that.

20    Q    Right.  That's --

21    A    That's not his wheelhouse.  Most doctors

22  don't even know that.

23    Q    The question is, is a catholic morally

24  obligated to receive the Covid 19 vaccination?

25  That's not what was happening.  You were saying --



Page 222

1    you were prohibited from your religion to get

2    vaccinated, and there's nothing in here that says

3    that.  It actually says the opposite.  It says it's

4    morally acceptable always a Catholic.  The question

5    you're referring to is about whether you're morally

6    obligated to get the vaccine.  And maybe you think

7    you weren't morally obligated to, but Takeda asked

8    you to do it?

9        A    Yeah, and Takeda -- so again, Takeda's

10   definition of what a vaccine is and what it does is

11   different than the bishop.  The bishop thinks that,

12   Hey, there's no fetal cell lines in the Moderna and

13   Pfizer, and we think -- and just like the first one

14   you showed me, right, Well, if you go take this,

15   you'll be protecting other people.  Takeda knows that

16   is not the case, and I can prove it by how I was

17   treated and the e-mails that were submitted back and

18   forth.

19            So if you were to go back to my bishop and

20   point blank throw him on the stand and ask him, "Do

21   you think Susan Welch should take the Covid vaccine?"

22   And by the way, the two moral considerations that you

23   have here to protect one's self and to pursue the

24   common good, I don't think he would.  I think you

25   guys from putting words into his mouth.



Page 225

```
 1      A    In the past two years -- well, let's

 2  see -- I have to mark when -- so I haven't taken

 3  anything over the counter since Jillyn told me about

 4  the cold medicine stuff that would be -- so I have

 5  not taken any cold or flu medicine, none of that.  I

 6  am taking naturopathic ones.

 7      Q    What about indigestion medication?

 8      A    Nope.  In fact, Manuka honey and lemon are

 9  the best for indigestion.  Better than even the stuff

10  I sold.  You know, if I had a chance to do it all

11  over again, I'd be a naturopathic doctor.  I wish I

12  would have known about this.  Now I'm 57 years old,

13  and I'm trying to pick up the pieces.  If I would

14  have known about all this, that's what I would have

15  done 30 years ago.  Now I'm too old.  It's a hell of

16  a time, 57 years later, for you guys to be telling me

17  this stuff, and again, we got a community that wants

18  to know it.

19      Q    Ma'am, I just put another document in the

20  chat.  It's a four-page document Bates labeled Takeda

21  020342 to 020 --

22      A    November 17th, correct?

23      Q    Yes.  To Takeda 020345.  Have you ever seen

24  this document before?

25      A    I'm just coming up.  I must have.  Okay.
```



Page 226

1    So -- so this is my -- must be my discussion with --

2    "not being recorded and no consent to being

3    recorded."

4             THE REPORTER:  Sorry.  Ma'am, I can't -- I

5    can't --

6        A    So this looks like a document from Irving

7    Forestier who was the HR person who interviewed us

8    about our religious beliefs.

9    BY MR. RANJO:

10       Q    So after you submitted those three documents

11   we just looked at, you had an interview with Irving,

12   right?

13       A    Um-hum.

14       Q    I'm sorry?

15       A    Yes.

16       Q    Thank you.  Was that interview on October

17   5th, 2021, the date at the top of this form?

18       A    Likely.  It was a while ago, but likely.

19       Q    I'll represent to you that these are

20   Irving's notes from that meeting with him.  How long

21   was that meeting, before you start reading?

22       A    I don't know.  Half hour to an hour.

23   Probably no longer than an hour.

24       Q    Was it via Zoom?

25       A    Yes.



Page 227

```
 1      Q     Just you and him?

 2      A     Correct.

 3      Q     Please take a look at this, and let me know

 4 if there's anything in there you disagree with in

 5 terms of his notetaking.

 6      A     Okay.

 7            (Pause.)

 8      A     Can I make one clarification?  This is the

 9 top of Page 2, right under where it says, "Takeda,"

10 and this is true.  St. Ann's Catholic Church in

11 Bismarck is my parish.  Even though I live in Mandan,

12 technically, I'm supposed to go to St. Joe's in

13 Mandan, but because my -- I went back to St. Ann's in

14 Bismarck because the Mandan, once my kids hit

15 middle-school age, Mandan didn't support the Catholic

16 high school.

17            So that's why my husband and I switched over

18 to the St. Ann's parish because we wanted to continue

19 our kids in the Catholic school.  So I just want to

20 clarify that because it kind of looks like that I,

21 you know, was -- it may be misconstrued that I was

22 not happy with the Mandan St. Joe's, and that wasn't

23 it.  It was strictly because I wanted my kids to

24 continue in the Catholic health system, and they

25 couldn't do it in Mandan.  Sixth grade was the --
```



Page 230

1    issue.  I'm not asking about it.

2        A    Understood.  Understood.  Okay.  I got it.

3    Hello?

4        Q    I'm here.  I'm here.  I'm not going

5    anywhere.

6        A    Yeah.  Hang on one second.  Did you send me

7    another document?

8        Q    We just looked at 19.  I'm about to put 20

9    in there.

10       A    So something's kind of weird.  I've got to

11   move my screen.  Okay.

12       Q    So I've put in the box a document that's

13   been marked as Exhibit 20.  It's actually a series of

14   documents with a Bates range of Takeda 20333 to

15   Takeda 20347.  Is this the medical --

16       A    I'm not bringing this up.  Sorry.  Hang on a

17   second.

18       Q    No problem.  My only question is if this is

19   your medical accommodation request that you submitted

20   to Takeda; that's my only question?

21       A    Yes.

22       Q    Okay.  You got it up and you looked at it?

23       A    I mean, I'm not reading it thoroughly, but

24   yes that --

25       Q    Okay.  Perfect.  Thank you.



Page 231

 1    A    Oh, there's 11 pages here.  Okay.

 2    Q    Yeah.  You attached a bunch of documents.

 3  You attached two medical notes, I think, from

 4  doctors?

 5    A    Yeah.

 6    Q    One of them talked about because of your

 7  sister, I think, doc said that that was the basis for

 8  the request?

 9    A    Correct.

10    Q    I'm going to throw another document in.

11    A    Is this going to be 21?

12    Q    Yes, ma'am.  This is a three-page document

13  Bates label Takeda 20358 to Takeda 20360.  I just

14  want to confirm that the October 25th e-mail is one

15  from you to Irving.

16    A    Yes.

17    Q    Okay.  I'm going to give you another

18  document.

19    A    I think I may have submitted these documents

20  on my end, as well, just so you know.

21    Q    Yeah, that may be right.  I just put in the

22  chat a document marked as Exhibit 22.  This is a

23  two-page document Bates labeled Takeda 20361 to

24  Takeda 20362.  This is Irving's e-mail to you denying

25  your medical accommodation, and then your response.



Page 232

1    Please let me know if that's accurate.

2        A    Yes.

3        Q    Great.  Thank you.  All right.  I'm going to

4    take a look at Exhibit 23.  This is an 82-page

5    document.

6        A    It hasn't come down yet.

7        Q    I'm just going to read the Bates range.

8    It's --

9        A    Here it is.  Hold on a second.  I'm going to

10   save that.  Okay.  So what page are you thinking of

11   here?

12       Q    The range is Welch 1067 to Bates label Welch

13   1148.  I want to go to Welch 1069.

14       A    Okay.

15       Q    1069?

16       A    Yes.

17       Q    Okay.  Are you there?

18       A    Yes, I am.

19       Q    Okay.  Thanks.  This is your shot record?

20       A    Yes, and I also submitted one from the

21   State.

22       Q    We'll get to that in a second.  It shows 16

23   flu vaccinations and two zoster vaccinations,

24   right?

25       A    Yes.



Page 233

1    Q    What's a zoster vaccination?

2    A    That would be for shingles.

3    Q    I'm sorry.  What was that?

4    A    Shingles.

5    Q    Shingles?

6    A    Yeah.

7    Q    Did you research whether the flu vaccination

8    or the zoster vaccination used fetal cells in their

9    development?

10    A    No.  Again, I was not aware of any of that

11    sort of thing, not even aware that that's a

12    possibility until the J&J information came out, and

13    it's pretty typical I would -- again, we have an

14    active pro-life community, and we were going after

15    the Susan B. Komen Foundation for sending money over

16    to Planned Parenthood.

17          So we're active.  We want to know this.  You

18    know, you buy a candy bar, and it will tell you if

19    it's made in a facility that manufactures with nuts,

20    but you -- it's not -- it's not -- it's very hard to

21    find this information, and I go back to you to go we

22    want to know how to find it because I looked at

23    patents.  I can't find it.

24          While we were on break, I looked at the

25    study that you provided.  So I did that with a Google



Page 234

```
 1   search.  I cannot find it.  So I think that our
 2   community would like to know how you find this.
 3       Q    You also had a tetanus shot.  Did you look
 4   to see whether a tetanus shot had any sort of fetal
 5   cells in it?
 6       A    I did.  I looked in the package insert.  All
 7   it lists is hamster.
 8       Q    Did you look anywhere but the package
 9   insert?
10       A    No.  It didn't even occur to me, so here's
11   the thing.  The reason why I questioned Moderna and
12   Pfizer Covid vaccine is because they were not
13   providing a package insert.  They were providing a
14   fact sheet.  Well, a fact sheet is not a package
15   insert.  A package insert is, you're liable.  If
16   you're not producing this, and it's in there, you're
17   liable, but under emergency-use authorization, they
18   didn't have to tell you what's in it, and there is
19   that folly between Irving and I on what is in this.
20           You know, my family's dropping over.  What's
21   in this?  And he goes, "Oh, go to the CDC," and I go,
22   you know what, the CDC is not a package insert.
23       Q    Ivermectin was developed with fetal cells,
24   right?
25       A    Well, from the document that you showed me,
```



Page 236

1  you know what, I'm going to do honestly when we're

2  done?  We're going to go -- I'm going to go with my

3  medical mandates group, and we're going to go

4  legislate that you guys have to use that in the

5  package insert if you want to do business here in

6  North Dakota because we don't know that.

7          That is cruel.  That's again, like taking --

8  like, taking a Hindu person and saying, "Well, we

9  used a bunch of cow cells in here, and ha, ha, ha."

10  It's very disingenuous.

11     Q    Ma'am, I've just sent you a document that's

12  been marked as Exhibit 24.  It's a three-page

13  document Bates labeled Welch 1153 to 1155.  Is this

14  the state vaccination document you just mentioned a

15  minute ago?

16     A    Yes, it is.

17     Q    You remember what that big exhibit was

18  numbered?  You have it up?  I don't have it up, your

19  medical records?  I got it.  It's 23.

20     A    You want me to go back to 23?

21     Q    Yes, please.

22     A    Okay.  It's bigger than that, by the way.

23     Q    Not looking at that.  The second page -- I'm

24  looking at the second page, 1068.  I'm just looking

25  at these lists of medications.  I see the Ivermectin.



Page 237

1    What's clob --

2        A    Clobetasol?  That is -- It's a foam.  It's a

3    steroid -- it's a foam steroid.

4        Q    Did you research to determine whether or not

5    fetal cells were involved in the development of this?

6        A    No, because this is filled -- again, I was

7    not aware, you know, the best way -- so you got a

8    date on that.  You got a date on when that was

9    filled.  The best way to check is I think in Signal

10   because it's been driving me crazy.  It's, like, it

11   is not here.  It's not in the package insert, and

12   then I say in Signal somewhere that, Hey, I'm hearing

13   it's not in the package insert as I'm right, as I'm

14   correct, that it may be in the patents.

15            So -- but then you can see that I haven't

16   even filled this in over a year.  I mean, I'm

17   terrified to take anything right now from -- I'm just

18   terrified to take anything right now.

19       Q    What is the one under Ivermectin?

20       A    Losartan.  That's a blood pressure medicine.

21            THE REPORTER:  What is it?

22            THE WITNESS:  Oh, it's a blood pressure

23   medicine, and I don't take it anymore.

24   BY MR. RANJO:

25       Q    Did you look up to see whether or not there



Page 238

```
 1   were fetal cells used in the development of that

 2   medication?

 3        A     I did not, but again -- but so that

 4   was -- let's see -- what is the date on this?  You

 5   know what you can do?  Is you can --

 6        Q     The date is August 29th, 2022?

 7        A     Okay.  So you know, so you can -- you can

 8   actually go to the pharmacy, and so anyways, I know I

 9   filled that.  I haven't taken -- I haven't taken any

10   of these in about, I think whenever it was that I

11   said it was in the pack.  I would say five months,

12   I'm guessing.

13        Q     What's phentermine?

14        A     That's for weight.

15        Q     Did you do any research on that?

16        A     No.

17        Q     What's pre --

18        A     I wouldn't have been doing research at this

19   time, and the reason is, when I heard -- was told to

20   Jillyn about the cold medicine, I thought it was the

21   biggest crock I had ever heard.  I was -- it is not

22   there.  They're just trying to -- they're just trying

23   to rattle you, and it isn't there.  It's not in the

24   package insert, and it should be.

25             My God, your Hershey bar will tell you if
```



Page 239

1   it's made in a facility with nuts, and like I said,

2   I'm going to start working with our legislators to

3   make sure that you guys are forward with this.  If

4   you're going to use it against me, then you damn well

5   better be open about where it's at so I don't have to

6   sit there and do research on every flipping thing

7   that you guys -- that the medical -- that the

8   prescriptions are.  I mean, you know.

9        Q    I'm going to switch gears away from this

10   topic.  This is kind of the home stretch, okay?

11        A    Okay.

12        Q    We're going to talk about your alleged

13   damages in this case, what you're seeking, and let

14   me -- some housekeeping items I need to do, too.  I

15   need to confirm that -- Exhibit 25, which I've passed

16   through the chat function is a copy of your initial

17   interrogatory responses in this case, and you can

18   confirm that, and let me know whether that is your

19   signature appearing on the 19th and last page.

20        A    I don't see a signature on the 19th -- wait.

21        Q    I'm sorry.  19th page of the PDF, has your

22   name at the top.

23        A    Okay.  Yes, that is my signature.  It looks

24   like I wrote it with my foot, but . . .

25        Q    My handwriting is no better than that for





Page 262

1      Q    And on that time, were you visiting -- were

2   you making in-person visits to health-care providers?

3      A    Oh, absolutely.  Absolutely.

4      Q    I think we -- you testified much earlier,

5   probably early in the morning, that you would

6   schedule visits in advance before you made them?

7      A    Right, right.  Because why sit there and

8   drive, you know, 200 miles and not see anybody.  In

9   fact, the manager would kill you if you do that.  If

10  you had a manager riding with you, and you didn't

11  have an appointment, and you drove 200 miles with him

12  in the car, he would not be happy.  He or she would

13  not be happy.

14     Q    Things are much farther away from North

15  Dakota than, let's say, Connecticut or New Jersey.

16     A    Right.

17     Q    So appreciate that.  So with that in mind,

18  while you were scheduling visits, did you and -- did

19  you and providers have to discuss any Covid 19

20  protocol such as mask wearing or --

21     A    Right.  So it would always be that I would

22  go -- I wouldn't say always, but frequently, I would

23  go in, and they would take my temperature and make

24  sure I was wearing a mask before I would go into the

25  facility.  That was very common.  Still might be.



Page 263

```
 1       Q    Were there any providers in your client roll
 2   that required the Covid 19 vaccination in order to
 3   visit?
 4       A    No.
 5       Q    So it was -- is it fair to conclude that
 6   your status of not being vaccinated against Covid 19
 7   did not prohibit you -- or did not specifically
 8   prohibit you from making any in-person visits?
 9       A    Correct.  I was making in-person visits all
10   the way to the last day, and I worked hard the last
11   day because I just wanted to make sure that everybody
12   had the supplies that they needed because it would
13   probably take a little while for them to, you know,
14   put somebody in to replace me.
15       Q    That's all I had, so thanks for your time.
16   There might be some redirect.
17            MR. RANJO:  I have no other questions.
18            THE REPORTER:  Would you like to ask about
19   reading and signing?
20            MR. DeMATTEO:  We'll waive that.
21            THE REPORTER:  And Jason, are you ordering
22   this?
23            MR. RANJO:  Yes, ma'am.
24            THE REPORTER:  And Chris, would you like a
25   copy?
```



Page 264

1          MR. DeMATTEO:  Just the regular PDF.

2          THE VIDEOGRAPHER:  Off the record, 4:36.

3          (The remote video deposition of SUSAN WELCH

4           concluded at 4:36 p.m., October 27, 2023.)

5                    *    *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 265

1   STATE OF WYOMING  )

2                     )ss.  REPORTER'S CERTIFICATE

3   COUNTY OF LARAMIE )

4        I, Rosemary Novario, do hereby certify that I am

5   a Registered Merit Reporter and Notary Public within

6   the State of Wyoming; that previous to the

7   commencement of the examination, the deponent was

8   duly sworn to testify to the truth.

9        I further certify that this deposition was taken

10  in shorthand by me at the time and place herein set

11  forth, that it was thereafter reduced to typewritten

12  form, and that the foregoing constitutes a true and

13  correct transcript.

14       I further certify that I am not related to,

15  employed by, nor of counsel for any of the parties or

16  attorneys herein, nor otherwise interested in the

17  result of the within action.

18       In witness whereof, I have affixed my signature

19  this _____ day of _____ , 2023.

20       My commission expires July 17, 2029.

21

22

23  _____
                                      _Rosemary Novario_
    Rosemary Novario, RMR, RPR

24

25



**EXHIBIT**

**9**

# Mechanism of Ivermectin Facilitation of Human P2X$_4$ Receptor Channels

Avi Priel and Shai D. Silberberg

Department of Life Sciences and The Zlotowski Center for Neuroscience, Ben-Gurion University of the Negev, Beer-Sheva 84105, Israel

abstract    Ivermectin (IVM), a widely used antiparasitic agent in human and veterinary medicine, was recently shown to augment macroscopic currents through rat P2X$_4$ receptor channels (Khakh, B.S., W.R. Proctor, T.V. Dunwiddie, C. Labarca, and H.A. Lester. 1999. *J. Neurosci.* 19:7289–7299.). In the present study, the effects of IVM on the human P2X$_4$ (hP2X$_4$) receptor channel stably transfected in HEK293 cells were investigated by recording membrane currents using the patch clamp technique. In whole-cell recordings, IVM ($\leq$10 μM) applied from outside the cell (but not from inside) increased the maximum current activated by ATP, and slowed the rate of current deactivation. These two phenomena likely result from the binding of IVM to separate sites. A higher affinity site (EC$_{50}$ 0.25 μM) increased the maximal current activated by saturating concentrations of ATP without significantly changing the rate of current deactivation or the EC$_{50}$ and Hill slope of the ATP concentration-response relationship. A lower affinity site (EC$_{50}$ 2 μM) slowed the rate of current deactivation, and increased the apparent affinity for ATP. In cell-attached patch recordings, P2X$_4$ receptor channels exhibited complex kinetics, with multiple components in both the open and shut distributions. IVM (0.3 μM) increased the number of openings per burst, without significantly changing the mean open or mean shut time within a burst. At higher concentrations (1.5 μM) of IVM, two additional open time components of long duration were observed that gave rise to long-lasting bursts of channel activity. Together, the results suggest that the binding of IVM to the higher affinity site increases current amplitude by reducing channel desensitization, whereas the binding of IVM to the lower affinity site slows the deactivation of the current predominantly by stabilizing the open conformation of the channel.

key words:    ion channel gating • allosteric regulation • purinergic receptors • ATP • patch clamp techniques

## introduction

Ivermectin (IVM), a semisynthetic derivative of the natural fermentation products of *Streptomyces avermitilis* (Fig. 1 A), is widely used in human and veterinary medicine as an antiparasitic agent (Burkhart, 2000). In humans, more than 18 million people receive IVM annually, predominantly to treat onchoceriasis (river blindness). Experiments on model organisms strongly suggest that at therapeutic levels, IVM activates glutamate-gated chloride channels in the nerves and muscles of the parasite, leading to membrane hyperpolarization and muscle paralysis (Dent et al., 1997, 2000). Thus, the major mode of action of IVM is most likely the disruption of ingestive activity of the parasite, resulting in starvation. An IVM-sensitive glutamate-gated chloride channel was first cloned from *Caenorhabditis elegans* using expression cloning (Cully et al., 1994). Two cDNA clones (GluCl α and GluCl β) were isolated that form functional homomeric and heteromeric channels. Interestingly, the binding site for IVM was on the α subunit while the binding site for

glutamate was on the β subunit. In channels containing both subunits, IVM directly activated the channels at high concentrations and at low concentrations potentiated the response to glutamate. Thus, IVM is both an agonist and an allosteric modulator of glutamate gated chloride channels. Subsequently, a glutamate-gated chloride channel subunit was cloned that forms homomeric glutamate and IVM-sensitive channels (Dent et al., 1997; Vassilatis et al., 1997). The three *C. elegans* genes encoding the glutamate-gated chloride channel subunits collectively account for the sensitivity of the nematode to IVM (for review see Burkhart, 2000; Dent et al., 2000; Köhler, 2001).

Several other ligand-gated ion channels are activated and/or modulated by IVM. These include a crayfish multiagonist–gated chloride-selective channel (Zufall et al., 1989); GABA$_A$ receptors from nematode (Feng et al., 2002), chick (Sigel and Baur, 1987), mouse (Krusek and Zemková, 1994), rat (Adelsberger et al., 2000), and human (Dawson et al., 2000); α7 nicotinic receptors from chick and human (Krause et al., 1998), human glycine receptor (Shan et al., 2001), the histamine receptor from fly (Zheng et al., 2002), and the P2X$_4$ receptor channel from rat (Khakh et al., 1999; Bowler et

Address correspondence to Shai Silberberg, Department of Life Sciences Ben-Gurion, University of the Negev, P.O. Box 653, Beer-Sheva 84105, Israel. Fax: (972) 8-6461-710; email: Silber@bgumail.bgu.ac.il

*Abbreviation used in this paper:* IVM, ivermectin.

The Journal of General Physiology

al., 2003). This seeming nonspecific nature of IVM action on ligand-gated channels is misleading since several instances of specificity exist. For example, P2X$_2$, P2X$_3$, and P2X$_7$ receptor channels, which are homologous to the P2X$_4$ receptor channel, are not modulated by IVM, indicating that specific structural requirements most likely exist for IVM action.

P2X receptors are cation-selective channels gated by extracellular ATP (North, 2002). Of the seven cloned subunits (P2X$_1$–P2X$_7$), all but P2X$_6$ can form functional homomeric cation-selective channels. As mentioned above, Khakh et al. (1999) investigated the effects of IVM on homomeric rat P2X$_2$, P2X$_3$, P2X$_4$, and P2X$_7$ receptor channels expressed in *Xenopus* oocytes using the double-electrode voltage-clamp technique and found only P2X$_4$ to be sensitive to IVM. IVM alone did not directly activate the P2X$_4$ receptor channels, but preincubating the oocytes with 0.1–10 μM IVM had dramatic effects on the current activated by ATP. IVM increased the maximal current activated by saturating ATP concentrations and slowed the rate of current deactivation after the washout of ATP. In addition, IVM increased the potency of ATP and of the weak agonist α,β-methylene-ATP. Together, these results indicate that IVM is an allosteric modulator of rat P2X$_4$ receptors, but do not reveal the mechanisms by which IVM modulates the channels.

