**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LISA AMOSON ET AL.,** | |
| Plaintiffs, | |
| v. | |
| **TAKEDA PHARMACEUTICALS, USA, INC.,** | |
| Defendant. | **1:22-cv-11963-GAO** |

# PLAINTIFFS' MEMORANDUM
# IN OPPOSITION TO SUMMARY JUDGMENT

Christopher DeMatteo
*Admitted pro hac vice.*
Pattis & Paz, LLC
383 Orange St., Fl. 1
New Haven, CT 06511
Tel: (203) 393-3017
Fax: (203) 393-9745
cdematteo@pattispazlaw.com

Brian Unger
BBO No. 706583
Warner Mendenhall
20 Park Plaza, 400-4
Boston, MA 02116
617.297.2227; f 330.762.9743
brian@warnermendenhall.com

*Counsel for the Plaintiffs*

# 1. Table of Contents

1. Table of Contents ............................................................................................................. i

2. Table of Authorities............................................................................................................ ii

3. Introduction........................................................................................................................ 1

4. Counter-Statement of the Facts ........................................................................................ 1

5. Argument ........................................................................................................................... 7

   I.    Whether religious beliefs are sincerely held is a question of fact. The Defendant has not met its burden on summary judgment that any plaintiff's beliefs are, as a matter of law, not sincerely-held, in order to remove the fact-finding inquiry from the jury. ..................................... 9

      A.    Religious sincerity is about credibility. Conformity and consistency are factors for the fact-finder to consider in determining sincerity. .......................................................................... 12

      B.    Religious beliefs and "secular concerns" are not mutually exclusive. It is for a jury to weigh whether purported religious beliefs are truly religious in nature. ................................. 13

   II.    Whether a religious accommodation would impose substantial, increased costs on an employer is a question of fact. The Defendant has not produced evidence of actual costs, let alone costs that would be so significant that they would impose an undue hardship on its business, were it to accommodate the plaintiffs' religious beliefs. .................................................. 15

      A.    The Defendant has not actually demonstrated the safety costs of allowing the plaintiffs to continue working in the field unvaccinated, especially when the providers they visited largely did not require them to be vaccinated................................................................................. 17

      B.    The Defendant has not shown on summary judgment that allowing the plaintiffs to work remotely while unvaccinated would have imposed substantial costs on it. No individualized inquiry was performed by the company in evaluating any plaintiff's request. 20

   III.    Summary judgment should also be denied on the Plaintiffs' claim for punitive damages. 22

6. Conclusion ........................................................................................................................ 24

7. Certificate of Service ........................................................................................................ 24

## 2. Table of Authorities

### Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................................8

Baltodano v. Merck, Sharp, and Dohme (I.A.) Corp., 637 F.3d 38 (1st Cir.2011)...........................8

Bass v. T-Mobile USA, Inc., 22-11975 (E.D. Mich. Mar. 27, 2024) ...................................... 12

Bazinet v. Beth Israel Lahey Health Inc., 24-1148 (1st Cir. Aug. 13, 2024) ...................................... 14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .................................................8

Cloutier v. Costco Wholesale Corp., 390 F.3d 126 (1st Cir. 2004)........................................7

E.E.O.C. v. Union Independiente De La Autoridad, 279 F.3d 49 (1st Cir. 2002) ............................9

Floyd v. Trinity Cent. Home Health, 6:22-cv-06117 (W.D. Ark. Aug. 5, 2024) ............................ 12

Gouin v. Nolan Assocs., LLC, 308 F. Supp. 3d 506 (D. Mass. 2018) ................................................. 23

Groff v. DeJoy, 600 U.S. 447 (2023)..........................................................................................15

Hernandez v. Commissioner, 490 U.S. 680 (1989)..................................................................10

International Soc. for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430 (2nd Cir. 1981)...... 12

Kane v. DeBlasio, 19 F.4th 152 (2nd Cir. 2021)..........................................................................10

Kiel v. Mayo Clinic Health Sys., 685 F. Supp. 3d 770 (D. Minn. Aug. 4, 2023) ............................... 14

Kolstad v. ADA, 527 U.S. 526 (1999) ......................................................................................... 23

Malone v. Legacy Health, 3:22-cv-01343-HZ (D. Or. Jul. 5, 2024).................................................. 18

Marsh v. Chambers, 463 U.S. 783 (1983) ................................................................................... 11

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)............................................9

Onebeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada, 684 F.3d 237 (1st Cir. 2012)...................................................................................................................................................8

Pasarella v. Aspirus, Inc., 23-1660 (7th Cir. July 29, 2024) ...................................................... 14

Passarella v. Aspirus, Inc., No. 22-CV-287-JDP, 2023 WL 2455681 (W.D. Wis. Mar. 10, 2023)14

Patrick v. LeFevre, 745 F.2d 153 (2nd Cir. 1984) .......................................................................9

Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894 (8th Cir. 2024)................................................. 14

Rodrique v. Hearst Commc'ns, Inc., 2024 U.S. Dist. LEXIS 30258, 2024 WL 733325 (D. Mass. Feb. 22, 2024)........................................................................................................................... 11

Salahuddin v. Goord, 467 F.3d 263 (2d Cir. 2006) .................................................................8

Scafidi v. B. Braun Med., 8:22-cv-2772-VMC-TGW (M.D. Fla. Jan 17, 2024)............................14, 18

South Port Marine, LLC v. Gulf Oil Ltd. Pshp., 234 F.3d 58 (1st Cir. 2000) .................................... 22

Taylor v. Gallagher, 737 F.2d 134 (1st. Cir. 1984) .................................................................... 10

Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707 (1981) ..................................... 14

Town of Greece v. Galloway, 572 U.S. 565 (2014) ............................................................ 11

Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977) ................................................ 16

United States v. Seeger, 380 U.S. 163 (1965) ................................................................. 10

**Statutes**

42 U.S.C. § 2003e-2(a)(1) ........................................................................................ 7

**Rules**

Fed. R. Civ. P. 56 ............................................................................................... 8, 9

## 3.  Introduction

The Court should deny the Defendant's Motion for Summary Judgment on all grounds against all plaintiffs because the issues of whether the Plaintiffs' religious beliefs were sincerely-held and whether accommodating their beliefs would have posed an undue hardship on the Defendant are factual considerations for the jury.

