# Exhibit B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA AMOSON, ROBB HUCK, TROBY )
LANE PARRISH, ALECIA RAMSEY,  )
LARRY HAROLD SAVAGE, JILLYN    )
SCHMIDT, SANDRA SALAZAR SILVA,)
BRITT HAROLD SINGLETON, SUSAN )
WELCH,                        )
                              )
        Plaintiffs,           )    CASE NO.
                              )
    vs.                       )    1:22-cv-11963-GAO
                              )
TAKEDA PHARMACEUTICALS U.S.A.,)
INC.,                         )
                              )
        Defendant.            )

                          - - -

        Remote Videotaped Videoconference Deposition

    of BRITT HAROLD SINGLETON, located in Canton,

    Georgia, taken on behalf of the Defendant, before

    Kimberly S. Bennett, RPR, CRR, CRC, Certified Court

    Reporter, on the 6th day of October 2023,

    commencing at the hour of 10:06 a.m. EST.

                          - - -


                Magna Legal Services
                   866-624-6221
                  www.MagnaLS.com



Page 116

what you're asking for them is something that was very personal to you and not necessarily supported by the church itself.  Is that right?

MR. DeMATTEO:  Objection to form.

THE WITNESS:  No.  No.  They were supportive within the constraints that they faced as members of a body.  And the fact that there was no official position by that body meant that they could not come out to my defense.  That's A.

And B, they couldn't actually explain what I believed because then it would be their sincerely held religious beliefs instead of my sincerely held religious beliefs which is different, you know, it's very personal to each person, but they were certainly willing to agree that what I had based my decision on, which was the power and -- or the providence and the sovereignty of God and, you know, those couple of verse references that I mentioned were solid grounds for basing a decision, a life decision.  And in this case specifically the COVID-19 vaccine.

Q    (By Mr. Ranjo) Okay.  I'm going to turn back to Exhibit 7.  This is your accommodation request.  And I'm looking at page 476.  Please take a look at that and let me know what that is.



A    You said Exhibit 7?

Q    Yes, sir.

A    That's my request.

Q    Page 476.

A    Yep.

Q    What is that?

A    This is a letter from an older man who has been a long time believer and who is someone I consider a spiritual mentor.

Q    And that's Robert Lester?

A    Yes.

Q    How long have you known him for?

A    Probably over ten years.

Q    And what do you know him from?

A    Participation in Trail Life USA.

Q    And what is that?

A    Trail Life USA, it's a Christ-centered, boy-focused, outdoor-oriented character and leadership development program in all 50 states.

Q    And you asked him to, Mr. Lester, to write this for you?

A    Yes.

Q    And it says here he's a reverend; is that right?

A    Well, he signed it chaplain.  Let's see.



Q    At the top.  Sorry.

A    Oh, yeah.  Mm-hmm.

Q    Do you know what church he's affiliated with?

A    Presbyterian church.

Q    The one he mentions there in Woodstock, Georgia?

A    Mm-hmm.

Q    Is that a "yes"?

A    Yes.  Sorry.

Q    No problem.  Okay.  And when did you approach him about providing a letter?

A    Probably around the same time that I approached Doug Mulkey.

Q    And how did you ask him?

A    Would you help me.  Here's the situation I'm in.  And could you attest that, you know, my beliefs are sincere and that, you know, you would write a letter on my behalf.

Q    Did you meet with him to ask him this?  Did you call him on the phone?

A    Both.

Q    Did you speak to him in text or e-mail about it?

A    I don't think so.

Q    Is it possible?



A    Possible.

Q    Did you look for communications from and to Mr. Lester in connection with discovery in this case?

A    Him specifically, no, I don't think so.

Q    Okay.  Well, I'm going to ask that you do so and I'll add that to the list as well.

Okay.  And the language here, who drafted the language in this letter?

A    This was -- he did this all on his own.

Q    Did you provide him an initial draft like you provided the other pastor?

A    No.

Q    Did you talk about what should be in the letter in advance of him writing it?

A    Yeah.  Just that, you know, my beliefs were sincerely held and that, you know, how he knows me and his credentials.

Q    Do you know if he's vaccinated?

A    He is.

Q    Is there any difference between the belief systems of Presbyterians like Reverend Lester and Protestants like yourself?

A    Well, it's a Protestant religion.  There's just shades of denominational differences.

Q    Anything major that you can think of?


MAGNA
LEGAL SERVICES

A    No, not -- nothing.  Nothing that I can think of.  We're good friends and we have an open and honest communication and discussions about faith issues and, you know, when it came time to talk about the COVID vaccine he got it and I didn't.