To better understand the molecular effects of IVM on P2X$_4$ receptor channels, we examined the changes induced by IVM to whole-cell and single-channel currents of the human P2X$_4$ (hP2X$_4$) receptor channel expressed in HEK293 cells. We found that IVM likely binds to separate extracellular sites on the hP2X$_4$ receptor channel to modulate current amplitude and the rate of current deactivation. At low concentrations IVM predominantly augments the maximal current activated by ATP, while higher concentrations of IVM predominantly slow the rate of current deactivation and increase the potency of ATP. The single-channel data suggest that IVM increases current amplitude by reducing channel desensitization, while the slowing of current deactivation results primarily from the stabilization of an open conformation of the channel.

## MATERIALS AND METHODS

### Materials

Solutions for electrophysiology were made with highly purified water (NANOpure) using chemicals of analytical grade. ATP (potassium salt) and IVM were purchased from Sigma-Aldrich. Solutions containing ATP were prepared freshly each day and the pH of the solution was readjusted. IVM was dissolved in DMSO (Sigma-Aldrich); the stock solutions were kept at −20°C for 2 wk. The concentration of DMSO in the final solutions did not exceed 0.03%.

### Cell Culture

Human embryonic kidney cells (HEK293) stably transfected with human P2X$_4$ (provided by Dr. Soto and Dr. Stühmer) were grown in DMEM/F12 supplemented with 10% fetal calf serum, 100 units ml$^{-1}$ penicillin, 100 mg ml$^{-1}$ streptomycin, and 0.5 mg/ml geneticin (G-418) in a 37°C incubator with 95% air and 5% CO$_2$. When the cultures were 70–90% confluent, the cells were mechanically dispersed and plated on 9-mm coverslips in 35-mm culture dishes, and used for recording within 1–3 d. Cells were used up to passage 15. All cell-culture chemicals were purchased from GIBCO BRL.

### Whole-cell Current Recording

Membrane currents were recorded using the standard whole-cell configuration of the patch-clamp technique (Sakmann and Neher, 1995). Once the whole-cell configuration was established, the cell was continuously superfused with extracellular solutions via a computer-controlled rapid perfusion system (RSC-200; Biologic). Experiments were initiated at least 2 min after establishing the whole-cell configuration to allow equilibration of the cytosol with the pipette solution. Membrane currents were recorded under voltage-clamp using an Axopatch 200A patch-clamp amplifier (Axon Instruments, Inc.) and stored on VCR tape for subsequent analysis (VR-10B; Instrutech). Membrane currents were also digitized on-line using a Digidata 1200 interface board and pCLAMP 6.03 software (Axon Instruments, Inc.). The sampling frequency was set to at least two times the corner frequency of the low-pass filter. The standard extracellular solution contained (mM): 140 NaCl, 5.4 KCl, 0.5 MgCl$_2$, 2 CaCl$_2$, 10 HEPES, and 10 D-glucose, adjusted to pH 7.4 with NaOH, 315–320 mOsmol Kg$^{-1}$. The standard pipette solution contained (mM): 140 KCl, 2 MgCl$_2$, 2 TEA-Cl, 11 EGTA, 10 HEPES, adjusted to pH 7.2 with KOH, 330 mOsmol Kg$^{-1}$.

Whole-cell perforated-patch current recordings were performed as previously described (Horn and Marty, 1988; Silberberg and van Breemen, 1992). A 100-mg/ml stock of nystatin was prepared fresh every 2 h in DMSO, and diluted 1:1,000 with pipette solution containing (mM): 75 K$_2$SO$_4$, 55 KCl, 5 MgSO$_4$, and 10 HEPES, adjust to pH 7.2 with KOH, 310–315 mOsmol Kg$^{-1}$. The extracellular solution contained (mM): 160 NaCl, 2 CaCl$_2$, and 10 HEPES, adjust to pH 7.4 with NaOH, 330 mOsmol Kg$^{-1}$. Only cells that had a series resistance of <15 MΩ were analyzed.

### Single-channel Current Recording

Single-channel currents were recorded in either the outside-out patch configuration or the on-cell (cell-attached) configuration of the patch-clamp technique (Hamill et al., 1981). For the outside-out recordings, the dissociated cells were anchored to the bottom of the experimental chamber using glass coverslips coated with concanavalin A (Sigma-Aldrich), as described by Kim et al. (1993). The external solution contained (mM): 147 NaCl, 1 CaCl$_2$, 10 HEPES, and 11 D-glucose, adjust to pH 7.4 with NaOH, 320 mOsmol Kg$^{-1}$. Several different concentrations of Ca$^{2+}$ (between nominally Ca$^{2+}$ free and 2 mM) were tested in the outside-out and cell-attached configurations, as Ca$^{2+}$ has been shown to block P2X$_4$ receptor channels (Ding and Sacks, 1999). In nominally Ca$^{2+}$-free solution the outside-out patches were unstable and the cell-attached patches were very noisy in the presence of IVM; hence, 1 mM CaCl$_2$ was used. The pipette solution contained (mM): 140 NaF, 5 NaCl, 10 EGTA, and 10 HEPES, adjust to pH 7.0 with NaOH, 315–320 mOsmol Kg$^{-1}$. F$^-$ was used as the major anion in the pipette solution since it was very difficult to obtain an outside-out patch when only Cl$^-$ was used. In whole-cell

experiments, the effects of IVM were the same when either Cl⁻ or F⁻ were the major intracellular anion. Single-channel currents were low-pass filtered at 5 kHz, digitized at 50 kHz, and stored on both VCR and computer. Occasional large brief noise spikes were visually identified and removed from the current traces. For the on-cell recordings, the pipette solution (external solution) contained (mM): 154 NaCl, 1 CaCl$_2$, and 10 HEPES, adjust to pH 7.4 with NaOH, 320–325 mOsmol Kg⁻¹. The currents were filtered and digitized as described for the outside-out patch configuration.

*Data Analysis*

The durations of open and shut intervals were measured with half-amplitude threshold analysis, as described previously (McManus and Magleby, 1988, 1991). The methods used to log bin the intervals into 1-D dwell-time distributions, fit the distributions with sums of exponentials by maximum likelihood fitting techniques (intervals less than two dead times were excluded from the fitting), and determine the number of significant exponential components with the likelihood ratio test, have been described previously (Blatz and Magleby, 1986; McManus and Magleby, 1988, 1991). The 1-D dwell-time distributions are plotted with the Sigworth and Sine (1987) transformation, as the square root of the number of intervals per bin with a constant bin width on logarithmic time axis.

To estimate the association rate constant, dissociation rate constant, and the equilibrium dissociation constant for the effects of IVM, it was assumed that there is no cooperativity in the binding of IVM, that the receptors are homogenous, and that the effects of IVM can be described by a second order reaction of the type:

$$R + M \underset{k_{-1}}{\overset{k_{+1}}{\rightleftharpoons}} RM$$

where R is the receptor (channel), M is the modulator (IVM), and $k_{+1}$ and $k_{-1}$ are the association and dissociation rate constants, respectively. Accordingly, the equilibrium dissociation constant ($K_d$) is given by:

$$K_d = \frac{k_{-1}}{k_1}.$$

The relationship between the association and dissociation rate constants and the time course of the observed changes in the current after the addition of IVM ($\tau_{on}$) and after the washout of IVM ($\tau_{off}$) are given by:

$$\frac{1}{\tau_{on}} = k_1 \times [M] + k_{-1}$$

$$\frac{1}{\tau_{off}} = k_{-1}.$$

R E S U L T S

Fig. 1 B shows membrane currents recorded in the whole-cell configuration of the patch-clamp technique in response to 10 μM extracellular ATP at a holding potential of −50 mV. The cell was continuously perfused with the standard extracellular solution while ATP was applied for 3 s every 3 min (indicated by short bars above the downward current traces). As a result of either partial recovery from desensitization or of rundown, the response to the second application of ATP in the control period was smaller than the first. However, after the addition of 3 μM IVM to the extracellular so-



**A**

Component B$_{1a}$, R = C$_2$H$_5$
Component B$_{1b}$, R = CH$_3$

**B**

Control    IVM    Wash

1 nA
10 s

FIGURE 1. IVM reversibly augments the response of hP2X$_4$ to ATP. (A) The structure of IVM (taken from Merck Index). (B) Whole-cell current traces in response to ATP (10 μM) applied for 3 s every 3 min (short bars) before, during, and after the application of IVM (3 μM), as indicated above the current traces. Holding potential −50 mV.

lution, the current in response to ATP increased while the current in the absence of ATP (holding current) was unchanged. After the removal of the IVM the ATP-induced currents returned to the control level. These effects of IVM are consistent with previous work on the rat P2X$_4$ receptor channel studied in *Xenopus* oocytes (Khakh et al., 1999; unpublished data).

*IVM Does Not Modulate hP2X$_4$ Channels from within the Cell*

The gradual onset and washout of the effects of IVM, as well as its lipophilic nature, suggest that IVM might need to penetrate the cell in order to modulate the channel. If this is the case, then IVM should be effective if directly introduced into the cell via the patch pipette. In such experiments, the first response to 10 μM ATP was measured 20 s after establishing the whole-cell configuration and thereafter at 3-min intervals. The response to the first application of ATP was taken to represent the control response to ATP. Intracellular IVM (3 μM) had no detectable effect on the amplitude or on the rate of deactivation of the current activated by ATP within 6 min. In contrast, 5 min after the addition of 3 μM IVM to the extracellular solution, the maximal current increased in the same cell 6.7-fold. A similar lack of effect of intracellular IVM and a significant ef-





FIGURE 2. IVM does not modulate hP2X$_4$ receptor channels from within the cell. (A) Whole-cell current traces in response to ATP (3 µM) applied for 3 s every 3 min (short bars) before and after the addition of IVM (3 µM) to the extracellular solution, as indicated above the current traces. The first application of ATP was 20 s after establishing the whole-cell configuration. The standard pipette solution also contained IVM (3 µM). Holding potential of −50 mV. (B) Average (±SEM) amplitude of the whole-cell current activated by extracellular ATP (3 µM) 6 min after the addition of 3 µM IVM to the extracellular solution (IVM$_{out}$), 6 min after exposure to intracellular 3 µM IVM (IVM$_{in}$), or 5 min after the addition of 3 µM extracellular IVM to the cells exposed to intracellular IVM for 6 min (IVM$_{in}$ + IVM$_{out}$). The amplitudes were normalized to the control response (dashed line). The bars represent between 5–14 cells. The statistical significance between IVM$_{out}$ and IVM$_{in}$ was determinate with the unpaired Student's $t$ test, where *** represent P < 0.001, and between IVM$_{in}$ + IVM$_{out}$ and IVM$_{in}$ with paired Student's $t$ test, where ** represent P < 0.01.

FIGURE 3. IVM has two distinct effects on hP2X$_4$ receptor channels. (A) Whole-cell current traces in response to ATP (3 µM) applied for 3 s every 2 min (short bars) before and during the application of IVM (3 µM), as indicated above the current traces. Holding potential of −60 mV. (B) Superposition of the current traces in A. (C) Whole-cell current traces in response to ATP (10 µM) applied for 3 s every 3 min (short bars) in the presence of IVM (3 µM) and after the washout IVM, as indicated above the current traces. The first exposure to ATP was after the cell was exposed to IVM (3 µM) for 6 min. IVM was washed out 50 s after the first application of ATP. Holding potential of −50 mV. (D) Superposition of the current traces in C.

fect of extracellular IVM was observed in five out of five experiments. On average, the enhancement in current amplitude induced by extracellular IVM in cells exposed to intracellular IVM was similar to the enhancement in current induced by extracellular IVM alone (Fig. 2 B). This indicates that intracellular IVM has no obvious effect on the hP2X$_4$ receptor channels. We conclude that IVM modulates the hP2X$_4$ receptor channels from outside the cell, though the possibility that IVM must partially embed in the membrane in order to modulate the channels cannot be excluded.

*IVM has Two Distinct Effects on hP2X$_4$ Channels*

To better resolve the onset of the effect of IVM, a lower concentration of ATP (3 µM) was applied. With this lower concentration of ATP the current largely recovered from desensitization within 2 min and thus the response to ATP could be probed at 2-min intervals. The current traces in response to ATP shown in Fig. 3 A are superimposed in Fig. 3 B. Similar to the effects of IVM on the P2X$_4$ receptor channel from rat (Khakh et al., 1999), IVM appeared to have at least two effects on the ATP-activated current: IVM increased the maximal current and slowed the rate of current deactivation after

the washout of ATP. The distinct effects of IVM on current amplitude and on the rate of deactivation were more clearly resolved after the washout of IVM, as demonstrated in Fig. 3, C and D. The first current trace in Fig. 3 C shows the response to 10 µM ATP applied for 3 s to a cell exposed to 3 µM IVM for 6 min. ATP was then applied at 3-min intervals with the next application occurring 130 s after washing out the IVM. Within the 2 min of the washout of IVM, the pronounced effect of IVM on the rate of deactivation was greatly reduced, whereas the increase in current amplitude induced by IVM was almost unchanged. This differential rate of recovery from the effects of IVM, most clearly seen when the ATP-activated currents are superimposed (Fig. 3 D), unambiguously demonstrates that IVM exhibits two distinct actions on P2X receptor channels.

Fig. 4 summarizes the time course of the effects of IVM on current amplitude and on the rate of current deactivation. Fig. 4 A shows the time course of the average normalized change in the amplitude of the ATP-activated current ($I_{max}$) after the wash-in of 3 µM IVM



A

B

FIGURE 4. The changes in $I_{max}$ and $t_{1/2}$ induced by IVM have distinct kinetics. Average (± SEM) normalized amplitude (A) and $t_{1/2}$ (B) of the whole-cell currents activated by extracellular ATP (3 μM) as a function of time after the addition of 3 μM IVM (left) and after the washout of IVM (right). The left and right graphs are the average of three and seven cells, respectively. The solid lines are exponential fits to the data.

(left) and after washout (right). Fitting single exponential functions to the data yielded time constants of 1.9 and 11.5 min, respectively (solid lines). As a first approximation, the apparent association rate constant, dissociation rate constant, and the equilibrium dissociation constant for the effect of IVM on current amplitude were estimated assuming a second order reaction to be $1.5 \times 10^5$ M$^{-1}$ min$^{-1}$, 0.087 min$^{-1}$, and $5.9 \times 10^{-7}$ M, respectively (see MATERIALS AND METHODS for details).

The time at which the current declined to half the maximal value ($t_{1/2}$) after the washout of ATP was taken as a measure of the rate of deactivation since the time course of current deactivation could not be fit by a single exponential. Fig. 4 B shows the average normalized change in $t_{1/2}$ induced by 3 μM IVM after wash-in (left) and after washout (right). As for $I_{max}$, single exponential functions fit the data, with time constants of 4.6 and 2.2 min, respectively. However, the rate of recovery during washout was faster than the rate of onset, indicating that the effect of IVM on current deactivation is not a simple second order reaction. In other words, more than one IVM molecule likely binds to the

receiver in order to induce a change in the rate of current deactivation (see DISCUSSION). The apparent deviation from second order reaction for the effects of IVM on $t_{1/2}$ as well as the difference in the rates of onset and recovery of the effect of IVM on $I_{max}$ and on $t_{1/2}$ point to at least two distinct effects of IVM on the hP2X$_4$ receptor channel.

*The Effects of IVM on Current Amplitude and on the Rate of Deactivation Have Distinct Concentration-response Relationships*

IVM is a mixture of >90% of 22,23-dihydroavermectin B$_{1a}$ and <10% of 22,23-dihydroavermectin B$_{1b}$ (Fig. 1 A). Hence, is it possible that the two components of IVM bind to the same site with different affinities and have disparate effects on channel gating? In this case, the concentration dependence for the two effects should be identical because the ratio of the two components does not change as the concentration of the mixture is changed. At equilibrium, the ratio of channels bound by the B$_{1a}$ and B$_{1b}$ components will remain fixed as long as the ratio of the two components in the solution is constant. To examine this possibility we studied the concentration dependence for the two effects of IVM on the P2X$_4$ receptor channel. Each cell was exposed to ATP (3 μM) for 3 s under control conditions and after exposing the cell to IVM for 5 min, and $I_{max}$ of the second application of ATP was then normalized to $I_{max}$ of the first application of ATP. An incubation time of 5 min in IVM was chosen in order to minimize the effects of desensitization/rundown, and since the effect of IVM on $I_{max}$ approached steady-state by this time (Fig. 4 A). The concentration-response relationship for the effect of IVM on $I_{max}$ is presented in Fig. 5 (circles). The concentration-response relationship was fitted by the Hill equation:

$$y = y_{con} + \frac{a[IVM]^n}{[IVM]^n + EC_{50}^n},$$

where $y$ is $I_{max}$ in response to 3 μM ATP at a given concentration of IVM, $y_{con}$ is $I_{max}$ in response to 3 μM ATP in the absence of IVM, $a$ is the maximal fold increase in $I_{max}$ induced by IVM, $n$ is the Hill coefficient, and $EC_{50}$ is the concentration of IVM ([IVM]) yielding an effect half the maximum. From the fit, $EC_{50}$ was estimated to be 0.25 ± 0.02 μM, similar to the equilibrium dissociation constant calculated from the association and dissociation rate constants (0.59 μM). The Hill coefficient (*n*) and the maximal increase in current amplitude (*a*) were estimated to be 2.4 ± 0.5- and 6.6 ± 0.3-fold, respectively.

The equilibrium dissociation constant for the effect of IVM on $t_{1/2}$ was initially approximated by constructing an IVM concentration-response relationship from the currents measured after 5 min in IVM (Fig. 5, filled



FIGURE 5.   The two effects of IVM have distinct affinities to IVM. Normalized concentration-response relationships for the effects of IVM on $I_{max}$ (empty circles) and on $t_{1/2}$ (full squares). Each point represents the average (±SEM) response of six cells 5 min after the addition of IVM. Solid lines are fits to the Hill equation with $EC_{50}$ and $n$ of 0.25 μM and 2.4, and 2.0 μM and 1.7 for $I_{max}$ and $t_{1/2}$, respectively. The concentration-response relationship for $t_{1/2}$ 20 min after the addition of IVM is also shown (empty squares).

squares). The Hill equation was fitted to the concentration-response relationship giving an $EC_{50}$, $n$, and $a$ of 2.0 ± 0.1, 1.7 ± 0.2, and 42 ± 2-fold μM, respectively. After 5-min incubation with 3 μM IVM, the effect of IVM on $t_{1/2}$ is ~75% of the maximal effect (Fig. 4 B). To test to what extent the data at 5 min reflects the steady-state concentration-response relationship, the effect of IVM on $t_{1/2}$ after 20 min was examined. The normalized concentration-response relationships for 5- and 20-min incubation in IVM are similar (Fig. 5), indicating that the initial estimate of $EC_{50}$ and $n$ represent the steady-state effects of IVM on $t_{1/2}$. Thus, the concentration-response relationships for the effects of IVM on $I_{max}$ and on $t_{1/2}$ are indeed displaced in relation to each other.

These results indicate that the two effects of IVM cannot be attributed to distinct effects of the $B_{1a}$ and $B_{1b}$ components binding to the same site. We conclude, therefore, that IVM binds to two separate sites on the hP2X$_4$ receptor channel: a higher affinity site that primarily affects $I_{max}$ and a lower affinity site which affects $t_{1/2}$ (see DISCUSSION).

### IVM Modulates the Efficacy of ATP

To determine whether IVM has an effect on the efficacy of ATP, concentration-response relationships for the effect of ATP were constructed in the absence and presence of IVM. To this end, whole-cell currents were recorded using the perforated-patch whole-cell configuration of the patch-clamp technique to avoid the decline in current amplitude observed in the conventional whole-cell configuration during repeated ATP

applications. A concentration-response relationship for the effect of ATP in the absence of IVM was constructed first. For each cell, different concentrations of ATP were applied, and each tested concentration of ATP was bracketed by a measurement with 3 μM ATP. The currents were then normalized to the current activated by the preceding dose of 3 μM ATP. Only cells in which the response to 3 μM ATP did not change by >20% were analyzed further. Fig. 6 A shows superimposed current traces measured from a single cell in response to 0.3, 1, 3, or 100 μM ATP applied for 2 s under control conditions. The resulting concentration-response relationship for ATP in the absence of IVM (averaged from seven experiments) is shown in Fig. 6 B (empty circles). The Hill equation was fitted to the data (solid line) with an $EC_{50}$ $n$ and maximal current of 3.8 ± 0.8 μM, 0.8 ± 0.1, and 300 ± 16 pA, respectively.

Next, cells were exposed either to 0.2 μM IVM, a concentration of IVM which primarily affects $I_{max}$ (Fig. 5) or to 1.0 μM IVM, which also affects $t_{1/2}$ (Fig. 5). Each cell was exposed to IVM for at least 25 min before current recording was attempted in order to provide sufficient time for IVM to equilibrate (see Fig. 4). The resulting concentration-response relationships for added ATP, averaged from eight experiments for 0.2 μM IVM (filled circles) and seven experiments for 1.0 μM IVM (filled inverted triangles), are shown in Fig. 6 B. The $EC_{50}$, $n$, and maximal current obtained from fitting the concentration-response relationships with the Hill equation (solid lines in Fig. 6 B) are: 2.5 ± 0.7 μM, 1.2 ± 0.3, and 1,200 ± 110 pA, and 0.5 ± 0.1 μM, 2.7 ± 0.6, and 1,100 ± 50 pA, for 0.2 μM IVM and 1.0 μM IVM, respectively. It appears from these results that the higher affinity site for IVM primarily increased the maximal response to ATP while the lower affinity site for IVM primarily increased the sensitivity to ATP and the apparent cooperativity of ATP.