The Defendant has not met its burden under the summary judgment standard that no factual issues exist. For the following reasons, the Court should deny the Defendant's Motion for Summary Judgment and allow the present case to proceed to trial. The Defendant's motion is also not proper or ripe on the issue of punitive damages and should be denied at this stage.

## 4.  Counter-Statement of the Facts

The eight plaintiffs were all employees who were fired by the Defendant, Takeda Pharmaceuticals, for refusing to comply with the company's COVID-19 vaccination policy in 2021. All eight were field-based employees and all eight are religious Christians.

Lisa Amoson worked as Sales Representative and covered the territory of eastern Oregon. (Defendant's Rule 56.1 Statement of Undisputed Material Facts, "D.S.U.M.F.," ¶¶ 31-32.) Robb Huck was a Senior Sales Representative whose territory was in Nebraska. (Id. ¶ 44.) Jillyn Schmidt was a Senior Sales Representative with a territory in Kansas. (Id. ¶ 49.) Sandra Silva was a Senior Sales Representative in Texas. (Id. ¶ 56.) Susan Welch was a Senior Sales Representative whose territory included almost all of North Dakota and parts of South Dakota. (Id. ¶ 61.) Alecia Ramsey worked as a Regional Sales Trainer and a District Business Manager and traveled to Georgia, Florida, North Carolina, South Carolina and Virginia. (Id. ¶¶ 72, 75.) Larry Savage was a Territory Business Manager and his territory included Georgia, Tennessee

and South Carolina. (Id. ¶ 83.) Britt Singleton was a Patient Access Manager and had a territory of northern Georgia, South Carolina and Alabama. (Id. ¶ 90.) Each plaintiff met with clients and customers, often at doctors' offices and other medical facilities.

In August 2021, during the COVID-19 pandemic, Takeda decided to implement a policy requiring all field-based employees to become vaccinated against COVID-19 by November 1, 2021. It announced the policy in September 2021. (Id. ¶ 15.) Such a policy was not requested by the medical providers that Takeda employees visited, nor were any providers consulted in the development of the policy. (Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts, "P.S.U.M.F.," ¶ 341.) company revenue was not considered in the development of the policy. (Id. ¶ 332.) Individual transmission rates of COVID-19 were also not considered. (Id. ¶ 334.) Takeda provided both religious and medical exemptions to the requirement for employees, (D.S.U.M.F. ¶ 19), and allowed employees to submit written request forms with supporting documents (id. ¶ 21).

Ms. Amoson is a life-long Christian. (P.S.U.M.F. ¶ 278.) She prayed over whether to take a COVID-19 vaccine and believes that God spoke to her, telling her that it was not right for her to take the vaccine. (Id. ¶ 281.) She believes that God answered her prayers. (Id. ¶ 282.) She submitted a religious exemption request on Oct. 22, 2021. (D.S.U.M.F. ¶ 117.) She requested to be exempt from receiving the vaccine and instead be allowed to wear a mask and test for the virus and continue to make in-person visits, or to work remotely. (Id. ¶ 118.) None of the healthcare providers in Ms. Amoson's territory required visitors to be vaccinated against COVID-19. (P.S.U.M.F. ¶ 284.)

Mr. Huck has been a Catholic his entire life and was raised in a Catholic family. (Id. ¶ 285.) He has been attending the same Roman Catholic church for 23 years. (Id. ¶ 287.) He is

opposed to abortion because he believes it violates the Ten Commandments, which prohibit killing. He has been involved in "right to life activities." (Id. ¶ 288.) He opposed the then-available COVID-19 vaccines because they used fetal cell lines in research and production. (Id. ¶ 290.) He spoke to his priest about the vaccine and the priest supported his religious objection. (Id. ¶ 289.) Mr. Huck submitted his religious exemption request on Sept. 14, 2021. (D.S.U.M.F. ¶ 134.) He did not have any religious objection to masking or testing for COVID-19. (P.S.U.M.F. ¶ 291.) None of the healthcare facilities that Mr. Huck visited in his territory required visitors to be vaccinated against COVID-19. (Id. ¶ 292.)

Alecia Ramsey is a lifelong Christian. She was christened in the Russian Orthodox church and now practices the Southern Baptist religion. (Id. ¶ 294.) She believes that her body is a temple and that she must rely on the word of God over the word of man. (Id. ¶ 295.) She prayed over whether to receive a COVID-19 vaccine. (Id. ¶ 296.) Following her prayers and a review of the Bible, she concluded that she could not receive a vaccine. (Id. ¶ 297.) She did not have any religious objection to masking or testing for the virus. (Id. ¶ 299.) No medical provider that Ms. Ramsey visited required her to be vaccinated against COVID-19. (Id. ¶ 298.) She requested a religious exemption from Takeda's vaccine requirement on Sept. 27, 2021. (D.S.U.M.F. ¶ 158.)