Q    It doesn't mention -- there's no Scriptures mentioned in here in support of the religiousness of your belief, is there?

A    No biblical references, no.

Q    There is a quote from Dr. Martin Luther King.

A    No.

Q    Martin Luther.

A    Yes.

Q    What does that mean to you, that quote?

A    So, well, it's kind of a summary of what I mentioned earlier with the reference in the Book of Kings and then the other reference that I mentioned. And that was that if something is placed on my heart that it is not for me by God that that is -- that becomes my conscience.

And that is bound because I believe that the word of God is true and that God has spoken to me and to do anything different would be -- in this specific instance it would not be right nor would it be safe and it would also be sin.



Page 121

Q    Then do you know if Reverend Lester provided notes like this for anyone else?

A    I don't.

Q    Okay.  So let's scroll up to the top of this same exhibit, Exhibit 7.  I'm sorry.  Not the top. Let's go to page 475.

A    Okay.

Q    What's this document?

A    This is a letter that I wrote for my submission and there's the Scriptural reference, Romans 14:23.

Q    Is that the one you couldn't recall before?

A    Yes.

Q    Okay.  Did you write this letter?

A    Yes.

Q    Did anyone help you?

A    No.

Q    Did anyone proofread it for you?

A    Maybe my wife.

Q    Did you send it to anyone other than Takeda?

A    The only ones that I can think of are Takeda and then, of course, Pattis & Smith.

Q    Right.  And this is consistent with what we have been talking about, the sovereignty of God in terms --


MAGNA
LEGAL SERVICES

Page 122

A    Yes.

Q    -- of your rationale?

A    Yes.

Q    Okay.  And then you request -- there's three numbers here.  And these are your accommodation requests to Takeda?

A    Yes.

Q    The first one is to continue doing the job completely remote; is that right?

A    Yes.

Q    In this scenario what would happen if a patient or a doctor or nurse asked to see you in person?

A    Well, I would request permission to go see them based on knowing that that's vital to the interests of the company.

Q    What's vital to the interests of the company?

A    Based on what you said earlier, that building relationships is important.  If they ask to meet with me face-to-face, I would certainly put in the request to meet with them face-to-face to my management.

Q    Okay.  And if the company deemed it too dangerous for you to do that, what would then need to happen?

A    I would have to handle it via phone, fax or e-mail.



Q    Or somebody else would have to do it, right?

A    Certainly possible but not -- that would not be what I would want to happen.

Q    Well, if the company's priority is to have face-to-face interactions where patients and providers want them and you're not vaccinated and maybe in some instances places required vaccination or the company deemed it too unsafe for you to go there, somebody would have to go in your place, right?

A    Yes.

Q    Who would that be?

A    Probably my manager Pete Fresca or it could be one of my other colleagues.

Q    Have you seen that happen before, the territory coverage in situations like that?

A    Yes.

Q    In what situation?

A    When people are on vacation or when people are -- you know, when there's a vacancy that goes for an extended period of time that somebody else can fill in.

Q    Have you filled in for somebody before?

A    Yes.

Q    Who is that?

A    Let me think.  Fill in for.  There was one of my colleagues that was out on maternity leave that I



Page 124

filled in for.  But I was able to do everything that she needed me to do 100 percent remotely.

Q    When was this?

A    I'm guessing 2017, '18, something like that.

Q    You had a different job at that point, right?

A    Different job, same company.  And I'm trying to think of other times -- I know I have filled in -- I can't remember specifics of having filled in for other people, but we had one of our colleagues depart the company so I was one of the few people that were asked to fill in for her vacant territory while they were hiring a new person.

And if I remember right, that was like the D.C., Maryland, Virginia area.  But I was again able to do everything remotely there in that situation.

Q    What job was that?

A    That was more recently when I was a PAM.

Q    And how long did that last?

A    A couple weeks.

Q    And during that time did anyone call or write and ask for an in-person education or meeting?

A    No.

Q    Okay.  So you got lucky.

MR. DeMATTEO:  Objection.  Form of the question.


MAGNA
LEGAL SERVICES

Page 125

Q    (By Mr. Ranjo) Any other instances you can recall?

A    Let's see.  I'm thinking.  Oh, yes.  I filled in for one of my PAM colleagues when she was on some sort of a vacation with her husband.  It was a couple of weeks.  She was immediately to my south.  That was for a week, maybe two weeks.  And I -- again, it was just all done remotely.

Q    When was that?

A    That was before the switcheroo.  Matt Rothwell was still my manager.  So that would have been late 2019 or early 2020.