### The Effects of IVM on Unitary hP2X$_4$ Receptor Channel Currents Measured in the Outside-out Configuration of the Patch-clamp Technique

Together, the results presented thus far are consistent with two distinct allosteric effects of IVM on the hP2X$_4$ receptor channel. To resolve the mechanisms by which IVM increases the maximal current and slows the rate of deactivation, single channel currents were measured. Single-channel currents activated by extracellular ATP were initially recorded in the outside-out configuration of the patch-clamp technique. The membrane potential was held at −150 mV since the conductance of P2X$_4$ receptor channels is relatively small (Evans, 1996; Negulyaev and Markwardt, 2000). The pipette contained the standard intracellular solution and the patch of membrane was continuously perfused with the standard extracellular solution. Upon exposing the patch to extra-



FIGURE 6. The functionally distinct sites for IVM have different effects on the efficacy of ATP. (A) Perforated-patch whole-cell current traces in response to different concentrations of ATP applied for 2 s, as indicated. Holding potential −50 mV. (B) Concentration-response relationships for ATP in the absence (empty circles) or presence of either 0.2 μM (full circles) or 1.0 μM (full inverted triangles) IVM. Each point represents the average (±SEM) of 6–8 cells. Solid lines are fits to the Hill equation.

cellular ATP (0.3–100 μM) bursts of channel activity were detected in 76 of 264 outside out patches tested. However, in all but 3 of the 76 patches channel activity was lost within 40 s and did not recover following several minutes of wash in the absence of ATP. One of the three patches in which channel activity persisted for several minutes is presented in Fig. 7. Representative current traces recorded in the presence of 3 μM ATP are shown. Downward (inward) current deflections indicate channel opening and the dashed lines indicate the average current level in the main conducting state in the absence of IVM (control). Initially, ATP was applied for 5 s under control conditions (top current trace). Subsequently, the patch was exposed to 3 μM IVM for 6 min and ATP applied again for 5 s (IVM₁). In the presence of IVM the baseline current tended to fluctuate, and the current recordings were typically noisier than in the absence of IVM. Nevertheless, it is clearly evident that in the presence of IVM channel open time is greatly increased. A small (∼20%) increase in the unitary current amplitude with IVM is also apparent. When IVM was washed out for 6 min and ATP was applied again (wash₁), the effect of IVM on channel open time was greatly reduced. The application and washout of IVM were repeated at 6-min intervals (IVM₂ and wash₂), revealing once again the significant effect of IVM on the open time of the channel. These results clearly indicate that the sixfold increase in I$_{max}$ in saturating ATP concentrations observed in whole-cell recordings in response to IVM (Fig. 6 B) is primarily not due to an increase in unitary conductance and likely involves changes in channel gating.

*The Effects of IVM on Unitary hP2X₄ Receptor Channel Currents Determined from On-cell Patches*

The rapid loss of channel activity in excised patches of membrane suggests that an intracellular factor is important for continued channel function. To obtain sufficient single-channel data to quantify the effects of

IVM on channel gating, channel activity was recorded in the cell-attached mode of the patch-clamp technique. The cells were bathed in a solution containing 150 mM KCl in order to shunt the membrane potential to zero, whereas the patch of membrane underlying the pipette was clamped to −150 mV. Although it is possible to change the composition of the solution in the pipette during on-cell recording, this is a rather slow process and it is difficult to determine when complete solution exchange has taken place. We, therefore, measured channel activity under a single experimental condition in each patch, and made comparisons between patches exposed to ATP alone (control) and patches exposed to ATP plus 0.3 or 1.5 μM IVM. These concentrations of IVM were chosen since 0.3 μM IVM primarily modified I$_{max}$ in the whole-cell recordings while 1.5 μM IVM modified both I$_{max}$ and $t_{1/2}$ (Fig. 5). To provide sufficient time for IVM to equilibrate (see Fig. 4), the cells were preincubated with IVM for 20–25 min before forming a tight seal and the recording pipette also contained the appropriate concentration of IVM. A relatively low concentration of ATP (0.3 μM) was used in the pipette solution in order to minimize the simultaneous activation of multiple channels and to limit channel desensitization.

Without ATP in the pipette solution, there were no channel openings resembling hP2X₄ receptor channel currents in either the absence ($n = 30$) or presence ($n = 20$) of IVM. In contrast, with 0.3 μM ATP in the pipette, a channel with a unitary conductance of ∼12 pS at −150 mV was observed in 96 of 197 patches. In these patches, channel activity disappeared after several minutes, suggesting that even at low ATP concentrations the channels enter a long-lasting desensitized state. Fig. 8 A shows representative current records in the absence and presence of either 0.3 or 1.5 μM IVM, as indicated above each current trace. The downward deflections in the current indicate channel openings





FIGURE 7.  Representative current records from an excised outside-out membrane patch exposed to 3 µM ATP. Downward (inward) currents indicate channel opening. Shown is channel activity under control conditions (control), 6 min after exposing the patch to 3 µM IVM (IVM₁) and 6 min after washing out the IVM (wash₁). The application and washout of IVM were repeated (IVM₂ and wash₂). The dashed lines present the average current of the main conductance state during the first exposure to ATP (control). Holding potential −150 mV. Sampled at 50 kHz and filtered at 1 kHz for display.

and the dashed lines represent the average current level in the open state measured in the absence of IVM. It is immediately apparent that as in the outside-out patches, IVM had a small (but statistically significant) effect on the unitary current amplitude. On average, the conductance of the channel in the absence of IVM was 11.8 ± 0.8 pS ($n = 5$), increasing to 15.3 ± 0.7 pS in 1.5 µM IVM ($n = 5$), ($P < 0.05$, unpaired Student's $t$ test). It is also clearly evident that 1.5 µM IVM considerably prolonged the open times. This increase in open time is not due to the greater potency of ATP in the presence of IVM (Fig. 6 B), since raising the concentrations of ATP in the absence of IVM did not significantly prolong the mean open time (Fig. 8 B). Fig. 8 C shows examples of 30 s of continuous current recordings under control conditions (top trace) and in the presence of 1.5 µM IVM. The absence of superimposed channel openings despite the significant channel activity in the patch exposed to 1.5 µM IVM

FIGURE 8.  The effects of IVM on unitary hP2X₄ receptor channel currents in on-cell patches. (A) Representative current records from three different on-cell patches. The pipette solution contained extracellular solution supplemented with 0.3 µM ATP (top trace), 0.3 µM ATP plus 0.3 µM IVM (middle trace), or 0.3 µM ATP plus 1.5 µM IVM (bottom trace). When IVM was included in the pipette solution, the cell was incubated in the same concentration of IVM for at least 25 min before establishing the cell-attached configuration. The dashed lines present the average current in the open state under control conditions. Sampled at 50 kHz and filtered at 1 kHz for display. (B) Representative single-channel current record with 3 µM ATP in the pipette solution. Same calibration as in A. Note the brief openings within the burst in comparison to the long openings induced by 1.5 µM IVM. (C) Representative current records 30 s in duration, from two different on-cell patches. The pipette solution contained extracellular solution supplemented with 0.3 µM ATP (top trace) or 0.3 µM ATP plus 1.5 µM IVM (bottom trace). Same experimental protocol as in A.

indicates that IVM significantly increases Po (see also Table I). Whether IVM also recruits silent channels remains to be determined.



FIGURE 9. The effects of IVM on hP2X$_4$ receptor channel gating are complex. (A) Distributions of open (left) and shut (right) interval durations for unitary hP2X$_4$ receptor channel activity recorded from an on-cell patch in response to 0.3 μM ATP under control conditions. The solid lines are the maximum likelihood fits with sums of exponentials. The open and shut intervals were described by the sum of three and five significant exponential components, respectively (patch c02 in Table I). (B and C) Time constants (B) and areas (C) of the open (left) and shut (right) significant exponential components fitted to the dwell-time distributions of the channels exposed to 0.3 μM ATP alone (open circles), 0.3 μM ATP plus 0.3 μM IVM (empty triangle), or 0.3 μM ATP plus 1.5 μM IVM (full triangle). The values are presented in Table I.

*Gating Properties of the hP2X$_4$ Receptor Channel*

In the control experiments and in most of the experiments with 0.3 μM IVM it was not possible to determine the total number of channels in the patch or whether two adjacent bursts of channel openings were from the same or different channels due to the relatively low Po. Consequently, kinetic analysis was largely restricted to the number and duration of open and shut events within a burst of channel activity and to the duration of the bursts using patches for which at least 1,200 open and shut events could be analyzed. The durations of all open and shut intervals were measured first with half-amplitude threshold analysis. The open and shut intervals were then log-binned into 1-D dwell-time distributions and the distributions were fit with sums of exponentials to determine the number of significant exponential components. Fig. 9 A plots open and shut dwell-time distributions for one experiment recorded under control conditions. The open (left panel) and shut (right panel) distributions were best fit with the sums of three and five significant exponential components, respectively (continuous lines). The time constants and magnitudes of the significant exponential components fit to the open and shut dwell time distributions for the control patches (open circles), the patches in 0.3 μM IVM (open triangles), and the patches in 1.5 μM IVM (filled inverted triangles) are summarized in Fig. 9, B and C, and in Table I. As might be expected from the single-channel current traces (Figs. 7 and 8), it is evident that 1.5 μM IVM gave rise to two open states of long duration not observed under control conditions or in the presence of 0.3 μM IVM. It is also apparent from Fig. 9 B that the three longest shut components were reduced in duration by 1.5 μM IVM, consistent with the increase in Po induced by IVM (Fig. 8 C). The



FIGURE 10.  The higher affinity site of IVM reduces hP2X$_4$ receptor channel desensitization. (A) Number of opening per burst (left) and burst duration (right) induced by 0.3 μM ATP as a function of the critical time between bursts of channel activity in the absence (open circles) or presence of 0.3 μM IVM (full circles). (B) Perforated-patch whole-cell currents in response to 2-s application of 30 μM ATP in the absence (left) and presence (right) of 0.2 μM IVM. The cell was incubated for 30 min with 0.2 μM IVM before exposure to ATP. Holding potential −60 mV. Calibration bars, 150 pA (left) and 500 pA (right). (C) Average (±SEM) desensitization after 2-s exposure to 30 μM ATP in the absence (control) and presence of 0.2 μM IVM ($n = 8$). The statistical significance between the groups was determinate with unpaired Student's $t$ test, where *** represent P < 0.001.

time constants of the two most brief shut components were not significantly affected by 1.5 μM IVM despite the overall increase in Po, suggesting that these components represent shut events within a burst of channel activity.

In 1.5 μM IVM it was not possible to reliably determine a minimal shut time (critical time) that would define the end of a burst since the third shut component (counting from the most brief component) was only 3–5-fold longer than the second component. Hence, burst analysis was used only to compare between the control experiments and the experiments in 0.3 μM IVM. To prevent possible errors arising from the selection of a specific critical time, critical times ranging from 1 to 50 ms were examined. Fig. 10 A shows the number of openings per burst (left) and burst duration (right) as a function of critical time under control conditions (open circles) and in the presence of 0.3 μM IVM (filled circles). Although the bursts are not well separated for this channel, it is evident that 0.3 μM IVM increased both the number of openings per burst and burst duration for all tested critical times. An increase in burst duration that is not accompanied by an increase in mean open time or mean shut time within a burst could arise from a greater efficacy of ATP, and/or from reduced channel desensitization. However, since low concentrations of IVM had little effect on the EC$_{50}$ of the ATP concentration-response relationship (Fig. 6 B), the increase in burst duration is likely due to reduced channel desensitization. This conclusion is supported by measurements of the effects of 0.2 μM IVM on the rate of deactivation of whole-cell currents activated by 30 μM ATP (Fig. 10, B and C).

In summary, 0.3 μM IVM increased burst duration without significantly affecting mean open time or single-channel conductance, whereas 1.5 μM IVM substantially prolonged mean open time and increased the probability of channel opening. The relationship of these effects of IVM to the changes in ensemble ATP-activated currents is addressed in the DISCUSSION.

DISCUSSION

The aim of this study was to examine the mechanism underlying the actions of IVM on the human P2X$_4$ receptor channel. From the whole-cell data it is clear that IVM at concentrations >1 μM has two distinct effects on hP2X$_4$ receptor channels: up to a sixfold increase in the maximum current activated by saturating concentrations of ATP, and up to a 10-fold slowing of the rate of current deactivation (Fig. 5). These two phenomena can be explained by assuming that IVM binds to separate sites, with the increase in maximal current resulting from the binding of IVM to a higher affinity site than the site that leads to a reduction in the rate of deactivation. This assertion is based on the following observations: (a) The time courses of onset and washout of the effect of IVM on I$_{max}$ and on $t_{1/2}$ were significantly different (Fig. 4). (b) The effect of IVM on $t_{1/2}$ deviates from a second order reaction (Fig. 4). (c) The effects of IVM on I$_{max}$ and on $t_{1/2}$ have distinct concentration-response relationships (Fig. 5). (d) Low concen-

TABLE I
*Significant Exponential Components Fit to the Open and Shut Dwell Time Distributions*

| Patch | IVM | Events | Po | Mean open | Open components Time constant and (area) | | | | | Shut components Time constant and (area) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 |
| | μM | | % | ms | ms | ms | ms | ms | ms | ms | ms | ms | ms | ms |
| C02 | | 2,018 | 2 | 3.4 | 0.30 (0.27) | 2.7 (0.45) | 6.1 (0.28) | | | 0.95 (0.63) | 11 (0.11) | 260 (0.14) | 1,100 (0.12) | |
| C04 | | 1,382 | 0.7 | 1.9 | 0.79 (0.63) | 3.5 (0.37) | | | | 0.078 (0.55) | 0.85 (0.31) | 5.7 (0.046) | 53 (0.026) | 1,600 (0.065) |
| C05 | | 1,992 | 2 | 3.9 | 0.27 (0.28) | 4.5 (0.72) | | | | 0.79 (0.65) | 2.6 (0.21) | 47 (0.032) | 660 (0.082) | 3,300 (0.032) |
| C07 | | 2,182 | 1.5 | 6.8 | 0.82 (0.45) | 6.3 (0.30) | 16 (0.25) | | | 0.65 (0.48) | 2.3 (0.11) | 12 (0.17) | 400 (0.12) | 3,200 (0.12) |
| I031 | 0.3 | 1,862 | 7.8 | 4 | 0.34 (0.16) | 2.9 (0.62) | 8.5 (0.22) | | | 0.16 (0.51) | 0.59 (0.43) | 9.5 (0.039) | 190 (0.011) | 2,500 (0.009) |
| I034 | 0.3 | 5,218 | 43 | 3.8 | 0.42 (0.15) | 3.2 (0.69) | 8.8 (0.16) | | | 0.32 (0.81) | 1.1 (0.17) | 35 (0.008) | 300 (0.009) | |
| I038 | 0.3 | 4,152 | 20 | 3.2 | 0.59 (0.48) | 3.2 (0.41) | 12 (0.11) | | | 0.29 (0.38) | 1.7 (0.37) | 8.9 (0.24) | 640 (0.012) | |
| I039 | 0.3 | 2,622 | 18 | 4 | 1.4 (0.51) | 6.5 (0.49) | | | | 0.39 (0.83) | 1.4 (0.12) | 51 (0.027) | 500 (0.023) | |
| I151 | 1.5 | 18,046 | 80 | 35 | 0.23 (0.10) | 2.1 (0.17) | 10 (0.29) | 39 (0.21) | 92 (0.23) | 0.26 (0.35) | 1.3 (0.48) | 6.5 (0.15) | 28 (0.041) | 620 (0.007) |
| I152 | 1.5 | 3,390 | 96 | 66 | 0.90 (0.45) | 1.3 (0.16) | 6.0 (0.15) | 170 (0.19) | 790 (0.050) | 0.26 (0.35) | 1.3 (0.45) | 6.5 (0.15) | 28 (0.041) | 620 (0.007) |
| I159 | 1.5 | 23,100 | 73 | 16 | 0.47 (0.44) | 1.4 (0.41) | 7.0 (0.084) | 69 (0.040) | 330 (0.032) | 0.24 (0.40) | 1.4 (0.34) | 4.7 (0.24) | 29 (0.017) | 540 (0.006) |

trations of IVM primarily increase the maximal response to ATP, whereas higher concentrations of IVM primarily increase the apparent affinity for ATP (Fig. 6 B). (e) The single-channel behavior of hP2X₄ receptor channels are distinct at low and high concentrations of IVM (Figs. 8 and 9).

There is insufficient data to construct a kinetic scheme which incorporates the effects of IVM on the gating of hP2X₄ receptor channels. Nevertheless, since functional P2X receptor channels likely contain three subunits (Nicke et al., 1998; Stoop et al., 1999), it is tempting to speculate that each channel has three identical binding sites for IVM. In this case, perhaps the binding of one molecule of IVM is sufficient to induce the observed effects of IVM on $I_{max}$. In contrast, the binding of a single molecule of IVM cannot account for the effects of IVM on $t_{1/2}$, since a single binding site cannot give rise to a rate of recovery during washout that is faster than the rate of onset (Fig. 4 B). Hence, we speculate that through allosteric interaction, the binding of the first molecule of IVM reduces the affinity of additional IVM molecules binding to the receptor (negative cooperativity). However, when one or two additional molecules of IVM bind to the receptor, the open state of the channel is greatly stabilized, giving rise to a substantial slowing of the rate of current deactivation. This model accounts for the higher concentrations of IVM needed to induce changes in $t_{1/2}$ in comparison to $I_{max}$ and can account for the apparent deviation from second order reaction for the effects of IVM on $t_{1/2}$.

The slow onset and washout of the effects of IVM suggests that IVM, which is lipophilic, might need to partition into the membrane to reach its binding sites. If this is the case, these sites must be close to the extracellular face of the membrane since intracellular IVM had

no apparent effect on channel gating (Fig. 2). The binding site for IVM appears to be extracellular in other channels as well, including the crayfish multiagonist–gated chloride-selective channel where application of IVM to the cytoplasmic side of inside-out patches had no effect (Zufall et al., 1989), and the glutamate-gated chloride channel from *Drosophila melanogater* (Cully et al., 1996) and the α7 nicotinic receptor (Krause et al., 1998) that could be activated by extracellular IVMPO₄, a hydrophilic form of IVM.

In an attempt to identify the molecular mechanisms underlying the effects of IVM, we examined single-channel activity in the absence and presence of IVM. Under control conditions, 2–3 and 4–5 significant exponential components fit the distributions of open and shut durations, respectively (Fig. 9). These observations suggest that hP2X₄ receptor channels gate among a minimum of three open and five shut states. At low concentrations (0.3 μM), IVM had minor effects on the number, duration, or area of the open and shut components (Table I). In contrast, at a higher concentration (1.5 μM), IVM gave rise to two additional open components of long duration, reduced the duration of the three longest shut components, and reduced the area of the shortest and two longest shut components. These results indicate that the effects of IVM on channel gating are highly complex and, thus, it was not feasible to construct a kinetic model for the effects of IVM on channel gating. To achieve this goal it would be necessary to examine the effects of multiple concentrations of IVM on patches containing a single channel. This could not be achieved due to the rundown of channel activity in outside out patches.

There were no significant effects of low concentrations of IVM on mean open time, or on single-channel conductance, whereas burst duration increased 3–5-

fold (for critical times between 5 and 20 ms). The absence of an obvious change in either the mean open time or mean shut time per burst (Table I) or in the apparent affinity for ATP (Fig. 6 B), suggests that the increase in burst duration induced by low concentrations of IVM results from less desensitization. We propose that in the absence of IVM the channels enter a desensitized state after activation within tens of milliseconds from which they can recover at a relatively low rate (hundreds of milliseconds). As a result, when ATP is applied under control conditions a fraction of the channels desensitize before the current fully develops. If IVM diminishes desensitization (either by increasing the rate of recovery from desensitization or by slowing the rate of entry into the desensitized state), then the number of channels contributing to the maximal current would increase substantially, giving rise to an increase in $I_{max}$.

Burst analysis could not be reliably applied to channel activity in 1.5 μM IVM due to the high Po. Nevertheless, the striking effect of high concentrations of IVM on mean-channel open time can largely account for the significant decrease in the rate of current deactivation after the washout of ATP observed in whole-cell recordings. In view of the significant effects of IVM on the stability of the open conformation of the channel, it is tempting to speculate that the observed increase in the potency of ATP (Fig. 6 B) reflects effects of IVM on channel gating rather then on the binding site for ATP.

In humans, IVM is typically given as an oral dose of 150 mg/kg, once a year. This dose, which has minimal adverse effects, results in a peak plasma concentration of IVM of ~50 ng/ml. In a recent study, higher concentrations of IVM were tested, resulting in a threefold greater peak plasma concentration, also with no significant adverse experiences (Guzzo et al., 2002). In view of the broad distribution of P2X$_4$ receptor channel mRNA in human tissues (Garcia-Guzman et al., 1997) and given that the EC$_{50}$ for the high affinity site for IVM was 0.25 μM, which is ~220 ng/ml, it is surprising that IVM is so well tolerated. The tolerability of IVM is likely due in part to its exclusion from the central nervous system by P-glycoproteins in the endothelial cells of brain capillary (Lankas et al., 1997; Nobmann et al., 2001). This could not explain, however, the limited adverse effects of IVM on peripheral tissues. P2X$_4$ receptor channel mRNA is abundant in human heart, adrenal, liver, kidney, skeletal muscle, and trachea (Garcia-Guzman et al., 1997), and in rat, P2X$_4$ receptor channel protein is extensively expressed in epithelia, vascular and visceral smooth muscle, and fat cells (Bo et al., 2003). These findings might indicate that native human peripheral P2X$_4$ receptor subunits are in association with other subunits, which reduce or eliminates the sensitivity of the receptor to IVM, or that native human P2X$_4$ receptor channels are less sensitive to IVM either due to regulatory mechanisms or due to inaccessibility of the binding sites to IVM.

We thank Florentina Soto and Walter Stühmer for providing HEK293 cells transfected with the human P2X$_4$ receptor channel, and Karl Magleby for single channel analysis programs. Thanks to Miguel Holmgren, Karl Magleby, Joe Mindell, and Kenton Swartz for helpful discussions.

This research was supported by a grant from G.I.F., the German-Israeli Foundation for Scientific Research and Development, and by the Zlotowski Center for Neuroscience.

Olaf S. Andersen served as editor.

Submitted: 1 December 2003
Accepted: 26 January 2004

REFERENCES

Adelsberger, H., A. Lepier, and J. Dudel. 2000. Activation of rat recombinant α$_1$β$_2$γ$_{2S}$ GABA$_A$ receptor by the insecticide ivermectin. Eur. J. Pharmacol. 394:163–170.

Blatz, A.L., and K.L. Magleby. 1986. Correcting single channel data for missed events. Biophys. J. 49:967–980.

Bo, X., M. Kim, S.L. Nori, R. Schoepfer, G. Burnstock, and R.A. North. 2003. Tissue distribution of P2X$_4$ receptors studied with an ectodomain antibody. Cell Tissue Res. 313:159–165.

Bowler, J.W., R.J. Bailey, R.A. North, and A. Surprenant. 2003. P2X$_4$, P2Y$_1$ and P2Y$_2$ receptors on rat alveolar macrophages. Br. J. Pharmacol. 140:567–575.

Burkhart, C.N. 2000. Ivermectin: an assessment of its pharmacology, microbiology and safety. Vet. Hum. Toxicol. 42:30–35.