Larry Savage requested a religious exemption from the vaccine requirement on Sept. 21, 2021. (Id. ¶ 182.) Mr. Savage was raised in the Christian faith. His father is a pastor in the Church of Christ, which is a non-denominational Christian church. (P.S.U.M.F. ¶ 300.) He decided to commit his life to God when he was 25 or 26. (Id. ¶ 302.) He and his wife have attended a non-denominational Christian church since 2016. (Id. ¶ 303.) Mr. Savage is opposed to the COVID-19 vaccines that used fetal cells in their development and confirmation.

According to his Christian faith, life begins at conception and murder is wrong. He believes that fetal tissue and unborn babies are as precious as born babies. (Id. ¶ 304.) He also believes that the body is a temple of the Holy Spirit and that medical treatment with a vaccine that was developed using fetal cell lines would not be honoring God. (Id. ¶ 305.) Mr. Savage has no religious objection to wearing a mask or testing for COVID-19. (Id. ¶ 306.) None of the medical providers in his territory required visitors to be vaccinated against COVID-19. (Id. ¶ 307.)

Jillyn Schmidt is a Christian, who grew up Episcopalian and also occasionally attended Catholic mass as a child. After marrying her husband, she grew in her faith and accepted Jesus as her Lord and savior. She was baptized and "born again" around 2010. (Id. ¶ 308.) She does not receive vaccines because she believes that God gave her immunity. (Id. ¶ 312.) She also objects to vaccines that were developed using fetal cell lines. (Id. ¶ 313.) She has no objection to wearing a mask or testing for COVID-19. (Id. ¶ 314.) Most offices in Ms. Schmidt's territory did not require that visits be vaccinated against COVID-19. (Id. ¶ 315.) For the one office that did, Ms. Schmidt's work partner covered the visit. (Id. ¶ 316.) She requested a religious exemption to the vaccination policy on Sep. 14, 2021. (D.S.U.M.F. ¶ 204.)

Sandra Silva requested a religious exemption from the vaccination policy on Sep. 20, 2021. (Id. ¶ 222.) She was born and raised Catholic and made her first communion, was confirmed and married in the Catholic Church. She also sent her children to Catholic school. (P.S.U.M.F. ¶ 317.) As a Catholic, she is religiously opposed to abortion, which is the basis for her objection to vaccines that were developed using fetal cell lines. (Id. ¶ 318.) She does not however, have any religious objections to masking or testing for COVID-19. (Id. ¶ 319.) At the time of her termination, none of the healthcare facilities in her territory required that visitors

4

be vaccinated against COVID-19. (Id. ¶ 320.) The one place that had such a policy rescinded it. (Id.)

Britt Singleton is a Protestant Christian who attends a Southern Baptist church in Georgia. He was raised as a Southern Baptist. (Id. ¶ 321.) He believes that God gives him guidance through the reading of Scripture and through prayer. (Id. ¶ 322.) He believes that God told him, through a "still small voice," that the COVID-19 vaccine was not for him or his family. (Id. ¶ 323.) At other times in his life, he believes that his prayers were answered. (Id. ¶ 324.) He was never asked about his COVID-19 vaccination status by a client or customer while working for Takeda, as he was not requested to make in-person visits. (Id. ¶ 326.)

Susan Welch is a lifelong Catholic who attended Catholic school and considers herself to be devout. (Id. ¶ 327.) Consistent with Catholic teaching, she considers herself pro-life. She believes that all life is precious and is opposed to abortion. She is opposed to the COVID-19 vaccines for that reason. (Id. ¶ 329.) She has no religious objection to masking or testing for COVID-19. (Id. ¶ 330.) None of the medical providers in Ms. Welch's territory required visitors to be vaccinated against COVID-19. (Id. ¶ 331.) She requested a religious exemption from Takeda's vaccination policy on Sept. 30, 2021. (D.S.U.M.F. ¶ 256.)

The Defendant did not dispute the sincerity of any of the plaintiffs' religious beliefs when it evaluated their exemption requests. (Id. ¶ 273.) It denied all of them solely on undue hardship grounds. (Id. ¶ 274.) In evaluating whether an employee's exemption request to the vaccine policy would post an undue hardship on the company, Takeda would look at the ability to perform the essential functions of the employee's job which, for a field-based employee, was in-person interactions, ability to the out in the field, engaging with our healthcare providers and stakeholders and vendors. (P.S.U.M.F. ¶ 335.) Employees could thus still perform the essential

functions of the employee's job if not prevented from entering a healthcare provider. (Id. ¶ 336.) Additionally, the undue hardship analysis did not consider the possible contraction of COVID-19 by employees (id. ¶ 337), nor did it conduct analyses on the transmission rates of individuals when evaluating exemption requests for undue hardship (id. ¶ 338). According to the Defendant, an employee or one their family members getting sick from COVID-19 would not pose undue hardships on the company. (Id. ¶ 342.)

The Defendant submitted the report of a proffered expert, Dr. Daniel Salmon. According to the report, he reviewed the Complaint, excerpts of the plaintiffs' depositions, job descriptions of the plaintiffs, the Defendant's vaccine policy announcement and a call with plaintiff Parrish's former supervisor. (Doc. 52-1, Def. Mem. Supp. Sum. J., Ex. K at 911.) The report does not state that he visited, communicated with or otherwise researched any of the facilities the plaintiffs visited in the performance of their jobs, or reviewed any of their COVID-19 protocols.