Q    Did you get any calls or requests from patients --

A    Yep.

Q    -- or providers requesting in-person meetings or education?

A    No.

Q    Okay.

A    Everything was done remotely.

Q    And if you look at number 2, I guess that's kind of the same thing.

A    Right.  Yeah.  I was never once asked by any of my customers if I was vaccinated or unvaccinated. Just when the topic came up about how I can best support



them, the answer in my territory was always that we're not allowing anybody in right now, we'll just continue to work on the phone, fax, and e-mail.

Q    Well, during that time they weren't allowing any in-person interactions; they had no need to know whether you were vaccinated or not, right?

A    Well, this was after the vaccine was available.

Q    That's not what I said.  If they weren't allowing anyone in there, why would they need to know if you were vaccinated or not?

A    Well, that's a good question.  I mean, I was still getting approvals through.  I was still getting patients started on medication without actually physically meeting with doctors, nurses or patients.

Q    Right.  You say it right there in the second line of bullet point number 2.  "There are currently no customers in my geography who are allowing patient access managers into their facility in person, whether vaccinated or unvaccinated."  Do you see that?

A    Yeah.

Q    And do you know what happened after you left your territory in Takeda in November of 2021?

A    All I know is that it was backfilled by the guy Scott Patterson.



Page 127

Q    Right.  You don't know to what extent people were calling and requesting in-person interactions after you left, right?

A    No.

Q    Okay.  And then bullet 3 says, "For those who are willing to allow patient access managers into their facilities in person at some point in the future, I would test myself in accordance with Takeda's COVID-19 testing protocol prior to meeting with them.  I would wear an authorized mask during 100% of these in-person customer interactions."  Do you see that?

A    Yes.

Q    Do you think COVID-19 is dangerous?

A    Potentially.

Q    Do you think that companies have an obligation to do what they need to to limit that sort of a risk to their patients and providers?

A    I think that companies have an obligation to do lots of things, including respect the religious rights of their employees.

But yes, I see your point that they do have a responsibility to try to mitigate risk as much as possible, which had been what we were doing for the previous 18 months.

Q    Okay.  And the only pages we haven't looked at



MAGNA
LEGAL SERVICES

Page 128

on this request are 474 which is the form that they gave you.

A    Mm-hmm.

Q    Is that "yes"?

A    Yes.

Q    Okay.  And then you basically just refer to the three documents we already discussed, right?

A    Yes.

Q    And then you also met with an employee relations investigator in connection with your request, right?

A    Yes.

Q    Do you remember who that was?

A    Christine -- I can't remember if it's Healey or Mealey off the top of my head.

Q    And then other than -- oh, I'm sorry.  When was that meeting with her; do you recall?

A    Sometime in September or October of 2021.

Q    And how long did it last?

A    Maybe 45 minutes.

Q    Do you think it needed to be any longer, or was that sufficient time to say what you needed to say?

A    I don't really have an opinion on that.  I think I said what I needed to say and she heard what she needed to hear and that was it.



Page 129

MR. RANJO:  Okay.  This is a logical breaking point.  Do you guys want to -- I know no one's had any lunch.  We started a little late so I thought it okay to push it.  You want to take a little lunch break?

MR. DeMATTEO:  Yeah, I'd appreciate one.

MR. RANJO:  Okay.  How long -- we can go off the record.

VIDEOGRAPHER:  The time is 1:51.  We are going off the record.

(A luncheon recess was taken from 1:51 to 2:23 p.m)

VIDEOGRAPHER:  The time is 2:23.  We are back on record.

Q    (By Mr. Ranjo) Mr. Singleton, we're back on record from a lunch break.  Do you understand that you're still under oath?

A    Yes.

Q    Okay.  I'm going to send you another document.

(Defendant's Exhibit No. 10 was marked for identification.)

Q    (By Mr. Ranjo) Sir, I've just sent you via chat a document that has been marked as Exhibit 10.  It is a four-page document marked Bates label Takeda 23 through 26.  Have you ever seen this document before,



Page 207

C E R T I F I C A T E

I hereby certify that the foregoing transcript was taken down, as stated in the caption, that the witness was first duly sworn, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 206 represent a true, correct, and complete transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.  The witness did not reserve the right to read and sign the transcript.

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia and O.C.G.A. 15-14-37 (a) and (b), written disclosure is attached herein.

This, the 10th day of October 2023.

_____*Kimberly S. Bennett*_____

Kimberly S. Bennett, CCR-B-1172

My commission expires the

1st of April 2024