Cully, D.F., D.K. Vassilatis, K.K. Liu, P.S. Paress, L.H. Van der Ploeg, J.M. Schaeffer, and J.P. Arena. 1994. Cloning of an avermectin-sensitive glutamate-gated chloride channel from Caenorhabditis elegans. Nature. 371:707–711.

Cully, D.F., P.S. Paress, K.K. Liu, J.M. Schaeffer, and J.P. Arena. 1996. Identification of a Drosophila melanogaster glutamate-gated chloride channel sensitive to the antiparasitic agent avermectin. J. Biol. Chem. 271:20187–20191.

Dawson, G.R., K.A. Wafford, A. Smith, G.R. Marshall, P.J. Bayley, J.M. Schaeffer, P.T. Meinke, and R.M. McKernan. 2000. Anticonvulsant and adverse effects of avermectin analogs in mice are mediated through the γ-aminobutyric acid$_A$ receptor. J. Pharmacol. Exp. Ther. 295:1051–1060.

Dent, J.A., M.W. Davis, and L. Avery. 1997. avr-15 encodes a chloride channel subunit that mediates inhibitory glutamatergic neurotransmission and ivermectin sensitivity in Caenorhabditis elegans. EMBO J. 16:5867–5879.

Dent, J.A., M.M. Smith, D.K. Vassilatis, and L. Avery. 2000. The genetics of ivermectin resistance in Caenorhabditis elegans. Proc. Natl. Acad. Sci. USA. 97:2674–2679.

Ding, S., and F. Sacks. 1999. Ion permeation and block of P2X$_2$ purinoceptors: single channel recordings. J. Membr. Biol. 172:215–223.

Evans, R.J. 1996. Single channel properties of ATP-gated cation channels (P2X receptors) heterologously expressed in Chinese hamster ovary cells. Neurosci. Lett. 212:212–214.

Feng, X.P., J. Hayashi, R.N. Beech, and R.K. Prichard. 2002. Study of the nematode putative GABA type-A receptor subunits: evidence for modulation by ivermectin. J. Neurochem. 83:870–878.

Garcia-Guzman, M., F. Soto, J.M. Gomez-Hernandez, P.E. Lund, and W. Stühmer. 1997. Characterization of recombinant human P2X4 receptor reveals pharmacological differences to the rat ho-

mologue. *Mol. Pharmacol.* 51:109–118.

Guzzo, C.A., C.I. Furtek, A.G. Porras, C. Chen, R. Tipping, C.M. Clineschmidt, D.G. Sciberras, J.Y. Hsieh, and K.C. Lasseter. 2002. Safety, tolerability, and pharmacokinetics of escalating high doses of ivermectin in healthy adult subjects. *J. Clin. Pharmacol.* 42:1122–1133.

Hamill, O.P., A. Marty, E. Neher, B. Sakmann, and F.J. Sigworth. 1981. Improved patch-clamp techniques for high-resolution current recording from cells and cell-free membrane patches. *Pflugers Arch.* 391:85–100.

Horn, R., and A. Marty. 1988. Muscarinic activation of ionic currents measured by a new whole-cell recording method. *J. Gen. Physiol.* 92:145–159.

Khakh, B.S., W.R. Proctor, T.V. Dunwiddie, C. Labarca, and H.A. Lester. 1999. Allosteric control of gating and kinetics at P2X$_4$ receptor channels. *J. Neurosci.* 19:7289–7299.

Kim, Y.K., E.R. Dirksen, and M.J. Sanderson. 1993. Stretch-activated channels in airway epithelial cells. *Am. J. Physiol.* 265:C1306–C1318.

Köhler, P. 2001. The biochemical basis of anthelmintic action and resistance. *Int. J. Parasitol.* 31:336–345.

Krause, R.M., B. Buisson, S. Bertrand, P.J. Corringer, J.L. Galzi, J.P. Changeux, and D. Bertrand. 1998. Ivermectin: a positive allosteric effector of the α7 neuronal nicotinic acetylcholine receptor. *Mol. Pharmacol.* 53:283–294.

Krusek, J., and H. Zemková. 1994. Effect of ivermectin on γ-aminobutyric acid-induced chloride currents in mouse hippocampal embryonic neurones. *Eur. J. Pharmacol.* 259:121–128.

Lankas, G.R., M.E. Cartwright, and D. Umbenhauer. 1997. P-glycoprotein deficiency in a subpopulation of CF-1 mice enhances avermectin-induced neurotoxicity. *Toxicol. Appl. Pharmacol.* 143:357–365.

McManus, O.B., and K.L. Magleby. 1988. Kinetic states and modes of single large-conductance calcium-activated potassium channels in cultured rat skeletal muscle. *J. Physiol.* 402:79–120.

McManus, O.B., and K.L. Magleby. 1991. Accounting for the Ca$^{2+}$-dependent kinetics of single large-conductance Ca$^{2+}$-activated K$^+$ channels in rat skeletal muscle. *J. Physiol.* 443:739–777.

Negulyaev, Y.A., and F. Markwardt. 2000. Block by extracellular Mg$^{2+}$ of single human purinergic P2X$_4$ receptor channels expressed in human embryonic kidney cells. *Neurosci. Lett.* 279:165–168.

Nicke, A., H.G. Bäumert, J. Rettinger, A. Eichele, G. Lambrecht, E. Mutschler, and G. Schmalzing. 1998. P2X$_1$ and P2X$_3$ receptors form stable trimers: a novel structural motif of ligand-gated ion channels. *EMBO J.* 17:3016–3028.

Nobmann, S., B. Bauer, and G. Fricker. 2001. Ivermectin excretion by isolated functionally intact brain endothelial capillaries. *Br. J. Pharmacol.* 132:722–728.

North, R.A. 2002. Molecular physiology of P2X receptors. *Physiol. Rev.* 82:1013–1067.

Sakmann, B., and E. Neher. 1995. Single-Channel Recording, 2nd edition. Plenum Press, New York.

Shan, Q., J.L. Haddrill, and J.W. Lynch. 2001. Ivermectin, an unconventional agonist of the glycine receptor chloride channel. *J. Biol. Chem.* 276:12556–12564.

Sigel, E., and R. Baur. 1987. Effect of avermectin B$_{1a}$ on chick neuronal γ-aminobutyrate receptor channels expressed in Xenopus oocytes. *Mol. Pharmacol.* 32:749–752.

Sigworth, F.J., and S.M. Sine. 1987. Data transformations for improved display and fitting of single-channel dwell time histograms. *Biophys. J.* 52:1047–1054.

Silberberg, S.D., and C. van Breemen. 1992. A potassium current activated by lemakalim and metabolic inhibition in rabbit mesenteric artery. *Pflugers Arch.* 420:118–120.

Stoop, R., S. Thomas, F. Rassendren, E. Kawashima, G. Buell, A. Surprenant, and R.A. North. 1999. Contribution of individual subunits to the multimeric P2X$_2$ receptor: estimates based on methanethiosulfonate block at T336C. *Mol. Pharmacol.* 56:973–981.

Vassilatis, D.K., J.P. Arena, R.H. Plasterk, H.A. Wilkinson, J.M. Schaeffer, D.F. Cully, and L.H. Van der Ploeg. 1997. Genetic and biochemical evidence for a novel avermectin-sensitive chloride channel in *Caenorhabditis elegans*. Isolation and characterization. *J. Biol. Chem.* 272:33167–33174.

Zheng, Y., B. Hirschberg, J. Yuan, A.P. Wang, D.C. Hunt, S.W. Ludmerer, D.M. Schmatz, and D.F. Cully. 2002. Identification of two novel *Drosophila melanogaster* histamine-gated chloride channel subunits expressed in the eye. *J. Biol. Chem.* 277:2000–2005.

Zufall, F., C. Franke, and H. Hatt. 1989. The insecticide avermectin B$_{1a}$ activates a chloride channel in crayfish muscle membrane. *J. Exp. Biol.* 142:191–205.

**EXHIBIT 16**

9/30/2021

• • •

Susan H. Welch
Takeda Pharmaceuticals Sales Representative
5008 South Bay Dr. SE, Mandan, ND 58554

**Dear Human Resources Manager:**

I am filing for both medical and religious exemptions.

  The reason for this letter is to request an exemption from the company mandate to receive the Covid-19 vaccine based on my strongly held ethical, moral, and medical beliefs.  This letter describes in greater detail my reasons for asking for the exemption than the official exemption forms .

I strongly believe in the sanctity of life and of the rights of the un-born.  This belief goes above any formal religious positions on the matter, it is a basic human right to life and a basic human right to decide what medications someone puts in their body.  All three of the currently available vaccines use cell lines from aborted fetuses either in their direct manufacturing, development, or in their testing procedures and it is my belief that this practice is unethical and immoral.

The decision as to what medications or material I put in my body should be left to me and my physician. I am hesitant to submit to this vaccine mandate due to medical reasons as well.

  My mother and my only sibling, a sister, who is 2 years younger and healthier than I am,  have both taken the Covid 19 vaccine. They both developed severe adverse events requiring several trips to the hospital  Both my mother and my only sister are full biological relatives.

  My mother took the Moderna vaccine and my sister took the Pfizer vaccine.  My sister's physician was the former head of the Minnesota medical association and now has determined that she has lymphoma like growths on her throat due to the Pfizer vaccine. Both my mother and my sister's physicians are advising that they should not  get another Covid 19 Vaccine.

A VAERS report will be enclosed describing my sister's events. She is adding the lymphoma lumps to her report.  She filled out the report online and has requested a keycode so that she can submit all the info to me to share with you so that I don't have to go through all of the injuries she is suffering. I am enclosing the confirmation number from VAERS to indicate that this has been filed. As soon as she gets the keycode she will provide me with the full report.

  I went through life threatening cardiac issues during one of my  pregnancies and nearly died.  For these reasons, I do not believe that the risk of this vaccine to my health outweighs a mandate by my employer to keep my job.

CONFIDENTIAL

In closing, I would like to state that if I was granted an exemption, it would not affect my ability to do my job or impact my access to see my providers. It would also not negatively impact the company in any way. I would also like to state that I would be acceptable to continue bi- weekly testing, wearing a mask while on the job, and or working remotely.

 During the height of the pandemic, I was able to work nearly a year doing all these things quite effectively and ended the year with a Crescent Gold. I had one of the highest reaches to my customers via remote meetings in my region.

It is taking some time to get all of the documents you are requesting. I was hoping to submit everything on Sept 24. I didn't want to wait any longer and am submitting what I have so far. As soon as I get them I will submit them to you.


Thank you in advance for your consideration of this matter.

Sincerely,

Susan H. Welch
Takeda Pharmaceuticals Sales Representative

Susan H. Welch • 2

CONFIDENTIAL



**Religious Accommodation Request Form**

Please return the completed form, along with supporting documentation, to US.ReligiousAccomm@takeda.com within 2 weeks.

**To be completed by employee**

Name: ___Susan Welch___    Position: ___NSBU Hybrid Primary Care___

Date of request: ___9-24-21___

Business/Function: ___Sales___

Immediate supervisor: ___Shannon Exner___

Describe fully the requested accommodation (e.g., scheduling changes, uniform accommodation, vaccination exemption, etc.):
___Covid-19 vaccine exemption___
_____

Frequency and duration of the accommodation requested: ___Full Time___

Describe religious belief or practice that necessitates this request for accommodation:
___Pro life advocate. I have a firmly held belief in not taking anything that is derived from cell lines of___
___aborted children for the use in development, manufacturing, or testing of any product. See the___
___accompanying letter that describes this in more detail.___

Please provide documentation from your spiritual leader confirming your religious belief or practice including your membership in any such religion which necessitates the need for a reasonable accommodation.
___See attached letter.___

Please provide alternative accommodations that might address your needs:

1. ___There is no impact on my ability to do my job.___

2. _____

3. _____

I have read and understand Takeda's policy on religious accommodation. My religious beliefs and practices which prompted this request for a religious accommodation are sincerely held. I understand that the accommodation requested above may not be granted but that Takeda will attempt to provide a reasonable accommodation that does not create an undue hardship on business operations. I understand that Takeda may need to obtain supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation and I agree to fully cooperate with any such requests. If there is a change in the need for this accommodation you agree to notify your Employee Relations or Human Resources Partner immediately.

Employee signature: _Susan Welch_    Date: _9-24-21_

Upon final determination the employee will receive a letter approving or denying the accommodation request.

    TAKEDA_020353



DIOCESE OF BISMARCK

PO Box 1575
Bismarck, ND 58502-1575
Phone: 701-223-1347
Fax: 701-223-3693

www.bismarckdiocese.com

OFFICE OF THE BISHOP

October 1, 2021
Feast of St. Thérèse of Lisieux

COVID-19 Vaccines & Mandates

Since the issue of vaccines remains timely and now that mandates seem to be more widespread, I want to address both issues and remind every Catholic what the Church teaches regarding both so that one's conscience can be properly formed and that a morally correct decision can be made by each person regarding vaccination.

One way to understand these issues is by the use of a few Questions.

**Question #1:** Is it morally acceptable for a Catholic to receive some COVID-19 vaccines?

**Answer:** YES. The reason being that with the Pfizer and Moderna vaccines there is sufficiently remote cooperation with evil. (cf. the December 2020 Congregation for the Doctrine of the Faith *Note on the Morality of using some anti-Covid 19 vaccines*, #1-4) However, the Church maintains that simply because this is morally permissible the person must be allowed the freedom to choose either to receive or not to receive the vaccine.

**Question #2:** Is a Catholic morally obligated to receive a COVID-19 vaccine?

**Answer:** NO. The vaccine is morally voluntary, that is, a Catholic is free in conscience to choose either to receive or not to receive the vaccine. However, a Catholic must make **Two Moral Considerations:** 1) To protect oneself; 2) To pursue the common good. Both of these considerations must be weighed carefully when discerning the choice to receive or not to receive the vaccine.

Because **Question #2** is **NO**, a **universal** mandate is never morally permissible. A **restricted** mandate could be permissible in certain circumstances if a reasonable accommodation is available to a person who chooses not to receive a vaccine. For instance, a hospital or nursing home must also weigh the two moral considerations noted above and must do so in a context where the work, by its very nature, is with high risk and vulnerable persons.

**Finally,** the distinction between the two types of mandates is important. With a universal mandate (everyone must receive the vaccine), the conscientious and free choice of the individual noted above is violated. With a restricted mandate an individual is still free to make a conscientious choice not to receive the vaccine even if it is a requirement of employment. An employer needs to offer an alternative to vaccination which respects the consciences of employees and continues to serve the common good. To threaten one's

CONFIDENTIAL

employment can be an act of coercion, and no one is morally bound to act under this condition.

Because **Answer #1 is YES**, it does call for an **exemption based on a conscientious objection** which is very legitimate and should be granted. For Catholics, one or the other of these statements would have to be answered in relation to the vaccine: "My Catholic faith forbids me to be vaccinated" or "My Catholic faith requires me to be vaccinated". Neither of these statements apply with regard to a COVID-19 vaccine. Thus, for a Catholic, that person's informed conscience must be followed, and that Catholic's conscience must be respected.

Since a Catholic is not morally forbidden from receiving or required to receive the two vaccines noted above, they still may weigh the ethical considerations and in good conscience choose to receive or choose not to receive the vaccine. In doing so, however, they are making that choice on the grounds of their own prudential judgment based on an informed and certain conscience.

Finally, to be clear, the Catholic Church does not issue exemptions, employers do this. Also, simply because the Catholic Church judges a vaccine morally permissible to receive, it cannot be concluded that the Catholic Church then requires a Catholic to receive that vaccine. The Catholic Church gives to Catholics its authoritative moral and social teaching. Knowing this teaching, every Catholic is obligated before God to form his or her conscience accordingly and then act. This is a human right every person possesses by the very fact of being a human being and this cannot be compromised by anyone.

The Most Reverend David D. Kagan
Bishop of Bismarck

This person, Susan Welch, is a Catholic.





*Interactive Process Notes*

**RELIGIOUS ACCOMMODATION**

Employee Name: Susan Welch
Division: Neuroscience
Position: Sr. Sales Representative
Field or Office based: Filed based hybrid rural area works along between 4 to 5 thousand miles per months.
ER Representative(s): Forestier Irving
Date of Interview: October 5, 2021

Not being recorded and no consent to being recorded.

What position do you hold?
Sr. Sales Representative

Do you work in the field/lab or are you office based?
Field

Do you see clients in the field?
Yes, I see almost all of my customers. I have approximately 40 HCPs that I see each week.

Approximately how many of your clients are you able to see now?
At one point, when this started, I was restricted to home work. I have worked my territory for 30 years, 6 of those have been with Takeda. I have very strong relationships. I am also a Cresset Award Gold Winner. I'm in the field working the same way I was working before COVID. I have been in the field working as I was pre COVID. I have a few customers that I see remotely only because of the distances of the territory.

Tell me more about your religious beliefs and religion or belief system generally.
I will be submitting more information. I will send you a letter from my priest. I am Catholic. I am pro-life. I went to catholic school since middle school. My whole family is catholic, we are several generations of Catholics. We participate in pro-life rallies and marches.

Are you a member of any particular church or religious organization?

CONFIDENTIAL                                                    TAKEDA_020342



Saint Anne Catholic Church in Bismarck, North Dakota. I live across the river. Technically, I don't go to my church, I go to Saint Anne because it is where I grew up.

If so – What do your religion's leaders say about the vaccine?
No, my priest has not said I have to take the vaccine.

Have your religious leaders specifically stated that you may not be vaccinated?
No.

How long have you subscribed to this belief system?
Most of my life.

Tell me more about how the company's policies/rules conflict with your beliefs.
Well, not only it is my opposition to the fetal cell issue but, I have been religious for a long time. There are 2 sets of rules that impact my decision. The problem with what I have to do under the Emergency Use Authorization Act where they don't have to tell us what is in the vaccine. I have a big problem with that.

My family, my older sister, she is healthier than me. My mother and my sister both got the vaccine. My mother got Moderna and my sister got Pfizer. She had a severe adverse event. She was in the emergency room two times. This was a huge cost for her. She had to close one of her therapy clinics. This scared me to take the vaccine. I did research to know why my family had those bad reactions and others did not but under the Act they don't have to tell us what is in the vaccine. That scares me.

What is it specifically about this religious belief that prohibits you from being able to become vaccinated?
Not knowing what is in the vaccine keeps me from taking the vaccine. If there's something out there that is not experimental, I would take it if it doesn't have fetal line cells. I know Pfizer says it was in development of the vaccine that fetal lines were used but, they don't have to tell us so we really don't know what is in them. I do have a concern about using fetal cell lines.

*If applicable:*
Please tell me more about the fetal cells (or substitute specific concern i.e. vegan) and how that connects to your request?


Have you taken any other vaccines in your life?  (do not ask for specifics)
Yes, I have taken every single one. Two weeks ago I took a tetanus vaccine. I have sold plenty of vaccines during my time. Everything I sold was a dead virus, nothing experimental.

Have you ever taken and do you currently take any of the following products:
Tylenol, Ibuprofen, Pepto Bismol, Claritin, Sudafed, Tums



Not asked.

Are you aware that all of those products, (and probably the other vaccines that you have taken) were developed using fetal cells?
Not informed.

If Takeda accommodates you, would you be willing to attest to the fact that you have not and will not take any of those vaccines or products?
N/A

What is the accommodation that you are requesting?
Not an accommodation, I need to be honest with you, we are a hot state right now but everything is wide open so no mass mandate. The state is challenging Biden on his order, the state is challenging the constitutionality of the mandate. I can fully do my job as I am doing it now. If you guys have a problem, I am willing to accommodate you guys and I can work from home as I did in March 2020 but, I can tell you that my providers are not restricting access for me. I am rural, my patient base and provider base are small business and farms. When I went o my priest he said, "You don't have to ask for this accommodation because the hospitals are not asking for it."

Are there any alternative accommodations that might address your needs?
I don't know.

You have chosen to work for a company that has manufactured and/or marketed a long list of pharmaceutical products for which there is a chance that, at some point, fetal cells were used in development.  How do you reconcile that with your stated position on taking the COVID vaccine?  Do you see this as consistent?

Right this is interesting. I have been doing this for many years. I have never been aware of any thing like that. There is no statement on that whatsoever. if I did learn of something like that, I did not know, I would need to decide what to do.

Besides vaccines, do your religious beliefs prevent you from being tested for COVID?
No.

*For body is a temple claim:*
Do you drink alcohol recreationally?
N/A

Do you have tattoos or piercings?
N/A

*If you found the same language used in request online*



I have reviewed your accommodation request, and I noticed that it is very similar to a few others we have receive and I see some of the language online.  Can you help me understand this?
Not asked.

Is there any additional information regarding your beliefs, observances or practices that support your request for a religious accommodation?
No.

Is there anything else we should know or consider as we review your request?

No.

**DISABILITY:**
Medical forms submitted the Friday before last. She will resend directly to me.

**EXHIBIT**
**20**

9/30/2021

● ● ●

Susan H. Welch
Takeda Pharmaceuticals Sales Representative
5008 South Bay Dr. SE, Mandan, ND 58554

**Dear Human Resources Manager:**

I am filing for both medical and religious exemptions.

The reason for this letter is to request an exemption from the company mandate to receive the Covid-19 vaccine based on my strongly held ethical, moral, and medical beliefs. This letter describes in greater detail my reasons for asking for the exemption than the official exemption forms .

I strongly believe in the sanctity of life and of the rights of the un-born. This belief goes above any formal religious positions on the matter, it is a basic human right to life and a basic human right to decide what medications someone puts in their body. All three of the currently available vaccines use cell lines from aborted fetuses either in their direct manufacturing, development, or in their testing procedures and it is my belief that this practice is unethical and immoral.

The decision as to what medications or material I put in my body should be left to me and my physician. I am hesitant to submit to this vaccine mandate due to medical reasons as well.

My mother and my only sibling, a sister, who is 2 years younger and healthier than I am, have both taken the Covid 19 vaccine. They both developed severe adverse events requiring several trips to the hospital Both my mother and my only sister are full biological relatives.

My mother took the Moderna vaccine and my sister took the Pfizer vaccine. My sister's physician was the former head of the Minnesota medical association and now has determined that she has lymphoma like growths on her throat due to the Pfizer vaccine. Both my mother and my sister's physicians are advising that they should not get another Covid 19 Vaccine.

A VAERS report will be enclosed describing my sister's events. She is adding the lymphoma lumps to her report. She filled out the report online and has requested a keycode so that she can submit all the info to me to share with you so that I don't have to go through all of the injuries she is suffering. I am enclosing the confirmation number from VAERS to indicate that this has been filed. As soon as she gets the keycode she will provide me with the full report.

I went through life threatening cardiac issues during one of my pregnancies and nearly died. For these reasons, I do not believe that the risk of this vaccine to my health outweighs a mandate by my employer to keep my job.

In closing, I would like to state that if I was granted an exemption, it would not affect my ability to do my job or impact my access to see my providers.  It would also not negatively impact the company in any way.  I would also like to state that I would be acceptable to continue bi- weekly testing, wearing a mask while on the job, and or working remotely.