The individuals Takeda describes as its patients are actually the patients of medical providers. (P.S.U.M.F. ¶ 340.) Those providers, which the plaintiffs visited, set their own COVID-19 policies and protocols. (Id. ¶ 339.) The Defendant's basis for its opinion that allowing unvaccinated employees to visit medical facilities that did not require COVID-19 vaccinations would cause an undue hardship was that doing so could harm the company's reputation. (Id. ¶ 343.) The Defendant has however, acknowledged that it granted medical exemptions to the vaccine policy.

Following the denials of their religious exemption requests, the plaintiffs all refused to comply with the vaccination policy and were subsequently fired from Takeda.

## 5. Argument

All plaintiffs bring this action under Title VII of the Civil Rights Act of 1964. They assert that the Defendant's termination of their employment for refusing to take the COVID-19 vaccine constituted illegal religious discrimination. There is no dispute that they submitted a religious exemption request to the Defendant's vaccine requirement. It is also not disputed that the requests were denied and that they were subsequently fired. What is disputed is whether those firings were legal.

Title VII, codified in relevant part at 42 U.S.C. § 2003e-2(a)(1) provides that is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Religion is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). A plaintiff alleging religious discrimination must first "make her *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action. If the plaintiff establishes her *prima facie* case, the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 133 (1st Cir. 2004) (internal citation omitted).

The Defendant has not demonstrated in its motion for summary judgment that there are no genuine issues of material fact regarding either the sincerity of any plaintiffs' beliefs or

the nature of any hardship that the Defendant might have borne had it attempted to accommodate a plaintiff's beliefs. Accordingly, the motion for summary judgment should be denied and the case should proceed to a jury trial.

"To prevail on a motion for summary judgment, the moving party must show "that there is no genuine dispute as to any material fact" and that it 'is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a); *see* Baltodano v. Merck, Sharp, and Dohme (I.A.) Corp., 637 F.3d 38, 41 (1st Cir.2011)..." Onebeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada, 684 F.3d 237 (1st Cir. 2012). "In deciding such a motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Id.

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986). Additionally, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" (internal citation omitted) Id.

"The moving party bears the initial burden of showing why it is entitled to summary judgment." Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Although the nonmovant bears the burden of proof at trial, the movant must show "prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine

issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." Id. at 272-73 (citing Celotex, 477 U.S. at 323). Once the movant makes a showing in either manner, the nonmovant must then "point to record evidence creating a genuine issue of material fact." Id. (citing Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). Both the movant and non-movant must point to specific evidence in the record to carry their burdens in summary judgment. Id. (citing Celotex, 477 U.S. 324; Matsushita, 475 U.S. at 586).

I.  **Whether religious beliefs are sincerely held is a question of fact. The Defendant has not met its burden on summary judgment that any plaintiff's beliefs are, as a matter of law, not sincerely-held, in order to remove the fact-finding inquiry from the jury.**

The United States Court of Appeals for the Second Circuit, opened its decision in

Patrick v. LeFevre, 745 F.2d 153, 154 (2nd Cir. 1984), with the following

> From time immemorial, our republic has prided itself on its unwavering commitment to spiritual liberty. Unpopular and unorthodox beliefs forbidden elsewhere have consistently found tolerance and acceptance on our shores. An abiding respect for the unfettered expression of conscience has served as the animating force behind the free exercise clause's coverage. Mindful of these precepts, the judiciary has steadfastly refused to become the arbiter of scriptural interpretation.

The court further noted that it "has consistently held where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable." Id. at 159. The sincerity of religious beliefs falls within that reasoning, as such an inquiry "demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination." Id. at 157.

Our circuit relied on Patrick, in E.E.O.C. v. Union Independiente De La Autoridad, 279 F.3d 49, 57 (1st Cir. 2002), wherein it noted that "assessing the bona fides of an employee's

religious belief is a delicate business" and that "that a jury, acting under proper instructions from the trial judge, is fully capable of evaluating the parties' evidence and making the appropriate factual determination."

The Second Circuit's reasoning is in line with that of the United States Supreme Court, which concluded, in evaluating the claims of conscientious objectors during Vietnam in United States v. Seeger, 380 U.S. 163, 185 (1965), "we hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact…"

District courts have however decided sincerity issues on summary judgment on the limited basis that no reasonable juror could conclude that the plaintiff's religious beliefs were sincerely-held. Still, courts do not sit as church elders or theologians. The Second Circuit for instance, in Kane v. DeBlasio, 19 F.4th 152, 168 (2nd Cir. 2021), opined that "denying an individual a religious accommodation based on someone else's publicly expressed religious views—even the leader of her faith—runs afoul of the Supreme Court's teaching that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Hernandez v. Commissioner, 490 U.S. 680, 699 (1989).

The Defendant wants this Court to do just that. The inquiry for this Court, in deciding this motion to determine whether the case should even reach a jury to decide that fact, is whether no reasonable juror would find the Plaintiff credible. See Taylor v. Gallagher, 737 F.2d 134, 137 (1st. Cir. 1984) ("summary judgment is appropriate where…only one inference can be drawn from the facts."). It cannot be disputed that millions of Americans, the same people who

make up our jury pools, believe in prayer. The United States Supreme Court acknowledged that fact when it upheld the constitutionality of municipalities opening public meetings with prayers. Justice Kennedy, writing for a unanimous court in Town of Greece v. Galloway, 572 U.S. 565, 575 (2014), declared that legislative prayer is a "tolerable acknowledgement of beliefs widely held" (quoting Marsh v. Chambers, 463 U.S. 783, 792 (1983)).