  During the height of the pandemic, I was able to work nearly a year doing all these things quite effectively and ended the year with a Crescent  Gold. I  had one of the highest reaches to my customers via remote meetings in my region.

It is taking some time to get all of the documents you are requesting. I was hoping to submit everything on Sept 24.  I didn't want to wait any longer and am submitting what I have so far.   As soon as I get them I will submit them to you.


Thank you in advance for your consideration of this matter.

Sincerely,

*Susan Welch*

Susan H. Welch
Takeda Pharmaceuticals Sales Representative



**HEALTH CARE PROVIDERS INFORMATION**
**CONFIDENTIAL RECORDS STATEMENT**
<u>AUTHORIZATION TO RELEASE MEDICAL RECORDS</u>

**INSTRUCTIONS FOR EMPLOYEE:** Complete health care provider information and sign authorization release below. Make additional copies of this form for each of your health care providers, if you have more than one provider.

Sign and date all forms and return to:
US.Occ.Health.ADA@takeda.com

## *HEALTH CARE PROVIDER INFORMATION*

Attending Health Care Provider's Name: <u>Dr. Julie Schwartz</u>

Address: <u>2700 State Street</u>

City: <u>Bismarck</u>          State: <u>North Dakota</u>          Zip: <u>58503</u>

Phone Number: (701) <u>712-4501</u>          Fax Number: (    )

## *AUTHORIZATION TO RELEASE MEDICAL RECORDS*

I have requested an accommodation from Takeda, my employer, under The Americans with Disabilities Act (ADA) of 1990.

**I hereby authorize the ADA Coordinator for Takeda and Takeda's Occupational Health Lead to communicate directly with the health care provider who completes this form, in order to obtain clarification of issues relating to the functional limitations for which I am seeking an accommodation.**

**A note about the Genetic Information Nondiscrimination Act of 2008 (GINA):**
**The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

**This authorization will automatically end within one year from the date the employee signs this form.**

August 20, 2018 SC          1

US.Occ.Health.ADA@takeda.com

Employee's Signature: _____ Date: 9-24-21

---

**CONFIDENTIALITY NOTICE: Medical-related information shall be kept confidential and maintained separate from other personnel records. However, supervisors and managers may be advised of information necessary to the determinations they are required to make in connection with a request for an accommodation. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations. Government officials investigating compliance with the ADA may also be provided relevant information as requested.**

CONFIDENTIAL

**EMPLOYEE REQUEST FOR ACCOMMODATION BASED ON DISABILITY**

*Please complete this form and return it via email at US.Occ.Health.ADA@takeda.com Please do not submit this form to your manager. Please note this form will not be placed in your personnel file but will be kept in a separate and secure confidential file. Contents of this request are confidential and will not be shared except as needed to consider any reasonable accommodation request.*

**ALL QUESTIONS TO BE COMPLETED BY EMPLOYEE/APPLICANT ONLY:**

Date: 9-24-21

Name: Susan Welch

Employee ID#: 50028835

Please explain which aspects of your employment responsibilities/duties are impacted by your condition.

My Covid-19 vaccine status has no impact on my ability to do my job.

What specific accommodation are you requesting (e.g., time off, additional equipment, etc.)? (Please submit Form B, completed by your medical provider, in support of your response to this question)

Covid-19 vaccine exemption based on immediate biological family members adverse events. -See attached VAERS reports

What other accommodations may be responsive to your request?

No other accommodation is necessary

How long do you anticipate the need for an accommodation? If requesting time off, please provide an estimated return to work date.

I am requesting exemption from the Covid-19 vaccine

I understand that my request for accommodation must be supported by medical documentation. I agree to provide that information as requested per the deadline required. I agree to fully cooperate with Human Resources in responding to my request. I understand I may not be provided with the specific accommodation that I have requested; however, I understand that good faith efforts will be made to consider my request.

Employee Signature: *Susan Welch*    Date: 9-24-21

Please note, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title 11 from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services

Form A

CONFIDENTIAL    TAKEDA_020337



**REQUEST FOR MEDICAL STATUS EVALUATION**
**UNDER THE ADA AMENDMENTS ACT (the "ADAAA")**

Employee Requesting Accommodation:  Susan Welch

Position/Title: Senior Sales Representative     Department:  Sales & Marketing

Work Location: Bismarck Footprint          Work Phone number:  (701) 391-7771

Immediate Supervisor:  Shannon Exner

The information below is treated confidentially, is not maintained in the employee's main personnel file, and will be used only by authorized individuals with a direct need to know and/or evaluate the information.  Please return this form, once completed, to: US.Occ.Health.ADA@takeda.com.

**Supervisors and managers may be advised of information necessary to make the determinations they are required to make in connection with a request for an accommodation.**

**INSTRUCTIONS FOR EMPLOYEE**

**Please provide this form to your healthcare provider along with your attached job description and your signed authorization form.  Takeda will consider your request for accommodation upon receipt of your completed Medical Status Evaluation Form.  If you have any questions, please do not hesitate to call Occ Health or Employee Relations.  Thank you.**

············································································

**THIS SECTION TO BE COMPLETED BY HEALTH CARE PROVIDER:**

Health Care Provider:  *Dr. Julie Schwartz*

Office Address:  *2700 State St. Bismarck, ND 58503*

Office Phone Number:  *701-712-4569*

1.  Based on the job description, can the employee perform the essential functions of the position without an accommodation?

     ☒ **Yes**          ☐ **No**

     *If no*, what essential job function(s) is the employee having trouble performing because of the impairment(s) (attach additional sheets of paper, if necessary)?

     _____
     _____

2.  Can the employee perform the essential functions of his/her position without being a direct threat to his or her own health and safety and/or the health and safety of others in the workplace?

     ☒ **Yes**          ☐ **No**

CONFIDENTIAL                                              TAKEDA_020338



3. *If no,* please explain the basis for your response; including objective medical or other factual evidence (attach additional sheets of paper, if necessary)?

_____

_____

**Questions to help determine effective accommodation options.**

4. *__Is there a reasonable accommodation__* that would enable the employee to perform the essential functions of the job as described in the attached job description? (Please note that the employer retains the discretion to determine whether an accommodation is reasonable.)

☐ **Yes**        ☐ **No**

| Accommodation Being Requested: |
|---|
| Defers the covid vaccine due to family members with reactions to same. |

5. How long do you estimate the accommodation(s) will be needed? Please comment on the estimated duration of the recommended accommodation and the frequency of accommodation if it entails time away from the employee's job:

_____

6. If your proposed accommodation is a leave of absence, when will the employee be able to return to work?

_____

| Reason for Accommodation (functional limitation(s) for which you seek an accommodation): |
|---|
| |
| |
| |
| |

7. Please provide any further information you feel would be useful to the Company in evaluating the employee's situation but do not identify the employee's specific medical condition and do not provide the details of your diagnosis of the employee.

_____

_____

_____

_____

*************************************************************

SIGNATURE OF HEALTHCARE PROVIDER          DATE          9-27-21
(Please do not use signature stamp or designee signature)

CONFIDENTIAL          TAKEDA_020339

## Report Confirmation

Dear Karen Jiran Salls,

*My Maiden name is Jiran*

Thank you for submitting a report to the Vaccine Adverse Event Reporting System (VAERS). Your report helps the Centers for Disease Control and Prevention (CDC) and the Food and Drug Administration (FDA) monitor the safety of vaccines and protect America's health.

*my only sibling is my younger sister this is her report*

Please keep this confirmation for your records.

## Report Confirmation

This confirmation may include updated information

**VAERS ID: 1053373**
**E-Report Number: 320752**
Date of Report: 02/24/2021
Date of Vaccination: 02/15/2021
Patient Age at Vaccination (years): 52.00
Vaccine Information:

1. COVID19 (COVID19 (PFIZER-BIONTECH)) / PFIZER\BIONTECH / EL9264

## How to Update Your Report

- Refer to the VAERS ID (see report summary) or E-Report Number (online reports) when contacting us about this report.

- If you need to update, correct, or add information to your report:

  **Fax:** 877-721-0366
  **Mail:** P.O. Box 1100
  Rockville, MD
  20849-1100

- Do not e-mail sensitive or personal information.

- See **below** for additional ways to contact us.

## How to Contact Us

VAERS

**VAERS**

**Tel:** 800-822-7967
**Fax:** 877-721-0366
**Address:**
P.O. Box 1100
Rockville, MD 20849-1100
**Website:** vaers.hhs.gov
**E-mail:** info@vaers.org
To protect your privacy, please do not send confidential information by email.

Thank you,
*VAERS Staff*

---

## If You Believe You Have Been Injured By Receiving A Vaccine

- First, seek medical attention.

- The federal government gives individuals harmed by covered vaccines a streamlined system for financial compensation for their injuries.

- The Health Resources & Services Administration (HRSA) administers these injury compensation programs:

  **National Vaccine Injury Compensation Program** (VICP):
  **Website:** www.hrsa.gov/vaccinecompensation
  **Tel:** 800-338-2382

  **Countermeasures Injury Compensation Program** (CICP):
  **Website:** www.hrsa.gov/cicp
  **Tel:** 855-266-2427

Compensation claims must be filed separately with HRSA. Reports to VAERS are <u>not</u> compensation claims.

---

  

ConfrmE_V01

**Notice:**
- This e-mail originated from an unattended account. Please do not reply. You may contact us at info@vaers.org.

### MEDICAL INQUIRY FORM IN RESPONSE TO AN ACCOMMODATION REQUEST

*Medical providers—ANSWER ALL QUESTIONS. Completed forms should be sent to the US.OCC.Health.ADA@takda.com. If required, please use additional sheets for any of the information requested below.*

### TO BE COMPLETED BY TREATING PHYSICIAN OR APPROPRIATE MEDICAL PROFESSIONAL ONLY:

Patient Name: _Susan Welch_

| | Yes ☐ | No ☒ |
|---|---|---|
| Does the individual have a physical or mental impairment | | |
| Is the impairment permanent? | Yes ☐ | No ☒ |

If no, how long will the impairment last?

NO impairment

Answer the following questions based on what limitations the employee has when his or her condition is in an active state and what limitations the employee would have if no mitigating measures were used. Mitigating measures include things such as medication medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, and learned behavioral or adaptive neurological modifications. Mitigating measures do not include ordinary eyeglasses or contact lenses.

| Does the impairment limit a major life activity? | | | | | | | Yes ☐ | No ☒ |
|---|---|---|---|---|---|---|---|---|
| *Note: Does not need to significantly or severely restrict to meet this standard.* | | | | | | | | |

If yes, what major life activity(s) is affected? (Please check all applicable below)

| Caring for Self | ☐ | Walking | ☐ | Hearing | ☐ | Lifting | ☐ | Other (describe) | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| Interacting with Others | | Standing | ☐ | Seeing | ☐ | Sleeping | ☐ | | |
| Performing Manual Tasks | | Reaching | ☐ | Speaking | ☐ | Concentrating | ☐ | | |
| Breathing | ☐ | Thinking | ☐ | Learning | ☐ | Reproduction | ☐ | | |
| Working | | Toileting | ☐ | Sitting | ☐ | | | | |

| Does the impairment limit the operation of a major bodily function? | | | | | | | Yes ☐ | No ☒ |
|---|---|---|---|---|---|---|---|---|
| *Note: Does not need to significantly or severely restrict to meet this standard.* | | | | | | | | |

If yes, what bodily function(s) is affected? (Please check all applicable below)

| Immune | ☐ | Hemic | ☐ | Circulatory | ☐ | Normal Cell Growth | ☐ | Other (describe in box below) | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| Special Sense Organs and Skin | | Endocrine | ☐ | Digestive | ☐ | Lymphatic | ☐ | | |
| Reproductive | ☐ | Bowel | ☐ | Neurological | ☐ | Musculoskeletal | ☐ | | |
| Bladder | ☐ | Brain | ☐ | Special Sense | ☐ | Genitourinary | ☐ | | |
| Respiratory | ☐ | Cardiovascular | ☐ | | | | | | |

ADA Reasonable Accommodation Request

CONFIDENTIAL



## MEDICAL INQUIRY FORM IN RESPONSE TO AN ACCOMMODATION REQUEST

What job function(s) is the employee having trouble performing because of the condition(s)?

NA

What assistance/accommodation do you believe would help the employee perform those job function(s)? (If requesting time off, please specify the length of time being requested)

NA

Why do you think it would it be helpful?

NA

How long is that assistance needed? (If request is for time off, please provide estimated return to work date)

NA

Other information relevant for consideration?

Susan defers the Covid vaccine due to family members who have had side effects.

Name of certifying professional (Please print): ___Julie Schwartz___

Title: ___MD___

Certification or license number: ___BS 2022705___

Business address: ___2700 State St. Bismarck, ND 58501___

Telephone number: ___701-712-4569___

_____ MD          1-07-21
Signature of Physician/Health Care Provider          Date

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title 11 from requesting or requiring genetic Information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

ADA Reasonable Accommodation Request

**EXHIBIT**
**22**

| | |
|---|---|
| **From:** | Welch, Susan |
| **Sent:** | Thursday, October 28, 2021 6:57 PM |
| **To:** | Forestier, Irving |
| **Cc:** | Exner, Shannon; Thompson, Staci |
| **Subject:** | RE: Request for Reasonable Accommodation-Disability |

Hello Irving

Thank-you for notifying me of the situation.

As mentioned in your interview, I love my job and was hoping to finish my career with Takeda.
I have been and will continue to work very hard until the very end to make sure all of our providers have everything they need until a replacement is designated.

As for getting the vaccine, there will be no second guessing, all I have to do is look at my mother and sister and know that I made the right choice not getting the vaccine.

Respectfully
Susan Welch

---

**From:** Forestier, Irving <irving.forestier@takeda.com>
**Sent:** Thursday, October 28, 2021 1:36 PM
**To:** Welch, Susan <susan.welch@takeda.com>
**Cc:** Exner, Shannon <shannon.exner@takeda.com>; Thompson, Staci <staci.thompson@takeda.com>
**Subject:** Request for Reasonable Accommodation-Disability

Dear Susan,

As you know, you provided Occupational Health Services (OHS) with a formal request for a reasonable accommodation under the Americans with Disabilities Act (ADA) and/or state equivalent. Your request and supporting documentation have been reviewed and Takeda has determined that you have failed to meet the necessary requirements for the requested exemption. Therefore, your request for a disability-related exemption from the COVID-19 vaccination requirement is denied.

As previously communicated, any U.S. field-based employees who do not report that they are fully vaccinated via the VaxDMS system by November 1, 2021 or who do not receive an approved exemption may be terminated. However, you will have the opportunity to comply with the policy by becoming either fully or partially vaccinated (i.e., receiving the first of a two-shot series) and recording this as directed in the VaxDMS system prior to November 1, 2021.  In such a case, if you are partially vaccinated by November 1, your manager will work with you to determine how to engage virtually after November 1, until you become fully vaccinated and are able to re-engage face-to-face in the field.

Thank you for your understanding as we work to stay safe during the pandemic. We understand that becoming vaccinated is an important personal decision. If you have any questions, please let me know.

1

TAKEDA_020361



Better Health, Brighter Future

Irving I. Forestier
Employee Relations Partner
**Takeda Pharmaceutical Company Limited**
45 Hayden Avenue
Lexington, MA  02421
Office: 978.735.3163
irving.forestier@Takeda.com



CONFIDENTIAL

# Exhibit K

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LISA AMOSON, ROBB HUCK, ALECIA RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH, MATTHEW LYNN HOFFACKER, as the executor of the estate of Troby Lane Parrish, <br><br> Plaintiffs, <br><br> v. <br><br> TAKEDA PHARMACEUTICALS U.S.A., INC., <br><br> Defendant. | Case No.: 1:22-cv-11963-GAO |

<u>**DEFENDANT'S RULE 26(a)(2) EXPERT DISCLOSURES**</u>

Defendant Takeda Pharmaceuticals U.S.A., Inc. ("Defendant" or "Takeda"), by and through its attorneys, Morgan, Lewis & Bockius LLP, hereby provides its expert disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. Daniel Salmon, PhD, MPH, of the Johns Hopkins University Bloomberg School of Public Health, may be used at trial to present evidence as an expert witness on Defendant's behalf concerning the efficacy of COVID-19 vaccines and other, alternative protective measures, as well as concerning the health and safety risks to the Plaintiffs, patients, and healthcare providers associated with Plaintiffs remaining unvaccinated. Dr. Salmon has prepared a report, which satisfies the requirements of Fed. R. Civ. P. 26(a)(2)(B), with his conclusions regarding the aforementioned topics. Dr. Salmon's report is attached hereto as Exhibit A. Defendant reserves the right to supplement or amend this expert disclosure. This disclosure is made subject to and without waiver of any objection to or privilege protecting the production or use of any document.

1

Dated: May 13, 2024

**MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ *Keri L. Engelman*
     Keri L. Engelman (BBO# 704360)

Celina Antonellis (BBO# 708904)
One Federal Street
Boston, MA 02110
Tel. (617) 341-7700
Fax. (617) 341-7701
keri.engelman@morganlewis.com
celina.antonellis@morganlewis.com

Thomas A. Linthorst*
Jason J. Ranjo*
502 Carnegie Center
Princeton, NJ 08540
Tel. (609) 919-6600
Fax. (609) 919-6701
thomas.linthorst@morganlewis.com
jason.ranjo@morganlewis.com

*Attorneys for Defendant*

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2024, the foregoing document was served by electronic mail upon the following:

Christopher DeMatteo
Pattis & Paz LLC
383 Orange Street
New Haven, CT 06511
Tel. (203) 393-3017
Fax. (203) 393-9745
cdematteo@pattispazlaw.com

*Attorney for Plaintiffs*

*/s/ Keri L. Engelman*
Keri L. Engelman

# Exhibit A

May 13, 2024

### Expert Report of Daniel Salmon, PhD, MPH

**<u>Professional Experience</u>**

Dr. Salmon is a Professor of Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins University Bloomberg School of Public Health. He also has a joint appointment in the Department of Health, Behavior and Society. Dr. Salmon serves as the Director of the Institute for Vaccine Safety at Johns Hopkins.

Dr. Salmon is broadly trained in vaccinology, with an emphasis in epidemiology, behavioral epidemiology, and health policy. Dr. Salmon received a Bachelor of Arts (BA) in Political Science with a minor in Psychology from Rutgers University in 1991. He received a Master of Public Health (MPH) from Emory University Rollins School of Public Health in 1996. Dr. Salmon received a Doctor of Philosophy (PhD) from Johns Hopkins University Bloomberg School of Public Health in 2003.

Dr. Salmon has held positions in government and academia. Dr. Salmon has worked for the Centers for Disease Control and Prevention as a contractor and later as a Policy Analyst. In these positions, he used surveillance systems to conduct studies of measles and pertussis and coordinated Federal efforts around vaccine safety, immunization information systems, and development of new vaccines such as for tuberculosis. Dr. Salmon also served as the Director of Vaccine Safety, National Vaccine Program Office, Department of Health and Human Services. In this capacity, Dr. Salmon was responsible for coordinating and overseeing the nation's vaccine safety system including vaccine safety activities in the Department of Health and Human Services (National Institute of Health, Food and Drug Administration, Centers for Disease Control and Prevention, and Health Resources and Services Administration) other federal departments (Defense, Veterans Affairs, State), and non-federal partners including academia, industry, professional medical and public health associations, states and localities, and the public.

Dr. Salmon led a Secretary's initiative in vaccine safety, oversaw the 2009 H1N1 vaccine safety program, and served as the Designated Federal Official for the National Vaccine Advisory Committee (NVAC) Vaccine Safety Working Group and the Advisory Commission on Childhood Vaccines (ACCV). Among other accomplishments, Dr. Salmon created the Post-Licensure Rapid Immunization Safety Monitoring (PRISM) Network to conduct active vaccine safety surveillance for the 2009 H1N1 immunization program. PRISM became an ongoing surveillance system for the Food and Drug Administration as a part of the Sentinel program.

Dr. Salmon has conducted a broad range of research in academia including research grants funded by the National Institutes of Health, Centers for Disease Control and Prevention, state health departments, the World Health Organization, Gavi, the Vaccine Alliance, the Robert Wood Johnson Foundation, and private industry including Walgreens, Pfizer, Merck and Crucell. Dr. Salmon has also served as a grant reviewer for the National Institutes for Health, Centers for

Disease Control and Prevention, Food and Drug Administration, National Science Foundation, the Gates Foundation, as well as numerous other country federal health authorities. Dr. Salmon has taught and continues to teach a class in vaccine policy for two decades and also currently teaches a class in public health practice at Johns Hopkins University Bloomberg School of Public Health. Dr. Salmon has mentored numerous students and scientists, many of which now hold leadership positions in academia, government, and international organizations.

Dr. Salmon's research and practice work has included a broad range of studies examining the individual and community risks of vaccine refusal, the impact of laws and policies in increasing vaccination coverage and controlling vaccine preventable diseases, the reasons why patients and parents refuse vaccines, and the role of healthcare providers in impacting patient and parent vaccine decision-making. Dr. Salmon is widely considered a national and global expert in these areas. Dr. Salmon was a member of the Lancet Commission on Vaccine Hesitancy and served on a National Vaccine Advisory Committee Working Group on vaccine hesitancy.

Dr. Salmon has published more than 100 papers in top medical and public health journals including the New England Journal of Medicine, the Lancet, the Journal of the American Medical Association, Health Affairs, and Pediatrics. Dr. Salmon regularly serves as a peer reviewer for these and other high impact journals. He has been invited to give presentations at the National Foundation for Infectious Diseases, federal advisory committees, and many international meetings. Dr. Salmon has served as an expert witness for a variety of legal cases. In the past 4 years he has testified [at trial or by deposition] in *Mitra v Mullenax* (Crawford County, PA, 3/17/23) and *Brandon v. Board of Education of the City of St. Lois* (deposition 04/12/24; St. Louis).

## **Documents**

In addition to the various documents cited throughout this Report, Dr. Salmon has considered the following materials provided by Morgan, Lewis & Bockius LLP, on behalf of Takeda Pharmaceuticals U.S.A.;

1) Complaint
2) Deposition Excerpts from Alecia Ramsey, Britt Singleton, Jillyn Schmidt, Larry Savage, Lisa Amoson, Robb Huck, Sandy Silva and Susan Welch
3) Job Description for Alecia Ramsey, Britt Singleton, Jillyn Schmidt, Larry Savage, Lisa Amoson, Robb Huck, Sandy Silva, Troby Parrish, and Susan Welch
4) Takeda Vaccination Policy Announcement
5) Call with Michael Maddock to discuss Troby Parrish's job functions, as described in the declaration included as Appendix 2.

## **Scope of Report**

The client has not impacted the content of this report. Dr. Salmon has been compensated $15,000 for this report. Dr. Salmon will be compensated at a rate of $450 per hour for time spent beyond this report such as deposition or testimony at trial.