When courts have granted summary judgment, by finding that no reasonable juror could find that a plaintiff's stated reasons for an accommodation are religious, it has typically been when the beliefs were not connected to religion or so overly broad that they cannot be said to part of a system of beliefs. In this district, the court reasoned as such in Rodrique v. Hearst Commc'ns, Inc., 2024 U.S. Dist. LEXIS 30258, 2024 WL 733325 (D. Mass. Feb. 22, 2024). That particular plaintiff had said only that "he objects to ingestion of artificial or man-made substances or substances developed using fetal cells." Id. at 3. It was not tied to an actual religious belief or position, such as an opposition to abortion. He also did use certain medications and other products that were man-made or developed using fetal cells. The court reasoned that his belief did "not address the type of 'fundamental and ultimate questions having to do with deep and imponderable matters' typically found to accompany a religious belief." Id. at 4 (internal citations omitted).

The Defendant did not dispute the sincerity of the Plaintiffs' religious beliefs when it reviewed their exemption requests. Although the Plaintiffs cannot assert an estoppel claim, they do posit that the fact that the stated beliefs did not appear to be false or invalid to the Defendant is sufficient to show that reasonable jurors can disagree over the Defendant's current position that none of the plaintiffs' beliefs are sincerely-held.

**A. Religious sincerity is about credibility. Conformity and consistency are factors for the fact-finder to consider in determining sincerity.**

While behavior inconsistent with religious beliefs may be indicative of a person's sincerity, that is just another factor for a fact-finder to consider. *See* International Soc. for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 441 (2nd Cir. 1981); E.E.O.C. v. Union Independiente De La Autoridad, 279 F.3d 49, 57 (1st Cir. 2002). The mere existence of inconsistent behavior does not render religious beliefs insincere as a matter of law for which summary judgment could be granted.

Several district courts have denied summary judgment on the sincerity prong of Title VII vaccination cases, concluding that whether an employee's religious beliefs are sincere is a factual question to be decided by a jury. Bass v. T-Mobile USA, Inc., 22-11975, slip op. at 5 (E.D. Mich. Mar. 27, 2024), concerned an employee who claimed that his religious beliefs lead him to oppose all vaccinations and that the specific belief was that "he had the right to exercise his free will in accordance with his intellect and that his faith, Catholicism, 'oppose[s] forcing individuals to take the vaccine.'" He later said that he opposed vaccines derived from fetal cells due to his religious opposition to abortion. Id. The court agreed that whether the belief was sincerely-held was a question for the jury and thereby denied summary judgment. Id. at 11.

Similarly, the plaintiff in Floyd v. Trinity Cent. Home Health, 6:22-cv-06117, slip op. at 8 (W.D. Ark. Aug. 5, 2024), stated that he was a Christian and believes that his body is a temple of the Holy Spirit, that he should follow divine law and follows the principles laid out by God, ultimately concluding that the COVID-19 vaccine would violate God's principles. The court held that the plaintiff's true motives bore on his credibility, which is an issue only for the jury. Id. at 11.

Plaintiffs Huck, Silva and Welch, who are Catholic, and Savage, who is a non-denominational Christian, primarily base their opposition to the COVID-19 vaccines in their religious opposition to abortion. The issue is not whether their churches officially oppose the vaccines, but whether they, as individuals, have beliefs based in religion that do. The inquiry is not that the beliefs are correct or reasonable, but whether they are truly rooted in religion. That is a factual question for the jury.

Plaintiffs Amoson, Singleton and Ramsey's objections to the COVID-19 are based in the guidance they received through prayer and Bible research. Ms. Amoson and Mr. Singleton believe that God spoke to them. The inquiry for them is not whether it actually happened or whether it is reasonable to believe, but whether they actually believed it. Again, it is a question of credibility which is to be solely decided by the jury. Ms. Schmidt's religious objection is based in a belief against vaccines because God gave her immunity, as well as a religious opposition to abortion. The credibility question with her, as with her co-plaintiffs, is whether she was honest in her exemption request.

Whether the plaintiffs followed the religious beliefs they used to support their vaccine exemption requests in other aspects of their lives, and whether they followed them consistently, are among the factors a fact-finder can consider in assessing their credibility.

**B. Religious beliefs and "secular concerns" are not mutually exclusive. It is for a jury to weigh whether purported religious beliefs are truly religious in nature.**

Religious beliefs and secular concerns are not mutually exclusive. A person with a safety concern or other non-religious issue with a vaccine can still sincerely hold a religious objection to it. The Seventh Circuit recently held, in Pasarella v. Aspirus, Inc., 23-1660, slip op. at 6 (7th

Cir. July 29, 2024),[1] that "an employee may object to an employer's vaccine mandate on both religious and non-religious grounds-for example, on the view that receiving the vaccine would violate a religious belief *and* implicate health and safety concerns." The court reasoned that an accommodation request that "turns upon secular considerations does not negate its religious nature. To conclude otherwise fails to give effect to Congress's expansive definition of 'religion' and, even more, denies that a matter of personal conviction can root itself in both religious and non-religious reasons." Id. at 7. The First Circuit endorsed the Passarella decision in another Title VII vaccine mandate case, Bazinet v. Beth Israel Lahey Health Inc., 24-1148, slip op. at 16 (1st Cir. Aug. 13, 2024), when it concluded that an employee's use of information copied and pasted information from the Internet in her religious exemption request "did not establish that her beliefs are insincere." The court also noted that whether "few or many share [her] religious view is irrelevant." Id. at 14.