Dr. Salmon was requested by the Defendant to provide opinions on the following issues:

1) What was the efficacy of Covid-19 vaccines available as of September 10, 2021?

2) What was the efficacy of alternative protective measures, such as masks, social distancing, and testing, as compared to Covid-19 vaccines available as of September 10, 2021?

3) Based on the information available as of September 10, 2021, what were the health/safety risks to NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers, Alpha 1 Territory Business Managers, and Immunology Patient Access Managers working in the field without vaccination?

4) Based on the information available as of September 10, 2021, what were the health/safety risks to patients and healthcare providers associated with NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers, Alpha 1 Territory Business Managers, and Immunology Patient Access Managers working in the field without vaccination?

5) Based on the information available as of September 10, 2021, how effective were alternative protective measures, such as masks, social distancing, and testing, in mitigating the risk of pharmaceutical field employees conducting in-person interactions without vaccination?

Dr. Salmon's professional judgement in these areas is based upon review of current scientific evidence and federal advisory repots (referenced accordingly). However, at the request of counsel, data sources were limited to those available as of September 10, 2021.

<u>What was the efficacy of Covid-19 vaccines available as of September 10, 2021?</u>

On September 10, 2021, three vaccines were available to prevent COVID-19:
1) Moderna COVID-19 vaccine (mRNA-1273);
2) Pfizer and BioNTech COVID-19 vaccine (BNT162b2); and
3) Janssen Biotech COVID-19 vaccine (Ad26.COV2.S)

The most accurate estimates of the efficacy of COVID-19 vaccines as of September, 2021 were based on the information available from the Phase 3 clinical trials that were considered by the Food and Drug Administration (FDA) and its Vaccines and Related Biological Product Advisory Committee (VRBPAC) which were made available to the public.

The Moderna COVID-19 vaccine (mRNA-1273) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blinded and placebo-controlled trial of mRNA-1273 included approximately 30,400 participants. The primary efficacy endpoint was the reduction of incidence of COVID-19 among participants without evidence of SARS-CoV-2 infection before the first dose of vaccine. Efficacy in preventing confirmed COVID-19 occurring at least 14 days after the second dose of vaccine was 94.5.0% (95% CI 86.5%, 97.8%). Subgroup analyses showed similar efficacy across

age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[1]

The Pfizer and BioNTech COVID-19 vaccine (BNT162b2) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blinded and placebo-controlled trial of BNT162b2 included approximately 44,000 participants. The primary efficacy endpoint was incidence of COVID-19 among participants without evidence of SARS-CoV-2 infection before or during the two-dose vaccination regimen. Efficacy in preventing confirmed COVID-19 occurring at least seven days after the second dose of vaccine was 95.0%. Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[2]

Janssen Biotech COVID-19 vaccine (Ad26.COV2.S) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blind and placebo-controlled trial of Ad26.COV2.S included approximately 40,000 participants. Vaccine efficacy against central laboratory-confirmed moderate to severe/critical COVID-19 was 66.9% (95% CI 59.0, 73.4) when considering cases occurring at least 14 days after the single-dose vaccination. Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[3]

<u>What was the efficacy of alternative protective measures, such as masks, social distancing, and testing, as compared to Covid-19 vaccines available as of September 10, 2021?</u>

Alternative infection control strategies such as masking, social distancing, and testing had an impact on the spread of COVID-19. However, these strategies had significant limitations, and the most effective policy to control COVID-19 in healthcare settings was a comprehensive approach where strategies were combined or layered.

The use of masks in healthcare settings to prevent COVID-19 vaccine was based on what was then known regarding mask wearing in healthcare settings to control influenza. Wearing a mask has a clear benefit in reducing the acquisition and transmission of influenza. Two studies have shown that surgical masks are similar to some types of respirators in protecting healthcare

---

[1] Vaccines and Related Biological Products Advisory Committee Meeting. December 17, 2020. FDA Briefing Document. Moderna COVID-19 Vaccine. https://www.fda.gov/media/144434/download  Accessed 04/12/24
[2] Vaccines and Related Biological Products Advisory Committee Meeting. December 10, 2020. FDA Briefing Document. Pfizer-BioNTech COVID-19 Vaccine. https://www.fda.gov/media/144245/download  Accessed 04/12/24.
[3] Vaccines and Related Biological Products Advisory Committee Meeting
February 26, 2021 FDA Briefing Document: Janssen Ad26.COV2.S Vaccine for the Prevention of COVID-19. https://www.fda.gov/media/146217/download. Accessed 04/12/24.

workers from acquiring influenza.[4,5] However, wearing a surgical mask when treating patients in lieu of mandatory vaccination is problematic for many reasons.

First and foremost, surgical masks do not work nearly as well as vaccinations which is why the CDC considered influenza vaccination the first and best way to prevent influenza. In fact, implementing a surgical mask policy in lieu of vaccination is problematic. A study of healthcare workers at 12 hospitals found that the SARS-CoV-2 test positivity rate among healthcare workers decreased from 14.7% to 11.5% during a three-week period after implementation of universal masking.[6] Such a program requires oversight to ensure compliance. Doing so would be very difficult, particularly if only for employees who have forgone vaccination. The healthcare institution would need to know who has an exemption and then develop a program that would target them to make sure they consistently wear the mask. This would be a difficult and expensive program to implement, and poor compliance would further enhance the risk of viral acquisition and transmission.

Regular testing for COVID-19 allows for the identification of persons who have active disease, however, there are limitations to this approach. First, as of September 10, 2021, available COVID-19 tests were imperfect with the potential for both false positives and false negatives.[7] Additionally, by September 10, 2021, it had been well-established that people could transmit COVID-19 before becoming symptomatic and among asymptomatic cases. As a consequence, even daily COVID-19 testing would not identify people as soon as they became infectious. In the time between when a person first became infectious and when the test was taken, there was risk that the person would infect others.

Social distancing can reduce the transmission of COVID-19, and many healthcare practices as well as schools, businesses, and government buildings were instituting social distancing policies. But, social distancing is difficult to implement and only has limited (and poorly defined) effectiveness.

Each of these approaches – vaccination, masks, testing, and social distancing – all have the potential to reduce disease transmission but are all imperfect by themselves. While the vaccines were shown to have very high efficacy, they are imperfect and some people who are vaccinated will still contract and transmit disease. The most effective approach to reducing transmission of COVID-19 in a healthcare setting is to require all these approaches, thus layering protection, as was done in most healthcare settings.

<u>Based on the information available as of September 10, 2021, what were the health/safety risks to NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers,</u>

---

[4] Johnson DF, Druce JD, Birch C, Grayson ML. A quantitative assessment of the efficacy of surgical and N95 masks to filter influenza virus in patients with acute influenza infection. Clin Infect Dis 2009;49(2):275–277.

[5] Aiello AE, Murray GF, Perez V, et al. Mask use, hand hygiene, and seasonal influenza-like illness among young adults: a randomized intervention trial. J Infect Dis;201(4):491–498.

[6] Wang X, Ferro EG, Zhou G, et al. Association between universal masking in a healthcare system and SARS-CoV-2 positivity among healthcare workers. *JAMA*. 2020;324(7):703.

[7] Korenkov M et al. Evaluation of a Rapid Antigen Test To Detect SARS-CoV-2 Infection and Identify Potentially Infectious Individuals. J Clin Microbiol. 2021 Aug 18;59(9).

Alpha 1 Territory Business Managers, and Immunology Patient Access Managers working in the field without vaccination?

Based on the demonstrated efficacy of the Moderna, Pfizer, and J&J COVID-19 vaccines in preventing disease and reducing transmission to others (both by reducing the risk of infection and reducing the viral load if a breakthrough infection),[8] unvaccinated persons were at increased risk of contracting COVID-19 and transmitting it to others who could not be vaccinated because of medical contraindications, were too young to be vaccinated, or for whom the vaccine was not effective (as well as persons who were unvaccinated because they did not have access to the vaccines or decided to forgo vaccination).

NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers, Alpha 1 Territory Business Managers, and Immunology Patient Access Managers, per their job descriptions, regularly interacted with other NSBU employees and consequently when unvaccinated had the potential to impact co-workers as unvaccinated persons are at greater risk of contracting and spreading COVID-19 than vaccinated persons. The risk of unvaccinated persons to co-workers depends on the level of proximity and frequency of interactions and the vulnerability of coworkers. The vulnerability of coworkers includes their susceptibility to COVID-19 (whether or not they are immune) and the likelihood of the co-worker having more severe disease including hospitalization and death. In addition to the risk of an unvaccinated person on an individual coworker, workplace outbreaks (started or contributed to by unvaccinated persons) have the potential to be extremely disruptive to the functioning of workplaces. COVID-19, as many infectious diseases, was coming in waves. Thus, a workplace experiencing an outbreak during a wave, particularly where there were unvaccinated persons, could run into significant difficulties continuing the operation of the workplace when many people became ill. Many workplaces took measures to reduce the spread of COVID-19 such as social distancing, wearing masks and regular testing, as described below. However, as discussed, vaccination of workers to prevent transmission in the workplace was extremely important.

Based on the information available as of September 10, 2021, what were the health/safety risks to patients and healthcare providers associated with NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers, Alpha 1 Territory Business Managers, and Immunology Patient Access Managers working in the field without vaccination?

NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers, Alpha 1 Territory Business Managers, and Immunology Patient Access Managers, per their job descriptions, regularly interacted (see depositions[9]) with patients and consequently when

---

[8] Marc Shamier, Alma Tostmann Susanne Bogers et al. Virological characteristics of SARS-CoV-2 vaccine breakthrough infections in healthcare workers. Medriv. Aug 21, 2021. https://www.medrxiv.org/content/10.1101/2021.08.20.21262158v1  accessed 04/13/24.

[9] Huck Tr., 132:23-134:11, 137:18-139:22, 145:11-25: Savage Tr., 136:17-137:9, 138:19-140:6, 141:1-142:10, 145:22-146:3; Singleton Tr., 65:18-23, 68:13-69:18, 71:6-73:7, 75:7-76:5; Schmidt Tr., 206:24-207:19, 209:2-210:16, 211:3-9, 222:5-223:19; Ramsey Tr., 240:11-242:23, 243:20-246:20, 248:10-249:16, 255:5-21.; Amoson Tr., 95:2-9, 101:20-102:19, 106:1-109:4.; Silva Tr., 127:25-128:4, 128:20-129:5, 132:22-133:12; Welch Dep. 128:12-133:17, 134:6-135:1.

unvaccinated had the potential to impact co-workers as unvaccinated persons are at greater risk of contracting and spreading COVID-19 than vaccinated persons.

As with coworkers, unvaccinated persons have a potential impact on patients as unvaccinated persons are at greater risk of contracting and spreading COVID-19 than vaccinated persons. Often, patients are at increased risk of serious complications and mortality from COVID-19, depending on their medical conditions and age (patients are often older and have more comorbidities than the general population). Additionally, patients and their families have a reasonable expectation that those who are providing them healthcare services are doing everything they can to reduce the potential for the worker to transmit disease to the patient, particularly during a pandemic.

Broadly speaking, even under normal circumstances, healthcare workers take a broad range of measures to protect their patients such as taking TB tests, frequent hand washing, wearing gloves and masks, and receiving recommended vaccines. Which of these practices are used depends on the healthcare setting, types of patients being seen, and policies of the organization employing the healthcare worker. As described by Bester, healthcare providers have a duty to protect their patients against COVID-19 spread.[10]  During the pandemic, most healthcare facilities had reduced or eliminated elective procedure and routine care to use healthcare capacity for COVID-19 and necessary procedures, and to protect patients and healthcare providers. Thus, when a patient had a necessary procedure, the choices of the patient were limited as the procedure or healthcare visit was necessary and the patient was dependent on the healthcare provider to reduce the risk of transmitting COVID-19.

Based on the information available as of September 10, 2021, how effective were alternative protective measures, such as masks, social distancing, and testing, in mitigating the risk of pharmaceutical field employees conducting in-person interactions without vaccination?

As previously discussed, alternative protective measures such as masks, social distancing and testing have the potential to reduce disease transmission but are all imperfect by themselves. While the vaccines were shown to have very high efficacy, they are imperfect and some people who are vaccinated will still contract and transmit disease. The most effective approach to reducing transmission of COVID-19 is to require all these approaches, thus layering protection, as was done in most settings.

## Conclusion

On September 10, 2021, it was well understood that COVID-19 was a highly infectious disease, causing substantial morbidity and mortality. COVID-19 vaccines had been shown to be very effective, providing significant protection to persons who were vaccinated and reducing the risk of disease transmission. Alternatives to vaccination such as masks, social distancing and regular testing had value, but were insufficient absent vaccination.

---

[10] Bester JC. A Clinician's Obligation to be Vaccinated: Four Arguments that Establish a Duty for Healthcare Professionals to be Vaccinated Against COVID-19. J Bioeth Inq. 2022 Sep;19(3):451-465.

Unvaccinated persons posed risk to themselves and others, particularly patients in medical offices.

While masking, social distancing and periodic testing were important policies in addition to vaccination, there is no doubt that patient safety was optimized by layering these approaches.

Daniel Salmon, Ph.D., MPH

Appendix 1

Revised January 6, 2024

**CURRICULUM VITAE**

## Daniel Salmon

*Home*
540 Walters Mill Rd
Forrest Hill, MD 21050

*Business*
615 N. Wolfe Street, W5035
Baltimore, MD 21205
Tel: (443) 803-7754
E-mail: dsalmon1@jhu.edu

Global Disease Epidemiology and Control
Department of International Health
Department of Health, Behavior & Society
Institute for Vaccine Safety
The Johns Hopkins University
Bloomberg School of Public Health

# Education and Training

2003    PhD, Health Policy and Management, Johns Hopkins University Bloomberg School of Public Health, Baltimore, MD
Dissertation:  School Implementation of Immunization Requirements: Are School Policies or Personnel Associated with the Likelihood of a Child Claiming an Exemptions or School-Based Outbreaks of Measles or Pertussis?

1996    MPH, Health Policy and Management, Emory University Rollins School of Public Health, Atlanta, GA
Thesis: Health Consequences of Religious and Philosophical Exemptions from Immunization Laws: Individual and Societal Risk of Measles

1991    BA, Political Science with Minor in Psychology, Rutgers University, New Brunswick, NJ

# Professional Experience

2018 -    Director, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health

2017 -    Professor, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health

2017 -          Professor, Health, Behavior and Society (joint appointment), The Johns
                Hopkins University, Bloomberg School of Public Health

2018 - 2021     Director of PhD Program, Global Disease Epidemiology and Control,
                Department of International Health, The Johns Hopkins University,
                Bloomberg School of Public Health

2012 - 2018     Deputy Director, Institute for Vaccine Safety, The Johns Hopkins University,
                Bloomberg School of Public Health

2012 - 2017     Associate Professor, Global Disease Epidemiology and Control, Department of
                International Health, The Johns Hopkins University, Bloomberg School of
                Public Health

2013 - 2017     Associate Professor, Health, Behavior and Society (joint appointment), The
                Johns Hopkins University, Bloomberg School of Public Health

2007 - 2012     Director of Vaccine Safety (GS 15 – Step 10), National Vaccine Program Office,
                Office of the Assistant Secretary for Health, Department of Health and Human
                Services

2007 - 2012     Adjunct Associate Professor, Global Disease Epidemiology and Control,
                Department of International Health, The Johns Hopkins University,
                Bloomberg School of Public Health

2005 - 2007     Associate Professor, Department of Epidemiology and Health Policy Research,
                University of Florida, College of Medicine

2003 - 2005     Assistant Scientist, Division of Disease Prevention and Control, Department
                of International Health, Associate Director for Policy and Behavioral
                Research, Institute for Vaccine Safety, The Johns Hopkins University,
                Bloomberg School of Public Health

2001 - 2003     Research Associate, Division of Disease Prevention and Control, Department
                of International Health, Associate Director for Policy and Behavioral
                Research, Institute for Vaccine Safety, The Johns Hopkins University,
                Bloomberg School of Public Health

1999 - 2001     Consultant, Institute for Vaccine Safety, The Johns Hopkins University,
                Bloomberg School of Public Health

2000            Consultant, Merck Vaccine Division, Merck and Co, Inc.

1997 - 1999     Policy Analyst, National Vaccine Program Office, Centers for Disease Control
                and Prevention

| 1995 -1997 | Contractor, National Immunization Program, Centers for Disease Control and Prevention |
| 1994 - 1995 | HIV Prevention Community Coordinator, Health Visions, Inc. |
| 1994 | Consultant, Health Visions, Inc. |
| 1990 - 1992 | Residential Aide/Counselor, Alternatives, Inc. |

# Professional Activities

*Society Membership*
American Public Health Association, Member (1995-1999)
Infectious Disease Society of America, Member (2005-2007)

*Advisory Panels*
39th National Immunization Conference External Planning Committee (2004)
Merck Vaccine Policy Board Member (2007)
Parents of Kids with Infectious Diseases (PKIDS), Board Member (2007- 2010)
Brighton Collaboration, Board Member, Vaccine Hesitancy Working Group Co-Chair (2012-2020)
National Vaccine Advisory Committee (NVAC) Vaccine Confidence Working Group (2018-22)
Janssen Vaccine Policy Board Member (2021)
Moderna Vaccine Safety Board (2022- )

# Editorial Activities

*Peer Reviewer (selected)*
American Journal of Preventive Medicine
American Journal of Public Health
Archives of Pediatric and Adolescent Medicine
Biosecurity and Bioterrorism
BMC Family Practice
BMC Public Health
Expert Reviews of Vaccines
Health Affairs
Health Education Research
Indian Journal of Medical Science
Journal of Comparative Family Studies
Journal of Health Communication
Journal of the American Medical Association

Journal of the National Medical Association
Journal of Urban Health
New England Journal of Medicine
Pediatrics Pediatric Infectious Disease Journal
Pediatrics International
Public Health Reports
The Lancet
The Lancet, Infectious Diseases
Vaccine
Vaccines

*Editorial Board*
Vaccine, Associate Editor (2021- 2022)
Vaccines (2012-2013)

*Guest Editor*
Pediatrics Supplement: Vaccine Safety Throughout the Product Life Cycle (2011)
Vaccines Supplement: Confidence in Vaccines (2013)

# Review of Proposals (selected)

National Institutes of Health, Dissemination & Implementation in Heath Study Section (DIHR). Special Emphasis Panels for National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration (Chair), National Science Foundation, and Canadian Institutes of Health Research.

# Honors and Awards

- Haddon Fellow, Johns Hopkins University Bloomberg School of Public Health (1999-2001)
- Achievement Award – Dedication to Students, Johns Hopkins Bloomberg School of Public Health (2005)
- Development of the Federal Immunization Safety Task Force, Assistant Secretary for Health (2008)
- Federal Monitoring of H1N1 Vaccine Safety, Assistant Secretary for Health (2010)
- Patient Education Working Group Co-Chair, Assistant Secretary for Health (2012)
- Outstanding recent graduate (within past 10 years), Johns Hopkins Bloomberg School of Public Health (2013)
- Delta Omega Society (2014)

# Publications (* indicated student/advisee/mentee)

## Journal Articles (Peer Reviewed in past 10 years).

1. Dudley MZ, Schwartz B, Brewer J, Kan L, Bernier R, Gerber JE, Budigan Ni H*, Proveaux TM, Rimal RN, **Salmon DA**. COVID-19 vaccination attitudes, values, intentions: US parents for their children, September 2021. Vaccine. 2023 Nov 30;41(49):7395-7408.

2. Delamater PL, Buttenheim AM, **Salmon DA**, Schwartz JL, Omer SB. Kindergarten Vaccination Status in California After Changes to Medical Exemption Policy. JAMA. 2023 Oct 24;330(16):1585-1587.

3. Schuh HB, Rimal RN, Breiman RF, Orton PZ, Dudley MZ, Kao LS, Sargent RH, Laurie S, Weakland LF, Lavery JV, Orenstein WA, Brewer J, Jamison AM*, Shaw J, Josiah Willock R, Gust DA, **Salmon DA**. Evaluation of online videos to engage viewers and support decision-making for COVID-19 vaccination: how narratives and race/ethnicity enhance viewer experiences. Front Public Health. 2023 Aug 21;11:1192676.

4. Kitano T*, Thompson DA, Engineer L, Dudley MZ, **Salmon DA**. Risk and Benefit of mRNA COVID-19 Vaccines for the Omicron Variant by Age, Sex, and Presence of Comorbidity: A Quality-Adjusted Life Years Analysis. Am J Epidemiol. 2023 Jul 7;192(7):1137-1147.

5. **Salmon DA**, Dudley MZ, Brewer J, Shaw J, Schuh HB, Proveaux TM, Jamison AM*, Forr A, Goryn M, Breiman RF, Orenstein WA, Kao LS, Josiah Willcock R, Cantu M, Decea T, Mowson R, Tsubata K, Bucci LM, Lawler J, Watkins JD, Moore JW, Fugett JH, Fugal A, Tovar Y, Gay M, Cary AM, Vann I, Smith LB, Kan L, Mankel M, Beekun S, Smith V, Adams SD, Harvey SA, Orton PZ. LetsTalkShots: personalized vaccine risk communication. Front Public Health. 2023 Jun 30;11:1195751.

6. Dudley MZ, Schuh HB, Shaw J, **Salmon DA**. Attitudes and Values of US Adults Not Yet Up-to-Date on COVID-19 Vaccines in September 2022. J Clin Med. 2023 Jun 8;12(12):3932.

7. Carleton BC, **Salmon DA**, Wong ICK, Lai FTT. Benefits v. risks of COVID-19 vaccination: an examination of vaccination policy impact on the occurrence of myocarditis and pericarditis. Lancet Reg Health West Pac. 2023 May 19;37:100797.

8. Schwartz B, Brewer J, Budigan H, Bernier R, Dudley MZ, Kan L, Proveaux TM, Roberts R, Tafoya N, Hamlin MD, Moore L, Hughes M, Turner B, Al-Dahir S, Velasco E, Privor-Dumm L, Veloz W, White JA, Dubois S, Ooton J, Kipp BJ, Show TJ, Salu K, Chavez B, Montes MDP, Najera R, King T, **Salmon DA**. Factors Affecting SARS-CoV-2 Vaccination Intent and Decision Making Among African American, Native American, and Hispanic Participants in a Qualitative Study. Public Health Rep. 2023 May-Jun;138(3):422-427.

9. **Salmon DA**, Plotkin S, Navar AM. Vaccine Decision-making in a Time of Conflicting Recommendations: A Call to Go Beyond Politics. Pediatr Infect Dis J. 2023 May 1;42(5):e138-e139.

10. Dudley MZ, Gerber JE*, Budigan Ni H*, Blunt M*, Holroyd TA*, Carleton BC, Poland GA, **Salmon DA**. Vaccinomics: A scoping review. Vaccine. 2023 Mar 31;41(14):2357-2367.