The Middle District of Florida reached the same result when it denied summary judgment in another vaccine case, Scafidi v. B. Braun Med., 8:22-cv-2772-VMC-TGW (M.D. Fla. Jan 17, 2024). The plaintiff in that case asserted that she was a Christian who must follow her conscience, which is guided by the Holy Spirit, and that her refusal to take the vaccine was a matter of conscience. Id. at 8. She also had concerns about the safety and science of the vaccine. Still, the court determined that whether the plaintiff's religious beliefs actually

---

[1] It was hot reversal summer for COVID-19 vaccine cases in the federal appellate courts. The Defendant relied on district court case that was reversed by the Seventh Circuit, Passarella v. Aspirus, Inc., No. 22-CV-287-JDP, 2023 WL 2455681 (W.D. Wis. Mar. 10, 2023) (Def. Mem. Supp. Summ. J. at 21.) It also cited Kiel v. Mayo Clinic Health Sys., 685 F. Supp. 3d 770 (D. Minn. Aug. 4, 2023) in arguing that courts have rejected broad expressions of belief, such as the body being a temple, as being sincerely-held. (Id.) That decision was reversed by the Eighth Circuit in Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894, 902 (8th Cir. 2024), which observed that "beliefs do not have to be uniform across all members of a religion or 'acceptable, logical, consistent, or comprehensible to others'" (quoting Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 714 (1981)).

conflicted with the requirement or whether that was just a guise for other reasons was a factual dispute because it was about her credibility. Id. at 24.

Nearly all of the plaintiffs expressed questions and concerns about the vaccines' development and safety in addition to their religious objections. Concerns about health and safety for any medical treatment and procedure are reasonable for anyone to have. The issue that must be decided in analyzing their sincerity is whether the stated religious objections were the real reasons for their opposition to the vaccines and not cover for other reasons that are not legally protected. That is a question of credibility, which is for the jury.

**II.    Whether a religious accommodation would impose substantial, increased costs on an employer is a question of fact. The Defendant has not produced evidence of actual costs, let alone costs that would be so significant that they would impose an undue hardship on its business, were it to accommodate the plaintiffs' religious beliefs.**

The Defendant has failed to meet its burden on summary judgment that there is no factual dispute that exempting the plaintiffs from its vaccine requirement would have caused it an undue hardship. It has not produced any quantification of costs, let alone significant costs to its business, sufficient that no reasonable juror could find that the plaintiffs could not be accommodated.

The United States Supreme Court held just last year, in Groff v. DeJoy, 600 U.S. 447, 468 (2023), that whether a religious accommodation would post an undue hardship on an employer is a "fact-specific inquiry." A burden rises to an undue hardship when it "is substantial in the overall context of an employer's business." Id. at 470. It "must be more severe than a mere burden." Id. at 469. Accordingly, the "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Id. at 470. The Defendant has not done that here.

The plaintiff in <u>Groff</u> was an Evangelical Christian mail carrier who worked for the Postal Service. He believed that Sundays should be "devoted to worship and rest, no 'secular labor' and the 'transportation' of worldly 'goods.'" <u>Id</u>. at 454. He was, in accordance with those beliefs, unwilling to work on Sundays. As a result, other mail carriers were required to make Sunday deliveries that otherwise would have been made by him. He was disciplined and eventually resigned. Thereafter, he sued under Title VII, claiming that the Postal Service could have accommodated his religious belief to not work on Sundays without undue hardship. <u>Id</u>. at 456.

Previously, many courts relied on the precursor to <u>Groff</u>, <u>Trans World Airlines, Inc. v. Hardison</u>, 432 U.S. 63 (1977). The plaintiff in that case worked in aircraft maintenance for Trans World Airlines. His religious beliefs prohibited him from working on Saturdays. 432 U.S. at 66. The company accommodated his beliefs by allowing him to not work on Saturdays, which his job seniority allowed. <u>Id.</u> at 68. He later transferred to another job which required Saturday work and for which he had low seniority. His union also would not go against the seniority system. <u>Id.</u> No accommodation could be reached, he refused to work on Saturdays and was fired. At the time the Supreme Court opined that "to require TWA to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship." <u>Id.</u> at 84. The Court, in <u>Groff</u>, concluded that the "more than de minimis standard" is not the rule of <u>Hardison</u>, and articulated the requirement for a showing of substantial increased costs. 600 U.S. at 470.

Whether accommodating the plaintiffs' religious objection to receiving COVID-19 vaccines would have caused an undue hardship to the Defendant—that it would have forced the company to incur significant, increased costs— is a question of fact squarely for a jury. Still, the

Defendant has not produced what those costs would or could be in monetary terms and how they would significantly impact the business of a worldwide pharmaceutical corporation.

   **A. The Defendant has not actually demonstrated the safety costs of allowing the plaintiffs to continue working in the field unvaccinated, especially when the providers they visited largely did not require them to be vaccinated.**

The Defendant advances the conclusory statement that "the health and safety risks in allowing the Plaintiffs to engage in in-person interactions created an undue hardship to Takeda." (Def. Mem. Summ. J. at 35.) It does not explain how or to what extent permitting unvaccinated individuals to visit facilities that did not require them to be vaccinated would cause the company to incur costs, significant or otherwise. The analysis does not end with safety risks. The determination is not whether there could be health risks; it is whether those risks would pose an undue hardship on the company by leading to significant, increased costs in its business. Moreover, since the Defendant granted medical exemptions to its vaccine requirement, the analysis should be whether and how granting a plaintiff a religious exemption would increase the company's costs more than one of its medical exemptions.[2]