11. Schwartz B, Brewer J, Budigan H, Bernier R, Dudley MZ, Kan L, Proveaux TM, Roberts R, Tafoya N, Hamlin MD, Moore L, Hughes M, Turner B, Al-Dahir S, Velasco E, Privor-

Dumm L, Veloz W, White JA, Dubois S, Ooton J, Kipp BJ, Show TJ, Salu K, Chavez B, Montes MDP, Najera R, King T, **Salmon DA**. Factors Affecting SARS-CoV-2 Vaccination Intent and Decision Making Among African American, Native American, and Hispanic Participants in a Qualitative Study. Public Health Rep. 2023 Mar 27:333549231160871.

12. Carpiano RM, Callaghan T, DiResta R, Brewer NT, Clinton C, Galvani AP, Lakshmanan R, Parmet WE, Omer SB, Buttenheim AM, Benjamin RM, Caplan A, Elharake JA, Flowers LC, Maldonado YA, Mello MM, Opel DJ, **Salmon DA**, Schwartz JL, Sharfstein JM, Hotez PJ. Confronting the evolution and expansion of anti-vaccine activism in the USA in the COVID-19 era. Lancet. 2023 Mar 18;401(10380):967-970.

13. Dudley MZ, Schuh HB, Shaw J, Rimal RN, Harvey SA, Balgobin KR*, Zapf AJ, **Salmon DA**. COVID-19 vaccination among different types of US Healthcare Personnel. Vaccine. 2023 Feb 17;41(8):1471-1479.

14. Dudley MZ, Barnett EE, Paulenich A, Omer SB, Schuh H, Proveaux TM, Buttenheim AM, Klein NP, Delamater P, McFadden SM, Patel KM, **Salmon DA**. Characterization of parental intention to vaccinate elementary school aged children in the state of California. Vaccine. 2023 Jan 16;41(3):630-635.

15. Budigan Ni H*, de Broucker G, Patenaude BN, Dudley MZ, Hampton LM, **Salmon DA**. Economic impact of vaccine safety incident in Ukraine: The economic case for safety system investment. Vaccine. 2023 Jan 4;41(1):219-225.

16. Opel DJ, Brewer NT, Buttenheim AM, Callaghan T, Carpiano RM, Clinton C, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Schwartz JL, Benjamin RM, Caplan A, DiResta R, Lakshmanan R, Maldonado YA, Mello MM, Parmet WE, **Salmon DA**, Sharfstein JM, Omer SB. The legacy of the COVID-19 pandemic for childhood vaccination in the USA. Lancet. 2023 Jan 7;401(10370):75-78.

17. **Salmon DA**, Schuh HB, Sargent RH, Konja A, Harvey SA, Laurie S, Mai BS, Weakland LF, Lavery JV, Orenstein WA, Breiman RF. Impact of vaccine pause due to Thrombosis with thrombocytopenia syndrome (TTS) following vaccination with the Ad26.COV2.S vaccine manufactured by Janssen/Johnson & Johnson on vaccine hesitancy and acceptance among the unvaccinated population. PLoS One. 2022 Oct 11;17(10):e0274443.

18. Mello MM, Opel DJ, Benjamin RM, Callaghan T, DiResta R, Elharake JA, Flowers LC, Galvani AP, **Salmon DA**, Schwartz JL, Brewer NT, Buttenheim AM, Carpiano RM, Clinton C, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, Sharfstein JM, Caplan A. Effectiveness of vaccination mandates in improving uptake of COVID-19 vaccines in the USA. Lancet. 2022 Aug 13;400(10351):535-538.

19. Omer SB, O'Leary ST, Bednarczyk RA, Ellingson MK, Spina CI, Dudley MZ, Chamberlain AT, Limaye RJ, Brewer SE, Frew PM, Malik FA, Orenstein W, Halsey N, Ault K, **Salmon DA**. Multi-tiered intervention to increase maternal immunization coverage: A randomized, controlled trial. Vaccine. 2022 Aug 12;40(34):4955-4963.

20. Sargent RH, Laurie S, Weakland LF, Lavery JV, **Salmon DA**, Orenstein WA, Breiman RF. Use of Random Domain Intercept Technology to Track COVID-19 Vaccination Rates in Real Time Across the United States: Survey Study. J Med Internet Res. 2022 Jul 1;24(7):e37920.

21.  Dudley MZ, Schwartz B, Brewer J, Kan L, Bernier R, Gerber JE, Ni HB, Proveaux TM, Rimal RN, **Salmon DA**. COVID-19 Vaccination Status, Attitudes, and Values among US Adults in September 2021. J Clin Med. 2022 Jun 28;11(13):3734.

22.  Sargent RH, Laurie S, Moncada L, Weakland LF, Lavery JV, **Salmon DA,** Orenstein WA, Breiman RF. Masks, money, and mandates: A national survey on efforts to increase COVID-19 vaccination intentions in the United States. PLoS One. 2022 Apr 21;17(4):e0267154.

23.  Brewer NT, Buttenheim AM, Clinton CV, Mello MM, Benjamin RM, Callaghan T, Caplan A, Carpiano RM, DiResta R, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, **Salmon DA,** Schwartz JL, Sharfstein JM, Opel DJ. Incentives for COVID-19 vaccination. Lancet Reg Health Am. 2022 Apr;8:100205.

24.  Trent MJ*, **Salmon DA**, MacIntyre CR. Predictors of pneumococcal vaccination among Australian adults at high risk of pneumococcal disease. Vaccine. 2022 Feb 16;40(8):1152-1161.

25.  Patel KM, McFadden SM, Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon DA**, Omer SB, Buttenheim AM. Evaluation of Trends in Homeschooling Rates After Elimination of Nonmedical Exemptions to Childhood Immunizations in California, 2012-2020. JAMA Netw Open. 2022 Feb 1;5(2):e2146467.

26.  Dudley MZ, Omer SB, O'Leary ST, Limaye RJ, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Chamberlain AT, Malik F, Frew PM, Church-Balin C, Riley LE, Ault KA, Orenstein WA, Halsey NA, **Salmon DA**. MomsTalkShots, tailored educational app, improves vaccine attitudes: a randomized controlled trial. BMC Public Health. 2022 Nov 21;22(1):2134.

27.  Trent M*, Seale H, Chughtai AA, **Salmon D**, MacIntyre CR. Trust in government, intention to vaccinate and COVID-19 vaccine hesitancy: A comparative survey of five large cities in the United States, United Kingdom, and Australia.  Vaccine. 2022 Apr 14;40(17):2498-2505.

28.  Brewer NT, Buttenheim AM, Clinton CV, Mello MM, Benjamin RM, Callaghan T, Caplan A, Carpiano RM, DiResta R, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, **Salmon DA**, Schwartz JL, Sharfstein JM, Opel DJ. Incentives for COVID-19 vaccination.  Lancet Reg Health Am. 2022 Apr;8.

29.  Patel KM, McFadden SM, Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon DA**, Omer SB, Buttenheim AM. Evaluation of Trends in Homeschooling Rates After Elimination of Nonmedical Exemptions to Childhood Immunizations in California, 2012-2020. JAMA Netw Open. 2022 Feb 1;5(2).

30.  Trent MJ*, **Salmon DA**, MacIntyre CR. Predictors of pneumococcal vaccination among Australian adults at high risk of pneumococcal disease. Vaccine. 2022 Feb 16;40(8):1152-1161.

31.  **Salmon DA**, Elharake JA, Brewer NT, Carpiano RM, DiResta R, Maldonado YA, Sgaier SK, Omer SB Vaccine Verification in the COVID-19 World. Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. Lancet Reg Health Am. 2022 Feb;6.

32.  Omer SB, Benjamin RM, Brewer NT, Buttenheim AM, Callaghan T, Caplan A, Carpiano RM, Clinton C, DiResta R, Elharake JA, Flowers LC, Galvani AP, Lakshmanan R, Maldonado YA, McFadden SM, Mello MM, Opel DJ, Reiss DR, **Salmon DA**, Schwartz JL, Sharfstein JM, Hotez PJ. Promoting COVID-19 vaccine acceptance: recommendations

from the Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. 2021 Dec 11;398(10317):2186-2192.

33. Sharfstein JM, Callaghan T, Carpiano RM, Sgaier SK, Brewer NT, Galvani AP, Lakshmanan R, McFadden SM, Reiss DR, **Salmon DA**, Hotez PJ. Uncoupling vaccination from politics: a call to action. Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. Lancet. 2021 Oct 2;398(10307):1211-1212.

34. **Salmon D**, Opel DJ, Dudley MZ, Brewer J, Breiman R. Reflections On Governance, Communication, And Equity: Challenges And Opportunities In COVID-19 Vaccination. Health Aff (Millwood). 2021 Mar;40(3):419-425. doi: 10.1377/hlthaff.2020.02254. Epub 2021 Feb 4.

35. Shaw J, Hanley S, Stewart T, **Salmon DA**, Ortiz C, Trief PM, Asiago Reddy E, Morley CP, Thomas SJ, Anderson KB. Health Care Personnel (HCP) attitudes about COVID-19 vaccination after emergency use authorization.  Clin Infect Dis. 2021 Sep 1.

36. Schoch-Spana M, Brunson EK, Long R, Ruth A, Ravi SJ, Trotochaud M, Borio L, Brewer J, Buccina J, Connell N, Hall LL, Kass N, Kirkland A, Koonin L, Larson H, Lu BF, Omer SB, Orenstein WA, Poland GA, Prior-Dumm L, Quinn SC, **Salmon D**, White A. The public's role in COVID-19 vaccination: Human-centered recommendations to enhance pandemic vaccine awareness, access, and acceptance in the United States. Vaccine. 2021 Sep 24;39(40):6004-6012.

37. Dudley MZ, Bernier R, Brewer J, **Salmon DA.** Walking the Tightrope: Reevaluating science communication in the era of COVID-19 vaccines. Vaccine. 2021 Sep 15;39(39):5453-5455.

38. Wu Q, Dudley MZ, Chen X, Bai X, Dong K, Zhuang T, **Salmon D**, Yu H. Evaluation of the safety profile of COVID-19 vaccines: a rapid review. BMC Med. 2021 Jul 28;19(1):173.

39. **Salmon DA**, Lambert PH, Nohynek HM, Gee J, Parashar UD, Tate JE, Wilder-Smith A, Hartigan-Go KY, Smith PG, Zuber PLF. Novel vaccine safety issues and areas that would benefit from further research. BMJ Glob Health. 2021 May;6(Suppl 2):e003814.

40. Gerber JE*, Brewer J, Limaye RJ, Sutherland A, Blunt M, Holroyd TA*, Geller G, Carleton B, Kahn J, **Salmon DA.** Vaccinomics: a cross-sectional survey of public values. Hum Vaccin Immunother. 2021 Jun 21:1-17.

41. Kochhar S, Dubé E, Graham J, Jee Y, Memish ZA, Menning L, Nohynek H, **Salmon D**, Top KA, MacDonald NE. COVID-19 vaccine safety questions and answers for healthcare providers (CONSIDER). Vaccine. 2021 Apr 28;39(18):2504-2505.

42. Holroyd TA*, Limaye RJ, Gerber JE*, Rimal RN, Musci RJ, Brewer J, Sutherland A, Blunt M, Geller G, **Salmon DA.** Development of a Scale to Measure Trust in Public Health Authorities: Prevalence of Trust and Association with Vaccination.  J Health Commun. 2021 May 16:1-9.

43. Limaye RJ, Opel DJ, Dempsey A, Ellingson M, Spina C, Omer SB, Dudley MZ, **Salmon DA**, Leary SO. Communicating With Vaccine-Hesitant Parents: A Narrative Review. Acad Pediatr. 2021 May-Jun;21(4S):S24-S29.

44. **Salmon DA**, Dudley MZ, Brewer J, Kan L, Gerber JE, Budigan H*, Proveaux TM, Bernier R, Rimal R, Schwartz B. COVID-19 vaccination attitudes, values and intentions among United States adults prior to emergency use authorization. Vaccine. 2021 Mar 24:S0264-410X(21)00315-7..

45. Gerber JE*, Brewer J, Limaye RJ, Sutherland A, Geller G, Spina CI, **Salmon DA.** Ethical and policy implications of vaccinomics in the United States: community members' perspectives. Hum Vaccin Immunother. 2021 Feb 24:1-12.

46. DeDominicis K, Buttenheim AM, Howa AC, Delamater PL, **Salmon D**, Klein NP, Omer SB. Studying attitudes towards vaccine hesitance and California law SB 277 in online discourse: a dataset and methodology. Data Brief. 2021 Feb 24;35:106841.

47. Trent MJ*, **Salmon DA**, MacIntyre CR. Using the health belief model to identify barriers to seasonal influenza vaccination among Australian adults in 2019. Influenza Other Respir Viruses. 2021 Feb 15.

48. Dudley MZ, Limaye RJ, **Salmon DA**, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Malik F, Frew PM, Chamberlain AT. Racial/Ethnic Disparities in Maternal Vaccine Knowledge, Attitudes, and Intentions. Public Health Rep. 2021 Jan 28.

49. Holroyd TA*, Howa AC, Proveaux TM, Delamater PL, Klein NP, Buttenheim AM, Limaye RJ, Omer SB, **Salmon DA**. School-level perceptions and enforcement of the elimination of nonmedical exemptions to vaccination in California. Hum Vaccin Immunother. 2021 Jan 25:1-8.

50. Shaw J, Stewart T, Anderson KB, Hanley S, Thomas SJ, **Salmon DA**, Morley C. Assessment of U.S. health care personnel (HCP) attitudes towards COVID-19 vaccination in a large university health care system. Clin Infect Dis. 2021 Jan 25. :

51. Dudley MZ, Taitel MS, Smith-Ray R, Singh T, Limaye RJ, **Salmon DA**. Effect of educational and financial incentive-based interventions on immunization attitudes, beliefs, intentions and receipt among close contacts of pregnant women. Vaccine. 2021 Feb 5;39(6):961-967.

52. DeDominicis K, Buttenheim AM, Howa AC, Delamater PL, **Salmon D**, Omer SB, Klein NP. Shouting at each other into the void: A linguistic network analysis of vaccine hesitance and support in online discourse regarding California law SB277. Soc Sci Med. 2020 Dec;266:113216.

53. Holroyd TA*, Howa AC, Delamater PL, Klein NP, Buttenheim AM, Limaye RJ, Proveaux TM, Omer SB, **Salmon DA**. Parental vaccine attitudes, beliefs, and practices: initial evidence in California after a vaccine policy change. Hum Vaccin Immunother. 2020 Nov 24:1-6.

54. Spina CI, Brewer SE, Ellingson MK, Chamberlain AT, Limaye RJ, Orenstein WA, **Salmon DA**, Omer SB, O'Leary ST. Adapting Center for Disease Control and Prevention's immunization quality improvement program to improve maternal vaccination uptake in obstetrics. Vaccine. 2020 Nov 25;38(50):7963-7969.

55. Kochhar S, **Salmon DA**. Planning for COVID-19 vaccines safety surveillance. Vaccine. 2020 Sep 11;38(40):6194-6198.

56. Dudley MZ, Limaye RJ, **Salmon DA**, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Malik F, Frew PM, Chamberlain AT. Latent Class Analysis of Maternal Vaccine Attitudes and Beliefs. Health Educ Behav. 2020 Oct;47(5):765-781.

57. Bleser WK, **Salmon DA**, Miranda PY. A hidden vulnerable population: Young children up-to-date on vaccine series recommendations except influenza vaccines. PLoS One. 2020 Jun 18;15(6):e0234466.

58. Limaye RJ, Malik F, Frew PM, Randall LA, Ellingson MK, O'Leary ST, Bednarczyk RA, Oloko O, **Salmon DA**, Omer SB. Patient Decision Making Related to Maternal and

Childhood Vaccines: Exploring the Role of Trust in Providers Through a Relational Theory of Power Approach. Health Educ Behav. 2020 Jun;47(3):449-456.

59. Dudley MZ, Halsey NA, Omer SB, Orenstein WA, O'Leary ST, Limaye RJ, **Salmon DA**. The state of vaccine safety science: systematic reviews of the evidence. Lancet Infect Dis. 2020 May;20(5):e80-e89.

60. Dudley MZ*, Limaye RJ, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Chamberlain AT, Bednarczyk RA, Malik F, Frew PM, Salmon DA. Factors associated with referring close contacts to an app with individually-tailored vaccine information. Vaccine. 2020 Mar 17;38(13):2827-2832.

61. Holroyd TA*, Oloko OK, **Salmon DA**, Omer SB, Limaye RJ. <u>Communicating Recommendations in Public Health Emergencies: The Role of Public Health Authorities.</u> Health Secur. 2020 Jan/Feb;18(1):21-28.

62. Dudley MZ*, Limaye RJ, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Chamberlain AT, Bednarczyk RA, Malik F, Frew PM, **Salmon DA**. Characterizing the vaccine knowledge, attitudes, beliefs, and intentions of pregnant women in Georgia and Colorado. Hum Vaccin Immunother. 2020 Feb 20:1-9.

63. Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon D**, Omer SB, Buttenheim AM. Homeschooling parents in California: Attitudes, beliefs and behaviors associated with child's vaccination status. Vaccine. 2020 Feb 18;38(8):1899-1905.

64. Gostin LO, Hodge JG Jr, Bloom BR, El-Mohandes A, Fielding J, Hotez P, Kurth A, Larson HJ, Orenstein WA, Rabin K, Ratzan SC, **Salmon D**. The public health crisis of underimmunisation: a global plan of action. Lancet Infect Dis. 2020 Jan;20(1):e11-e16.

65. Delamater PL, Buttenheim AM, Klein NP, Mohanty S, **Salmon DA**, Omer SB. Assessment of Exemptions from Vaccination in California, 2015 to 2027. Ann Intern Med. 2019 Nov 5.

66. **Salmon DA**, Limaye RJ, Dudley MZ*, Oloko OK, Church-Balin C, Ellingson MK, Spina CI, Brewer SE, Orenstein WA, Halsey NA, Chamberlain AT, Bednarczyk RA, Malik FA, Frew PM, O'Leary ST, Omer SB. MomsTalkShots: An individually tailored educational application for maternal and infant vaccines. Vaccine. 2019 Oct 8;37(43):6478-6485.

67. Pingali SC, Delamater PL, Buttenheim AM, **Salmon DA**, Klein NP, Omer SB. Associations of Statewide Legislative and Administrative Interventions with Vaccination Status Among Kindergartners in California. JAMA. 2019 Jul 2;322(1):49-56.

68. Ratzan SC, Bloom BR, El-Mohandes A, Fielding J, Gostin LO, Hodge JG, Hotez P, Kurth A, Larson HJ, Nurse J, Omer SB, Orenstein WA, **Salmon D**, Rabin K. The Salzburg Statement on Vaccination Acceptance. J Health Commun. 2019;24(5):581-583.

69. Delamater PL, Pingali SC, Buttenheim AM, **Salmon DA**, Klein NP, Omer SB. <u>Elimination of Nonmedical Immunization Exemptions in California and School-Entry Vaccine Status.</u> Pediatrics. 2019 Jun;143(6).

70. Chamberlain AT, Limaye RJ, O'Leary ST, Frew PM, Brewer SE, Spina CI, Ellingson MK, Dudley MZ*, Orenstein WA, Donnelly MA, Riley LE, Ault KA, **Salmon DA**, Omer SB. <u>Development and acceptability of a video-based vaccine promotion tutorial for obstetric care providers.</u> Vaccine. 2019 May 1;37(19):2532-2536.

71. Herman R, McNutt LA, Mehta M, **Salmon DA**, Bednarczyk RA, Shaw J.  Vaccination perspectives among adolescents and their desired role in the decision-making process. Hum Vaccin Immunother. 2019 Feb 8

72. McDonald P*, Limaye RJ, Omer SB, Buttenheim AM, Mohanty S, Klein NP, **Salmon DA**. Exploring California's new law eliminating personal belief exemptions to childhood vaccines and vaccine decision-making among homeschooling mothers in California. Vaccine. 2019 Jan 29;37(5):742-750.

73. Ellingson MK, Dudley MZ*, Limaye RJ, **Salmon DA**, O'Leary ST, Omer SB.  Enhancing uptake of influenza maternal vaccine.  Expert Rev Vaccines. 2019 Feb;18(2):191-204.

74. Bleser WK*, Miranda PY, **Salmon DA**.  Child Influenza Vaccination and Adult Work Loss: Reduced Sick Leave Use Only in Adults With Paid Sick Leave. Am J Prev Med. 2019 Feb;56(2):251-261.

75. Mohanty S, Buttenheim AM, Joyce CM, Howa AC, **Salmon D**, Omer SB.  Californian's Senate Bill 277: Local health jurisdictions' experience with the elimination of nonmedical vaccine exemptions.  Am J Public Health. 2018 Nov 29:e1-e6.

76. Mohanty S, Buttenheim AM, Joyce CM, Howa AC, **Salmon D**, Omer SB. Experiences With Medical Exemptions After a Change in Vaccine Exemption Policy in California. Pediatrics. 2018 Nov;142(5).

77. Kasting ML, Christy SM, Sutton SK, Lake P, Malo TL, Roetzheim RG, Schechtman T, Zimet GD, Walkosz BJ, **Salmon D**, Kahn JA, Giuliano AR, Vadaparampil ST. Florida physicians' reported use of AFIX-based strategies for human papillomavirus vaccination.  Prev Med. 2018 Nov;116:143-149.

78. Jones M, Buttenheim AM, **Salmon D**, Omer SB.  Mandatory health care provider counseling of parents led to a decline in vaccine exemptions in California.  Health Aff (Millwood). 2018 Sep;37(9):1494-1502.

79. Bednarczyk RA, Chamberlain A, Mathewson K, **Salmon DA**, Omer SB.  Practice-, Provider, and Patient-level interventions to improve preventive care: Development of the P3 Model. Prev Med Rep. 2018 Jun 18;11:131-138.

80. Buttenheim AM, Jones M, Mckown C, **Salmon D**, Omer SB. Conditional admission, religious exemption type, and nonmedical vaccine exemption in California before and after a state policy change.  Vaccine. 2018 May 16. Epub ahead of print.

81. Omer SB, Allen K, Chang DH, Guterman LB, Bednarczyk RA, Jordan A, Buttenheim A, Jones M, Hannan C, deHart MP, **Salmon DA**.  Exemptions from mandatory immunization after legally mandated parental counseling.  Pediatrics. 2018 Jan;141(1).

82. Frew PM, Randall LA, Malik F, Limaye RJ, Wilson A, O'Leary ST, **Salmon D**, Donnelly M, Ault K, Dudley MZ*, Fenimore VL, Omer SB.  Clinician perspectives on strategies to improve patient maternal immunization acceptability in obstetrics and gynecology practice settings.  Hum Vaccin Immunother. 2018 Jan 9:1-10.