District courts have denied summary judgment when an unvaccinated employee was not prevented from performing his or her job or entering locations on account of vaccine status. The plaintiffs were not medical providers and did not provide care directly to patients. Takeda's "patients" were actually the patients of the medical providers and healthcare facilities that their field-based employees visited. Those providers set their COVID-19 protocols, which were likely took their patients' safety into consideration. Those key facts readily distinguish the present case from <u>Bushra</u>, in which the plaintiff was a physician in a hospital that enacted its

---

[2] Presumably, the COVID-19 virus cannot tell the difference between a person who is unvaccinated because of a medical reason and one who is unvaccinated because of a religious reason.

own vaccine policy, and also Isaac, wherein the plaintiff was directly visiting and working with her employer's clients. Those courts rejected the Defendant's argument that the health risks of COVID-19 pose a near per se undue hardship on a company when the health risk is to other providers' patients. Courts that have analyzed such cases have held that those health risks must still be quantified as costs to the employer with actual evidence in order to establish an undue hardship.

Scafidi again presents a similar hardship analysis to the present case. Ms. Scafidi worked as a senior hospital account manager—a sales representative—for the defendant company, Braun, which supplied medical equipment to hospitals and other medical facilities. Scafidi at 2. The job required her to make "in-person, on-site sales of IV systems to clinical staff and hospital management at facilities within her territory." Id. Braun instituted a COVID-19 vaccine policy right around the same time as Takeda did, in September 2021. Id. at 5. Scafidi requested a religious exemption, asking to perform her current job without being vaccinated. The request was denied and she was fired. Id. at 12.

In denying summary judgment, the court noted that a "genuine issue of material fact [existed] as to whether Braun would have suffered an undue hardship if it had allowed Scafidi to stay in her customer-facing position without getting vaccinated." Id. at 30. Although Braun showed that there might be some administrative costs and difficulties if she could not receive exemptions from all of her hospitals, it did not present an estimate of the costs it would have incurred if she stayed in her position unvaccinated. Moreover, there was no evidence that any hospital denied her access or denied an exemption request. Id.

In yet another factually comparable case, Malone v. Legacy Health, 3:22-cv-01343-HZ (D. Or. Jul. 5, 2024), the District of Oregon denied summary judgment on undue hardship

18

grounds. Molly Malone was a respiratory therapist who actually worked with patients directly in a hospital's trauma unit. Id. at 4. The court accepted the defendant hospital's position on the COVID-19 vaccines' efficacy and the need for a vaccination requirement. Id. at 8. Still, it held that the hospital did not demonstrate that no reasonable jury find for the plaintiff. Although the hospital put forth evidence of virus transmission and the vulnerability of its patients, it did not produce any evidence that it made an "individual inquiry" into whether Malone could be accommodated. Id. The record, the court opined, was "murky" as to what other safety measures could be used. A jury could therefore conclude that the accommodation would not be a substantial burden.

The Defendant's corporate representative also had trouble articulating how, if there were not vaccination requirements that barred the plaintiffs from visiting facilities, and those employees were thereby able to perform the essential functions of their jobs by visiting those places, that the company allowing them to do so would cause an undue hardship. The representative, Ms. Denmark, finally settled on saying that the risk to the medical providers' patients and personnel would harm Takeda's reputation. Since that is all the designated voice of the Defendant could state about where and how additional costs could be incurred, the Court's analysis should be limited to evidence of reputational costs.

The Court, should it not strike Dr. Salmon's report, can accept his opinions on the risks of COVID-19 transmission and the efficacy of the vaccines in the same manner as the Oregon district did in Malone, and still decide that factual questions remain. Rather than explaining with any certainty what harms the increased COVID-19 transmission risks of unvaccinated visitors would cause people in medical offices, Dr. Salmon opines only that unvaccinated NSBU Sales Representatives, NSBU Territory Managers, NSBU Regional Sales Trainers, Alpha1 Territory

19

Business Managers, and Immunology Patient Access Managers "had the potential to impact co-workers as unvaccinated persons are at greater risk of contracting and spreading COVID-19 than vaccinated persons" and also "have a potential impact on patients." (Def. Mem. Supp. Sum. J., Doc. 52-1, Ex. K at 916-917). He does not state with any particularity or certainty how much greater those impacts or risks would or even could be. The words "potential to impact" are lukewarm at best, connoting hypothesis and possibility, but not necessarily likelihood. A factual inquiry on safety would consider the various protocols that the plaintiffs' clients used, such as an unvaccinated person wearing a mask in a facility that had a separate area for its patients vs. a vaccinated person in a crowded, mixed waiting room. Or a medical facility that included doctors, nurses and office staff who themselves were not vaccinated. Such potential safety issues, risks and costs are questions of fact under the law established in <u>Hardison</u> and <u>Groff</u>.

In addition, the facts and reasoning of both <u>Hardison</u> and <u>Groff</u> are illustrative in analyzing the potential accommodation for the plaintiffs because it could involve scheduling and coverage.[3] Of all the plaintiffs and all of the medical providers that were in their respective territories, only Jillyn Schmidt and Sandra Silva encountered any had a policy that required visits to be vaccinated against COVID-19 and even then, it was only one facility for each that had a requirement against far many more that did not.

**B. The Defendant has not shown on summary judgment that allowing the plaintiffs to work remotely while unvaccinated would have imposed substantial costs on it. No individualized inquiry was performed by the company in evaluating any plaintiff's request.**

---

[3] <u>Hardison</u> pivoted on a seniority system which made shift swaps and scheduling difficult. There is no evidence of any difficulty or costs for Ms. Schmidt's or Ms. Silva's coverage.