83. Omer SB, Porter RM, Allen K, **Salmon DA**, Bednarczyk RA. Trends in Kindergarten Rates of Vaccine Exemption and State-Level Policy, 2011-2016.  Open Forum Infect Dis. 2017 Nov 15;5(2).

84. Bednarczy RA, Frew PM, **Salmon DA**, Whitney E, Omer SB.  ReadyVax: A new mobile vaccine information app. Hum Vaccin Immunother. 2017 May 4;13(5):1149-1154.

85. Vadaparampil ST, Malo TL, Sutton SK, Ali KN, Kahn JA, Casler A, **Salmon D**, Walkosz B, Roetzheim RG, Zimet GD, Giuliano AR.  Missing the target for routine Human

Papillomavirus vaccination: consistent and strong physician recommendations are lacking for 11 to 12-year old males.  Cancer Epidemiol Biomarkers Prev. 2016 Oct;25(10):1435-46.

86.  Lee C, Whetten K, Omer S, Pan W, **Salmon D**. Hurdles to herd immunity: distrust of government and vaccine refusal in the U.S., 2002-2003.  Vaccine. 2016 Jul 25; 34(34):2972-8.

87.  Phadke VK. Bednarczyk RA, **Salmon DA**, Omer SB. Association between Vaccine Refusal and Vaccine Preventable Diseases in the United States: A Focus on Measles and Pertussis.  JAMA.  2016 Mar; 315(11): 1149-58.

88.  Halsey NA, Talaat KR, Greenbaum A, Mensah E, Dudley* MZ, Proveaux T, **Salmon DA**. The safety of influenza vaccines in children: An Institute for Vaccine Safety white paper. Vaccine. 2015 Dec 30;33 Suppl 5:F1-67.

89.  **Salmon DA**, Dudley MZ*, Glanz JM, Omer SB. Vaccine hesitancy: Causes, consequences, and a call to action. Co-Published.  Vaccine & Am J Prev Med. 2015 Nov 23; Suppl 4:D66-71.

90.  Buttenheim AM, Sethuraman K, Omer SB, Hanlon AL, Levy MZ, **Salmon D**. MMR vaccination status of children exempted from school-entry immunization mandates. Vaccine. 2015 Nov 17;33(46):6250-6.

91.  Geller G, Dvoskin R, Thio CL, Duggal P, Lewis MH, Bailey TC, Sutherland A, **Salmon DA**, Kahn JP.  Genomics and infectious disease: a call to identify the ethical, legal and societal implications for public health and clinical practice.  Genome Medicine 2014 Nov 18; 6:(11): 106.

92.  Vadaparampil ST, Malo TL, Kahn JA, **Salmon DA**, Lee JH, Quinn GP, Roetzheim RG, Bruder KL, Proveaux TM, Zhao X, Halsey NA, Giuliano AR. Physicians' human papillomavirus vaccine recommendations, 2009 and 2011.  Am J Prev Med. 2014 Jan; 46(1):80-4.

## Commentaries

1.  **Salmon DA**, Black S, Didierlaurent AM, Moulton LH. Commentary on "Common Vaccines and the Risk of Dementia: A Population-Based Cohort Study": Science Can be Messy but Eventually Leads to Truths. J Infect Dis. 2023 May 29;227(11):1224-1226.

2.  Gostin LO, Shaw J, **Salmon DA.** Mandatory SARS-CoV-2 Vaccinations in K-12 Schools, Colleges/Universities, and Businesses. JAMA. 2021 Jun 7. *Invited*

3.  Gostin LO, **Salmon DA**, Larson HJ. Mandating COVID-19 Vaccines. JAMA. 2021 Feb 9;325(6):532-533. doi: 10.1001/jama.2020.26553. PMID: 33372955. *Invited*

4.  Opel DJ, **Salmon DA**, Marcuse EK. Building Trust to Achieve Confidence in COVID-19 Vaccines. JAMA Netw Open. 2020 Oct 1;3(10):e2025672. doi: *Invited*

5.  **Salmon DA**, Dudley MZ, Carleton BC. Guillain-Barré Syndrome Following Influenza Vaccines Affords Opportunity to Improve Vaccine Confidence. J Infect Dis. 2021 Feb 13;223(3):355-358. doi: 10.1093/infdis/jiaa544. PMID: 33137189. *Invited*

6.  **Salmon DA**, Dudley MZ. It is time to get serious about vaccine confidence. Lancet. 2020 Sep 26;396(10255):870-871. doi: 10.1016/S0140-6736(20)31603-2. Epub 2020 Sep 10. PMID: 32919522. *Invited*

7.    Gostin LO, **Salmon DA**. The Dual Epidemics of COVID-19 and Influenza: Vaccine Acceptance, Coverage, and Mandates. JAMA. 2020 Jul 28;324(4):335-336. doi: 10.1001/jama.2020.10802. PMID: 32525519. *Invited*

8.    **Salmon DA**, MacIntyre CR, Omer SB. Making mandatory vaccination truly compulsory: well intentioned but ill conceived.  Lancet Infect Dis. 2015 Aug;15(8):872-3.

9.    Halsey NA, **Salmon DA**. Measles at Disneyland, a problem for all ages.  Ann Intern Med. 2015 May 5;162(9):655-6.  *Invited*

10.   Atwell JE*, **Salmon DA**.  Pertussis resurgence and vaccine uptake: implications for reducing vaccine hesitancy.  Pediatrics. 2014 Sep; 134(3): 602-4. *Invited*

11.   **Salmon DA**, Halsey. Guillain-Barré Syndrome and vaccination.  Clin Infect Dis. 2013 Jul; 57(2):205-7.  *Invited*

12.   **Salmon DA**, Halsey NA.  Keeping the M in medical exemptions: protecting our most vulnerable children.  J Infect Dis. 2012 Oct 1; 206(7): 987-8.

13.   MacIntyre CR, Kelly H, Jolley D, Butzkueven H, **Salmon D**, Halsey N, Moulton LH Recombinant hepatitis B vaccine and the risk of multiple sclerosis: a prospective study. Neurology. 2005 Apr 12;64(7):1317.


## Books

The Clinician's Vaccine Safety Resource Guide: Optimizing the Prevention of Vaccine-Preventable Diseases Across the Lifespan.  Mathew Z. Dudley.  **Daniel A Salmon**, Neal A. Halsey, alter A. Orenstein, Rupali J. Limaye, Sean T. O'Leary, Saad B. Omer. Springer Publishing, 2018.


## Government and Advisory Committee Reports

1.    White Paper on the United States Vaccine Safety System.  National Vaccine Advisory Committee (NVAC), 2012.  Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the working group, holding closed and public meetings to gather scientific and programmatic information and incorporation of stakeholder views, and oversaw drafting of final report.

2.    H1N1 Vaccine Safety Risk Assessment Working Group (VSRAWG).  National Vaccine Advisory Committee (NVAC).  Interim reports (12/2009, 1/2010, 2/2010, 3/2010, 4/2010, 6/2010) and final report (1/2012). Role: Served as the Designated Federal Official with responsibilities including determining the charge and membership of the VSRAWG, coordinating bi-monthly conference calls with the Federal Immunization Safety Task Force and the VSRAWG reviewing all H1N1 safety data, facilitated discussions of safety issues among the VSRAWG, drafting all reports.

3.    Recommendations on 2009 H1N1 Influenza Vaccine Safety Monitoring.  National Vaccine Advisory Committee (NVAC). 7/2009. Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the Working Group, holding meetings with Working Group and HHS leadership, and drafting final report.

4.  Federal Plans to Monitor Immunization Safety for Pandemic 2009 H1N1 Influenza Vaccination Program.  Department of Health and Human Services, 2009.  Role: Primary author with the Federal Immunization Safety Task Force.
5.  Recommendations on the Centers for Disease Control and Prevention Immunization Safety Office Draft 5-Year Scientific Agenda. National Vaccine Advisory Committee (NVAC), 2009.  Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the working group, holding closed and public meetings to gather scientific and programmatic information and incorporation of stakeholder views, and oversaw drafting final report.
6.  A Comprehensive Review of Federal Vaccine Safety Programs and Pubic Health Activities.  Department of Health and Human Services, 2008.  Role:  Primary author with the Federal Immunization Safety Task Force.
7.  Vaccine Safety Action Plan (Implementation Plan for the Task Force Report on Safer Childhood Vaccines).  Department of Health and Human Services, 1999.  Role: Primary author with the many HHS agencies (NIH, FDA, CDC, HRSA).

**CURRICULUM VITAE**

# Daniel Salmon

# Part II

# Research Grant Participation

## Current

**Adult Immunization Quality Improvement for Providers (IQIP)**
Sponsor: CDC
Role: Principal Investigator (15% effort)
Dates: 08/01/23 – 08/01/26
Project: Develop, evaluate and widely disseminate an evidence-based QI program for immunization that integrates adult-specific strategies across healthcare provider settings.

**Evaluating Social Media as a Tool for Connecting Vulnerable Communities with a Personalized Vaccination Decision-Making Website**
Sponsor: Vaccine Confidence Fund
Role: Principal Investigator (15% effort)
Dates: 04/01/23 – 03/01/24
Project: Evaluate the relative impact and cost effectiveness of grassroot public health efforts vs. paid social media strategies on community engagement with LetsTalkShots.

**LetsTalkCOVIDVaccines | Orange County, New York**
Sponsor: Orange County Health Department
Role: Principal Investigator (20% effort)
Dates: 12/01/22 – 12/01/23
Project:  Pilot the LetsTalkShots provider talking points with Little Pediatrics in Orange County, NY.

**Improving Vaccine Acceptance through EHR Integrated Patient- and Provider-Facing Decision Support**
Sponsor: Merck Sharp And Dohme Corp
Role: Principal Investigator (10% effort)
Dates: 11/01/22 – 11/01/24,
Project: Establish the technical feasibility and evaluate the effectiveness of a scalable, integrated platform to improve patient informed decision-making and increase vaccine uptake.

**Health Care Provider Training to Increase Vaccine Uptake and Reduce Vaccine Hesitancy**
Sponsor: Merck Sharp And Dohme Corp
Role: Principal Investigator (15% effort)
Dates: 01/11/2021 – 01/10/2025
Project: Develop and evaluate Johns Hopkins CME module teaching how clinicians can effectively communicate with patients about vaccines and conversion of Springer published clinical guide into Unbound Medicine version.

**Public and Health Care Provider knowledge, attitudes, beliefs, intentions, and behaviors regarding COVID-19 disease and SARS-CoV-2 vaccines: the mediating role of trust in health care providers and public health authorities**
Sponsor: Merck Sharp And Dohme Corp
Role: Principal Investigator (10% effort)
Dates: 01/11/2021 – 01/11/2024
Project: Evaluate the immediate impact of outbreaks of COVID-19 disease and response measures on uptake of recommended vaccines, including but not limited to SARS-CoV-2 vaccines (when such vaccines are recommended), with a focus on trust in health care providers and public health authorities, and their vaccine knowledge, attitudes and beliefs.

**TweenVax: A comprehensive practice-, provider-, and parent/patient-level intervention to improve adolescent HPV vaccination**
Sponsoring Agency: National Cancer Institute, National Institutes of Health
Role: Co-Investigator (5% effort)
Dates: 09/01/2019 – 06/30/2024
Project: The aim of the project is to develop and refine the practice-, provider-, and patient/parent-level intervention that will be tested in primary care pediatric and family practice offices for adolescents aged 9-14.

## Completed

**LetsTalkCovidVaccine Tailored for Local Communities**
Sponsor: NACCHO
Role: Principal Investigator (20% effort)
Dates: 12/1/2021 - 7/31/2023
Project: Tailored LetsTalkCovidVaccine, a personalized health communication tool, to five underserved communities.

**Assessing Vaccine Hesitancy and a Pharmacist Led Intervention Model to**
Sponsor: XULA
Role: Co- Investigator (5% effort)
Dates: 11/13/2020 - 5/23/2023
Project: Training pharmacists to work with vaccine hesitant patients.

**LetsTalkCovidVaccine Tailored for Guilford County**
Sponsor: GCGPH
Role: Principal Investigator (5% effort)
Dates: 3/1/2022 - 10/31/2022
Project: Tailored LetsTalkCovidVaccine, a personalized health communication tool, to Guildford County, NC.

**CGHI Vaccine Access and Training (VAT) Initiative for a Community-Based Workforce**
Sponsor: GHC3
Role: Co-Investigator (20% effort)
Dates: 3/1/2022 - 10/31/2022
Project: Trained over 100 community health workers to go into their vulnerable communities and work with vaccine hesitant persons.

**Vaccine Hesitancy for COVID 19**
Sponsor: NACHC
Role: Principal Investigator (20% effort)
Dates: 7/15/2021 - 6/30/2022
Project: Built LetsTalkCovidVacciens, a personalized risk communication tool, based on our MomsTalkShots model.

**Let's talk COVID shots web app for Canadians**
Sponsor: CPHA
Role: Principal Investigator (10% effort)
Dates: 10/1/2021 - 3/18/2022
Project: Tailored LetsTalkCovidVaccine, a personalized health communication tool, for Canada.

**SARS-CoV2 Vaccines Information Equity and Demand Creation Project (COVIED)**
Sponsor: Centers for Disease Control and Prevention

Role: Multiple Principal Investigator (mPIs Robert Breiman and Walter Orenstein) (25% effort)
Dates: 02/01/2021-09/31/2021
Project: Implements a systematic approach to provide interpretable, context- and culture-specific accurate and trusted information about the vaccines that will be offered, and to package and deliver this information to susceptible populations at risk for COVID and demonstrating vaccine hesitancy as a means to substantively reduce the disproportionate impact of COVID illness and death associated with this pandemic.

**Understanding Diverse Communities and Supporting Equitable and Informed COVID-19 Vaccination Decision-Making**
Sponsor: Robert Wood Johnson Foundation
Role: Principal Investigator (20% effort)
Dates: 11/1/2020-9/1/2021
Project: Collaborat with NACCH, ASTHO, AIM and NIHB to better understand how people are approaching decision-making regarding COVID-19 vaccination and what additional information they need to make an informed decision for themselves, their family, and their community.

**Valuation of Vaccine Safety**
Sponsor: GAVI
Role: Principal Investigator (20% effort)
Dates:   07/15/2020 – 07/31/2021
Project: Quantify the health and economic costs associated with the vaccine safety disaster that occurred in the Ukraine in 2008 where there was a decline in vaccine public confidence triggered by mishandled death following a measles vaccine campaign, leading to a large measles outbreak including exportation to other countries.

**Impact of Eliminating Non-Medical Exemptions in California**
Sponsoring Agency: National Institute of Allergy and Infectious Diseases, National Institutes of Health
Role: Co-Investigator (20% effort)
Dates: 2016-2021
Project: California is the first state in decades to abolish non-medical exemptions to school immunization requirements.  This study examines the implementation and impact of this change by assessing the burdens on health care providers, health departments, schools and parents and the rates of medical exemptions and home schooling.

**PHASE II: Development and Writing of the Global Vaccine Safety Blueprint 2.0**
Sponsor: WHO
Role: Principal Investigator (15% effort)
Dates: 1/17/2020 - 4/30/2020
Project: In collaboration with the World Health Organization, drafted verson 2.0 of the Global Vaccine Safey Blueprint.

**Ethical, Legal and Social Issues (ELSI) for Precision Medicine and Infectious Disease:**

**Centers for Excellence in ELSI Research (CEER)**
Sponsoring Agency: National Human Genome Research Institute, National Institutes of Health
Role: Co-Investigator, Lead Vaccinomics (15% effort)
Dates: 2016-2020
Project: Anticipate and examine the ethical, legal, social, historical and policy issues confronting the incorporation of genomics in the prevention, outbreak control, and treatment of a range of infectious diseases, and plan for the responsible translation of genomic advances into practice.

**A Comprehensive Pre-natal Intervention to Increase Vaccine Coverage**
Sponsoring Agency: National Institutes of Health: Dissemination and Implementation Research in Health (R01)
Role: Multiple Principal Investigator (with Saad Omer, Emory University) (35% effort)
Dates: 2015-2020
Project: Develop and evaluate a comprehensive intervention at the patient, provider and practice levels to increase maternal and childhood vaccine uptake.

**Cocooning (influenza and Tdap vaccines)**
Sponsor: Walgreens
Role: Principal Investigator (15% effort)
Dates: 1/26/2017 - 6/30/2019
Project: Randomized controlled Trial to ascertain the impact of MomsTalkShots on friends and family of pregnant women.

**The Vaccine Safety Communication E-Library**
Sponsor: WHO
Role: Principal Investigator (5% effort)
Dates: 02/01/2019 – 04/30/2019
Project: The objective is to work with the WHO vaccine safety office to develop the e-library by assisting with growing the content and enhancing the organization and searchability of the VSN e-library and the development of a plan of action to increase participation of members and new members.

**Programmatic Impact of Multi-dose Vaccines**
Sponsoring Agency: Bill and Melinda Gates Institute through the Johns Snow Institute
Role: Co-Investigator (10% effort)
Dates: 2016-2018
Project: Equip global and country level decision makers with the evidence, guidance, and tools needed to assess when, where, and how the selection of vaccine presentation affects timely, equitable, and safe vaccination coverage.

**Case Studies of the Impact of Meningitis Epidemics on Local Health Departments and College Health Facilities**
Sponsoring Agency: Pfizer
Role: Principal Investigator (25% effort)
Dates: 2015-2016

Project: Evaluate the non-medical costs associated with Meningitis outbreaks in university settings.

**Capitalizing on Recent Changes to School Immunization Requirements to Improve the Publics Health**
Sponsoring Agency: Robert Wood Johnson Foundation Public Health Law Program
Role: Hopkins Principal Investigator (10% effort)
Dates: 2014-2016
Project: Evaluate the implementation and impact of recent changes made to state school immunization requirements and develop model school immunization law.

Note: Dr. Salmon was a Federal employee for 5 years and consequently could not receive external funding

**Evaluation of Parents Claiming Exemptions to School Entry Immunization Requirements**
Sponsoring Agency: Centers for Disease Control and Prevention
Role: Principal Investigator (20% effort)
Dates: 2004-2006
Project: Examine the secular trends and geographical clustering of immunization exemptions and associations with pertussis, reasons why parents refuse vaccines, and conducted a content analysis of vaccine safety newspaper stories.

**Mentored Patient-Oriented Research Career Development Award (K23). Decision Making of Parents to Vaccinate Their Children**
Sponsoring Agency: National Institutes of Health
Role: Principal Investigator (75% effort)
Dates: 2004-2007
Project: Explore the role of health care providers in influencing parental vaccination decisions.

**Policy and Ethical Consultation on Pandemic Planning and Public Health Emergencies**
Sponsoring Agency: Florida Department of Health
Role: Principal Investigator (10% effort)
Dates: 2005-2006
Project: Explore ethical issues regarding responding to an influenza pandemic and developed a training module for public health workers to understand ethical issues surrounding vaccination during a pandemic.

**Implementation of Mandatory Immunization Requirements**
Sponsoring Agency: Centers for Disease Control and Prevention
Role: Co-Principal Investigator (with Neal Halsey) (75% effort)
Dates: 2001-2003

Project: Assess the role of school personnel and school policies in implementing immunization requirements.  Explored the reasons why some parents claim exemptions to school immunization requirements.

**The Role of School Personnel and Policies in Implementing Immunization Requirements** Sponsoring Agency: Washington State Department of Health
Role: Principal Investigator (10% effort)
Dates: 2001-2004
Project: Explore the role of school personnel and school policies in implementing immunization requirements in Washington State.


# Academic Service

| | |
|---|---|
| 2003 - 2005 | Admissions Committee for MSPH Program, Disease Prevention and Control, Department of International Health, Johns Hopkins Bloomberg School of Public Health |
| 2005 - 2007 | Epidemiology Program Director, Interdisciplinary Program (IDP), University of Florida, College of Medicine |
| 2012 - | Admissions Committee for PhD Program, Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins Bloomberg School of Public Health |
| 2014 - | Honors and Awards Committee, Department of International Health, Johns Hopkins Bloomberg School of Public Health |
| 2015 - | Public Health Practice Committee, Johns Hopkins Bloomberg School of Health |


# Advisory Committee Presentations (selected)

National Vaccine Advisory Committee, Vaccine Confidence Working Group (2020- ).

National Vaccine Advisory Committee, Adolescent Vaccine Working Group.  History and Impact of School Immunization Requirements: Implications for Adolescent Vaccination. (2006)

National Vaccine Advisory Committee, Subcommittee on Vaccine Safety.  Enhancing Public Confidence in Vaccines through Independent Oversight of Post-Licensure Vaccine Safety (2004).

National Vaccine Advisory Committee Working Group on Implementing Vaccine Recommendations, presentation to the Committee and expert witness for panel discussion (2002).

National Vaccine Advisory Committee Working Group on Philosophical Exemptions, presentation to the Committee (1998)

DocuSign Envelope ID: C25D85B4-4096-4509-820C-5A2B61B8B35B

Appendix 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LISA AMOSON, ROBB HUCK, TROBY LANE PARRISH, ALECIA RAMSEY, LARRY HAROLD SAVAGE, JILLYN SCHMIDT, SANDRA SALAZAR SILVA, BRITT HAROLD SINGLETON, SUSAN WELCH,<br><br>              Plaintiffs,<br><br>    v.<br><br>TAKEDA PHARMACEUTICALS U.S.A., INC.,<br><br>              Defendant. | Case No.: 1:22-cv-11963-GAO |

**DECLARATION OF MICHAEL MADDOCK**

I, Michael Maddock, hereby state and declare as follows:

1.  I am employed by Takeda Pharmaceuticals U.S.A., Inc. ("Takeda") as a Neuroscience District Business Manager in the Takeda's Neuroscience Business Unit.  I have worked for Takeda for approximately 13 years and previously held a position as a Senior District Business Manager in the Neuroscience Business Unit, covering the Dallas – Fort Worth territory.  In that position, I was the direct supervisor of Troby Parrish.  The following is based on my personal knowledge.

2.  In her role as a Territory Manager for Takeda, Ms. Parrish acted as a sales representative, promoting Takeda's products—specifically, Trintellix and Vyvanse—to healthcare providers in the eastern Dallas area.

3.  Ms. Parrish's role required her to travel to providers' offices and have in-person, face-to-face meetings with the provider there.  Ms. Parrish, in particular, called on pediatricians, primary care doctors, and internal medicine doctors.

1

4. Though Ms. Parrish's role did not require her to directly interact with patients, she would frequently encounter patients in the waiting rooms and hallways of providers' offices. In fact, as part of her role, Ms. Parrish would interact face-to-face with several individuals in each provider's office, beyond patients and providers, themselves, including front desk staff, nurses, and mid-level prescribers.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

May 13, 2024

_____
Date

DocuSigned by:

*Michael Maddock*
887A20812E6F434...

Michael Maddock
Neuroscience District Business Manager