The Defendant claims that allowing the plaintiffs to work remotely would have significantly harmed its sales, yet it could not really quantify those costs either. It has not submitted a report from an economics expert. It has not submitted a report at all—just statements two declarations that reference studies the company did but do not include the actual studies. Those statements, if they are even considered by the Court at all,[4] should be disregarded. They were not individualized inquiries of any plaintiff's accommodation request to work remotely. They were not done at the time the plaintiffs made their requests but came later.

It is on the Defendant to demonstrate here that there is no factual dispute regarding the costs of remote work on the company. Without seeing those studies, there are still genuine issues of material fact on its claims of reduced sales and the overall impact on its business. For instance, one reason for the reduction in prescriptions could have been that while sales representatives were working remotely and not visiting doctors' offices, patients were not visiting those doctors either, and thus did not receive prescriptions. The declarations do not mention. Whether the reduction in prescriptions was caused by, or just correlated with, a reduction in in-person sales visits, is squarely a factual question for the jury. Indeed, the line by the declarant, Chris Dezelan, that his team's analysis "attributed a significant portion of this decline to the reduction in in-person interactions with healthcare providers during the COVID-19 pandemic," (Doc. 52-5, Def. Mem. Supp. Summ. J., Decl. of Chris Dezelan ¶ 6), suggests that there were other reasons for the decline.

The Declaration of Jennifer Nojiri, if it is relevant or admissible at all, also asks more questions worthy of jury consideration than it answers. First, the "impact analysis" it references

---

[4] *See* Plaintiffs' Response to Defendant's 56.1 Statement of Undisputed Material Facts ¶¶ 98-105.

was conducted in 2023, not 2021 when the Plaintiffs requested their exemptions. (Doc. 52-6, Def. Mem. Supp. Summ. J., Decl. of Jennifer Nojiri ¶ 2.) Second, it was conducted not to analyze remote work for sales representatives, but to replace human sales representatives with digital marketing. (Id. ¶ 3.) It is not stated whether that digital marketing was available in 2021. Finally, it notes that while eliminating the sales force could save the company $108 million, it decided to keep the sales force because eliminating it would apparently have a greater adverse impact on sales, although that is not specified.[5] (Id. ¶ 5.) Whatever any of that means and whatever that impact might be, are factual matters for the jury.

Also absent from the record is evidence of the Defendant's revenue and expenditures for the time period the plaintiffs requested their exemptions. Groff requires a factual inquiry of whether a religious accommodation poses a burden that would be substantial in the overall context of a business. That requires more than a reference that one drug's prescriptions dropped 19% over a time period that is not actually specified.

### III. Summary judgment should also be denied on the Plaintiffs' claim for punitive damages.

The Court should deny the Defendant's motion for summary judgment on the Plaintiffs' claim for punitive damages. Whether there is evidence to support an award of punitive damages is a matter to be taken up at trial, typically when jury charges. Still, at this juncture, the Defendant has failed to demonstrate that as a matter of law, the Plaintiffs should not be entitled to punitive damages if they prevail at trial.

Punitive damages are a remedy, not a cause of action. *E.g.* South Port Marine, LLC v. Gulf Oil Ltd. Pshp., 234 F.3d 58, 64 (1st Cir. 2000). There really is no reason for the Court to

---

[5] This would seem to suggest that there is a non-sales revenue value in having representatives visit medical providers. The plaintiffs all wanted to continue working in person. Whether the value they bring is outweighed by health, safety and reputational costs is another question of fact that cannot be found on summary judgment.

take up this issue now because it does not have any bearing on the Title VII claims or defenses. See Gouin v. Nolan Assocs., LLC, 308 F. Supp. 3d 506, 509 (D. Mass. 2018) (holding that the issue was not ripe because a jury would still have to first find gross negligence or recklessness and, a the absence pretrial decision would not prejudice the defendant).

In employment discrimination cases, punitive damages may be awarded by the jury "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Kolstad v. ADA, 527 U.S. 526, 536 (1999).  "An employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." Id.

The factual record in the present case so far provides a basis for the jury or Court to conclude that the Defendant acted with malice or reckless indifference when it denied the Plaintiffs' religious accommodation requests. By the Defendant's own admission, it granted medical exemptions to employees. It has not, according to the facts presently in the record, granted a religious exemption to anyone, even though the risk or cost of an unvaccinated employee would logically be the same regardless of the reason for the exemption. Additionally, the Defendant did not conduct individual hardship analyses on the Plaintiffs' requests. There are sufficient facts to argue that the Defendant was not seriously planning on granting any religious exemptions at all.

For those reasons, the Court should deny the Defendant's motion for summary judgment as it concerns the Plaintiffs' claim for punitive damages or alternatively, defer its consideration of the issue to the time of trial.

## 6. Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment should be denied.

Dated: September 10, 2024

Respectfully Submitted,
The Plaintiffs

By:  **/s/ Christopher DeMatteo**
Christopher DeMatteo
*Admitted pro hac vice.*
Bar no. ct28584
Pattis & Paz, LLC
383 Orange St., Fl. 1
New Haven, CT 06511
Tel: (203) 393-3017
Fax: (203) 393-9745
cdematteo@pattispazlaw.com

Brian Unger
BBO No. 706583
THE LAW OFFICES OF
WARNER MENDENHALL,
INC
20 Park Plaza, 400-4
Boston, MA 02116
617.297.2227; f 330.762.9743
brian@warnermendenhall.com

## 7. Certificate of Service

I hereby certify that on September 10, 2024 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Christopher DeMatteo
Christopher DeMatteo
